**BUSINESS LOAN AGREEMENT**

**Morris Bank**
301 Bellevue Ave
P O Box 520
Dublin, Georgia 31040-0520
(478)272-5202

| AGREEMENT DATE | AGREEMENT/ACCOUNT NUMBER | |
|---|---|---|
| December 12, 2017 | ▮7000 | |

**BORROWER INFORMATION**

AMOA FINANCE, LLC
3330 PRESTON RIDGE RD #300
ALPHARETTA, GA 30066

**Type of Business Entity:** Limited Liability Company
**State of Organization/Formation:** Georgia

**GUARANTOR INFORMATION**

MARK WILLIAM MCCORD
3330 PRESTON RIDGE DR
ATLANTA, GA 30005

**Type of Entity:** Individual
**State of Residence:** Georgia

CUREPOINT, LLC
3330 PRESTON RIDGE DRIVE SUITE 300
ATLANTA, GA 30005

**Type of Business Entity:** Limited Liability Company
**State of Organization/Formation:** Georgia

DALE LYNN MCCORD
30 OLD RIDGEWOOD PL NW
ATLANTA, GA 30327

**Type of Entity:** Individual
**State of Residence:** Georgia

**AGREEMENT.** This Business Loan Agreement will be referred to in this document as the "Agreement." This Agreement is made by Morris Bank (Lender), AMOA FINANCE, LLC (Borrower), MARK WILLIAM MCCORD, CUREPOINT, LLC, and DALE LYNN MCCORD (Guarantor). The consideration is the promises, representations, and warranties made in this Agreement and the Related Documents.

**DEFINITIONS.** These definitions are used in this Agreement.

"**Collateral**" means the Property that any Party to this Agreement or the Related Documents may pledge, mortgage, or give Lender a security interest in, regardless of where the Property is located and regardless of when it was or will be acquired, together with all replacements, substitutions, proceeds, and products of the Property.

"**Events of Default**" means any of the events described in the "Events of Default" section of this Agreement.

"**Financial Statements**" mean the balance sheets, earnings statements, and other financial information that any Party has, is, or will be giving to Lender.

"**Indebtedness**" means the Loan and all other loans and indebtedness of Borrower to Lender, including but not limited to Lender's payments of insurance or taxes, all amounts Lender pays to protect its interest in the Collateral, overdrafts in deposit accounts with Lender, and all other indebtedness, obligations, and liabilities of Borrower to Lender, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising.

"**Loan**" means any loan or loans described in the "Identification of Loan" section of this Agreement.

"**Parties**" means all Borrowers, Guarantors, and Hypothecators signing this Agreement.

"**Party**" means any Borrower, Guarantor, or Hypothecator signing this Agreement.

"**Property**" means the Parties' assets, regardless of what kind of assets they are.

"**Related Documents**" means all documents, promissory notes, security agreements, leases, mortgages, construction loan agreements, assignments of leases and rents, guaranties, pledges, and all other documents or agreements executed in connection with this Agreement as such documents may be modified, amended, substituted, or renewed from time to time. The term includes both documents existing at the time of execution of this Agreement and documents executed after the date of this Agreement.

**IDENTIFICATION OF LOAN.** The following loan and all other indebtedness, obligations, and liabilities of Borrower to Lender, due or to become due, now existing or hereafter arising, as well as any and all amendments, modifications, extensions, and renewals thereof are subject to this Agreement:

- Loan Number ▮7000 with a principal amount of $2,586,354.00

**BORROWER'S REPRESENTATIONS AND WARRANTIES.** The statements made in this section will continue and remain in effect until all of the Indebtedness is fully paid to Lender. Each Borrower represents and warrants to Lender the following:

  

AMOA 000039

**Borrower's Existence and Authority.** Each Borrower is duly formed and in good standing under all laws governing the Borrower and the Borrower's business, and each Borrower executing this Agreement has the power and authority to execute this Agreement and the Related Documents and to bind that Borrower to the obligation created in this Agreement and the Related Documents.

**Financial Information and Filing.** All Financial Statements provided to Lender have been prepared and will continue to be prepared in accordance with generally accepted accounting principles, consistently applied, and fully and fairly present the financial condition of each Borrower, and there has been no material adverse change in Borrower's business, Property, or condition, either financial or otherwise, since the date of Borrower's latest Financial Statements. Each Borrower has filed all federal, state, and local tax returns and other reports and filings required by law to be filed before the date of this Agreement and has paid all taxes, assessments, and other charges that are due and payable prior to the date of this Agreement. Each Borrower has made reasonable provision for these types of payments that are accrued but not yet payable. The Borrower does not know of any deficiency or additional assessment not disclosed in the Borrower's books and records.

All financial statements or records submitted to Lender via electronic means, including, but not limited to, facsimile, open internet communications or other telephonic or electronic methods, including, but not limited to, documents in Tagged Image Format Files ("TIFF") and Portable Document Format ("PDF") shall be treated as originals, and will be fully binding with full legal force and effect. Parties waive any right they may have to object to such treatment. Lender may rely on all such records in good faith as complete and accurate records produced or maintained by or on behalf of the Party submitting such records.

**Title and Encumbrances.** Borrower has good title to all of the Borrower's assets. All encumbrances on any part of the Property were disclosed to Lender in writing prior to the date of this Agreement.

**Compliance with General Law.** Each Borrower is in compliance with and will conduct its business and use its assets in compliance with all laws, regulations, ordinances, directives, and orders of any level of governmental authority that has jurisdiction over the Borrower, the Borrower's business, or the Borrower's assets.

**Environmental Laws.** Each Borrower is in compliance with all applicable laws and rules of federal, state, and local authorities affecting the environment, as all have been or are amended.

**No Litigation/No Misrepresentations.** There are no existing or pending suits or proceedings before any court, government agency, arbitration panel, administrative tribunal, or other body, or threatened against Borrower that may result in any material adverse change in the Borrower's business, property, or financial condition, and all representations and warranties in this Agreement and the Related Documents are true and correct and no material fact has been omitted.

**EVENTS OF DEFAULT.** The occurrence of any of the following events will be an Event of Default.

**Noncompliance with Lender Agreements.** Default by Borrower or Guarantor under any provision of this Agreement, the Related Documents, or any other agreement with Lender.

**False Statements.** If a Party made or makes a false or misleading misrepresentation in this Agreement, in the Related Documents, or in any supporting material submitted to Lender or to third parties providing reports to Lender, or in Financial Statements given or to be given to Lender.

**Material Adverse Change.** Any material adverse change in the Borrower's business, financial condition, or the Property has occurred or is imminent; if the full performance of the obligations of any Party is materially impaired; or if the Collateral and its value or Lender's rights with respect thereto are materially impaired in any way. The existence or reasonable likelihood of litigation, governmental proceeding, default, or other event that may materially and adversely affect a Party's business, financial condition, or the Property.

**Insolvency or Liquidation.** A Party voluntarily suspends transaction of its business or does not generally pay debts as they mature. If a Party has or will make a general assignment for the benefit of creditors or will file, or have filed against it, any petition under federal bankruptcy law or under any other state or federal law providing for the relief of debtors if the resulting proceeding is not discharged within thirty days after filing. If a receiver, trustee, or custodian is or will be appointed for a Party.

**Default on Unrelated Debt.** If Borrower or Guarantor materially defaults under a provision of an agreement with a third party or if the indebtedness under such an agreement is accelerated.

**Judgments or Attachments.** If there is entered against a Party a judgment that materially affects the Borrower's business, financial condition, or the Property, or if a tax lien, levy, writ of attachment, garnishment, execution, or similar item is or will be issued against the Collateral or which materially affects Borrower's business, financial condition, or the Property, and which remains unpaid, unstayed on appeal, undischarged, unbonded, or undismissed for thirty days after it was issued.

**Collateral Impairment.** Lender has a good-faith belief that Lender's rights in the Collateral are or will soon be impaired or that the Collateral itself is or soon will be impaired.

**Termination of Existence or Change in Control.** If Borrower or Borrower's business is sold or merged or if Borrower or Borrower's business suspends business or ceases to exist.

**Insecurity.** If Lender has a good-faith belief that any Party is unable or will soon be unable to perform that Party's duties under this Agreement or under the Related Documents.

**Death.** The death of an individual who is a Party, a partner in a partnership that is a Party, a member in a limited liability company that is a Party, an officer of a corporation that is a Party, or an individual of similar position in any other type of business organization that is a Party.

 

AMOA 000040

**REMEDIES ON DEFAULT.**

**Remedies, No Waiver.** The remedies provided for in this Agreement, the Related Documents, and by law are cumulative and not exclusive. Lender reserves the right to exercise some, all, or none of its rights and reserves the right to exercise any right at any time that Lender has the right, without regard to how much time has passed since the right arose. Lender may exercise its rights in its sole, absolute discretion.

**Acceleration, Setoff.** Upon an Event of Default, the Loan and the Indebtedness may, at Lender's sole option, be declared immediately due and payable. Lender may apply the Parties' bank accounts and any other property held by Lender against the Indebtedness.

**ATTORNEYS' FEES AND OTHER COSTS.** If legal proceedings are instituted to enforce the terms of this Note, I agree to pay all costs of the Lender in connection therewith, including reasonable attorneys fees which shall be affixed at 15 percent of the principal and interest owing.

**EXPENSES.** The Parties agree to pay all of Lender's reasonable expenses incidental to perfecting Lender's security interests and liens, all insurance premiums, Uniform Commercial Code search fees, and all reasonable fees incurred by Lender for audits, inspection, and copying of the Parties' books and records. The Parties also agree to pay all reasonable costs and expenses of Lender in connection with the enforcement of Lender's rights and remedies under this Agreement, the Related Documents, and any other agreement between one or more Parties and Lender, and in connection with the preparation of all amendments, modifications, and waivers of consent with respect to this Agreement, including reasonable attorneys' fees.

**GOVERNING LAW/PARTIAL ILLEGALITY.** This Agreement and the Related Documents are and will be governed by, and the rights of the Parties are determined by the laws of the state of Georgia except to the extent that federal law controls. If any part, term, or provision of this Agreement is determined to be illegal or in conflict with state or federal law, the validity of the remaining portion or provisions of this Agreement will not be affected, unless the stricken portion or provision adversely affects Lender's risk of realizing Lender's anticipated return, in which case Lender may, in its sole discretion, deem the Loan matured.

**NOTICES.** All notices required under this Agreement must be in writing and will be considered given: (i) on the day of personal delivery, or (ii) one business day after deposit with a nationally recognized overnight courier service, or (iii) three business days after deposit with the United States Postal Service sent certified mail, return receipt requested. Any of these methods may be used to give notice. All notices must be sent to the party or parties entitled to notice at the addresses first set forth in this Agreement. Any Party may change its address for notice purposes on five days prior written notice to the other Parties.

**INTEGRATION AND AMENDMENT.** This Agreement and other written agreements among the Parties, including but not limited to the Related Documents, are the entire agreement of the Parties and will be interpreted as a group, one with the others. None of the Parties will be bound by anything not expressed in writing, and this Agreement cannot be modified except by a writing executed by those Parties burdened by the modification.

**FURTHER ACTION.** The Parties will, upon request of Lender, make, execute, acknowledge, and deliver to Lender the modified and additional instruments, documents, and agreements, and will take the further action that is reasonably required, to carry out the intent and purpose of this transaction.

**CONTINUING EFFECT.** Unless superseded by a later Business Loan Agreement, this Agreement will continue in full force and effect until all of the Parties' obligations to Lender are fully satisfied and the Loan and Indebtedness are fully repaid.

**HEADINGS.** All headings in this Agreement are included for reference only and do not have any effect on the interpretation of this Agreement.

**COUNTERPARTS.** This Agreement may be executed by the Parties using any number of copies of the Agreement. All executed copies taken together will be treated as a single Agreement.

**TIME IS OF THE ESSENCE.** Time is of the essence in the performance of this Agreement.

**TRANSFERS.** Borrower may not assign or transfer its rights or obligations under this Agreement without Lender's prior written consent. Lender may transfer its interest in Lender's sole discretion. Borrower waives all rights of offset and counterclaim Borrower has against Lender. The purchaser of a participation in the loan may enforce its interest regardless of any claims or defenses Borrower has against Lender.

**JURISDICTION.** The Parties agree to waive any objection to jurisdiction or venue on the ground that the Parties are not residents of Lender's locality. The Parties authorize any action brought to enforce the Parties' obligations to be instituted and prosecuted in any state court having jurisdiction or in the United States District Court for the District that includes Lender's location as set forth at the beginning of this Agreement. The Parties authorize Lender to elect the court at Lender's sole discretion.

**ORAL AGREEMENTS DISCLAIMER.** This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**By signing this Agreement, Borrower acknowledges reading, understanding and agreeing to all its provisions and receipt of a copy hereof.**

AMOA FINANCE, LLC

By: MCCORD FAMILY PARTNERSHIP, L.P., MANAGER

© 2004-2017 Compliance Systems, Inc. 2950f3d6-03414044 - 2017.200.0.2
Business Loan Agreement - DL4004

Page 3 of 4

www.compliancesystems.com



AMOA 000041

By: MCCORD FAMILY INVESTMENTS, LLC, GENERAL PARTNER/MANAGER

By: DALE LYNN MCCORD          Date
Its: MEMBER

### AGREEMENT OF GUARANTOR

Guarantor (i) acknowledges reading and understanding this Agreement; (ii) consents to the provisions of this Agreement relating to Borrower; (iii) agrees to furnish the Financial Statements to Lender that Lender reasonably requests; (iv) agrees to those portions of this Agreement that apply to Guarantor; (v) acknowledges that this Agreement has been freely executed without duress and after an opportunity to consult with counsel; and (vi) confirms that Guarantor received a copy of this Agreement, the Guaranty, and the other documents Guarantor requested.

MARK WILLIAM MCCORD          Date
Individually

DALE LYNN MCCORD          Date
Individually

CUREPOINT, LLC

By: PHYSICIAN FINANCIAL PARTNERS, LLC, Manager

By: MARK WILLIAM MCCORD          Date
Its: Manager

By: JAMILA DADABHOY          Date
Its: Manager

 

AMOA 000042

**COMMERCIAL PROMISSORY NOTE**

Morris Bank
301 Bellevue Ave
P O Box 520
Dublin, Georgia 31040-0520
(478)272-5202

| LOAN NUMBER | NOTE DATE | PRINCIPAL AMOUNT | MATURITY DATE |
|---|---|---|---|
| 7000 | December 12, 2017 | $2,586,354.00 | December 26, 2023 |

LOAN PURPOSE: PURCHASE MEDICAL EQUIPMENT

**BORROWER INFORMATION**

AMOA FINANCE, LLC
3330 PRESTON RIDGE RD #300
ALPHARETTA, GA 30066

**NOTE.** This Commercial Promissory Note will be referred to in this document as the "Note."

**LENDER.** "Lender" means Morris Bank whose address is 301 Bellevue Ave, P O Box 520, Dublin, Georgia 31040-0520 , its successors and assigns.

**BORROWER.** "Borrower" means each person or legal entity who signs this Note.

**PROMISE TO PAY.** For value received, receipt of which is hereby acknowledged, on or before the Maturity Date, the Borrower promises to pay the principal amount of Two Million Five Hundred Eighty-six Thousand Three Hundred Fifty-four and 00/100 Dollars ($2,586,354.00) and all interest on the outstanding principal balance and any other charges, including service charges, to the order of Lender at its office at the address noted above or at such other place as Lender may designate in writing. The Borrower will make all payments in lawful money of the United States of America.

**PAYMENT SCHEDULE.** This Note will be paid according to the following schedule: 71 consecutive payments of principal and interest in the amount of $42,346.76 beginning on January 26, 2018 and continuing on the same day of each month thereafter. This will be followed by 1 payment of principal and interest in the amount of $42,347.11 on December 26, 2023. The unpaid principal balance of this Note, together with all accrued interest and charges owing in connection therewith, shall be due and payable on the Maturity Date. All payments received by the Lender from the Borrower for application to this Note may be applied to the Borrower's obligations under this Note in such order as determined by the Lender.

**INTEREST RATE AND SCHEDULED PAYMENT CHANGES.** Interest will begin to accrue on the date of this Note. The interest rate on this Note will be fixed at 5.500% per annum.

Nothing contained herein shall be construed as to require the Borrower to pay interest at a greater rate than the maximum allowed by law. If, however, from any circumstances, Borrower pays interest at a greater rate than the maximum allowed by law, the obligation to be fulfilled will be reduced to an amount computed at the highest rate of interest permissible under applicable law and if, for any reason whatsoever, Lender ever receives interest in an amount which would be deemed unlawful under applicable law, such interest shall be automatically applied to amounts owed, in Lender's sole discretion, or as otherwise allowed by applicable law. Interest on this Note is calculated on an Actual/365 day basis. The unpaid balance of this loan after the Maturity Date, whether by acceleration or otherwise, shall be subject to a post-maturity rate of interest equal to 16.000% per annum.

**LATE PAYMENT CHARGE.** If any required payment is more than 10 days late, then at Lender's option, Lender will assess a late payment charge of $40.00 or 8.000% of the amount of the regularly scheduled payment then past due, whichever is greater, subject to a maximum charge of $1,000.00 and a minimum charge of $40.00.

**PREPAYMENT PENALTY.** This Note may be prepaid, in full or in part, at any time, without penalty.

**SECURITY TO NOTE.** Security (the "Collateral") for this Note is granted pursuant to the following security document(s):

- Security Agreement dated December 12, 2017 evidencing security interest in ELEKTA INFINITY LINEAR ACCELERATOR, SERIAL NUMBER 15435 PLEASE SEE ATTACHED EXHIBIT A FOR COMPLETE DESCRIPTION OF EQUIPMENT., ALL ASSETS OF DEBTOR, WHEREVER LOCATED, AND NOW OWNED OR HEREAFTER ACQUIRED, INCLUDING ALL GOODS, EQUIPMENT, FIXTURES, ACCOUNTS, CHATTEL PAPER, DEPOSIT ACCOUNTS, DOCUMENTS, EQUIPMENT, GENERAL INTANGIBLES, PAYMENT INTANGIBLES, INSTRUMENTS, INVENTORY, INVESTMENT PROPERTY, LETTER-OF-CREDIT RIGHTS AND COMMERCIAL TORT CLAIMS, AND THE PROCEEDS AND PRODUCTS OF THE FOREGOING, INCLUDING BUT LIMITED TO THE SPECIFIC LEASE ATTACHED HERETO., ASSIGNMENT OF LEASE AGREEMENT DATED DECEMBER 12, 2017, BETWEEN AMOA FINANCE, LLC ("ASSIGNOR") AND MORRIS BANK ("ASSIGNEE").

**GUARANTY.** In support of this transaction, a Guaranty dated December 12, 2017 has been executed by MARK WILLIAM MCCORD; a Guaranty dated December 12, 2017 has been executed by CUREPOINT, LLC; and a Guaranty dated December 12, 2017 has been executed by DALE LYNN MCCORD.

© 2004-2017 Compliance Systems, Inc. 52e0df64-8ae5873d - 2017.214.0.3
Commercial Promissory Note - DL4006

Page 1 of 3

www.compliancesystems.com

  

**RIGHT OF SET-OFF.** To the extent permitted by law, Borrower agrees that Lender has the right to set-off any amount due and payable under this Note, whether matured or unmatured, against any amount owing by Lender to Borrower including any or all of Borrower's accounts with Lender. This shall include all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. Such right of set-off may be exercised by Lender against Borrower or against any assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor of Borrower, or against anyone else claiming through or against Borrower or such assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set-off has not been exercised by Lender prior to the making, filing or issuance or service upon Lender of, or of notice of, assignment for the benefit of creditors, appointment or application for the appointment of a receiver, or issuance of execution, subpoena or order or warrant. Lender will not be liable for the dishonor of any check when the dishonor occurs because Lender set-off a debt against Borrower's account. Borrower agrees to hold Lender harmless from any claim arising as a result of Lender exercising Lender's right to set-off.

**DISHONORED ITEM FEE.** If Borrower makes a payment on the loan with a check or preauthorized charge which is later dishonored, a fee in the amount of $32.00 will be charged.

**RELATED DOCUMENTS.** The words "Related Documents" mean all promissory notes, security agreements, mortgages, deeds of trust, deeds to secure debt, business loan agreements, construction loan agreements, resolutions, guaranties, environmental agreements, subordination agreements, assignments and any other documents or agreements executed in connection with this Note whether now or hereafter existing, including any modifications, extensions, substitutions or renewals of any of the foregoing. The Related Documents are hereby made a part of this Note by reference thereto, with the same force and effect as if fully set forth herein.

**DEFAULT.** Upon the occurrence of any one of the following events (each, an "Event of Default" or "default" or "event of default"), Lender's obligations, if any, to make any advances will, at Lender's option, immediately terminate and Lender, at its option, may declare all indebtedness of Borrower to Lender under this Note immediately due and payable without further notice of any kind notwithstanding anything to the contrary in this Note or any other agreement: (a) Borrower's failure to make any payment on time or in the amount due; (b) any default by Borrower under the terms of this Note or any other Related Documents; (c) any default by Borrower under the terms of any agreement between Lender and Borrower; (d) the death, dissolution, or termination of existence of Borrower or any guarantor; (e) Borrower is not paying Borrower's debts as such debts become due; (f) the commencement of any proceeding under bankruptcy or insolvency laws by or against Borrower or any guarantor or the appointment of a receiver; (g) any default under the terms of any other indebtedness of Borrower to any other creditor; (h) any writ of attachment, garnishment, execution, tax lien or similar instrument is issued against any collateral securing the loan, if any, or any of Borrower's property or any judgment is entered against Borrower or any guarantor; (i) any part of Borrower's business is sold to or merged with any other business, individual, or entity; (j) any representation or warranty made by Borrower to Lender in any of the Related Documents or any financial statement delivered to Lender proves to have been false in any material respect as of the time when made or given; (k) if any guarantor, or any other party to any Related Documents in favor of Lender entered into or delivered in connection with this Note terminates, attempts to terminate or defaults under any such Related Documents; (l) Lender has deemed itself insecure or there has been a material adverse change of condition of the financial prospects of Borrower or any collateral securing the obligations owing to Lender by Borrower. Upon the occurrence of an event of default, Lender may pursue any remedy available under any Related Document, at law or in equity.

**GENERAL WAIVERS.** To the extent permitted by law, the Borrower severally waives any required notice of presentment, demand, acceleration, intent to accelerate, protest and any other notice and defense due to extensions of time or other indulgence by Lender or to any substitution or release of collateral. No failure or delay on the part of Lender, and no course of dealing between Borrower and Lender, shall operate as a waiver of such power or right, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

**JOINT AND SEVERAL LIABILITY.** If permitted by law, each Borrower executing this Note is jointly and severally bound.

**SEVERABILITY.** If a court of competent jurisdiction determines any term or provision of this Note is invalid or prohibited by applicable law, that term or provision will be ineffective to the extent required. Any term or provision that has been determined to be invalid or prohibited will be severed from the rest of this Note without invalidating the remainder of either the affected provision or this Note.

**SURVIVAL.** The rights and privileges of the Lender hereunder shall inure to the benefits of its successors and assigns, and this Note shall be binding on all heirs, executors, administrators, assigns and successors of Borrower.

**ASSIGNABILITY.** Lender may assign, pledge or otherwise transfer this Note or any of its rights and powers under this Note without notice, with all or any of the obligations owing to Lender by Borrower, and in such event the assignee shall have the same rights as if originally named herein in place of Lender. Borrower may not assign this Note or any benefit accruing to it hereunder without the express written consent of the Lender.

**ORAL AGREEMENTS DISCLAIMER.** This Note represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**GOVERNING LAW.** This Note is governed by the laws of the state of Georgia except to the extent that federal law controls.

**HEADING AND GENDER.** The headings preceding text in this Note are for general convenience in identifying subject matter, but have no limiting impact on the text which follows any particular heading. All words used in this Note shall be construed to be of such gender or number as the circumstances require.

**ATTORNEYS' FEES AND OTHER COSTS:** If legal proceedings are instituted to enforce the terms of this Note, I agree to pay all costs of the Lender in connection therewith, including reasonable attorneys fees which shall be affixed at 15 percent of the principal and interest owing.

