**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CUREPOINT, LLC, | Case No. 22-56501- PMB |
| Debtor. | |

**RESPONSE OF CHAPTER 11 TRUSTEE IN SUPPORT OF SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS**

David A. Wender, solely in his capacity as the chapter 11 trustee (the "Trustee") for the above-captioned debtor (the "Debtor") in the above-styled case (the "Case"), by and through counsel, and hereby files this response (the "Response") in support of the Trustee's motion requesting, among other things, the Court's approval of a sale of substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code [Doc. No. 124] (the "Sale Motion").  In support of the Sale Motion and this Response, the Trustee attaches: (i) the *Declaration of David A. Wender in Support of Chapter 11 Trustee's Sale Motion* (the "Wender Declaration"), attached hereto as **Exhibit 1** and incorporated herein by reference; and (ii) the *Declaration of SOLIC Capital Advisors, LLC in Support of Chapter 11 Trustee's Sale Motion* (the "Hagood Declaration"), attached hereto as **Exhibit 2** and incorporated herein by reference.  In further support, the Trustee respectfully states as follows:

**PERTINENT BACKGROUND**

**A.    General Background**

1.    On August 19, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under Chapter 11 of the Bankruptcy Code.

2.      On September 21, 2022, Mark W. McCord, M.D. and the United States Trustee filed motions to appoint a chapter 11 trustee in the Case. [Doc. Nos. 52, 54].  Shortly thereafter, on October 3, 2022, AMOA Finance, LLC filed its motion to appoint a chapter 11 trustee in the Case. [Doc. No. 68].   On October 13, 2022, the Court entered an order granting Mark W. McCord, M.D.'s and AMOA Finance, LLC's motions and directing the United States Trustee to appoint a chapter 11 trustee in the Case. [Doc. No. 96].

3.      On October 17, 2022, the United States Trustee filed the *Notice of Appointment of Chapter 11 Trustee and Setting of Bond*, which, among other things, appointed the Trustee as chapter 11 trustee for the Debtor's estate. [Doc. No. 104].  On October 18, 2022, the Trustee filed his *Acceptance of Appointment as Chapter 11 Trustee*. [Doc. No. 106].  The Court approved the appointment of the Trustee on October 19, 2022. [Doc. No. 108].

4.      On October 27, 2022, the Court entered its *Order Approving Chapter 11 Trustee's Application to Retain Eversheds Sutherland (US) LLP as Counsel, Subject to Objection* [Doc. No. 119] (the "ES Order").

5.      On November 7, 2022, the Trustee filed, on an emergency basis, the Sale Motion seeking, among other things, the authority to conduct a sale of substantially all of the Debtor's assets (the "Sale"), approval of procedures in connection with the Sale, and for the Court's final approval of the resulting Sale.

6.      On November 14, 2022, the Trustee filed the *Application of Chapter 11 Trustee to Retain Investment Banker Effective as of November 1, 2022* [Doc. No. 130] (the "SOLIC Application"), seeking authority to retain SOLIC as investment banker to assist the Trustee in

connection with the marketing and conducting the Sale.

7.      On November 18, 2022, the Court entered the order granting the Sale Motion [*see* Doc. No. 145] (the "Sale Procedures Order"), which, among other things, granted the Trustee the authority to conduct the Sale, approved procedures to effectuate the same, and scheduled a hearing to occur on December 15, 2022 at which time the Court would consider the approval of the Sale.

8.      On November 18, 2022, the Court entered the order approving the SOLIC Application, subject to objection [*see* Doc. No. 146] (the "SOLIC Order").  The SOLIC Order approved, among other things, the SOLIC Engagement Letter and SOLIC's right to receive certain payments thereunder, including the Success Fee upon a successful sale closing.

9.      On December 13, 2022, the Court entered the joint amended SOLIC Order [*see* Doc. No. 191], incorporating the Trustee and United States Trustee's agreed upon revisions to the indemnity agreement between the Trustee and SOLIC, but otherwise leaving the SOLIC Order in full force and effect.  No objections were filed to the SOLIC Order within the time provided therein.  As a result, SOLIC's retention was approved without objection effective as of November 1, 2022.

**B.      The Sale and Marketing Process**

10.      Upon entry of the Sale Procedures Order and as directed therein, the Trustee provided prompt and sufficient notice to all parties-in-interest as instructed by the Court of all Sale related processes, including the Sale Procedures Order, the Bidding Procedures, the Notice of Auction, and Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases. [*See* Doc. Nos. 152, 174, 178, 179, and 193].

11.      In conjunction therewith, the Trustee and SOLIC developed and commenced a

robust and extensive marketing and sale process designed to identify potential purchasers and/or strategic partners and investors that could enable the Trustee to maximize the value of the Debtor's assets for the benefit of all stakeholders. The marketing process was designed and implemented to obtain the highest and best price for the Debtor's assets.

12.     First, SOLIC and the Trustee developed marketing materials describing the Debtor, its business operations, assets and other pertinent information that may interest a potential purchaser. Second, SOLIC created and supplemented a dataroom containing not only the marketing materials but also operational and financial due diligence materials and other pertinent materials, such as the Sale Procedures Order and Bidding Procedures (all documents contained in the dataroom are collectively, the "Due Diligence Materials").

13.     Commencing on or around November 1, 2022 and continuing through December 9, 2022, SOLIC solicited thirty-five (35) potential purchasers, which included various hospital systems, private medical care providers, and investment bankers/private equity groups. Of the thirty-five (35) parties solicited, nine (9) of them expressed preliminary interest in acquiring the Debtor and executed confidentiality agreements for the purpose of gaining access to the dataroom and conducting their respective due diligence. Six (6) of these nine (9) parties requested and participated in separate due diligence calls with SOLIC.

**C.     CancerCare and the Asset Purchase Agreement**

14.     As a result of the marketing efforts, SOLIC received offers from 2406 CancerCare, LLC ("CancerCare," or, alternatively, the "Purchaser") to purchase substantially all of the Debtor's assets. Between December 2, 2022, and December 11, 2022, the Trustee, with the assistance of SOLIC, engaged in multiple good faith discussions with CancerCare to improve the offer.

15.     Based on the marketing process and discussions had with potential purchasers and the negotiations with CancerCare, the Trustee and SOLIC ultimately concluded that the offer from CancerCare was the highest and best offer and provided the best opportunity to maximize the value of the Debtor's assets for the benefit of its stakeholders.  No other person or entity offered to purchase the Debtor's assets for an amount that would provide a greater value to the Debtor than what was offered by CancerCare.

16.     Consequently, the Trustee and CancerCare engaged in further negotiations regarding the ultimate terms of a purchase and sale agreement, and, on December 9, 2022, CancerCare and the Trustee, on the Debtor's behalf, entered into an asset purchase agreement (the "Asset Purchase Agreement")[1].  A true and correct copy of the Asset Purchase Agreement, is attached hereto as **Exhibit 3** and incorporated herein by reference.

17.     The Asset Purchase Agreement provides that CancerCare will purchase substantially all of the Debtor's assets (the "Sale Assets"), as set forth more fully in the Asset Purchase Agreement, to continue the Debtor's ongoing business operations for a purchase price of $5,425,000.  In addition, under the Asset Purchase Agreement, CancerCare is assuming liabilities totaling approximately $119,329.66 as a result of the assumption and assignment of certain executory contracts and unexpired leases.  CancerCare is also leaving behind certain cash held by the Debtor that the Trustee estimates will total approximately $300,000.

**D.     Objections to the Sale**

18.     Per the Sale Procedures Order, the applicable deadlines to file objections were

---

[1] Terms used but not defined herein shall have the meaning ascribed in the Asset Purchase Agreement, the Sale Procedures Order, and Bidding Procedures, as applicable.

(i) December 8, 2022, which was the deadline to object to assumption and assignment of executory contracts and unexpired leases and proposed cure amounts, and (ii) December 10, 2022, which was the deadline to object to the Sale generally.

19.     Prior to the objection deadline, the Trustee received an informal request from counsel to Arvest Bank seeking clarification related to certain copiers subject to Equipment Finance Agreements with Arvest Bank (the "Arvest Equipment"). In view of this informal request, the Trustee and the Purchaser revised the proposed Asset Purchase Agreement and the proposed Sale Order (defined below) to confirm that the Arvest Equipment was not being sold.

20.     AMOA Finance, LLC ("AMOA") filed an objection to the Sale on December 7, 2022 [Doc. No. 182] (the "AMOA Objection") asserting its belief that the Trustee could not sell one of the linear accelerators used by the Debtor until there was a judicial determination on whether the linear accelerator was subject to a lease or a financing.  Though the Trustee disagrees with the positions taken by AMOA, the Trustee and AMOA engaged in discussions to resolve the issues presented in the AMOA Objection to facilitate the proposed Sale.  As a result of these discussions, the objections raised by AMOA, particularly as they relate to the Sale and Sale Hearing, have been resolved as set forth more fully below through an agreement by the Trustee to escrow certain proceeds of the Sale.

## **REQUEST FOR RELIEF**

21.     The Trustee requests, by and through this Response, that the Court approve the Sale of substantially all of the Debtor's assets and approve the terms and conditions of the Asset Purchase Agreement in connection therewith and enter an order substantially in the form attached hereto as **Exhibit 4** (the "Sale Order").

A.    **The Sale and Entry into the Asset Purchase Agreement is an Appropriate Exercise of the Debtor's Business Judgment**

22.    Section 363(b)(1) of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have found that a trustee's sale or use of assets outside the ordinary course of business should be approved if the trustee can demonstrate a sound business justification for the proposed transaction. *See, e.g., In re Eagle Picher Holdings, Inc.*, 2005 Bankr. LEXIS 2894, at ¶ 3 (Bankr. S.D. Ohio 2005); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996). Once a trustee articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

23.    The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. *See Martin*, 91 F.3d at 395; *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999).

24.    Based upon the Trustee's experience with the Debtor's operations, including issues associated with employee retention and maintaining the Debtor as a going concern, the Trustee's entry into the Asset Purchase Agreement (i) constitutes a sound and reasonable exercise of the

Trustee's business judgment consistent with his fiduciary duties, (ii) provides value to and is beneficial to the Debtor's estate and is in the best interest of the Debtor and its creditors, and (iii) is reasonable and appropriate under the circumstances.

25.      The business justifications for the proposed Sale include, but are not limited to: (i) the Purchase Price set forth in the Asset Purchase Agreement constitutes the highest and best offer received for the Sale Assets; (ii) the Asset Purchase Agreement presents the best opportunity to maximize the value of the Sale Assets; (iii) the value of the Debtor's estate will be maximized through the sale of the Sale Assets pursuant to the Asset Purchase Agreement; and (iv) the Sale Transaction provides the only viable path for the Debtor to continue providing uninterrupted and necessary medical services in Dublin, Georgia, and for the continued employment of the Debtor's employees.

26.      Moreover, the consideration to be provided by CancerCare under the Asset Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code, (ii) reasonably equivalent value under Georgia's Uniform Voidable Transactions Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

**B.      The Court Should Approve the Assumption and Assignment of Executory Contracts and Unexpired Leases**

27.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a trustee in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such

contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B. R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986)

28.    The standard governing bankruptcy court approval of a trustee's decision to assume or reject an executory contract or unexpired lease is whether the trustee's reasonable business judgment supports assumption or rejection. *See e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). The business judgment test "requires only that the trustee demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)). If the trustee's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3rd. Cir. 1989).

29.    Here, non-Debtor to parties to Assigned Contracts have received adequate and sufficient notice of the Trustee's intent to assume and assign the respective Assigned Contracts. All such parties have had a reasonable opportunity to object to both the Cure Costs and the

assumption in general.  No parties have filed objections, except for AMOA (which is discussed below) and Radiation Business Solutions ("RBS"). [*See* Doc. No. 184].  RBS's "objection" is not an objection to the Sale or assignment of its executory contract but rather is a reservation of rights for the purpose of ensuring and reserving its right to payment of any future amounts coming due under its contract. [*See id.*].

30.    Consequently, the assumption and assignment of the Assigned Contracts is integral to the Asset Purchase Agreement, is in the best interests of the Debtor and its estate, and represents the valid and reasonable exercise of the Trustee's sound business judgment.

**C.    The Court Should Approve the Sale Free and Clear of Liens and Encumbrances**

31.    Section 363(f) of the Bankruptcy Code permits a trustee to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of such interests in property if:

  a.  applicable nonbankruptcy law permits a sale of such property free and clear of such interest;
  b.  such entity consents;
  c.  such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
  d.  such interest is in bona fide dispute; or
  e.  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

32.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to permit the sale of the assets "free and clear" of interests. *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio*

*Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991).

33.     Here, the requirements of section 363(f) have been satisfied.  First, all holders of claims referenced in section 363(f) who did not object to the Sale are deemed to have consented to the Trustee's entry, on behalf of the Debtor, into the Asset Purchase Agreement.

34.     The requirements of section 363(f) with respect to AMOA are also satisfied.  First, the interest of AMOA is currently in *bona fide* dispute.  Contemporaneously with the filing of this Response, the Trustee has filed an adversary proceeding against AMOA, seeking, among other things, the recharacterization of AMOA's asserted claim that one of the Debtor's linear accelerators is subject to a lease in its favor and contesting the asserted claim amount.  Second, pursuant to the purported lease agreement between AMOA and the Debtor, AMOA has can be compelled to accept money satisfaction of its asserted interest as the agreement includes a purchase option. Moreover, the Purchase Price provided for in the Asset Purchase Agreement covers all asserted secured claims. Following the closing of the Sale, the Trustee shall hold proceeds in an amount sufficient to cover AMOA's claim (as asserted by AMOA) and all other asserted secured claims pending resolution of the Trustee's challenges (if any) to the same.

**D.     CureCancer is Entitled to the Protections of Section 363(m)**

35.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith buyer is one who purchases assets for value, in good faith, and without notice of adverse claims. *See In re Abbotts Dairies*, 788 F.2d at 147; *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993). Specifically, section 363(m) provides:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization

and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).

