UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 22-56501-pmb |
| | ) | |
| CUREPOINT, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| DAVID A. WENDER, in his capacity | ) | |
| as CHAPTER 11 TRUSTEE, | ) | |
| | ) | Adv. Proc. No. [●] |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Phillip Miles, Jamila Dadabhoy, | ) | |
| MEC Capital, Inc., Mittere Inc., | ) | |
| MMI Educational Technologies, | ) | |
| LLC, Northwinds Leasing, Inc., and | ) | |
| Physician Financial Partners, LLC, | ) | |
| Defendants. | ) | |

## **COMPLAINT**

David A. Wender, in his capacity as Chapter 11 Trustee (the "Trustee") of

Debtor Curepoint, LLC (the "Debtor"), files this complaint (the "Complaint")

against Defendants Phillip Miles ("Mr. Miles"), Jamila Dadabhoy ("Ms.

Dadabhoy"), MEC Capital, Inc. ("MEC"), Mittere, Inc. ("Mittere"), MMI

Educational Technologies, LLC ("MMI"), Northwinds Leasing, Inc.

1

("Northwinds"), and Physician Financial Partners, LLC ("PFP", together with MEC, Mittere, MMI, and Northwinds, collectively, the "Miles Entities"), as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334. This adversary proceeding arises in and relates to *In re Curepoint, LLC*, filed under Chapter 11 in the United States Bankruptcy Court for the Northern District of Georgia, Case No. 22-56501-pmb.

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

3.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (b)(2)(E), (b)(2)(F), (b)(2)(H), among others.

4.     The statutory predicates for the relief requested herein include sections 544(b), 547, 548, and 550 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), O.C.G.A. §§ 13-6-11, 18-2-74, 18-2-75, and Rules 6009, 7001, and 7054 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

5.     The Debtor consents to entry of final orders by the bankruptcy court.

## PARTIES

6.     The Trustee is the trustee of the Debtor's bankruptcy estate pursuant to the order entered by the Court on October 19, 2022. (DI 108).[1]

7.     The Debtor provided radiation therapy for cancer patients at a facility located at 2406 Bellevue Road, Suite 7, Dublin, Georgia 31021 (the "Bellevue Address").

8.     The Debtor's principal business address was 11175 Cicero Drive, Suite 100, Alpharetta, Georgia 30022 (the "Cicero Address").

9.     Mr. Miles is a natural person who resides at 300 Hayward Lane, Alpharetta, Georgia 30022.  Mr. Miles may be served with summons and complaint in compliance with Bankruptcy Rule 7004(b)(1) at either the Cicero Address or the 300 Hayward Lane, Alpharetta, Georgia 30022.

10.     Ms. Dadabhoy is a natural person who can be served with summons and complaint in compliance with Bankruptcy Rule 7004(b)(1) at either the Bellevue Address or the Cicero Address.

11.     MEC is a corporation, organized and existing under the laws of the State of Georgia that can be served with summons and complaint in compliance with

---

[1] References to "DI ___" or to "Claim No. ___" are to case 22-56501-pmb.

Bankruptcy Rule 7004(b)(3) on its registered agent, Mr. Miles with the registered agent address of 300 Hayward Lane, Alpharetta, Georgia 30022.

12.    Mittere is a corporation, organized and existing under the laws of the State of Georgia that can be served with summons and complaint in compliance with Bankruptcy Rule 7004(b)(3) on its registered agent, Mr. Miles with the registered agent address of 300 Hayward Lane, Alpharetta, Georgia 30022.

13.    MMI is a Georgia limited liability company that can be served with summons and complaint in compliance with Bankruptcy Rule 7004(b)(3) on its registered agent, Michael Miles with the registered agent address of 300 Hayward Lane, Alpharetta, Georgia 30022.

14.    Northwinds is a corporation, organized and existing under the laws of the State of Georgia that can be served with summons and complaint on its registered agent, Mr. Miles with the registered agent address of 300 Hayward Lane, Alpharetta, Georgia 30022.

15.    PFP is a Georgia limited liability company that can be served with a summons and complaint in compliance with Bankruptcy Rule 7004(b)(3) on its registered agent, Mr. Miles with the registered agent address of 300 Hayward Lane, Alpharetta, Georgia 30022.

## FACTUAL BACKGROUND

I.   **Mr. Miles and Ms. Dadabhoy's Relationship with the Debtor and the Miles Entities**

16.   At all relevant times, Debtor operated a cancer treatment facility providing radiation oncology services at the Bellevue Address.

17.   Upon information and belief, the Debtor did not generate any revenue for services rendered outside the Bellevue Address.

18.   In May 2014, that certain *Operating Agreement of CurePoint, LLC* (the "Operating Agreement") was executed, designating PFP as the sole member and manager of the Debtor.

19.   A true and correct copy of the Operating Agreement is attached hereto as **Exhibit A**.

20.   Pursuant to that certain *First Amendment to Curepoint, LLC Operating Agreement*, PFP owns 95.01% of the Debtor; the remaining 4.99% is owned by Radiation Business Solutions, Inc.  (*Id.*)

21.   Ms. Dadabhoy is sole manager of PFP.  Mot. to Appoint Trustee Hr'g Tr. 59:13-18, Oct. 12, 2022 ("Oct. 12 Tr.").

22.   A true and correct copy of the Oct. 12 Transcript is attached hereto as **Exhibit B**.

23.     As the sole manager of PFP, Ms. Dadabhoy had the corporate authority to exercise all managerial authority over the Debtor at all times relevant to this Complaint.   Oct. 12 Tr. 59:13-18.

24.     According to the testimony of Mr. Miles, PFP is partly owned by MEC. Miles Dep. 14:7-12, Oct. 10, 2022 (the "Miles Dep.").

25.     A true and correct copy of the Miles Dep. is attached hereto as **Exhibit C**.

26.     Mr. Miles owns 100% of MEC.  Sec. 341 Mtg. Tr. 25:17-18, Sept. 12, 2022 (the "341 Tr.").

27.     A true and correct copy of the 341 Tr. is attached hereto as **Exhibit D**.

28.     Ms. Dadabhoy is the President, Secretary, and Chief Operating Officer of MEC.  Oct. 12 Tr. 62:3-10.

29.     Mr. Miles owns 50% of Mittere.  341 Tr. 29:2-11.

30.     Ms. Dadabhoy owns the remaining 50% of Mittere.  (*Id.*)

31.     According to Mr. Miles testimony, Mr. Miles owns 50% of Northwinds.  (*Id.* at 30:6-15.)

32.     According to Mr. Miles testimony, Mr. Miles possesses an interest in MMI.  Oct. 12 Tr. 98:17-19.

33.   Mr. Miles is the manager of Zeroholdings.  (Zeroholdings DI 70).[2]

34.   Upon information and belief, including Mr. Miles's testimony, Mr. Miles owns or controls each of the Miles Entities.

## II.   The Debtor's Operating Processes

35.   As noted above, PFP is the sole manager of the Debtor.

36.   Ms. Dadabhoy is the sole manager of PFP.

37.   Consequently, Ms. Dadabhoy had the authority to exercise control over the Debtor.

38.   Section 5.3 of the Operating Agreement provides that:

> Unless authorized to do so by this Operating Agreement or by the Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it pecuniarily liable for any purpose.  No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

39.   Section 5.6 of the Operating Agreement provides, among other things, that:

> Each Manager shall act in a manner he believes in good faith to be in the best interest of the Company and ***with such care as an ordinarily prudent person in a like position would use under similar circumstances***. *(emphasis added)*

---

[2] "Zeroholdings DI __" refers to Case No. 22-56502-jwc, pending in the Bankruptcy Court for the Northern District of Georgia.

40.    Section 5.6 of the Operating Agreement also provides that:

No Manager shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member *except loss or damage resulting from such Manager's intentional misconduct or knowing violation of law or a transaction for which such Manager received a personal benefit in violation or breach of the provisions of this Operating Agreement.* (emphasis added)

41.    Section 5.7 of the Operating Agreement permits the Manager to contract and do business with any

Member or Manager or Affiliate of any Member or Manager…provided that such …dealings *are commercially reasonable and necessary or appropriate for Company purposes and the fees, prices or other compensation paid by the Company therefor is, in the good faith judgment of the Managers, reasonable and typical or competitive with the fees, prices or other compensation customarily paid for similar property or services in the same general area.* (emphasis added)

42.    Section 5.8 of the Operating Agreement provides, among other things, that:

A Member or Manager may lend money to and transact other business with the Company on terms *no less favorable than would be obtainable from an unaffiliated third Person*….No transaction with the Company shall be voidable solely because a Member or Manager has a direct or indirect interest in the transaction *if either the transaction is fair to the Company or the disinterested Members, in either case knowing the material facts of the transaction authorize, approve, or ratify the transaction*. (emphasis added)

8

### III.    The Debtor's Path to Bankruptcy

43.    At all times relevant to this Complaint, the Debtor was insolvent or unable to pay its debts as they became due.

44.    In or around 2018, the Debtor's linear accelerator, equipment used in the provision of radiation therapy, was removed from its place of business.

45.    The Debtor's linear accelerator was its primary, if not sole, revenue generating asset.

46.    As a result, the Debtor was unable to generate any revenues for at least four (4) months.

47.    As a result, the Debtor became insolvent and was unable satisfy its obligations as and when they became due.

48.    Also starting in 2018 and continuing to the Petition Date, the Debtor became involved in numerous state court actions between and among the Debtor, Mr. Miles, Ms. Dabadhoy, and other beneficial owners of the Debtor and certain of the Miles Entities.

