# EXHIBIT A

# Operating Agreement
## of
## CurePoint, LLC

**Securities created by this Operating Agreement, if any, have not been registered under the Georgia Uniform Securities Act of 2008, as amended, in reliance upon the exemption from registration set forth in Section 10-5-11(14) of such Act. In addition, securities created by this Operating Agreement, if any, have not been registered with the United States Securities and Exchange Commission in reliance upon an exemption from such registration set forth in the Securities Act of 1933, as amended, provided by Section 4(2) thereof, nor have they been registered under the securities or Blue Sky laws of any other jurisdiction. The interests created hereby have been acquired for investment purposes only and may not be offered for sale, pledged, hypothecated, sold or transferred except in compliance with the terms and conditions of this Operating Agreement and in a transaction which is either exempt from registration under such Acts or pursuant to an effective registration statement under such Acts.**

**THIS OPERATING AGREEMENT** is made and entered into effective as of the ___ day of May, 2014, by the parties who have executed counterparts of the Operating Agreement as indicated on the signature pages attached.

## ARTICLE 1. DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein):

*"Additional Member."* Additional Member means a Member other than an initial Member or a Substitute Member.

*"Admission Agreement."* Admission Agreement means any agreement between a prospective Member and the Company which sets out the prospective Member's acceptance of membership under the conditions set forth in this Operating Agreement and the terms of any Capital Contribution required of him.

*"Affiliate."* With respect to any Person, (i) in the case of an individual, any relative of such Person, (ii) any officer, director, trustee, partner, member, manager or holder of ten percent (10%) or more of any class of the voting securities or equity interest in such Person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person; or (iv) any officer, director, trustee, partner, member, manager or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

*"Articles of Organization."* The Articles of Organization of CurePoint, LLC, as filed with the Secretary of State of Georgia, as the same may be amended from time to time.

"*Capital Account*" shall mean, with respect to any Member or Economic Interest Owner, the Capital Account maintained for such Person in accordance with the following provisions:

(i)    To each Person's Capital Account there shall be credited such Person's Capital Contributions, such Person's distributive share of Profits, and any items in the nature of income or gain that are specially allocated to such Person, and the amount of any Company liabilities that are assumed by such Person (including any Assumption Agreement) or that are secured by any Company property distributed to such Person.

(ii)    To each Person's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Person pursuant to any provision of this Agreement, such Person's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated to such Person, and the amount of any liabilities of such Person that are assumed by the Company or that are secured by any property contributed by such Person to the Company.

(iii)    In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv)    In determining the amount of any liability, there shall be taken into account Code section 752(c) and any other applicable provisions of the Code and Regulations.

(v)    In the event the values of Company assets are adjusted, the Capital Accounts of all Members and Economic Interest Owners shall be adjusted simultaneously to reflect the aggregate net adjustment as if the Company had recognized gain or loss equal to the amount of such aggregate net adjustment.

(vi)    The provisions of this Agreement concerning maintenance of Capital Accounts are intended to comply with the Treasury Regulations under Section 704 of the Code, and shall be interpreted and applied in a manner consistent with such Regulations.  Should the Members determine that it is prudent to modify the manner in which Capital Accounts are maintained in order to comply with such Regulations, the Manager may make such modification provided that it is not likely to have a material effect on the amounts distributable to any Member or Economic Interest Owner upon dissolution of the Company.  The Manager shall adjust the amounts debited or credited to Capital Accounts with respect to (a) any property contributed to the Company or distributed to the Members or Economic Interest Owners, and (b) any liabilities that are secured by such contributed or distributed property or that are assumed by the Company or the Members or Economic Interest Owners, in the event the Manager shall determine that such adjustments are necessary or appropriate pursuant to such Regulations.  The Manager shall also make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with such Regulations.

"*Capital Contribution.*" Any contribution to the capital of the Company in cash or property by a Member whenever made.

*"Code."* The Internal Revenue Code of 1986, as amended from time to time.

*"Commitment."* Commitment means a Member's agreement to make an Initial Capital Contribution in an amount and at the time or times agreed upon in the Supplemental Agreement with respect to the initial parties to this Agreement and an Admission Agreement for any subsequent Members.

*"Company."* CurePoint, LLC, a Georgia limited liability company.

*"Current Value."* Current Value of a Member's Interest for certain purposes herein shall be equal to the product obtained when the Member's Ownership Percentage is multiplied by the net assets of the Company as determined by subtracting the sum of all Company liabilities from the sum of all Company assets.

*"Default Interest Rate."* Default Interest Rate means twelve percent (12%) per annum.

*"Delinquent Member."* Delinquent Member means a Member who fails to make his Commitment.

*"Distributable Cash."* All cash received by the Company from Company operations, plus any cash that becomes available from Reserves, less the sum of the following to the extent paid or put aside by the Company (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred in the operation of the Company's business.

*"Distributions."* Distributions shall mean Distributable Cash or other property distributed to a Member.

*"Economic Interest."* A Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and rights to distributions of the Company's assets pursuant to this Operating Agreement and the Georgia Act, but shall not include any right to vote on, consent to or otherwise participate in any decision of the Members.

*"Economic Interest Owner."* The owner of an Economic Interest who is not a Member.

*"Entity."* Any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

*"Fiscal Year."* The Company's fiscal year, which shall be the calendar year.

*"Georgia Act."* The Georgia Limited Liability Company Act at Section 14-11-100, *et seq.* of the Georgia Act.

*"Initial Capital Contribution."* The initial contribution to the capital of the Company made or to be made by a Member pursuant to this Operating Agreement as set forth in the Exhibit "A".

*"Interest."* Any interest in the Company, including a Membership Interest, an Economic Interest, any right to vote or participate in the business of the Company, or any other interest in the Company.

*"Majority Vote."* Vote or written consent of Persons holding a majority of the Ownership Percentages held by all such Persons entitled to vote on or consent to the issue in question.

*"Manager."* Manager means one or more managers designated pursuant to this Operating Agreement or any other person(s) that succeed such person(s) in the capacity as Manager in accordance with this Operating Agreement and Section 14-11-304 of the Georgia Act.