**ADDITIONAL PROVISIONS.** ****BORROWER WILL NOT PERMIT AN ASSIGNMENT, TRANSFER, OR SUBLEASE OF THE MASTER LEASE AGREEMENT WITH CUREPOINT, LLC, DATED DECEMBER 12, 2017, WITHOUT THE LENDER'S PRIOR WRITTEN APPROVAL. ****

© 2004-2017 Compliance Systems, Inc. 52e0dfb4-8ae5873d - 2017.214.0.3
Commercial Promissory Note - DL4006

Page 2 of 3

www.compliancesystems.com

 

AMOA 000044

**By signing this Note, Borrower acknowledges reading, understanding, and agreeing to all its provisions and receipt hereof.**

AMOA FINANCE, LLC

By: MCCORD FAMILY PARTNERSHIP, L.P., MANAGER

By: MCCORD FAMILY INVESTMENTS, LLC, GENERAL PARTNER/MANAGER

By: DALE LYNN MCCORD                    Date

Its: MEMBER

AMOA 000045

This page is intentionally blank to support duplex printing.

AMOA 000046

**COMMERCIAL LOAN SETTLEMENT STATEMENT**

Morris Bank
301 Bellevue Ave
P O Box 520
Dublin, Georgia 31040-0520
(478)272-5202

| LOAN NUMBER | AGREEMENT DATE | |
|---|---|---|
| 7000 | December 12, 2017 | |

**COLLATERAL DESCRIPTION:** ELEKTA INFINITY LINEAR ACCELERATOR, SERIAL NUMBER 15435 PLEASE SEE ATTACHED EXHIBIT A FOR COMPLETE DESCRIPTION OF EQUIPMENT.; ALL ASSETS OF DEBTOR, WHEREVER LOCATED, AND NOW OWNED OR HEREAFTER ACQUIRED, INCLUDING ALL GOODS, EQUIPMENT, FIXTURES, ACCOUNTS, CHATTEL PAPER, DEPOSIT ACCOUNTS, DOCUMENTS, EQUIPMENT, GENERAL INTANGIBLES, PAYMENT INTANGIBLES, INSTRUMENTS, INVENTORY, INVESTMENT PROPERTY, LETTER-OF-CREDIT RIGHTS AND COMMERCIAL TORT CLAIMS, AND THE PROCEEDS AND PRODUCTS OF THE FOREGOING, INCLUDING BUT LIMITED TO THE SPECIFIC LEASE ATTACHED HERETO.; ASSIGNMENT OF LEASE AGREEMENT DATED DECEMBER 12, 2017, BETWEEN AMOA FINANCE, LLC ("ASSIGNOR") AND MORRIS BANK ("ASSIGNEE")

**BORROWER INFORMATION**

AMOA FINANCE, LLC
3330 PRESTON RIDGE RD #300
ALPHARETTA, GA 30066

**BORROWER.** The term "Borrower" means each person or legal entity identified above in the BORROWER INFORMATION section.

**LENDER.** "Lender" is Morris Bank whose address is 301 Bellevue Ave, P O Box 520, Dublin, Georgia 31040-0520 .

| TOTAL LOAN AMOUNT | $2,586,354.00 |
|---|---|

| SUMMARY OF LOAN-RELATED CHARGES - PAID OUTSIDE OF CLOSING | |
|---|---|
| TOTAL CHARGES PAID OUTSIDE OF CLOSING | $0.00 |

| SUMMARY OF LOAN-RELATED CHARGES - PAID AT CLOSING | |
|---|---|
| TOTAL CHARGES PAID AT CLOSING | $0.00 |

| DISBURSEMENTS | |
|---|---|
| AMOUNT GIVEN DIRECTLY TO BORROWER | $1,155,000.00 |
| AMOUNTS PAID TO OTHERS ON BORROWERS BEHALF | |
| Administrative Fee Administrative Fee | $300.00 |
| UCC Filing Clerk of Courts | $84.00 |
| ELEKTA | $1,039,691.00 |
| JOSHUA E KIGHT, LLC | $850.00 |
| AMOA MORRIS BANK ACCT # 96881 | $390,429.00 |

By signing this Settlement Statement, each Borrower acknowledges reading, understanding and receiving a copy of a completed copy of this statement.

AMOA FINANCE, LLC
  By: MCCORD FAMILY PARTNERSHIP, L.P., MANAGER
  By: MCCORD FAMILY INVESTMENTS, LLC, GENERAL PARTNER/MANAGER

_____  12/12/17
By: DALE LYNN MCCORD        Date
Its: MEMBER

© 2007-2017 Compliance Systems, Inc. 41b7f87c-6b841f48 - 2017.204.0.4
Commercial Loan Settlement Statement - DL4033                                          Page 1 of 1                                          www.compliancesystems.com

  

AMOA 000047

This page is intentionally blank to support duplex printing.

AMOA 000048

**COMMERCIAL SECURITY AGREEMENT**

Morris Bank
301 Bellevue Ave
P O Box 520
Dublin, Georgia 31040-0520
(478)272-5202

| LOAN NUMBER | AGREEMENT DATE | |
|---|---|---|
| ▮▮▮7000 | December 12, 2017 | |

**BORROWER INFORMATION**

AMOA FINANCE, LLC
3330 PRESTON RIDGE RD #300
ALPHARETTA, GA 30066

**COLLATERAL OWNER INFORMATION**

AMOA FINANCE, LLC
3330 PRESTON RIDGE RD #300
ALPHARETTA, GA 30066

**AGREEMENT.** For purposes of this document, the term "Agreement" is used when reference is made to this Commercial Security Agreement.

**LENDER.** "Lender" means Morris Bank whose address is 301 Bellevue Ave, P O Box 520, Dublin, Georgia 31040-0520 , its successors and assigns.

**DEBTOR.** For purposes of this Agreement, "Debtor" refers to any party to this Agreement, whose name and address is recited above, and who executes this Agreement.

**SECURITY INTEREST GRANT.** Debtor, in consideration of the Obligations to Lender, as defined in the "OBLIGATIONS" provision below, hereby agrees to all of the terms of this Agreement and further hereby specifically grants Lender a continuing security interest in the Collateral as defined in the "DESCRIPTION OF COLLATERAL" provision below. Debtor further grants Lender a security interest in the proceeds of said Collateral; the proceeds of hazard insurance and eminent domain or condemnation awards involving the Collateral; all products of, and accessions to, such Collateral or interests therein; any and all deposits or other sums at any time credited by or due from Lender to Debtor; and any and all instruments, documents, policies, and certificates of insurance, securities, goods, accounts receivable, choses in action, chattel paper, cash, property, and the proceeds thereof (whether or not the same are Collateral or proceeds thereof hereunder), owned by Debtor or in which Debtor has an interest which are now or at any time hereafter in possession or control of Lender, or in transit by mail or carrier to or from Lender, or in possession of any third party acting on Lender's behalf, without regard to whether Lender received the same in pledge, for safekeeping, as agent or otherwise, or whether Lender has conditionally released the same. Debtor's grant of a continuing security interest in the foregoing described Collateral secures to Lender the payment of all loans, advances, and extensions of credit from Lender to Borrower, including all renewals and extensions thereof, and any and all obligations of every kind whatsoever, whether heretofore, now, or hereafter existing or arising between Lender and Borrower and howsoever incurred or evidenced, whether primary, secondary, contingent, or otherwise.

**OBLIGATIONS.** As used in this Agreement, the term "Obligations" shall mean any and all of Debtor's obligations to Lender, whether they arise under this Agreement or the note, loan agreement, guaranty, or other evidence of debt executed in connection with this Agreement, or under any other mortgage, trust deed, deed of trust, security deed, security agreement, note, lease, instrument, contract, document, or other similar writing heretofore, now, or hereafter executed by the Borrower to Lender, including any renewals, extensions and modifications thereof, and including oral agreements and obligations arising by operation of law. The Obligations shall also include all expenditures that Lender may make under the terms of this Agreement or for the benefit of Borrower or Debtor, all interest, costs, expenses, and attorneys' fees accruing to or incurred by Lender in enforcing the Obligations or in the protection, maintenance, preservation, or liquidation of the Collateral, and any of the foregoing that may arise after the filing of any petition by or against Borrower or Debtor under the Bankruptcy Code, irrespective of whether the obligations do not accrue because of the automatic stay under Bankruptcy Code Section 362 or otherwise.

**RELATED DOCUMENTS.** The words "Related Documents" mean all promissory notes, security agreements, prior mortgages, prior deeds of trust, prior deeds to secure debt, business loan agreements, construction loan agreements, resolutions, guaranties, environmental agreements, subordination agreements, assignments of leases and rents and any other documents or agreements executed in connection with this Agreement whether now or hereafter existing, including any modifications, extensions, substitutions or renewals of any of the foregoing. The Related Documents are hereby made a part of this Agreement by reference thereto, with the same force and effect as if fully set forth herein.

**DESCRIPTION OF COLLATERAL.** The collateral covered by this Agreement (the "Collateral") is all of the Debtor's property described below which the Debtor now owns or may hereafter acquire or create and all proceeds and products thereof, whether tangible or intangible, including proceeds of insurance and which may include, but shall not be limited to, any items listed on any schedule or list attached hereto.

© 2004-2017 Compliance Systems, Inc. b4123a8a-a1722877 - 2017.200.0.2
Commercial - Security Agreement DL4008

Page 1 of 6

www.compliancesystems.com

  

AMOA 000049

**Equipment.** "Equipment" shall consist of all goods of the Debtor that are not inventory, farm products, or consumer goods. Equipment includes, but is not limited to, all equipment and fixtures of every nature and description whatsoever, now owned or hereafter acquired by Debtor, wherever located, including all machinery, manufacturing equipment, shop equipment, furnishings, furniture, record keeping equipment, and vehicles, together with all accessions, parts, embedded software, attachments, accessories, tools, and dies, or appurtenances thereto intended for use in connection therewith, and all substitutions, betterments, and replacements thereof and additions thereto.

**Instruments.** "Instruments" consist of all negotiable instruments and other writings owned or acquired by the Debtor that evidence a right to the payment of a monetary obligation, and are of a type that in the ordinary course of business are transferred by delivery with all necessary endorsements or assignments. Instruments are not themselves security agreements or leases. The term does not include investment property, letters of credit, or writings that evidence a right to payment arising out of the use of a credit or charge card or information contained on or for use with the card.

**Chattel Paper.** "Chattel Paper" shall consist of all records now held or hereafter acquired by Debtor that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a security interest in specific goods and license of software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods. In this paragraph, "monetary obligation" means a monetary obligation secured by the goods or owed under a lease of the goods and includes a monetary obligation with respect to software used in the goods. The term does not include (i) charters or other contracts involving the use or hire of a vessel, or (ii) records that evidence a right to payment arising out of the use of a credit card or charge card of information contained on or for use with the card. If a transaction is evidenced by records that include an instrument or series of instruments, the group of records taken together constitutes chattel paper. The definition of chattel paper includes electronic chattel paper. Debtor agrees that it will assist Lender in obtaining control of electronic chattel paper by (i) creating a single authoritative copy of the record(s) existing which is unique and identifiable, (ii) ensuring that the authoritative copy identifies the Lender as the assignee of the record(s), and (iii) ensuring that the authoritative copy is communicated to and maintained by the Lender or its designated custodian. Copies or revisions that add or change an identified assignee of the authoritative copy can be made only with the participation of the Lender. Debtor agrees that each copy or authoritative copy and any copy of a copy shall be readily identifiable as a copy that is not the authoritative copy, and any revision of any authoritative copy is readily identifiable as an authorized or unauthorized revision.

**Specific Collateral.** "Specific" refers to the specific property, together with all related rights, described below.

SPECIFIC COLLATERAL DESCRIPTION: ELEKTA INFINITY LINEAR ACCELERATOR, SERIAL NUMBER 15435 PLEASE SEE ATTACHED EXHIBIT A FOR COMPLETE DESCRIPTION OF EQUIPMENT.; ALL ASSETS OF DEBTOR, WHEREVER LOCATED, AND NOW OWNED OR HEREAFTER ACQUIRED, INCLUDING ALL GOODS, EQUIPMENT, FIXTURES, ACCOUNTS, CHATTEL PAPER, DEPOSIT ACCOUNTS, DOCUMENTS, EQUIPMENT, GENERAL INTANGIBLES, PAYMENT INTANGIBLES, INSTRUMENTS, INVENTORY, INVESTMENT PROPERTY, LETTER-OF-CREDIT RIGHTS AND COMMERCIAL TORT CLAIMS, AND THE PROCEEDS AND PRODUCTS OF THE FOREGOING, INCLUDING BUT LIMITED TO THE SPECIFIC LEASE ATTACHED HERETO.; and ASSIGNMENT OF LEASE AGREEMENT DATED DECEMBER 12, 2017, BETWEEN AMOA FINANCE, LLC ("ASSIGNOR") AND MORRIS BANK ("ASSIGNEE")

**WARRANTIES.** The Debtor warrants the following: Debtor has or will acquire free and clear title to all of the Collateral, unless otherwise provided herein; the security interest granted to the Lender shall be a first security interest unless the Lender specifically agrees otherwise, and the Debtor will defend same to the Lender against the claims and demands of all persons; the Debtor will fully cooperate in placing, perfecting, or maintaining Lender's lien or security interest; the Debtor agrees to take whatever actions requested by Lender to perfect and continue Lender's security interest on the Collateral; the Debtor agrees not to allow or permit any lien, security interest, adverse claim, charge, or encumbrance of any kind against the Collateral or any part thereof, without the Lender's prior written consent; all of the Collateral is located in the state of the Debtor's address specified at the beginning of this Agreement, unless otherwise certified to and agreed to by the Lender, or, alternatively, is in possession of the Lender; the Debtor will not remove or change the location of any Collateral without the Lender's prior written consent; the Debtor will use the Collateral only in the conduct of its own business, in a careful and proper manner; the Debtor will not use the Collateral or permit it to be used for any unlawful purpose; except as otherwise provided in this Agreement with respect to inventory, Debtor will not, without the Lender's prior written consent, sell, assign, transfer, lease, charter, encumber, hypothecate, or dispose of the Collateral, or any part thereof, or any interest therein, nor will Debtor offer to sell, assign, transfer, lease, charter, encumber, hypothecate, or dispose of the Collateral, or any part thereof, or any interest therein; the Debtor will not conduct business under any name other than that given at the beginning of this Agreement, nor change, nor reorganize the type of business entity as described, except upon the prior written approval of the Lender, in which event the Debtor agrees to execute any documentation of whatsoever character or nature demanded by the Lender for filing or recording, at the Debtor's expense, before such change occurs; the information regarding Debtor's state of organization or formation as set forth in the Resolution is correct, and Debtor further warrants that Debtor will not change Debtor's state of organization or formation without Lender's prior written consent and will assist Lender with any changes to any documents, filings, or other records resulting or required therefrom; the Debtor will keep all records of account, documents, evidence of title, and all other documentation regarding its business and the Collateral at the address specified at the beginning of this Agreement, unless notice thereof is given to the Lender at least ten (10) days prior to the change of any address for the keeping of such records; the Debtor will, at all times, maintain the Collateral in good condition and repair and will not sell or remove same except as to inventory in the ordinary course of business; the Debtor is a legally created business entity, as described before, and it has the power, and the person signing is duly authorized, to enter into this Agreement; the execution of this Agreement will not create any breach of any provision of the Debtor's organizational documents (Articles of Incorporation and By-Laws if the Debtor is a corporation, Articles of Organization and Operating Agreement if the Debtor is a limited liability company, or Certificate of Limited Partnership (if applicable) or Partnership Agreement if the Debtor is a partnership), or any other agreement to which the Debtor is or may become a party; all financial

 

AMOA 000050

information and statements delivered by the Debtor to the Lender to obtain loans and extensions of credit are true and correct and are prepared in accordance with generally accepted accounting principles; there has been no material adverse change in the financial condition of the Debtor since it last submitted any financial information to the Lender; there are no actions or proceedings, including set-off or counterclaim, which are threatened or pending against the Debtor which may result in any material adverse change in the Debtor's financial condition or which might materially affect any of the Debtor's assets; and the Debtor has duly filed all federal, state, municipal, and other governmental tax returns, and has obtained all licenses, permits, and the like which the Debtor is required by law to file or obtain, and all such taxes and fees for such licenses and permits required to be paid, have been paid in full.

**INSURANCE.** The Debtor agrees that it will, at its own expense, fully insure the Collateral against all loss or damage for any risk of whatsoever nature in such amounts, with such companies, and under such policies as shall be satisfactory to the Lender. All policies shall expressly provide that the Lender shall be the loss payee or, alternatively, if requested by Lender, mortgagee. The Lender is granted a security interest in the proceeds of such insurance and may apply such proceeds as it may receive toward the payment of the Obligations, whether or not due, in such order as the Lender may in its sole discretion determine. The Debtor agrees to maintain, at its own expense, public liability and property damage insurance upon all its other property, to provide such policies in such form as the Lender may approve, and to furnish the Lender with copies of other evidence of such policies and evidence of the payments of the premiums thereon. All policies of insurance shall provide for a minimum 10 days' written notice of cancellation to Lender. At the request of Lender, such policies of insurance shall be delivered to and held by Lender. Debtor agrees that Lender is authorized to act as attorney for Debtor in obtaining, adjusting, settling, and canceling such insurance and endorsing any drafts or instruments issued or connected with such insurance. Debtor specifically authorizes Lender to disclose information obtained in conjunction with this Agreement and from policies of insurance to prospective insurers of the Collateral. If the Debtor at any time fails to obtain or to maintain any of the insurance required above or pay any premium in whole or in part relating thereto, the Lender, without waiving any default hereunder, may make such payment or obtain such policies as the Lender, in its sole discretion, deems advisable to protect the Debtor's property. All costs incurred by the Lender, including reasonable attorneys' fees, court costs, expenses, and other charges thereby incurred, shall become a part of the Obligations and shall be payable on demand.

**INSTRUMENTS.** Debtor shall immediately deliver to Lender all instruments included in the Collateral. Negotiable instruments shall be endorsed to the order of Lender. With respect to other writing(s) evidencing a right to the payment of money that, in the ordinary course of business, is transferred by delivery with any necessary endorsement or assignment, Debtor shall deliver to Lender and to any third-party issuer a document of assignment in a form and content satisfactory to Lender assigning the Debtor's rights in the said writing(s), and the third-party issuer shall acknowledge receipt of notice of the assignment.

Debtor agrees that Lender may, at any time (whether before or after default) and in its sole discretion, surrender for payment and obtain payment of any portion of the Collateral.

Any and all replacement instruments and other benefits and proceeds related to the Collateral that are received by the Debtor shall be held by Debtor in trust for lender and immediately delivered to Lender to be held as part of the Collateral.

**ADDITIONAL COLLATERAL.** In the event that Lender should, at any time, determine that the Collateral or Lender's security interest in the Collateral is impaired, insufficient, or has declined or may decline in value, or if Lender should deem that payment of the Obligations is insecure, time being of the very essence, then Lender may require, and Debtor agrees to furnish, additional Collateral that is satisfactory to Lender. Lender's request for additional collateral may be oral or in writing delivered by United States mail addressed to Debtor and shall not affect any other subsequent right of the Lender to request additional Collateral.

**FINANCING STATEMENT(S) AND LIEN PERFECTION.** Lender is authorized to file a conforming financing statement or statements to perfect its security interest in the Collateral, as provided in Revised Article 9, Uniform Commercial Code - Secured Transactions. Debtor agrees to provide such information, supplements, and other documents as Lender may from time to time require to supplement or amend such financing statement filings, in order to comply with applicable state or federal law and to preserve and protect the Lender's rights in the Collateral. The Debtor further grants the Lender a power of attorney to execute any and all documents necessary for the Lender to perfect or maintain perfection of its security interest in the Collateral, and to change or correct any error on any financing statement or any other document necessary for proper placement of a lien on any Collateral which is subject to this Agreement.

**LANDLORD'S WAIVER.** Upon request, Debtor shall furnish to Lender, in a form and upon such terms as are acceptable to Lender, a landlord's waiver of all liens with respect to any Collateral covered by this Agreement that is or may be located upon leased premises.

**RELATIONSHIP TO OTHER AGREEMENTS.** This Agreement and the security interests (and pledges and assignments, as applicable) herein granted are in addition to (and not in substitution, novation or discharge of) any and all prior or contemporaneous security agreements, security interest, pledges, assignments, mortgages, liens, rights, titles, or other interests in favor of Lender or assigned to Lender by others in connection with the Obligations. All rights and remedies of Lender in all such agreements are cumulative.

**TAXES, LIENS, ETC.** The Debtor agrees to pay all taxes, levies, judgments, assessments, and charges of any nature whatsoever relating to the Collateral or to the Debtor's business. If the Debtor fails to pay such taxes or other charges, the Lender, at its sole discretion, may pay such charges on behalf of the Debtor; and all sums so dispensed by the Lender, including reasonable attorneys' fees, court costs, expenses, and other charges relating thereto, shall become a part of the Obligations and shall be payable on demand.

**ENVIRONMENTAL HAZARDS.** Debtor certifies that the Collateral has never been, and so long as this Agreement continues to be a lien on the Collateral, never will be used in violation of any local, state or federal environmental laws, statutes or regulations or used for the generation, storage, manufacture, transportation, disposal, treatment, release or threatened release of any hazardous substances and Debtor will immediately notify Lender in writing of any assertion made by any party to the contrary. Debtor indemnifies and holds Lender and Lender's directors, officers, employees, and agents harmless from any liability or expense of whatsoever nature, including reasonable attorneys' fees, incurred

  

AMOA 000051

directly or indirectly as a result of Debtor's involvement with hazardous or environmentally harmful substances as may be defined or regulated as such under any local, state or federal law or regulation or otherwise resulting from a breach of this provision of this Agreement.

**PROTECTION OF COLLATERAL.** Debtor agrees that Lender may, at Lender's sole option, whether before or after any event of default, and without prior notice to Debtor, take the following actions to protect Lender's interest in the Collateral: (a) pay for the maintenance, preservation, repair, improvement, or testing of the Collateral; (b) pay any filing, recording, registration, licensing, certification, or other fees and charges related to the Collateral; or (c) take any other action to preserve and protect the Collateral or Lender's rights and remedies under this Agreement, as Lender may deem necessary or appropriate from time to time. Debtor agrees that Lender is not obligated and has no duty whatsoever to take the foregoing actions. Debtor further agrees to reimburse Lender promptly upon demand for any payment made or any expenses incurred by Lender pursuant to this authorization. Payments and expenditures made by Lender under this authorization shall constitute additional Obligations, shall be secured by this Agreement, and shall bear interest thereon from the date incurred at the maximum rate of interest, including any default rate, if one is provided, as set forth in the notes secured by this obligation.

**INFORMATION AND REPORTING.** The Debtor agrees to supply to the Lender such financial and other information concerning its affairs and the status of any of its assets as the Lender, from time to time, may reasonably request. The Debtor further agrees to permit the Lender, its employees, and agents, to have access to the Collateral for the purpose of inspecting it, together with all of the Debtor's other physical assets, if any, and to permit the Lender, from time to time, to verify Accounts, if any, as well as to inspect, copy, and to examine the books, records, and files of the Debtor.

**CROSS-COLLATERALIZATION.** Debtor agrees that any security interest provided in Collateral under this Agreement or any Collateral provided in connection with any and all other indebtedness of Debtor to Lender, whether or not such indebtedness is related by class or claim and whether or not contemplated by the parties at the time of executing each evidence of indebtedness, shall act as Collateral for all said indebtedness. This cross-collateralization provision shall not apply to any Collateral that is/are household goods or a principal dwelling.

**DEFAULT.** The occurrence of any of the following events shall constitute a default of this Agreement: (a) the non-payment, when due (whether by acceleration of maturity or otherwise), of any amount payable on any of the Obligations or any extension or renewal thereof; (b) the failure to perform any agreement of the Debtor contained herein or in any other agreement Debtor has or may have with Lender; (c) the publication of any statement, representation, or warranty, whether written or oral, by the Debtor to the Lender, which at any time is untrue in any respect as of the date made; (d) the condition that any Debtor becomes insolvent or unable to pay debts as they mature, or makes an assignment for the benefit of the Debtor's creditors, or conveys substantially all of its assets, or in the event of any proceedings instituted by or against any Debtor alleging that such Debtor is insolvent or unable to pay debts as they mature (failure to pay being conclusive evidence of inability to pay); (e) Debtor makes application for appointment of a receiver or any other legal custodian, or in the event that a petition of any kind is filed under the Federal Bankruptcy Code by or against such Debtor and the resulting proceeding is not discharged within thirty days after filing; (f) the entry of any judgment against any Debtor, or the issue of any order of attachment, execution, sequestration, claim and delivery, or other order in the nature of a writ levied against the Collateral; (g) the death of any Debtor who is a natural person, or of any partner of the Debtor which is a partnership; (h) the dissolution, liquidation, suspension of normal business, termination of existence, business failure, merger, or consolidation or transfer of a substantial part of the property of any Debtor which is a corporation, limited liability company, partnership or other non-individual business entity; (i) the Collateral or any part of the Collateral declines in value in excess of normal wear, tear, and depreciation or becomes, in the judgment of Lender, impaired, unsatisfactory, or insufficient in character or value, including but not limited to the filing of a competing financing statement; breach of warranty that the Debtor is the owner of the Collateral free and clear of any encumbrances (other than those encumbrances disclosed by Debtor or otherwise made known to Lender, and which were acceptable to Lender at the time); sale of the Collateral (except in the ordinary course of business) without Lender's express written consent; failure to keep the Collateral insured as provided herein; failure to allow Lender to inspect the Collateral upon demand or at reasonable time; failure to make prompt payment of taxes on the Collateral; loss, theft, substantial damage, or destruction of the Collateral; and, when Collateral includes inventory, accounts, chattel paper, or instruments, failure of account debtors to pay their obligations in due course; or (j) the Lender in good faith, believes the Debtor's ability to repay the Debtor's indebtedness secured by this Agreement, any Collateral, or the Lender's ability to resort to any Collateral, is or soon will be impaired, time being of the very essence.