36.    Here, in compliance with the Sale Procedures Order and Bidding Procedures, the Asset Purchase Agreement was negotiated at arms-length and in good faith.  The Trustee represents that providing CancerCure with such protections is necessary for CancerCure's entry into the Asset Purchase Agreement, for the yielding a maximum purchase price for the Sale Assets, and, ultimately, obtaining the highest and best result for the benefit of the Debtor's estate and its stakeholders.

**E.    SOLIC Is Entitled to the Success Fee**

37.    Pursuant to the Engagement Letter between the Trustee and SOLIC, as approved by the Court through the SOLIC Order, SOLIC is entitled to a Success Fee in the amount of $241,329.89.[2]

38.    The Trustee requests the authority to pay this fee to SOLIC directly from the proceeds of the Sale at the time of the Sale's closing.

**F.    Waiver of Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

39.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property…is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease…is stayed until the expiration of the 14 days after entry of the order, unless the court orders otherwise."  Fed. R.

---

[2] The Engagement Letter provides that, at the closing of the Sale, the Debtor will pay to SOLIC out of the proceeds of Sale a success fee equal to (i) $225,000, plus (ii) 3.0% of the sale value in excess of $5.0 million.  *See* Exhibit 2 to the SOLIC Application.

Bankr. P. 6006(d).

40.     Here, Time is of the essence as (i) the Debtor's pending bankruptcy has caused apprehension within the Dublin community, referral sources and employees and (ii) the approaching holidays are threatening to impact the timing of closing (as banks and other institutions intend to close offices).  Waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) will allow any Sale to close as soon as possible and, thus, prevent delay in the administration of these Chapter 11 Cases.  Further, a waiver of the 14-day stay is necessary to comply with the milestones under the Asset Purchase Agreement.  Accordingly, the Trustee requests that any Sale order be effective immediately upon entry by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests entry of an order, substantially in the form attached hereto (i) approving the Asset Purchase Agreement Among the Trustee, on behalf of the Debtor, and CancerCure, (ii) authorizing the sale of substantially all of the Debtor's assets free and clear of liens, claims, interests, and encumbrances, (iii) authorizing the assumption and assignment of executory contracts and unexpired leases in connection therewith, (iv) finding CancerCare to be a good faith purchaser under section 363(m), (v) authorizing payment of the SOLIC Success Fee, (vi) waiving Bankruptcy Rules 6004(h) and 6006(d), and (vii) granting related relief.

Dated:  December 14, 2022                    Respectfully submitted,

                                                              /s/ *David A. Wender*
                                                              David A. Wender (Ga. Bar No. 748117)

Nathaniel T. DeLoatch (Ga. Bar No. 216330)
Eversheds Sutherland (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
Telephone: 404.853.8175
Facsimile: 404.853.8806
Davidwender@eversheds-sutherland.com
Nathanieldeloatch@eversheds-sutherland.com

- and –

Erin Broderick (Admitted *Pro Hac Vice*)
227 W Monroe St., Suite 6000
Chicago, IL 60606
Telephone: 312.585.8793
Facsimile: 312.724.9322
Erinbroderick@eversheds-sutherland.com

*Counsel for the Chapter 11 Trustee*

**EXHIBIT 1**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CUREPOINT, LLC | ) | Case No. 22-56501-PMB |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**DECLARATION OF DAVID A. WENDER IN SUPPORT OF
<u>CHAPTER 11 TRUSTEE'S SALE MOTION</u>**

I, David A. Wender, solely in my capacity as the chapter 11 trustee (the "<u>Trustee</u>") for the above-captioned debtor (the "<u>Debtor</u>") in the above-styled case (the "<u>Case</u>"), declare under penalty of perjury as follows:

1.    I am the duly appointed Chapter 11 Trustee of the Debtor and have the authority to submit this declaration (the "<u>Declaration</u>") on behalf of the Debtor and the Trustee with respect to the matters set out herein.

2.    I submit this Declaration in support of the Trustee's emergency motion seeking, among other things, the authority to conduct a sale of substantially all of the Debtor's assets (the "<u>Sale</u>"), to solicit and accept bids in connection therewith, and for the approval of certain other procedures necessary to effectuate the Sale [*see* Doc. No. 124] (the "<u>Sale Procedures Motion</u>").

3.    Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of the documents, or opinion based thereon.

48305700.2

4.      On August 19, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

5.      On September 21, 2022, Mark W. McCord, M.D. and the United States Trustee filed motions to appoint a chapter 11 trustee in the Case. [Doc. Nos. 52, 54].  Shortly thereafter, on October 3, 2022, AMOA Finance, LLC filed its motion to appoint a chapter 11 trustee in the Case. [Doc. No. 68].

6.      On October 13, 2022, the Court entered an order granting the aforementioned motions and directing the United States Trustee to appoint a chapter 11 trustee in the Case. [Doc. No. 96].

7.      On October 17, 2022, the United States Trustee filed the *Notice of Appointment of Chapter 11 Trustee and Setting of Bond*, which, among other things, appointed me as chapter 11 trustee for the Debtor's estate. [Doc. No. 104].

8.      On October 18, 2022, I filed my *Acceptance of Appointment as Chapter 11 Trustee*. [Doc. No. 106].

9.      The Court approved my appointment as the Trustee on October 19, 2022. [Doc. No. 108].

10.     On October 27, 2022, the Court entered its *Order Approving Chapter 11 Trustee's Application to Retain Eversheds Sutherland (US) LLP as Counsel, Subject to Objection* [Doc. No. 119] (the "Trustee's Counsel Order").

11.     On November 7, 2022, I caused to be filed the Sale Procedures Motion, seeking, as noted above, authority to conduct a sale of substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code and requesting that the Court schedule a final hearing to approve the resulting sale.

2

12.     On November 14, 2022, the Trustee filed the *Application of Chapter 11 Trustee to Retain Investment Banker Effective as of November 1, 2022* [Doc. No. 130] (the "SOLIC Application"), seeking authority to retain SOLIC in connection with the Sale and approving compensation as set forth in the Engagement Letter (*see* SOLIC Application, Ex. 2).

13.     The Trustee's Sale Procedures Motion came before the Court for hearing on November 17, 2022 and, on November 18, 2022, the Court entered the order granting the Sale Procedures Motion [*see* Doc. No. 145] (the "Sale Procedures Order").

14.     On November 18, 2022, the Court entered the order approving the SOLIC Application, subject to objection [see Doc. No. 146] (the "SOLIC Order"). In the absence of any timely objection, the SOLIC Order became a final order on December 12, 2022, and, consequently, SOLIC's retention was approved effective as of November 1, 2022.

15.     The Trustee retained SOLIC to provide advisory services to the Trustee and lead a sale process to sell substantially all of the Debtor's assets and maximize value of the same for the benefit of the Debtor's estate and its creditors.

16.     SOLIC and the Trustee, to effectuate the Sale, commenced a robust and extensive marketing and sale process pursuant to the Sale Procedures Order and Bidding Procedures (the "Marketing Process") designed to identify potential acquirers and/or strategic partners and investors that could enable the Trustee to maximize value from the Debtor's assets for the benefit of all stakeholders.

17.     The Marketing Process was designed and implemented to obtain the highest and best price for the Debtor's assets.

18.     As a part of the Marketing Process, I worked with SOLIC to prepare marketing materials describing the Debtor and created an electronic dataroom containing operational and

3

financial due diligence material as well as information regarding bidding procedures to facilitate due diligence. All due diligence material was reviewed by the Trustee, SOLIC, Michael Miles, Phillip Miles, and Jamila Dadabhoy.

19.    Upon information and belief, commencing on November 1, 2022 and lasting through December 9, 2022, SOLIC solicited 35 potential acquirers. Nine (9) of these parties expressed preliminary interest, executed confidentiality agreements, and requested access to the electronic dataroom to review due diligence material. Six (6) of the nine (9) parties who executed confidentiality agreements expressed further interest in the Debtor's assets and, as a result, SOLIC, held due diligence calls with these six (6) parties.

20.    As a result of SOLIC's solicitation efforts, SOLIC received offers from *2406 CancerCare, LLC* ("CancerCare," alternatively, the "Purchaser" or "Winning Bidder") to purchase substantially all of the Debtor's assets.

21.    CancerCare and the Trustee, with the assistance of SOLIC, engaged in multiple good faith negotiations between December 2, 2022 and December 11, 2022 to improve its offer.

22.    Based on the Marketing Process, discussions had with potential purchasers, and negotiations with CancerCare, the Trustee and SOLIC ultimately concluded that the offer received from CancerCare represents the highest and best opportunity to maximize the value of the Debtor's assets and, thereafter, actively negotiated the ultimate terms of a purchase and sale agreement.

23.    No other person or entity, or group of persons or entities, has offered to purchase the Sale Assets for an amount that would provide greater value to the Debtor than CancerCare.

24.    Based on my experience with the Debtor's operations, including issues associated with employee retention and my ability to maintain the Debtor as a going concern, the Trustee's entry into and performance under the Asset Purchase Agreement (i) constitutes a sound and

4

reasonable exercise of the Trustee's business judgment consistent with my fiduciary duties, (ii) provides value to and are beneficial to the Debtor's estate, and is in the best interests of the Debtor and its creditors, and (iii) is reasonable and appropriate under the circumstances.

25.    Business justifications for the Sale Transaction include, but are not limited to: (i) the Purchase Price set forth in the Asset Purchase Agreement constitutes the highest and best offer received for the Sale Assets; (ii) the Asset Purchase Agreement presents the best opportunity to maximize the value of the Sale Assets; (iii) the value of the Debtor's estate will be maximized through the sale of the Sale Assets pursuant to the Asset Purchase Agreement; and (iv) the Sale Transaction provides the only viable path for the Debtor to continue providing necessary medical services in Dublin, Georgia, and for the Debtor's employees to retain employment.

26.    The consideration to be provided by Cancer Care under the Asset Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code, (ii) reasonably equivalent value under Georgia's Uniform Voidable Transactions Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

27.    The Trustee conducted a fair and open sale process. The sale process and the Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Sale Assets.

28.    The Trustee, with SOLIC's assistance, and Purchaser complied with the Sale Procedures Order and the Bidding Procedures in all respects. Purchaser subjected its bid to the competitive Bidding Procedures approved by this Court and was designated the Winning Bidder for the Sale Assets by the Trustee in an exercise of his business judgement, in accordance with his

fiduciary duties, and in accordance with the Sale Procedures Order and Bidding Procedures. The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Sale Assets.

29.     As evidenced by the certificates of service filed with this Court: (i) proper, timely, adequate, and sufficient notice of the Sale Motion, the bidding process (including the deadline for submitting bids and the Auction), the Sale Hearing, the Sale Transaction, and the Proposed Sale Order was provided by the Trustee; (ii) such notice was good, sufficient, and appropriate under the particular circumstances and complied with the Sale Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing, or the Proposed Sale Order is required.

30.     The Trustee is authorized to sell the Sale Assets to Purchaser free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), property interests, rights, liabilities, encumbrances, and other interests of any kind or nature whatsoever against the Debtor or the Sale Assets, including, without limitation, any debts, claims, rights, causes of action, and/or suits arising under or out of, in connection with, or in any way relating to, any acts, omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, and/or claims for taxes of or against the Debtor and/or the Sale Assets, and any derivative, vicarious, transferee, or successor liability claims, rights, or causes of action (whether in law or in equity, under any law, statute, rule, or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior or subsequent to the commencement of this chapter 11 case, whether secured or unsecured, senior or subordinated, matured or unmatured, known or

6

unknown, whether fixed or contingent, whether anticipated or unanticipated, whether yet accrued or not, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to the Debtor, the Debtor's interests in the Sale Assets, the operation of the Debtor's business before the Closing, or the transfer of the Debtor's interests in the Sale Assets to Purchaser, all Excluded Assets, and all Excluded Liabilities (collectively, excluding any Assumed Liabilities, the "Claims"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of Claims who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion are deemed to have consented to the Debtor's entry into the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Sale Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Sale Assets attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same extent, validity, force, and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtor.

31.    Upon Closing, subject to payment of the transaction fee to SOLIC, all cash proceeds of the Sale Transaction shall be paid directly to the Trustee to be held in escrow and disbursed only as permitted and required under the Bankruptcy Code or as otherwise approved by the Bankruptcy Court following notice and hearing.

32.    Any and all Claims that represent interests in property shall attach to the net proceeds of the Sale Transaction, in the same amount and order of their priority, with the same extent, validity, force and effect which they have against the Sale Assets, and subject to any claims

7

and defenses the Debtor may possess with respect thereto, in each case immediately before the Closing.

33.    As evidenced by the certificates of service filed with this Court and in accordance with the provisions of the Bidding Procedures, Trustee has served notice of the Trustee's intent for the Debtor to assume and assign the Assigned Contracts and of the related proposed cure amounts (the "Cure Costs") upon each non-Debtor party to the Assigned Contracts (the "Cure Notice"). The service of the Cure Notice was timely, good, sufficient, and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Assigned Contracts.

34.    All non-Debtor parties to the Assigned Contracts have had a reasonable opportunity to object both to the Cure Costs listed on the Cure Notice and to the assumption and assignment of the Assigned Contracts to Purchaser.

35.    No defaults exist in the Debtor's performance under the Assigned Contracts as of the date of this Order other than the failure to pay the Cure Costs, as may be required, or such defaults that are not required to be cured.

36.    The assumption and assignment of the Assigned Contracts are integral to the Asset Purchase Agreement, are in the best interests of the Debtor and its estate, and represent the valid and reasonable exercise of the Trustee's sound business judgment.

37.    The assumption and assignment of the Assigned Contracts (i) is necessary to sell the Sale Assets to Purchaser, (ii) limit the losses suffered by non-Debtor parties to the Assigned Contracts, and (iii) maximize the recoveries to other creditors of the Debtor by limiting the amount of claims against the Debtor's estates by avoiding the rejection of the Assigned Contracts.

38.     With respect to each of the Assigned Contracts, the Trustee has met all requirements of section 365(b) of the Bankruptcy Code.

39.     Pursuant to the Asset Purchase Agreement, Purchaser has cured or will cure on or before the Closing any monetary default required to be cured with respect to the Assigned Contracts under section 365(b)(l) of the Bankruptcy Code and has provided adequate assurance of future performance under the Assigned Contracts in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the non-Debtor parties to such Assigned Contracts.