49.    These actions involved allegations regarding the misappropriation of the Debtor's funds.

50.    The costs of litigation and the damages sustained from the Debtor's loss of its sole revenue generating asset rendered the Debtor insolvent.

51.    The costs of litigation and the damages sustained from the Debtor's loss of its sole revenue generating asset rendered the Debtor unable to pay its obligations as and when they arose.

52.    Starting in or around 2018, the Debtor entered into or became obligated in respect of numerous high interest merchant cash advance agreements that purported to pledge portions of its outstanding accounts receivables.

53.    The Debtor ultimately pledged more than 100% of its accounts receivable in conjunction with the merchant cash agreements.

54.    The encumbrance of the Debtor's accounts receivable further limited the Debtor's access to needed capital.

55.    As a result of the merchant cash agreements, the Debtor became obligated to make daily payments to the merchant cash lenders in addition to its obligations on its preexisting long term debt.

56.    Based upon review of the Debtor's and the Miles Entities' financial records, the proceeds of many of the merchant cash agreements went to the Miles Entities, not the Debtor.

57.    Upon information and belief, Mr. Miles caused proceeds of many of the merchant cash agreements to go to the Miles Entities, not the Debtor.

58.    As a result, the Debtor was unable to satisfy various obligations to certain creditors from 2018 to the Petition Date.

## IV.    The Bankruptcy Court's Findings Regarding Mr. Miles Use of the Debtor

59.    The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 19, 2022 (the "Petition Date"). (DI 1).

60.    Mr. Miles signed Debtor's petition as Designated Manager of the Debtor. (*Id*.)

61.    Upon information and belief, no resolution or any other document was executed designating Mr. Miles as officer or manager of the Debtor for the purposes of initiating a bankruptcy filing or acting as the Debtor's manager during the course thereof.

62.    According to Mr. Miles testimony, Mr. Miles has never been an officer or manager for the Debtor.  Oct. 12 Tr. 61:18-62:2.

63.    Between September 21, 2022 and October 3, 2022, several parties in the case sought the appointment of a chapter 11 trustee due to Mr. Miles's involvement in the case.  (DI 52, 54, and 68).

64.    A full evidentiary hearing on the motions to appoint a chapter 11 trustee occurred on October 12, 2022 (the "October 12 Hearing").

11

65.    On October 13, 2022, the Court issued an oral ruling granting the motions and directing the appointment of the chapter 11 trustee (the "October 13 Ruling").

66.    In its October 13 ruling, the Court found that "uncontradicted evidence and expert testimony" was presented "regarding the transfer of significant amounts of cash from the Debtor's bank account to entities owned or controlled by the Debtor's manager for purposes of this bankruptcy case, [Mr.] Miles."  Mot. to Appoint Trustee Hr'g Tr. 17:11-16, Oct. 13, 2022 ("Oct. 13 Tr.").

67.    A true and correct copy of the Oct. 13 Tr. is attached hereto as **Exhibit E**.

68.    The Court found that "[t]he evidence clearly established that [Mr.] Miles caused at least $2,748,777.43 of net cash to be transferred out of Curepoint's bank accounts to its related entities in the years preceding this case and no contrary evidence was offered to establish any consideration or documentation to support such transfers." (*Id*. at 17:17-22.)

69.    The Court further found that "the evidence established the following net transfer[s] out of Curepoint…." (*Id*. at 17:23-24.)

70.    "First, $596,095.88 from Curepoint to MEC [], a [Mr.] Miles entity." (*Id*. at 18:1-2.)

12

71.    "Second, $598,137.71 [from] Curepoint to [Zeroholding], a Miles – a [Mr.] Miles related entity."  (*Id*. at 18:2-4.)

72.    Third, "$280,404.55 from Curepoint to [Mittere], a [Mr.] Miles owned and operated entity."  (*Id*. at 18:4-6.)

73.    Finally, "$1,346,140.29 from Curepoint to Northwinds [], a [Mr.] Miles and Mark Miles owned and operated entity."  (*Id*. at 18:6-8.)

74.    The Court also found that Mr. Miles failed to fully disclose these transfers in both the Debtor's initial and amended schedules, which he signed under penalty of perjury.  (*Id*. at 18:9-17.)

75.    Ultimately, the Court found that over $2 million of preferential or fraudulent transfers occurred to the Miles Entities.  (*Id.* at 20:13-16.)

## V.    **The Funds Transfers**

76.    According to the testimony of Mr. Miles, Mr. Miles has never been elected or appointed by the members of the Debtor to serve as the Debtor's manager. Oct. 12 Tr. 95:15-18.

77.    Despite this, Mr. Miles testified at the 341 Meeting that he, not Ms. Dadabhoy, made all of the financial decisions for the Debtor since the Debtor's formation.  341 Tr. 30:25-31:15.

78.    Mr. Miles also testified that, since at least 2015, he directed the transfer of funds from the Debtor to the Miles Entities.  Oct. 12 Tr. 73:11-12.

79.    Mr. Miles testified further that, in directing transfers from the Debtor to the Miles Entities, he generally did not consult with Ms. Dadabhoy regarding such transfers.  (*Id.* at 76:20-78:1)

80.    Mr. Miles further testified that he effectively transferred funds from the Debtor to the Miles Entities without restriction or limitation.  (*Id.* at 79:20-23.)

81.    Based on, among other things, Mr. Miles's testimony, there are no loan documents or any other documents evidencing any obligation of the Debtor to make any transfer to the Miles Entities.  341 Tr. 65:2-10; Oct. 12 Tr. 78:2-20.

82.    Based on, among other things, Mr. Miles's testimony, there are no promissory notes, interest rates, due dates, or other customary documents that evidence any obligation owed by the Debtor to the Miles Entities.  Oct. 12 Tr. 78:2-20; 341 Tr. 27:12-21; 29:24-30:2; 31:18-32:1; 32:11-14.

83.    Upon information and belief, including the testimony of Mr. Miles, the Debtor was under no obligation to transfer any funds to any Miles Entity.

A.    **The Zeroholdings Transfers**

84.    According to documents admitted into evidence at the October 12 Hearing and the Debtor's Statement of Financial Affairs ("SOFA"), in the two (2)

14

years prior to the Petition Date, Debtor transferred to Zeroholdings funds in an amount not less than $587,100 (the "ZH 2 Year Transfers"). (DI 86, Ex. 1).

85.    Moreover, in the four (4) years prior to the Petition Date, the Debtor transferred to Zeroholdings funds in an amount not less than $799,600 (the "ZH 4 Year Transfers", together with the ZH 2 Year Transfers, the "ZH Transfers").  (*Id.*)

86.    Mr. Miles caused the ZH Transfers.  *See* 341 Tr. 31:5-15; Oct. 12 Tr. 76:20-78:1.

87.    The Debtor had no obligation to make the ZH Transfers.

88.    At the time of the ZH Transfers, the Debtor was insolvent or became insolvent as a result thereof.

89.    At the time of the ZH Transfers, the Debtor was left without sufficient cash to operate its business.

90.    At the time of the ZH Transfers, the Debtor believed that it would incur debts beyond its ability repay as they matured.

**B.    The Northwinds Transfers**

91.    According to the Debtor's SOFA, in the 90 days prior to the Petition Date, the Debtor transferred to Northwinds funds in an amount not less than $45,000 (the "NW 90 Day Transfers").

15

92.    In the two (2) years prior to the Petition Date, the Debtor transferred to Northwinds funds in an amount not less than $646,421.17 (the "NW 2 Year Transfers").  (DI 82, SOFA).

93.    In the four (4) years prior to the Petition Date, the Debtor transferred to Northwinds funds in an amount not less than $2,849,863.47 (the "NW 4 Year Transfers", together with the NW 90 Day Transfers and NW 2 Year Transfers, the "NW Transfers").  (*Id*.); (DI 86, Ex. 2).

94.    Mr. Miles caused the NW Transfers.  *See* 341 Tr. 31:5-15; Oct. 12 Tr. 76:20-78:1.

95.    The Debtor had no obligation to make the NW Transfers.

96.    At the time of the NW Transfers, the Debtor was insolvent or became insolvent as a result thereof.

97.    At the time of the NW Transfers, the Debtor was left without sufficient cash to operate its business.

98.    At the time of the NW Transfers, the Debtor believed that it would incur debts beyond its ability repay as they matured.

C.    **The MEC Transfers**

99.    According to the Debtor's SOFA, in the 90 days prior to the Petition Date, the Debtor transferred to MEC funds in an amount not less than $20,000 (the "MEC 90 Day Transfers").  (DI 82, SOFA.)

100.    In the two (2) years prior to the Petition Date, the Debtor transferred to MEC funds in an amount not less than $326,675.80 (the "MEC 2 Year Transfers").  (*Id.*)

101.    In the four (4) years prior to the Petition Date, the Debtor transferred to MEC funds in an amount not less than $570,375.80 (the "MEC 4 Year Transfers", together with the MEC 90 Day Transfers and MEC 2 Year Transfers, the "MEC Transfers").  (*Id.*); (DI 86, Ex. 3.)

102.    Upon information and belief, Mr. Miles caused the MEC Transfers.  *See* 341 Tr. 31:5-15; Oct. 12 Tr. 76:20-78:1.

103.    The Debtor had no obligation to make the MEC Transfers.

104.    At the time of the MEC Transfers, the Debtor was insolvent or became insolvent as a result thereof.

105.    At the time of the MEC Transfers, the Debtor was left without sufficient cash to operate its business.

106.    At the time of the MEC Transfers, the Debtor believed that it would incur debts beyond its ability repay as they matured.

**D.    The MMI Transfers**

107.    According to the Debtor's SOFA, in the 90 days prior to the Petition Date, the Debtor transferred to MMI funds in an amount not less than $4,150 (the "MMI 90 Day Transfers").  (DI 82, SOFA).