*"Member."* Each Person who executes this Operating Agreement or a counterpart thereof as a Member and each of the Persons who may hereafter become Members as provided in this Operating Agreement. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Interest.

*"Membership Interest."* A Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement or the Georgia Act.

*"Net Profits"* and *"Net Losses."* In the event the Company has more than one partner, the Company's taxable income or loss determined in accordance with Code Section 703(a) for each of its Fiscal Years (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss); provided, such Net Profits and Net Losses will be computed as if items of tax-exempt income and nondeductible, noncapital expenditures (under Code Section 705(a)(1)(B) and 705(a)(2)(B)) were included in the computation of taxable income or loss. If any Member contributes property to the Company with an initial book value to the Company different from its adjusted basis for federal income tax purposes, or if Company property is revalued pursuant to Section 1.704-1(b)(2)(iv)(f) of the Regulations or as otherwise required by the Regulations, Net Profits and Net Losses will be computed as if the initial adjusted basis for federal income tax purposes to the Company of such contributed or revalued property equaled its initial book value to the Company as of the date of contribution or revaluation. Credits or debits to Capital Accounts due to a revaluation of Company assets in accordance with Section 1.704-1(b)(2)(iv)(f) of the Regulations, or due to a distribution of noncash assets, will be taken into account as gain or loss from the disposition of such assets for purposes of Article 10 hereof.

*"Operating Agreement."* This Operating Agreement as originally executed and as amended from time to time.

*"Ownership Percentage."* The Ownership Percentages of the Members as of the date of this Operating Agreement are as follows:

| Member's Name | Ownership Percentage |
| --- | --- |
| Physician Financial Partners, LLC | 100% |

For purposes of the provisions hereof relating to actions taken or approval by Members, including voting, written consents or other approval, only Ownership Percentages held by Members shall be taken into account.

*"Person."* Any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such *"Person"* where the context so permits.

*"Reserves."* Funds set aside and amounts allocated to reserves in amounts determined by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

*"Substitute Member."* Substitute Member shall mean any Person who is admitted to the Company with all rights of a Member who has died or has assigned his Interest in the Company pursuant to the Operating Agreement.

*"Treasury Regulations"* or *"Regulations."* The federal income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE 2. FORMATION OF COMPANY

2.1    *Formation.* The Company was formed on May 30, 2014 as a Georgia limited liability company by the filing of the Articles of Organization with the Secretary of State of Georgia in accordance with the provisions of the Georgia Act.

2.2    *Name.* The name of the Company is CurePoint, LLC

2.3    *Principal Place of Business.* The principal place of business of the Company within the State of Georgia is 2406 Bellevue Avenue Suite 7 Dublin, Ga. 31021. The Company may locate its places of business and registered office at any other place or places as the Manager or Managers may from time to time deem advisable.

2.4    *Registered Office and Registered Agent.* The Company's registered office shall be at 11175 Cicero Drive Suite 100 Alpharetta, Ga. 30022. The registered agent is Michael Miles. The registered office and registered agent may be changed from time to time pursuant to the Georgia Act and the applicable rules promulgated thereunder.

2.5    *Term.*    The term of the Company commenced on the date the Articles of Organization were filed with the Secretary of State of Georgia and shall continue until the Company is dissolved and its affairs wound up in accordance with the provisions of this Operating Agreement or the Georgia Act.

## ARTICLE 3. BUSINESS OF COMPANY

The purpose for which the Company is organized is to engage in any lawful business or activity for which limited liability companies may be organized under the Act as defined herein, including, without limitation, to own, operate, conduct and manage the affairs of any lawful business.

## ARTICLE 4. NAMES AND ADDRESSES
## OF MEMBERS

The names and addresses of the Members are set out on *Exhibit "A"* attached hereto and incorporated herein.

## ARTICLE 5. MANAGEMENT

5.1    *Number, Tenure and Qualifications.*    The Company shall have one (1) Manager, who initially shall be Physician Financial Partners, LLC.    The number of Managers of the Company shall be fixed from time to time by the Majority Vote of the Members, but in no instance shall there be less than one (1) Manager.    The initial Manager shall hold office unless removed for cause or until such time as the Majority Vote of the Members select his successor.    Managers shall be elected by the Majority Vote of the Members.    Managers need not be residents of the State of Georgia or Members of the Company.    The Manager shall be responsible for the day to day operation of Company, including the financial management of the Company, including, without limitation maintaining Company bank accounts, and providing Company accounting.

5.2    *Management.*    The business and affairs of the Company shall be managed by its Managers.    Except as set forth in Section 14-11-308 of the Georgia Act or Section 5.4 below, the Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other management of the Company's business.

5.3    *Certain Powers of Managers.*    Without limiting the generality of Section 5.2, and subject to the restrictions set forth in Section 5.4, the Managers shall have the power and authority, on behalf of the Company:

(a)    To acquire real and/or personal property of any kind or nature whatsoever from any Person as the Managers may determine.    The fact that a Member or Manager is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person, provided such dealings are on terms no less favorable than if the Managers had dealt with an unaffiliated Person;

6

(b)     To borrow money for the Company from banks or other lending institutions, one or more Members, Managers or Affiliates of a Member or Manager, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(c)     To purchase liability and other insurance to protect the Company's property and business;

(d)     To create offices and designate officers, who need not be Members;

(e)     To hold and own any Company real and/or personal properties in the name of the Company;

(f)     To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(g)     To execute, on behalf of the Company, all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages, deeds to secure debt or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; partnership agreements, operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of the Managers, or any of them to the business of the Company;

(h)     To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

(i)     To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as a Manager may approve;

(j)     To provide all services otherwise required under this Operating Agreement;

(k)     Subject to the limitations set forth in Section 5.11 hereof, increase, decrease, modify, amend or adjust the level of salary, compensation or other employment benefits received by any Member or Manager (if any), however, nothing contained herein shall authorize the Manager to change the allocations and distribution provisions contained herein; and

(l)     To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business, including without limitation, opening and maintaining brokerage accounts for the purchase and sale of securities, such as equities, options and futures contracts and to actively manage the financial assets of the Company.