**REMEDY.** Upon the occurrence of an event of default, Lender, at its option, shall be entitled to exercise any one or more of the remedies described in this Agreement, in all documents evidencing the Obligations, in any other agreements executed by or delivered by Debtor for benefit of Lender, in any third-party security agreement, mortgage, pledge, or guaranty relating to the Obligations, in the Uniform Commercial Code of the state in which Lender is located, and all remedies at law and equity, all of which shall be deemed cumulative. The Debtor agrees that, whenever a default exists, all Obligations may (notwithstanding any provision in any other agreement), at the sole option and discretion of the Lender and without demand or notice of any kind, be declared, and thereupon immediately shall become due and payable; and the Debtor may exercise, from time to time, any rights and remedies, including the right to immediate possession of the Collateral, available to it under applicable law. The Lender agrees, in the case of default, to assemble, at its own expense, all Collateral at a convenient place acceptable to the Lender. The Lender shall, in the event of any default, have the right to take possession of and remove the Collateral, with or without process of law, and in doing so, may peacefully enter any premises where the Collateral may be located for such purpose. Debtor waives any right that Debtor may have, in such instance, to a judicial hearing prior to such retaking. The Lender shall have the right to hold any property then in or upon said Collateral at the time of repossession not covered by the security agreement until return is demanded in writing by Debtor. Debtor agrees to pay all reasonable costs of the Lender in connection with the collecting of the Obligations and enforcement of any rights connected with retaking, holding, testing, repairing, improving, selling, leasing, or disposing of the Collateral, or like expenses. These expenses, together with interest thereon from the date incurred until paid by Debtor at the maximum post-default rate stated in the notes secured hereby, which Debtor agrees to pay, shall constitute additional Obligations and shall be secured by and entitled to the benefits of this Agreement. The Lender may sell, lease, or otherwise dispose of the Collateral, by public or private proceedings, for cash or credit, without assumption of credit risk.

© 2004-2017 Compliance Systems, Inc. b4123a8a-a1722877 - 2017.200.0.2
Commercial - Security Agreement DL4008

www.compliancesystems.com

 

AMOA 000052

Unless the Collateral is perishable or threatens to decline speedily in value or of a type customarily sold on a recognized market, Lender will send Debtor reasonable notice of the time and place of any public sale or of the time after which any private sale or other disposition will be made. Any notification of intended disposition of the Collateral by the Lender shall be deemed to be reasonable and proper if sent United States mail, postage prepaid, electronic mail, facsimile, overnight delivery or other commercially reasonable means to the Debtor at least ten (10) days before such disposition, and addressed to the Debtor either at the address shown herein or at any other address provided to Lender in writing for the purpose of providing notice. Proceeds received by Lender from disposition of the Collateral may be applied toward Lender's expenses and other obligations in such order or manner as Lender may elect. Debtor shall be entitled to any surplus if one results after lawful application of the proceeds. If the proceeds from a sale of the Collateral are insufficient to extinguish the Obligations of the Debtor hereunder, Debtor shall be liable for a deficiency. Lender shall have the right, whether before or after default, to collect and receipt for, compound, compromise, and settle, and give releases, discharges, and acquittances with respect to, any and all amounts owed by any person or entity with respect to the Collateral. Lender may remedy any default and may waive any default without waiving the default remedied and without waiving any other prior or subsequent default. The rights and remedies of the Lender are cumulative, and the exercise of any one or more of the rights or remedies shall not be deemed an election of rights or remedies or a waiver of any other right or remedy.

**FUTURE ADVANCES AND AFTER-ACQUIRED PROPERTY.** Future advances may be made at any time by the Lender under this Agreement to the extent allowed by law. The security interest grant contained in this Agreement also applies to any Collateral of the type(s) identified in this Agreement that the Debtor acquires after this Agreement is executed, except that no security interest attaches to after-acquired consumer goods unless the Debtor acquires rights in such goods within 10 days of Lender giving value. In anticipation of future advances by Lender, the Debtor authorizes Lender to file any necessary financing statements to protect Lender's security interest.

**EXERCISE OF LENDER'S RIGHTS.** Any delay on the part of the Lender in exercising any power, privilege, or right hereunder, or under any other document executed by Debtor to the Lender in connection herewith, shall not operate as a waiver thereof, and no single or partial exercise thereof or any other power, privilege, or right shall preclude other or further exercise thereof. The waiver by the Lender of any default of the Debtor shall not constitute a waiver of subsequent default.

**CONTINUING AGREEMENT.** This is a continuing agreement and the security interest (and pledge and assignment, as applicable) hereby granted and all of the terms and provisions of this Agreement shall be deemed a continuing agreement and shall remain in full force and effect until the Obligations are paid in full. In the event that Lender should take additional Collateral, or enter into other security agreements, mortgages, guarantees, assignments, or similar documents with respect to the Obligations, or should Lender enter into other such agreements with respect to other obligations of Debtor, such agreements shall not discharge this Agreement, which shall be construed as cumulative and continuing and not alternative and exclusive.

Any attempted revocation or termination shall only be effective if explicitly confirmed in a signed writing issued by Lender to such effect and shall in no way impair or affect any transactions entered into or rights created or liabilities incurred or arising prior to such revocation or termination, as to which this Agreement shall be truly operative until same are repaid and discharged in full. Unless otherwise required by applicable law, Lender shall be under no obligation to issue a termination statement or similar document unless Debtor requests same in writing, and providing further, that all Obligations have been repaid and discharged in full and there are no commitments to make advances, incur any obligations, or otherwise give value.

**ABSENCE OF CONDITIONS OF LIABILITY.** This Agreement is unconditional. Lender shall not be required to exhaust its remedies against Debtor, other collateral, or guarantors, or pursue any other remedies within Lender's power before being entitled to exercise its remedies hereunder. Lender's rights to the Collateral shall not be altered by the lack of validity or enforceability of the Obligations against Debtor, and this Agreement shall be fully enforceable irrespective of any counterclaim which the Debtor may assert on the underlying debt and notwithstanding any stay, modification, discharge, or extension of Debtor's Obligation arising by virtue of Debtor's insolvency, bankruptcy, or reorganization, whether occurring with or without Lender's consent.

**NOTICES.** Any notice or demand given by Lender to Debtor in connection with this Agreement, the Collateral, or the Obligations, shall be deemed given and effective upon deposit in the United States mail, postage prepaid, electronic mail, facsimile, overnight delivery or other commercially reasonable means addressed to Debtor at the address designated at the beginning of this Agreement, or such other address as Debtor may provide to Lender in writing from time to time for such purposes. Actual notice to Debtor shall always be effective no matter how such notice is given or received.

**WAIVERS.** Debtor waives notice of Lender's acceptance of this Agreement, defenses based on suretyship, and to the fullest extent permitted by law, any defense arising as a result of any election by Lender under the Bankruptcy Code or the Uniform Commercial Code. Debtor and any maker, endorser, guarantor, surety, third-party pledgor, and other party executing this Agreement that is liable in any capacity with respect to the Obligations hereby waive demand, notice of intention to accelerate, notice of acceleration, notice of nonpayment, presentment, protest, notice of dishonor, and any other similar notice whatsoever.

**JOINT AND SEVERAL LIABILITY.** To the extent permitted by law, each Debtor executing this Agreement is jointly and severally bound.

**SEVERABILITY.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law; but, in the event any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity and shall be severed from the rest of this Agreement without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**SURVIVAL.** The rights and privileges of the Lender hereunder shall inure to the benefits of its successors and assigns, and this Agreement shall be binding on all heirs, executors, administrators, assigns, and successors of Debtor.

  

AMOA 000053

**ASSIGNABILITY.** Lender may assign, pledge, or otherwise transfer this Agreement or any of its rights and powers under this Agreement without notice, with all or any of the Obligations, and in such event the assignee shall have the same rights as if originally named herein in place of Lender. Debtor may not assign this Agreement or any benefit accruing to it hereunder without the express written consent of the Lender.

**GOVERNING LAW.** This Agreement has been delivered in the State of Georgia and shall be construed in accordance with the laws of that state.

**HEADINGS AND GENDER.** The headings preceding text in this Agreement are for general convenience in identifying subject matter, but have no limiting impact on the text which follows any particular heading. All words used in this Agreement shall be construed to be of such gender or number as the circumstances require.

**MISCELLANEOUS.** Time is of the essence of this Agreement. Except as otherwise defined in this Agreement, all terms herein shall have the meanings provided by the Uniform Commercial Code as it has been adopted in the state of Georgia. All rights, remedies, and powers of the Lender hereunder are irrevocable and cumulative, and not alternative or exclusive, and shall be in addition to all rights, remedies, and powers given hereunder or in or by any other instruments or by the provision of the Uniform Commercial Code as adopted in the state where the Lender is located, or any other laws, now existing or hereafter enacted. The Debtor specifically agrees that, if it has heretofore or hereafter executed any loan agreement in conjunction with the Agreement, any ambiguities between this Agreement and any such loan agreement shall be construed under the provisions of the loan agreement, to the extent that it may be necessary to eliminate any such ambiguity. Debtor releases Lender from any liability which might otherwise exist for any act or omission of Lender related to the collection of any debt secured by this Agreement or the disposal of any Collateral, except for the Lender's willful misconduct.

**ORAL AGREEMENTS DISCLAIMER.** This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**ACKNOWLEDGMENT. Debtor acknowledges agreeing to all of the provisions in this Agreement, and further acknowledges receipt of a true and complete copy of this Agreement.**

**IN WITNESS WHEREOF,** Debtor has executed this Agreement on the date and year shown below.

AMOA FINANCE, LLC

By: MCCORD FAMILY PARTNERSHIP, L.P., MANAGER

By: MCCORD FAMILY INVESTMENTS, LLC, GENERAL PARTNER/MANAGER

 

By: DALE LYNN MCCORD                Date
Its: MEMBER

© 2004-2017 Compliance Systems, Inc. b4123a6a-a1722877 - 2017.200.0.2
Commercial - Security Agreement DL4008

www.compliancesystems.com

AMOA 000054

GSCCCA.org - Image Index

http://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=6048...

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| KELLY PETRIE |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| KPETRIE@MORRIS.BANK |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
┌                                    ┐
  MORRIS BANK
  PO BOX 520
  DUBLIN, GA 31040
└                                    ┘
```

CTY# YEAR        UCC #
0602018-01355
Filed and Recorded Feb-13-2018 08:39am
CATHELENE ROBINSON
Clerk of Superior Court
Fulton County, Georgia

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AMOA FINANCE, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3330 PRESTON RIDGE RD #300 | ALPHARETTA | GA | 30066 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| MCCORD | MARK | | WILLIAM | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2007 BRECKENRIDGE LANE | ALPHARETTA | GA | 30005 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MORRIS BANK | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 301 BELLEVUE AVE | DUBLIN | GA | 31021 | USA |

4. COLLATERAL: This financing statement covers the following collateral

ELEKTA INFINITY LINEAR ACCELERATOR, SERIAL NUMBER 15435.

PLEASE SEE ATTACHED EXHIBIT A FOR COMPLETE DESCRIPTION OF EQUIPMENT.

THIS IS TO SECURE PURCHASE MONEY.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative |
|---|

| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien ☐ Non-UCC Filing | |

| 7. ALTERNATIVE DESIGNATION (if applicable): | ☐ Lessee/Lessor | ☐ Consignee/Consignor | ☐ Seller/Buyer | ☐ Bailee/Bailor | ☐ Licensee/Licensor |
|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA:
4004607000

**FULTON**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

1 of 1

3/12/18, 4:11 PM

AMOA 000055

GSCCCA.org - Image Index                                    http://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=6048...

| Agreement: 2017-186199-AH | Version: 4 | Dated: August 31, 2017 |

CTY# YEAR        UCC #
06 2018 - 01355

# EXHIBIT A
## SCOPE OF SUPPLY

**Elekta Infinity™ to Replace SN151098**

| Qty | Description |
| --- | --- |
| 1 | **Elekta Infinity™**<br>Dual modality digital accelerator provides: |

- a choice of up to three different x-ray energies and up to 9 electron energies
- Agility™, Elekta's integrated multi-leaf collimator, that provides full field high resolution beam shaping (5mm at isocentre), a 40 x 40cm treatment field and effective leaf tip speed of up to 6.5cm/sec, capable of covering multiple targets with interdigitation and island shapes
- A broad spectrum of delivery techniques from 3D Conformal Radiotherapy to IMRT, VMAT- VMAT enables simultaneous and dynamic movement of the MLC while rotating the gantry in combination with varying the dose rate, gantry speed and or collimator angle to deliver a highly conformal dose.
- XVI, offering 2D and 3D kV image guidance for advanced soft tissue visualization supporting image guided treatment workflows . XVI Software options VolumeView™, MotionView™ and PlanarView™ are included.
- MewGT™, offering 2D MV imaging capability supporting image guided treatment workflows
- remote system diagnostic ready and will function with the optional Elekta IntelliMax™ service monitoring and support system. IntelliMax is enabled through software and is available during the original system warranty period or through purchase of an Elekta Advanced Service Agreement
- Precise Treatment Table™ which comprises a vertical lift mechanism, couch base and the control system
- low isocentric height of 124cm.

| | |
| --- | --- |
| 1 | **Stereotactic MV Isocenter Setup**<br>Service to evaluate the MV (Gantry), and combined MV (Gantry) and table isocenter using software tool based on the Winston Lutz test. The following values will be achieved at 6 MV; |

- MV Isocenter (Gantry): ≤ 0.7 mm radius
- Combined MV isocenter (Gantry) and table isocenter: ≤ 1.mm radius.

| | |
| --- | --- |
| 1 | **ExacTrac Goalpost Set**<br>Precise, Synergy, Infinity, Axesse and Versa HD compatible Goalposts in combination with Brainlab ExacTrac System. |
| 1 | **Agility ™ Kit**<br>Agility - fully integrated 160 leaf Beam Shaping Device with fine resolution leaves (0.5 cm wide) across the full 40x40 cm field size. The MLC comes with a Treatment Control System Rack Cabinet and Integrity R3.X software which includes integral leaf calibration workflows. Agility is designed to support high resolution stereotactic radiation therapy and volumetric arc therapy (VMAT), providing high conformance beam shaping for these advanced delivery techniques. It also supports conventional and electron based radiation techniques. |
| 1 | **Agility ™ - Linac Parts** |
| 1 | **Agility head covers and touchguard  - Non Axesse**<br>Required for all Elekta delivery systems with the Agility beam shaping device. |
| 1 | **Integrity™ R3.2 control system software** Integrity is the latest generation of Elekta's fully digital treatment control system software for systems with Agility™. Integrity is built on the latest LynX OS platform and is the monitoring and control foundation of Elekta treatment delivery systems. Integrity additionally supports Continuously Variable Dose Rate, dynamic and VMAT deliveries. |
| 1 | **MOSAIQ Sequencer PC**<br>This option provides a MOSAIQ Sequencer PC that can be mounted in the Agility Treatment Control system cabinet. |
| 1 | **6 MV Low Energy Photon** |
| 1 | **10 MV Mid Energy Photon** |
| 1 | **15 MV High Energy Photon** |
| 1 | **6 MeV Electron Energy** |

Page 4 of  30



3/12/18, 4:12 PM

AMOA 000056

GSCCCA.org - Image Index          http://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=6048...

Agreement: 2017-186199-AH      Version: 4      Dated: August 31, 2017

CTY#   YEAR    UCC #
060 2018 - 01355

| | |
|---|---|
| 1 | 9 MeV Electron Energy |
| 1 | 12 MeV Electron Energy |
| 1 | 15 MeV Electron Energy |
| 1 | 18 MeV Electron Energy |
| 1 | U.S.A. Electron Flatness<br>Electron flatness according to U.S.A. standards, optimized at 100 cm. |
| 1 | Standard Set of Aperture Plate Electron Beam Applicators<br>Field sizes: |

- 6 x 6 cm, SSD 95 cm
- 10 x 10 cm, SSD 95 cm
- 14 x 14 cm, SSD 95 cm
- 20 x 20 cm, SSD 95 cm

Fitted with spring loaded touch guard, coded end frames and electrical connection to linear accelerator latch mounting system enables easy and rapid attachment.

| | |
|---|---|
| 1 | PreciseBEAM™ VMAT<br>Provides Volumetric Intensity Modulated Arc Therapy which offers simultaneous dynamic control of the MLC, diaphragms, gantry and collimator. It allows continuous variable MU/degree along the arc. |
| 1 | Combined Interdigitation & CVDR license<br>License providing Interdigitation and Continuously Variable Dose Rate (CVDR) functionality. |
| 1 | VMAT Treatment Planning System Manual |
| 1 | VMAT CAT (Volumetric Arc Therapy Customer Acceptance Test) |
| 1 | SYNERGISTIQ ™ Software License<br>Enables the XVI functionality to support SYNERGISTIQ. SYNERGISTIQ integrates MOSAIQ® and XVI into a consolidated and synchronized user interface. |
| 1 | Software Media Pack, SYNERGISTIQ™ Clients |
| 1 | SYNERGISTIQ ™ Monitor kit<br>Specification for Extender/Receiver and cable for a remote monitor. Required for sites that use SYNERGISTIQ with a remote monitor in the treatment room. |
| 1 | kiloVoltage Cone-beam CT Hardware for Elekta Infinity™ |
| 1 | 40kW kV generator - 480V<br>The integrated 40kW kV generator provides multiple settings control via the XVI software. Acquisition parameters are configured within the preset protocol function in the XVI software, and is user configurable. The generator and X-ray tube have been optimized for the 3D VolumeView™ imaging, as well as the 2D radiographic type exposures of PlanarView™ and MotionView™. |
| 1 | Control System hardware for XVI R5.0.3<br>The XVI control system is a high specification PC which supports all aspects of the IGRT process including 2D, 3D and 4D kV image acquisition, reconstruction, and analysis using a suite of registration functionality. |
| 1 | Base XVI License<br>The XVI 5.x base license includes the following features as standard: |

- PlanarView™: 2D kV radiograph mode
- MotionView™: 2D kV fluoroscopic mode
- VolumeView™: 3D kV volumetric imaging mode

- Segmental MotionView™ and VolumeView™: Pause/Restart 2D fluoro or 3D volumetric acquisitions manually.

Page 5 of 30



AMOA 000057

Case 22-56501-pmb    Doc 84-2    Filed 10/07/22    Entered 10/07/22 13:11:40    Desc
Exhibit 2 - Morris Bank Loan Documents    Page 20 of 64

GSCCCA.org - Image Index                              http://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=6048...

**CTY# YEAR       UCC #**
**0602018-01355**

Agreement: 2017-186199-AH                Version: 4                Dated: August 31, 2017

1  **Intrafraction Imaging License**
Provides the ability to acquire kV images during the delivery of an MV treatment field. Intra-fraction imaging allows you to:

- Acquire images (2D fluoro) for a specified time, and then move directly into a 3D volumetric acquisition.
- Acquire a 3D volumetric image during conformal, IMRT or VMAT MV deliveries to measure intrafraction movement.
- Perform intra-fraction 3D or 4D volumetric imaging and registration per arc during dual (or multiple) arc procedures, allowing table corrections in between arcs.

1  **Symmetry™ License**
Symmetry is primarily indicated for respiratory motion management. It offers a unique 4D IGRT online solution that is correlated to internal organ movement. It facilitates for the planned dose to be delivered to the volume where the target spends most of its time in. This allows for margin reduction and baseline shift compensation, supporting treatment deliveries during free-breathing with no surrogates. The use of Symmetry does not require planning on a 4D reference CT.

1  **Critical Structure Avoidance**
Critical Structure Avoidance allows the registration of two separate areas of anatomy, utilizing both the clipbox and the Shaped Registration Region of Interest. XVI software will calculate the relationship of both areas of anatomy to the proposed correction vectors and alert the user if the target has moved closer to the critical structures due to anatomical changes. The user can then choose to select a compromise between the two areas, or send the patient for re-planning.

1  **3D Shaped Registration Region of Interest**
The 3D Shaped Registration Region of Interest can be generated from any structure imported from the treatment planning system, or created manually using tools in the software. This allows generation of a 3D registration volume that conforms to anatomical structures.

1  **3D Automated Seed Match License**
Offers an optimized 3D registration algorithm to register implanted markers, without compromising on 3D volumetric information.

1  **Distributed Review**
Distributed Review allows the sending of XVI CBCT data to MOSAIQ® for review at any MOSAIQ® workstation, as well as the primary XVI workstation.
Pre-requisites:

- Distributed Imaging/Treatment
- DICOM CT Export (+/- Auto DICOM CT Export).

1  **Distributed Imaging**
Distributed Imaging allows the transfer a patient between XVI systems without having to prepare the registration settings on the secondary XVI system, through MOSAIQ®.

1  **Elekta XVI Basic Calibration Kit - Bearing Phantom Assembly**
Specially designed geometric calibration phantom for kV to MV isocentre alignment. Suitable for the XVI system with the iBEAM® evo couch top.

1  **Couch top Adapter kit for QA Phantom**
Single ball phantom table top adapter kit. This attachment supports the single ball bearing phantom which is used to calibrate the XVI imaging software to the mechanical isocenter. Fits the iBEAM®, iBEAM® evo, HexaPOD™ evo and Connexion™ couch tops.

1  **XVI Daily QA Phantom Kit**
Daily QA Phantom for kV and MV projection imaging and kV VolumeView™. Checks the laser and light field coincide and additionally provides a spreadsheet for recording and analyzing trend results.

1  **XVI Water Calibration Kit**
Water phantom calibration kit for XVI calibration. It provides a reduction in CBCT image ring artefacts in addition to image quality improvements.

1  **VolumeView™ Contrast phantom**
QA phantom to enable measurement of high resolution and contrast resolution and other image quality parameters of the VolumeView images acquired on the XVI workstation.

Page 6 of  30



AMOA 000058

Agreement: 2017-186199-AH                    Version: 4

CTY# YEAR     UCC #
060 2018-01355

Dated: August 31, 2017

1   **2D Image Quality Phantom**
Image quality phantom use for 2D kV image quality to determine the low contrast and spatial resolution of XVI 2D images (PlanarView™ images). This test tool is used for the 2D image quality of the Customer Acceptance Test for XVI and can be used to monitor image quality over a period of time.

1   **Automated DICOM CT export license**
This tool uses DICOM Auto-Push for 3D images. DICOM Auto-Push automatically exports the CBCT image when you accept or save a 3D VolumeView reconstruction.

1   **Manual DICOM RT Image Export**
This tool uses DICOM to export 2D PlanarView images manually from XVI.

1   **Auto DICOM RT Image Export**
This tool uses DICOM Auto-Push for 2D images. DICOM Auto-Push automatically exports the image when you acquire a 2D PlanarView image.

1   **DICOM CT export license**
This tool uses DICOM to export the 3D images manually from XVI to MOSAIQ®, or any 3rd party DICOM-based tool.

1   **DICOM 4D export**
4D DICOM export allows the user to export to a third party system the CBCT data as generated by Symmetry™ of:

   • Average phases
   • All phases
   • Single phase.

1   **Archive and retrieve to network**
Performs automatic archiving of patient images to a pre-defined network location, outside of MOSAIQ®. Archiving can be scheduled, and the network location can be specified at will. The same tool performs retrieval of files from the same location.

1   **Extra Collimators**
Provision of additional XVI collimators for imaging. Includes:

   • VolumeView cassettes: L10, M2, L2.

1   **Elekta Infinity™ iViewGT™**
This kit contains all of the components for iViewGT including;

   • A MK 6 imaging control system cabinet with the iViewGT software R3.4.1. pre-installed.
   • A rigid and fully retractable slim line MV imaging detector arm with a large, square active detector area and wide lateral and longitudinal movement adjustments. The arm has automatic and manual arm movements and is fully interlocked.

1   **iViewGT™ R3.4.1 Installation Kit**

1   **iViewGT™ R3.4.1 Software License**

1   **iViewGT ™ R3.4.1 Software License Collation**
Third Party License toolkit necessary for supporting iViewGT.

1   **Remote Retraction of the iViewGT™ detector - 30M**
This kit allows Remote Retraction of the iViewGT detector from the Function Key Pad.

Page 7 of  30



AMOA 000059

GSCCCA.org - Image Index

http://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=6048...

| CTY# YEAR | UCC # |
|---|---|
| 0602018 | −01355 |

Agreement: 2017-186199-AH          Version: 4          Dated: August 31, 2017

1  **DICOM 3.0 software interface for image transfer**
The international standard interface protocol for network transfer of medical images.

1  **iViewGT™ IMRT Verification Software License**
This software expands existing iViewGT functions to verify multiple segment beams for IMRT. The iViewGT image acquisition is triggered automatically and the image taken depends on whether the user selects single, multiple or movie image.

1  **Template Matching Software License**
The template matching option enables the user to compare the portal image with a nominated reference image for any set-up error. The set-up error is measured by matching visible anatomy and the field edge on the referenced image with the portal image. The user can move the templates to provide an image displacement.

1  **Patient Auto Select Software License**
This enables the prescription selected on the Linac to automatically select or create that patient record on iViewGT™ or iViewC™ using the iCom-Vx protocol. In addition, images will automatically be acquired and stored in the iViewGT / iViewC database without further operator intervention.

1  **Software License Image Approval**
This allows the user, assigned with the 'review' permission, to approve or disapprove any image within iViewGT™ or iViewC™.

1  **Las Vegas Calibration Phantom**
The Las Vegas phantom is a device that is used to check image quality of a portal imaging device at different megavoltage energies both at acceptance and as part of the corrective maintenance procedure.

1  **iBEAM® evo Couchtop**
The iBEAM evo Couchtop has no metallic components apart from the rails. The Couchtop comes complete with the following extensions:

•  iBEAM evo Extension 415
•  indexing bar
•  iBEAM evo Extension removable rails EP (aluminum).

The table top comes with a fixed rail at the foot end of the couch and a removable, light weight rail for the superior couch end.

1  **iBEAM® evo Extension 650**
The iBEAM evo Extension 650 is designed to support the patients upper body and extends off the end of the iBEAM evo Couchtop by 650 mm, thus allowing for treatment of the prostate of very tall patient's.

1  **Precise Treatment Table™ or Pedestal Pit Kit**
This kit provides the necessary fixings, floor boards and template to install a Precise Treatment Table into a custom built pit or a modified Pedestal pit.

1  **Independent X/Y movement of table top**
To save time, in reaching the desired position, this kit allows the X/Y brakes to be released independently.

1  **Beam Block Tray - Star Pattern**
Lexan beam block tray with holes in a star pattern. Trays are designed with threaded, removable plugs for the coding of each block. Specially designed for use with the Elekta shadow tray assembly.

1  **Hook and Latch Magnification Graticule**
Solid Frame Port Film magnification graticule that attaches directly to the linac, taking the place of the coded shadow tray, thus providing more clearance between the patient and the accessory. Used in treatment verification for situations where simultaneous fitment of blocking tray is not required.

1  **Electron Beam Field Shaping System**

Page 8 of 30

Ⓔ Elekta

AMOA 000060

GSCCCA.org - Image Index                                    http://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=6048...

CTY# YEAR    UCC #
0602018-01355

Agreement: 2017-186199-AH                          Version: 4                                  Dated: August 31, 2017

For use with Electron applications from Elekta and allows the user to easily provide Electron Beam field shaping.  The system comprises:

- A Universal leveling template with an adjustable arm for securing styro-foam inserts- Set of five (5) rubber molds compatible with Elekta Electron applicators
  - 6cm x 6cm
  - 10cm x 10cm
  - 14cm x 14cm
  - 20cm x 20cm
  - 25cm x 25cm

Provided as part of the system is one (1) Hot Wire Cutter.

4    19-Inch Control Room LCD Monitor

1    IMKM
The In-room Monitor and Keyboard function provides the operator with access to all clinical and service functions available at the control console from inside the treatment room.
Comprising:

- Cable switching connectors for attaching the in-room monitor to the treatment control system.

1    In-room Monitor, Keyboard and Mouse Local Procurement Specification

1    Table ASU License
In addition to normal linac ASU, the user is able to separately request the auto setup of the table isocenter from inside and outside the room.

1    Delivery Parameters Log File Converter
Enables a user to upload log files and have them converted into csv format.

1    Software License Linac Record
The Daily Record Function allows the Treatment System radiation beam information to be recorded on a continuous basis. Every time the beam is turned on it records the incidence: patient treatments or port films. This can be used as a back up for record and verify systems or for billing purposes.

1    Software license Linac Record to file
The Software license Linac record to file offers the user the option to configure the Linac (in Service Mode) to send the data to network file rather than to a printer.

1    IntelliMax™ Intelligent Agent
This license provides only the IntelliMax Intelligent Agent license. Any provision of services relating to the use of data collected by the Agent (via the IntelliMax Enterprise) should be negotiated as part of the Service Contract between the Customer and the BU/distributor.  IntelliMax Intelligent Agent requires a dedicated PC. Provision of this PC must be negotiated between the Customer and the Elekta BU/distributor. A specification of the PC can be obtained from your Elekta representative.  IntelliMax Intelligent Agent also requires a direct internet connection to the Agent PC opening secure port 443 (https).

1    Extended Service License
This license allows the user extra service tools/functionality.

1    Extender Cards
Extender cards for fault diagnosis on the Electrical Interface Module (EIM).

1    Linear Accelerator Manual Set

Page 9 of  30

⊚Elekta

GSCCCA.org - Image Index                                    http://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=6048...

Agreement: 2017-186159-AH                  Version: 4                            Dated: August 31, 2017

1    ExacTrac Hardware CITB Kit - 10m
     The CITB-ET enables communication between ElektaLinac and Brainlab ExacTrac System. The provided cable length is 10m.

1    Turbo Starter Kit for Linear Accelerators
     Ancillary equipment required for the installation and maintenance of any Precise Digital Accelerator. Comprising:

     •    Rotary vacuum pump
     •    Turbo molecular pump attachment for rapid pump down times and higher roughing vacuum.

1    General Function Key Pad
     The Function Key Pad provides the following features:

     •    MV Start, Interrupt and Terminate
     •    LEDs to indicate radiation on / off status
     •    Linac Assisted Setup (ASU) - facilitating automatic gantry and diaphragm rotations
     •    Table ASU - facilitating automatic table translations and isocentric setup
     •    Imaging ASU - facilitating automatic remote retraction of the iViewGT™ detector.