Dated: December 13, 2022

By:     David A. Wender
        Chapter 11 Trustee

9

**EXHIBIT 2**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CUREPOINT, LLC | ) | Case No. 22-56501-PMB |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

**DECLARATION OF SOLIC CAPITAL ADVISORS, LLC IN SUPPORT OF
CHAPTER 11 TRUSTEE'S SALE MOTION**

I, Gregory F. Hagood of SOLIC Capital Advisors, LLC and SOLIC Capital, LLC (collectively, the "Firm" or "SOLIC"), declare under penalty of perjury as follows:

1.      I am a Senior Managing Director of the Firm and, in that capacity, I have personal knowledge of, and authority to speak on behalf of, the Firm with respect to the matters set out herein.

2.      I submit this declaration ("Declaration") in support of the Trustee's (defined below) emergency motion seeking, among other things, the authority to conduct a sale of substantially all of the Debtor's assets (the "Sale"), to solicit and accept bids in connection therewith, and for the approval of certain other procedures necessary to effectuate the Sale [*see* Doc. No. 124] (the "Sale Procedures Motion").

3.      Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.  If I were called upon to testify,

I could and would testify to each of the facts set forth herein based on such personal knowledge, review of the documents, or opinion based thereon.

4.      David A. Wender, in his capacity as the Chapter 11 Trustee (the "Trustee") for the above-captioned debtor (the "Debtor") in the above-styled case (the "Case"), retained SOLIC effective as of November 1, 2022.

5.      SOLIC was retained to provide advisory services and lead the sale process contemplated in the Sale Procedures Motion.

6.      As a part of this process, SOLIC commenced a marketing process (the "Marketing Process") designed to identify potential acquirers and/or strategic partners and investors that could enable the Trustee to maximize value from the Debtor's assets for the benefit of all stakeholders.

7.      The Marketing Process was designed and was implemented to obtain the highest and best price for the Debtor's assets.

8.      As a part of the Marketing Process, SOLIC identified 35 potential partners likely to be interested in the Debtor or its assets - 19 strategic potential partners and 16 potential financial partners.

9.      SOLIC prepared marketing materials describing the Debtor and created an electronic dataroom containing operational and financial due diligence material as well as information regarding bidding procedures to facilitate due diligence. All due diligence material was reviewed by the Trustee, Michael Miles, Phillip Miles, and Jamila Dadabhoy.

10.     Commencing on November 1, 2022, and lasting through December 9, 2022, SOLIC solicited 35 potential acquirers. Nine (9) of these parties expressed preliminary interest and executed confidentiality agreements and requested access to the electronic dataroom to review due diligence material. Six (6) of the nine (9) parties who executed the confidentiality agreements, expressed further interest in the debtor and, as a result, SOLIC held due diligence calls with these

2

48304895.2

six (6) parties.

11.     As a result of SOLIC's solicitation efforts, SOLIC received offers from *2406 CancerCare, LLC* ("<u>CancerCare</u>") to purchase substantially all of the Debtor's assets.

12.     CancerCare and the Trustee, with the assistance of SOLIC, engaged in multiple good faith negotiations between December 2, 2022 and December 11, 2022 to improve its offer.

13.     Based on the Marketing Process, discussions had with potential purchasers, and negotiations with CancerCare, the Trustee and SOLIC ultimately concluded that the offer received from CancerCare represented the highest and best opportunity to maximize the value of the Debtor's assets and, thereafter, actively negotiated the ultimate terms of a purchase and sale agreement.

Dated: December 13, 2022

_____
By:     Gregory Hagood
        Senior Managing Director,
        SOLIC Capital Advisors, LLC

3

48304895.2

**EXHIBIT 3**

**ASSET PURCHASE AGREEMENT**

**by and between**

**2406 CANCER CARE, LLC, LLC.**

**AND**

**DAVID A. WENDER, NOT INDIVIDUALLY, BUT SOLELY AS THE CHPATER 11 TRUSTEE
FOR CUREPOINT, LLC**

**December ___, 2022**

48301228.1

**ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of December 9, 2022, 2022, is made and entered into between 2406 CANCER CARE, LLC (together with any affiliate or permitted assignee, the "Purchaser"), and David A Wender, not individually, but solely as the chapter 11 trustee (the "Trustee" or "Seller") of the bankruptcy estate of Curepoint, LLC ("Curepoint" or "Debtor"). The Purchaser and Seller are sometimes individually referred to herein as a "Party" and collectively as the "Parties."

**WITNESSETH**

WHEREAS, Curepoint is engaged in the business of operating a radiation center that provides radiation treatment for cancer patients (the "Business");

WHEREAS, on August 19, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, on September 9, 2022, the Debtor filed its Schedules and Statement of Financial Affairs [Docket No. 37] and, on October 6, 2022, Debtor filed its supplemental Schedules and Statement of Financial Affairs [Docket No. 82];

WHEREAS, on October 13, 2022, the Court entered an Order [Doc. No. 96] granting Mark W. McCord, M.D.'s Motion to Appoint Chapter 11 Trustee [Doc. No. 52] and AMOA Finance, LLC's Motion to Appoint Chapter 11 Trustee [Doc. No. 54] and directing the United States Trustee to appoint a chapter 11 trustee in the Case;

WHEREAS, on October 17, 2022, the United States Trustee filed the Notice of Appointment of Chapter 11 Trustee and Setting of Bond [Doc. No. 104], which, among other things, appointed the Trustee as chapter 11 trustee for the Debtor's estate. On October 18, 2022, the Trustee filed his Acceptance of Appointment as Chapter 11 Trustee. [Doc. No. 106]. The Court approved the appointment of the Trustee on October 19, 2022. [Doc. No. 108];

WHEREAS, this Agreement, the Acquisition (defined below) and the other transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court pursuant to Sections 105, 363 and 365 of title 11 of the United States Code (11 U.S.C. § 101, *et seq*.) (the "Bankruptcy Code");

WHEREAS, the Parties desire to enter into this Agreement pursuant to which Seller proposes to sell to Purchaser, and Purchaser proposes to purchase from Seller, substantially all of the assets used or held for use by Curepoint in the operation of the Business, in each case free and clear of any and all Liens of any kind or nature whatsoever (other than Permitted Liens and other than Assumed Liabilities) (the "Acquisition"); and

WHEREAS, the Parties desire to make certain representations, warranties, agreements, and covenants in connection with the Acquisition and the other transactions contemplated hereby;

2

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby, each Party hereby agrees as follows:

## ARTICLE I

## DEFINITIONS AND RULES OF CONSTRUCTION

1.1     <u>Definitions</u>. Unless otherwise defined herein, terms used herein shall have the meanings set forth on <u>Exhibit A</u> attached hereto and incorporated herein by this reference.

1.2     <u>Accounting Terms</u>. All accounting terms not specifically defined herein shall be construed in accordance with GAAP.

1.3     <u>Rules of Construction</u>. Unless the context otherwise clearly indicates, in this Agreement:

(a) the singular includes the plural;

(b) "includes" and "including" are not limiting;

(c) "may not" is prohibitive and not permissive; and

(d) "or" is not exclusive.

## ARTICLE II

## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

2.1     <u>Purchase and Sale of Assets</u>. Subject to the terms and conditions hereof, at the Closing and except as otherwise specifically provided in this Article II, Seller, as consideration for the payment of the Purchase Price in accordance with Section 3.1 and the other agreements and covenants made by the Purchaser herein, shall grant, sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase and acquire from Seller, all right, title and interest of Curepoint in and to the Sale Assets (as defined in Section 2.2), free and clear of any and all Liens of any kind or nature whatsoever (other than Permitted Liens and the Assumed Liabilities).

2.2     <u>Assets</u>. Except for the Excluded Assets, the "<u>Sale Assets</u>" shall consist of all of the assets, properties and rights of Curepoint of every type and description, whether real, personal or mixed, tangible or intangible, and wherever located, including the following:

(a)     All cash up to $300,000;

(b)     all inventory, including supplies, drugs, controlled substances, disposables, consumables, office and other supplies, spare, replacement and component parts (the "<u>Inventory</u>");

(c)     all tangible personal property of Curepoint, including all equipment, vehicles, furniture, machinery, office furnishings and other personal property owned by Curepoint, wherever located;

3

48301228.1

(d)    all Company Intellectual Property;

(e)    all rights of Curepoint under the Assigned Contracts (listed on Schedule 2.2(e) hereto), including all rights of setoff and recoupment and all rights and claims arising under (or relating to) the Assigned Contracts, whether under federal or state law and whether arising by way of counterclaim or otherwise;

(f)    all deposits posted under Assigned Contracts and all advances, pre-paid expenses and credits for the benefit of Curepoint;

(g)    all rights in and under all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights in favor of Curepoint relating to the other Sale Assets;

(h)    to the extent transferable, all Licenses relating to the Business;

(i)    subject to Section 2.3(f) below, all information (but excluding information subject to Curepoint's attorney-client or other similar privilege), files, correspondence, records, data, plans, reports, and recorded knowledge, including, to the extent permitted by applicable Laws, all patient medical records and medical staff records, including all patient lists, files, patient billing records and other patient records, and copies of financial records and files (copied at Purchaser's sole expense), employee records, supplier lists, price and mailing lists, and copies of all accounting or other books and records (copied at Purchaser's sole expense), which were generated, maintained, used and/or stored in the course of operations of the Business, provided however, Seller shall retain all rights to access to Curepoint's books and records as provided in Section 6.2 below;

(j)    all prepaid expenses, credits and security and other deposits;

(k)    all goodwill of Curepoint as a going concern; and

(l)    all accounts receivable, patient receivables and trade receivables and all other rights of Curepoint to payment from third parties, and the full benefit of all security for such receivables or rights to payment, in each case arising or accruing on or before the Closing Date (collectively, "Accounts Receivable").

(m)    Curepoint's Synovus lockbox accounts numbers 101-198-843-1 and 101-554-795-1 (collectively, the "Lockboxes").

2.3    Excluded Assets.

(a)    all cash as described in Section 2.2(a) above;

(b)    any bank accounts of Curepoint, except the Lockboxes

(c)    minute books and organizational documents;

(d)    any shares of stock, membership interests or other equity interests held by Curepoint in any other Person;

4

(e)    All Causes of Action asserted or existing as of the Closing Date, including any actual or potential claims by or through Curepoint against any of its Affiliates;

(f)    All Avoidance Actions;

(g)    All information, files, correspondence, records, data, plans, reports, and recorded knowledge, including, to the extent permitted by applicable Laws, and copies of all accounting or other books and records that the Trustee identifies as being necessary to analyze, preserve or otherwise pursue the Avoidance Actions and Causes of Action;[1]

(h)    any Licenses that applicable Law prohibits Seller from transferring;

(i)    All copiers identified in the "Copier Listing Proofs of Claim Nos. 6, 8, 10, and 11;

(j)    all Benefit Plans and assets attributable thereto; and

(k)    all rights of Seller arising under this Agreement.

2.4    <u>Assumption of Liabilities</u>. Subject to the terms and conditions set forth in this Agreement, including <u>Section 2.5</u> hereto, Purchaser shall only assume from Seller and thereafter be responsible for the payment, performance or discharge of the Liabilities and obligations of Seller arising under or in connection with the Assigned Contracts set forth on Schedule 2.2(e) after the Closing Date. To the extent that any Assigned Contract is subject to a Cure Cost, Purchaser shall be responsible for such Cure Costs.

2.5    <u>Excluded Liabilities</u>.  Specifically, and without in any way limiting the generality of <u>Section 2.4</u>, the Assumed Liabilities shall not include, and in no event shall Purchaser assume, agree to pay, discharge or satisfy any Liability or Claim hereunder or otherwise have any responsibility for any Liability or Claim (together with all other Claims and Liabilties that are not Assumed Liabilities, the "<u>Excluded Liabilities</u>"):

(a)    relating to, resulting from, or arising out of the operation of the Business prior to the Effective Date - particularly the  AMOA Finance Lease;

(b)    relating to, resulting from, or arising out of, (i) claims made in pending or future suits, actions, investigations or other legal, governmental or administrative proceedings or (ii) claims based on violations of law, breach of contract, employment practices or environmental, health and safety matters or any other actual or alleged failure of Curepoint to perform any obligation, in each case arising out of, or relating to, (A) events, acts or omissions that have occurred, (B) services performed, or (C) the operation of the Business, in each case prior to the Effective Date;

(c)    pertaining to any Excluded Asset; and

---

[1]    For the avoidance of doubt, if Purchaser believes that information set forth in Section 23(f) is necessary to the continued operation of the Business post Closing, the Purchase may obtain copies of such at its sole expense.

5



48301228.1

(d)    of Curepoint or the Trustee arising or incurred in connection with the negotiation, preparation and execution hereof and the transactions contemplated hereby and any fees and expenses of counsel, accountants, brokers, financial advisors or other experts of Curepoint or the Trustee.

Such Excluded Liabilities shall include all claims, actions, litigation and proceedings relating to any or all of the foregoing and all costs and expenses in connection therewith.

2.6    <u>Deemed Consents</u>. Seller shall request that by providing notice of its intent to assume and assign any Contract or Lease (a "<u>Cure Notice</u>"), that the Bankruptcy Court deem the non-debtor party to such Contract or Lease to have consented to the sale if, and to the extent that, pursuant to the Sale Order or other Order of the Bankruptcy Court, Seller is authorized to assume and assign to Purchaser and Purchaser is authorized to accept such Assigned Contracts pursuant to section 365 of the Bankruptcy Code.

## ARTICLE III

## BASIC TRANSACTION

3.1    <u>Payment of Purchase Price</u>. As consideration for the sale, transfer, conveyance and assignment of the Sale Assets to Purchaser at the Closing and the assumption and assignment to Purchaser of the Assigned Contracts, Purchaser shall (collectively, the "<u>Purchase Price</u>"):

(a)    pay to Seller cash in immediately available funds in an amount equal to $5,425,000 (five million, four hundred twenty-five thousand dollars), less the Good Faith Deposit (defined below); and

(b)    assume the Assumed Liabilities at the Closing (including the obligation to pay the Cure Costs.