108.    In the two (2) years prior to the Petition Date, the Debtor transferred to MMI funds in an amount not less than $16,100 (the "MMI 2 Year Transfers", together with the MMI 90 Day Transfers, the "MMI Transfers"). (*Id.*)

109.    Mr. Miles caused the MMI Transfers.  *See* 341 Tr. 31:5-15; Oct. 12 Tr. 76:20-78:1.

110.    The Debtor had no obligation to make the MMI Transfers.

111.    At the time of the MMI Transfers, the Debtor was insolvent or became insolvent as a result thereof.

112.    At the time of the MMI Transfers, the Debtor was left without sufficient cash to operate its business.

113.    At the time of the MMI Transfers, the Debtor believed that it would incur debts beyond its ability repay as they matured.

**E.**     **The Mittere Transfers**

114.    According to the Debtor's SOFA, in the 90 days prior to the Petition Date, the Debtor transferred to Mittere funds in an amount not less than $133,087.50 (the "Mittere 90 Day Transfers").  (DI 82, SOFA.)

115.    In the two (2) years prior to the Petition Date, the Debtor transferred to Mittere funds in an amount not less than $2,157,665.50 (the "Mittere 2 Year Transfers"). (*Id.*)

116.    In the four (4) years prior to the Petition Date, the Debtor transferred to Mittere funds in an amount not less than $2,215,048.05 (the "Mittere 4 Year Transfers", together with the Mittere 90 Day Transfers and Mittere 2 Year Transfers, the "Mittere Transfers").  (*Id.*); (DI 86, Ex. 4.)

117.    Upon information and belief, Mr. Miles caused the Mittere Transfers. *See* 341 Tr. 31:5-15; Oct. 12 Tr. 76:20-78:1.

118.    The Debtor had no obligation to make the Mittere Transfers.

119.    At the time of the Mittere Transfers, the Debtor was insolvent or became insolvent as a result thereof.

120.    At the time of the Mittere Transfers, the Debtor was left without sufficient cash to operate its business.

121.   At the time of the Mittere Transfers, the Debtor believed that it would incur debts beyond its ability repay as they matured.

**F.    The PFP Transfers**

122.   According to the Debtor's SOFA, in the 90 days prior to the Petition Date, the Debtor transferred to PFP funds in an amount not less than $7,984.44 (the "PFP 90 Day Transfers").  (DI 82, SOFA).

123.   In the two (2) years prior to the Petition Date, the Debtor transferred to PFP funds in an amount not less than $55,384.44 (the "PFP 2 Year Transfers"). (*Id.*)

124.   In the four (4) years prior to the Petition Date, the Debtor transferred to PFP funds in an amount not less than $75,684.44 (the "PFP 4 Year Transfers", together with the PFP 90 Day Transfers and PFP 2 Year Transfers, the "PFP Transfers").  (*Id*.)

125.   Upon information and belief, Mr. Miles caused the PFP Transfers.

126.   The Debtor had no obligation to make the PFP Transfers.

127.   At the time of the PFP Transfers, the Debtor was insolvent or became insolvent as a result thereof.

128.   At the time of the PFP Transfers, the Debtor was left without sufficient cash to operate its business.

129.    At the time of the PFP Transfers, the Debtor believed that it would incur debts beyond its ability repay as they matured.

130.    The ZH Transfers, NW Transfers, MEC Transfers, MMI Transfers, Mittere Transfers, and PFP Transfers are collectively, the "Miles Entities Transfers".

131.    Based on, among other things, Mr. Miles's testimony, there are no loan documents or any other documents evidencing any obligation of the Debtor to make any of the Miles Entities Transfers.  341 Tr. 65:2-10; Oct. 12 Tr. 78:2-20.

132.    Based on, among other things, Mr. Miles's testimony, there are no promissory notes, interest rates, due dates, or other customary documents that evidence any of the Miles Entities Transfers.  Oct. 12 Tr. 78:2-20; *See* 341 Tr. 27:12-21; 29:24-30:2; 31:18-32:1; 32:11-14.

133.    Aside from Mr. Miles and Ms. Dadabhoy, the Debtor has no connection to the Miles Entities.

134.    The Debtor had no obligation to make the Miles Entities Transfers.

135.    The Debtor transferred more funds to the Miles Entities than it received from the same.

136.    The Debtor did not receive reasonably equivalent value in exchange for the Miles Entities Transfers.

## VI.    **Mr. Miles Obligating Debtor on the Debts of Miles Entities**

21

137.  As described below, Mr. Miles obligated the Debtor on several agreements involving the Miles Entities for which the Debtor received no or less than reasonably equivalent value in return.

A.    **The Newtek Guaranty**

138.  Newtek Small Business Finance, LLC ("Newtek") asserts an unsecured claim against the Debtor in the total amount of $3,431,841.65 (the "Newtek Claim") arising from a loan agreement by and between Zeroholdings and Newtek dated March 18, 2022 (the "Newtek Loan"). (Claim No. 11.)

139.  The Newtek Loan is in the principal amount of $3,500,000.

140.  The Newtek Loan was signed by Mr. Miles as the "President of MEC Capital, Inc."

141.  Accompanying the Newtek Loan, and as security for the same, is an Unconditional Guarantee executed by Debtor in favor of Newtek (the "Newtek Guaranty").

142.  The Newtek Guaranty is signed by Mr. Miles as "Manager of Curepoint, LLC".

143.  At all times relevant to the Newtek Loan, Mr. Miles was not the manager of Debtor.

144.    Mr. Miles testified at the October 12 Hearing that he misrepresented his authority to obligate the Debtor on the Newtek Loan and Newtek Guaranty.  Oct. 12 Tr. 94:21-96:20.

145.    Mr. Miles testified that the Debtor did not hold a meeting relative to the Newtek Loan or Newtek Guaranty, despite Mr. Miles representing that it had occurred.  (*Id.*)

146.    Mr. Miles testified that the Debtor did not adopt or execute any resolution regarding the Newtek Loan or Newtek Guaranty, despite Mr. Miles representing that this had occurred.  (*Id.*)

147.    Upon information and belief, Mr. Miles lacked the authority to sign the Newtek Loan.

148.    Upon information and belief, including Mr. Miles's testimony, the "vast majority [of the proceeds of the Newtek Loan] went to pay off" Zeroholdings' obligations.  Oct. 12 Tr. 108:14-109:9.

149.    The Debtor did not receive any benefit from the Newtek Loan.

150.    Debtor did not receive reasonably equivalent value from the Newtek Loan.

151.    Mr. Miles signed the Newtek Loan when a substantial portion of the Debtor's accounts receivable was encumbered.

152.   Mr. Miles signed the Newtek Loan when the Debtor did not have sufficient cash flow to sustain its business.

153.   Mr. Miles signed the Newtek Loan when the Debtor was insolvent.

154.   After Mr. Miles signed the Newtek Loan, Debtor did not have sufficient cash flow to sustain its business. Debtor was left with unreasonably small capital to operate its business.

155.   When Mr. Miles signed the Newtek Loan, the Debtor believed it would incur debts that would be beyond the Debtor's ability to pay such debts as they matured.

**B.    The Merchant Cash Advance Agreements**

1.    Secure Capital MCA

156.   Secure Capital, LLC filed a claim against the Debtor, asserting an allegedly secured claim for $162,141.00 in respect of an alleged merchant cash advance agreement, dated February 9, 2022 (the "Secure Capital MCA").  (Claim No. 23.)

157.   The Secure Capital MCA reflects the purported sale and assignment of 10% of the Debtor's outstanding accounts receivable and requires daily payments in the amount of $6,000.  (*Id.*)

158.    Secure Capital purports to possess an all asset lien against the Debtor as a result of the Secure Capital MCA.  (*Id.*)

159.    The Secure Capital MCA lists Debtor as "Merchant". (*Id.*)

160.    Mr. Miles executed the Secure Capital MCA as "Owner". (*Id.*)

161.    Upon information and belief, at all times relevant to the Secure Capital MCA, Mr. Miles was not the owner of the Debtor.

162.    Upon information and belief, Mr. Miles lacked the authority to obligate Debtor on the Secure Capital MCA.

163.    The Debtor did not receive the funds provided under the Secure Capital MCA.

164.    Certain of the Miles Entities received the funds provided under the Secure Capital MCA.

165.    The Debtor did not receive any benefit or value from the funds provided under the Secure Capital MCA.

166.    Instead, the Debtor's business was damaged by the purported sale of 10% of its outstanding accounts receivables and the all asset lien alleged by Secure Capital.

167.    After negotiations with the Trustee, Secure Capital has agreed to a general unsecured claim of $81,070.50.  (DI 324, 325.)

25

168.   The Debtor's estate has suffered damage by incurring costs, including legal fees, relating to the Secure Capital MCA.

169.   The Debtor's estate will suffer damage to the extent Secure Capital receives a distribution on its claim.

### 2.   Premium Merchant

170.   Premium Merchant Funding 18, LLC ("PMF") filed a claim against Debtor, alleging a secured claim in the amount of $390,714.20 as a result of a merchant agreement dated February 16, 2022 (the "PMF MCA"). (Claim No. 22.)