Unless authorized to do so by this Operating Agreement or by the Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any

power or authority to bind the Company in any way, to pledge its credit or to render it pecuniarily liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

5.4    *Restrictions on Authority of Managers.*  Notwithstanding the powers granted in Section 5.2, the Managers shall not, without the prior written consent of Members owning at least a majority of the Ownership Percentages:

(a)    Do any act in contravention of this Operating Agreement;

(b)    Amend the Operating Agreement;

(c)    Admit an Additional or Substitute Member to the Company or authorize any Additional Capital Contribution;

(d)    Sell, transfer, or otherwise dispose of all or substantially all of the assets of Company prior to its dissolution;

(e)    Merge the Company into or with another entity;

(f)    Encumber all or substantially all of the assets of the Company;

(g)    Change the accounting method for tax purposes of the Company.

5.5    *Managers' Standard of Care.*  A Manager's duty of care in the discharge of the Manager's duties to the Company and its Members is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.    In discharging its duties, a Manager shall be fully protected in relying in good faith upon the records required to be maintained under Article 12 and upon such information, opinions, reports or statements by any of the other Managers, Members, or agents, or by any other Person, as to matters the Manager reasonably believes are within such other Person's professional expertise or competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid.

5.6    *Liability for Certain Acts.*  Each Manager shall act in a manner he believes in good faith to be in the best interest of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  A Manager is not liable to the Company, its Members, or other Managers for any action taken in managing the business or affairs of the Company if it performs the duty of its office in compliance with the standard contained in this **Section 5.6**.  No Manager has guaranteed nor shall any Manager have any obligation with respect to the return of a Member's Capital Contribution or profits from the operation of the Company. No Manager shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member except loss or damage resulting from such Manager's intentional

misconduct or knowing violation of law or a transaction for which such Manager received a personal benefit in violation or breach of the provisions of this Operating Agreement. Each Manager shall be entitled to rely on information, opinions, reports or statements, including but not limited to financial statements or other financial data prepared or presented in accordance with the provisions of Section 14-11-305 of the Georgia Act.

5.7     *Dealings with Affiliates.*  Each Manager is specifically authorized to employ, contract and deal with, from time to time, any Member or Manager or Affiliate of any Member or Manager, and in connection therewith to pay such person or entity fees, prices or other compensation provided that such employment, contracts, and dealings are commercially reasonable and necessary or appropriate for Company purposes and the fees, prices or other compensation paid by the Company therefor is, in the good faith judgment of the Managers, reasonable and typical or competitive with the fees, prices or other compensation customarily paid for similar property or services in the same general area. Nothing contained herein is intended to provide authority to alter or amend the distribution or allocation provisions contained herein.

The Members contemplate that initially no Member or Manager of the Company shall be employed by the Company.

5.8     *Conflicts of Interest.*  A Member or Manager shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company, it being expressly understood that some of the Members or Managers may enter into transactions that are similar to the transactions into which the Company may enter. A Member or Manager, including a Member who is a Manager, does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member or Manager may lend money to and transact other business with the Company on terms no less favorable than would be obtainable from an unaffiliated third Person. The rights and obligations of a Member or Manager who lends money to or transacts business with the Company are the same as those of a person who is not a Member or Manager, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member or Manager has a direct or indirect interest in the transaction if either the transaction is fair to the Company or the disinterested Members, in either case knowing the material facts of the transaction authorize, approve, or ratify the transaction.

5.9     *Resignation.*  Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.10    *Removal.*  At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by the Majority Vote of the Members. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of such Member.

5.11    *Vacancies.*  Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the Majority Vote of the Members.  Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the Majority Vote of the Members.  A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and shall hold office until the expiration of such term and until his successor shall be elected and shall qualify or until his earlier death, resignation or removal.  A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next Annual Meeting of Members and until his successor shall be elected and shall qualify, or until his earlier death, resignation or removal.

5.12    *Managers Have No Exclusive Duty to Company.*  No Manager shall be required to manage the Company as such Manager's sole and exclusive function and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Manager or Member shall have any right, by virtue of the Operating Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.  The Manager shall incur no liability to the Company or to any other business or venture.

5.13    *Indemnity of the Managers, Officers, Employees and Other Agents.*  To the fullest extent permitted by Section 14-11-306 of the Georgia Act, the Company shall indemnify each Manager and make advances for expenses to each Manager arising from any loss, cost, expense, damage, claim or demand, in connection with the Company, the Manager's status as a Manager of the Company, the affairs of the Company or such Manager's activities on behalf of the Company.  To the fullest extent permitted by Section 14-11-306 of the Georgia Act, the Company shall also indemnify its officers, employees and other agents who are not Managers arising from any loss, cost expense, damage, claim or demand in connection with the Company, any such Person's participation in the business and affairs of the Company or such Person's activities on behalf of the Company, provided that such indemnification in any given situation is approved by the Majority Vote of the Members.

## ARTICLE 6. MEETINGS AND ACTIONS OF MANAGERS

6.1    *Place of Meeting.*  The Managers of the Company may hold their meetings, both regular and special, at any place within or without the State of Georgia.

6.2    *Notice of Meetings.*  The first meeting of newly elected Managers shall be held immediately following the adjournment of the annual meeting of the Members.  The Managers may otherwise meet at such intervals and at such time and place as they shall schedule.  The first meeting of Managers, and any scheduled meetings of the Managers, may be held without notice.  Special meetings of the Managers may be called at any time by no less than one-half of the then serving Managers for any purpose or purposes.  Notice of such special meetings, unless waived by attendance or by written consent to the holding of the special meeting, shall state that it shall be held at the principal place of business of the Company or such other place set forth in the notice, the date and hour of the special meeting, and its purpose or purposes.  Absent the written consent

10

of a majority of the Managers to take other action, the business transacted at such special meeting shall be limited to such purpose or purposes as stated in the notice.