```
CTY#  YEAR      UCC #
0602018-01355
```

1    XVI cable reeling

1    Remote Automatic Table Movement License
     This license enables the user to make the translation correction movements remotely and automatically at the Precise Treatment
     Table ™. This movement can either take place following a registration as part of an on-line VolumeView imaging workflow or the
     table can be moved remotely and automatically to coordinates entered into MOSAIQ®.

1    Agility™ Service Tool
     Tool to support maintenance of the Agility beam shaping device.

1    Room Lasers, Green, Remote
     Set of 4 green room lasers with remote control adjustment. Comprising 3 crosshair and 1 line sagittal laser. Featuring  fine lines (<
     1mm), high precision adjustment at the isocenter and stable mounting bracket. Inclusive of switchable (110v to 240v) power supply
     and universal main adaptor.

1    Clinical academic course: IMRT/VMAT
     The objective of this clinical program is to present the steps required to implement IMRT/VMAT for routine treatment on Elekta's
     linear accelerators.
        Target groups
     Radiation oncologists
     Medical physicists
     Dosimetrists
     Radiation Therapists/Radiographers

     Content:

     •    Commissioning the linear accelerator and treatment
     •    planning system for IMRT/VMAT
     •    Acquisition of beam data
     •    Dosimetry and stability of beam segments of small MU and dimensions
     •    Methods to establish the appropriate margins for IMRT/VMAT
     •    inverse planning methods for IMRT/VMAT
     •    QA tools for IMRT/VMAT delivery
     •    Demonstrations performed on Elekta linear accelerators
     •    2-day course

     Pricing Does Not Include:

     •    Airfare
     •    Hotel
     •    Travel related expenses.

                            Page 10 of  80                        

AMOA 000062

GSCCCA.org - Image Index                                    http://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=6048...

Agreement: 2017-186199-AH                     Version: 4                          Dated: August 31, 2017

1   **Applications Training for Standard Therapy on the Desktop**
    The 2-day Standard Precise Desktop Course (travel time inclusive) provides training for 4 Radiation Therapists in the clinical use of the Precise Desktop Digital Linear Accelerator. Successful participants will be equipped with the knowledge and skills to operate the system effectively. This course does not provide training in the principles or techniques used in Radiation Therapy.

1   **Applications training for iViewGT™**
    The 3-day iViewGT training course (travel time inclusive), provides training for 4 radiation therapists in the clinical use of the iViewGT imaging system. Successful participants will be equipped with the knowledge and skills to operate the system effectively. The course does not provide training in the principles or techniques used in radiation therapy.

1   **XVI Applications Training**
    The 4-day XVI training course (travel time inclusive) provides training for Radiation Therapists in the clinical use of the X-ray Volume Imaging portion of the Elekta Digital Accelerators. Successful participants will be equipped with the knowledge and skills to operate the system effectively. This course does not provide training in the principles or techniques used in Radiation Therapy, CT, or Diagnostic Imaging. This course is given at the customer site for a maximum of 4 users.

1   **Weekend Rigging & Handling**
    Basic rigging of Linac to first floor or ground floor location outside of Elekta's normal working hours. Elekta will provide the necessary crew to offload, uncrate, rigging and machinery moving required to set system as per plan, and remove debris. Basic rigging excludes use of a crane or rigging down an elevator shaft.
    Standard Rigging includes:

    - Make one pre-installation site visit and delivery project management.
    - Drill holes for equipment fasteners.
    - Supply a 12,000 lb capacity forklift during the off loading procedure.
    - Stage and uncrate the linac machine, move all components into the facility, and set as directed.
    - Remove and dispose of all packaging that will not be reused.
    - Transport the base, gantry and beam arm into the facility/bunker on transport trolleys supplied by Elekta.
    - Set the base frame in place (Elekta will level).
    - Set the gantry drum onto the base frame.
    - Set beam arm into the gantry.
    - Install counterweight holder and stack the counterweights.
    - Supply a manual gantry tilting system to perform aforementioned setting activities and all necessary tools.
    - Supply a crew, including a rigging supervisor.
    - Include the cost of all associated meals and expenses, including related travel time.
    - Complete all rigging activities in a single day.

    Standard Rigging excludes:

    - Crane service.
    - Elevator, or shaft deliveries.
    - No clear access to the building (exterior).
    - Interior obstruction en route to treatment room.
    - Any shoring needed to protect the structure from the weight of the system.
    - Any shoring and/or plating needed to build temporary dock or landing area for the unit.
    - Extra long delivery routes, distances in excess of 150' from offload site to the treatment room.
    - Overtime, weekend, premium time, unless Weekend Rigging selected.
    - Additional travel expenses should the project exceed the time allotted in this scope for reasons beyond Elekta or our contractor's control.

    - Additional man-hours, manpower, travel expenses, or equipment required due to delays caused by incorrect site preparation, waiting time, or delays not caused by Elekta or our contractor will be itemized and billed to the customer at then current rates.

1   **Open Air Graticule**
    The Open Air Graticule is intended to be used for Radiation Therapy to project a scale of defined increments on port film images which can aid in treatment setup and verification. The Open Air Graticule does not require the use of a shadow tray holder and can be attached directly to the head of the Precise Treatment System or SL Linac. It consists of two wires delineating the X & Y axis of the treatment field. This model of graticule is ideal for MLC customers and especially those using Elekta's iView & iViewGTM. Because the open air graticule has a minimal transmission factor, with Physic's approval, the customer does not have to re-enter the treatment room after the port film to deliver the treatment. Please see product User manual for specific treatment information.

1   **Agility™ Beam Arm Cover (new white)**

<div style="writing-mode: vertical">CTY# YEAR - UCC #  060201 8-01355</div>

Page 11 of 30



AMOA 000063

Case 22-56501-pmb    Doc 84-2    Filed 10/07/22    Entered 10/07/22 13:11:40    Desc
Exhibit 2 - Morris Bank Loan Documents    Page 26 of 64

GSCCCA.org - Image Index                    http://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=6048...

Agreement: 2017-186199-AH                    Version: 4                    Dated: August 31, 2017

1    Aperture Plate Electron Beam Applicator 25 x 25 cm
     Fitted with spring loaded touch guard, coded end frames and electrical connection to linear accelerator.
     The X-ray diaphragms are then set automatically to the optimum position.
     A unique hook and latch mounting system enables easy and rapid attachment.

1    Order two sets of pre defined terminated cable kits
     Pre installation treatment room and inter bay terminated cable kits.

1    Elekta Infinity Drum and Ring Cover Set                    CTY# YEAR    UCC #
                                                               0602018-01355
1    MRT 24841 STANDARD QUADRANT COVER SET

1    iViewGT™ Amorphous Silicon detector panel for production systems.

1    Closed Circuit TV System - Color
     The standard CCTV system consists of two Samsung SNP-S321 (1.3 Megapixel HD) dome-shaped color cameras and two
     pan/tilt/zoom control mounts allowing the operator full control of both cameras. An 18.5 inch flat screen monitor is also provided and
     supports a resolution of up to 1360 x 768.

1    Additional Closed Circuit TV System Camera
     This optional camera can be added to the standard CCTV system to create a three camera CCTV system. The additional camera
     consists of one Samsung SNP-S321 (1.3 Megapixel HD) dome-shaped color camera and one pan/tilt/zoom control mount allowing
     the operator full control of the additional camera.

1    Intercom system for patient and radiographer communication
     The ASK-4B 501-TLI-CF is a single zone audio monitoring system with 2-way talk/listen capabilities. It consists of a remote
     speaker/microphone and audio base station with built-in microphone and speaker.

1    Medical Gases SF6 for Installation and Service
     Includes:

        •    44-liter cylinder for SF6 gas
        •    115 lbs of SF6 gas
        •    Regulator
        •    Delivery.

1    Medical Gases Nitrogen for Installation and Service
     Includes:

        •    10-liter cylinder for Nitrogen (N2) gas
        •    Nitrogen (N2) gas
        •    Regulator
        •    Delivery.

1    Physics 1: Medical Accelerator Introduction
     Objective
     After completing this course, attendees will:

        •    Identify different components of an Elekta linear accelerator.
        •    Operate the linear accelerator's controls.
        •    Summarize the system communication and the different protocols used.
        •    Operate the accelerator in service and clinical modes.
        •    Perform calibration of dosimetry system.
        •    Understand fundamentals of MLC control system, optical tracking, and calibration.
        •    Outline the operation of imaging systems for IGRT and perform basic quality assurance.

     Course Content

        •    Theory of Operation
        •    Control System and System Communication
        •    Beam Measurement and Dosimetry
        •    Agility Beam Limiting Device
        •    Imaging Systems and Introduction to IGRT

     The application has been made to CAMPEP for 31.2 Medical Physics Continuing Education Credits (MPCEC.)

                                Page 12 of 30                    

AMOA 000064

GSCCCA.org - Image Index                                    http://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=6048...

Agreement: 2017-186199-AH                    Version: 4                         Dated: August 31, 2017

**Duration**
5-day training at Elekta's Region North America LINC
**Target Group**

- Medical Physicists
- Medical Physics Students

**Pre-requisites**
None