3.2    <u>Allocation of Purchase Price</u>. Purchaser shall, within 120 days after the Closing Date, prepare and deliver to Seller a schedule allocating the Purchase Price (and any other items that are required for federal income tax purposes to be treated as part of the purchase price) among the Sale Assets in accordance with the requirements of section 1060 of the Code (such schedule, the "<u>Allocation</u>"). Purchaser and Seller shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Authority or any other proceeding). Purchaser and Seller shall cooperate in the filing of any forms (including Form 8594 under section 1060 of the Code) with respect to such Allocation.

3.3    <u>Good Faith Deposit</u>. Pursuant to the Bidding Procedures Order, concurrently with the execution of this Agreement, Purchaser shall pay to Seller a good faith deposit in an amount of 10% of the proposed cash portion of the Purchase Price (the "<u>Good Faith Deposit</u>") by wire transfer of immediately available funds. The Good Faith Deposit shall be held in a separate escrow account under the custody and control of Seller or its counsel. The Good Faith Deposit shall not be deemed to constitute property of the Bankruptcy Estate, and the Bankruptcy Estate shall have no interest of any kind (equitable or otherwise) in the Good Faith Deposit unless and until such deposit is released from escrow to Seller in

6



accordance with this Agreement. If the Closing occurs, then the Good Faith Deposit shall be released from escrow to Seller at Closing in accordance with this Agreement. If this Agreement is validly terminated pursuant to Section 10.1(b), the Good Faith Deposit shall be released from Escrow to Seller, it being understood that the Good Faith Deposit shall be deemed liquidated damages in favor of Seller and shall not be construed as a penalty.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

Trustee represents and warrants to Purchaser as follows as of the date hereof and the Closing Date:

4.1     Organization. To the best of Trustee's Knowledge, Curepoint is registered as a Georgia limited liability company control number 14054680, according to the records of the Secretary of State of Georgia, which records reflect that Curepoint is active and in good standing.

4.2     Authorization. Subject to the applicable provisions of the Bankruptcy Code and the approval of this Agreement by the Bankruptcy Court in the Bankruptcy Case pursuant to the Sale Order, the Trustee has full power and authority to execute and deliver this Agreement and the Ancillary Documents to which he is a party and, upon entry and effectiveness of the Sale Order, will have all authority necessary to perform the obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Documents by the Trustee, and the performance by the Trustee of his obligations hereunder and thereunder, and subject to the entry and effectiveness of the Sale Order and any applicable Bankruptcy Code provision, the consummation of the transactions provided for herein and therein have been duly and validly authorized by all necessary action on the part of the Trustee. Subject to entry of the Sale Order approving this Agreement in the Bankruptcy Case, this Agreement has been and the Ancillary Documents will be as of the Closing Date, duly executed and delivered by the Trustee and does or shall, as the case may be, constitute the valid and binding agreements of the Trustee, enforceable against the Trustee in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar Laws affecting or relating to claims against the Trustee.

4.3     Absence of Restrictions and Conflicts. To the best of Trustee's Knowledge, subject to entry of the Sale Order in the Bankruptcy Case and other approvals by any Governmental Authority required by applicable Laws, the execution, delivery and performance of this Agreement and the Ancillary Documents, the consummation of the transactions contemplated hereby and thereby and the fulfillment of and compliance with the terms and conditions hereof and thereof do not or will not (as the case may be), with the passing of time or the giving of notice or both, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, permit the acceleration of any obligation under, or create in any party the right to terminate, modify or cancel, or result in the creation of any Lien under, (a) any term or provision of the charter documents of Curepoint, (b) any judgment, decree or order of any Governmental Authority to which Curepoint is a party or by which Curepoint or any of its properties or assets is bound, (c) any statute, law, rule or regulation applicable to Curepoint or the

7

48301228.1

Business or (d) any Contract to which Curepoint is a party or by which Curepoint or any of its properties is bound.

4.4     Assets. Pursuant to the Sale Order approving this Agreement, at the Closing, Purchaser shall pay to Trustee the Purchase Price and the Trustee shall convey to Purchaser, all of Curepoint's right, title and interest in and to the Assets, free and clear of any and all Liens of any kind or nature whatsoever (other than Permitted Liens). Further, Purchaser will be allowed for a period of 180 days from the purchase date or Purchaser's receipt of Billing Contracts for Purchaser to bill under Curepoint's tax ID number and Medicare provider number.

4.5     Compliance with Law. To the best of Trustee's Knowledge, Curepoint has not been charged with, and, to Trustee's Knowledge, Curepoint is not currently under investigation with respect to, a violation of any applicable Law.

4.6     Licenses. To the best of Trustee's Knowledge, the Trustee has no reason to believe that the Facilities, equipment, staffing and operations of the Business fail to satisfy the applicable licensing requirements of any Governmental Authority. Curepoint will continue the uninterrupted conduct of the Business until Closing. Curepoint will take no action with regard to, or communicate with, the Georgia Department of Community Health, the federal Centers for Medicare and Medicaid Services or any fiscal intermediary thereof, or any accrediting organization prior to Closing, without the prior, express consent of the Purchaser.

4.7     Labor Relations. To the best of Trustee's Knowledge: (a) no employee of Curepoint who provided services at, for or on behalf of the Business is represented by any labor union or other labor organization in connection with their employment by Curepoint; (b) there is no representation election petition involving Curepoint pending or threatened before the NLRB or any other labor relations board; and (c) there is no labor strike, dispute, slowdown, stoppage, handbilling or other "concerted action" actually pending or threatened against or involving Curepoint.

4.8     Brokers, Finders and Investment Bankers. Other than the Trustee's proposed retention of SOLIC Capital Advisors, LLC ("SCA") and SOLIC Capital, LLC ("SC", and together with SCA, "SOLIC"), the Trustee has not employed any broker, finder or investment banker or incurred any Liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated hereby.

4.9     Section 4.9 Disclaimers of Other Representations and Warranties. EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 4, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THE ASSETS (INCLUDING THE SALE ASSETS), LIABILITIES OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT TO THE EXTENT SPECIFICALLY SET FORTH IN THIS ARTICLE 4, PURCHASER IS PURCHASING THE SALE ASSETS ON AN "AS-IS, WHERE-IS" BASIS.

8

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

5.1     Organization. Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

5.2     Authorization. Purchaser has full power and authority to execute and deliver this Agreement and the Ancillary Documents and, subject to entry of the Sale Order in the Bankruptcy Case, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Documents by Purchaser, the performance by Purchaser of its obligations hereunder and thereunder, and the consummation of the transactions provided for herein and therein have been duly and validly authorized by all necessary action on the part of Purchaser. Subject to entry of the Sale Order in the Bankruptcy Case, this Agreement has been, and the Ancillary Documents will be as of the Closing Date, duly executed and delivered by Purchaser and, provided this Agreement and the Ancillary Documents are executed by Seller and subject to entry of the Sale Order in the Bankruptcy Case, do or shall, as the case may be, constitute the valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar Laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

5.3     Absence of Restrictions and Conflicts. The execution, delivery and performance of this Agreement and the Ancillary Documents, the consummation of the transactions contemplated hereby and thereby and the fulfillment of, and compliance with, the terms and conditions hereof and thereof do not or will not (as the case may be), with the passing of time or the giving of notice or both, violate or conflict with or constitute a breach of or default under, (a) any term or provision of the charter documents of Purchaser, (b) any material Contract to which Purchaser is a party, (c) any judgment, decree or order of any Governmental Authority to which Purchaser is a party or by which Purchaser or any of its properties or assets is bound or (d) any statute, law, rule or regulation applicable to Purchaser.

5.4     Ability to Perform. Purchaser represents and warrants that it has the financial wherewithal necessary to consummate this transaction. Immediately after giving effect to the transactions contemplated hereby, Purchaser shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all Liabilities); and (c) have adequate capital to carry on its business. In connection with the transactions contemplated hereby, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

5.5     Brokers. Purchaser has incurred no Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby.

9

5.6    <u>Investigation</u>. The Purchaser has or will make its own investigation concerning the physical condition of the Sale Assets and the Business, Seller's title to or any other matter pertaining to the Sale Assets, and Purchaser acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Curepoint for such purpose. Other than the specific representations made by Seller pursuant to this Agreement, Purchaser is not relying on any representations, warranties or inducements of Seller (or any representative of Seller) with respect to the physical or other condition of the Sale Assets, Seller's title to the Sale Assets or any other matter pertaining to the Sale Assets or related business.

5.7    <u>Litigation</u>. There are no Claims, actions, lawsuits or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Purchaser that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

5.8    <u>No Other Representations or Warranties</u>. Except for the representations and warranties contained in this Agreement, Purchaser does not make any other express or implied representation or warranty with respect to the transactions contemplated hereby, and Purchaser disclaims any other representations or warranties, whether made by it or any of its Affiliates, officers, directors, employees, agents or representatives.

## ARTICLE VI

## COVENANTS OF SELLER; OTHER AGREEMENTS

6.1    <u>Conduct of Business</u>. Except as expressly required hereby, except as otherwise consented to in advance in writing by Purchaser, and except as prohibited by or otherwise required under the Bankruptcy Code, from the date of this Agreement until the Closing Date, Trustee shall exercise his best efforts to:

(a)    conduct the Business in the Ordinary Course of Business;

(b)    not knowingly or intentionally take action that would adversely affect the existence and good standing of Curepoint in its jurisdiction of organization and in each jurisdiction as it existed on the Petition Date;

(c)    not knowingly and intentionally amend or modify the charter documents of Curepoint;

(d)    not knowingly and intentionally permit any event or condition that with or without notice or lapse of time or both would constitute a default under, any Assigned Contract (except those being contested in good faith) and not amend any Assigned Contract, in each case other than such defaults that existed prior to or arose as a result of the filing of the Bankruptcy Case;

(e)    not knowingly and intentionally dispose of or permit to lapse any right to the use of any patent, trademark, trade name, service mark, License or copyright of Curepoint, or dispose of or disclose to any Person any trade secret, formula, process, technology or know-how of Curepoint not heretofore a matter of public knowledge;

10

(f)    not knowingly and intentionally (i) sell any Sale Asset, (ii) create, incur or assume any indebtedness secured by the Sale Assets, (iii) grant, create, incur or suffer to exist any Lien on the Sale Assets that did not exist on the date hereof, (iv) incur any Liability outside the Ordinary Course of Business, except as agreed to in writing by Purchaser, (v) make any commitment for any capital expenditure to be made on or following the date hereof without the written consent of Purchaser, or (ix) enter into any material Contract without the written consent of Purchaser;

(g)    not knowingly and intentionally recognize any collective bargaining representative, consent to any representation election, or enter into a new collective bargaining agreement; and

(h)    not knowingly and intentionally authorize, or commit or agree (i) not to take any of the actions required in Sections 6.1(a), or (ii) to take any of the actions prohibited in Sections 6.1(b)-(g).

6.2    <u>Inspection and Access to Information</u>. Seller agrees that, prior to the Closing Date, Purchaser and its representatives (including its accountants, advisors, consultants and legal counsel) shall, upon reasonable notice to the Trustee, and so long as such access does not unreasonably interfere with the operations of the Business, have reasonable access during normal business hours to all Facilities and shall be entitled to make such reasonable investigation of the properties, businesses and operations of Curepoint (including to conduct a physical inventory of the Inventory) and such examination of the books and records and financial condition of Curepoint as it reasonably requests and to make extracts and copies to the extent necessary of the books and records.

6.3    <u>Notices of Certain Events</u>. Seller shall promptly notify Purchaser of:

(a)    any notice or other communication personally received by Trustee from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated hereby;

(b)    any notice or other communication received by Trustee from any Governmental Authority in connection with the transactions contemplated hereby; and

(c)    (i) the damage or destruction by fire or other casualty of any material Asset or part thereof, or (ii) any material Asset or part thereof becoming the subject of any proceeding (or, to the Knowledge of Trustee, threatened proceeding) for the taking thereof or of any right relating thereto by condemnation, eminent domain or other similar governmental action.

6.4    <u>Reimbursement</u>. If, after the Closing Date, Seller receives a payment with respect to any Accounts Receivable, Seller shall forward to Purchaser any such payment within three (3) Business Days of receipt.

6.5    <u>Notification of Certain Matters</u>. Seller shall add Purchaser, and Purchaser's counsel, to Seller's so-called "Rule 2002 notice list" and otherwise provide notice to Purchaser of all matters that are required to be served on Seller's creditors pursuant to the Bankruptcy Code and Rules.

11

6.6    <u>Further Assurances</u>. Subject to the other provisions hereof, Purchaser and Seller shall each execute all documents and take all actions as may be reasonably required to carry out the provisions of this Agreement and the transactions contemplated hereby. Purchaser and Seller shall each use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Article VIII and Article IX, respectively, of this Agreement.

6.7    <u>Conditional Validity and Enforceability of Agreement.</u>

(a)    Purchaser and Seller acknowledge that the Sale Assets will be sold at Auction in accordance with the Bidding Procedures Order and therefore, that except as expressly set forth herein, unless and until Seller's bid as embodied in this agreement as subsequently modified by agreement of Purchaser and Seller, is approved as a Winning Bid pursuant to the Sale Order, this Agreement will not be binding or enforceable by either Seller or Purchaser or any party claiming through either.

(b)    The Trustee may, in an exercise of his sole discretion, select Purchaser as the Stalking Horse Bidder in accordance with the Bidding Procedures order, in which event Purchaser shall be entitled to the Bid Protections provided in the Bidding Procedures Order.

6.8    <u>Other Bids/Auction</u>. Purchaser acknowledges that pursuant to the Bidding Procedures Order, Seller will solicit competing Bids and conduct an Auction of the Sale Assets.

6.9    <u>Taxes</u>.

(a)    On or prior to the Closing (or after the Closing when due and payable, to the extent such Taxes are due and payable after the Closing), Seller shall pay all sales taxes, use taxes, payroll taxes, and Taxes which will be owed by Seller or Curepoint and attributable to periods prior to the Closing.

(b)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges due and which may be payable by reason of the sale of the Sale Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne and timely paid by Purchaser, and Purchaser shall prepare and timely file all Tax Returns required to be filed in connection with such payments.

(c)    Seller shall cooperate in the preparation, execution and filing of all returns, questionnaires, applications and other documents regarding Taxes and all transfer, recording, registration and other fees that become payable in connection with the transactions contemplated hereby that are required or permitted to be filed at or prior to the Closing.