171.   The PMF MCA purports to sell and assign to PMF 15% of the Debtor's outstanding accounts receivables and requires daily payments in the amount of $8,514.29. (*Id.*)

172.   The PMF MCA identifies "Curepoint LLC/ Zeroholding LLC" as the merchant. (*Id.*)

173.   Mr. Miles executed the PMF MCA as the purported "Owner". (*Id.*)

174.   Upon information and belief, at all times relevant to the PMF MCA, Mr. Miles was not the owner of the Debtor.

175.   Upon information and belief, Mr. Miles lacked the authority to obligate Debtor on the PMF MCA.

176.   Debtor did not receive the funds provided for under the PMF MCA.

177.   Certain of the Miles Entities received the funds provided for under the PMF MCA.

178.   The Debtor did not receive a benefit from the funds provided under the PMF MCA.

179.   Instead, the Debtor's business was damaged by the purported sale of 15% of its outstanding accounts receivables.

180.   After negotiations with the Trustee, PMF has agreed to a general unsecured claim in the amount of $225,000. (DI 304, 308.)

181.   The Debtor's estate has suffered damage by incurring costs, including legal fees, relating to the PMF MCA.

182.   The Debtor's estate will suffer damage to the extent PMF receives a distribution on its claim.

### 3.    City Capital

183.   City Capital NY filed two claims against the Debtor, alleging secured claims totaling $893,340 as a result of two revenue purchase agreements, dated June 16, 2022 and June 28, 2022, respectively (the "City Capital MCAs").  (Claim No. 27, 28).

184.   The June 16, 2022 agreement purports to sell and assign to City Capital 20% of the Debtor's outstanding accounts receivable and requires a daily payment in the amount of $7,250.  (*Id*.)

185.   The June 28, 2022 agreement purports to sell and assign to City Capital 20% of the Debtor's outstanding accounts receivable and requires a daily payment in the amount of $9,000.  (*Id.*)

186.  The City Capital MCAs list "CUREPOINT, LLC AND ALL ENTITIES LISTED ON 'EXHIBIT A'" as the "Merchant".  (*Id.*)

187.   The City Capital MCAs list certain Miles Entities on Exhibit A to the City Capital MCAs.  (*Id.*)

188.   Mr. Miles purported to execute the City Capital MCAs as "Owner" of Debtor.  (*Id.*)

189.   Upon information and belief, at all times relevant to the City Capital MCAs, Mr. Miles was not the "Owner" of the Debtor.

190.   Upon information and belief, Mr. Miles lacked the authority to obligate Debtor on the City Capital MCAs.

191.   The Debtor did not receive the funds provided for under the City Capital MCAs.

192.    Certain of the Miles Entities received the funds provided for under the City Capital MCAs.

193.    The Debtor did not receive any benefit from the funds provided for under the City Capital MCAs.

194.    Instead, the Debtor's business was damaged by the purported sale of 40% of its outstanding accounts receivables.

195.    After negotiations with the Trustee, City Capital agreed to general unsecured claims totaling $446,670.  (DI 309, 310).

196.    The Debtor's estate has suffered damage by incurring costs, including legal fees, relating to the City Capital MCAs.

197.    The Debtor's estate will suffer damage to the extent City Capital receives a distribution on its claims.

### 4.    Click Capital

198.    Click Capital Group asserts a secured claim against Debtor in the total amount of $551,068.00, as a result of two merchant cash advance agreements, executed on July 5, 2022 and July 19, 2022, respectively (the "Click Capital MCAs").  (Claim No. 26.)

199.   The July 5, 2022 agreement purports to sell and assign to Click Capital 12% of the Debtor's outstanding accounts receivables and requires a daily payment in the initial amount of $4,138.00. (*Id.*)

200.   The July 19, 2022 agreement purports to sell and assign to Click Capital 21.63% of the Debtor's outstanding accounts receivable and requires a daily payment in the initial amount of $6,000 per day.  (*Id.*)

201.   Together, the Click Capital MCAs purport to sell and assign 33.63% of the Debtor's outstanding accounts receivable.  (*Id.*)

202.   Click Capital purports to possess an all asset lien against the Debtor as a result of the Click Capital MCAs.  (*Id.*)

203.   The "Merchant" listed on both agreements is "Zeroholding, LLC, and all entities listed on Exhibit A."  (*Id.*)

204.   The Debtor is listed as a "Merchant" on the attached Exhibit A.  (*Id.*).

205.   Mr. Miles executed the agreement on behalf of Debtor by stating that he was "Owner" of Debtor.  (*Id.*)

206.   Upon information and belief, at all times relevant to the Click Capital MCAs, Mr. Miles was not the owner of the Debtor.

207.   Upon information and belief, Mr. Miles lacked the authority to obligate Debtor on the Click Capital MCAs.

208. The Debtor did not receive the funds provided for under the Click Capital MCAs. Oct. 12 Tr. 97:1-9.

209. Zeroholdings or one of the other Miles Entities received the funds provided for under the Click Capital MCAs. (*Id.*)

210. The Debtor did not receive any value from the Click Capital MCAs.

211. Instead, the Debtor's business was damaged by the purported sale of 33.63% of its outstanding accounts receivables and the all asset lien filed by Click Capital.

212. After negotiations with the Trustee, Click Capital agreed to a full and final settlement of its claim for a one-time payment of $105,000. (DI 328, 329).

213. The Debtor's estate will suffer damage to the extent Click Capital receives such payment.

214. The Debtor's estate has suffered damage by incurring costs, including legal fees, relating to the Click Capital MCAs.

215. The Click Capital MCAs, Secure Capital MCA, City Capital MCAs, and PMF MCA are, collectively, the "MCAs".

## VII.    **The CurePoint Dublin Lease**

216. On or around October 27, 2014, pursuant to that certain *Assignment, Assumption and Amendment of Lease Agreement and Consent of Landlord* (the

"Carmike Lease"), Debtor became the assignee and tenant to a lease agreement with Carmike Realty II, LLC ("Carmike") as landlord.

217.  Under the Carmike Lease, the monthly base rent payments totaled $9,968.75.

218.  On or around August 1, 2019, Debtor and Carmike entered into that certain *First Amendment to Lease Agreement* (the "First Amendment").

219.  The First Amendment increased the monthly base rent to $11,968.75, effective as of January 1, 2020, and provided for a two percent (2%) increase in monthly base rent each year.

220.  On or around June 5, 2020, Carmike and Curepoint Dublin entered into that certain *Assignment and Assumption Lease* whereby Carmike assigned the Carmike Lease (and accompanying amendments) to CurePoint Dublin.

221.  Consequently, Curepoint Dublin became the landlord of Debtor.

222.  On or around June 1, 2021, Curepoint Dublin and Debtor entered into that certain *Second Amendment to Lease Agreement* (the "Curepoint Dublin Amendment").

223.  The Curepoint Dublin Amendment increased monthly base rent from $11,968.75 per month to $17,000 per month and extended the lease term to expire on May 31, 2031.

224. Mr. Miles signed the Curepoint Dublin Amendment on behalf of Debtor.

225. Upon information and belief, Mr. Miles lacked the authority to obligate Debtor on the Curepoint Dublin Amendment. (*Id.*)

226. Curepoint Dublin was organized by Michael Miles, the son of Mr. Miles, on or around June 18, 2020.

227. At all relevant times, CurePoint Dublin's principal office address was the Cicero Address.

228. CurePoint Dublin's Annual Registration filed with the Georgia Secretary of State on February 31, 2021, listed Michael Miles as the Registered Agent for CurePoint Dublin.

229. At all relevant times, CurePoint Dublin's registered office was Mr. Miles home address – 300 Hayward Lane, Alpharetta, GA 30222.

230. Upon information and belief, Mr. Miles was involved with the creation of CurePoint Dublin.

231. Upon information and belief, Mr. Miles was involved with the ownership of CurePoint Dublin.

232.    Upon information and belief, Mr. Miles caused the Debtor to enter into the Curepoint Dublin Amendment with CurePoint Dublin to the Debtor's financial detriment.

233.    Upon information and belief, Mr. Miles caused the Debtor to enter into the Curepoint Dublin Amendment for his own personal benefit or that of his affiliates.

234.    Upon information and belief, the Curepoint Dublin Amendment was not entered into in good faith.

235.    Upon information and belief, the Curepoint Dublin Amendment was not an arms-length transaction.

236.    Upon information and belief, the Curepoint Dublin Amendment was not reflective of market rates (especially in light of the then on-going COVID-19 pandemic).

237.    Based on the Curepoint Dublin Amendment, during the one-year period preceding the Debtor's bankruptcy filing, the Debtor was obligated to pay CurePoint Dublin, at a minimum, $65,406.25 more than it would have paid to Carmike or another landlord under a lease negotiated at arms-length and one reflective of actual market rates.

## VIII.  **The Equipment Related Transactions**

238.   Mr. Miles, for his own pecuniary interests, caused the Debtor to incur substantial debt and obligations relative to the leasing of equipment that the Debtor did not receive or use in the operation of its business.

### A.   Arvest Equipment Lease

239.   On or around November 16, 2021, Mr. Miles caused the Debtor to enter into a certain *Equipment Finance Agreement* (the "First Arvest Finance Agreement") with Arvest Equipment Finance ("Arvest") providing for the financing of various printing and copier equipment.  (Claim No. 8).

240.   The total amount financed under the First Arvest Finance Agreement totaled $699,859.00.  (*Id.*)

241.   The First Arvest Finance Agreement purported to obligate Debtor to make monthly payments to Arvest in the amount of $16,203.38.  (*Id.*)

242.   Mr. Miles purported to execute the First Arvest Finance Agreement as the Debtor's "Member/Manager".  (*Id.*)

243.   Arvest filed a claim against the Debtor with respect to the first Arvest Finance Agreement, alleging a secured claim in the amount of $622,325.79.  (*Id.*)

244.   On or around November 1, 2021, Mr. Miles purportedly caused the Debtor to enter into another *Equipment Finance Agreement* (the "Second Arvest Finance Agreement" and, together with the First Arvest Finance Agreement, the

"Arvest Finance Agreements") with Arvest in the principal amount of $179,399. (Claim No. 9.)