6.3    *Action by Managers; Quorum; Voting; Action without a Meeting.*

(a)    Each Manager shall have one vote.

(b)    With the exception of matters that pursuant to this Agreement require the vote of the Members, every act or decision done or made by the majority vote of the Managers shall be regarded as the act of the Company.

(c)    Managers may participate in any meeting of the Managers by means of conference telephone or similar communications equipment, provided all persons participating in the meeting can hear one another, and such participation in a meeting shall constitute presence in person at the meeting.

(d)    All votes required of Managers hereunder may be by voice vote unless a written ballot is requested, which request may be made by any one Manager.

(e)    Any action which under any provision of the Georgia Act or this Operating Agreement is to be taken at a meeting of the Managers may be taken without a meeting by written consent signed by all Managers who would be entitled to vote upon such action at a meeting.  Such written consent must be kept with the records of the Company.

6.4    *Adjournment.*  A majority of the Managers present may adjourn any Managers' meeting to meet again at a stated day and hour or until the time fixed for the next regular meeting of the Managers.

6.5    *Meetings If Only One Manager.*  In the event there is only one Manager, the Manager is not required to comply with the obligations of this Article 6.

## ARTICLE 7. RIGHTS AND OBLIGATIONS OF MEMBERS

7.1    *Limitation on Liability.*  Each Member's liability shall be limited as set forth in this Operating Agreement, the Georgia Act and other applicable law.

7.2    *No Liability for Company Obligations.*  No Member will have any liability for any debts, losses or other obligations of the Company beyond such Member's Capital Contribution, except as provided by law.  In no event shall a Member be obligated to make any additional contributions to the capital of the Company.

7.3    *Indemnification.*  To the fullest extent permitted under Section 14-11-306 of the Georgia Act, the Company shall indemnify the Members and make advances to them for expenses with respect to the matters for which indemnification is permitted thereunder.

7.4     *List of Members.*  Upon written request of any Member, the Manager shall provide a list showing the names, addresses and Membership Interest, Ownership Percentage and Economic Interest of all Members and Managers and the other information required by Section 14-11-313 of the Georgia Act and maintained pursuant to Section 12.2.

7.5     *Management Rights.*  The Members have elected to conduct the day-to-day operations of Company through designated Managers, and in so doing have empowered the Managers to conduct the operations of the Company in accordance with provisions contained in this Operating Agreement.

7.6     *Representations and Warranties.*  Each Member, and in the case of an organization, the person(s) executing this Operating Agreement on behalf of the organization, hereby represents and warrants to the Company, and each other Member that: (a) if that Member is an organization, that it is duly organized, validly existing, and in good standing under the law of its state or country of organization and that it has full organizational power to execute and agree to the Operating Agreement and to perform its obligations hereunder; (b) that the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest; and (c) the Member acknowledges that the interest has not been registered under the Securities Act of 1933 or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.

## ARTICLE 8. MEETINGS OF MEMBERS

8.1     *Annual Meeting.*  An annual meeting of the Members may be held at such time and date at the principal office of the Company or at such other place within or without the State of Georgia as shall be designated by the Manager(s) from time to time and stated in the Notice of Meeting.  The purposes of the annual meeting need not be enumerated in the notice of such meeting.

8.2     *Meetings.*  Meetings of the Members, for any purpose or purposes, may only be called by a Manager or a Member or Members holding at least ten percent (10%) of the Ownership Percentages.  Business transacted at all special meetings shall be confined to the purpose or purposes stated in the notice.

8.3     *Place of Meetings.*  The Members may designate any place, either within or outside the State of Georgia, as the place of meeting for any meeting of the Members.  If no designation is made the place of meeting shall be the principal executive office of the Company in the State of Georgia.

8.4     *Notice of Meetings.*  Unless otherwise agreed to by the Members, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than five (5) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or Person calling the meeting, to each Member entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail,

addressed to the Member at its address as it appears on the books of the Company, with postage thereon prepaid. Notice provided in accordance with this Section shall be effective notwithstanding anything in Section 14-11-311 of the Georgia Act to the contrary.

8.5     *Meeting of all Members.* If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting any lawful action may be taken.

8.6     *Record Date.* For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the distribution is made, as the case may be, shall be the record date for such determination of Members unless the Members shall otherwise agree upon another record date. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

8.7     *Quorum.* Members holding a majority of the Ownership Percentages, represented in person or by proxy shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Ownership Percentages so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if at the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Ownership Percentages whose absence would cause less than a quorum to be present.

8.8     *Manner of Acting.* Except as may be otherwise set forth in Section 5.4 hereof, the Majority Vote of the Members at a meeting at which a quorum is present shall be the act of the Members. Section 14-11-307 of the Georgia Act (relating to conflicting interest transactions) shall not apply in the case of Members who have an interest (economic or otherwise) in the outcome of any particular matter upon which the Members vote or consent or may vote or consent upon any such matter and their Ownership Percentage, vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter was approved by the Members.

8.9     *Proxies.* A Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such written proxy shall be delivered to the Company.

8.10     *Action by Members without a Meeting.* Action required or permitted to be taken by the Members at a meeting may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by the Members entitled to vote and having the requisite Ownership Percentages required to approve such action. Action taken under

this Section is effective when the Members required to approve such action have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

8.11    *Waiver of Notice.*  In lieu of any procedures contained in Section 14-11-312 of the Georgia Act, when any notice is required to be given to any Member, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

8.12    *Meeting by Telephone.*  In lieu of any procedures contained in Section 14-11-310(b)(3) of the Georgia Act, Members may also meet by conference telephone call if all Members participating in the meeting can hear one another on such call and the requisite notice is given or waived.

8.13    *List of Members Entitled to Vote.*  The Managers shall make, at least five (5) days before each meeting of the Members, a complete list of the Members entitled to vote at such meeting, or any adjournment of such meeting, arranged in alphabetical order, with the addresses of the Members and the Membership Interest held by each, which list, for a period of five (5) days prior to such meeting, shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member at anytime during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to inspection of Members at all times during the meeting. However, failure to comply with the requirements of this Section shall not effect the validity of any action taken at such meeting.