```
CTY$  YEAR   UCC $
0602018-01355
```

1    **Volumetric Modulated Arc Therapy (VMAT) QA**
     **Objectives**
     After completing this course, attendees will:

- Explain the clinical rational for the VMAT treatment technique.
- Evaluate the key factors influencing the quality of VMAT plans.
- List advantages and limitations of VMAT treatment technique.
- Explain the method by which VMAT is delivered by an Elekta linear accelerator.
- List the constraints required by the delivery system to ensure optimal treatment planning.
- Evaluate which aspects of VMAT must be tested prior to clinical use.
- Perform Picket Fence with Gantry Rotation, synchronization of dose rate and gantry speed, and synchronization of dose rate and MLC speed tests to evaluate proper performance of the Elekta medical accelerator.
- Develop and execute commissioning benchmark tests to determine baseline system performance for routine quality control testing post future repairs, upgrades, or cal checks.
- Discuss implementation strategies for patient specific measurement to determine gamma pass rate of the delivered plan.

**Content**
During this one-day course, attendees will learn the rationale for VMAT as a treatment technique and the different methods for creating VMAT treatment plans. The course will also cover VMAT delivery, commissioning, and quality assurance for the Elekta medical accelerator as well as advantages and limitations for VMAT as a treatment technique. The application has been made to CAMPEP for 7.75 Medical Physics Continuing Education Credits (MPCEC).
**Duration**
1 day
**Target Audience**

- Certified Medical Physicists
- Medical physics students

**Prerequisites**

- Physics 1: Medical Accelerator Introduction
- Quality Assurance of Elekta Medical Accelerators.

1    **Education & Training Travel Support (2-3 day course)**
     Elekta will provide reasonable and necessary travel to support completion of the Off-Site Education & Training course(s) purchased under this Agreement.  This Travel Support includes reasonable and necessary airfare and accommodations booked at least three (3) weeks in advance through Elekta's approved travel agent, proof of course registration at the time of booking is required.  Extended airfare and accommodations beyond the duration required to travel and attend the course(s) is not permitted.  This Travel Support also includes reasonable and necessary local transportation costs and up to $100 (USD) per person per day to cover reasonable and necessary meals, which will be paid by Elekta directly to Customer (not to Customer employees) upon receipt of invoice, proof of course completion and supporting receipts.  This Travel Support is available for up to two (2) years after date of Acceptance, no exceptions permitted. Price - $1,700.00 USD (ea).

1    **Education & Training Travel Support (4-5 day course)**
     Elekta will provide reasonable and necessary travel to support completion of the Off-Site Education & Training course(s) purchased under this Agreement.  This Travel Support includes reasonable and necessary airfare and accommodations booked at least three (3) weeks in advance through Elekta's approved travel agent, proof of course registration at the time of booking is required.  Extended airfare and accommodations beyond the duration required to travel and attend the course(s) is not permitted.  This Travel Support also includes reasonable and necessary local transportation costs and up to $100 (USD) per person per day to cover reasonable and necessary meals, which will be paid by Elekta directly to Customer (not to Customer employees) upon receipt of invoice, proof of course completion and supporting receipts.  This Travel Support is available for up to two (2) years after date of Acceptance, no exceptions permitted. Price - $2,000.00 USD (ea)

1    **Power Distribution Unit for Elekta® Linear Accelerator - 480 Volt Input**
     The PDCU incorporates a transformer, output circuit breakers, filtering for high frequency noise, distortion, and transient pulse suppression, in one cabinet.  This reduces site preparation costs and complexity for the customer.



GSCCCA.org - Image Index                                    http://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=6048...

Agreement: 2017-186199-AH                    Version: 4                    Dated: August 31, 2017

1    Elekta will make reasonable endeavors during installation to achieve:

- MV isocenter radius, at 6MV flat, for gantry radiation isocenter of 0.6mm radius; and
- MV isocenter radius, at 6MV flat, for the combined gantry + collimator + treatment table rotation radiation isocenter of 0.75mm radius

**Third Party Pass-Through Items:**
RS&A Rel #OP-005911 attached hereto as pdf.
Sun Nuclear Corporation Quote# Q-05764-1 attached hereto as pdf

CTY# YEAR    UCC #
0602018-01355
**CATHELENE ROBINSON**
Clerk of Superior Court
Fulton County, Georgia

Page 14 of 30



AMOA 000066

**RESOLUTION**
**LIMITED LIABILITY COMPANY**

**Morris Bank**
301 Bellevue Ave
P O Box 520
Dublin, Georgia 31040-0520
(478)272-5202

| RESOLUTION DATE | | |
|---|---|---|
| December 12, 2017 | | |

**LIMITED LIABILITY COMPANY INFORMATION**

AMOA FINANCE, LLC
3330 PRESTON RIDGE RD #300
ALPHARETTA, GA 30066

By signing below, I certify to Morris Bank ("Lender") that: I am duly authorized by the members of the above named for profit Limited Liability Company ("Company") to manage this Company validly organized and operating under the laws of the State of Georgia, and its articles were filed at the appropriate governmental office on September 12, 2017; the following is a true and complete copy of the Resolution, properly adopted at a duly called meeting held on December 12, 2017 by a quorum of all members as provided in the articles or certificate of organization or operating agreement; this Resolution is contained in the minutes of that meeting and that such Resolution is still in force and effect and has not been amended or rescinded, was and still is in accordance with the articles or certificate of organization or operating agreement of the Company; provided below are the correct titles and names and the genuine signatures of the persons authorized to exercise the powers provided in the Resolution ("Authorized Signers"); I have provided the Lender with a true and complete copy of the articles or certificate of organization or operating agreement as in effect as of the date of this Resolution; and that I have the power and authority to make this certification and to execute this Resolution.

**IT IS RESOLVED:**

**The Authorized Signers shall possess the powers indicated as contained in this Resolution. Each power has a designated Authority Code that indicates the powers available to each Authorized Signer.**

| NAME/TITLE | SIGNATURE | AUTHORITY CODE/LIMITATIONS |
|---|---|---|
| MCCORD FAMILY PARTNERSHIP, L.P. MANAGER |  | L1, L2, L3, L4, L5, L6, L8 |

**BORROW MONEY. [Authority Code - L1]** As in their judgment, to borrow from time to time from Lender, on such terms as may be agreed upon between the Company and Lender, such sum or sums of money without limitation.

Number of signers required: 1

**EXECUTE NOTES. [Authority Code - L2]** To execute and deliver to Lender the promissory note(s), or other evidence of credit accommodations of the Company, on Lender's forms, at such rates of interest and on such terms as may be agreed upon evidencing the sums of money so borrowed or any indebtedness of the Company to Lender, and also to execute and deliver to Lender one or more renewals, extensions, modifications, refinancings, consolidations, or substitutions for one or more of the notes, any portion of the notes, or any other evidence of credit accommodations.

Number of signers required: 1

**GRANT SECURITY. [Authority Code - L3]** To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver to Lender, as security for the payment of any loans or credit accommodations so obtained, any promissory notes so executed including any amendments to or modifications, renewals, and extensions of such promissory notes, or any other or further indebtedness of the Company or any third party to Lender at any time owing, however the same may be evidenced, any property now or hereafter belonging to the Company or in which the Company now or hereafter may have an interest, including without limitation all real property and all personal property (tangible or intangible) of the Company. Such property may be mortgaged, pledged, transferred, endorsed, hypothecated, or encumbered at the time such loans are obtained or such indebtedness is incurred, or at any other time or times, and may be either in addition or in lieu of any property theretofore mortgaged, pledged, transferred, endorsed, hypothecated, or encumbered.

Number of signers required: 1

**EXECUTE SECURITY DOCUMENTS. [Authority Code - L4]** To execute and deliver to Lender the forms of mortgage, deed of trust, pledge, agreement, hypothecation agreement, and other security agreements and financing statements which may be submitted by Lender, and which shall evidence the terms and conditions under and pursuant to which liens and encumbrances, or any of them are given; and also to execute and deliver to Lender any authorizations and other written instruments, any chattel paper, or any other collateral, of any kind or nature, which they may at their discretion deem reasonably necessary or proper in connection with or pertaining to the giving and perfecting of liens and encumbrances.

 

AMOA 000067

Number of signers required: 1

**NEGOTIATE ITEMS. [Authority Code - L5]** To draw, endorse, and discount with Lender all drafts, trade acceptances, promissory notes, or other evidences of indebtedness payable to or belonging to the Company in which the Company may have an interest, and either to receive cash for the same or to cause such proceeds to be credited to the account of the Company with Lender, or to cause such other disposition of the proceeds derived therefrom as they may deem advisable.

Number of signers required: 1

**ADVANCE UNDER LINE OF CREDIT. [Authority Code - L6]** In the case of lines of credit, to designate additional or alternative individuals as being authorized to request advances thereunder, and in all cases, to perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements, (including agreements waiving the right to a trial by jury) as they may in their discretion deem reasonably necessary or proper in order to carry into effect the provisions of these Resolutions. The person indicated herein are currently authorized to request advances and authorize payments under the line of credit until Lender receives written notice or revocation of their authority.

Number of signers required: 1

**ENTER INTO LEASE AGREEMENTS. [Authority Code - L8]** To enter into any form of personal property or fixture lease with Lender, upon such terms as this Company and Lender may agree.

Number of signers required: 1

**IT IS FURTHER RESOLVED THAT:**

**AUTHORIZED SIGNER'S POWERS.** Authorized Signers are authorized to make any and all other contracts, agreements, stipulations and orders which the Authorized Signers may deem advisable for the effective exercise of their powers.

**SIGNATURES.** The Lender shall be indemnified and held harmless by the Company for any claims, expenses, damages or attorney fees resulting from the honoring of any signature, authorized by this Resolution, or refusing to honor any signature not so authorized, regardless of whether or not such signature was genuine, if such signature reasonably resembles the specimen provided to the Lender. The Lender shall also be permitted to rely upon non-signature security and verification codes which it provides to or receives from an Authorized Signer and shall be indemnified and held harmless by the Company for any claims, expenses, damages or attorney fees resulting from their use.

**IMPROPER ENDORSEMENT.** Any negotiable instrument, check, draft or order for the payment of moneys not clearly endorsed by the Authorized Signer may be returned to the Company by the Lender. The Lender, in its sole discretion, alternatively may endorse on behalf of the Company any negotiable instrument, check, draft or order for the payment of money not clearly endorsed in order to facilitate collection. Lender shall have no liability for any delay in the presentment or return of any negotiable instrument, check, draft, or order for the payment of money which is not properly endorsed.

**DISPOSITION OF FUNDS.** When withdrawal or transfer powers are granted to an Authorized Signer, the Lender is directed and authorized to act upon and honor withdrawal or transfer instructions issued and to honor, pay, transfer from and charge to any depository account(s) of the Company, all negotiable instruments, checks, drafts, or orders for the payment of money so drawn when signed consistent with the Resolution without inquiring as to the disposition of the proceeds or the circumstances surrounding the issuance of the negotiable instrument, check or order for the payment of money involved, whether such negotiable instruments, checks, drafts or orders for the payment of money are payable to the order of, or endorsed or negotiated by any Authorized Signer signing them or any Authorized Signer in their individual capacities or not, and whether they are deposited to the individual credit of or tendered in payment of the individual obligation or account of any Authorized Signer signing them or of any other Authorized Signer.

**PRIOR ENDORSEMENTS.** All negotiable instruments, checks, drafts or orders for the payment of money deposited with prior endorsements are guaranteed by the Company.

**PRE-RESOLUTION TRANSACTIONS.** All actions by Authorized Signers in accordance with this Resolution but before the adoption of this Resolution are approved, ratified, adopted and confirmed by the Company.

**WARRANTY.** The Lender may rely upon the certification as to the authority of the Company to execute this Resolution and make the representations in this Resolution.

**NOTIFICATION OF CHANGES.** The Company shall notify Lender in writing at its address shown above in advance of any changes which would affect the validity of any matter certified in this Resolution.

**REVOCATION AND MODIFICATION.** An act ("Act") to modify, terminate, amend or replace this Resolution will not immediately affect the ability of the Lender to rely upon this Resolution. The Act shall not affect any action by the Lender in reliance on this Resolution before the date the Act becomes effective as set forth in the next sentence. An Act will not become effective until all of the following occur: (a) Lender receives written notification of the Act in form and substance satisfactory to Lender and (b) the Lender has had a reasonable period of time to act upon such notification. Until the Act is effective, this Resolution shall remain in full force and bind the Company, its legal representatives, heirs, successors and assigns.

**FACSIMILE SIGNATURES.** The Lender shall be entitled to honor and charge the Company for all such negotiable instrument, checks, drafts or other orders for payment of money drawn in the name of the Company, on its regular accounts, including an order for electronic debit, whether by electronic tape or otherwise, regardless of by whom or by what means facsimile signatures or other non-manual signature (collectively, "Facsimile Signatures") may have been affixed, or electronically communicated, if such Facsimile Signatures

 

AMOA 000068

resembles the specimens duly certified to or filed with the Lender for any of the named Authorized Signers, regardless of whether any misuse is with or without the negligence of the Company. The Company agrees that the duty of maintaining the security of any such Facsimile Signatures or device by which it is affixed is solely that of the Company.

**IN WITNESS WHEREOF, we have hereunto subscribed our names as Members and hereby acknowledge that the above Authorized Signer has authority to exercise the powers provided in this Resolution on December 12, 2017.**

  12/12/17

MCCORD FAMILY INVESTMENTS,    Date
LLC by DALE LYNN MCCORD its
MEMBER

© 2004-2017 Compliance Systems, Inc. 57bd9f68-d2c3455e - 2017.200.0.2
Resolution - Limited Liability Company DL4012

Page 3 of 3

www.compliancesystems.com



AMOA 000069

This page is intentionally blank to support duplex printing.

AMOA 000070

**AGREEMENT TO PROVIDE INSURANCE**

**Morris Bank**
301 Bellevue Ave
P O Box 520
Dublin, Georgia 31040-0520
(478)272-5202

| LOAN NUMBER | AGREEMENT DATE | |
|---|---|---|
| 7000 | December 12, 2017 | |

**BORROWER INFORMATION**

AMOA FINANCE, LLC
3330 PRESTON RIDGE RD #300
ALPHARETTA, GA 30066

**INSURANCE COMPANY INFORMATION**

**SINGULAR AND PLURAL TERMS.** In the provisions hereof, the use of the terms "Borrower" and "Policy" shall be construed in the singular and plural whether or not there are one or more borrowers, collateral owners or policies; whenever used, the singular shall include the plural, the plural, the singular.

**GENERAL TERMS AND PROVISIONS.** The Borrower has entered into a credit transaction with Morris Bank whose address is 301 Bellevue Ave, P O Box 520, Dublin, Georgia 31040-0520 ("Lender"), identified by the above note number, which is secured by collateral owned by the Borrower. The Borrower is required to keep and maintain insurance coverage on the collateral identified in the Insured Collateral Information section for the entire term of the loan. Borrower has arranged for the required insurance through _____ and will instruct its Agent to send to Lender notice of any change in coverage or cancellation of the Policy at least 10 days prior to such change or cancellation. Borrower further understands that the insurance policy must name Lender as loss payee or at Lender's request, as mortgagee.

If for any reason the Borrower fails to maintain such insurance, Lender may, in its sole discretion, secure insurance to protect its interest and may add the premium and any financing charge to Borrower's loan balance. Borrower acknowledges that this insurance does not provide bodily injury and property damage liability insurance coverage, and does not comply with any financial responsibility or no-fault insurance laws.

**INSURED COLLATERAL INFORMATION.** The Borrower agrees to insure the following collateral with the coverages indicated:

- **Equipment** with the following description: ELEKTA INFINITY LINEAR ACCELERATOR, SERIAL NUMBER 15435 PLEASE SEE ATTACHED EXHIBIT A FOR COMPLETE DESCRIPTION OF EQUIPMENT.

**By signing this Agreement to Provide Insurance, the Borrower acknowledges reading, understanding, and agreeing to all its provisions.**

AMOA FINANCE, LLC

By: MCCORD FAMILY PARTNERSHIP, L.P., MANAGER

BY: MCCORD FAMILY INVESTMENTS, LLC, GENERAL PARTNER/MANAGER



12/12/17

By: DALE LYNN MCCORD          Date
Its: MEMBER

© 2004-2017 Compliance Systems, Inc. e20ed c5-565329de - 2017.200.0.2
Collateral - Agreement To Provide Insurance DL6001

Page 1 of 1                www.compliancesystems.com

AMOA 000071

This page is intentionally blank to support duplex printing.

AMOA 000072

INTENTIONALLY SKIPPED

AMOA 000073 – AMOA 000084

**Agreement to Provide Financial Documentation**

**Morris Bank**
**301 Bellevue Ave**
**P O Box 520**
**Dublin, Georgia 31040-0520**

## AGREEMENT TO PROVIDE FINANCIAL DOCUMENTATION

From the date hereof until the indebtedness is fully repaid, the Parties cited below agree, unless otherwise consented to in writing by the Lender, they will submit the following:

[ ]   Tax Returns within 30 days after the end of each filing due date (as such date may be extended in accordance with properly granted extensions) each year.

[ ]   Financial Statements within 30 days after the end of each fiscal Year in form acceptable to Lender. Said statements should be [ ] compiled, [ ] reviewed, or [ ] audited (check which should apply). Additionally, interim statements should be submitted [ ] monthly, [ ] quarterly, or [ ] semi-annually.

[ ]   Personal Tax Returns within 30 days after the end of each filing due date (as such date may be extended in accordance with properly granted extensions) each year.

[ ]   Compiled Personal Financial Statements within 30 days after the end of each calendar Year in form acceptable to Lender.

I authorize _____ (firm) to release the above indicated information to Morris Bank, P.O. Box 520, Dublin, GA 31040. My contact at the firm is _____. I understand this form will remain in effect until revoked in writing or until I no longer have a banking relationship with Morris Bank, unless I specify otherwise. You have the ability to request a more limited disclosure of tax return information as you may direct. I also agree to allow Morris Bank to release account balances and transaction history to the firm should they need it in preparing the financial statements and tax returns listed above.

**Borrower(s)**

AMOA FINANCE, LLC

By: MCCORD FAMILY PARTNERSHIP, L.P., MANAGER

By: MCCORD FAMILY INVESTMENTS, LLC, GENERAL PARTNER/MANAGER

AMOA 000085

By: DALE LYNN MCCORD                               Date
Its: MEMBER


Morris Bank


By: Stacy Brantley                                 Date
Title: Executive Vice President


**CONSENT TO DISCLOSURE OF TAX RETURN INFORMATION**

Federal law requires this consent form be provided to you. Unless authorized by law, we cannot disclose, without your consent, your tax return information to third parties for purposes other than the preparation and filing of your tax return. Tax return information shall include any and all personal and financial information located on your tax return. If you consent to the disclosure of your tax return information, Federal law may not protect your tax return information from further use or distribution.

Your tax preparer cannot require you to complete this form. If your tax preparer obtains your signature on this form by conditioning their services on your consent, your consent will not be valid. If you agree to the disclosure of your tax return information, your consent is valid for the amount of time specified above. If you do not specify the duration of your consent, your consent is valid for one year.




AMOA 000086

**UNLIMITED CONTINUING GUARANTY**

**Morris Bank**
301 Bellevue Ave
P O Box 520
Dublin, Georgia 31040-0520
(478)272-5202

| GUARANTY DATE | | |
|---|---|---|
| December 12, 2017 | | |

**GUARANTOR INFORMATION**

MARK WILLIAM MCCORD
3330 PRESTON RIDGE DR
ATLANTA, GA 30005

**Type of Entity:** Individual
**State of Residence:** Georgia

**BORROWER INFORMATION**

AMOA FINANCE, LLC
3330 PRESTON RIDGE RD #300
ALPHARETTA, GA 30066

**Type of Business Entity:** Limited Liability Company
**State of Organization/Formation:** Georgia

**UNLIMITED CONTINUING GUARANTY.** This Unlimited Continuing Guaranty will be referred to in this document as the "Guaranty."

**LENDER.** "Lender" means Morris Bank whose address is 301 Bellevue Ave, P O Box 520, Dublin, Georgia 31040-0520 , its successors and assigns.

**BORROWER.** "Borrower" means each party identified above to whom Lender has extended credit and financial accommodations.

**GUARANTOR.** "Guarantor" means the party identified above that is undertaking certain liabilities to the Lender, as specified herein.

**OBLIGATIONS.** "Obligations" means any and all indebtedness, obligations, undertakings, covenants, agreements, and liabilities of the Borrower to the Lender, and all claims of the Lender against the Borrower, now existing or hereafter arising, direct or indirect (including participations or any interest of the Lender in indebtedness of the Borrower to others), acquired outright, conditionally, or as collateral security from another, absolute or contingent, joint or several, secured or unsecured, matured or not matured, monetary or nonmonetary, arising out of contract or tort, liquidated or unliquidated, arising by operation of law or otherwise and all extensions, renewals, refundings, replacements, and modifications of any of the foregoing.

**NOTICE TO GUARANTOR.** Lender has agreed to extend credit and financial accommodations to Borrower pursuant to a promissory note executed on even date herewith (the "Note"), and all agreements, instruments and documents executed or delivered in connection with the foregoing or otherwise related thereto (together with any amendments, modifications, or restatements thereof, the "Related Documents").

Guarantor is affiliated with Borrower, and as such, shall be benefited directly by the transaction contemplated by the Related Documents, and shall execute this Guaranty in order to induce Lender to enter the transaction.

In consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby guarantees, promises and undertakes, both jointly and severally, as follows:

**UNLIMITED CONTINUING GUARANTY.** Guarantor hereby unconditionally, absolutely, and irrevocably guarantees to Lender the full and prompt payment and performance when due (whether at the maturity date or by required prepayment, acceleration, or otherwise) of all Obligations of the Borrower to the Lender (notwithstanding the fact that from time to time there may be no indebtedness outstanding), however created, of every kind and description, whether now existing or hereafter arising and whether direct or indirect, due or which may become due, absolute or contingent, primary or secondary, liquidated or unliquidated, whether originated with Lender or owed to others and acquired by Lender by purchase, assignment, or otherwise, and including without limitation all loans, advances, indebtedness and each and every other obligation arising under the Related Documents, and all agreements, instruments and documents evidencing, guarantying, securing or otherwise executed in connection with any of the foregoing, together with any amendments, modifications, and restatements thereof, plus Expenses (as that term is defined below).

This Guaranty is an absolute, present, unconditional, and continuing guaranty of payment and performance that shall remain in full force and effect until all such Obligations shall be fully paid to Lender and otherwise performed.

To the extent permitted by law, if any settlement, discharge, payment, grant of security or transfer of property relating to discharging any duty or liability created under or guaranteed by this Guaranty is rescinded or avoided by virtue of any provision of any bankruptcy, insolvency, or other similar law affecting creditors' rights, Lender will be entitled to recover the value or amount of any such settlement, discharge, payment, grant of security or transfer of property from Guarantor as if such settlement, discharge, payment, grant of security or transfer of property had not occurred.

**EXPENSES .** Guarantor hereby agrees, to the extent permitted by law, to pay any and all expenses incurred in enforcing any rights under this Guaranty. Without limiting the foregoing, Guarantor agrees that whenever any attorney is used by the Lender to obtain payment hereunder, to

© 2004-2017 Compliance Systems, Inc. 8e230a2d-2b226233 - 2017.200.0.2
Unlimited Continuing Guaranty - DL4011

Page 1 of 3

www.compliancesystems.com

  

enforce this Guaranty, to adjudicate the rights of the parties hereunder, or to advise the Lender of its rights, the Lender shall be entitled to recover reasonable attorneys' fees, all court costs, and expenses attributable thereto (the "Expenses").

**CONSENT.** The Guarantor consents to all extensions, renewals, and modifications made by the Lender for, or on account of, any indebtedness of Borrower to Lender. Lender may proceed directly against Guarantor in the event of any default by Borrower without resorting to any other persons, to the assets of Borrower, to any collateral security granted by Borrower to Lender, or the liquidation of any collateral security given hereunder to secure this Guaranty. Furthermore, to the extent permitted by law, Guarantor hereby agrees and consents that the Lender may from time to time without notice to Guarantor and without affecting the liability of Guarantor (a) release, impair, sell or otherwise dispose of any security or collateral, (b) release or agree not to sue any guarantor or surety, (c) fail to perfect its security interest in or realize upon any security or collateral, (d) fail to realize upon any of the obligations of Borrower or to proceed against Borrower or any guarantor or surety, (e) renew or extend the time of payment, (f) increase or decrease the rate of interest, (g) accept additional security or collateral, (h) determine the allocation and application of payments and credits and accept partial payments, (i) determine what, if anything, may at any time be done with reference to any security or collateral, and (j) settle or compromise the amount due or owing or claimed to be due or owing from any Borrower, guarantor or surety, which settlement or compromise shall not affect the undersigned's liability for the full amount of the guaranteed obligations. To the extent permitted by law, Guarantor expressly consents to and waives notice of all of the above.

**REPRESENTATIONS.** Guarantor represents and warrants that Guarantor has established adequate means of obtaining from sources other than Lender, on a continuing basis, financial and other information pertaining to Borrower's financial condition, and the status of Borrower's performance of obligations imposed by the loan documents, and Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder, and Lender has made no representation to Guarantor as far as any such matters. Guarantor further represents and warrants that (i) neither this Guaranty nor any other Related Document to which Guarantor is a party will violate any provision of law, rule, or regulation, or any order of any court or other governmental agency to which Guarantor is subject, any provision of any agreement or instrument to which the Guarantor is a party or by which the Guarantor or any of the Guarantor's assets are bound, or be in conflict with, result in a breach of, or constitute a default under any such agreement or instrument; and (ii) no action, approval, filing, or registration with any governmental authority, nor the consent of any other person or entity, nor any other legal formality, is required in connection with the entering into, performance, or enforcement of this Guaranty, except such as have already been obtained or taken and with respect to which a copy or other satisfactory evidence has been provided to Lender.

**SUBROGATION.** If the Guarantor shall make payment to the Lender of all or any part of the Obligations and all the Obligations shall be paid in full, the Lender will, at the Guarantor's request, execute and deliver to the Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to the Guarantor of an interest in the Obligations resulting from such payment by the Guarantor. Notwithstanding any payment or payments made by the Guarantor hereunder, the Guarantor will not exercise any rights of the Lender against the Borrower, nor shall the Guarantor seek contribution from any other Guarantor until all the Obligations shall have been paid and performed in full. If any amount shall be paid to the Guarantor on account of such subrogation rights at any time when all the Obligations will not have been paid in full, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender to be credited and applied to the Obligations, whether matured or unmatured.

**GENERAL WAIVERS.** Guarantor, to the extent permitted by law, hereby waives (a) notice of acceptance of this Guaranty and all notice of the creation, extension or accrual of any of the Obligations, (b) diligence, presentment, protest, demand for payment, notice of dishonor, notice of intent to accelerate, and notice of acceleration, (c) notice of any other nature whatsoever to the extent permitted by law, (d) any requirement that the Lender take any action whatsoever against the Borrower or any other party or file any claim in the event of the bankruptcy of the Borrower, or (e) failure to protect, preserve, or resort to any collateral, and (f) any and all defenses that could be asserted by Borrower or Guarantor, including, but not limited to, any defenses arising out of failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, lack of capacity, statute of limitations, lender liability, unenforceability of any loan document, accord and satisfaction, or usury.

Further, Guarantor, to the extent permitted by law, waives and agrees not to assert any and all rights, benefits, and defenses that might otherwise be available under the provisions of the governing law that might operate, contrary to Guarantor's agreements in this Guaranty, to limit Guarantor's liability under, or the enforcement of, this Guaranty, including all defenses of suretyship. Specifically, Guarantor also waives the right to require Lender, or other holder of the obligations hereby guaranteed, to: (a) take action against the Borrower or Guarantor as provided in O.C.G.A. § 10-7-24 as presently enacted, or hereinafter amended; or (b) obtain confirmation and approval of a foreclosure sale as provided in O.C.G.A. § 44-14-161 as presently enacted, or hereinafter amended, prior to Lender pursuing a deficiency judgment against Guarantor.