# ARTICLE VII

## COVENANTS OF PURCHASER

7.1    <u>Assumed Liabilities</u>. Subsequent to the Closing, Purchaser agrees to be responsible for the payment and performance of the Assumed Liabilities.

12

48301228.1

7.2    Operation. Purchaser shall be obligated to discharge, pay, perform and satisfy all of the duties, liabilities and obligations arising, from and after the Closing, from the ownership, maintenance, operation, use, development, sale or leasing of, or other operation of business with respect to the Sale Assets and the Assigned Contracts.

7.3    Further Assurances. Subject to the other provisions hereof, Purchaser shall use its reasonable, good faith efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to obtain all consents required and all regulatory approvals and to satisfy all conditions to its obligations hereunder and to cause the transactions contemplated herein to be effected as soon as practicable in accordance with the terms hereof and shall cooperate fully with Seller and other designees in connection with any step required to be taken as a part of its obligations hereunder.

7.4    Release of Chief Sales Officer. Purchaser shall release the Trustee from and on account of any demands, suits, or claims of any sort arising out of or in connection with the sale of the Sale Assets hereunder.

7.5    Taxes and Expenses. Any Taxes (other than income Taxes) or recording fees payable as a result of the Acquisition or any other action contemplated hereby shall be paid by the Purchaser. Purchaser shall cooperate in the preparation, execution and filing of all returns, questionnaires, applications and other documents regarding Taxes and all transfer, recording, registration and other fees that become payable in connection with the transactions contemplated hereby that are required or permitted to be filed at or prior to the Closing.

7.6    Confidential Information. Subject to the requirements of applicable Law, including the Bankruptcy Code, related rules of procedure, and orders of the Bankruptcy Court, Purchaser shall hold in confidence at all times following the date hereof all Confidential Information and shall not disclose, publish or make use of Confidential Information at any time following the date hereof without the prior written consent of Seller. In the event the transactions contemplated hereby are not consummated for any reason, without limiting the other rights and/or remedies of the Parties, the Purchaser shall promptly return to Seller, or, with Seller's written permission, destroy, all documents and other materials and all copies of the foregoing that were furnished to the Purchaser to date in connection with its due diligence investigation of the Business and the Sale Assets, as provided therein.

## ARTICLE VIII

## CONDITIONS TO CLOSING

8.1    Conditions to Obligations of Purchaser. The obligations of Purchaser to consummate the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing of each of the following conditions:

(a)    Injunction. There shall be no effective injunction, writ or preliminary restraining order or any order of any nature issued by a Governmental Authority of competent jurisdiction to the effect that the Acquisition may not be consummated as provided herein, and no proceeding or lawsuit shall have been commenced by any Governmental Authority for the purpose of obtaining any such injunction, writ or preliminary restraining order.

13

48301228.1

(b)    <u>Representations and Warranties</u>. The representations and warranties of Seller set forth in <u>Article IV</u> shall have been true and correct in all material respects as of the date hereof and shall be true and correct in all material respects as of the Closing as though made at and as of the Closing (other than those made as of a specified date, in which case as of such specified date), except that those representations and warranties that by their terms are qualified by materiality shall be true and correct in all respects.

(c)    <u>Performance of Obligations of Seller</u>. Seller shall have performed in all material respects all covenants and agreements required to be performed by Seller hereunder at or prior to the Closing.

(d)    <u>Ancillary Documents</u>. Seller shall have delivered, or caused to be delivered, to Purchaser the following:

   i.    executed deeds, bills of sale, instruments of assignment, certificates of title and other conveyance documents, dated as of the Closing Date, transferring to Purchaser all of Curepoint's right, title and interest in and to the Sale Assets, together with possession of the Sale Assets, including a Trustee Bill of Sale, in form and substance reasonably acceptable to Purchaser (the "<u>Bill of Sale</u>"); and

   ii.    all other documents required to be entered into by Trustee pursuant hereto or reasonably requested by Purchaser to convey the Sale Assets to Purchaser or to otherwise consummate the transactions contemplated hereby.

(e)    <u>Bankruptcy Court Orders</u>. (i) The Bankruptcy Court shall have entered the Sale Order substantially in the form set forth as Exhibit B hereto, with any changes thereto that affect (directly or indirectly) the Purchaser, satisfactory to the Purchaser and Seller, and (ii) as of the Closing Date, the Sale Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated, reversed, modified or amended without Purchaser's prior written consent (which may be given or withheld in the sole discretion of the Purchaser).

(f)    Notwithstanding anything to the contrary herein, if Synovus Bank does not consent to the Purchaser's purchase of the Lockboxes, Purchaser shall remain obligated to close on the Sale; provided, as provided for Section 6.4, Seller will transfer any Sale Assets deposited into the Lockboxes after the Closing to Purchaser within three (3) Business Days of receipt.

8.2    <u>Conditions to Obligations of Trustee</u>.    The obligations of Seller to consummate the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing of each of the following conditions, provided that Seller may waive any of the following conditions:

(a)    <u>Injunction</u>. There shall be no effective injunction, writ or preliminary restraining order or any order of any nature issued by a Governmental Authority of competent jurisdiction to the effect that the Acquisition may not be consummated as provided herein, and no proceeding or lawsuit shall have been commenced by any Governmental Authority for the purpose of obtaining any such injunction, writ or preliminary restraining order;

14

(b)      Representations and Warranties. The representations and warranties of Purchaser set forth in Article V shall have been true and correct in all material respects as of the date hereof and shall be true and correct in all material respects as of the Closing as though made at and as of the Closing (other than those made as of a specified date, in which case as of such specified date), except that those representations and warranties that by their terms are qualified by materiality shall be true and correct in all respects;

(c)      Performance of Obligations by Purchaser. Purchaser shall have performed in all material respects all covenants and agreements required to be performed by it hereunder on or prior to the Closing Date.

(d)      Ancillary Documents. Purchaser shall have delivered, or caused to be delivered, to Seller the following:

i.       documents evidencing the assumption of the Assigned Contracts and the acceptance of the assignable Licenses and the Assumed Liabilities, including the Assignment and Assumption Agreement;

ii.      a certificate by the Secretary of Purchaser, dated the Closing Date, as to (1) the good standing of Purchaser in its jurisdiction of incorporation and (2) the effectiveness of the resolutions of the [manager] of Purchaser authorizing the execution, delivery and performance hereof by Purchaser passed in connection herewith and the transactions contemplated hereby; and

iii.     all other documents required to be entered into or delivered by Purchaser at or prior to the Closing pursuant hereto.

(e)      Sale Order. The Bankruptcy Court shall have entered the Sale Order in a form reasonably satisfactory to the Trustee and Purchaser.

8.3     Bankruptcy Conditions.

(a)      The Sale Order shall have been entered finding Purchaser to be a Winning Bidder, as defined in the Bidding Procedures approved by the Bankruptcy Court.

(b)      The Sale Order shall approve and authorize the assumption and assignment of the Assigned Contracts and the Assigned Contracts shall have been actually assumed and assigned to Purchaser such that the Assigned Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Purchaser, among other things, defaults, breaches or claims (including, without limitation, cure claims under section 365 of the Bankruptcy Code, except as otherwise specifically provided in the Sale Order) existing as of the Closing or by reason of the Closing.

# ARTICLE IX

## CLOSING

15

48301228.1

The Closing shall occur within five (5) Business Days following the satisfaction or waiver (to the extent waivable) of the conditions set forth in Article VIII, or on such other date as the Parties may agree. The Closing shall take place at such place as the Parties may agree. The Closing shall be effective as of 12:01 a.m. Eastern time on the Closing Date (such time, the "Effective Time").

## ARTICLE X

### TERMINATION; TERMINATION PAYMENT

10.1    Termination. This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written agreement of Purchaser and Seller;

(b)    by written notice from Seller to Purchaser, in the event Purchaser (i) fails to perform in any material respect any of its agreements contained herein required to be performed by it at or prior to the Closing or (ii) breaches any of its representations and warranties contained herein such that any such breach would result in a failure of the condition in Section 8.2(c), which failure or breach is not cured within ten (10) days following Seller having notified Purchaser of its intent to terminate this Agreement;

(c)    by either Purchaser or Seller if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(d)    by Purchaser or Seller if the Bankruptcy Court enters an order approving the sale of the Sale Assets to another purchaser and such transaction has closed.

10.2    Effect of Termination.  In the event of termination of this Agreement pursuant to this Article XI, this Agreement shall thereupon become void and there shall be no liability on the part of any Party or its Affiliates, officers, directors, employees or representatives; provided, however, the provisions of Section 3.3, 7.6 and Article XI all shall survive the Termination Date. Notwithstanding the foregoing, nothing contained herein shall relieve any Party from liability for any willful breach of this Agreement prior to termination.

10.3    Liquidated Damages.  In the event that this Agreement is terminated by Seller pursuant to Section 10.1(b), the Good Faith Deposit shall be retained by Seller, as Seller's liquidated damages and as Seller's sole remedy for Purchaser's breach hereunder. THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ASCERTAIN THE ACTUAL DAMAGES SUFFERED BY SELLER AS A RESULT OF PURCHASER'S FAILURE TO COMPLETE THE PURCHASE OF THE SALE ASSETS PURSUANT TO THIS AGREEMENT, AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS AGREEMENT, THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS SECTION REPRESENT A REASONABLE ESTIMATE OF THE DAMAGES WHICH SELLER AND THEIR AFFILIATES WOULD INCUR AS A RESULT OF SUCH FAILURE. THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS

16

48301228.1

INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER. EACH PARTY HEREBY AGREES TO WAIVE ANY AND ALL RIGHTS WHATSOEVER TO CONTEST THE VALIDITY OF THE LIQUIDATED DAMAGE PROVISIONS FOR ANY REASON WHATSOEVER, INCLUDING THAT SUCH PROVISION WAS UNREASONABLE UNDER CIRCUMSTANCES EXISTING AT THE TIME THIS AGREEMENT WAS MADE. THE PARTIES FURTHER AGREE THAT CUREPOINT SHALL HAVE NO REMEDY FOR ANY BREACH OF THIS AGREEMENT BY PURCHASER.

### ARTICLE XI

### MISCELLANEOUS

11.1    <u>Survival</u>. The representations and warranties contained in this Agreement shall not survive the Closing. Each of the covenants and obligations of Purchaser and Seller in this Agreement and in the other Ancillary Documents shall survive in accordance with their respective terms.

11.2    <u>Schedules and Exhibits</u>.   The Schedules and Exhibits are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full herein.

11.3    <u>Expenses</u>. Except as set forth in the Bidding Procedures Order, each Party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing party in such action or proceeding (i.e., the party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

11.4    <u>Amendment</u>. This Agreement may not be amended, modified or supplemented except by a written instrument signed by Seller and Purchaser.

11.5    <u>Captions</u>.   The titles, captions and table of contents contained herein are inserted herein only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

11.6    <u>Notices</u>. All notices, communications and deliveries hereunder shall be made in writing signed by or on behalf of the Party making the same, shall specify the Section pursuant to which it is given or being made, and shall be delivered personally or by UPS Next Day Air or other nationally recognized overnight courier service (with evidence of delivery and postage and other fees prepaid) as follows:

To Seller:                         Mr. David A. Wender
                                   Eversheds Sutherland (US) LLP
                                   999 Peachtree Street, NE, Suite 2300,
                                   Atlanta, GA 30309-3996
                                   (404) 853-8175

17



With a copy to:        Mr. Nathan T. DeLoatch
Eversheds Sutherland (US) LLP
999 Peachtree Street, NE, Suite 2300,
Atlanta, GA 30309-3996
(404) 853-8356

To Purchaser:

With a copy to:

or to such other individual or address as a Party hereto may designate for itself by notice given as herein provided.

11.7    <u>Severability</u>. Any provision hereof that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Law, each Party hereby waives any provision of law that renders any such provision prohibited or unenforceable in any respect.

11.8    <u>Waivers</u>. The failure of a Party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a Party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Seller in the case of a waiver by Seller, or Purchaser, in the case of any waiver by Purchaser, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

11.9    <u>Counterparts and Execution</u>. This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

11.10    <u>SUBMISSION TO JURISDICTION</u>. THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT.

11.11    <u>Governing Law</u>. Unless governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the Laws of the State of Georgia without regards to any conflict of Law principles as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

18

48301228.1

11.12   <u>Binding Nature; Assignment</u>. Subject to approval of the Bankruptcy Court, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties hereto without prior written consent of the other Party (which shall not be unreasonably withheld or delayed); except that (a) Purchaser may assign any of its rights and obligations hereunder to any Affiliate or subsidiary of Purchaser (whether wholly owned or otherwise) or as collateral to its lenders and, following the Closing, in whole or in part to any successor-in-interest to any Person acquiring all or any portion of the Business or the Sale Assets; (b) this Agreement may be assigned to any entity appointed as a successor to Seller pursuant to a confirmed Chapter 11 plan; and (c) that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code.

11.13   <u>No Third Party Beneficiaries</u>. This Agreement is solely for the benefit of the Parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the Parties hereto or their successors and permitted assigns and any Persons named as an indemnitee herein, any rights, remedies, obligations, Claims, or causes of action under or by reason of this Agreement.

11.14   <u>Construction</u>. Unless the context of this Agreement otherwise clearly requires, (a) references to the plural include the singular, and references to the singular include the plural, (b) references to any gender include the other genders, (c) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (d) the term "or" has the inclusive meaning represented by the phrase "and/or", (c) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (f) the terms "day" and "days" mean and refer to calendar day(s) and (g) the terms "year" and "years" mean and refer to calendar year(s). Unless otherwise set forth herein, references in this Agreement to (i) any document, instrument or agreement (including this Agreement) (A) includes and incorporates all exhibits, schedules and other attachments thereto, (B) includes all documents, instruments or agreements issued or executed in replacement thereof and (C) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time, and (ii) a particular Law (as hereinafter defined) means such Law as amended, modified, supplemented or succeeded, from time to time and in effect at any given time. All Article, Section, Exhibit and Schedule references herein are to Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specified. This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it.