245.  The Second Arvest Finance Agreement purported to obligate Debtor to make monthly payments to Arvest in the amount of $5,490.79.  (*Id.*)

246.  Mr. Miles purported to execute the Second Arvest Finance Agreement as the Debtor's "Manager".  (*Id.*)

247.  Arvest filed a claim against the Debtor with respect to the Second Arvest finance Agreement, alleging a secured claim in the amount of $147,695.16. (*Id.*)

248.  At all times relevant to the Arvest Finance Agreements, Mr. Miles was neither a Member nor a Manager of the Debtor.

249.  Upon information and belief, Mr. Miles lacked the authority to obligate Debtor on the Arvest Finance Agreements.

250.  The Arvest Finance Agreements related to financing certain pieces of printer and copier equipment (the "Arvest Copiers").

251.  The Arvest Copiers were not used in the Debtor's operations.  341 Tr. 74:13-75:8.

252.  Upon information and belief, Mr. Miles used or caused entities affiliated with him to use the Arvest Copiers for their benefit.  (*See id.)*

36

253.   Upon information and belief, Mr. Miles or entities affiliated with him (not the Debtor) received and retained revenues generated from the Arvest Copiers.

254.   While the Debtor did not use or benefit from the Arvest Copiers, the Debtor paid Arvest $179,044.15 on account of the Arvest Finance Agreements.

### B.    First American Commercial Bancorp

255.   On or around February 18, 2022, Mr. Miles purportedly caused the Debtor to enter into that certain *Lease Agreement* (the "First American Lease") with First American Commercial Bancorp, Inc. ("First American") providing for the lease of various copiers and printers (the "First American Equipment").  (*See* Claim No. 10).

256.   The First American Lease shows the Cicero Address as the Debtor's address.  (*Id.*)

257.   The First American Lease required monthly payments from the Debtor to First American in the amount of $3,732.97.  (*Id.*)

258.   Mr. Miles executed the First American Lease agreement as the purported "Owner" of the Debtor.  (*Id.*)

259.   At all times relevant to the First American Lease, Mr. Miles was not the owner of the Debtor.

260.    Upon information and belief, Mr. Miles lacked the authority to obligate Debtor on the First American Lease.

261.    As set forth in the First American Lease, the First American Equipment was delivered to the Cicero Address.  (*Id.*)

262.    Upon information and belief, the First American Equipment was never delivered to the Bellevue Address.

263.    Upon information and belief, the First American Equipment was not used in the Debtor's operations.

264.    Upon information and belief, Mr. Miles used or caused entities affiliated with him to use the First American Equipment for their benefit.

265.    Upon information and belief, Mr. Miles or entities affiliated with him (not the Debtor) received and retained revenues generated from the First American Equipment.

266.    First American filed a claim against the Debtor alleging a claim in the amount of $190,405.15.

267.    The Debtor and its estate will be damaged to the extent that First American receives a distribution on its claim.

## C.    Arrow Capital Solutions

268.   On or around November 22, 2021, Mr. Miles caused the Debtor to enter into that certain *Installment Payment Agreement* (the "<u>Arrow Agreement</u>") with Arrow Capital Solutions ("<u>Arrow</u>") providing for the financing of various printers and copiers (the "<u>Arrow Equipment</u>").  (*See* Claim No. 6.)

269.   The Arrow Agreement required monthly payments from the Debtor to Arrow in the amount of $2,484.17.  (*Id*.)

270.   Mr. Miles executed the Arrow Agreement as the purported "MGR" of the Debtor.  (*Id*.)

271.   At the time Mr. Miles executed the Arrow Agreement, he was not the "MGR" of Debtor.

272.   At the time Mr. Miles executed the Arrow Agreement, he was not the manager of Debtor.

273.   Upon information and belief, Mr. Miles lacked the authority to obligate Debtor on the Arrow Agreement.

274.   Upon information and belief, the Arrow Equipment was never delivered to the Bellevue Address.

275.   Upon information and belief, the Arrow Equipment was not used in the Debtor's operations.

276.   Upon information and belief, the Debtor received no benefit from the Arrow Equipment.

277.   Upon information and belief, Mr. Miles used or caused entities affiliated with him to use the Arrow Equipment for their benefit.

278.   Upon information and belief, Mr. Miles or entities affiliated with Mr. Miles (not the Debtor) received and retained revenues generated from the Arrow Equipment.

279.   On or around April 22, 2022, Arrow assigned the agreement to U.S. Bank, N.A. ("U.S. Bank").

280.   U.S. Bank filed a claim against the Debtor alleging a secured claim in the amount of $131,661.01.

281.   The Debtor paid an amount not less than $13,747.30 prior to the Petition Date under the Arrow Agreement.

282.   The Debtor and its estate will be further damaged to the extent that U.S. Bank receives a distribution on its claim.

### D.    Hewlett-Packard Financial Services

283.   On or around November 2, 2021, Mr. Miles caused the Debtor to enter into that certain *Business Lease Agreement* (the "HP Agreement") with Hewlett-Packard Financial Services Company ("HP") providing for the leasing and/or

financing of various copiers, printers, and related office equipment (the "HP Equipment"). (*See* Claim No. 12).

284.  The HP Agreement required monthly payments form the Debtor to HP in the amount of $2,583.96. (*Id.*)

285.  Mr. Miles executed the agreement as the purported "Manager" of the Debtor. (*Id.*)

286.  At all times relevant to the HP Agreement, Mr. Miles was not the Manager of the Debtor.

287.  Upon information and belief, Mr. Miles lacked the authority to obligate Debtor on the HP Agreement.

288.  Upon information and belief, the HP Equipment was never delivered to the Bellevue Address.

289.  Upon information and belief, the Debtor received no benefit from the HP Equipment.

290.  Upon information and belief, the HP Equipment was not used in the Debtor's operations.

291.  Upon information and belief, Mr. Miles used or caused entities affiliated with him to use the HP Equipment for their benefit.

292.   Upon information and belief, Mr. Miles or entities affiliated with him (not the Debtor) received and retained revenues generated from the HP Equipment.

293.   The Debtor paid HP $31,115.40 on account of the HP Agreement.

294.   HP filed a claim against the Debtor alleging a claim in the amount of $126,613.55.

### E.    North American Banking Company

295.   On or about November 15, 2021, Mr. Miles caused the Debtor to enter into that certain *EFA Agreement* (the "North American EFA") with North American Banking Company ("North American"), involving the financing of various copiers and copier equipment (the "North American Equipment").

296.   The North American EFA required monthly payments from the Debtor to North American in the amount of $1,706.68.

297.   Mr. Miles executed the North American EFA as the purported "Manager" of the Debtor.

298.   At all times relevant to the North American EFA, Mr. Miles was not the Manager of the Debtor.

299.   Upon information and belief, Mr. Miles lacked the authority to obligate Debtor on the North American EFA.

300.   Upon information and belief, the North American Equipment was never delivered to the Bellevue Address.

301.   Upon information and belief, the Debtor received no benefit from the North American Equipment.

302.   Upon information and belief, the North American Equipment was not used in the Debtor's operations.

303.   Upon information and belief, Mr. Miles used or caused entities affiliated with him to use the North American Equipment for their benefit.

304.   Upon information and belief, Mr. Miles or entities affiliated with him (not the Debtor) received and retained revenues generated from the North American Equipment.

305.   The Debtor paid North American $27,306.88 on account of the North American EFA.

306.   The Arvest Finance Agreements, First American Lease, Arrow Agreement, HP Agreement, North American EFA are, collectively, the "Equipment Agreements".

307.   Upon information and belief, the Debtor did not use the Arvest Copiers, the Arrow Equipment, the First American Equipment, the HP Equipment, or the North American Equipment (collectively, the "Equipment").

308.   Upon information and belief, though Mr. Miles obligated the Debtor to pay amounts in respect of the Equipment Agreements, the Equipment was used by and benefited entities other than the Debtor.

309.   Upon information and belief, Mr. Miles or the Miles Entities (not the Debtor) received the Equipment and used it to receive and retain revenues generated therefrom.

## COUNT I

**(Avoidance and Recovery of Preferential Payments Pursuant to 11 U.S.C. §§ 547 and 550 With Respect to MEC and Phillip Miles)**

310.   The Debtor incorporates the paragraphs 43-83 and 99-106 of the Complaint as if fully alleged herein.

311.   MEC was, at most, an unsecured creditor of the Debtor.

312.   The MEC 90 Day Transfers occurred within 90 days prior to the Petition Date.

313.   The MEC 90-Day Transfers were transfers of an interest in property of the Debtor.

314.   The MEC 90 Day Transfers were made on account of an antecedent debts owed by Debtor to MEC.

315.   The MEC 90 Day Transfers were made to or for the benefit of MEC or Mr. Miles.

44

316.   The MEC 90 Day Transfers were made while the Debtor was insolvent.

317.   The MEC 90 Day Transfers enabled MEC to receive more than it would in a chapter 7 case, the transfer had not been made, and MEC received payment to the extent entitled under the Bankruptcy Code.

318.   Accordingly, the Debtor is entitled under 11 U.S.C. § 547(b) to avoid an amount not less than $20,000 as a result of all amounts transferred to MEC during the 90 days prior to the Petition Date in and taking into account MEC's reasonably knowable affirmative defenses.