8.14    *Registered Members.*  The Company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact of such Membership Interest for all purposes, and accordingly shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person, whether or not it shall have express or other notice of such claim or interest, except as expressly provided by this Operating Agreement or the laws of Georgia.

## ARTICLE 9. CONTRIBUTIONS TO THE
## COMPANY AND LOANS

9.1    *Members' Initial Capital Contributions.*  Each Member shall make the contribution designated for such Member and provided for in the Supplemental Agreement.

9.2    *Additional Capital Contributions.*    (a)  In the event that at any time or from time to time the Members, by Majority Vote determine the Company is in need of additional capital, or will be in need of additional capital within sixty (60) days, for any purpose related to the Company's business, then the Managers shall send a notice ("Capital Call Notice") to each Member setting forth (i) the amount of the total capital call ("Additional Capital Requirement"), (ii) the purposes for which the funds will be used and (iii) such Member's pro-rata share ("Additional Capital Contribution") of such Additional Capital Requirement, such pro-rata share being equal to the Additional Capital Requirement multiplied by such Member's Ownership Interest. Each

Member shall contribute in cash such Member's Additional Capital Contribution within fifteen (15) days following receipt of the Capital Call Notice, provided that the remedies specified in Section 9.2(b) below shall constitute the sole remedies in the event any Member fails to contribute such Member's required Additional Capital Contribution.

(b)    <u>Defaulting Member</u>. If any Member ("Defaulting Member") fails to pay an Additional Capital Contribution within the specified time as required pursuant to Section 9.2(a), then the other Members (*i.e.*, other than the Defaulting Member) ("Non-Defaulting Members") may, at their option contribute all or any portion of the Defaulting Member's required Additional Capital Contribution by making an Advance pursuant to Section 9.2(c), by making Additional Capital Contributions, or by securing a third party loan. If there is more than one Non-Defaulting Member desiring to make an Advance or Additional Capital Contribution on behalf of the Defaulting Member, such Non-Defaulting Members shall be entitled to contribute the Defaulting Member's pro-rata share of the Additional Capital Requirement in such amounts as they may agree among each other or, in the absence of such agreement, in proportion to their respective Ownership Interests. The amount contributed by the Non-Defaulting Member on behalf of a Defaulting Member, shall, at the election of the Non-Defaulting Members, be treated as an Advance or an Additional Capital Contribution by such Non-Defaulting Members pursuant to Section 9.2(a). If such amounts are deemed Additional Capital Contributions, the Ownership Interests of the Members shall be adjusted to reflect their respective aggregate Capital Contributions to the Company.

(c)    To the extent approved by the Managers, any Member may make a secured or unsecured loan ("Advance") to the Company provided any such loan is on commercially reasonable terms.

9.3    *Enforcement of Commitments*. In the event any Member fails to perform its or his Commitment, a Manager shall give such Delinquent Member notice of the failure to meet the Commitment. If the Delinquent Member fails to perform the Commitment (including any costs associated with the Member's failure to comply with the Commitment and interest on such obligation at the Default Interest Rate) within ten (10) business days of the giving of such notice, a Manager may take such action including, but not limited to, enforcing the Commitment in the court of appropriate jurisdiction in the state in which the Company's principal office is located or the state of the Delinquent Member's residence as reflected in the Operating Agreement. Each Member expressly agrees to the jurisdiction of such courts but only for the enforcement of Commitments. A Manager may allow the remaining Members to contribute the amount of the Delinquent Member's Commitment on a pro rata basis. The Members who shall contribute their pro rata shares shall be entitled to treat the amounts contributed pursuant to this Section as a loan bearing interest at the Default Interest Rate secured by the Delinquent Member's interest in the Company. Members contributing their pro rata share of the Delinquent Member's Commitment shall, until such time as their pro rata shares shall be fully repaid, be entitled to receive all Distributions to which the Delinquent Member would otherwise be entitled.

**ARTICLE 10. DISTRIBUTIONS**

10.1     *Distributions*.  The Manager shall make distributions to Members and Economic Interest Holders of Distributable Cash to the Members in proportion to their respective Ownership Percentages.

10.2     *Limitation upon Distributions*.  No distribution shall be made to Members if prohibited by Section 14-11-407 of the Georgia Act.

10.3     *Interest on and Return of Capital Contributions*.  Except as provided for in the Supplemental Agreement, no Member shall be entitled to interest on such Member's Capital Contribution or to a return of its Capital Contribution, except as otherwise specifically provided for herein.

10.4     *Priority and Return of Capital*.  Except as provided for in the Supplemental Agreement, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or Distributions.  This Section shall not apply to loans (as distinguished from Capital Contributions) which any Member has made to the Company.

## ARTICLE 11. ALLOCATIONS OF NET PROFITS
## AND NET LOSSES

To the extent the company is taxed as partnership for income tax purposes, the following shall apply:

11.1         *No Liability for Negative Balances in Member Accounts.*  No Member is liable, either before or upon dissolution of the Company, to the Company for any negative balance in either account except to the extent that such a negative balance arose as a result of receipt of a distribution in excess of the amount rightfully due such Member under this Agreement.

11.2     *Allocations of Accounting Items.*  The following principles govern the allocation of accounting items required under this Agreement.

(a) *Allocation of Losses.*  When the aggregate of all items of income, gain, loss and deduction is in the negative for a particular accounting period, these items are allocated as follows:

(i)     First, losses shall be allocated to the extent of the aggregate of all positive balances in the Capital Accounts of all Members, in proportion to the positive balances in the respective accounts.

(ii)     Second, losses shall be allocated to the Members in proportion to their respective Ownership Percentages.

(b)     *Allocation of Profits.*  When the aggregate of all items of income, gain, loss and deduction is in the positive for a particular accounting period, these items are allocated as follows:

16

(i)    First, if there is an excess of allocations of net losses from prior accounting periods over allocations of net profits, as to any of the Members, then there is to be a proportionate allocation to each Member applied to that excess amount, up to the extent of the aggregate total of the excess; and

(ii)    Second, there shall be an allocation of such items to the Members in amounts equal to the cash distributions made to such Members during the same accounting period; and

(iii)    Thereafter, the remaining aggregate shall be allocated to the Members in proportion to the cash distributions made to each Member during the same accounting period.