**LENDER'S RIGHTS.** Any delay, failure, omission, or lack on the part of the Lender to enforce, assert, or exercise any provision or take any action pursuant to the Related Documents, including any right, power, or remedy conferred on Lender in any of the Related Documents or any action on the part of Lender granting indulgence or extension in any form Guaranty or any Related Documents does not operate as a waiver of the Lender's ability to exercise all of its rights. The Lender may choose to partially exercise rights under this Guaranty and any Related Documents, but that does not prevent the Lender from fully exercising these rights.

**SURVIVAL.** This Guaranty is binding on all heirs, executors, personal representatives, administrators, assigns and successors of the Guarantor.

**ASSIGNABILITY.** The Lender may, without notice, assign the Obligations, in whole or in part, and each successive assignee of the Obligations so assigned may enforce this Guaranty for its own benefit with respect to the Obligations so assigned. In the event that any person other than the Lender shall become a holder of any of the Obligations, the reference to the Lender shall be construed to refer to each such holder.

**RIGHT OF SET-OFF.** To the extent permitted by law, Guarantor gives Lender the right to set-off any of Guarantor's accounts or property which may be in Lender's possession against any amount owed under this Guaranty. This right of set-off does not extend to any Keogh account,

  

AMOA 000088

IRA, or similar tax deferred deposit. Further, the Lender shall have available all remedies under applicable state and federal laws, including the garnishment of wages, to the extent permitted by law.

**SEVERABILITY.** If a court of competent jurisdiction determines any term or provision of this Guaranty is invalid or prohibited by applicable law, that term or provision will be ineffective, but only to the extent required to make it lawful. Any term or provision that has been determined to be invalid or prohibited will be severed from the rest of this Guaranty without invalidating the remainder of the provisions of this Guaranty.

**GOVERNING LAW.** This Guaranty shall be governed by and construed in accordance with the laws of the State of Georgia except to the extent that federal law controls.

**HEADINGS AND GENDER.** The headings in this Guaranty are for convenience in identifying subject matter. The headings have no limiting effect on the text that follows any particular heading. As the context herein requires, the singular shall include the plural and one gender shall include one or both other genders.

**ORAL AGREEMENTS DISCLAIMER.** This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**ACKNOWLEDGMENT.** Guarantor hereby acknowledges that: (a) the Obligations hereunder shall be joint and several; (b) the liabilities undertaken by Guarantor in this Guaranty are complex in nature; and (c) numerous possible defenses to the enforceability of these liabilities may presently exist and/or may arise hereafter. As part of Lender's consideration for entering into this transaction, Lender has specifically bargained for the waiver and relinquishment by Guarantor of all such defenses, and Guarantor has had the opportunity to seek and receive legal advice from skilled legal counsel in the area of financial transactions of the type contemplated herein. Given all of the above, Guarantor does hereby represent and confirm to Lender that Guarantor is fully informed regarding, and that Guarantor does thoroughly understand: (i) the nature of all such possible defenses, and (ii) the circumstances under which such defenses may arise, and (iii) the benefits which such defenses might confer upon Guarantor, and (iv) the legal consequences to Guarantor of waiving such defenses. Guarantor acknowledges that Guarantor makes this Guaranty with the intent that this Guaranty and all of the informed waivers herein shall each and all be fully enforceable by Lender, and that Lender is induced to enter into this transaction in material reliance upon the presumed full enforceability thereof.

By signing this Guaranty, Guarantor acknowledges reading, understanding, and agreeing to all its provisions.

    12/12/12

—————————————————————        —————————
MARK WILLIAM MCCORD                Date
Individually

© 2004-2017 Compliance Systems, Inc. fb230a3d-2b226233 - 2017.200.0.2
Unlimited Continuing Guaranty - DL4011

Page 3 of 3                www.compliancesystems.com

 

AMOA 000089

This page is intentionally blank to support duplex printing.

UNLIMITED CONTINUING GUARANTY

**Morris Bank**
301 Bellevue Ave
P O Box 520
Dublin, Georgia 31040-0520
(478)272-5202

| GUARANTY DATE | | |
|---|---|---|
| December 12, 2017 | | |

**GUARANTOR INFORMATION**

CUREPOINT, LLC
3330 PRESTON RIDGE DRIVE SUITE 300
ATLANTA, GA 30005

**Type of Business Entity:** Limited Liability Company
**State of Organization/Formation:** Georgia

**BORROWER INFORMATION**

AMOA FINANCE, LLC
3330 PRESTON RIDGE RD #300
ALPHARETTA, GA 30066

**Type of Business Entity:** Limited Liability Company
**State of Organization/Formation:** Georgia

**UNLIMITED CONTINUING GUARANTY.** This Unlimited Continuing Guaranty will be referred to in this document as the "Guaranty."

**LENDER.** "Lender" means Morris Bank whose address is 301 Bellevue Ave, P O Box 520, Dublin, Georgia 31040-0520 , its successors and assigns.

**BORROWER.** "Borrower" means each party identified above to whom Lender has extended credit and financial accommodations.

**GUARANTOR.** "Guarantor" means the party identified above that is undertaking certain liabilities to the Lender, as specified herein.

**OBLIGATIONS.** "Obligations" means any and all indebtedness, obligations, undertakings, covenants, agreements, and liabilities of the Borrower to the Lender, and all claims of the Lender against the Borrower, now existing or hereafter arising, direct or indirect (including participations or any interest of the Lender in indebtedness of the Borrower to others), acquired outright, conditionally, or as collateral security from another, absolute or contingent, joint or several, secured or unsecured, matured or not matured, monetary or nonmonetary, arising out of contract or tort, liquidated or unliquidated, arising by operation of law or otherwise and all extensions, renewals, refundings, replacements, and modifications of any of the foregoing.

**NOTICE TO GUARANTOR.** Lender has agreed to extend credit and financial accommodations to Borrower pursuant to a promissory note executed on even date herewith (the "Note"), and all agreements, instruments and documents executed or delivered in connection with the foregoing or otherwise related thereto (together with any amendments, modifications, or restatements thereof, the "Related Documents").

Guarantor is affiliated with Borrower, and as such, shall be benefited directly by the transaction contemplated by the Related Documents, and shall execute this Guaranty in order to induce Lender to enter the transaction.

In consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby guarantees, promises and undertakes, both jointly and severally, as follows:

**UNLIMITED CONTINUING GUARANTY.** Guarantor hereby unconditionally, absolutely, and irrevocably guarantees to Lender the full and prompt payment and performance when due (whether at the maturity date or by required prepayment, acceleration, or otherwise) of all Obligations of the Borrower to the Lender (notwithstanding the fact that from time to time there may be no indebtedness outstanding), however created, of every kind and description, whether now existing or hereafter arising and whether direct or indirect, due or which may become due, absolute or contingent, primary or secondary, liquidated or unliquidated, whether originated with Lender or owed to others and acquired by Lender by purchase, assignment, or otherwise, and including without limitation all loans, advances, indebtedness and each and every other obligation arising under the Related Documents, and all agreements, instruments and documents evidencing, guarantying, securing or otherwise executed in connection with any of the foregoing, together with any amendments, modifications, and restatements thereof, plus Expenses (as that term is defined below).

This Guaranty is an absolute, present, unconditional, and continuing guaranty of payment and performance that shall remain in full force and effect until all such Obligations shall be fully paid to Lender and otherwise performed.

To the extent permitted by law, if any settlement, discharge, payment, grant of security or transfer of property relating to discharging any duty or liability created under or guaranteed by this Guaranty is rescinded or avoided by virtue of any provision of any bankruptcy, insolvency, or other similar law affecting creditors' rights, Lender will be entitled to recover the value or amount of any such settlement, discharge, payment, grant of security or transfer of property from Guarantor as if such settlement, discharge, payment, grant of security or transfer of property had not occurred.

**EXPENSES .** Guarantor hereby agrees, to the extent permitted by law, to pay any and all expenses incurred in enforcing any rights under this Guaranty. Without limiting the foregoing, Guarantor agrees that whenever any attorney is used by the Lender to obtain payment hereunder, to

© 2004-2017 Compliance Systems, Inc. fb230a2d-081eec1d - 2017.200.0.2
Unlimited Continuing Guaranty - DL4011

Page 1 of 3

www.compliancesystems.com

 

AMOA 000091

enforce this Guaranty, to adjudicate the rights of the parties hereunder, or to advise the Lender of its rights, the Lender shall be entitled to recover reasonable attorneys' fees, all court costs, and expenses attributable thereto (the "Expenses").

**CONSENT.** The Guarantor consents to all extensions, renewals, and modifications made by the Lender for, or on account of, any indebtedness of Borrower to Lender. Lender may proceed directly against Guarantor in the event of any default by Borrower without resorting to any other persons, to the assets of Borrower, to any collateral security granted by Borrower to Lender, or the liquidation of any collateral security given hereunder to secure this Guaranty. Furthermore, to the extent permitted by law, Guarantor hereby agrees and consents that the Lender may from time to time without notice to Guarantor and without affecting the liability of Guarantor (a) release, impair, sell or otherwise dispose of any security or collateral, (b) release or agree not to sue any guarantor or surety, (c) fail to perfect its security interest in or realize upon any security or collateral, (d) fail to realize upon any of the obligations of Borrower or to proceed against Borrower or any guarantor or surety, (e) renew or extend the time of payment, (f) increase or decrease the rate of interest, (g) accept additional security or collateral, (h) determine the allocation and application of payments and credits and accept partial payments, (i) determine what, if anything, may at any time be done with reference to any security or collateral, and (j) settle or compromise the amount due or owing or claimed to be due or owing from any Borrower, guarantor or surety, which settlement or compromise shall not affect the undersigned's liability for the full amount of the guaranteed obligations. To the extent permitted by law, Guarantor expressly consents to and waives notice of all of the above.

**REPRESENTATIONS.** Guarantor represents and warrants that Guarantor has established adequate means of obtaining from sources other than Lender, on a continuing basis, financial and other information pertaining to Borrower's financial condition, and the status of Borrower's performance of obligations imposed by the loan documents, and Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder, and Lender has made no representation to Guarantor as far as any such matters. Guarantor further represents and warrants that (i) neither this Guaranty nor any other Related Document to which Guarantor is a party will violate any provision of law, rule, or regulation, or any order of any court or other governmental agency to which Guarantor is subject, any provision of any agreement or instrument to which the Guarantor is a party or by which the Guarantor or any of the Guarantor's assets are bound, or be in conflict with, result in a breach of, or constitute a default under any such agreement or instrument; and (ii) no action, approval, filing, or registration with any governmental public body or authority, nor the consent of any other person or entity, nor any other legal formality, is required in connection with the entering into, performance, or enforcement of this Guaranty, except such as have already been obtained or taken and with respect to which a copy or other satisfactory evidence has been provided to Lender.

**SUBROGATION.** If the Guarantor shall make payment to the Lender of all or any part of the Obligations and all the Obligations shall be paid in full, the Lender will, at the Guarantor's request, execute and deliver to the Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to the Guarantor of an interest in the Obligations resulting from such payment by the Guarantor. Notwithstanding any payment or payments made by the Guarantor hereunder, the Guarantor will not exercise any rights of the Lender against the Borrower, nor shall the Guarantor seek contribution from any other Guarantor until all the Obligations shall have been paid and performed in full. If any amount shall be paid to the Guarantor on account of such subrogation rights at any time when all the Obligations will not have been paid in full, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender to be credited and applied to the Obligations, whether matured or unmatured.

**GENERAL WAIVERS.** Guarantor, to the extent permitted by law, hereby waives (a) notice of acceptance of this Guaranty and all notice of the creation, extension or accrual of any of the Obligations, (b) diligence, presentment, protest, demand for payment, notice of dishonor, notice of intent to accelerate, and notice of acceleration, (c) notice of any other nature whatsoever to the extent permitted by law, (d) any requirement that the Lender take any action whatsoever against the Borrower or any other party or file any claim in the event of the bankruptcy of the Borrower, or (e) failure to protect, preserve, or resort to any collateral, and (f) any and all defenses that could be asserted by Borrower or Guarantor, including, but not limited to, any defenses arising out of failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, lack of capacity, statute of limitations, lender liability, unenforceability of any Related Documents, accord and satisfaction, or usury.

Further, Guarantor, to the extent permitted by law, waives and agrees not to assert any and all rights, benefits, and defenses that might otherwise be available under the provisions of the governing law that might operate, contrary to Guarantor's agreements in this Guaranty, to limit Guarantor's liability under, or the enforcement of, this Guaranty, including all defenses of suretyship. Specifically, Guarantor also waives the right to require Lender, or other holder of the obligations hereby guaranteed, to: (a) take action against the Borrower or Guarantor as provided in O.C.G.A. § 10-7-24 as presently enacted, or hereinafter amended; or (b) obtain confirmation and approval of a foreclosure sale as provided in O.C.G.A. § 44-14-161 as presently enacted, or hereinafter amended, prior to Lender pursuing a deficiency judgment against Guarantor.

**LENDER'S RIGHTS.** Any delay, failure, omission, or lack on the part of the Lender to enforce, assert, or exercise any provision or take any action pursuant to the Related Documents, including any right, power, or remedy conferred on Lender in any of the Related Documents or any action on the part of Lender granting indulgence or extension in any form Guaranty or any Related Documents does not operate as a waiver of the Lender's ability to exercise all of its rights. The Lender may choose to partially exercise rights under this Guaranty and any Related Documents, but that does not prevent the Lender from fully exercising these rights.

**SURVIVAL.** This Guaranty is binding on all heirs, executors, personal representatives, administrators, assigns and successors of the Guarantor.

**ASSIGNABILITY.** The Lender may, without notice, assign the Obligations, in whole or in part, and each successive assignee of the Obligations so assigned may enforce this Guaranty for its own benefit with respect to the Obligations so assigned. In the event that any person other than the Lender shall become a holder of any of the Obligations, the reference to the Lender shall be construed to refer to each such holder.

**RIGHT OF SET-OFF.** To the extent permitted by law, Guarantor gives Lender the right to set-off any of Guarantor's accounts or property which may be in Lender's possession against any amount owed under this Guaranty. This right of set-off does not extend to any Keogh account,

 

IRA, or similar tax deferred deposit. Further, the Lender shall have available all remedies under applicable state and federal laws, including the garnishment of wages, to the extent permitted by law.

**SEVERABILITY.** If a court of competent jurisdiction determines any term or provision of this Guaranty is invalid or prohibited by applicable law, that term or provision will be ineffective, but only to the extent required to make it lawful. Any term or provision that has been determined to be invalid or prohibited will be severed from the rest of this Guaranty without invalidating the remainder of the provisions of this Guaranty.

**GOVERNING LAW.** This Guaranty shall be governed by and construed in accordance with the laws of the State of Georgia except to the extent that federal law controls.

**HEADINGS AND GENDER.** The headings in this Guaranty are for convenience in identifying subject matter. The headings have no limiting effect on the text that follows any particular heading. As the context herein requires, the singular shall include the plural and one gender shall include one or both other genders.

**ORAL AGREEMENTS DISCLAIMER.** This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**ACKNOWLEDGMENT.** Guarantor hereby acknowledges that: (a) the Obligations hereunder shall be joint and several; (b) the liabilities undertaken by Guarantor in this Guaranty are complex in nature; and (c) numerous possible defenses to the enforceability of these liabilities may presently exist and/or may arise hereafter. As part of Lender's consideration for entering into this transaction, Lender has specifically bargained for the waiver and relinquishment by Guarantor of all such defenses, and Guarantor has had the opportunity to seek and receive legal advice from skilled legal counsel in the area of financial transactions of the type contemplated herein. Given all of the above, Guarantor does hereby represent and confirm to Lender that Guarantor is fully informed regarding, and that Guarantor does thoroughly understand: (i) the nature of all such possible defenses, and (ii) the circumstances under which such defenses may arise, and (iii) the benefits which such defenses might confer upon Guarantor, and (iv) the legal consequences to Guarantor of waiving such defenses. Guarantor acknowledges that Guarantor makes this Guaranty with the intent that this Guaranty and all of the informed waivers herein shall each and all be fully enforceable by Lender, and that Lender is induced to enter into this transaction in material reliance upon the presumed full enforceability thereof.

**By signing this Guaranty, Guarantor acknowledges reading, understanding, and agreeing to all its provisions.**

CUREPOINT, LLC

By: PHYSICIAN FINANCIAL PARTNERS, LLC, Manager

By: MARK WILLIAM MCCORD     Date     12/12/17
Its: Manager

By: JAMILA DADABHOY     Date     12/12/17
Its: Manager



AMOA 000093

This page is intentionally blank to support duplex printing.

AMOA 000094

**UNLIMITED CONTINUING GUARANTY**

**Morris Bank**
301 Bellevue Ave
P O Box 520
Dublin, Georgia 31040-0520
(478)272-5202

| GUARANTY DATE | | |
|---|---|---|
| December 12, 2017 | | |

### GUARANTOR INFORMATION

DALE LYNN MCCORD
30 OLD RIDGEWOOD PL NW
ATLANTA, GA 30327

**Type of Entity:** Individual
**State of Residence:** Georgia

### BORROWER INFORMATION

AMOA FINANCE, LLC
3330 PRESTON RIDGE RD #300
ALPHARETTA, GA 30066

**Type of Business Entity:** Limited Liability Company
**State of Organization/Formation:** Georgia

**UNLIMITED CONTINUING GUARANTY.** This Unlimited Continuing Guaranty will be referred to in this document as the "Guaranty."

**LENDER.** "Lender" means Morris Bank whose address is 301 Bellevue Ave, P O Box 520, Dublin, Georgia 31040-0520 , its successors and assigns.

**BORROWER.** "Borrower" means each party identified above to whom Lender has extended credit and financial accommodations.

**GUARANTOR.** "Guarantor" means the party identified above that is undertaking certain liabilities to the Lender, as specified herein.

**OBLIGATIONS.** "Obligations" means any and all indebtedness, obligations, undertakings, covenants, agreements, and liabilities of the Borrower to the Lender, and all claims of the Lender against the Borrower, now existing or hereafter arising, direct or indirect (including participations or any interest of the Lender in indebtedness of the Borrower to others), acquired outright, conditionally, or as collateral security from another, absolute or contingent, joint or several, secured or unsecured, matured or not matured, monetary or nonmonetary, arising out of contract or tort, liquidated or unliquidated, arising by operation of law or otherwise and all extensions, renewals, refundings, replacements, and modifications of any of the foregoing.

**NOTICE TO GUARANTOR.** Lender has agreed to extend credit and financial accommodations to Borrower pursuant to a promissory note executed on even date herewith (the "Note"), and all agreements, instruments and documents executed or delivered in connection with the foregoing or otherwise related thereto (together with any amendments, modifications, or restatements thereof, the "Related Documents").

Guarantor is affiliated with Borrower, and as such, shall be benefited directly by the transaction contemplated by the Related Documents, and shall execute this Guaranty in order to induce Lender to enter the transaction.

In consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby guarantees, promises and undertakes, both jointly and severally, as follows:

**UNLIMITED CONTINUING GUARANTY.** Guarantor hereby unconditionally, absolutely, and irrevocably guarantees to Lender the full and prompt payment and performance when due (whether at the maturity date or by required prepayment, acceleration, or otherwise) of all Obligations of the Borrower to the Lender (notwithstanding the fact that from time to time there may be no indebtedness outstanding), however created, of every kind and description, whether now existing or hereafter arising and whether direct or indirect, due or which may become due, absolute or contingent, primary or secondary, liquidated or unliquidated, whether originated with Lender or owed to others and acquired by Lender by purchase, assignment, or otherwise, and including without limitation all loans, advances, indebtedness and each and every other obligation arising under the Related Documents, and all agreements, instruments and documents evidencing, guarantying, securing or otherwise executed in connection with any of the foregoing, together with any amendments, modifications, and restatements thereof, plus Expenses (as that term is defined below).

This Guaranty is an absolute, present, unconditional, and continuing guaranty of payment and performance that shall remain in full force and effect until all such Obligations shall be fully paid to Lender and otherwise performed.

To the extent permitted by law, if any settlement, discharge, payment, grant of security or transfer of property relating to discharging any duty or liability created under or guaranteed by this Guaranty is rescinded or avoided by virtue of any provision of any bankruptcy, insolvency, or other similar law affecting creditors' rights, Lender will be entitled to recover the value or amount of any such settlement, discharge, payment, grant of security or transfer of property from Guarantor as if such settlement, discharge, payment, grant of security or transfer of property had not occurred.

**EXPENSES .** Guarantor hereby agrees, to the extent permitted by law, to pay any and all expenses incurred in enforcing any rights under this Guaranty. Without limiting the foregoing, Guarantor agrees that whenever any attorney is used by the Lender to obtain payment hereunder, to

  

AMOA 000095

enforce this Guaranty, to adjudicate the rights of the parties hereunder, or to advise the Lender of its rights, the Lender shall be entitled to recover reasonable attorneys' fees, all court costs, and expenses attributable thereto (the "Expenses").

**CONSENT.** The Guarantor consents to all extensions, renewals, and modifications made by the Lender for, or on account of, any indebtedness of Borrower to Lender. Lender may proceed directly against Guarantor in the event of any default by Borrower without resorting to any other persons, to the assets of Borrower, to any collateral security granted by Borrower to Lender, or the liquidation of any collateral security given hereunder to secure this Guaranty. Furthermore, to the extent permitted by law, Guarantor hereby agrees and consents that the Lender may from time to time without notice to Guarantor and without affecting the liability of Guarantor (a) release, impair, sell or otherwise dispose of any security or collateral, (b) release or agree not to sue any guarantor or surety, (c) fail to perfect its security interest in or realize upon any security or collateral, (d) fail to realize upon any of the obligations of Borrower or to proceed against Borrower or any guarantor or surety, (e) renew or extend the time of payment, (f) increase or decrease the rate of interest, (g) accept additional security or collateral, (h) determine the allocation and application of payments and credits and accept partial payments, (i) determine what, if anything, may at any time be done with reference to any security or collateral, and (j) settle or compromise the amount due or owing or claimed to be due or owing from any Borrower, guarantor or surety, which settlement or compromise shall not affect the undersigned's liability for the full amount of the guaranteed obligations. To the extent permitted by law, Guarantor expressly consents to and waives notice of all of the above.

**REPRESENTATIONS.** Guarantor represents and warrants that Guarantor has established adequate means of obtaining from sources other than Lender, on a continuing basis, financial and other information pertaining to Borrower's financial condition, and the status of Borrower's performance of obligations imposed by the loan documents, and Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder, and Lender has made no representation to Guarantor as far as any such matters. Guarantor further represents and warrants that (i) neither this Guaranty nor any other Related Document to which Guarantor is a party will violate any provision of law, rule, or regulation, or any order of any court or other governmental agency to which Guarantor is subject, any provision of any agreement or instrument to which the Guarantor is a party or by which the Guarantor or any of the Guarantor's assets are bound, or be in conflict with, result in a breach of, or constitute a default under any such agreement or instrument; and (ii) no action, approval, filing, or registration with any governmental public body or authority, nor the consent of any other person or entity, nor any other legal formality, is required in connection with the entering into, performance, or enforcement of this Guaranty, except such as have already been obtained or taken and with respect to which a copy or other satisfactory evidence has been provided to Lender.

**SUBROGATION.** If the Guarantor shall make payment to the Lender of all or any part of the Obligations and all the Obligations shall be paid in full, the Lender will, at the Guarantor's request, execute and deliver to the Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to the Guarantor of an interest in the Obligations resulting from such payment by the Guarantor. Notwithstanding any payment or payments made by the Guarantor hereunder, the Guarantor will not exercise any rights of the Lender against the Borrower, nor shall the Guarantor seek contribution from any other Guarantor until all the Obligations shall have been paid and performed in full. If any amount shall be paid to the Guarantor on account of such subrogation rights at any time when all the Obligations will not have been paid in full, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender to be credited and applied to the Obligations, whether matured or unmatured.

**GENERAL WAIVERS.** Guarantor, to the extent permitted by law, hereby waives (a) notice of acceptance of this Guaranty and all notice of the creation, extension or accrual of any of the Obligations, (b) diligence, presentment, protest, demand for payment, notice of dishonor, notice of intent to accelerate, and notice of acceleration, (c) notice of any other nature whatsoever to the extent permitted by law, (d) any requirement that the Lender take any action whatsoever against the Borrower or any other party or file any claim in the event of the bankruptcy of the Borrower, or (e) failure to protect, preserve, or resort to any collateral, and (f) any and all defenses that could be asserted by Borrower or Guarantor, including, but not limited to, any defenses arising out of failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, lack of capacity, statute of limitations, lender liability, unenforceability of any loan document, accord and satisfaction, or usury.

Further, Guarantor, to the extent permitted by law, waives and agrees not to assert any and all rights, benefits, and defenses that might otherwise be available under the provisions of the governing law that might operate, contrary to Guarantor's agreements in this Guaranty, to limit Guarantor's liability under, or the enforcement of, this Guaranty, including all defenses of suretyship. Specifically, Guarantor also waives the right to require Lender, or other holder of the obligations hereby guaranteed, to: (a) take action against the Borrower or Guarantor as provided in O.C.G.A. § 10-7-24 as presently enacted, or hereinafter amended; or (b) obtain confirmation and approval of a foreclosure sale as provided in O.C.G.A. § 44-14-161 as presently enacted, or hereinafter amended, prior to Lender pursuing a deficiency judgment against Guarantor.