11.15   <u>Public Announcements</u>. Except as required by this Agreement and/or permitted by the Bidding Procedures Order, applicable Law or in connection with the Chapter 11 Case, neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned. Prior to making any public disclosure required by applicable Law, Seller shall give Purchaser a copy of the proposed disclosure and reasonable opportunity to comment on the same and shall use its best efforts to include Purchaser's comments in such public

19

disclosure. For purposes of clarity, the reference to "applicable Law" in the preceding sentence does not include filings in the Chapter 11 Case.

11.16    Entire Understanding. This Agreement, the other Ancillary Documents the Disclosure Schedules and the Bidding Procedures Order set forth the entire agreement and understanding of the Parties hereto in respect to the transactions contemplated hereby and the Agreement and the Disclosure Schedules supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

11.17    Closing Actions. All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the Party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

11.18    Cooperation Following the Closing. Following the Closing, each Party shall deliver to the other Parties such further information and documents and shall execute and deliver to the other Parties such further instruments and agreements as any other Party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other Party the benefits hereof.

11.19    Conflict between Transaction Documents. The Parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement or document referred to herein, this Agreement shall govern and control.

[Signature Page Follows]

20

48301228.1

IN WITNESS WHEREOF, the Parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**PURCHASER**

By: _____

Name: ERICH O. RANDOLPH

Title: MANAGING PARTNER 2416 - ANCER CARE LLC

**SELLER:**

David A Wender, not individually, but solely as the chapter 11 trustee of the bankruptcy estate of Curepoint, LLC

By: _____

David A. Wender, Chapter 11 Trustee

**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

21

## EXHIBIT A

### Definitions

"Accounts Receivable" shall mean all rights of Curepoint to payment, refunds, or other forms of remuneration that arose before the Closing Date.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"Affiliated Group" means an affiliated group as defined in section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law) of which Curepoint is or has been a member.

"Agreement" means this Asset Purchase Agreement, including all the Disclosure Schedules hereto, as the same may be amended, modified or waived from time to time in accordance with its terms.

"Allocation" shall have the meaning set forth in Section 3.2 hereof .

"Ancillary Documents" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by any Party in connection with the transactions contemplated hereby.

"Assigned Contracts" means all Contracts and Leases identified in Schedule 2.2(e).

"Assumed Liabilities" means all obligations of Curepoint that the Purchaser expressly assumes in this Agreement, including the obligations of Curepoint arising under or in connection with the Assigned Contracts after the Closing.

"Auction" shall have the meaning set forth in the Bidding Procedures Order.

"Avoidance Actions" means a right to recover, or to obtain other relief arising under or referenced in: § 550 of the Bankruptcy Code; the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act as enacted in any state, or any other law providing for recovery of consideration given, or reversal of any transfer by or for the benefit of Seller.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Georgia.

"Benefit Plan" means any benefit, retirement, vacation, paid time off, welfare and fringe-benefit agreement, plan, policy and program in effect and covering one or more employees, former employees of Curepoint, current or former directors of Curepoint or the beneficiaries or dependents of any such Persons, and is maintained, sponsored, contributed to, or required to be contributed to by Curepoint, or under which Curepoint has any material Liability for premiums or benefits.

"Bid" or "Bids" shall have the meaning set forth in the Bidding Procedures Order.

"Bidding Procedures" shall mean the bidding procedures approved pursuant to the Bidding Procedures Order.

"Bidding Procedures Order" means the Order of the Bankruptcy Court entered on November __, 2022 [Doc. No.__].

48301228.1



"Business" means the business activities carried on by or on behalf of Curepoint.

"Chapter 11 Case" means Case No. 22-56501 under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" means the consummation of the transactions contemplated by Article II and the consummation of the transactions contemplated herein.

"Closing Date" means the date on which the Closing occurs.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Company Intellectual Property" means any Intellectual Property that is owned by or licensed to Curepoint and used in connection with the Business, including the Company Software.

"Confidential Information" means any data or information of Curepoint (including trade secrets) that is valuable to the operation of the Business and not generally known to the public or competitors.

"Contract" means any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral, to which Curepoint is a party and which Curepoint is permitted under the Bankruptcy Code and applicable law to assume and assign.

"Cure Costs" means the amounts necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults, under the Assigned Contracts, in each case as of the Closing Date and to the extent required by Section 365 of the Bankruptcy Code and any order of the Bankruptcy Court; provided, however, that Cure Costs shall only include those amounts listed in a schedule of Cure Costs circulated to counterparties to contracts that Purchaser designates as Assigned Contracts.

"Cure Notice" means that notice given by Seller to all counterparties to the Contracts on or about November __, 2022 setting forth Seller's best estimate of the monetary payment needed to cure any default under the Contract.

"Disclosure Schedules" or "Schedules" mean those schedules attached to this Agreement and made a part hereof.

"Dollars" or "$" means dollars of the United States of America.

"Excluded Assets" shall have the meaning set forth in Section 2.3 hereof.

"Expense Reimbursement" shall have the meaning set forth in the Bidding Procedures Order.

"Facilities" means collectively the premises at which Curepoint operates the Business.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.



48301228.1

"Intellectual Property" means all of the following in any jurisdiction throughout the world including: (i) inventions (whether or not patentable or reduced to practice), all improvements thereto, and patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, reexaminations and counterparts thereof; (ii) trademarks, service marks, trade dress, logos, slogans, trade names, corporate names and all other indicia of origin, together with all translations, derivations and combinations thereof, and together with all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (iii) internet domain names and social media account or user names (including "handles"), whether or not trademarked, all associated web addresses, URLs, websites and web pages, social media accounts and pages, and all content and data thereon or relating thereto, whether or not Copyrights; (iv) works of authorship (whether or not copyrightable), and copyrights, mask works and copyrightable works, and applications, registrations and renewals in connection therewith; (v) trade secrets, know-how and other confidential, proprietary or business information (including ideas, research and development, formulas, compositions, manufacturing, production and other processes and techniques, methods, designs, technical and other data, charts, plans, diagrams, drawings and specifications, customer and supplier lists and business, marketing and other plans, studies and proposals); (vi) computer software (including source code, executable code data, databases and documentation) and systems; (vii) copies and tangible embodiments of any of the foregoing in whatever form or medium; (viii) all other intellectual property and proprietary rights; and (ix) the right to sue and recover for any past, present or future infringement, misappropriation, dilution or any other causes of action, and to recover or collect any damages, proceeds, income, royalties or other payments in connection with or relating to any of the foregoing.

"Knowledge" with respect to Trustee means all facts actually and personally known by the Trustee as to Curepoint, with no duty of inquiry with respect to the matters at hand.

"Law" means any law, statute, regulation, ruling, or Order of, administered or enforced by or on behalf of, any Governmental Authority, or common law.

"Lease" means any agreement pursuant to which Curepoint is a lessee of personal property or a lessee or tenant with respect to real property and/or improvements therein, in each instances as to which the leasehold period has not expired.

"Liability" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes.

"License" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, certificates of need, accreditations, approvals, exemptions, waivers, classifications, registrations and other similar documents and authorizations issued by any Governmental Authority, and applications therefor; including, without limitation, all certificate of needs applicable to the Business and its National Provider Number (CurePoint NPI: 1891190674, PTAN: 0457).

"Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, Liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), Order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that the Purchaser is a successor, transferee or continuation of Curepoint, Seller or the Business, and (iv) any leasehold interest, License or other right, in favor of a

48301228.1

Third Party or a seller, to use any portion of the Sale Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business by Curepoint in the usual and ordinary course in a manner substantially similar to the manner in which Curepoint operated, consistent with past practice prior to the date hereof, subject to any obligations as a debtor under the Bankruptcy Code or any order of the Bankruptcy Court.

"Party" shall have the meaning ascribed to it in the Preamble hereof.

"Permitted Liens" means Liens of record on real property, leasehold estates or personalty that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto.

"Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person.

"Purchase Price" shall have the meaning set forth in Section 3.1(a) hereof.

"Purchaser" shall have the meaning set forth in the preamble hereof.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve this Agreement and the transactions contemplated herein.

"Sale Motion" means the motion filed by Seller in the Bankruptcy Court seeking the sale of the Sale Assets and assumption of the Assigned Contracts pursuant to Sections 363 and 365 of the Bankruptcy Code, filed on _____ __, 2022 at Docket No. __ in the Bankruptcy Case.

"Sale Order" means the Final Order of the Bankruptcy Court in respect of the Sale Motion, in form and substance acceptable to the Purchaser and Seller to be entered by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code that is not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

"Sale Assets" shall have the meaning set forth in Section 2.1(a) hereof.

"Seller" shall have the meaning set forth in the preamble hereof.

"Stalking Horse Bidder" shall have the meaning set forth in the Bidding Procedures Order.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, real property, personal property, unclaimed property, environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not, (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other

Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Third Party" means any Person other than Seller, Curepoint, Buyer or any of their respective Affiliates.

"Trustee" shall have the meaning ascribed to it in the Preamble hereof.

26



**DISCLOSURE SCHEDULES TO ASSET PURCHASE AGREEMENT**

48301228.1

(all Disclosure Schedules shall be updated as of the Closing Date)

Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to such terms in the Agreement.

These Disclosure Schedules are being delivered in accordance with, and are incorporated into and made part of, the Agreement.

These Schedules relate to certain matters concerning the transactions contemplated by the Agreement. Except as otherwise set forth herein, information disclosed in any Schedule shall be deemed to be disclosed on any other Schedule to the extent that it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other Schedule or Disclosure Schedules.

Nothing in these Schedules will be deemed or will constitute an admission of any Liability of any party to any third party, nor an admission to any third party against the interests of any or all of the parties. Headings have been inserted on and within this Schedule for convenience of reference only and will not change the express description of the corresponding sections of the Agreement. The numbering of these Schedules reflect the corresponding numbering in the Agreement.

48301228.1

## Schedule 2.2(e) – Assigned Contracts

| | | | | | |
|---|---|---|---|---|---|
| CurePoint Dublin LLC | 2406 Bellevue Rd | Dublin | GA | 31021 | - |
| Erich Randolph | 159 The Prado NE | Atlanta | GA | 30309 | 80,000.00 |
| Phillips Healthcare | 13560 Morris Rd | Alpharetta | GA | 30004 | 9,855.00 |
| Radiation Business Solutions, Inc. | 1044 Jackson Felts Rd | Joelton | TN | 37080 | $0.00 |
| Sun Nuclear Corporation | 3275 Suntree Blvd. | Melbourne | FL | 32940 | 29,474.66 |

29

48301228.1

**EXHIBIT 4**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CUREPOINT, LLC, | Case No. 22-56501- PMB |
| Debtor. | |

**ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AMONG DEBTOR
AND PURCHASER, (II) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF
DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND
ENCUMBRANCES, (III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION
THEREWITH, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Sale Motion"),[1] dated November 7, 2022 [Doc. No. 124], Chapter

11 Trustee (the "Trustee") of the above-captioned debtor (the "Debtor"), pursuant to sections 105,

363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004,

6006, 9006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), for an order authorizing and approving the sale of the Sale Assets and the assumption and

assignment of certain executory contracts and unexpired leases of the Debtor in connection

therewith; and the Court having taken into consideration this Court's prior order, dated November

18, 2022 [Doc. No. 145] (the "Sale Procedures Order"), approving bidding procedures for the sale

of the Sale Assets (the "Bidding Procedures") and granting certain related relief; and 2406 Cancer

Care, LLC, (the "Purchaser"), having submitted the highest and best bid for the Sale Assets and

having thus been designated the Winning Bidder (as defined in the Bidding Procedures) for the

Sale Assets; and this Court having conducted a hearing to consider the Sale Transaction (as defined

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset
Purchase Agreement (as defined below) or, if not defined in the Asset Purchase Agreement, the meanings given to
them in the Sale Motion or Sale Procedures Order, as applicable.

48301178.2

below) on December 15, 2022 (the "Sale Hearing"), during which time all interested parties were offered an opportunity to be heard with respect to the Sale Transaction; and this Court having reviewed and considered (i) the Sale Motion and the exhibits thereto, (ii) the Asset Purchase Agreement, dated as of December 9, 2022 (together with exhibits and schedules thereto, as may be further amended, modified, supplemented and/or restated as provided therein) (the "Asset Purchase Agreement") by and between the Trustee, on behalf of the Debtor, and Purchaser, a copy of which is attached hereto as **Exhibit A**, whereby the Trustee has agreed, among other things, to sell the Sale Assets to Purchaser, on the terms and conditions set forth in the Asset Purchase Agreement (the "Sale Transaction"), and (iii) the arguments of counsel made, and the evidence proffered and adduced, at the Sale Hearing; and due notice of the Sale Motion and the form of this Order (the "Proposed Sale Order") having been provided; and all objections to the Sale Transaction and the Proposed Sale Order having been withdrawn, resolved, or overruled; and it appearing that the relief granted herein is in the best interests of the Debtor, its estate, creditors, and all parties in interest in this chapter 11 case; and upon the record of the Sale Hearing and this chapter 11 case; and after due deliberation and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**

A.      Fed.  R. Bankr. P. 7052.  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      Jurisdiction and Venue.  This Court has jurisdiction to decide the Sale Motion and over the Sale Transaction pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding

48301178.2

pursuant to 28 U.S.C. § 157(b)(2). Venue of this chapter 11 case and the Sale Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.    **Statutory and Rule Predicates.** The statutory and other legal predicates for the relief granted herein are sections 105(a), 363, 365, and 541 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014.

D.    **Opportunity to Object.** A fair and reasonable opportunity to object to, and be heard with respect to, the Sale Motion and the Sale Transaction has been given to all Persons entitled to notice pursuant to the Sale Procedures Order, including, but not limited to, the following: (i) all entities known or reasonably believed to have asserted any lien, claim, encumbrance, or other interest in the Sale Assets; (ii) all affected federal, state and local regulatory and taxing authorities; (iii) all parties known or reasonably believed to have expressed interest in the Sale Assets; (iv) all parties to the Assigned Contracts, and (v) all of the Debtor's known creditors (for whom identifying information and addresses are available to, or reasonably attainable by, the Debtor and/or Trustee); and (vi) all parties that have requested notice in this chapter 11 case pursuant to Bankruptcy Rule 2002.