319.   The Debtor is entitled to recover the value of any monies so transferred to MEC or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## **COUNT II**

### **(Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548 and 550 With Respect to MEC and Phillip Miles)**

320.   The Debtor incorporates the paragraphs 43-83 and 99-106 of the Complaint as if fully alleged herein.

321.   The MEC 2 Year Transfers occurred within two years of the Petition Date.

322.   The Debtor received less than reasonably equivalent value for the MEC 2 Year Transfers.

323.   At the time the Debtor made the MEC 2 Year Transfers, Debtor was insolvent.

324.   The Debtor was rendered insolvent by the MEC 2 Year Transfers.

325.   After the Debtor made the MEC 2 Year Transfers, it was left with unreasonably small capital to operate its business.

326.   The MEC 2 Year Transfers were made at a time when Debtor believed it would incur debts that would be beyond the Debtor's ability to pay as such debts as they matured.

327.   At all relevant times, the Debtor had at least one creditor prior to making the transfer, First Liberty Capital Partners, LLC.

328.   Accordingly, the Debtor is entitled under 11 U.S.C. § 548(a)(1)(B) to avoid all amounts transferred to MEC during the two years prior to the Petition Date in an amount not less than $326,675.80.

329.   The Debtor is entitled to recover the value of any monies so transferred to MEC or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## COUNT III

**(Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. § 544 and O.C.G.A. §§ 18-2-74 and 18-2-75 with Respect to MEC and Phillip Miles)**

330.   The Debtor incorporates the paragraphs 43-83 and 99-106 of the Complaint as if fully alleged herein.

331.   The MEC 4 Year Transfers occurred within four years of the Petition Date.

332.   At all times relevant hereto, the Debtor had at least one creditor prior to and during all relevant periods, First Liberty Capital Partners, LLC.

333.   The Debtor did not receive reasonably equivalent value in connection with the MEC 4 Year Transfers.

334.   At the time the Debtor made the MEC 4 Year Transfers, it was insolvent.

335.   The Debtor became insolvent as a result of the MEC 4 Year Transfers.

336.   After the Debtor made the MEC 4 Year Transfers, it was left with unreasonably small capital to operate its business.

337.   The MEC 4 Year Transfers were made at a time when Debtor believed it would incur debts that would be beyond the Debtor's ability to pay as such debts as they matured.

338.   Accordingly, the Debtor is entitled under O.C.G.A. §§ 18-2-74 and 18-2-75 and Section 544 of the Bankruptcy Code to avoid all amounts transferred to

MEC during the four years prior to the Petition Date in an amount not less than $570,375.80.

339.   The Debtor is entitled to recover the value of any monies so transferred to MEC or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## **COUNT IV**

**(Avoidance and Recovery of Preferential Payments Pursuant to 11 U.S.C. §§ 547 and 550 With Respect to Northwinds and Phillip Miles)**

340.   The Debtor incorporates the paragraphs 43-83 and 91-98 of the Complaint as if fully alleged herein.

341.   Northwinds was, at most, an unsecured creditor of the Debtor.

342.   The NW 90 Day Transfers occurred within 90 days prior to the Petition Date.

343.   The NW 90-Day Transfers were transfers of an interest in property of the Debtor.

344.   The NW 90 Day Transfers were made on account of an antecedent debts owed by Debtor to NW.

345.   The NW 90 Day Transfers were made to or for the benefit of Northwinds.

346.   The NW 90 Day Transfers were made while the Debtor was insolvent.

347.   The NW 90 Day Transfers enabled Northwinds to receive more than it would in a chapter 7 case, the transfer had not been made, and Northwinds received payment to the extent entitled under the Bankruptcy Code.

348.   Accordingly, the Debtor is entitled under 11 U.S.C. § 547(b) to avoid an amount not less than $24,000 as a result of all amounts transferred to NW during the 90 days prior to the Petition Date in and taking into account NW's reasonably knowable affirmative defenses.

349.   The Debtor is entitled to recover the value of any monies so transferred to Northwinds or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## <u>COUNT V</u>

**(Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548 and 550 With Respect to Northwinds and Phillip Miles)**

350.   The Debtor incorporates the paragraphs 43-83 and 91-98 of the Complaint as if fully alleged herein.

351.   The NW 2 Year Transfers occurred within two years of the Petition Date.

352.   The Debtor received less than reasonably equivalent value for the NW 2 Year Transfers.

353.   At the time the Debtor made the NW 2 Year Transfers, Debtor was insolvent.

354.   The Debtor was rendered insolvent by the NW 2 Year Transfers.

355.   After the Debtor made the NW 2 Year Transfers, it was left with unreasonably small capital to operate its business.

356.   The NW 2 Year Transfers were made at a time when Debtor believed it would incur debts that would be beyond the Debtor's ability to pay as such debts as they matured.

357.   At all relevant times, the Debtor had at least one creditor prior to making the transfer, First Liberty Capital Partners, LLC.

358.   Accordingly, the Debtor is entitled under 11 U.S.C. § 548(a)(1)(B) to avoid all amounts transferred to Northwinds during the two years prior to the Petition Date in an amount not less than $646,421.17.

359.   The Debtor is entitled to recover the value of any monies so transferred to Northwinds or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## COUNT VI

**(Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. § 544 and O.C.G.A. §§ 18-2-74 and 18-2-75 with Respect to Northwinds and Phillip Miles)**

360.   The Debtor incorporates the paragraphs 43-83 and 91-98 of the Complaint as if fully alleged herein.

361.   The NW 4 Year Transfers occurred within four years of the Petition Date.

362.   At all times relevant hereto, the Debtor had at least one creditor prior to and during all relevant periods, First Liberty Capital Partners, LLC.

363.   The Debtor did not receive reasonably equivalent value in connection with the NW 4 Year Transfers.

364.   At the time the Debtor made the NW 4 Year Transfers, it was insolvent.

365.   The Debtor became insolvent as a result of the NW 4 Year Transfers.

366.   After the Debtor made the NW 4 Year Transfers, it was left with unreasonably small capital to operate its business.

367.   The NW 4 Year Transfers were made at a time when Debtor believed it would incur debts that would be beyond the Debtor's ability to pay as such debts as they matured.

368.    Accordingly, the Debtor is entitled under O.C.G.A. §§ 18-2-74 and 18-2-75 and Section 544 of the Bankruptcy Code to avoid all amounts transferred to Northwinds during the four years prior to the Petition Date in an amount not less than $2,849,863.47.

369.    The Debtor is entitled to recover the value of any monies so transferred to Northwinds or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## COUNT VII

**(Avoidance and Recovery of Preferential Payments Pursuant to 11 U.S.C. §§ 547 and 550 With Respect to MMI and Phillip Miles)**

370.    The Debtor incorporates the paragraphs 43-83 and 107-113 of the Complaint as if fully alleged herein.

371.    MMI was, at most, an unsecured creditor of the Debtor.

372.    The MMI 90 Day Transfers occurred within 90 days prior to the Petition Date.

373.    The MMI 90-Day Transfers were transfers of an interest in property of the Debtor.

374.    The MMI 90 Day Transfers were made on account of an antecedent debts owed by Debtor to MMI.

375.    The MMI 90 Day Transfers were made to or for the benefit of MMI.

376.    The MMI 90 Day Transfers were made while the Debtor was insolvent.

377.   The MMI 90 Day Transfers enabled MMI to receive more than it would in a chapter 7 case, the transfer had not been made, and MMI received payment to the extend entitled under the Bankruptcy Code.

378.   Accordingly, the Debtor is entitled under 11 U.S.C. § 547(b) to avoid an amount not less than $4,150 as a result of all amounts transferred to MMI during the 90 days prior to the Petition Date in and taking into account MMI's reasonably knowable affirmative defenses.

379.   The Debtor is entitled to recover the value of any monies so transferred to MMI or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## <u>COUNT VIII</u>

**(Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548 and 550 With Respect to MMI and Phillip Miles)**

380.   The Debtor incorporates the paragraphs 43-83 and 107-113 of the Complaint as if fully alleged herein.

381.   The MMI 2 Year Transfers occurred within two years of the Petition Date.

382.   The Debtor received less than reasonably equivalent value for the MMI 2 Year Transfers.

383.   At the time the Debtor made the MMI 2 Year Transfers, Debtor was insolvent.

384.    The Debtor was rendered insolvent by the MMI 2 Year Transfers.

385.    After the Debtor made the MMI 2 Year Transfers, it was left with unreasonably small capital to operate its business.

386.    The MMI 2 Year Transfers were made at a time when Debtor believed it would incur debts that would be beyond the Debtor's ability to pay as such debts as they matured.

387.    At all relevant times, the Debtor had at least one creditor prior to making the transfer, First Liberty Capital Partners, LLC.

388.    Accordingly, the Debtor is entitled under 11 U.S.C. § 548(a)(1)(B) to avoid all amounts transferred to MMI during the two years prior to the Petition Date in an amount not less than $16,100.

389.    The Debtor is entitled to recover the value of any monies so transferred to MMI or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## COUNT IX

**(Avoidance and Recovery of Preferential Payments Pursuant to 11 U.S.C. §§ 547 and 550 With Respect to Mittere and Phillip Miles)**

390.    The Debtor incorporates the paragraphs 43-83 and 114-121 of the Complaint as if fully alleged herein.

391.    Mittere was, at most, an unsecured creditor of the Debtor.

392.   The Mittere 90 Day Transfers occurred within 90 days prior to the Petition Date.

393.   The Mittere 90-Day Transfers were transfers of an interest in property of the Debtor.

394.   The Mittere 90 Day Transfers were made on account of an antecedent debts owed by Debtor to Mittere.

395.   The Mittere 90 Day Transfers were made to or for the benefit of Mittere.

396.   The Mittere 90 Day Transfers were made while the Debtor was insolvent.

397.   The Mittere 90 Day Transfers enabled Mittere to receive more than it would in a chapter 7 case, the transfer had not been made, and Mittere received payment to the extend entitled under the Bankruptcy Code.