(c)    *Application of Credit Items.*  To the extent permitted by law, all credit items are allocated in proportion to each Member's respective Ownership Percentages in the Company.

(d)    <u>*Minimum Gain Chargeback*</u>.  Notwithstanding any other provision of this Article 11, if there is a net decrease in Partnership Minimum Gain determined in accordance with Regulations Section 1.704(2)(g) during any Company fiscal year, each Member or Economic Interest Owner who would otherwise have an Adjusted Capital Account Deficit at the end of such year shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible.  The items to be so allocated shall be determined in accordance with Section 1.704-2(f)(6) and 1.704-(j)(2) of the Regulations.  This Section 11.2(d) is intended to comply with the minimum gain chargeback requirement in such Section of the Regulations and shall be interpreted consistently therewith.

(e)    <u>*Gross Income Allocation*</u>.  In the event any Member or Economic Interest Owner has a deficit Capital Account at the end of any Company fiscal year which is in excess of the sum of (i) the amount such Member or Economic Interest Owner is obligated to restore pursuant to any provision of this Agreement, (ii) the amount such Member or Economic Interest Owner is deemed to be obligated to restore pursuant to the penultimate sentence of Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5), and (iii) the amount such Member or Economic Interest Owner would be deemed obligated to restore if Partner Loan Recourse Deductions were treated as Nonrecourse Deductions, each such Member or Economic Interest Owner shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 11.2(e) shall be made only if and to the extent that such Member or Economic Interest Owner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 11.2(e) have been made as if Section 11.2(f) hereof and this Section 11.2(e) were not in this Agreement.

(f)    <u>*Qualified Income Offset*</u>.  Any other provision in this Agreement to the

contrary notwithstanding, in the event any Member or Economic Interest Owner unexpectedly receive any adjustments, allocations or distributions described in Treasury Regulation Section 1.7041(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), or similar provisions, items of Company income and gain shall be specially allocated to such Member or Economic Interest Owner (in proportion to their respective deficit balances in their Capital Accounts) in an amount and manner sufficient to eliminate the deficit balances in their Capital Accounts created by such adjustments, allocations, or distributions as quickly as possible.  Any special allocations of items of income or gain pursuant to this Section 11.2(f) shall be taken into account in computing subsequent allocations of Profits pursuant to this Article 11, so that the net amount of any items so allocated and the Profits, Losses and all other items allocated to each Member or Economic Interest Owner shall, to the extent possible, be equal to the net amount that would have been allocated to each such Person if such unexpected adjustments, allocations or distributions had not occurred.

(g)    _Nonrecourse Deductions_.  Nonrecourse deductions for any fiscal year or other period shall be specially allocated to the Member or Economic Interest Owner in accordance with and proportion to their Interests in the Company.

(h)    _Member Loan Non-recourse Deductions_.  Any Member Loan Non-recourse Deductions for any fiscal year or other period shall be allocated to the Member or Economic Interest Owner who bears the risk of loss with respect to the loan which such Member Loan Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

(i)    _Section 754 Adjustments._    To the extent an adjustment to the adjusted tax basis of any Company asset purchase to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to Member or Economic Interest Owner in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(j)    Curative Allocations.  The allocations set forth in this Section 11.2 (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.

## ARTICLE 12. BOOKS AND RECORDS

12.1    _Accounting Period; Annual Statements_.  The financial statements of the Company shall be maintained in accordance with generally accepted accounting principles on a basis consistent with prior years.  A Manager designated by the Members, who initially shall be Physician Financial Partners, LLC, shall prepare and deliver monthly to each Member financial statements of the Company including, without limitation, a statement of profits and losses for the month (with year to date summary) and the balance sheet of the Company.  The Company's accounting period shall be the Fiscal Year.

12.2    *Records and Reports.*  The Company shall maintain records and accounts of all operations and expenditures of the Company.  The Company shall keep at its principal place of business the following records:

(a)    A current list of the full name and last known address of each Member and Economic Interest Owner;

(b)    Copies of records to enable a Member to determine the relative voting rights, if any, of the Members;

(c)    A copy of the Articles of Organization of the Company and all amendments thereto;

(d)    Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three (3) most recent years;

(e)    Copies of this Operating Agreement, together with any amendments thereof; and

(f)    Copies of any financial statements of the Company for the three (3) most recent fiscal years.

The books and records shall at all times be maintained at the principal office of the Company and shall be open to the reasonable inspection and examination of the Members, Economic Interest Owners, or their duly authorized representatives during the reasonable business hours.

12.3    *Tax Returns.*  The Company shall prepare and timely file all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.  Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year.

12.4    *Bank Accounts.*  The bank account or accounts of the Company shall be maintained in the bank approved by the Managers.  The terms governing such account shall be determined by the Managers and withdrawals from such bank account shall only be made by such parties as may be approved by the Managers.  Any account opened by the Managers for the Company shall not be commingled with other funds of the Managers or the Members.

12.5    *Tax Matters.*  In the event the Company is taxed as a partnership for federal income tax purpose, the Managers shall designate a Member serving as a Manager, or if there is none or if none are eligible to act, any Member, as the "tax matters partner" for federal income tax purposes (referred to herein as the "tax matters Manager").  Physician Financial Partners, LLC is initially designated as tax matters Manager.  The tax matters Manager is authorized and required to represent the Company in connection with all examinations of the Company's affairs by tax

authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The tax matters Manager shall have the final decision making authority with respect to all Federal income tax matters involving the Company. The Members agree to cooperate with the tax matters Manager in any action or proceeding involving issues of federal income taxation affecting the Company or the Members. Notwithstanding anything to the contrary contained herein, the tax matters Manager may not settle any tax issue, institute suit or extend the statute of limitations (except insofar as any such action is taken by the tax matters Manager in his or its individual capacity and not as the tax matters Manager) without the prior written consent of not less than a majority of the Ownership Percentages in the Company.