**LENDER'S RIGHTS.** Any delay, failure, omission, or lack on the part of the Lender to enforce, assert, or exercise any provision or take any action pursuant to the Related Documents, including any right, power, or remedy conferred on Lender in any of the Related Documents or any action on the part of Lender granting indulgence or extension in any form Guaranty or any Related Documents does not operate as a waiver of the Lender's ability to exercise all of its rights. The Lender may choose to partially exercise rights under this Guaranty and any Related Documents, but that does not prevent the Lender from fully exercising these rights.

**SURVIVAL.** This Guaranty is binding on all heirs, executors, personal representatives, administrators, assigns and successors of the Guarantor.

**ASSIGNABILITY.** The Lender may, without notice, assign the Obligations, in whole or in part, and each successive assignee of the Obligations so assigned may enforce this Guaranty for its own benefit with respect to the Obligations so assigned. In the event that any person other than the Lender shall become a holder of any of the Obligations, the reference to the Lender shall be construed to refer to each such holder.

**RIGHT OF SET-OFF.** To the extent permitted by law, Guarantor gives Lender the right to set-off any of Guarantor's accounts or property which may be in Lender's possession against any amount owed under this Guaranty. This right of set-off does not extend to any Keogh account,



IRA, or similar tax deferred deposit. Further, the Lender shall have available all remedies under applicable state and federal laws, including the garnishment of wages, to the extent permitted by law.

**SEVERABILITY.** If a court of competent jurisdiction determines any term or provision of this Guaranty is invalid or prohibited by applicable law, that term or provision will be ineffective, but only to the extent required to make it lawful. Any term or provision that has been determined to be invalid or prohibited will be severed from the rest of this Guaranty without invalidating the remainder of the provisions of this Guaranty.

**GOVERNING LAW.** This Guaranty shall be governed by and construed in accordance with the laws of the State of Georgia except to the extent that federal law controls.

**HEADINGS AND GENDER.** The headings in this Guaranty are for convenience in identifying subject matter. The headings have no limiting effect on the text that follows any particular heading. As the context herein requires, the singular shall include the plural and one gender shall include one or both other genders.

**ORAL AGREEMENTS DISCLAIMER.** This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**ACKNOWLEDGMENT.** Guarantor hereby acknowledges that: (a) the Obligations hereunder shall be joint and several; (b) the liabilities undertaken by Guarantor in this Guaranty are complex in nature; and (c) numerous possible defenses to the enforceability of these liabilities may presently exist and/or may arise hereafter. As part of Lender's consideration for entering into this transaction, Lender has specifically bargained for the waiver and relinquishment by Guarantor of all such defenses, and Guarantor has had the opportunity to seek and receive legal advice from skilled legal counsel in the area of financial transactions of the type contemplated herein. Given all of the above, Guarantor does hereby represent and confirm to Lender that Guarantor is fully informed regarding, and that Guarantor does thoroughly understand: (i) the nature of all such possible defenses, and (ii) the circumstances under which such defenses may arise, and (iii) the benefits which such defenses might confer upon Guarantor, and (iv) the legal consequences to Guarantor of waiving such defenses. Guarantor acknowledges that Guarantor makes this Guaranty with the intent that this Guaranty and all of the informed waivers herein shall each and all be fully enforceable by Lender, and that Lender is induced to enter into this transaction in material reliance upon the presumed full enforceability thereof.

By signing this Guaranty, Guarantor acknowledges reading, understanding, and agreeing to all its provisions.

_____    _____
DALE LYNN MCCORD                          Date
Individually

AMOA 000097

INTENTIONALLY SKIPPED

AMOA 000098 – AMOA 000101

**STATE OF GEORGIA**
**COUNTY OF** _____

## COLLATERAL ASSIGNMENT
## OF LEASE AGREEMENT

This Collateral Assignment, made this ___ day of December, 2017, between **AMOA**
**FINANCE, LLC,** ("Assignor") and **MORRIS BANK** ("Assignee"),

WHEREAS, a Lease, a true and correct copy of which is attached hereto as Exhibit A,
was executed on December ___, 2017, between AMOA Finance, LLC, as Lessor, and Curepoint,
LLC, as Lessee;

WHEREAS, the Lease is for the purpose of allowing Lessee to have possession and use
of certain property as set forth within said Lease; and

WHEREAS, Assignor desires to assign all of its rights, title, and interests arising under
the terms of said Lease to serve as collateral for a loan issued by Assignee to Assignor;

NOW, THEREFORE, for value received, Assignor hereby collaterally assigns and
transfers its rights, title, and interests in the above-described Lease to Assignee for the purpose of
securing a loan from Assignee to Assignor.

IN WITNESS WHEREOF, Assignor has executed this Assignment on the above date.


On this ___ day of December,    **AMOA FINANCE,**
2017, signed, sealed and delivered    **LLC**
in the presence of:

_____    Name: _____
WITNESS    Title: _____

_____
NOTARY PUBLIC

**EXHIBIT "A"**

Page 2
Collateral Assignment of Lease Agreement

AMOA 000103

**STATE OF GEORGIA**
**COUNTY OF** _____

### BORROWER'S AFFIDAVIT AND INDEMNITY AGREEMENT

Personally appeared before me, the undersigned deponent who, being duly sworn, deposed and said on oath that:

1. Deponent is a manager or officer of **AMOA FINANCE, LLC** ("AMOA"), a Georgia limited liability company, and is authorized to make this affidavit.

2. AMOA has requested that Morris Bank extend credit to AMOA for the purchase of certain specialized equipment described on the attached Exhibit A (the "Equipment").

3. A portion of the proceeds of said loan from Lender will reimburse AMOA for funds already deposited for the purchase of the Equipment;

4. AMOA has in fact paid to the supplier of the Equipment, Elekta, Inc., those fund for which it seeks reimbursement from Lender.

5. No person or entity has extended credit to AMOA for the purchase of the Equipment other than Lender.

6. No person or entity has any claim of lien, security interest, assessment, or other interest in the Equipment other than Lender and the Equipment is not subject to the claims of any nature whatsoever from any other creditor.

7. Deponent knows of no set of facts nor has taken any action which would create any defects, liens, encumbrances, adverse claims or other matters that would impair Lender's first-position, first-priority security interest in the Equipment.

8. Deponent makes this Affidavit as part of a transaction involving a loan secured by the Equipment and for the purpose of inducing the Lender to extend credit secured by the Equipment.

On this ___ day of December, 2017, signed, sealed and delivered in the presence of:

Name: _____

_____
WITNESS

_____
NOTARY PUBLIC

AMOA 000104

EXHIBIT "A"

AMOA 000105

# AMOA FINANCE, LLC
## MASTER LEASE AGREEMENT
3330 Preston Ridge Road
Suite 300
Alpharetta, GA 30005

THIS LEASE, dated as of December 12, 2018 is made by and between AMOA Finance, LLC hereafter referred to as "Lessor," and Curepoint, LLC hereafter referred to as "Lessee."

**LESSOR AND LESSEE COVENANT AND AGREE AS FOLLOWS:**

**1. PROPERTY LEASED.** Lessor agrees to lease to Lessee and Lessee agrees to lease from Lessor the personal property ("Property") together with any replacements, additions, repairs, now or hereafter incorporated therein as described in any Schedule to Master Lease Agreement ("Schedule") now or hereafter executed by the parties hereto.

**2. TERM.** This Lease shall become effective on the execution hereof by Lessor, The Term of this Lease may consist of an "Interim Term" and a "Base Term" in regard to each Schedule. The Interim Term for each Schedule shall begin on the date that Lessee executes a Delivery and Acceptance Certificate in connection with any item of Property or provides to Lessor written approval for payment for such item of Property. Each Interim Term shall continue until the Base Term Commencement Date set forth in each Schedule. The Base Term for each Schedule shall begin on the Base Term Commencement Date and shall continue for the period specified in each Schedule. During each Interim Term, if any, Lessee shall pay rental ("Interim Rental") in the amount set forth in each Schedule plus applicable tax thereon.

**3. RENT, PAYMENT AND TAXES.** Rental payments are specified in each Schedule. All rents shall be payable by Lessee each month on or before the payment date shown in each Schedule at Lessor's address herein, or as otherwise directed by Lessor, without notice or demand and without abatement, set-off or deduction of any amount whatsoever. Lessee shall pay when due all taxes, fees, assessments, or other charges, however designated, now or hereafter levied or based upon the rentals. ownership, use, possession, leasing, operation, control, or maintenance of the Property, whether or not payable by Lessor, excluding Lessor's income, franchise and business and occupation taxes, and shall supply Lessor with proof of payment satisfactory to Lessor at least seven (7) days before delinquency. At its option, Lessor may pay any tax, assessment, insurance premium, expense, repair, release, confiscation expense, lien, encumbrance, or other charge or fee payable hereunder by Lessee, and any amount so paid shall be repayable by Lessee on demand.

For any payment due hereunder which is not paid within five (5) days after the date such payment is due, Lessee agrees to pay a late charge calculated thereon at a rate of ten percent (10%) of such overdue amount. The parties hereto agree that: a) the amount of such late charge represents a reasonable estimate of the cost that Lessor would incur in processing each delinquent payment by Lessee and that such late charge shall be paid as liquidated damages for each delinquent payment; and, b) the payment of late charges and the payment of Default Interest are distinct and separate from one another. Acceptance of any late charge or interest shall not constitute a waiver of default with respect to the overdue amount or prevent Lessor from exercising any other available rights and remedies. Payments received shall be applied first to delinquent amounts due, including late charges, then to current installments. If any such rental payment is made by check and such check is returned to Lessor for any reason, including without limitation, insufficient funds in Lessee's account, then Lessee shall be assessed a fee of $35.00 in addition to any other late charge or any other fee which may be applicable.

Lessee agrees that its obligation to pay all rent and any other amounts owing hereunder shall be absolute and unconditional under all circumstances. Lessee agrees to pay all rent and any of the other amounts regardless of any claim in the nature of set off or compensation which may be made by Lessee. The Lessee shall not be entitled to any abatement of rent or other amounts payable hereunder by Lessee or any reduction of them including, but not limited to abatements or deductions due to any present or future claims of Lessee against Lessor or any assignee, under this Lease or otherwise, or against any manufacturer, vendor or supplier of the Property, nor, except as otherwise expressly provided in this Lease, shall any such lease terminate, or the respective obligations of Lessor or Lessee be affected, by reason of any defect in or damage to or loss or destruction of any of the Property from any cause, the interference with use by any private person, corporation or governmental authority, the invalidity or unenforceability or lack of due authorization of the Lease, or for any other cause, any present or future law or regulation to the contrary notwithstanding, it being the intention of the parties to this Lease that the rents and other amounts payable by the Lessee hereunder shall continue to be payable in all events unless the obligation to pay these amounts shall be terminated pursuant to the express provisions of this Lease.

If the Property is located in a jurisdiction which imposes any "Sales," "Use," or "Rental" tax, at Lessor's option. Lessor shall collect such tax from Lessee and remit such tax to the appropriate taxing authority or Lessee shall remit such tax directly to the appropriate taxing authority. Such requirement may only be waived if Lessee is exempt from such tax under applicable laws or regulations. Lessee is responsible for ensuring that such exemption is properly documented in accordance with such laws and regulations and that such documentation is provided to Lessor at the inception of each Schedule.

Except as specifically provided in the Schedule, if the Property is subject to personal property taxes, Lessor shall report all leased Property to the proper taxing authorities unless the laws or regulations of the applicable taxing jurisdictions require that Lessee shall report such Property. If Lessor receives any invoice from the taxing authorities for applicable personal property taxes, Lessor shall pay any such taxes directly and Lessee agrees to reimburse Lessor for all such taxes paid by Lessor. If Lessee receives any such invoice, Lessee agrees to promptly remit such taxes directly to the taxing authorities and maintain proof of payment. Upon termination of each Schedule, Lessor will, if applicable, estimate Personal Property Taxes on the Property based upon the most recent tax assessment of the Property or on the tax rates and taxable value calculations as available from the appropriate taxing jurisdiction. In the event that the actual personal property tax bill is within $500.00 of such estimate, then Lessor shall not seek reimbursement from Lessee for any underpayment,

and Lessor may retain any overpayment. If the difference between such estimate and the actual tax bill exceeds $500.00, Lessor shall refund or Lessee shall remit the entire difference.

**4. LOSS OR DAMAGE.**  No loss or damage to the Property, or any part of it, shall impair any obligation of Lessee hereunder. Lessee assumes all risk of damage to or loss of the Property, however caused, while in transit and during the term hereof. If any Property is totally destroyed, Lessee's liability to pay rent for it may be discharged by paying Lessor the Stipulated Loss Value of the Property if such a Value is provided in the applicable Schedule or, the amount specified in Section 14(e)
of this Lease, less the amount of any recovery received by Lessor from any insurance or other source.

**5. OWNERSHIP, LOCATION, MAINTENANCE AND USE.**  Lessee transfers to Lessor all right, title and interest, including any and all ownership interest, which Lessee may have in or to the Property. Lessee represents and warrants that it has the legal right to make such transfer and that such transfer does not constitute a transfer of all or substantially all of the assets of Lessee, and that such transfer does not constitute all or a portion of a "bulk transfer" under the Uniform Commercial Code. It is agreed between the parties hereto that Lessor shall be the owner of, and hold legal title to, the Property for all purposes. Notwithstanding the foregoing, if the Property consists of any titled vehicles, at Lessor's option, Lessee may be shown as owner on the title(s) in which case Lessor shall be shown as lien holder. At its own risk, Lessee shall use or permit the use of the Property primarily at the location specified in the Schedule (unless the Property is mobile, in which case it may be moved in the ordinary course of business) and, without Lessor's prior written consent, shall not loan, sublet, remove from such location, part with possession or otherwise dispose of the Property. Lessee shall at its sole expense maintain the Property in good repair, condition, appearance and functional order and in compliance with any manufacturer's and regulatory maintenance and performance standards, shall from time to time make all needful and proper repairs, renewals, replacements and improvements thereto so that Lessee's business may be properly conducted, and shall keep complete records and documents regarding the use, maintenance and repair of the Property. Lessee shall not use or permit the use of the Property in any unintended, injurious or unlawful manner, shall not permit use or operation of the Property by any one other than Lessee's qualified employees and shall not change or alter the Property without Lessor's written consent. Lessee shall not create, cause, or permit any kind of claim, levy, lien or legal process on the Property, and shall forthwith satisfy, remove and procure the release thereof. The Property is and always shall remain personal property. Lessee shall not cause or permit the Property to be used or located in such a manner that it might be deemed a fixture. Lessee shall secure from each person not a party hereto who might secure an interest, lien or other claim in the Property, a waiver thereof. Lessee shall affix and maintain, at its expense, in a prominent and visible location, all ownership notices supplied by Lessor. Lessee shall permit Lessor to mark the Property in a manner sufficient to identify the Property as Lessor's Property.

**6. LEASE.**    This is a non-cancelable contract of lease only and, except as otherwise provided in any Schedule hereunder, nothing herein or in any other document executed in conjunction herewith shall be construed as conveying or granting to Lessee any right, title or interest, legal or equitable, in or to the Property, other than use, possession and quiet enjoyment of the Property, subject to and upon full compliance with the provisions hereof. It is the express intention of the parties hereto that (1) this Lease (including any and all Schedules hereunder) constitutes a true "lease" and a "finance lease" as such terms are defined in the Uniform Commercial Code Article 2A-Leases as in effect in the State of Georgia ("Article 2A"), and not a sale or retention of a security interest; and (2) title to the Property shall at all times remain in Lessor, and Lessee shall acquire no ownership, property, rights, equity, or interest other than a leasehold interest, solely as Lessee subject to the terms and conditions hereof.  If, notwithstanding the express intent of the parties, a court of competent jurisdiction determines that this Lease is not a true lease, but is rather a sale and extension of credit, a lease intended for security, a loan secured by the Property, or other similar arrangement, the parties agree that in such event, (i) in order to secure the prompt payment and performance as and when due of all of Lessee's obligations (both now existing and hereafter arising) hereunder and under each such Schedule and of every kind and nature, Lessee shall be deemed to have granted, and it hereby grants, to Lessor a first priority security interest in the following (whether now existing and hereafter created): the Property and all replacements, substitutions, parts, repairs, additions, accessions, accessories, and improvements incorporated therein or affixed or attached thereto, and any and all proceeds (cash and non-cash; but without power of sale), including the proceeds of all insurance policies, thereof, and (ii) Lessee agrees that with respect to the Property, in addition to all of the other rights and remedies available to Lessor hereunder upon the occurrence of an Event of Default (as hereinafter defined), Lessor shall have all of the rights and remedies of a first priority secured party under the Uniform Commercial Code as in effect in the State of Georgia (the "UCC").   Lessee hereby authorizes Lessor to file any financing statements necessary to perfect such security interest granted hereunder. Lessee shall not create, incur, assume or suffer to exist any mortgage, lien, charge or encumbrance on, or security interest in, or conditional sale or other title retention agreement to, the Property (other than pursuant to this Lease).

Lessee hereby acknowledges that all of the leased Property was selected by Lessee from supplier(s) chosen by Lessee. Lessee is familiar with all supply contract rights provided by the supplier(s) and is aware that the supplier(s) may be contacted for a full description of any rights Lessee may have under any supply contract. Provided Lessee is not in default under this Lease, Lessor hereby assigns to Lessee without recourse, all rights arising under any warranties applicable to the Property provided by the manufacturer or any other person. All proceeds of any warranty claim from the manufacturer or any other person shall first be used to repair the affected Property.  Any such claim shall not affect in any manner the unconditional obligation of Lessee to make rent payments hereunder.  Lessee agrees that if the Property or any part of it, or any machinery, equipment or other property intended by Lessee or by the manufacturer, vendor or supplier thereof to constitute the Property hereunder, is not properly installed, does not operate as intended by Lessee or as represented or warranted by the manufacturer, vendor or supplier thereof, totally fails to function or perform so as to give rise to a fundamental breach or alleged fundamental breach with respect to this Lease or the Property or part of it, or is unsuitable, unsatisfactory or unacceptable for any other reason, Lessee shall make claim and any complaint thereto solely and directly against the manufacturer, vendor or supplier of the Property (other than Lessor) and shall unconditionally pay Lessor all rent and other amounts expressed to be payable hereunder.

**7. GENERAL INDEMNIFICATION AND INSURANCE.**  Lessee assumes liability for, and agrees to defend, indemnify and hold Lessor harmless from any claim, liability, loss, cost, expense, or damage of every nature (including, without limitation, fines, forfeitures, penalties, settlements, and attorneys' fees) by or to any person whomsoever and/or property whatsoever, regardless of the basis, including allegations (by third parties) of wrongful, negligent or improper

act or misuse by Lessor, which directly or indirectly results from or pertains to the leasing, manufacture, delivery, ownership, use, possession, selection, performance, operation, inspection, condition (including without limitation, latent or other defects, and whether or not discoverable), improvements, removal, return or storage of the Property, except arising while the Property is in the possession of Lessor.

Upon request of Lessor, Lessee shall assume the defense of all demands, claims, or actions, suits and all proceedings against Lessor for which indemnity is provided and shall allow Lessor to participate in the defense thereof. Lessor shall be subrogated to all rights of Lessee for any matter which Lessor has assumed obligation hereunder, and may settle any such demand, claim, or action without Lessee's prior consent, and without prejudice to Lessor's right to indemnification hereunder.

At its expense, Lessee shall maintain in force, at all times from shipment of the Property to Lessee until surrender thereof, property damage insurance and liability insurance with such coverage and from such insurance carriers as shall be satisfactory to Lessor. The Property must be insured against all risks which are customarily insured against on the type of property leased hereunder. The amount of Lessee's liability insurance shall not be less than $1,000,000.00. Such insurance policies must name Lessor as an additional insured and loss payee, with endorsements satisfactory to Lessor, naming Lessor as its interests may appear, and provide for thirty (30) days advance written notice to Lessor of modification or cancellation. Lessee shall, upon request, deliver to Lessor satisfactory evidence of the insurance coverage. In the event Lessee fails to do so, Lessor may, at Lessor's option, in addition to any other rights available to Lessor, obtain coverage, and any sum paid therefore by Lessor (including any charges assessed by Lessor for such service) shall be immediately due and payable to Lessor by Lessee.

**8. INCOME TAX INDEMNITY.**   Lessee hereby represents, warrants, and covenants to Lessor as follows:

    (a)   This Lease will be a lease for federal and state income tax purposes; Lessor will be treated as the purchaser, owner, lessor, and original user of the Property and Lessee will be treated as the lessee of the Property for such purposes.

    (b)   Lessor shall be entitled to depreciation deductions with respect to each item of Property as provided by Section 167(a) of the Internal Revenue Code of 1986, as amended (the "Code"), determined under Section 168 of the Code by using the applicable depreciation method, the applicable recovery period, and the applicable convention, all as may be specified on the applicable Schedule for the Property, and Lessor shall also be entitled to corresponding state depreciation deductions.

    (c)   For purposes of determining depreciation deductions, the Property shall have an income tax basis equal to Lessor's cost for the Property specified on the applicable Schedule, plus such expenses of the transaction incurred by Lessor as may be included in basis under Section 1012 of the Code.

    (d)   The maximum federal and state income tax rates applicable to Lessor in effect on the date of execution and delivery of a Schedule with respect to an item or items of Property will not change during the lease term applicable to such Property.

    (e)   If for any reason whatsoever any of the representations, warranties, or covenants of Lessee contained in this Lease or in any other agreement relating to the Property shall prove to be incorrect and

        i.   Lessor shall determine that it is not entitled to claim all or any portion of the depreciation deductions in the amounts and in the taxable years determined as specified in (b) and (c), above, or

        ii.   such depreciation deductions are disallowed, adjusted, recomputed, reduced, or recaptured, in whole or in part, by the Internal Revenue Service or applicable state taxing authority (such determination, disallowance, adjustment, recomputation, reduction, or recapture being herein called a "Loss"), then Lessee shall pay to Lessor as an indemnity and as additional rent such amount as shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yield (the "Net Economic Return") to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred. The amount payable to Lessor pursuant to this section shall be payable on the next succeeding rental payment date after written demand therefore from Lessor accompanied by a written statement describing in reasonable detail such Loss and the computation of the amount so payable.

    (f)   Further, in the event

        i.   there shall be any change, amendment, addition, or modification of any provision of applicable state law or of the Code or regulations there under or interpretation thereof with respect to the matters set forth in this section with respect to any Property or

        ii.   if at any time there shall be any change, amendment, addition, or modification of any provision of applicable state law or of the Code or regulations thereunder or interpretation thereof with respect to the maximum applicable federal and state income tax rates as set forth in (d) above, which results in a decrease in Lessor's Net Economic Return, then Lessor shall recalculate and submit to Lessee the modified rental rate required to provide Lessor with the same Net Economic Return as it would have realized absent such change and the lease shall thereupon automatically be deemed to be amended to adopt such rental rate and values.

**9. INSPECTION AND REPORTS.**   Lessor shall have the right, at any reasonable time, to enter on Lessee's premises or elsewhere and inspect, appraise or reappraise the Property and inspect, audit and make extracts from any records and documents regarding its use, maintenance and repair. Upon Lessor's request, but in no event later than thirty (30) days after such request, Lessee will deliver all information requested by Lessor which Lessor deems reasonably necessary to determine Lessee's current financial condition or faithful performance of the terms hereof. Lessee shall give Lessor immediate notice and copy of all tax notices, reports, or inquiries, and of all seizure, attachment, or judicial process affecting or relating to the use, maintenance, operation, possession, or ownership of the Property.

10. **LESSEE'S REPRESENTATIONS AND WARRANTIES.** Lessee hereby represents, warrants, and covenants that:

(a)  Lessee has the necessary power, authority and capacity to enter into this Lease, any Schedule, and any other documents required to be delivered in connection with this Lease (collectively, the "Documents"); the Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms; there are no proceedings presently pending or threatened against Lessee which will impair its ability to perform under the Lease or which could reasonably be expected to have a material adverse effect on the business, condition (financial or otherwise), operations, performance or properties of Lessee; and all information supplied to Lessor is accurate and complete.

(b)  Lessee's entering into the Lease and leasing the Property does not and will not; (i) violate any judgment, order, or law applicable to the Lease, Lessee or Lessee's organizational documents; (ii) breach or constitute a default under any indenture, mortgage, contract or other agreement to which Lessee is a party or by which it or its properties is bound; or (iii) result in the creation of any lien, security interest or other encumbrance upon the Property, other than as granted hereunder.

(c)  All information and representations furnished by Lessee to Lessor concerning the Property are accurate and correct.

(d)  All financial data of Lessee or of any consolidated group of companies of which Lessee is a member ("Lessee Group"), delivered to Lessor have been prepared in accordance with generally accepted accounting principles applied on a consistent basis with prior periods and fairly present the financial position and results from operations of Lessee, or of the Lessee Group, as of the stated date and period(s). Since the date of the most recently delivered financial data, there has been no material adverse change in the financial or operating condition of Lessee or of the Lessee Group.