E.    **Final Order.** This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

F.    **Sound Business Purpose.** The Trustee has demonstrated good, sufficient, and sound business purposes and justifications for approval of and entry into the Asset Purchase Agreement, and the other agreements, documents, and instruments deliverable thereunder, and approval of the Sale Transaction. The Trustee's entry into and performance under the Asset Purchase Agreement (i) constitutes a sound and reasonable exercise of the Trustee's business judgment consistent with his fiduciary duties, (ii) provides value to and are beneficial to the

3

Debtor's estate, and is in the best interests of the Debtor and its creditors, and (iii) is reasonable and appropriate under the circumstances. Business justifications for the Sale Transaction include, but are not limited to, the following: (i) the Purchase Price set forth in the Asset Purchase Agreement constitutes the highest and best offer received for the Sale Assets; (ii) the Asset Purchase Agreement presents the best opportunity to maximize the value of the Sale Assets; (iii) the value of the Debtor's estate will be maximized through the sale of the Sale Assets pursuant to the Asset Purchase Agreement; and (iv) the Sale Transaction provides the only viable path for the Debtor to continue providing necessary medical services in Dublin, Georgia, and for the Debtor's employees to retain employment.

G.     Compliance with Bidding Procedures Order. The Trustee and Purchaser complied with the Sale Procedures Order and the Bidding Procedures in all respects. Purchaser subjected its bid to the competitive Bidding Procedures approved by this Court and was designated the Winning Bidder for the Sale Assets by the Trustee in an exercise of his fiduciary duties and in accordance with the Sale Procedures Order and Bidding Procedures. The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Sale Assets.

H.     Marketing Process. (i) The Trustee and his advisors, including his investment banker, SOLIC, engaged in a robust and extensive marketing and sale process pursuant to the Sale Procedures Order and Bidding Procedures, (ii) the Trustee conducted a fair and open sale process, (iii) the sale process and the Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Sale Assets, and (iv) the process conducted by the Trustee pursuant to the Sale Procedures Order and the

4

Bidding Procedures obtained the highest or best value for the Sale Assets, and any other transaction would not have yielded as favorable an economic result for the Debtor and its estate with respect to the Sale Assets.

I.        Fair Consideration; Highest or Best Value.  The consideration to be provided by Purchaser under the Asset Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code, (ii) reasonably equivalent value under Georgia's Uniform Voidable Transactions Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.  Such consideration constitutes the highest and best bid for the Sale Assets.  No other person or entity, or group of persons or entities, has offered to purchase the Sale Assets for an amount that would provide greater value to the Debtor than Purchaser.

J.        No Successor or Other Derivative Liability.  (i) Purchaser is not, and the consummation of the Sale Transaction will not render Purchaser, a mere continuation, and Purchaser is not holding itself out as a mere continuation, of the Debtor or its estate, enterprise, or operations, and there is no continuity or common identity between Purchaser and the Debtor; (ii) the Sale Transaction does not amount to a consolidation, merger, or de facto merger of Purchaser with or into the Debtor or its estate; and (iii) Purchaser is not, and shall not be deemed to be, a successor to the Debtor or its estate as a result of the consummation of the Sale Transaction.

K.        Good Faith.  The Asset Purchase Agreement and the Sale Transaction were negotiated, proposed, and entered into by the Trustee and Purchaser in good faith, without collusion, and from arm's-length bargaining positions.  Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby.  Effective upon the Closing, it shall be judicially determined that

48301178.2

neither the Trustee, Debtor, nor Purchaser have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Effective upon the Closing, it shall be judicially determined that neither Purchaser nor any of its members, partners, officers, directors, principals, or shareholders is an "insider" of any of the Debtor, as that term is defined in section 101 of the Bankruptcy Code and no common identity of incorporators, directors, or controlling stockholders exists between Purchaser and the Debtor. The Asset Purchase Agreement and any agreements, documents or other instruments entered into pursuant thereto or in connection therewith (collectively, the "Transaction Documents") were not entered into, and the Sale Transaction is not being consummated for the purpose of hindering, delaying, or defrauding present or future creditors of the Debtor. All payments to be made by Purchaser in connection with the Sale Transaction have been disclosed. Neither the Trustee nor Purchaser is entering into the Transaction Documents, or proposing to consummate the Sale Transaction, fraudulently, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Colombia.

L.     Notice. As evidenced by the certificates of service filed with this Court: (i) proper, timely, adequate, and sufficient notice of the Sale Motion, the bidding process (including the deadline for submitting bids and the Auction), the Sale Hearing, the Sale Transaction, and the Proposed Sale Order was provided by the Trustee; (ii) such notice was good, sufficient, and appropriate under the particular circumstances and complied with the Sale Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing, or the Proposed Sale Order is required.

M.      Cure Notice.  As evidenced by the certificates of service filed with this Court, and in accordance with the provisions of the Trustee has served notice of the Trustee's intent for the Debtor to assume and assign the Assigned Contracts and of the related proposed cure amounts (the "Cure Costs") upon each non-Debtor party to the Assigned Contracts (the "Cure Notice").  The service of the Cure Notice was timely, good, sufficient, and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Assigned Contracts.  All non-Debtor parties to the Assigned Contracts have had a reasonable opportunity to object both to the Cure Costs listed on the Cure Notice and to the assumption and assignment of the Assigned Contracts to Purchaser.  No defaults exist in the Debtor's performance under the Assigned Contracts as of the date of this Order other than the failure to pay the Cure Costs, as may be required, or such defaults that are not required to be cured.

N.      Satisfaction of Section 363(f) Standards.  The Trustee is authorized to sell the Sale Assets to Purchaser free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), property interests, rights, liabilities, encumbrances, and other interests of any kind or nature whatsoever against the Debtor or the Sale Assets, including, without limitation, any debts, claims, rights, causes of action, and/or suits arising under or out of, in connection with, or in any way relating to, any acts, omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, and/or claims for taxes of or against the Debtor and/or the Sale Assets, and any derivative, vicarious, transferee, or successor liability claims, rights, or causes of action (whether in law or in equity, under any law, statute, rule, or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior or subsequent to the commencement of this chapter 11 case, whether secured or unsecured, senior or

48301178.2

subordinated, matured or unmatured, known or unknown, whether fixed or contingent, whether anticipated or unanticipated, whether yet accrued or not, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to the Debtor, the Debtor's interests in the Sale Assets, the operation of the Debtor's business before the Closing, or the transfer of the Debtor's interests in the Sale Assets to Purchaser, all Excluded Assets, and all Excluded Liabilities (collectively, excluding any Assumed Liabilities, the "Claims"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Those holders of Claims who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion are deemed to have consented to the Debtor's entry into the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Claims who did object that have an interest in the Sale Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Sale Assets attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same extent, validity, force, and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtor.  All Persons having Claims of any kind or nature whatsoever against the Debtor or the Sale Assets shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such Claims against Purchaser, its Affiliates, successors, assigns, assets (including Sale Assets), and/or properties.

O.     Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction, thus adversely affecting the Debtor and its estate and its creditors, if the sale of the Sale Assets was not free and clear of all Claims, or if Purchaser would,

or in the future could, be liable for any such Claims.  A sale of the Sale Assets, other than one free and clear of all Claims, would yield substantially less value for the Debtor's estate.

P.      The total consideration to be provided under the Asset Purchase Agreement reflects Purchaser's reliance on this Order to provide Purchaser, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Sale Assets free and clear of all Claims.

Q.      Assumption and Assignment of Assigned Contracts.  The assumption and assignment of the Assigned Contracts are integral to the Asset Purchase Agreement, are in the best interests of the Debtor and its estate, and represent the valid and reasonable exercise of the Trustee's sound business judgment.  Specifically, the assumption and assignment of the Assigned Contracts (i) is necessary to sell the Sale Assets to Purchaser, (ii) limit the losses suffered by non-Debtor parties to the Assigned Contracts, and (iii) maximize the recoveries to other creditors of the Debtor by limiting the amount of claims against the Debtor's estate by avoiding the rejection of the Assigned Contracts.

R.      With respect to each of the Assigned Contracts, the Trustee has met all requirements of section 365(b) of the Bankruptcy Code.  Further, Purchaser has cured or will cure on or before the Closing any monetary default required to be cured with respect to the Assigned Contracts under section 365(b)(l) of the Bankruptcy Code and has provided adequate assurance of future performance under the Assigned Contracts in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the non-Debtor parties to such Assigned Contracts.  Accordingly, the Assigned Contracts may be assumed by the Debtor and assigned to Purchaser as provided for in the Asset Purchase Agreement and herein.

9

S.    Validity of Transfer.  As of the Closing, the transfer of the Sale Assets to Purchaser will be a legal, valid, and effective transfer of the Sale Assets, will vest Purchaser with all right, title, and interest of the Debtor in and to the Sale Assets, free and clear of all Claims.  The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

T.    The Trustee, on behalf of the Debtor, (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary action of the Debtor, (ii) has all of the power and authority necessary to consummate the Sale Transaction, and (iii) upon entry of this Order, other than any consents identified in the Asset Purchase Agreement (including with respect to antitrust matters), need no consent or approval from any other Person to consummate the Sale Transaction.

U.    The Sale Assets constitute property of the Debtor's estate, and good title to the Sale Assets is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.

V.    The Asset Purchase Agreement is a valid and binding contract between the Trustee, acting on behalf of the Debtor, and Purchaser and shall be enforceable pursuant to its terms.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale Transaction, and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the

10

Debtor, and the Trustee, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

W.      Waiver of Bankruptcy Rules 6004(h) and 6006(d).  The sale of the Sale Assets must be approved and consummated promptly in order to preserve the value of the Sale Assets. Therefore, time is of the essence in consummating the Sale Transaction, and the Trustee and Purchaser intend to close the Sale Transaction as soon as reasonably practicable, but by no later than December 30, 2022.  The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement. Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to the transactions contemplated by this Order.

X.      **Legal and Factual Bases.**  The legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS ORDERED THAT**:

1.      **Motion is Granted.**  The Sale Motion and the relief requested therein is granted and approved as set forth herein.

2.      **Objections Overruled.**  All objections, if any, and any and all joinders thereto, to the Sale Motion or the relief requested therein that have not been withdrawn with prejudice, waived, or settled as announced to this Court at the Sale Hearing, by stipulation filed with this Court, or as provided in this Order, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice.

48301178.2

3.        **Notice.**    Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

4.        **Fair Purchase Price.** The consideration provided by Purchaser under the Asset Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code, (ii) reasonably equivalent value under Georgia's Uniform Voidable Transactions Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

5.        **Approval of Asset Purchase Agreement.** The Sale Transaction documents (the "Transaction Documents"), and all of the terms and conditions thereof, are hereby approved in their entirety.  The failure to specifically include any particular provision of the Transaction Documents in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Transaction Documents, and the Debtor's entry therein, be authorized and approved in their entirety.  For the avoidance of doubt, the property identified in the *Motion for Relief from the Automatic Stay* filed by Arvest Bank [Doc. No. 57] and the Court's order granting the same [Doc. No. 159] constitutes an Excluded Asset and is incorporated into the definition of Excluded Asset as set forth in the Asset Purchase Agreement.

6.        **Consummation of Sale Transaction.**  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Trustee, on behalf of the Debtor, as well as its officers, employees, and agents, are authorized to execute, deliver, and perform their obligations under and comply with the terms of the Transaction Documents and to consummate the

Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Transaction Documents and this Order. For the avoidance of doubt, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtor to transfer the Sale Assets to the Purchaser in accordance with the Transaction Documents and this Order.

7.     The Trustee, on behalf of the Debtor, is authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, including the transfer and, as applicable, the assignment of all the Sale Assets, and the assumption and assignment of the Assigned Contracts, and to take all further actions as may be (i) reasonably requested by Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to Purchaser, or reducing to Purchaser's possession, the Sale Assets, and/or (ii) necessary or appropriate to the performance of the obligations contemplated by the Transaction Documents, all without further order of this Court.

8.     All Persons that are currently in possession of some or all of the Sale Assets are hereby directed to surrender possession of such Sale Assets to Purchaser as of the Closing.

9.     Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction.

13

10.  **Transfer of Assets Free and Clear.**  Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Trustee, on behalf of the Debtor, is authorized, empowered, and directed to transfer the Sale Assets in accordance with the terms of the Asset Purchase Agreement and the terms of this Order.  The Sale Assets shall be transferred to Purchaser and, upon the Closing, such transfer shall: (i) be valid, legal, binding, and effective; (ii) vest Purchaser with all right, title, and interest of the Debtor in the Sale Assets; and (iii) be free and clear of all Claims in accordance with section 363(f) of the Bankruptcy Code, with any and all Claims that represent interests in property to attach to the net proceeds of the Sale Transaction, in the same amount and order of their priority, with the same extent, validity, force and effect which they have against the Sale Assets, and subject to any claims and defenses the Debtor may possess with respect thereto, in each case immediately before the Closing.

11.  Notwithstanding clause (iii) of Paragraph 10 above, or any other contrary provision of this Order, upon Closing, subject to payment of (a) the transaction fee to SOLIC, set forth in paragraph 25 of this Order, all cash proceeds of the Sale Transaction shall be paid directly to the Trustee to be held in escrow and disbursed only as permitted and required under the Bankruptcy Code or as otherwise approved by separate order the Bankruptcy Court following notice and hearing.

12.  Except as otherwise provided in the Asset Purchase Agreement, all Persons (and their respective successors and assigns) including, without limitation, the Debtor, the Debtor's estate, all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors who may or do hold Claims against

14

48301178.2

the Debtor, the Sale Assets, and/or the Debtor's business, are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such Claims against Purchaser, its Affiliates, successors, assigns, assets (including the Sale Assets), and/or properties, including, without limitation, taking any of the following actions with respect to any Claims: (i) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against Purchaser, its Affiliates, successors, assigns, assets (including the Sale Assets), and/or properties; (ii) enforcing, attaching, collecting,  or recovering in any manner any judgment, award, decree, or order against Purchaser, its Affiliates, successors, assigns, assets (including the Sale Assets), and/or properties; (iii) creating, perfecting, or enforcing any Claim against Purchaser, its Affiliates, successors, assigns, assets (including the Sale Assets), and/or properties; (iv) asserting a Claim as a setoff, right of subrogation, or recoupment of any kind against any obligation due Purchaser or its successors or assigns; or (v) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof.   No such Person shall assert or pursue against the Purchaser, its Affiliates, successors, assigns, assets (including the Sale Assets), and/or properties any such Claim.