398.   Accordingly, the Debtor is entitled under 11 U.S.C. § 547(b) to avoid an amount not less than $133,087.50 as a result of all amounts transferred to Mittere during the 90 days prior to the Petition Date in and taking into account Mittere reasonably knowable affirmative defenses.

399.   The Debtor is entitled to recover the value of any monies so transferred to Mittere or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## COUNT X

**(Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548 and 550 With Respect to Mittere and Phillip Miles)**

400.   The Debtor incorporates the paragraphs 43-83 and 114-121 of the Complaint as if fully alleged herein.

401.   The Mittere 2 Year Transfers occurred within two years of the Petition Date.

402.   The Debtor received less than reasonably equivalent value for the Mittere 2 Year Transfers.

403.   At the time the Debtor made the Mittere 2 Year Transfers, Debtor was insolvent.

404.   The Debtor was rendered insolvent by the Mittere 2 Year Transfers.

405.   After the Debtor made the Mittere 2 Year Transfers, it was left with unreasonably small capital to operate its business.

406.   The Mittere 2 Year Transfers were made at a time when Debtor believed it would incur debts that would be beyond the Debtor's ability to pay as such debts as they matured.

407.   At all relevant times, the Debtor had at least one creditor prior to making the transfer, First Liberty Capital Partners, LLC.

408.    Accordingly, the Debtor is entitled under 11 U.S.C. § 548(a)(1)(B) to avoid all amounts transferred to Mittere during the two years prior to the Petition Date in an amount not less than $2,157,665.50.

409.    The Debtor is entitled to recover the value of any monies so transferred to Mittere or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## COUNT XI

**(Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. § 544 and O.C.G.A. §§ 18-2-74 and 18-2-75 with Respect to Mittere and Phillip Miles)**

410.    The Debtor incorporates the paragraphs 43-83 and 114-121 of the Complaint as if fully alleged herein.

411.    The Mittere 4 Year Transfers occurred within four years of the Petition Date.

412.    At all times relevant hereto, the Debtor had at least one creditor prior to and during all relevant periods, First Liberty Capital Partners, LLC.

413.    The Debtor did not receive reasonably equivalent value in connection with the Mittere 4 Year Transfers.

414.    At the time the Debtor made the Mittere 4 Year Transfers, it was insolvent.

415.    The Debtor became insolvent as a result of the Mittere 4 Year Transfers.

416.    After the Debtor made the Mittere 4 Year Transfers, it was left with unreasonably small capital to operate its business.

417.    The Mittere 4 Year Transfers were made at a time when Debtor believed it would incur debts that would be beyond the Debtor's ability to pay as such debts as they matured.

418.    Accordingly, the Debtor is entitled under O.C.G.A. §§ 18-2-74 and 18-2-75 and Section 544 of the Bankruptcy Code to avoid all amounts transferred to Mittere during the four years prior to the Petition Date in an amount not less than $2,215,048.05.

419.    The Debtor is entitled to recover the value of any monies so transferred to Mittere or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## COUNT XII

**(Avoidance and Recovery of Preferential Payments Pursuant to 11 U.S.C. §§ 547 and 550 With Respect to PFP and Phillip Miles)**

420.    The Debtor incorporates the paragraphs 43-83 and 122-136 of the Complaint as if fully alleged herein.

421.    PFP was, at most, an unsecured creditor of the Debtor.

422.    The PFP 90 Day Transfers occurred within 90 days prior to the Petition Date.

423.   The PFP 90-Day Transfers were transfers of an interest in property of the Debtor.

424.   The PFP 90 Day Transfers were made on account of an antecedent debts owed by Debtor to PFP.

425.   The PFP 90 Day Transfers were made to or for the benefit of PFP or Mr. Miles.

426.   The PFP 90 Day Transfers were made while the Debtor was insolvent.

427.   The PFP 90 Day Transfers enabled PFP to receive more than it would in a chapter 7 case, the transfer had not been made, and PFP received payment to the extend entitled under the Bankruptcy Code.

428.   Accordingly, the Debtor is entitled under 11 U.S.C. § 547(b) to avoid an amount not less than $7,984.44 as a result of all amounts transferred to PFP during the 90 days prior to the Petition Date in and taking into account PFP's reasonably knowable affirmative defenses.

429.   The Debtor is entitled to recover the value of any monies so transferred to PFP or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## COUNT XIII

### (Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548 and 550 With Respect to PFP and Phillip Miles)

430.    The Debtor incorporates the paragraphs 43-83 and 122-136 of the Complaint as if fully alleged herein.

431.    The PFP 2 Year Transfers occurred within two years of the Petition Date.

432.    The Debtor received less than reasonably equivalent value for the PFP 2 Year Transfers.

433.    At the time the Debtor made the PFP 2 Year Transfers, Debtor was insolvent.

434.    The Debtor was rendered insolvent by the PFP 2 Year Transfers.

435.    After the Debtor made the PFP 2 Year Transfers, it was left with unreasonably small capital to operate its business.

436.    The PFP 2 Year Transfers were made at a time when Debtor believed it would incur debts that would be beyond the Debtor's ability to pay as such debts as they matured.

437.    At all relevant times, the Debtor had at least one creditor prior to making the transfer, First Liberty Capital Partners, LLC.

438.    Accordingly, the Debtor is entitled under 11 U.S.C. § 548(a)(1)(B) to avoid all amounts transferred to PFP during the two years prior to the Petition Date in an amount not less than $55,384.44.

439.    The Debtor is entitled to recover the value of any monies so transferred to PFP or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## COUNT XIV

**(Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. § 544 and O.C.G.A. §§ 18-2-74 and 18-2-75 with Respect to PFP and Phillip Miles)**

440.    The Debtor incorporates the paragraphs 43-83 and 122-136 of the Complaint as if fully alleged herein.

441.    The PFP 4 Year Transfers occurred within four years of the Petition Date.

442.    At all times relevant hereto, the Debtor had at least one creditor prior to and during all relevant periods, First Liberty Capital Partners, LLC.

443.    The Debtor did not receive reasonably equivalent value in connection with the PFP 4 Year Transfers.

444.    At the time the Debtor made the PFP 4 Year Transfers, it was insolvent.

445.    The Debtor became insolvent as a result of the PFP 4 Year Transfers.

446.   After the Debtor made the PFP 4 Year Transfers, it was left with unreasonably small capital to operate its business.

447.   The PFP 4 Year Transfers were made at a time when Debtor believed it would incur debts that would be beyond the Debtor's ability to pay as such debts as they matured.

448.   Accordingly, the Debtor is entitled under O.C.G.A. §§ 18-2-74 and 18-2-75 and Section 544 of the Bankruptcy Code to avoid all amounts transferred to PFP during the four years prior to the Petition Date in an amount not less than $75,684.44.

449.   The Debtor is entitled to recover the value of any monies so transferred to PFP or Mr. Miles pursuant to 11 U.S.C. § 550(a)(1).

## COUNT XV

### (Unjust Enrichment (the MCAs) Against the Miles Entities)

450.   The Debtor incorporates the paragraphs 16-34, 43-58, and 156-215 of the Complaint as if fully alleged herein.

451.   The Miles Entities were unjustly enriched through their receipt of funds provided under the MCAs.

452.   The Debtor did not receive a benefit under the MCAs to the extent that it did not receive funds provided thereunder.

453.   The Debtor was damaged by the MCAs because its accounts receivables and other assets were purportedly sold and otherwise encumbered as a result of the MCAs.

454.   The Debtor is entitled damages in an amount not less than $1,384,879 on account of the claims filed against it on account of the MCAs, amounts paid by the Debtor in connection therewith and legal fees incurred by the Debtor in respect thereof.

## COUNT XVI

### (Unjust Enrichment (the MCAs) Against Mr. Miles)

455.   The Debtor incorporates the paragraphs 16-34, 43-58, and 156-215 of the Complaint as if fully alleged herein.

456.   The Miles Entities received funds provided under the MCAs.

457.   Mr. Miles was unjustly enriched by the Miles Entities receipt of funds to the extent of his ownership interest in the Miles Entities.

458.   The Debtor did not receive a benefit under the MCAs to the extent that it did not receive funds provided thereunder.

459.   The Debtor was damaged by the MCAs because its accounts receivables and other assets were purportedly sold and otherwise encumbered as a result of the MCAs.

460.   The Debtor is entitled to damages from Mr. Miles to the extent of his ownership interest in the Miles Entities on account of the claims filed against the Debtor on account of the MCAs, amounts paid by the Debtor in connection therewith and legal fees incurred by the Debtor in respect thereof.

## COUNT XVII

### (Unjust Enrichment (the MCAs) Against Ms. Dadabhoy)

461.   Debtor incorporates the paragraphs 16-34, 43-58, and 156-215 of the Complaint as if fully alleged herein.

462.   The Miles Entities received funds provided under the MCAs.

463.   Ms. Dadabhoy was unjustly enriched by the Miles Entities receipt of funds to the extent of her ownership interest in the Miles Entities.

464.   The Debtor did not receive a benefit under the MCAs to the extent that it did not receive funds provided thereunder.

465.   The Debtor was damaged by the MCAs because its accounts receivables and other assets were purportedly sold and otherwise encumbered as a result of the MCAs.

466.   The Debtor is entitled to damages from Ms. Dadabhoy to the extent of her ownership interest in the Miles Entities on account of the claims filed against the

64

Debtor on account of the MCAs, amounts paid by the Debtor in connection therewith and legal fees incurred by the Debtor in respect thereof.