12.6    *Elections.*  Managers shall make elections for federal income tax purposes as they so determine.

12.7    *Allocation Amendments.*  The Managers shall prepare and execute any amendments to this Operating Agreement necessary for Company to comply with the provisions of Code Sections 704(b) and (c) and the regulations promulgated thereunder.

## ARTICLE 13. TRANSFERABILITY

13.1    *General Prohibition.*  Except as specifically provided for herein, no Member or Economic Interest Owner may assign, convey, sell, transfer, liquidate, encumber, or in any way alienate (collectively  a "Transfer"), all or any part of its Interest without having obtained the Majority Vote of the remaining Members, which consent may be given or withheld in the sole discretion of each Member. Any attempted Transfer of all or any portion of an Interest without the necessary consent, or as otherwise permitted hereunder, shall be null and void and shall have no effect whatsoever.

13.2    *Conditions of Transfer and Assignment.*  A transferee of an Interest permitted under Section 13.1 shall become a Member only upon obtaining the Majority Vote of the remaining Members and the following conditions have been satisfied:

(a)    the transferor, his legal representative or authorized agent must have executed a written instrument of transfer of such Interest in form and substance satisfactory to the Managers, other than the transferor;

(b)    the transferee must have executed a written agreement, in form and substance satisfactory to the Managers other than the transferor, to assume all of the duties and obligations of the transferor under this Operating Agreement with respect to the transferred Interest and to be bound by and subject to all of the terms and conditions of this Operating Agreement;

(c)    the transferor, his legal representative or authorized agent, and the transferee must have executed a written agreement, in form and substance satisfactory to the Managers (other than the transferor), to indemnify and hold the Company, the

Managers and the other Members harmless from and against any loss or liability arising out of the transfer;

(d)    the transferee must have executed such other documents and instruments as the Managers (other than the transferor) may deem necessary to effect the admission of the transferee as a Member; and

(e)    unless waived by the Managers (other than the transferor), the transferee or the transferor must have paid the expenses incurred by the Company in connection with the admission of the transferee to the Company.

A permitted transferee of an Economic Interest who does not become a Member shall be an Economic Interest Owner only and shall be entitled only to the transferor's Economic Interest to the extent assigned.  Such transferee shall not be entitled to vote on any question regarding the Company, and the Ownership Percentage associated with the transferred Economic Interest shall not be considered to be outstanding for voting purposes.

13.3    *Successors as to Economic Rights*.  References in this Operating Agreement to Members shall also be deemed to constitute a reference to Economic Interest Owners where the provision relates to the economic rights and obligations.  By way of illustration and not limitation, such provisions would include those regarding Capital Accounts, Distributions, allocations, and contributions.  A transferee shall succeed to the transferor's Capital Contributions and Capital Account to the extent related to the Economic Interest transferred, regardless of whether such transferee becomes a Member.

13.4    *Void Transfer.*  Any transfer in violation of this Article 13 is null and void.

13.5    *Additional Members.*  From the date of the formation of the Company, any Person or Entity acceptable to Members owning at least a majority of the Ownership Percentages may become a Member of the Company by executing an Admission Agreement setting forth the terms of his or its Commitment and by the issuance of the Company of Membership Interests for such consideration.

13.6    *Allocation to Substitute and Additional Members.*    No Substitute or Additional Member or Economic Interest Owner shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company.  The Managers may, at their option, at the time a Substitute or Additional Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Treasury Regulations promulgated thereunder.

## ARTICLE 14. DISSOLUTION AND TERMINATION

14.1    *Dissolution.*

The Company shall be dissolved upon the occurrence of any of the following events:

(i)      the unanimous vote or written consent of all Members;  or

(ii)     the sale of all or substantially all of the Company's assets and the collection of all proceeds therefrom.

14.2    *Effect of Dissolution*.  Upon dissolution, the Company shall cease to carry on its business, except as permitted by the Georgia Act.  Upon dissolution, the Members shall file a statement of commencement of winding up and publish the notice permitted by the Georgia Act.

14.3    *Winding-Up, Liquidation and Distribution of Assets.*

(a)      Upon dissolution, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.  The Member(s) shall immediately proceed to wind up the affairs of the Company.

(b)      If the Company is dissolved and its affairs are to be wound up, the Member(s) shall:

(i)      Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Member(s) may determine to distribute any assets to the Members in kind);

(ii)     Allocate any profit or loss resulting from such sales to the Members and Economic Interest Owners in accordance with Article 11 hereof;

(iii)    Discharge all liabilities of the Company, including liabilities to Members, Managers and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for Distributions, and establish such Reserves as may be reasonably necessary to provide for contingencies or liabilities of the Company;

(iv)     Distribute the remaining assets to the Members, either in cash or in kind, in accordance with the positive balance (if any) in each Member's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's Fiscal Year during which the liquidation occurs), with any balance in excess thereof being distributed in proportion to the Members' respective Ownership Percentages.  Any such Distributions in respect to Capital Accounts shall, to the extent practicable, be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations; and

(v)      If any assets of the Company are to be distributed in kind, the net fair market value of such assets shall be determined by independent appraisal or by

agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of this Operating Agreement to reflect such deemed sale.

(c)     Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution to reduce or eliminate the negative balance of such Member's Capital Account.

(d)     Upon completion of the winding-up, liquidation and distribution of the assets, the Company shall be deemed terminated.

14.4    *Certificate of Termination.* When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, a certificate evidencing such termination may be executed and filed with the Secretary of State of Georgia in accordance with the Georgia Act.

14.5    *Return of Contribution Nonrecourse to Other Members.* Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Account. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Account of one or more Members, including, without limitation, all or any part of that Capital Account attributable to Capital Contributions, then such Member or Members shall have no recourse against any other Member.

## ARTICLE 15. MISCELLANEOUS PROVISIONS

15.1    *Application of Georgia Law.* This Operating Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the Georgia Act.

15.2    *No Action for Partition.* No member has any right to maintain any action for partition with respect to the property of the Company.