(e)  If Lessee is a business entity, it is and will be validly existing and in good standing under laws of the state of its organization. Lessee will not change its state of organization, headquarters or residence without providing at least thirty (30) days prior written notice to Lessor. The persons signing the Documents are acting with all necessary authority and hold the offices indicated below their signatures, which are genuine.

(f)  The precautionary security interests granted to Lessor hereunder are first priority security interests in and to the Property, and there is no other mortgage, lien, charge, encumbrance or security interest in, or conditional sale or other title retention agreement with respect to, the Property.

11. **ASSIGNMENT.** LESSEE SHALL NOT ASSIGN OR IN ANY WAY DISPOSE OF ALL OR ANY OF ITS RIGHTS OR OBLIGATIONS UNDER THIS LEASE OR ENTER INTO ANY SUBLEASE OF ALL OR ANY PART OF THE LEASED PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR'S LENDER. In the event that Lessor's lender has consented to any lease or sublease of the Property, Lessee hereby assigns and grants a security interest to Lessor's lender, to secure all obligations to Lessor's lender, any and all rights under any sublease(s), and Lessee shall deliver to Lessor the original of such sublease(s).

LESSEE AGREES THAT LESSOR MAY ASSIGN OR TRANSFER THIS LEASE OR LESSOR'S INTEREST IN THE LEASED PROPERTY WITH APPROVAL FROM LESSOR'S LENDER AND NOTICE TO LESSEE. Any assignee of Lessor shall have all of the rights, but none of the obligations, of Lessor under this Lease and Lessee will not assert against any assignee of Lessor any defense, counterclaim or offset that Lessee may have against Lessor. Lessee acknowledges that any assignment or transfer by Lessor will not materially change Lessee's duties or obligations under this Lease nor materially increase the burdens or risks imposed on Lessee. Lessee shall cooperate with Lessor in executing any documentation reasonably required by Lessor or any assignee of Lessor to effectuate any such assignment.

12. **SURRENDER.** On the expiration or termination of the term specified in each Schedule, unless Lessee shall exercise any purchase option granted in connection with such Schedule, Lessee shall, at its risk and expense and according to manufacturer's recommendations, assemble, prepare for delivery, and deliver the applicable Property and all manuals, records, certificates and documents regarding its use, maintenance and repair to any location specified by Lessor within the continental United States. To the extent that any such purchase option specifies that the purchase price shall *be* the "fair market value" of the Property, the term "fair market value" shall be defined as the value of the Property in continued use. Upon return of the Property any upgrades and improvements shall become the property of Lessor. Any upgrades, parts or improvements may only be removed from the Property if their removal shall not impair the Property's ability to operate according to any manufacturers and regulatory performance standards and specifications. The Property shall be delivered unencumbered and free of any liens, charges, or other obligations (including delivery expense and sales or use taxes, if any, arising from such delivery) and shall be in good working order, in the same condition, appearance, and functional order as when first leased hereunder, reasonable wear excepted, and in the condition specified or described in the applicable Schedule. At Lessor's request, Lessee shall at Lessee's expense provide Lessor with a written certification by an independent engineer or other recognized expert acceptable to Lessor to the effect that the Property is in the condition required hereunder. In lieu of delivery, Lessor may, at its option, direct Lessee to dispose of all or a portion of the Property in a proper and lawful manner at a recognized disposal site at Lessee's sole cost and responsibility.

13. **DEFAULT.** Time is of the essence under this Lease, and Lessee shall be in default in the event of any of the following ("Event of Default"): (a) any failure to pay when due the full amount of any payment required hereunder, including, without limitation, rent, taxes, liens, insurance, indemnification, repair or other charge; (b) any misstatement or false statement in connection with, or non-performance of any of lessee's obligations, agreements, or affirmations under or emanating from, this Lease; (c) Lessee's death, dissolution, or termination of existence; (d) if any of the following actions or proceedings are not dismissed within sixty (60) days after commencement: Lessee's insolvency, becoming the subject of a petition in bankruptcy, either voluntary or involuntary, or in any other proceeding under federal bankruptcy laws; making an assignment for benefit of creditors; or being named in, or the Property being subjected to a suit for the appointment of a receiver; (e) any default under any agreement between Lessee and Lessor (other than this Lease) or between Lessee and any affiliate of Lessor; (f) any failure to pay, as and when due, any obligation of Lessee, whether or not to Lessor, arising independently of this Lease; (g) any removal, sale, transfer, sublease, encumbrance, seizure or levy of or upon the Property; (h) bankruptcy, insolvency, termination, death, dissolution, or default of any guarantor for Lessee; or (i) any filing by Lessee of a termination statement for any financing statement filed by Lessor.

**14. REMEDIES.**  Upon the occurrence of any Event of Default which continues for more than ten (10) days (or immediately upon an Event of Default described in subsections (d) or (h) of Paragraph 13 above), and at any time thereafter, Lessor shall have all remedies provided by law; and, without limiting the generality of the foregoing and without terminating this Lease, Lessor, at its sole option, shall have the right at any time to exercise concurrently, or separately, without notice to Lessee (unless specifically stated), any one or all of the following remedies:

    (a)  Request Lessee to assemble the Property and make it available to Lessor at a reasonable place designated by Lessor and put Lessor in possession thereof on demand;

    (b)  Immediately and without legal proceedings or notice to Lessee, enter the premises, take possession of, remove and retain the Property or render it unusable (any such taking shall not terminate this Lease);

    (c)  Declare the entire amount of rent and other sums payable hereunder immediately due and payable; however, in no event shall Lessor be entitled to recover any amount in excess of the maximum permitted by applicable law;

    (d)  Terminate the leasing of any or all items of Property. Such termination shall occur only upon notice by Lessor and only as to such items of Property as Lessor specifically elects to terminate. This Lease shall continue in full force and effect as to any remaining items;

    (e)  Recover the sum of: **(i)** any accrued and unpaid rent, plus **(ii)** the present value of all future rentals reserved in the Lease and contracted to be paid over the unexpired term of the Lease, discounted at the rate of six percent (6%); plus, **(iii)** the anticipated residual value of the Property as of the expiration of this Lease or any renewal thereof; **(iv)** any indemnity payment, if then determinable; **(v)** all commercially reasonable costs and expenses incurred by Lessor in any repossession, recovery, storage, repair, sale, re-lease or other disposition of the Property, including reasonable attorneys' fees and costs incurred in connection therewith or otherwise resulting from Lessee's default (including any incurred at trial, on appeal or in any other proceeding); and, **(vi)** the value of all tax benefits lost to Lessor as a result of Lessee's default or the enforcement by Lessor of any remedy, plus interest on each of the foregoing at a rate of fifteen percent (15.0%) per annum ("Default Interest"); and,

    (f)  Lessor may, but is not required to, re-lease or sell any or all of the Property at a public or private sale on such terms and notice as Lessor shall deem reasonable. The proceeds of any sale or lease shall be applied in the following order of priorities:

        i.  to pay all of Lessor's expenses in taking, removing, holding, repairing and disposing of Property; then

        ii.  to pay any late charges and interest accrued; then

        iii.  to pay accrued but unpaid rent together with the anticipated residual value, future rent, interest and all other due but unpaid sums (including any indemnification and sums due under other Leases or agreements in default). Any remaining proceeds will reimburse Lessee for payments which it made to reduce the amounts owed to Lessor in the preceding sentence. Lessor shall keep any excess. If the proceeds of any sale or lease are not enough to pay the amounts owed to Lessor under this Section, Lessee shall pay the deficiency. No remedy referred to in this paragraph is intended to be exclusive, but shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity.

**15. LESSEE'S WAIVERS.**  To the extent permitted by applicable law, Lessee hereby waives any and all rights and remedies now or hereafter conferred by statute or otherwise including but not limited to Lessee's rights to: (i) cancel or repudiate this Lease; (ii) reject or revoke acceptance of the Property; (iii) recover damages from Lessor for any breaches of warranty; (iv) claim, grant or permit a security interest in the Property in Lessee's possession or control for any reason; (v) deduct all or part of any claimed damages resulting from Lessor's default if any, under this Lease; (vi) accept any partial delivery of the property; (vii) "cover" by making any purchase or lease of or contract to purchase or lease property in substitution for the Property; (viii) commence legal action against Lessor for specific performance, replevin, sequestration, claim and delivery or the like for the Property; (ix) file a termination statement of any financing statement filed by Lessor.

**16. NOTICES, PAYMENTS AND GOVERNING LAW.**  All notices and payments shall be mailed or delivered by facsimile or overnight courier to the respective parties at the addresses shown on any Schedule hereto or such other address as a party may provide in writing from time to time. This Lease and the rights and liabilities of the parties shall be governed by applicable federal law and the laws of the State of Georgia. The parties agree that any action or proceeding arising out of or relating to this Lease and the Documents may be commenced in any state or federal court in the State of Georgia. Service of process by overnight courier will be sufficient to confer personal jurisdiction over the Lessee. LESSOR AND LESSEE EACH IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY LITIGATION ARISING FROM OR RELATED TO THIS LEASE.

**17. SEVERABILITY.** If any of the provisions of this Lease are contrary to, prohibited by, or held invalid under applicable laws, regulations or public policy of any jurisdiction in which it is sought to be enforced, then that provision shall be considered inapplicable and omitted but shall not invalidate the remaining provisions. In no event shall this Lease be enforced in any way which permits Lessor to charge or collect interest in excess of the maximum lawful rate. Should interest collected exceed such rate, Lessor shall refund such excess interest to Lessee. In such event, Lessee agrees that Lessor shall not be subject to any penalties provided by law for contracting for or collecting interest in excess of the maximum lawful rate.

**18. SURVIVAL.**  All of Lessor's rights, privileges and indemnities contained herein shall survive the expiration or other termination of the Lease and any Schedules,
and the rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by, Lessor, its successors and assigns.

**19. LESSOR'S DISCLAIMERS.**  Lessor has obtained the Property based on specifications furnished by the Lessee. Lessor does not deal in property of this kind or

otherwise hold itself or its agents out as having knowledge or skill peculiar to the Property. Lessee acknowledges that it has relied on its own skill and experience in selecting property suitable to the Lessee's particular needs or purposes and has neither relied upon the skill or judgment of Lessor nor believes that Lessor or its agents possess any special skill or judgment in the selection of Property for Lessee's particular purposes. Further, Lessee has not notified Lessor of Lessee's particular needs in using the Property.

Lessee understands and agrees that neither the suppliers (nor any salesman or any agent of the suppliers) is an agent of Lessor. No salesman or agent of supplier is authorized to waive or alter any term or condition of this Lease, and no representation as to the Property or any other matter by the supplier shall in any way affect Lessee's duty to pay the rent and perform its obligations as set forth in this Lease. Lessor shall not be liable to Lessee for any incidental, consequential, or indirect damages or for any act, neglect, omission, breach or default by any third party.

**LESSOR IS NOT A SELLER, SUPPLIER OR MANUFACTURER (AS SUCH TERMS ARE DEFINED OR USED, AS THE CASE MAY BE, IN THE UCC), OR DEALER, NOR A SELLER'S OR A DEALER'S AGENT. THE EQUIPMENT IS LEASED HEREUNDER "AS IS", AND LESSOR HAS NOT MADE, AND HEREBY DISCLAIMS LIABILITY FOR, AND LESSEE HEREBY WAIVES ALL RIGHTS AGAINST LESSOR RELATING TO, ANY AND ALL WARRANTIES, REPRESENTATIONS OR OBLIGATIONS OF ANY KIND WITH RESPECT TO THE PROPERTY, EITHER EXPRESS OR IMPLIED, ARISING BY APPLICABLE LAW OR OTHERWISE, INCLUDING ANY OF THE SAME RELATING TO OR ARISING IN OR UNDER (A) AS TO THE TITLE, DESIGN, COMPLIANCE WITH SPECIFICATIONS, CONDITION, QUALITY, WORKMANSHIP, (B) THE SUITABILITY, SAFTEY, ADEQUACY, OPERATION, USE OR PERFORMANCE OF THE PROPERTY,(C) MERCHANTABILITY OR FITNESS FOR PARTICULAR USE OR PURPOSE, (D) COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OR TRADE, OR (E) TORT (WHETHER OR NOT ARISING FROM THE ACTUAL, IMPLIED OR IMPUTED NEGLIGENCE OF LESSOR OR STRICT LIABILITY) OR THE UCC (INCLUDING ARTICLE 2A) OR OTHER APPLICABLE LAW WITH RESPECT TO THE PROPERTY, INCLUDING ITS TITLE OR FREEDOM FROM LIENS, FREEDOM FROM TRADEMARK, PATENT OR COPYRIGHT INFRINGEMENT, FREEDOM FROM LATENT DEFECTS (WHETHER OR NOT DISCOVERABLE), CONDITION, MANUFACTURE, DESIGN, SERVICING OR COMPLIANCE WITH APPLICABLE LAW; it being agreed that all such risks, as between Lessor and Lessee, are to be borne by Lessee; and Lessor's agreement to enter into this Lease and any and all Schedules relating hereto is in reliance upon the freedom from and complete negation of liability or responsibility for the matters waived and disclaimed herein.. ANY DELAY IN DELIVERY SHALL NOT AFFECT THE VALIDITY OF THIS LEASE.**

**LESSOR SHALL NOT BE LIABLE TO LESSEE FOR ANY REPRESENTATION, CLAIM, BREACH OF WARRANTY, EXPENSE OR LOSS DIRECTLY OR INDIRECTLY CAUSED BY ANY PERSON, INCLUDING LESSOR, OR IN ANY WAY RELATED TO THE PROPERTY.**

**20. ENTIRE AGREEMENT, WAIVERS, SUCCESSORS, NOTICE.** This Lease and any Schedule and associated documents expressly referring hereto (each, a "Transaction") contain the entire agreement of the parties and shall not be qualified or supplemented by course of dealing. However, in any case where the Lessor takes an assignment from a vendor of its security interest in the same Property, the terms of the Transaction shall be incorporated into the assigned agreement and shall prevail over any inconsistent terms therein but shall not be construed to create a new contract. References to "this Lease" and "hereunder" shall be deemed to refer to this Lease together with each applicable Schedule. No waiver or modification by Lessor of any of the terms or conditions hereof shall be effective unless in writing signed by an officer of Lessor. No waiver or indulgence by Lessor of any default or deviation by Lessee of any required performance shall be a waiver of Lessor's right to subsequent or other full and timely performance. This Lease shall be binding on the parties hereto and their respective successors and assigns and shall inure to the benefit of such successors and assigns. Paragraph headings shall not be considered a part of this Lease. If any of the executed Documents are delivered to Lessor by facsimile transmission, such Documents (and signatures thereon) shall be treated as, and have the same force and effect as, originals. This Lease and the other Documents may be executed in any number of counterparts and on separate counterparts, each of which, when so executed and delivered, shall be an original, but all such counterparts shall together consist of one and the same instrument.

**BY INITIALING THIS SECTION, LESSEE ACKNOWLEDGES THAT LESSEE HAS READ THE ABOVE PARAGRAPHS UNDER SECTION 19,**
**LESSOR'S DISCLAIMERS, AND SECTION 20, ENTIRE AGREEMENT, AND FULLY UNDERSTANDS THEIR CONTENT.**

INITIALED

**21. PREPAYMENT:** Lessee has the right with ninety (90) day notice to pay the lease in full. The calculation is remaining payments due pursuant to the lease discounted six (6%) percent.

**22. LESSOR DEFAULT.** Lessor is required to notify Lessee within ten (10) days of any notice of default related to Lessor's financing of the leased equipment. If Lessor does not cure the third party default within the time parameters provided by Lessor's third party financing institution, Lessee has the right to terminate the Lease and cure unilaterally.

IN WITNESS WHEREOF, Lessor and Lessee have each caused this Master Lease Agreement to be duly executed as of the day and year first above written.

| AMOA FINANCE, LLC (LESSOR) | Curepoint, LLC (LESSEE) |
|---|---|
| BY: _____ | BY: _____ |
| **An Authorized Officer Thereof** | Name _Jamila Dadabhoy_ |
| | Title _Manager_ |

AMOA 000112

**AMOA FINANCE, LLC**

**SCHEDULE TO MASTER LEASE AGREEMENT**
Schedule Number: CP12112017

**THIS SCHEDULE** is made as of December 12, 2018 by and between AMOA Finance, LLC ("Lessor"), having its principal place of business at 3330 Preston Ridge Road, Suite 300, Alpharetta GA 30005, and Curepoint, LLC, ("Lessee"), having its principal place of business located at 2406 Bellevue Road, #7 Dublin GA 31021 (which shall be Lessee's address for notices hereunder) pursuant to the Master Lease Agreement dated as of date between Lessee and Lessor (the "Lease"), the terms of which (including the definitions) are incorporated herein. The terms of the Lease and this Schedule together shall constitute a separate instrument. Capitalized terms used but not defined herein are used with the respective meanings specified in the Lease. If any terms hereof are inconsistent with the terms of the Lease, the terms hereof shall prevail.

**LESSOR AND LESSEE HEREBY COVENANT AND AGREE AS FOLLOWS:**

**1.** The following specified equipment (the "Property") is hereby made and constituted Property for all purposes pursuant to the Lease:

New 2017 ELEKTA INFINITY Linear Accelarator w/ attachments and parts; EXHIBIT "A"
Serial Number: 154535

**TOGETHER WITH ALL REPLACEMENTS, PARTS, REPAIRS, ADDITIONS, ACCESSIONS AND ACCESSORIES INCORPORATED THEREIN OR AFFIXED OR ATTACHED THERETO AND ANY AND ALL PROCEEDS OF THE FOREGOING, INCLUDING, WITHOUT LIMITATION,** INSURANCE **RECOVERIES.**

**2.** The Property will be installed or stored at the following address:
2406 Bellevue Avenue, Suite 7
Dublin, GA 31021

3. The cost of the Property ("Property Cost") is: $3,110,526.16

**4.** The total amount financed pursuant to this Schedule is: $2,585,120.00

**5.** Lessee shall owe basic rental payments in Advance payable as follows: **72 Monthly Payments of $42,358.39.** Payments shall be due on the Payment Due Day (as defined in the paragraph below).

**PAYMENT DUE DAY.** Payment Due Days are on the 1st of each month. Starting February 11, 2018.

**6. LATE CHARGE.** If any installment of rent shall not be received by Lessor within ten (10) days after such amount is due, Lessee shall pay to Lessor a late charge equal to the lesser of the maximum amount allowed by law or One (1%) percent of such overdue amount.

**7. PURCHASE OPTION. A.** As long as no Event of Default has occurred and is continuing, Lessee shall have the option, to purchase all, but not part, of the Property at the end of the Term or any renewal thereof (the "Option") for the value of $524,170.16 (the "Purchase Price"), The Option may only be exercised by Lessee by written notice of such exercise to Lessor, which notice must be received by Lessor not later than thirty (30) days prior to the last day of the Term. Payment of the Purchase Price must be received by Lessor on or before the last day of the Term. Lessor acknowledges receipt of security deposit in the amount of $524,170.16. In exercising Option, Lessee has the right to satisfy the previously paid security deposit in full satisfaction of Option payment.

**b.** The Purchase Price shall be deemed to be the "anticipated" residual value of the Property (as such term is used in the Lease).

**c.** Upon receipt of payment of the Purchase Price together with any and all applicable sales or other taxes due in connection therewith, and any and all remaining sums or other amounts payable under this Schedule, Lessor shall transfer all its right, title and interest in and to the Property to Lessee. The Property shall be transferred "As Is" and "Where Is" without any express or implied representations or warranties along with the security deposit of $524,170.16.

**d.** Should Lessee fail to either exercise the Option or surrender the Property, then Lessor, at its sole option, shall have the right to: a) declare the Option terminated and demand immediate return of the Property; or, b) extend the Term for an additional six (6) months (the "Extended Term"). Should Lessor elect to extend the Term, Lessee shall be irrevocably obligated to remit monthly rent for the period beginning on the day immediately succeeding the last day of the Term (the "Holdover Date") and ending at the end of the sixth (6) month thereafter. A payment of such shall be due on the Holdover Date and on the same day of each consecutive month thereafter. Each payment of rent during any Extended Term shall be in the amount of the basic monthly rent for the last month of the Term, in accordance with the provisions of this Schedule. All Lessee's other obligations under the Lease shall remain in full force and effect for so long as Lessee shall continue to possess the Property. Upon the expiration of each Extended Term, Lessor, at its sole option, shall have the right to: a) permit Lessee to exercise the Option in accordance with its terms; b) declare the Option terminated and demand immediate return of the Property; or, c) extend the Term for an additional six (6) month Extended Term. Any and all rental payments pursuant to this Paragraph shall be deemed for all intents and purposes to be payments for possession and use of the Property after the expiration of the Term, and shall not be credited to any other obligation of Lessee to Lessor. Lessor's invoicing and/or

accepting any such payment shall not give rise to any right, title or interest of Lessee other than to possession and use of the Property during the period to which such rent applies in accordance with this Paragraph. The aforesaid right to charge Lessee rent for possession and use of the Property is not in limitation or derogation of any of Lessor's rights pursuant to the Lease.

e. If Lessee does not choose the purchase option for the purchase price, Lessee shall return all property listed in Exhibit A to Lessor at Lessee's expense. Lessee shall incur all costs related to removal, package, transport and delivery. Property shall be delivered to Lessor's choice of delivery.

f. Lessee may only use the security deposit towards the Purchase Option, otherwise, Lessee shall forfeit the security deposit at the end of the Term of the Lease.

8.  Lessor and Lessee agree that Section 8 of the Lease entitled Income Tax Indemnity* shall NOT apply to this Schedule.

IN WITNESS WHEREOF, the Lessor and the Lessee have each caused this Schedule to be duly executed as of the day and year first above written.

| AMOA FINANCE, LLC (LESSOR) | Curepoint, LLC (LESSEE) |
|---|---|
| BY: | BY: |
| An Authorized Officer Thereof | Name: Jamila Dadabhoy |
| | Title: Manager |

ADDRESS FOR ALL NOTICES:

AMOA FINANCE, LLC
3330 Preston Ridge Road
Suite 300
Alpharetta, GA 30005

AMOA 000114

**AMOA FINANCE, LLC**                                   **CERTIFICATE OF AUTHORITY**

**I/WE HEREBY CERTIFY** to AMOA FINANCE, LLC (the "Creditor") that: a) I/we am/are the persons) authorized to certify on behalf of Curepoint, LLC a LLC (the "Company") organized and maintaining good standing under the laws of the State of Georgia; b) the following is a true, correct and complete copy of certain Resolutions duly adopted or voted by the Board of Directors, Members or Managers, as appropriate, of the Company; c) I/we have placed a copy of such Resolutions in the official records of the Company; d) such Resolutions have not been rescinded, amended, or otherwise altered or repealed; and e) such Resolutions are now in full force and effect and are in full compliance with the formation documents of the Company, as such may have been amended. The Company has resolved the following:

1) That the Company from time to time leases personal property and/or borrows money or otherwise obtains credit from Creditor and that the entire amount of leasing, borrowing or credit under this resolution at any one time, whether direct or indirect, absolute or contingent, shall be unlimited;

2) That any one of the officers, agents, members, or managers designated below is hereby authorized to borrow money and to obtain credit and other financial accommodations (including the leasing of personal property) for the Company; and to execute and deliver on behalf of the Company any and all documentation required in connection therewith in such form and containing such terms and conditions as the person(s) executing such documents shall approve as being advisable and proper and in the best interests of the Company, and that the execution thereof by such person(s) shall be conclusive evidence of such approval; and, as security for the Company's obligations to Creditor to pledge, assign, transfer, mortgage, grant a security interest in, hypothecate, or otherwise encumber any and all property of the Company, whether tangible or intangible; and to execute and deliver all instruments of assignment and transfer;

3) That any officer, member, manager, agent or employee of the Company is hereby further authorized to take any and all such other actions as may be necessary to carry out the intent and purposes of these Resolutions, and that any and all actions taken by such person(s) to carry out such intent and purposes prior to the adoption of these Resolutions are hereby ratified and confirmed by, and adopted as the action of, the Board, members or managers of the Company, as appropriate; and

4) That these Resolutions shall constitute a continuing authority to the designated person or persons to act on behalf of the Company, and the powers and authority granted herein shall continue until revoked by the Company and formal written notice of such revocation shall have been given to Creditor. These Resolutions do not supersede similar prior resolutions given to Creditor.

**I/WE HEREBY FURTHER CERTIFY** that pursuant to the formation documents and any other appropriate documents of the Company as may be necessary, the following named persons) have been properly designated and appointed to the position(s) /office(s) indicated below, that such person(s) continue to hold such position(s) office(s) at the time of execution of the documentation for the transaction(s) with Creditor, that such person(s) are duly authorized to execute such documentation on behalf of the Company, and that the signatures) of such person(s) shown below are genuine,

| OFFICER | NAME | SIGNATURE |
|---------|------|-----------|
| Manager | Jamila Dadabhoy | |

**I/WE HEREBY FURTHER CERTIFY** that, pursuant to the formation documents of the Company, and any other appropriate documents of the Company as may be necessary, I/we have the power and authority to execute this Certificate on behalf of the Company, and that I/we have so executed this Certificate on December 12, 2018. A copy of this Certificate, which is duly signed and which is received by facsimile transmission ("fax"), shall be deemed to be of the same force and effect as the original.

BY:

Name: Jamila Dadabhoy

Title: Manager

AMOA 000115

**AMOA FINANCE, LLC**

**DELIVERY AND ACCEPTANCE CERTIFICATE
AND LEASE AMENDMENT**

Schedule Number: CP12112017

This Certificate is delivered to and for the benefit of Lessor and pertains to the following personal property (the "Property") which is the subject of Schedule Number CP12112017 dated as of December 12, 2018 to Master Lease Agreement, dated as of December 12, 2018 between AMOA FINANCE, LLC as Lessor and Curepoint, LLC as Lessee (the "Lease"):

New 2017 ELEKTA INFINITY Linear Accelarator w/ attachments and parts; EXHIBIT "A"
Serial Number: 154535

**TOGETHER WITH ALL REPLACEMENTS, PARTS, REPAIRS, ADDITIONS, ACCESSIONS AND ACCESSORIES INCORPORATED THEREIN OR AFFIXED OR ATTACHED THERETO AND ANY AND ALL PROCEEDS OF THE FOREGOING, INCLUDING, WITHOUT LIMITATION, INSURANCE RECOVERIES.**

To the extent that the above description has been altered by us or differs from the Property description set forth in the Lease (including, but not limited to, changes to model or serial numbers), we certify that such alterations or differences are accurate and we acknowledge that, based upon this certification: 1) the Lease is hereby amended to reflect the above Property description; and 2) Lessor is hereby authorized to execute on our behalf and to file amendment(s) to any Financing Statements filed under the Uniform Commercial Code in connection with the Lease, provided that all such amendments are consistent with the above Property description.

**WE HEREBY CERTIFY AND ACKNOWLEDGE THAT: a) the Property has been delivered to us; b) any necessary** installation of the Property has been fully and satisfactorily performed; c) after full inspection thereof, we have determined that the Property is in compliance with all applicable specifications and we have accepted the Property for all purposes as of the date hereof; d) Lessor has fully and satisfactorily satisfied all its obligations under the Lease; e) any and all conditions to the effectiveness of the Lease or to our obligations there under have been satisfied; f) we have no defenses, set-offs or counterclaims to any such obligations; g) the Lease is in full force and effect; and, h) no Event of Default has occurred under the Lease.

**WE HEREBY REPRESENT AND WARRANT THAT:** a) any right we may have now or in the future to reject the Property or to revoke our acceptance thereof has terminated as of the date of hereof; b) we hereby waive any such right by the execution hereof; c) the date of this Certificate is the earliest date upon which the certifications, acknowledgments, representations and warranties made herein could be correctly and properly made. We hereby acknowledge that Lessor is relying on this Certificate as a condition to making payment for the Property.

IN WITNESS WHEREOF, we have executed this Certificate as of December 12,                                    2018.

By: _____

Name _Jamila Dadabhoy_

Title _Manager_

AMOA 000116