13.    This Order (i) shall be effective as a determination that all Claims, have been unconditionally released, discharged and terminated as to the Purchaser and the Sale Assets (with such Claims attaching to the proceeds of sale in in the same amount and order of priority, with the same extent, validity, force and effect which they have against the Sale Assets), and that the conveyances and transfers described herein have been effected, and (ii) is and shall be binding upon and govern the acts of all Persons, including all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Purchaser is the assignee and owner of the Sale Assets free and clear of all Claims, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "Recording Officers"). All Recording Officers are authorized to strike recorded encumbrances, claims, liens, and other interests against the Sale Assets recorded prior to the date of this Order. A certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, claims, liens, and other interests against the Sale Assets recorded prior to the date of this Order. All Recording Officers are hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction.

14. Following the Closing, no holder of any Claim shall interfere with Purchaser's title to or use or enjoyment of the Sale Assets based on or related to any Claim or based on any actions or omissions by the Debtor, including any actions or omissions the Debtor may take in this chapter 11 case.

15. Except as expressly set forth in the Asset Purchase Agreement, Purchaser and each of its Affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders shall have no liability whatsoever for any Claims, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether liquidated or unliquidated, whether asserted derivatively or vicariously, whether

48301178.2

asserted based on Purchaser's status as a transferee, successor, or otherwise, of any kind, nature, or character whatsoever, including Claims based on, relating to, and/or arising under, without limitation: (i) the Debtor's business operations or the cessation thereof; (ii) any litigation involving the Debtor; (iii) any antitrust laws; (iv) any product liability or similar laws, whether state, federal, or otherwise; (v) any bulk sales or similar laws; (vi) any federal, state, or local tax statutes, rules, regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (vii) any common law doctrine of *de facto* merger, successor, transferee, or vicarious liability, substantial continuity liability, successor-in-interest liability theory, and/or any other theory of or related to successor liability.

16.     If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens,* or other documents or agreements evidencing Claims against the Debtor or the Sale  Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all interests which the Person has with respect to the Debtor or the Sale Assets, then with regard to the Sale Assets that are purchased by Purchaser pursuant to the Asset Purchase Agreement and this Order (i) the Trustee and the Purchaser are hereby authorized to execute and file such statements, instruments, or releases on behalf of the Person with respect to the Sale Assets, and (ii) Purchaser is hereby authorized to file, register, or otherwise  record a certified  copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Sale Assets; *provided that,* notwithstanding anything in this Order to the contrary, the provisions of this Order shall be self-executing, and neither the Seller nor Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments

48301178.2

in order to effectuate, consummate, and implement the provisions of this Order, other than as required by the Asset Purchase Agreement.   This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

17.     On the Closing Date, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Sale Assets acquired under the Asset Purchase Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Sale Assets to the Purchaser.

18.     To the maximum extent available under applicable law and to the extent provided for under the Asset Purchase Agreement, Purchaser shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor with respect to the Sale Assets and, to the maximum extent available under applicable law and to the extent provided for under the Asset Purchase Agreement, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to Purchaser as of the Closing.   All existing licenses or permits applicable to the business shall remain in place for the Purchaser's benefit until either new licenses and permits  are obtained, or existing licenses and permits are transferred in accordance with applicable administrative procedures.

19.     **No Successor or Other Derivative Liability.**  By virtue of the Sale Transaction, neither Purchaser nor any of its Affiliates shall be deemed to: (i) be a legal successor, or otherwise deemed to be a successor, to the Debtor under any theory of law or equity; (ii) have, *de facto* or otherwise, merged with or into the Debtor or its estate;

(iii) have a common identity or a continuity of enterprise with the Debtor; or (iv) be a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtor or any business, enterprise, or operation of the Debtor.   Upon the Closing, to the maximum extent available under applicable law, Purchaser's acquisition of the Sale Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted at the time of the Closing and the Sale Assets shall not be subject to any Claims arising under or in connection with any Excluded Asset or Excluded Liability.   The operations of Purchaser and its Affiliates shall not be deemed a continuation of the Debtor's  business as a result of the acquisition of the Sale Assets.

20.     **Assumption and Assignment of Assigned Contracts.**  The Trustee is hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to cause the Debtor to assume and assign the Assigned Contracts to Purchaser free and clear of all Claims, and to execute and deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to Purchaser as provided in the Asset Purchase Agreement.  Upon the Closing, Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtor in, to, and under the Assigned Contracts and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Assigned Contracts.   Purchaser acknowledges and agrees that, from and after the Closing, it shall comply with the terms of each assumed and assigned contract in its entirety, including any indemnification obligations expressly contained in such Assigned Contract that could arise as a result of events or omissions that occur from and after the Closing.

21.    All Cure Costs that have not been waived shall be determined in accordance with the Sale Procedures Order or other applicable order of this Court and paid by Purchaser in accordance with the terms of the Asset Purchase Agreement.    Payment of the Cure Costs shall be in full satisfaction and cure of any and all defaults under the Assigned Contracts and deemed to fully satisfy the Debtor's obligations under sections 365(b) and 365(f) of the Bankruptcy Code.  Each non-Debtor party to the Assigned Contracts is forever barred, estopped, and permanently enjoined from asserting against the Debtor or against Purchaser, its Affiliates, successors, assigns, assets (including the Sale Assets), and/or properties, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.  Purchaser has provided adequate assurance of future performance under the Assigned Contracts within the meaning of sections 365(b)(l)(c) and 365(f)(2)(B) of the Bankruptcy Code.  Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtor, and the assignment by the Debtor to Purchaser, of each of the Assigned Contracts.

22.    The Cure Cost has been and shall be deemed to be finally determined, and any such non-Debtor party shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at any time.    Consistent with the Sale Procedures Order, the non-Debtor party to an Assigned Contract is forever bound by the applicable Cure Cost and, upon payment of such Cure Cost as provided herein and in the Asset Purchase Agreement, is hereby enjoined from taking any action against Purchaser with respect to any claim for cure under the Assigned Contract.    To the extent no timely objections to adequate assurance or the cure amounts have been filed and served with respect to an Assigned

48301178.2

Contract, the non-Debtor party to such Assigned Contract is deemed to have consented to the assumption and assignment of the Assigned Contract to Purchaser.

23.    **Ipso Facto Clauses.**  Except as otherwise specifically provided for by order of this Court, the Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, Purchaser in accordance with their respective terms, including all rights of Purchaser as the assignee of the Assigned Contracts, notwithstanding any provision in any such Assigned Contract (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.  There shall be no, and all non-Debtor parties to any Assigned Contract are forever barred and permanently enjoined from raising or asserting against the Debtor or Purchaser any defaults, breach, claim, pecuniary loss, rent accelerations, escalations, assignment fees, increases, or any other fees charged to Purchaser or the Debtor as a result of the assumption or assignment of the Assigned Contracts.

24.    Except as otherwise specifically provided for by order of this Court, upon the Debtor's assignment of the Assigned Contracts to Purchaser, no default shall exist under any Assigned Contracts, and no non-Debtor party to any Assigned Contracts shall be permitted to declare a default by any Debtor or Purchaser, or otherwise take action against Purchaser, as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assigned Contracts.  Any provision in an Assigned Contract that prohibits or conditions the assignment or sublease of such Assigned Contract (including, without limitation, the granting of a lien therein) or allows the non-Debtor party thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment or sublease, constitutes

48301178.2

an unenforceable anti-assignment provision that is void and of no force and effect. The failure of the Debtor or Purchaser to enforce at any time one or more terms or conditions of any of the Assigned Contracts shall not be a waiver of such terms or conditions, or of the Debtor's and Purchaser's rights to enforce every term and condition of the Assigned Contracts.

25. **Payment of Success Fee.** Pursuant to the *Order Approving Application of Chapter 11 Trustee to Retain Investment Banker Effective as of November 1, 2022, Subject to Objection* [Doc. No. 146], the Success Fee of $241,329.89 to be paid to SOLIC shall be paid directly from the proceeds of the Sale at Closing.

26. **Statutory Mootness.** The Sale Transaction is undertaken by Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the Sale Assets to Purchaser free and clear of Claims, unless such authorization is duly stayed before the Closing pending such appeal.

27. **No Avoidance of Asset Purchase Agreement.** Neither the Trustee, on behalf of the Debtor, nor Purchaser has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Transaction Documents and the Sale Transaction shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Transaction Documents or the Sale Transaction.

28.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d).** Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.   Time is of the essence in closing the Sale Transaction, and the Trustee, on behalf of the Debtor, and Purchaser intend to close the Sale Transaction as soon as practicable.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing, or risk its appeal being foreclosed as moot.

29.    **Allowance of Claims Affecting Purchaser.** The Trustee, on behalf of the Debtor, shall not consent or agree to the allowance of any claim to the extent that it would constitute an Assumed Liability without the prior written consent of Purchaser.   Purchaser shall have standing in this chapter 11 case to object to the validity, amount, or priority of any claim against the Debtor to the extent it would otherwise constitute an Assumed Liability, and this Court will retain the right to hear and determine such objections.   Purchaser shall pay or otherwise satisfy the Assumed Liabilities on or before the later of: (i) the date on which such liability becomes due and owing to the holder of same in the ordinary course of business; and (ii) the date on which the Purchaser and the holder agree such liability is to be satisfied.

30.    **Exculpation and Release of Purchaser.** Except with respect to Purchaser's obligations under this Order or the Transaction Documents, effective upon the Closing, and to the maximum extent available under applicable law, neither Purchaser nor any of its Affiliates, successors, assigns, members, partners, officers, directors,

48301178.2

principals, shareholders, advisors, or representatives shall have or incur any liability to, or be subject to any action by, the Debtor, its estate, or any of its predecessors, successors or assigns, arising from, based on, or related in any way to the negotiation, documentation, or due diligence in respect of, performance, or consummation of the Transaction Documents, the Debtor, its estate, and the conduct of its business prior to closing, and the entry into and consummation of the Sale Transaction.

31.     **Binding Effect of this Order.**  The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon, or shall inure to the benefit of, the Debtor, its estate and its creditors, Purchaser and its Affiliates, successors, and assigns, and any affected third parties, including all Persons asserting Claims, notwithstanding any subsequent appointment of any trustee, examiner, or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, or receiver and shall not be subject to rejection or avoidance by the Debtor, its estate, its creditors or any trustee, examiner, or receiver.  The Trustee shall  be authorized  and directed to (i) operate the business of the Debtor to the fullest extent necessary to permit compliance with the terms of the Transaction Documents, and (ii) perform under the Transaction Documents without the need for further order of this Court.

32.     **Reservation    of    Rights    Regarding    U.S.    Government    Agreements.** Notwithstanding any provision to the contrary in the Sale Motion, this Order, and any implementing Sale documents, nothing in the Sale Motion, this Order, and any implementing Sale documents shall: (1) authorize or effectuate the assumption, sale, assignment or other transfer to the Purchaser of any grants, grant funds, contracts,

property, receivables, leases or agreements of or with the federal government, (collectively, "Federal Interests"); (2) be interpreted to set cure amounts or to require the government to novate, approve or otherwise consent to the assumption, sale, assignment or other transfer of any Federal Interests; (3) subject to Section 553 of the Bankruptcy Code, affect the government's rights, if any, to offset or recoup any amounts due under, or relating to, the Federal Interests; (4) waive any obligation of the Debtor or any Purchaser or any other entity to comply with applicable legal requirements and approvals under any police or regulatory laws governing the transfer or assignment of, or compliance with, any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval; (5) releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity may be subject to as the post-sale owner or operator of property after the date of entry of this Order; or (6) confer exclusive jurisdiction to the Bankruptcy Court with respect to the Federal Interests, except to the extent set forth in 28 U.S.C. Section 1334 (as limited by any other provisions of the United States Code).

33.    **Conflicts; Precedence.** In the event that there is a direct conflict between the terms of this Order and the terms of (i) the Asset Purchase Agreement, or (ii) any other order of this Court, the terms of this Order shall control.  Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases, or any order confirming such plan, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order, and, to the extent that there is any conflict among them, the terms of the Asset Purchase Agreement and/or this Order, as applicable, shall control.

48301178.2

34.    **Modification of Asset Purchase Agreement.** Subject to the terms therein, the Transaction Documents may be modified, amended, or supplemented by the parties thereto, in a writing signed by the party against whom enforcement of any such modification, amendment, or supplement is sought, and in accordance with the terms thereof, without further order of this Court; *provided* that notwithstanding any such modification, amendment, or supplement, the sale of the Sale Assets to Purchaser will still comply with the requirements of section 363 of the Bankruptcy Code.

35.    **Bulk Sales.** No bulk sales law, bulk transfer law, or similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.

36.    **Automatic Stay.** Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Transaction Documents or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Order.

37.    **Provisions Non-Severable.** The provisions of this Order are nonseverable and mutually dependent.

38.    **Retention of Jurisdiction.** This Court shall retain exclusive jurisdiction to, among other things, (i) interpret, enforce, and implement the terms and provisions of this Order and the Asset Purchase Agreement (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith), and (ii) adjudicate disputes related to this Order and the Transaction Documents (including all amendments thereto, and any waivers and consents thereunder).

Dated:  December [●], 2022

26

48301178.2

Respectfully submitted,

/s/ *David A. Wender*
David A. Wender (Ga. Bar No. 748117)
Nathaniel T. DeLoatch (Ga. Bar No. 216330)
Eversheds Sutherland (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
Telephone: 404.853.8175
Facsimile: 404.853.8806
Davidwender@eversheds-sutherland.com
Nathanieldeloatch@eversheds-sutherland.com

– and –

Erin Broderick (Admitted *Pro Hac Vice*)
227 W Monroe St., Suite 6000
Chicago, IL 60606
Telephone: 312.585.8793
Facsimile: 312.724.9322
Erinbroderick@eversheds-sutherland.com

*Counsel for the Chapter 11 Trustee*

27

48301178.2