## COUNT XVIII

**(Unjust Enrichment (the Equipment Agreements) Against the Miles Entities)**

467.    The Debtor incorporates the paragraphs 16-34, 43-58, and 238-309 of the Complaint as if fully alleged herein.

468.    The Miles Entities were unjustly enriched through their receipt of and use of the Equipment provided under the Equipment Agreements.

469.    The Debtor did not receive a benefit under the Equipment Agreements because it did not receive the Equipment nor did it receive any revenues generated therefrom.

470.    Instead, the Debtor was damaged because it incurred the liabilities and obligations under the Equipment Agreements but did not receive any benefits provided therefrom.

471.    The Debtor is entitled damages in an amount not less than $1,343,300 on account of the claims filed against it on account of the Equipment Agreements and the amounts paid by the Debtor in connection therewith.

## COUNT XIX

### (Unjust Enrichment (the Equipment Agreements) Against Mr. Miles)

472.    The Debtor incorporates the paragraphs 16-34, 43-58, and 238-309 of the Complaint as if fully alleged herein.

473.    The Miles Entities were unjustly enriched through their receipt of and use of the Equipment provided under the Equipment Agreements.

474.    Mr. Miles personally was unjustly enriched by the Miles Entities receipt of funds to the extent of his ownership interest in the Miles Entities.

475.    The Debtor did not receive a benefit under the Equipment Agreements because it did not receive the Equipment nor did it receive any revenues generated therefrom.

476.    Instead, the Debtor was damaged because it incurred the liabilities and obligations under the Equipment Agreements but did not receive any benefits provided therefrom.

477.    The Debtor is entitled damages from Mr. Miles to the extent of his ownership interest in the Miles Entities in an amount not less than $1,343,300 on account of the claims filed against it on account of the Equipment Agreements and the amounts paid by the Debtor in connection therewith.

## COUNT XX

### (Unjust Enrichment (the Equipment Agreements) Against Ms. Dadabhoy)

478.   The Debtor incorporates the paragraphs 16-34, 43-58, and 238-309 of the Complaint as if fully alleged herein.

479.   The Miles Entities were unjustly enriched through their receipt of and use of the Equipment provided under the Equipment Agreements.

480.   Ms. Dadabhoy personally was unjustly enriched by the Miles Entities receipt of funds to the extent of her ownership interest in the Miles Entities.

481.   The Debtor did not receive a benefit under the Equipment Agreements because it did not receive the Equipment nor did it receive any revenues generated therefrom.

482.   Instead, the Debtor was damaged because it incurred the liabilities and obligations under the Equipment Agreements but did not receive any benefits provided therefrom.

483.   The Debtor is entitled damages from Ms. Dadabhoy to the extent of her ownership interest in the Miles Entities in an amount not less than $1,343,300 on account of the claims filed against it on account of the Equipment Agreements and the amounts paid by the Debtor in connection therewith.

## COUNT XXI

### (Breach of Contract (MCAs) Against PFP)

484.    The Debtor incorporates the paragraphs 16-58 and 156-215 of the Complaint as if fully alleged herein.

485.    PFP breached the Operating Agreement as a result of the Debtor entering into the MCAs.

486.    PFP was the sole manager of the Debtor.

487.    The Debtor's entry into the MCAs violated Section 5.6 of the Operating Agreement because an ordinarily prudent person in a like position under like circumstances would not have agreed to sell a majority of the Debtor's outstanding account receivable and not receive any funds in return.

488.    PFP is liable for damages incurred as a result under Section 5.6 of the Operating Agreement because it received a benefit because the Miles Entities received the funds provided under the MCAs.

489.    The Debtor is entitled to damages in an amount not less than $1,384,879 as a consequence of the breach.

## COUNT XXII

### (Breach of Contract (MCAs) Against Ms. Dadabhoy)

490.   The Debtor incorporates the paragraphs 16-58 and 156-215 of the Complaint as if fully alleged herein.

491.   PFP is the sole manager of the Debtor.

492.   Ms. Dadabhoy is the sole manager of PFP.

493.   Ms. Dadabhoy acted as the manager of the Debtor.

494.   Ms. Dadabhoy breached the Operating Agreement as a result of the Debtor entering into the MCAs.

495.   The Debtor's entry into the MCAs violated Section 5.6 of the Operating Agreement because an ordinarily prudent person in a like position under like circumstances would not have agreed to sell a majority of the Debtor's outstanding account receivable and not receive any funds in return.

496.   Ms. Dadabhoy is liable for damages incurred as a result under Section 5.6 of the Operating Agreement because she received a benefit to the extent of her interests in the Miles Entities because the Miles Entities received the funds provided under the MCAs.

497.   The Debtor is entitled to damages in an amount not less than $1,384,879 as a consequence of the breach.

## COUNT XXIII

### (Breach of Contract (MCAs) Against Mr. Miles)

498.    The Debtor incorporates the paragraphs 16-58 and 156-215 of the Complaint as if fully alleged herein.

499.    To the extent he was actually authorized to do so, Mr. Miles acted as the manager of the Debtor.

500.    Mr. Miles breached the Operating Agreement as a result of the Debtor entering into the MCAs.

501.    The Debtor's entry into the MCAs violated Section 5.6 of the Operating Agreement because an ordinarily prudent person in a like position under like circumstances would not have agreed to sell a majority of the Debtor's outstanding account receivable and not receive any funds in return.

502.    Mr. Miles is liable to the extent of his ownership interest in the Miles Entities for damages incurred as a result under Section 5.6 of the Operating Agreement because he received a benefit because the Miles Entities received the funds provided under the MCAs.

503.    The Debtor is entitled to damages in an amount not less than $1,384,879 as a consequence of the breach.

## COUNT XXIV

### (Breach of Contract (Equipment Agreements) Against PFP)

504.   The Debtor incorporates the paragraphs 16-58 and 238-309 of the Complaint as if fully alleged herein.

505.   PFP breached the Operating Agreement as a result of the Debtor entering into the Equipment Agreements.

506.   The Debtor's entry into the Equipment Agreements violated Section 5.6 of the Operating Agreement because an ordinarily prudent person in a like position under like circumstances would not have agreed to obligate itself on agreements for which it received no benefit.

507.   PFP is liable for damages incurred as a result under Section 5.6 of the Operating Agreement in an amount not less than $1,343,300 as a consequence of the breach.

## COUNT XXV

### (Breach of Contract (Equipment Agreements) Against Ms. Dadabhoy)

508.   The Debtor incorporates the paragraphs 16-58 and 238-309 of the Complaint as if fully alleged herein.

509.   PFP is the sole manager of the Debtor.

510.   Ms. Dadabhoy is the sole manager of PFP.

511.   Ms. Dadabhoy acted as the manager of the Debtor.

512.   Ms. Dadabhoy breached the Operating Agreement as a result of the Debtor entering into the Equipment Agreements.

513.   The Debtor's entry into the Equipment Agreements violated Section 5.6 of the Operating Agreement because an ordinarily prudent person in a like position under like circumstances would not have agreed to obligate itself on agreements for which it received no benefit.

514.   Ms. Dadabhoy is liable to the extent of her ownership interest in the Miles Entities for damages incurred by the Debtor as a consequence of the breach.

## COUNT XXVI

### (Breach of Fiduciary Duties Against PFP)

515.   The Debtor incorporates the paragraphs 16-42 and 156-309 of the Complaint as if fully alleged herein.

516.   PFP was the sole manager of the Debtor.

517.   PFP breached its fiduciary duties to the Debtor by entering into and permitting the Debtor to enter into the Curepoint Dublin Amendment, MCAs, and Equipment Agreements.

518.   The Debtor incurred significant damages as a result of PFP's breaches of fiduciary duties.

519.   As a result, the Debtor is entitled to damages in an amount not less than $2,728,179 as a consequence of such breaches.

## COUNT XXVII

### (Breach of Fiduciary Duties Against Ms. Dadabhoy)

520.   The Debtor incorporates the paragraphs 16-58 and 156-309 of the Complaint as if fully alleged herein.

521.   PFP was the sole manager of the Debtor.

522.   Ms. Dadabhoy was the sole manager of PFP.

523.   Ms. Dadabhoy breached her fiduciary duties to the Debtor by entering into and permitting the Debtor to enter into the Curepoint Dublin Amendment, MCAs, and Equipment Agreements.

524.   The Debtor incurred significant damages as a result of her breaches of fiduciary duties.

525.   As a result, the Debtor is entitled to damages in an amount not less than $2,728,179 as a consequence of such breaches.

## COUNT XXVIII

### (Breach of Fiduciary Duties Against Mr. Miles)

526.   The Debtor incorporates the paragraphs 16-58 and 156-309 of the Complaint as if fully alleged herein.

527.   To the extent he had actual authority to do so, Mr. Miles acted as manager of the Debtor.

528.   Mr. Miles breached his fiduciary duties to the Debtor by entering into and permitting the Debtor to enter into the Curepoint Dublin Amendment, MCAs, and Equipment Agreements.

529.   The Debtor incurred significant damages as a result of his breaches of fiduciary duties.

530.   As a result, the Debtor is entitled to damages in an amount not less than $2,728,179 as a consequence of such breaches.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment against the Defendants, that the Court enter an order directing the Defendants to pay the amounts set forth herein, and grant the Trustee such other and further relief as the Court deems just.

*/s/ David A. Wender*
David A. Wender  (748117)
Valerie S. Sanders (625819)

EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, Georgia 30309-3996

404.853.8000 (t)
404.853.8806 (f)
davidwender@eversheds-sutherland.com
valeriesanders@eversheds-sutherland.com

*Counsel for David A. Wender,*
*in his capacity as Chapter 11 Trustee*