15.3    *Execution of Additional Instruments.* Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

15.4    *Construction.* Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

15.5    *Headings.*  The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

15.6    *Waivers.*  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

15.7    *Rights and Remedies Cumulative.*  The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by a party shall not preclude or waive the right to use any or all other remedies.  Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

15.8    *Severability.*  If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall  be affected and shall be enforceable to the fullest extent permitted by law.

15.9    *Exhibits.*  All exhibits referred to in this Operating Agreement and attached hereto are incorporated herein by this reference.

15.10  *Heirs, Successors and Assigns.*  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

15.11  *Creditors.*  None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company or by any Person not a party hereto.

15.12  *Counterparts.*  This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

15.13  *Certification of Non-Foreign Status.*  In order to comply with Section 1445 of the Code and the applicable Treasury Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Treasury Regulations, each Member shall provide to the Company, an affidavit stating, under penalties of perjury: (i) the Member's address, (ii) United States taxpayer identification number, and (iii) that the Member is not a foreign person as that term is defined in the Code and Treasury Regulations.  Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Managers to withhold ten percent (10%) of each such Member's distributive share of the amount realized by the Company on the disposition.

15.14  *Notices.*  Any and all notices, offers, demands or elections required or permitted to be made under this Operating Agreement ("Notices") shall be in writing, signed by the party giving such Notice, and shall be deemed given and effective (i) when hand-delivered (either in person by

the party giving such notice, or by its designated agent, or by commercial courier) or (ii) on the third (3rd) business day (which term means a day when the United States Postal Service, or its legal successor ("Postal Service") is making regular deliveries of mail on all of its regular appointed week-day rounds in Atlanta, Georgia) following the day (as evidenced by proof of mailing) upon which such notice is deposited, postage pre-paid, certified mail, return receipt requested, with the Postal Service, and addressed to the other party at such party's respective address as set forth on *Exhibit "A,"* or at such other address as the other party may hereafter designate by Notice.

15.15 *Amendments.*  Any amendment to this Operating Agreement shall be made in writing and signed by Members representing at least a majority of the Ownership Percentages.

15.16 *Invalidity.*   The invalidity or unenforceability of any particular provision of this Operating Agreement shall not affect the other provisions hereof, and the Operating Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.  If any particular provision herein is construed to be in conflict with the provisions of the Georgia Act, the provisions of this Operating Agreement shall control to the fullest extent permitted by applicable law.  Any provision found to be invalid or unenforceable shall not affect or invalidate the other provisions hereof, and this Operating Agreement shall be construed in all respects as if such conflicting provision were omitted.

15.17 *Determination of Matters Not Provided for in This Operating Agreement.*  The Members shall decide any questions arising with respect to the Company and this Operating Agreement which are not specifically or expressly provided for in this Operating Agreement.

15.18 *Further Assurances.*  The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Operating Agreement.

15.19 *No Partnership Intended for Non-Tax Purposes.*  The Members have formed the Company under the Georgia Act, and expressly disavow any intention to form a partnership under Georgia's Uniform Partnership Act, Georgia's Uniform Limited Partnership Act or the partnership act or law of any other state.  The Members do not intend to be partners one to another or partners as to any third party.  To the extent any Member, by work or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

15.20 *Time.*  Time is of the essence of this Operating Agreement, and to any payments, allocations and Distributions provided for under this Operating Agreement.

15.21 *Waiver of Right to Dissent.*  All of the Members do hereby waive any right to dissent from, and obtain payment of the fair value of its Membership Interest in the event of any of the actions taken by the Company set forth in Section 14-11-1002 of the Georgia Act.

15.22   *Power of Attorney.*   Each Member hereby makes, constitutes and appoints each elected Manager as may be serving from time to time, severally and with full power of substitution, as the Member's true and lawful attorney-in-fact for such Member and in such Member's name, place and stead and for the Member's use and benefit to sign and acknowledge, file and record any amendments hereto, among the Members and for the further purpose of executing and filing on behalf of each Member, any documents necessary to constitute the continuation of the Company, the admission or withdrawal of a Member, the admission of substitute Members, the qualification of the Company in a foreign jurisdiction (or amendment to such qualification), or the dissolution or termination of the Company, provided such continuation, admission, withdrawal, qualification or dissolution and termination are in accordance with the terms of this Agreement.

The foregoing power of attorney is a special power of attorney coupled with an interest, is irrevocable and shall survive the death or legal incapacity of each Member.  It may be exercised by any one of said attorneys by listing all the Members executing any instrument over the signature of the attorney-in-fact acting for all of them.  The power of attorney shall survive the delivery of an assignment by a Member of the whole or any portion of his Membership Interest. In those cases in which the Assignee of, or the successor to, a Member owing Membership Interest has been approved by the Members for admission to the Company as a Substitute Member, the power of attorney shall survive for the sole purpose of enabling the Mangers to execute, acknowledge and file any instrument necessary to effect such substitution.

This power of attorney shall not be affected by the subsequent incapacity or mental incompetence of any Member.

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be executed, under seal, all as of the day and year first above written.

**PHYSICIAN FINANCIAL PARTNERS, LLC**

(SEAL)

By: *Jamila Dadabhoy*

Title: *Manager*

**EXHIBIT "A"**

Members

| Name | Address | Capital Contribution |
|---|---|---|
| Physician Financial Partners, LLC | 2406 Bellevue Avenue Suite 7 Dublin, Georgia 31021 | $100.00 |

**FIRST AMENDMENT TO CUREPOINT, LLC. OPERATING AGREEMENT**

Physician Financial Partners hereby resolves and confirms on June 19, 2018 the following:

Ownership will be amended to:

Physician Financial Partners, LLC.        95.01%
Radiation Business Solutions, Inc.         4.99%

All other sections of the attached current Operating Account remain the same.

The undersigned have duly executed this LLC operating agreement amendment on the date below:

Physician Financial Partners, LLC.

Curepoint, LLC. Manager

Jamila Dadabhoy                                                         Manager

Physician Financial Partners, LLC. manager