# EXHIBIT B

PROCEEDINGS
CUREPOINT, LLC

October 12, 2022
1

1

2

3

4

5

6

7          UNITED STATES BANKRUPTCY COURT

8      FOR THE NORTHERN DISTRICT OF GEORGIA

9          ATLANTA DIVISION

10

11   IN RE:  CUREPOINT, LLC,
                    DEBTOR
12   CHAPTER 11

13   CASE NO. 22-56501-jwc

14

15

16

17

18

19

20

21

22

23

24   JOB No.:  J8792549

25

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                        2

1         A P P E A R A N C E S

2 ON BEHALF OF DEBTOR:

3     WILL B. GEER, ESQUIRE

4     Rountree Leitman Klein & Geer, LLC

5     2987 Clairmont Road, Suite 350

6     Atlanta, Georgia 30329

7     wgeer@rlkglaw.com

8     (404) 584-1238

9

10     WILLIAM A. ROUNTREE, ESQUIRE

11     Rountree Leitman Klein & Geer, LLC

12     2987 Clairmont Road, Suite 350

13     Atlanta, Georgia 30329

14     wrountree@rlkglaw.com

15     (404) 584-1238

16

17 ON BEHALF OF U.S. TRUSTEE:

18     LINDSAY KOLBA, ESQUIRE

19     Office of The United States Trustee

20     75 Ted Turner Drive, Southwest, Room 362

21     Atlanta, Georgia 30303

22     ustp.region21@usdoj.gov

23     (404) 331-4437

24

25

PROCEEDINGS                                                      October 12, 2022
CUREPOINT, LLC                                                              3

1          A P P E A R A N C E S

2  ON BEHALF OF DR. MARC MCCORD, CREDITOR:

3     MICHAEL LEVENGOOD, ESQUIRE

4     Law Office of J. Michael Levengood, LLC

5     150 South Perry Street, Suite 208

6     Lawrenceville, Georgia 30046

7     mlevengood@levengoodlaw.com

8     (678) 765-1745

9

10     TOM BARTON, ESQUIRE

11     Coles Barton LLP

12     150 South Perry Street, Suite 100

13     Lawrenceville, Georgia 30046

14     tbarton@colesbarton.com

15     (770) 995-5570

16

17     AARON TADY, ESQUIRE

18     Coles Barton LLP

19     150 South Perry Street, Suite 100

20     Lawrenceville, Georgia 30046

21     atady@colesbarton.com

22     (770) 995-5560

23

24

25

1              A P P E A R A N C E S

2   ON BEHALF OF AMOA FINANCE, CREDITOR:

3      MICHAEL F. HOLBEIN, ESQUIRE

4      Smith Gambrell Russell, LLP

5      1105 West Peachtree Street, Northeast, Suite 1000

6      Atlanta, Georgia 30309

7      mholbein@sgrlaw.com

8      (404) 815-3607

9

10  ALSO PRESENT:

11      David A. Garland, Esquire, Lafayette Bank

12      Leslie M. Pineyro, Esquire, Morris Bank

13      Mr. Miajan, Morris Bank

14      Mr. Dobb, Merchant Funding

15      John McCullough, Newtech

16      Fred Walker, First Liberty Capital Partners, LLC

17      Steven M. Kushner, Fellows LaBriola, LLP

18

19

20

21

22

23

24

25

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                      5

1              C O N T E N T S

2  OPENING STATEMENT                          PAGE

3     By Counsel for Dr. McCord            16

4     By Counsel for AMOA Finance          29

5     By Counsel for Debtor                34

6

7  WITNESS:                  DX  CX  RDX RCX

8  PHILLIP MILES

9     By Mr. Barton              57      218

10    By Mr. Geer            195

11    By Mr. Holbein              214

12

13  CARMEN SIMMONS

14    By Mr. Holbein       115     126

15    By Mr. Rountree          123

16

17  KAREN FORTUNE

18    By Mr. Barton        165     189

19    By Mr. Geer              185     190

20

21  ERICH RANDOLPH

22    By Mr. Holbein           225

23    By Mr. Levengood          238

24    By Mr. Geer          245

25

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                         6

```
 1              C O N T E N T S

 2  WITNESS:                    DX  CX  RDX RCX

 3  BRANT FROST IV

 4    By Mr. Geer           260

 5    By Mr. Holbein            264

 6    By Mr. Levengood           261

 7

 8              E X H I B I T S

 9  EXHIBIT  DESCRIPTION              MARKED   ADMITTED

10     DR. MARC MCCORD

11  28     CurePoint bank statements

12         Re: Z.E.R.O. Holding      90      110

13  29     CurePoint bank statements

14         Re: Northwinds Leasing
                        x  90     110
15  30     CurePoint bank statements

16         Re: MEC Capital       90      110

17  31     CurePoint bank statements

18         Re: Mittere, Inc.     90     110

19  41     Debtor's Amended Schedule  67     110

20  34     Newtech loan documents     94     110

21  39     Click Capital loan

22         documents              96     110

23  37     PointOne Capital loan

24         documents
                        101     110
25  19     FINRA documentation      104     110
```

PROCEEDINGS                                           October 12, 2022
CUREPOINT, LLC                                                    7

```
 1              E X H I B I T S
 2  EXHIBIT  DESCRIPTION           MARKED   ADMITTED
 3     DR. MARC MCCORD
 4  1      Transfer Summary
 5         Re: CurePoint and Z.E.R.O.
 6         Holding, LLC        172     185
 7  2      Transfer Summary
 8         Re: CurePoint and North
 9         Winds Leasing, LLC      174     185
10  3      Transfer Summary
11         Re: CurePoint and MEC
12         Capital, LLC       175     185
13  4      Transfer Summary
14         Re: CurePoint and
15         Mittere, Inc.        176     185
16
17              E X H I B I T S
18  EXHIBIT  DESCRIPTION           MARKED   ADMITTED
19     AMOA FINANCE, LLC
20  84-1     Linac licensing and
21         purchase agreement      132     133
22  84-2     Composite exhibit     135     144
23  84-3     Linac licensing and
24         purchase agreement      145     150
25
```

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                      8

1              E X H I B I T S

2 EXHIBIT  DESCRIPTION              MARKED   ADMITTED

3    AMOA FINANCE, LLC

4 84-4     Georgia Heritage Bank

5        loan documents          150      151

6

7              E X H I B I T S

8 EXHIBIT  DESCRIPTION              MARKED   ADMITTED

9    DEBTOR

10 79-2     Letter of Interest

11        McCord to CurePoint     202      203

12 79-8     Final judgment          267      267

13 12     Revised APA              248      267

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                      9

1              P R O C E E D I N G S

2          THE COURT:  Well, that'll take up the

3   CurePoint case.  And I know we have a number of

4   different matters to be heard on the CurePoint case.

5   So let's take appearances of Counsel in the CurePoint

6   case.  First for the Debtor.

7          MR. GEER:  Will Geer, Your Honor, for the

8   Debtor.  And we also have Will Rountree.  Phillip

9   Miles, the designated manager, is also here.  As well

10  as the manager Jamila Dadabhoy.

11         THE COURT:  All right.  And for Dr. McCord?

12         MR. LEVENGOOD:  Thank you, Your Honor.

13  Michael Levengood, with the law firm of -- Law Office

14  of J. Michael Levengood, together with Tom Barton and

15  Aaron Tady with the law -- with the Coles Barton Law

16  Firm in Lawrenceville, and we represent Dr. Marc W.

17  McCord.  We have two witnesses.

18         THE COURT:  All right.  Thank you.  For the

19  U.S. Trustee?

20         MS. KOLBA:  Good morning, Your Honor.

21  Lindsay Kolba on behalf of the United States Trustee.

22  The United States Trustee and the Debtor have reached

23  an agreement with respect to the United States

24  Trustee's motion.  And I can either outline that for

25  the Court now, or after you finish taking appearances.

1        THE COURT:  We'll do it in a minute.

2        MS. KOLBA:  Okay.

3        THE COURT:  So thank you.  For AMOA Finance?

4        MR. HOLBEIN:  Thank you, Your Honor.  Michael

5  Holbein for AMOA Finance.  We all have four witnesses

6  that we're going to ask questions of, but one of those

7  overlaps with Mr. Levengood.

8        THE COURT:  All right.  Thank you.  All

9  right.  And any other appearances in the courtroom?

10  All right.  On Zoom, Mr. Garland for Lafayette Bank?

11        Mr. GARLAND:  Yes, sir, Your Honor.  This is

12  David Garland from Moore, Clarke, DuVall & Rodgers, on

13  behalf of Lafayette Bank.

14        THE COURT:  All right.  And Ms. Pineyro

15  again?

16        MS. PINEYRO:  Yes, Your Honor.  Leslie

17  Pineyro on behalf of Morris Bank.  And again, Mr.

18  Miajan (ph) may step in for me when I step out.

19        THE COURT:  All right.  And Mr. Dobb (ph),

20  are you participating in this hearing as well?

21        MR. DOBB:  Yes, Your Honor.  I'll be here on

22  behalf of (Inaudible) Capital (inaudible) Merchant

23  Funding.

24        THE COURT:  All right.  And Mr. McCullough?

25        MR. MCCULLOUGH:  Yes, Your Honor.  John

PROCEEDINGS                                         October 12, 2022
CUREPOINT, LLC                                                    11

1  McCullough for Newtech.

2        THE COURT:  All right.  Any other creditor or

3  party in interest wish to make an appearance via Zoom?

4        MR. WALKER:  Good morning, Your Honor.  Fred

5  Walker on behalf of First Liberty Capital Partners,

6  LLC.

7        THE COURT:  Mr. Walker, good morning.

8        MR. WALKER:  Good morning.

9        THE COURT:  Any --

10        MR. WALKER:  I apologize for my tech

11  difficulties earlier.

12        THE COURT:  No, no problem.  Any other

13  creditor or party in interest wish to make an

14  appearance?  All right.  I know we have three motions,

15  one of which Ms. Kolba's indicated has been resolved.

16  What I want to hear from is -- from each of the

17  parties.  I know you -- some of you have indicated how

18  many witnesses.

19        I want to know how much time you need to

20  present your case, both witnesses and argument.

21  Direct, cross.  I want to -- I want the best estimate

22  you can give me, how much time you need to present

23  your case.  And I want to hear from the parties in the

24  order in which the motions were presented.

25        So, Mr. Levengood, your motion was filed

1  first.

2        MR. LEVENGOOD:  Thank you, Your Honor.  If

3  you can give me just a moment, let me check with co-

4  counsel.

5        THE COURT:  Okay.

6        MR. LEVENGOOD:  Your Honor, we believe an

7  hour and 15 minutes will be sufficient.

8        THE COURT:  All right.  Mr. Holbein?

9        MR. HOLBEIN:  Your Honor, I believe I'll

10  probably be closer to two hours with witnesses and

11  arguments.

12        THE COURT:  All right.  Ms. Kolba, I'm

13  assuming you're not going to need time if you've

14  resolved your motion?  Do you want to go ahead and

15  announce your resolution?

16        MS. KOLBA:  Yes, Your Honor.  Lindsay Kolba

17  on behalf of the United States Trustee.  As the Court

18  is well aware, there have been a number of motions

19  that have been filed, all seeking the same relief.

20  The Debtor has consented to the appointment of a

21  Chapter 11 Trustee, but at a specific point in time.

22        As the Court is also aware, the Debtor has

23  filed a motion to prevent procedures and a -- has

24  proposed a sale.  And there are a number of issues

25  with the appointment of a trustee and the sale motion

1  that somewhat overlap.  The United States Trustee

2  believes that any issues with respect to the adequacy

3  of the proposed sale, the adequacy of the marketing of

4  the proposed sale, whether the price is -- you know,

5  the fair market price for this entity.

6          All of those issues should be handled not in

7  the context of a motion to appoint a trustee, but

8  should be handled in the context of the sale motion

9  and through the objections -- or the objection that

10  has been filed to the bid procedures motion that is on

11  for hearing today.

12          The Debtor has agreed to include language in

13  the order that would direct that the United States

14  Trustee would appoint a Chapter 11 Trustee in

15  conjunction with the Court approving a sale of the

16  entity.  So at the time that we all come back to court

17  for the Court to review the auction that took place,

18  and to determine who, if not the (inaudible) --

19  proposed (inaudible) has the -- has presented the

20  highest and best offer, and is a successful purchaser

21  of the entity.

22          When the Court is entering the order

23  approving the purchaser, that is when the United

24  States Trustee would be directed to appoint a Chapter

25  11 trustee, and it would be the Chapter 11 trustee

1  that would oversee the closing of the proposed sale of

2  the Debtor's business operations.

3          So from the United States Trustee's

4  perspective, that resolves the United States Trustee's

5  motion, and allows the proposed sale that has been

6  presented by the Debtor to be evaluated by the

7  parties, and by the Court, and for other proposed or

8  possible purchasers to have time to complete due

9  diligence.  And we're not running the risk of walking

10  away from money that is presently on the table.  So

11  that seemed to be a fair resolution to the United

12  States Trustee.

13          We are confident with the procedures that are

14  presently in place for the Debtor to be filing monthly

15  operating reports on a regular basis.  That that is

16  adequately made to its trustee to ensure that there

17  are no continued issues with Mr. Miles transferring

18  money to other entities that he owns and controls.

19  But to the extent that the United States Trustee were

20  to see any of that behavior, obviously we would seek

21  appropriate intervention from the Court at that time.

22          But with that agreement from the Debtor to

23  appoint a trustee, the United States Trustee believes

24  that her motion is resolved.

25          THE COURT:  All right.  Thank you very much.

1      MS. KOLBA:  Okay.

2      THE COURT:  All right.  Mr. Geer?

3      MR. GEER:  Your Honor, we expect our side an

4  hour and a half.  I think it's quite an overestimate.

5      THE COURT:  Okay.  Based on the timing, it

6  seems like everybody thinks we can get done in a day,

7  which is encouraging.  All right.  What I'd like to do

8  is hear opening arguments on all the issues.  Both the

9  motion to appoint a trustee and the Debtor's sale,

10  proposed sale transaction.  From all the parties at

11  the same time.  Well, let me -- let me back up for one

12  second.

13      Is there anybody on Zoom who is going to be

14  seeking to present argument or evidence on either

15  motion?  Let me hear from Ms. Pineyro first.

16      MS. PINEYRO:  Your Honor, (inaudible) a

17  limited objection to the sale motion, but it does not

18  relate to the debt procedures or the sale (inaudible).

19  It's -- so I don't believe that we intend any

20  arguments today.

21      THE COURT:  Oh, all right.  Mr. Garland?

22      MR. GARLAND:  Your Honor, we are monitoring

23  the hearing more than -- and we do not anticipate

24  making any arguments or opening today.

25      THE COURT:  All right.  Thank you.  Mr. Dobb?

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    16

1        MR. DOBB:  Same (inaudible) make any argument

2  today, because we're here to monitor.

3        THE COURT:  All right.  Thank you.  Mr.

4  McCullough?

5        MR. MCCULLOUGH:  Your Honor, it's John

6  McCullough.  The same for Newtech.  I don't anticipate

7  having any questions or making any argument.

8        THE COURT:  All right.  And Mr. Walker?

9        MR. WALKER:  Your Honor, the same for First

10  Liberty as well.  We intend just to monitor.  We don't

11  anticipate making any arguments today.

12        THE COURT:  All right.  Thank you very much.

13  All right.

14        MR. WALKER:  Thank you.

15        THE COURT:  I'm going to hear opening

16  arguments in the same order as the motions were filed.

17  So I'll begin with Mr. Levengood.

18        MR. LEVENGOOD:  Thank you, Your Honor.

19  Michael Levengood on behalf of Dr. Marc McCord.  And

20  together with Tom Barton and Aaron Tady.  Mr. Barton

21  will be conducting the examination of the witnesses.

22        Your Honor, I'll start by identifying the

23  relationship of Dr. McCord to this debtor.  Next I'll

24  talk about why cost exists for the appointment of a

25  Chapter 11 trustee under 1104(a)(1).  And,

1  alternatively, why this court should appoint a trustee

2  as being in the interest of the Creditors under

3  1104(a)(2) of the bankruptcy code.  And then finally,

4  in accordance with the Court's direction, I'll talk

5  about Dr. McCord's objection to the settlement.

6        Your Honor, first Dr. McCord holds an

7  unsecured claim against the Debtor for more than $1

8  million, arising out of the payment of $850,000 in

9  order to settle a claim bought by a bank that loaned

10  money to CurePoint several years ago, and that was

11  guaranteed by Dr. McCord and others.  His payment

12  reduced the amount of that bank loan that benefited

13  CurePoint.

14        He has filed a proof of claim for $1 million

15  as opposed to 850 to pick up the pre-petition -- I'm

16  sorry, the pre-judgment interest and legal fees that

17  relate to that claim.

18        Dr. McCord is a physician who treats patients

19  who have cancer.  Dr. McCord is also a minority member

20  in Physician Professional -- Physician Financial

21  Partners, LLC, which is the largest member of

22  CurePoint.  The other two members of Physician

23  Financial Partners are David Dooley and MEC Capital

24  which is owned by Phillip Miles.

25        Dr. McCord was removed as a manager of

1  Physician Financial Partners by Misters Miles and

2  Dooley in February of 2018.  And has been frozen out

3  of control of Physician Financial Partners, and in

4  turn CurePoint since then.  While CurePoint has

5  transferred substantial sums of money to entities in

6  which Dr. McCord has no interest, but Mr. Miles does,

7  neither directly or indirectly.

8         And while CurePoint has executed corporate

9  guarantees of debt for Phillip Miles' owned or

10  controlled entities without consideration to

11  CurePoint.  Tracking of the transfers between

12  CurePoint and Phillip Miles' entities is a spreadsheet

13  identifying intercompany transactions.  And according

14  to the testimony of the designated representative of

15  CurePoint earlier this year, the intercompany

16  transfers are loans.  Although there are no promissory

17  notes, interest rates, due dates, or other customary

18  documents that would demonstrate a loan.

19         My second point is why cost exists for the

20  appointment of a trustee, and why the Court should

21  appoint a trustee now and not wait until December or

22  perhaps later.  First the Debtor and the United States

23  Trustee have agreed, apparently, that the Debtor will

24  not oppose the Trustee's motion to appoint a trustee

25  after the Debtor's sale of its assets to Dr. Randolph

1  closes.

2       In my mind, delaying a review of the self-

3  interested transactions in which Phillip Miles has

4  engaged, and permitting him to control the access to

5  due diligence materials and to bidding procedures are

6  significant differences that will exist if this Court

7  delays the appointment of a trustee.

8       The burden of proof in a motion for the

9  appointment of a trustee appears to be that Dr. McCord

10  and other (inaudible) must demonstrate by clear and

11  convincing evidence that a Chapter 11 trustee should

12  be appointed.  In that regard, I would like to point

13  to two recent decisions by judges in the Northern

14  District of Georgia.

15       First, Judge Hagenau in the case of In Re:

16  Nilhan, N-I-L-H-A-N, Developers, 2021 Bankruptcy Lexis

17  266, 2021 Westlaw 408977, February 8, 2021.  A

18  decision in which she awarded compensation to counsel

19  for a Chapter 11 trustee, and stated that the Court

20  notes that a Chapter 11 trustee is only appointed in

21  certain circumstances.  The appointment of a Chapter

22  11 trustee is an extraordinary remedy, and is the

23  exception rather than the rule.

24       Dr. McCord agrees with Judge Hagenau, and

25  believes that CurePoint presents facts that justifies

1  such an extraordinary remedy, and points out that

2  Judge Hagenau did appoint a Chapter 11 trustee in that

3  case.

4          Second, Judge Ellis-Monro's decision in the

5  case of In Re: YC Atlanta Hotel, LLC, 630 B.R. 348.  A

6  decision at the Northern District of Georgia

7  Bankruptcy Court in 2021, in which the Court denied a

8  motion to appoint a Chapter 11 trustee, and instead

9  appointed an examiner to investigate the accuracy of

10 financial reporting and certain intercompany

11 transfers.

12         The Court balanced the benefits and costs in

13 that case, and decided that the appointment of an

14 examiner rather than a trustee would be appropriate

15 where, in that juncture in the case, that was a

16 reorganization that was in prospect.

17         As the Debtor has indicated in this case,

18 there will be no reorganization, this is a

19 liquidation.  The Debtor intends to pursue a sale

20 substantial to all of its assets pursuant to Section

21 363 of the bankruptcy code, and then liquidate.

22         So we believe that Judge Ellis-Monro's

23 opinion actually would support the appointment of a

24 trustee in this case as well.  We will demonstrate the

25 cause exists for the appointment of a Chapter 11

1  trustee.  The bankruptcy code sets forth two avenues

2  for the appointment.

3        As I've just mentioned, one mandatory and one

4  discretionary.  Under bankruptcy rule 1104(a)(1), the

5  court is required to appoint a Chapter 11 trustee upon

6  finding of cause.  Including fraud, dishonesty,

7  incompetence, or gross management by the Debtor.  The

8  word shall leaves no room for discretion once cause is

9  found.

10        However, under 1104(a)(2), the Court may

11  appoint a Chapter 11 trustee if such appointment is in

12  the interest of creditors, equity holders, and other

13  interests of the estate.  That does not require the

14  finding of fault.  The Court may appoint a trustee

15  even if no cost exists.

16        Factors that have been used to determine

17  whether or not the Court should exercise its

18  discretion under 1104(a)(2) include the

19  trustworthiness of the Debtor, the Debtor in

20  Possession's past and present performance, and

21  prospect for rehabilitation.  The confidence, or lack

22  thereof, of the business community, and creditors, and

23  the present management.  And the benefits derived from

24  the appointment of a trustee balanced against the cost

25  of that appointment.

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                         22

1        For that announcement of the -- or recitation

2  of standards, I cite the Court In Re: Sundale, Ltd.,

3  400 bankruptcy, reporter 890.  The decision of the

4  bankruptcy court for the Southern District of Florida

5  back in 2009 in which the Court cited Judge Burton

6  Lifland's seminal decision in the Ionosphere Clubs

7  case in which he decided to appoint a trustee, saying

8  that by clear and convincing evidence cost existed

9  under both 1104(a)(1) and 1104(a)(2).

10       Your Honor, officers and directors of

11  companies, and managers of limited liability companies

12  have three fiduciary duties.  One is a duty of care,

13  one is the duty of loyalty auditing, and the other is

14  a duty of obedience.

15       The duty of care is protected by the business

16  judgment rule.  And that means that courts don't

17  substitute their judgment for the decisions of

18  managers of limited liability companies that are

19  taken, pursuant to a process, in good faith.

20       However, the duty of loyalty does not have

21  the benefit of the business judgment rule.  If there

22  is a conflicted transaction, then the parties in the

23  conflicted transaction must show the overall fairness

24  of the transaction without any presumption that it is.

25       So when they engage in self-interested

1  transactions, they bear the burden of demonstrating

2  the entire fairness to the company.  And for that I

3  cite In Re: Intercat, 247 B.R. 911 (Bankr. S.D.Ga.

4  2000), in which the Court granted the motion to

5  appoint a trustee, Chapter 11 trustee, recognizing

6  that the business judgment rule is not implicated for

7  claims involving breach of duty and loyalty.  Stating

8  protection of the business judgment rule will be lost

9  if the director appears on both sides of the

10  transaction or derives personal benefit from it.

11          Phillip Miles has filed papers in this case

12  as the designated manager of the Debtor.  That same

13  Phillip Miles has been barred by the Financial

14  Industry Regulatory Authority, also known as FINRA,

15  from acting as a broker or otherwise associating with

16  broker dealer firms.  The allegations were that he

17  failed to respond to FINRA requests to provide a

18  written statement regarding unauthorized trading and

19  false account values.  And without admitting or

20  denying the findings he consented to the described

21  sanction and to the entry of findings.

22          The self-interested transactions in which

23  Phillip Miles has imposed upon CurePoint include, but

24  are not limited to causing CurePoint to transfer

25  almost $8 million to parties that he controls.  Namely

1  MEC Capital, Mittere, Inc., Northwinds Leasing, and

2  Z.E.R.O. Holding.

3        Now, he's also caused those companies to put

4  -- transfer money back to CurePoint.  Nevertheless, if

5  you net those amounts as he proposes, the amount

6  CurePoint is owed by these four Miles-related entities

7  is $2,728,777.43.

8        Now, whether or not you can sell is a matter

9  of state law, and also bankruptcy law.  If these are

10 true loans, I think he has greater arguments about the

11 ability to do that.  If these are avoidable

12 transactions, which I submit they are, he doesn't have

13 a right to sell.  And I cite a case out of -- there's

14 a Ninth Circuit, I think, that case that I can -- In

15 Re: Okubo.  If you give me a minute, I'll pull it.

16        I'm sorry, it's In Re: Acequia, Inc., 34 F.3d

17 800 (9th Cir. 1994).  Which the Court held when a

18 insider defendant argued that fraudulent transfers

19 that he had engaged in should be netted with his claim

20 in the bankruptcy case held that (inaudible)

21 obligations did not exist, and therefore he could not

22 exert himself under those circumstances.

23        Your Honor, the primary evidence of post-

24 petition in propriety is that this Debtor has failed

25 not once, but twice, to fully disclose the amounts of

1 money owed by these Miles-related entities to the

2 Debtor.  In the schedules filed initially, the

3 schedules are silent as in regards to any asset that

4 this Debtor had against those Miles-related entities.

5        The Debtor filed an amended schedule recently

6 in which the Debtor for the first time said, "Oh,

7 well, there may be some claims against the entities

8 that are described in an attachment to the statement

9 of financial affairs."  And then when asked to say how

10 much the value of those claims are in the schedules

11 said unknown.  So there is no demonstration of the

12 $2.7 million of assets that this Debtor has with

13 regards to the Miles-related entities.  We think

14 that's material.  Failure to disclose.

15        Additionally, the Debtor -- I'm sorry.

16 Additionally, Mr. Miles caused the Debtor to execute

17 corporate guarantees of debt in favor of Z.E.R.O.

18 Holdings without consideration.  Those corporate

19 guarantees by CurePoint of Z.E.R.O. Holdings debt

20 includes Newtech Small Business Finance at a $3.5

21 million guarantee, Click Capital Group (ph) with a

22 $420,000 guarantee, Premium Merchant Funding a

23 $200,000 guarantee, and Zen Capital a $100,000

24 guarantee.

25        With regard to evidence of fraud, we will put

1   on evidence that Mr. Miles has executed documents that

2   are false in connection with borrowing money, both for

3   CurePoint and other entities.

4        Your Honor, with regard to the sale we filed

5   an objection last night.  Essentially, we are

6   concerned that Mr. Miles will not run a fair and open

7   process.  He certainly has the ability to do so, but

8   he just doesn't have the incentive to do so.  He has

9   picked his stalking horse, who is a physician who

10  currently practices in Dublin, who operates -- who

11  provides cancer care for patients in Dublin at the

12  Debtor's Dublin facility.  And he has drafted the sale

13  -- not the good doctor down in Dublin, but rather Mr.

14  Miles.

15       The Debtor has failed to describe what is

16  meant by managed practice, but it's pretty clear in

17  our -- we examined the Debtor on Monday, and Mr. Miles

18  testified that he met Dr. Randolph when he talked

19  about the managed practice.  Why is that important?

20  Well, there's assets being sold, but what's not being

21  sold is professional assets.  Patient records, the

22  records that are necessary to provide ongoing care for

23  the patients at the Dublin facility.

24       Those assets are not going to be included in

25  the sale, they're just going to be transferred to Dr.

1   Randolph at closing for no consideration.  His answer

2   to that is, well, he's the successful bidder so it all

3   works out.  But that is a poison pill that prevents

4   anybody else from bidding.  If you're going to buy a

5   facility, and you can't provide care to the patients

6   in the community because you don't have any of the

7   records, it's going to be a substantial deterrent to

8   the Debtor's ability to find true third party interest

9   in buying.

10          And because the Debtor reserves to itself the

11   ability to determine whether terms of the asset

12   purchase agreement, other than the purchase price,

13   affect whether it's the highest and best bid, then Mr.

14   Miles has the ability to say this was not a higher and

15   better bid because it doesn't allow Dr. Randolph to

16   walk off with all of the medical records.

17          So we believe that a trustee wouldn't do

18   that, and we believe that that particular provision

19   should be excised from the asset purchase.  The Debtor

20   does not disclose what steps the Debtor has taken to

21   determine that Dr. Randolph is a qualified bidder

22   under the statement of the bid procedures that

23   everybody else would have to comply with.

24          The Debtor has indicated that Indiana law

25   should apply when, in fact, this property is in

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                        28

1  Georgia, and all the parties are in Georgia.  So we

2  believe Georgia law should apply.  The Debtor has not

3  disclosed what information will be contained in the

4  due diligence data room.  And Mr. Holbein will

5  indicate that multiple requests have been made for

6  access to the due diligence data room over the --

7  since the petition was filed, and access was not

8  granted until yesterday.

9          So my only other comment on the sale motion

10 is I believe that no distribution should be made at

11 closing to holders of secured claims.  I believe that

12 it would be more appropriate for a trustee to file a

13 complaint to determine validity, extent, and priority

14 of liens against the sale proceeds and allow a

15 valuation of the assets that are sold that may be

16 subject to a secured interest to be addressed and

17 assessed as a part of the appropriate division of the

18 sale proceeds to the secured creditors.

19         We thank the Court for its consideration.

20         THE COURT:  Mr. Levengood, let me ask you one

21 question.

22         MR. LEVENGOOD:  Sir?

23         THE COURT:  Is Dr. McCord prepared to pay in

24 excess of $6 million to buy the business?

25         MR. LEVENGOOD:  Dr. McCord is not proposing

PROCEEDINGS                                                      October 12, 2022
CUREPOINT, LLC                                                                  29

1  to participate, to my knowledge, in the purchase.  But

2  I understand there are candidates who are interested

3  in bidding, and Mr. Holbein can talk about that.

4          THE COURT:  All right.  Thank you.

5          MR. LEVENGOOD:  Thank you.

6          THE COURT:  Ms. Kolba, your motion was

7  second, but since it's been resolved I'm assuming you

8  don't want to make an opening argument?

9          MS. KOLBA:  That's correct, Your Honor.  But

10  I did leave out one thing from my presentation.  The

11  Debtor did understand that to the extent that the

12  Court were amenable to United States Trustee's

13  proposal the United States Trustee would begin the

14  process of consulting with the various parties,

15  interviewing candidates, and will be prepared to make

16  an appointment as soon as the Court entered the order

17  directing the United States Trustee to do so.  So

18  there would be no delay in getting a trustee appointed

19  from the United States Trustee's perspective.

20          THE COURT:  All right.

21          MS. KOLBA:  I left that out.

22          THE COURT:  Thank you very much.  All right.

23  Mr. Holbein?

24          MR. HOLBEIN:  Thank you, Your Honor.  Michael

25  Holbein for AMOA Finance, LLC.  I think it -- a little

1   bit of background here would be helpful, to understand

2   the sliver of an epic battle that this Court is

3   seeing.

4          So AMOA Finance is an affiliate of Mr.

5   Levengood's client.  And behind that there are --

6   there is a family.  On the other side there is Mr.

7   Miles, and he has a stew of entities that will

8   interact at various levels with CurePoint and with

9   other entities on sort of my client's side of the

10  dispute.

11         It's an old story of a series of enterprises

12  that began as business friendships, and that were over

13  the years poisoned.  There is -- it is an

14  understatement to say there is no shortage of mistrust

15  here.  I think that that will be clear.

16         However, it's too easy to then dismiss this

17  as a bickering dispute among divorcing business

18  partners.  And that's not what the issue before the

19  Court today is.  The bankruptcy code is very specific,

20  and Mr. Levengood referenced this, that when cause has

21  been shown a trustee shall be appointed.  And that

22  prescription cannot be avoided by simply rushing

23  through an inside sale.

24         I've sold a lot of assets in bankruptcy

25  courts over the years, and oftentimes when a party

1  comes forward and says, "This isn't a good seal," --

2  "This isn't a good sale," the immediate response is,

3  "Can you do better?"  And I think the answer today is

4  that someone will do better, number one.  And number

5  two, my clients are partnering with other entities to

6  submit a bid.

7        However, my client's efforts have been

8  stymied at every turn.  My -- I personally reached out

9  to Debtor's Counsel on August 29th and requested

10  diligence materials.  I followed that up the end of

11  September, on the 28th, and on October 4th.  I also

12  followed-up on October 11th.

13        I received an NDA yesterday, as I was

14  preparing for this trial.  Not access, and NDA.  I was

15  told along the way that the data room hadn't been

16  created.  And then when Mr. Miles testified yesterday

17  -- or Monday, he indicated that, in fact, it had been

18  around for weeks.  The -- I also specifically

19  requested it from Mr. Miles at the meeting of

20  creditors.  And again, that was quite some time ago.

21        But there are -- I know the Court is hearing

22  these together, and I think that makes sense, but I

23  also think it's important to focus on sort of the

24  legal requirements separately.  And so, if we begin

25  from the beginning, from the appointment of a trustee,

1  that sort of obviates the sale motion.  Because a

2  trustee would then want to come in and see what was

3  going on.  We're not going to saddle a trustee with

4  another party's pleas.

5          Why, then, do we need a trustee?  And the

6  reason is simple.  The evidence today will show a

7  history and pattern of flagrant fraud when it comes to

8  borrowing and moving money.  When it comes to using

9  collateral that doesn't belong to the entity that's

10  purporting to borrow.  The level of fraud, even in one

11  instance, is so staggering and so significant that

12  that instance alone should give this Court pause to

13  consider whether that individual has any business

14  managing a Debtor in Possession.

15          It would be easy to say, well, the United

16  States Trustee has agreed that a trustee will come in

17  after the sale.  The problem is that's not what the

18  code says.  It says on cause we appoint a trustee.

19  And the reason why is because every action of the

20  disqualified operator taints the process.  This sale

21  is tainted by his fraud.  There can be no confidence,

22  based on the history of fraud that we will show today,

23  that this was an above-board process.

24          The other thing to remember is that this

25  isn't the emergent situation that the Debtors present.

1  We do not have the proverbial melting ice cube.  We

2  have a business that continues to operate.  Yes, with

3  Dr. Randolph as a providing physician, but there are

4  ways -- and we will present evidence today to show

5  those ways -- there are ways to account for the

6  absences of physicians if they choose to abandon their

7  practice.

8         So there is no reason why this process can't

9  be slowed down.  And it needs to be slowed down.  We

10  are less than two months out from the filing of a

11  case, and we're looking at a sale to the person who

12  currently works there.  In a case that's beset with

13  allegations of mismanagement and outright fraud.

14         Well, if we're going to slow it down then why

15  not have a trustee run it?  Then we don't have to

16  worry about coming to Court every week over an

17  allegation that documents haven't been supplied, that

18  documents aren't correct.  That we're not being

19  qualified when we should be qualified.  That we're

20  being boxed out -- as we have been, for six weeks,

21  from obtaining information related to this sale.

22         And I think the answer is simple.  There is

23  no reason.  The process is tainted.  The fact that we

24  need a trustee isn't because we need a trustee to

25  conduct the sale.  We need a trustee because we're

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              34

1  going to show a pattern of fraud that requires the

2  appointment of a trustee.  Once we have that trustee,

3  it will be the trustee's job to conduct the sale of

4  the asset.  And it will be fine.

5        But only then can this Court, the Debtor's

6  creditors, and the potential purchasers have any

7  confidence in the process.  That's all.

8        THE COURT:  All right.  Thank you very much.

9  Mr. Geer?

10       MR. GEER:  Thank you, Your Honor.  Your

11  Honor, we're at a crossroads in this case.  We have

12  two paths to take.  One is appointing a trustee

13  immediately, and stopping the sale from going through,

14  and the bidding procedures from being entered.  The

15  other is appoint one later, let $6 million come into

16  the estate, and let the United States Trustee's plan

17  and the Debtor's plan come to fruition.  Which is

18  clearly, in our mind, the best viewpoint and the best

19  pathway for this Debtor.

20       Your Honor, trustees inherently have an

21  uncertainty about it when you come into something like

22  this.  This is a radiation oncology clinic.  We're not

23  manufacturing hockey sticks, we do have an attending

24  physician, Dr. Randolph, who is sitting in the

25  courtroom today.  He is one of two radiation

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                            35

1  oncologists that are in Dublin, Georgia.  The other

2  one is Dr. Williams, he also works at CurePoint.

3  That's it, Your Honor.  Right now on this sale, Your

4  Honor, we have a $6 million sale in hand, we have a

5  bird in the hand.

6         This is going to be financed by a current

7  creditor, actually, First Liberty Building and Loan.

8  I believe that's the same client as Mr. Walker's

9  client.  It's just a DBA.  But they are ready,

10  willing, and able to finance this sale 100 percent for

11  $6 million.  And as soon as the order will be entered

12  we're going to get $100,000 non-refundable deposit,

13  Your Honor.

14         And I can, of course, respond to many of the

15  objections of Mr. Levengood.  We can even solve some

16  of his objections quite easily, Your Honor.  Regarding

17  Mr. -- Dr. McCord's objections to the sale process,

18  and to the APA.  Which we've already fixed numerous of

19  those objections, Your Honor.

20         The problem we have now, Your Honor, is we

21  are on a timetable.  We do have November 30th.  First

22  Liberty has given us until November 30th.  They wanted

23  less time.  We pleaded, frankly, for more time, and

24  they agreed to provide up until November 30th to close

25  on this deal.  Without that, this sale and Dr.

PROCEEDINGS                                            October 12, 2022
CUREPOINT, LLC                                                      36

1  Randolph -- Dr. Randolph is not interested -- and he

2  will testify to this -- he's not interested in hanging

3  around.  Of course, I -- using the term abandoning

4  patients is quite harsh.  He will abide by his ethical

5  duties under his medical license to, of course,

6  transition patients as needed.

7        But let's be also clear, Your Honor, Dr.

8  Randolph is the only physician who is credentialed

9  with commercial payors for the Debtor that account for

10 30 to 40 percent of the Debtor's revenue.  You can

11 treat patients and not be credentialed.  You just

12 can't bill, you can't have cash flow.  Dr. Randolph is

13 also the only physician who is -- who has hospital

14 privileges at the local hospital in Dublin.  I believe

15 that's called Fairview Hospital, Your Honor.

16       Dr. Randolph is in a position of leverage,

17 there is no doubt about that.  But he has been -- we

18 are in the fortunate position of having an offer that

19 matches any other offer that we've for this Debtor,

20 including pre-petition, Your Honor.  Your Honor, pre-

21 petition, we want to really focus on that, which I

22 think at this point it's moot.  We consented to a

23 trustee to come in and determine how that money shall

24 be divvied up.

25       I do agree with Mr. Levengood on one point.

PROCEEDINGS                                      October 12, 2022
CUREPOINT, LLC                                                37

1  That money shouldn't just be given to secured

2  creditors immediately.  The trustee -- and this is

3  what we would do.  We've just decided that a trustee

4  is -- should do this.  They're going to come in,

5  attack certain security interests, which also includes

6  attacking the security interest of AMOA Finance, LLC's

7  interest in the linear accelerator.  There's going to

8  be a lot of litigation, I think, a trustee's going to

9  have to deal with regarding who should get the money,

10  whether guarantees are valid.  That's all for a

11  trustee to decide.  Including avoidance actions, Your

12  Honor.

13        A lot has been talked about pre-petition

14  transfers.  And just to be clear, and this is for Mr.

15  Levengood's objection, we are not attempting to sell

16  any kind of avoidance actions to any kind of -- any

17  purchaser.  So any trustee is not going to be hampered

18  by that.  If we need to put that in an order just for

19  clarity, Your Honor, happy to do so.  That would be

20  the Debtor's fiduciary duty to do so.  So just to make

21  that clear.

22        As far as Indiana law, Your Honor, I have the

23  draft of the APA.  Dr. Randolph is willing to sign it.

24  It's going to be Georgia law, that was actually a typo

25  on our behalf.  The managed practice issue, Your

1 Honor, that issue was primarily for -- relating to

2 HIPAA and patient records issues.  I have taken it out

3 and reserved that section, because I did not -- I

4 didn't even think about the objection the way Mr.

5 Levengood finds it.  We certainly don't want to hold

6 up any patient records for any higher or better

7 bidder, and that would not be a reason why someone

8 would not bid on this.  So we've taken the exception

9 out.

10        Now, some non-physician party comes in, we

11 would need some kind of guidance on -- from that party

12 on how they would -- you know, if they intend to

13 comply with HIPAA and the rules to transfer medical

14 records.  But they won't go to Dr. Randolph, it just

15 doesn't happen, to be clear.  We're not just

16 transferring records no matter what happens to Dr.

17 Randolph.  So that absolutely will not happen.

18        As far as Mr. Miles' decision regarding who

19 would be the winning bidder, and -- Your Honor, we're

20 going to have a final hearing.  Anyone can come to

21 that hearing, and the Court can ultimately decide

22 who's the winning bidder.  If there are any other

23 bidders.

24        We are dealing with a very discreet and

25 unique asset.  Your Honor, this is a radiation

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              39

1  oncology clinic.  It's the downstream, a last referral

2  source for doctors.  And that's -- that's important.

3  These referring physicians will only refer to Dr.

4  Randolph.  He's been working there for two years.  He

5  has ingratiated himself with the community.  He is the

6  ideal party to have a physician-owned practice in a

7  rural area.  To treat his patients.  These are

8  currently patients that he sees.  That is an ideal

9  situation.

10        Now we, of course, will be marketing.  And

11  Mr. Miles will testify that he has marketed it to

12  numerous entities.  Including Northside, who is not

13  interested.  WellStar, Piedmont, Emory.  A number of

14  other -- another -- a number of other entities,

15  including ION Network (ph), who they did have a offer

16  in, Your Honor, approximately a year ago, I believe it

17  was last fall, for $6 million plus $1 million earnout.

18  The ultimately pulled out because the McCords filed

19  litigation to blow up that deal.

20        The McCords have made various offers over the

21  years, Your Honor.  One of which was $2 million, and I

22  believe another under testimony was three and a half,

23  though I'm not sure of the details of it.  But

24  regardless, those deals have not come to fruition.

25  And, Your Honor, to be clear, they've had five years

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    40

1  to know a lot about this Debtor.

2          We're certainly not trying to prevent anyone

3  access from the data room.  There is a manpower issue

4  here.  We've had a lot going on as Debtor Counsel.

5  We've (inaudible) motions preparing for this, working

6  with the United States Trustee.  But the Debtor,

7  overall, we've filed a monthly operating report,

8  amended schedules, two 341 meetings, and we've also

9  secured a sale.  And that APA, I had -- did a lot of

10  it, Your Honor.  In favor of the Debtor.  There is no

11  breakup fee.

12          The bidding procedures provide for a $50,000

13  initial overbid on a $6 million sale, and then a

14  $25,000 overbids.  That is more than fair.  And, Your

15  Honor, to be clear, we wholeheartedly believe that we

16  could have done a sale without bidding procedures

17  here, given the amount in question.  It's $6 million,

18  which is the best and highest offer we have.

19          We have asked, and we've heard a little

20  conflicting with openings.  One, Dr. McCord is not

21  interested in buying, and now they're partnering with

22  someone to try to buy it.  I'm not really sure how

23  that coincides, Your Honor.  It sounds like they want

24  more time to buy themselves.  Because a physician, you

25  still have to have a physician in there, Your Honor.

PROCEEDINGS                                October 12, 2022
CUREPOINT, LLC                                          41

1  And that's very important.

2         A physician, it's like the star chef of a

3  restaurant, Your Honor.  You're going to have to have

4  that person treat, the physician.  So if Dr. McCord

5  buys it, Dr. McCord, to my knowledge, is an

6  oncologist.  He's a radiation oncologist.  Perhaps

7  that is his plan, to come in and be the radiation

8  oncologist here.  I'm not sure what his plan is.

9         We've asked for more money from them; could

10 they beat the $6 million offer.  We didn't get that.

11 We said, "Well, we're working with groups."  So

12 that's, at this juncture, Your Honor, where we are.

13        If Dr. Randolph does decide to leave, which I

14 believe he would.  He is currently being underpaid.

15 He is in this to own this, Your Honor.  He does want

16 to own this, because that would be the best for the

17 patients.  And he is a physician.  It's almost like a

18 law firm, with the lead partner selling -- leaving the

19 practice, and all the referrals go -- could

20 potentially go with him.

21        But the nearest clinic around here, Your

22 Honor, I believe is 50 miles away in Hawkinsville.  So

23 it's -- it is vitally important that this clinic does

24 not shut down.  But if we were to just look at this,

25 even ignoring -- which is hard to say out loud --

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              42

1  ignoring the patients' needs, and we want to keep this

2  operating, you know.

3        Some mention has been made of a locum tenens

4  -- I hope I'm pronouncing that right -- physician,

5  which is like basically a traveling physician coming

6  in.  Extremely expensive.  That's speculation.  We

7  don't even know who this person is.  Would referring

8  physicians still refer patients?  Would patients want

9  to deal with another physician?

10        A lot of the talk has been made about what

11  could happen if a trustee is immediately appointed.

12  Well, we just don't know.  That's the problem.  And

13  frankly, the employees at CurePoint don't know,

14  either.  And Dr. Randolph certainly is -- this is a

15  classic tale of -- a little bit of Hatfield and

16  McCoys, Your Honor.  There's a lot of insider

17  fighting.  We have Dr. McCord as an insider, we have

18  Mr. Miles as an insider.  They've been fighting for

19  five years now, through no less than five, or six,

20  maybe seven state court lawsuits.  One of -- I think

21  one or two of which are still pending.

22        I do not have the experience of knowledge of

23  the -- or the benefit of four or five years in

24  litigation that the other side has regarding all this

25  pre-petition -- all these pre-petition issues.  What

1  we do have, Your Honor, is a very, very strong sale

2  for $6 million that is going to be in the best

3  interest of all creditors to complete.  And certainly

4  there are protections in place to allow this sale to

5  go forward with no tainting.

6          No -- we're going to have a court process,

7  Your Honor.  That's why we're here.  The Court will

8  approve this sale through a federal court order under

9  rule 3 -- under code section 363.  So I don't think

10  there's any argument that could be made, at least

11  viably, that this somehow would be tainted, or that

12  the process -- it's all about dollars and cents, Your

13  Honor.  It's about the amount of money that we're

14  selling this for, and this is a more than fair offer

15  of $6 million.

16          Getting to the case law, Your Honor. I'm --

17  the YC Atlanta Hotel case, I was actually aware Judge

18  Barbara Ellis-Monro did appointment an examiner and

19  not a trustee in that case.  And we've already agreed

20  to a trustee, because it -- we agree that once this

21  thing is sold, it -- given all the pre-petition

22  transfers it's not appropriate, perhaps, for someone

23  to go after avoidance actions against them self.  And

24  there are a lot of pre-petition issues in this case,

25  it appears.  But the point being, that's what the

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    44

1   trustee is going to do.  And this also gives the

2   United States Trustee time to find that person.

3        If we shut this sale down now, and First

4   Liberty has already made note that if this is not

5   approved today they are out.  They are not a

6   traditional bank, Your Honor.  They are an entity that

7   has money available from investors, and they are

8   ready, willing, and able to do this if we can close by

9   November 30th and we can show them an order that says

10  that there were bidding procedures.

11       They understand the risk as well, Your Honor,

12  that they may be outbid.  They understand that, but

13  they're willing to take that risk to do this.

14       THE COURT:  Can you help me understand what

15  First Liberty's claim is in the case?

16       MR. GEER:  It's a $2.5 million claim, Your

17  Honor.  We did not find a UCC for them, so we believe

18  they're an unsecured creditor.  Of course, that will

19  be for a trustee to ultimately decide.  But First

20  Liberty also understands that they won't get any

21  preference in the distribution of proceeds.  This is a

22  -- these are two discreet transactions.  So First

23  Liberty is doing this because it's -- this is one

24  transaction that, of course, it's going to benefit

25  from.  It's going to do a $6 million loan to Dr.

1  Randolph's entity, 2406 Cancer Care, LLC.  And

2  whatever those terms are between Dr. Randolph and

3  First Liberty.  Because once the Debtor gets the

4  money, that's none of the Court's or our business,

5  frankly.  What happens after that.  Because the

6  Court's concern is how much money is coming in for the

7  estate and for the creditors.  So that's their claim,

8  Your Honor.  It's $2.5 -- it's a substantial claim.

9        THE COURT:  So they're not -- what you're not

10  proposing is for them to loan $3.5 million and --

11        MR. GEER:  Oh, no.

12        THE COURT:  -- offset $2.5 million.  You're

13  proposing a loan that's $6 million into the estate?

14        MR. GEER:  One hundred percent, Your Honor.

15        THE COURT:  All right.

16        MR. GEER:  It's just like a I have in a

17  pharmacy case I just recently had, when McKesson had a

18  $1.8 million secured claim, and they financed

19  completely another pharmacist to come in and buy it.

20  Which, of course, that proceeding, Your Honor, wound

21  up being -- we didn't have bidding procedures, we just

22  allowed time -- which was around 30 days, I believe --

23  for other people to come in and overbid.

24        On one of the locations Northside came in and

25  bid a little more money.  The wound up getting one

PROCEEDINGS                                                  October 12, 2022
CUREPOINT, LLC                                                            46

1  location.  And the -- it was Dr. -- Jame Cartell

2  Investments (ph) was the name of the entity.  I can't

3  remember the pharmacist's name behind it, but they

4  wound up being -- they were the stalking horse, so to

5  speak, but we didn't have any bidding procedures just

6  because of the (inaudible) of the situation.  That was

7  a melting ice cube in that the business was failing.

8          In this case, Your Honor, the melting ice

9  cube is what happens if a trustee is appointed, and

10 the uncertainty that it brings.  Dr. Randolph is just

11 not interested in being a part of this litigation, in

12 this anymore.  Or a trustee, or dealing with that

13 issue.  And certainly, has a -- again, he's going to,

14 of course -- I mean, he's been a radiation oncologist

15 for quite some time.

16          That's not a comment on your age, Dr.

17 Randolph.  But he's been doing this for quite some

18 time, and he's never going to "abandon" a patient.

19 But those patients will likely be sent 50 miles away

20 to Hawkinsville, which certainly is not as good for

21 them.  And the Debtor will absolutely suffer.  Because

22 the value of these things is to leave a debt, Your

23 Honor.

24          I mean, if a Debtor can't bill to commercial

25 payors -- which is like insurance companies, Your

1  Honor, as opposed to Medicaid or Medicare -- that's

2  going to severely depress the value.  Which that's

3  what we're concerned about, Your Honor.  That is -- if

4  we could have more time this wouldn't be an issue.

5  But we are in a situation where the attending

6  physician, who is the referring -- who all the

7  referrals come to him.  That's how that works.  He is

8  the one wanting to buy this.

9          So we're in that position where he is the

10  ideal candidate to buy this.  And he could have --

11  frankly, could have offered less money, probably, Your

12  Honor.  A lot of parties do.  They could offer less

13  money.  He wanted to do it in such a way that he had a

14  very, very strong offer that would be hard to beat,

15  and I don't blame him for that.

16          He wants to do this, he wants to provide

17  rural care, but he's going to go seek opportunities

18  elsewhere if this doesn't work.  Which puts the Debtor

19  in a bit of a pickle, and that is true.  So that's the

20  crossroads we're at, Your Honor.  It's either a

21  trustee later, which we've already consented to after

22  all this money comes in -- and, by the way, if the

23  sale fails, the way that the order will be -- let's

24  say that, for some reason, Dr. Randolph pulls out,

25  well, the Debtor gets to keep $100,000 and the trustee

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                              48

1  immediately gets appointed.  So that's that happens.

2       If a trustee is appointed now, before the

3  sale is done, there is no sale -- there is no better

4  sale process.  There is no sale process.  There's no -

5  - they have to go find it.  And it sounds like they

6  want to go find it.  So we have a competing bidder

7  bring a sale -- bringing an objection to a sale

8  motion, and then trying to appoint a trustee, it

9  sounds like to try to depress the value of the Debtor.

10      Again, with all the issues that AMOA Finance

11 has as well, certainly they could use that to their

12 advantage in trying to bid on this if this thing were

13 to perhaps go to liquidation, which is not what anyone

14 wants.  We want this thing to continue, we don't want

15 to keep it.  We don't want to let it shut down.

16      But the McCords, unfortunately, have a

17 history of shutting this down before.  Withholding

18 payments.  They've shut down this center before

19 because they controlled all the services that went to

20 it, which caused Mr. Miles to have to go to non-

21 traditional lenders in the first place.  Your Honor,

22 there is just no path that is clearer for us than

23 allowing this sale to go through.

24      We have a -- November 30th.  We could

25 schedule -- to be clear, the dates in the motion are

PROCEEDINGS                                      October 12, 2022
CUREPOINT, LLC                                              49

1  suggestions.  Of course, we were beholden to the

2  Court's calendar.  We're also welcoming other party's

3  date suggestions.  As long as we can get the auction,

4  the final bid close enough -- the final bid, for all

5  we care, could be a day before the final hearing.

6        And the final hearing could be, I think the

7  week before the 30th is Thanksgiving, Your Honor.  We

8  could have it either that week, or we could have it on

9  the 28th or 29th, whichever one is a Monday.  As long

10  as we could get that hearing in.  If there's a higher

11  and better offer from a monetary standpoint, great.

12        And if Mr. Miles all of a sudden surprises us

13  and says, "Oh, no, no, no.  We're not going to go with

14  that offer," then all the parties can come argue.

15  "Your Honor, that -- this should be the best -- this

16  should be the best offer."  And the Court can decide

17  which one it would be.  So there's plenty of

18  protection in place.

19        I believe one other objection in Mr.

20  Levengood's motion was -- and it was a good catch on

21  the APA.  I didn't quite catch it.  That the Debtor

22  and -- the Debtor and Dr. Randolph could mutually

23  agree, for instance, to terminate the APA.  Well, we

24  don't want that to happen.  So we would scratch that

25  from the APA that would actually be approved, Your

1 Honor.

2        And that way we -- there's not going to be no

3 allegation or possibility that, you know -- we're not

4 saying this would happen -- if the Debtor and Mr.

5 Miles were just to get together and say, "Well, you

6 know, here's your $100,000 back because we're going to

7 cancel the agreement on our own notice."  Like there's

8 no other -- there's no way that this $100,000 is going

9 to be lost, unless someone overbids basically.  That's

10 it.

11       And again, on the managed practice issue,

12 Your Honor, just to wrap that up, we've taken that out

13 completely.  Because Dr. Randolph is the attending

14 physician.  He owns the clinic.  We've done a little

15 bit of light research, Your Honor.  Myself, it seems

16 find to transfer those records to 2406 Care Center.  I

17 believe that line, which is a holdover from the ION

18 Network, which is not a physician-owned entity, and

19 they would need a managed practice to come in, which

20 would be a doctor, to effectively transfer that in.

21 But, again, it's kind of a moot point, Your Honor.  We

22 can easily cure that issue.

23       Thank you, Your Honor.

24       THE COURT:  One other question --

25       MR. GEER:  Yes, Your Honor.

1        THE COURT:  -- before you sit down, Mr. Geer.

2   Is there any regulatory approval of a transfer of

3   certificates of need that are issued here?

4        MR. GEER:  I've talked extensively with Mr.

5   Miles on this.  They've -- I think he sold 12 or 13 of

6   these clinics.  There's no issue there, Your Honor.

7        THE COURT:  All right.

8        MR. GEER:  We don't need any regulatory

9   approval.

10        THE COURT:  All right.  Thank you.  All

11  right.  Let's start with the evidence.  Do you -- have

12  y'all consulted on how you're going to call your

13  witnesses?  You and Mr. Holbein, Mr. Levengood?

14        MR. LEVENGOOD:  Yes, Your Honor, we have.

15        THE COURT:  All right.

16        MR. HOLBEIN:  We have, Your Honor.  I --

17  there is one preliminary housekeeping matter before we

18  call witnesses.  We deposed -- Mr. Barton deposed Mr.

19  Miles Monday morning, and I deposed Mr. Miles Monday

20  afternoon.  In that short time we were only able to

21  get an unofficial transcript, a so-called dirty

22  transcript.  Those contain a legend at the very top

23  that says, "This can't be used in court."

24        I spoke with Mr. Geer this morning about the

25  ability to use that solely for the purposes of

1 impeachment, and he said that he would check on it,

2 and so I'm following back up on that.

3         We would, to the extent necessary, like to be

4 able to use that transcript for the purposes of

5 impeachment.  Subject to someone saying that wasn't

6 taken down right.  Because there hasn't been an

7 errata, there hasn't been a waiver of signature.

8         THE COURT:  Mr. Geer?

9         MR. GEER:  Perfectly fine, Your Honor.  I

10 understand (inaudible).  It was a very long deposition

11 yesterday, and there's no way they could have gotten a

12 final transcript.  So we have no issue with them using

13 it for impeachment purposes.  Our only concern would

14 be filing it as an official deposition, because there

15 just hasn't been a chance to review it.  So for

16 impeachment purposes, no issue, Your Honor.

17         THE COURT:  All right.  Is there any issue

18 with sequestration of witnesses?

19         MR. HOLBEIN:  Yeah?

20         MR. LEVENGOOD:  It's up to you.

21         MR. HOLBEIN:  Yeah.  I would like the

22 witnesses sequestered.

23         THE COURT:  So what potential witnesses are

24 in the courtroom currently?

25         MR. HOLBEIN:  So -- well, if I'm asking for

1  us, all -- could you name the witnesses?  My witness

2  is Ms. Simmons, I have a witness named Brant Frost,

3  who's on the phone.  But Mr. Walker, I had talked to

4  about monitoring for him.  I was going to call Mr.

5  Miles, but he's going to be here as part of the

6  Debtor.  And then there is Dr. Randolph, also part of

7  the Debtor.  But I think Dr. Randolph is -- should be

8  sequestered.

9          THE COURT:  Okay.

10          MR. BARTON:  Your Honor, Tom Barton on behalf

11  of Dr. McCord.  We also have Karen Fortune, who is a

12  forensic accounting expert.  And she is in the

13  courtroom.

14          THE COURT:  Okay.

15          MR. HOLBEIN:  And Carmen.  Were you going to

16  call (inaudible).  Okay.  All right.

17          THE COURT:  Mr. Geer, what witnesses do you

18  have in the courtroom?

19          MR. GEER:  Your Honor, we have Jamila

20  Dadabhoy, we have Mr. Miles, and we have Erich

21  Randolph in the courtroom.  Brant Frost was also --

22  he's with First Liberty -- he's also a witness.  But

23  those are the only witnesses we have, Your Honor. in

24  the court.

25          THE COURT:  All right.

PROCEEDINGS                                      October 12, 2022
CUREPOINT, LLC                                              54

1        MR. GEER:  And available.

2        THE COURT:  And Mr. Miles is your corporate

3   representative, I assume?

4        MR. GEER:  Yes.

5        THE COURT:  All right.  I'm going to ask

6   everyone else, other than the witness who's going to

7   take the stand, to be excused from the courtroom.

8   Unless there's any reason why anybody else should

9   stay?  Mr. Barton, you said you have forensic

10  accountant?  I'm not sure why she needs to stay,

11  unless there's a justification for her hearing

12  testimony from other witnesses.

13       MR. BARTON:  Other than her hearing what Mr.

14  Miles is about to say, Your Honor.  That would be my

15  justification.

16       THE COURT:  Mr. Geer, any objection to that?

17       MR. GEER:  One second, Your Honor, if you

18  don't mind.

19       THE COURT:  Yes.  While they're conferring,

20  are there any witnesses on the -- on Zoom currently?

21  Can y'all tell?

22       MR. LEVENGOOD:  I can't.  Mr. Frost, I

23  believe, would be appearing through Walker.  Also,

24  Your Honor, a question.  I guess will we be proceeding

25  with movements presenting their case in chief first?

1       THE COURT:  Yes.

2       MR. LEVENGOOD:  Okay.

3       THE COURT:  Mr. Walker, is your client

4  currently on the -- on Zoom?

5       MR. WALKER:  He is not, Your Honor.  I'm

6  supposed to let him know when it's time for him to

7  testify, and then he will join the Zoom at that time.

8       THE COURT:  All right.  So I would like for

9  him to remain off Zoom until he's called.  For our

10  current purposes.  So thank you.

11      MR. WALKER:  He will, Your Honor.  He's

12  waiting for me to tell him to join, so he's not going

13  to join before then.

14      THE COURT:  All right.  Thank you very much.

15      MR. GEER:  No issue with her staying, Your

16  Honor.

17      THE COURT:  All right.  That resolves that

18  issue.  So all of the other witnesses, other than the

19  forensic accountant and whoever is being called next -

20  - first.  Who is being called first?

21      MR. BARTON:  Your Honor, on behalf of Dr.

22  McCord we would call Mr. Miles first.

23      THE COURT:  All right.  Mr. Miles, if you'll

24  approach the bench.  And all other witnesses, I'm

25  going to ask that you step out into the hallway, and

1  you'll be called when it's your turn.

2        MR. GREER:  Yeah.  (Inaudible).

3        MR. MILES:  May I --

4        MR. GEER:  Do you want to sit here?

5        THE COURT:  You do not, Mr. Miles.

6        MR. MILES:  Okay, bring this.  Yep.  Do I

7  stand up or sit down?  (Inaudible).

8        THE COURT:  I'm going to ask -- wait one

9  second.  I want to ask the gentleman in the rear of

10  the room to identify himself for the Court, please?

11        MR. KUSHNER:  Good morning, Your Honor.

12  Steve Kushner, I'm a -- an attorney that I represent

13  AMOA Holdings in one of the pending cases in Superior

14  Court.

15        THE COURT:  All right.  Thank you very much.

16  (cross talk)  Go ahead.

17        THE BAILIFF:  All right.  raise your right

18  hand.

19  WHEREUPON,

20             PHILLIP MILES

21  called as a witness, and having been sworn by the

22  notary public, was examined and testified as follows:

23        THE BAILIFF:  State your name for the record.

24        THE WITNESS:  Phillip Miles, M-I-L-E-S.

25        MR. BARTON:  Your Honor, as a housekeeping

1  matter, I believe your chambers asked us for a copy

2  for the Court --

3         THE COURT:  Okay.

4         MR. BARTON:  -- and as well as the --

5         THE WITNESS:  Oh.

6         MR. BARTON:  -- the witness copy there.

7         THE COURT:  Okay.

8         MR. GEER:  Your Honor, one other thing --

9         THE WITNESS:  Your Honor, may I step down --

10         MR. GEER:  -- in the spirit of full

11  disclosure, Mr. Kushner here is to observe, but he's

12  also a potential impeachment witness.  If that would

13  fall under the Court's sequestration, I'd understand.

14         THE COURT:  If he's a potential witness then

15  he should be excluded.

16         MR. GEER:  Yeah.  Okay.  They're going to

17  make you sit out.

18         THE COURT:  Just wait one second, Mr. Barton.

19         MR. GEER:  Your Honor, we're going to --

20  we're not going to call Mr. Kushner, so that he can

21  sit here.

22         THE COURT:  Okay.  All right.  That resolves

23  that issue.  Go ahead, Mr. Barton.

24              DIRECT EXAMINATION

25  BY MR. BARTON:

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                            58

1    Q  Mr. Miles, good morning.  As you know, I'm

2 Tom Barton.  I represent Dr. McCord.  Would you please

3 state your full name for our record?

4    A  Phillip Edward Miles, M-I-L-E-S.

5    Q  And what's your current residence address,

6 sir?

7    A  300 Hayward Lane, Alpharetta, Georgia --

8    Q  And --

9    A  -- 30022.

10    Q  Excuse me.  You are identified in the filings

11 on behalf of the Debtor in this case as the designated

12 manager.  Is that correct?

13    A  That is correct.

14    Q  And you signed its filings and schedules on

15 behalf of the Debtor?

16    A  That is correct.

17    Q  The actual named manager of CurePoint -- and

18 this is just to set sort of a framework here for the

19 Court's benefit -- is Physician Financial Partners.

20 Correct?

21    A  That is correct.

22    Q  And Physician Financial Partners, which we

23 can refer to as PFP, if that's all right with you?

24    A  That is -- that is fine with me.

25    Q  All right.  And you and I have been through

1 this drill a few times, so we have the acronyms, but

2 we need to make sure the Court knows what we're

3 talking about.  PFP has been the manager of CurePoint

4 since its inception in 2014?

5    A  That is correct.

6    Q  And PFP owns a little over 95 percent of

7 CurePoint?

8    A  95.01 percent, correct.

9    Q  With a balance being owned by a company

10 called RBS?

11    A  Correct, 4.99 percent by Radiation Business

12 Solutions, Inc.

13    Q  And Ms. Jamila Dadabhoy is the sole manager

14 of PFP?

15    A  That is correct.

16    Q  And as such, she functions as the manager of

17 CurePoint through her position with PFP?

18    A  That is correct.

19    Q  Your role as designated manager is an

20 informal one, correct?

21    A  Please describe -- did you say informal?

22    Q  Informal.

23    A  I don't know the -- is it -- that a --

24 informal being a legal term?  I was designated manager

25 for purposes of the bankruptcy.

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                              60

1    Q   Okay.  Your designation is -- has not been

2 done in writing.  It's just oral, correct?

3    A   Oh, that is correct.

4    Q   Let's just set the landscape for the Court's

5 benefit here.  I want to -- I want to walk through a

6 few of your entities, and help you have the Court

7 understand the relationship of those entities to the

8 Debtor.  First, Mittere Tax and Advisory is a company

9 that is 100 percent owned by Mittere, Inc., which you

10 and Ms. Dadabhoy own on a 50/50 basis.  Correct?

11    A   That is correct.

12    Q   And Mittere Tax and Advisory provides

13 bookkeeping and accounting services for a number of

14 your affiliated entities, including CurePoint?

15    A   It is a reviewer for CurePoint, that is

16 correct.

17    Q   And also for PFP, the majority owner of

18 CurePoint?

19    A   That is correct.

20    Q   And Mittere is managed by you and Ms.

21 Dadabhoy, correct?

22    A   That is correct.

23    Q   Both of the Mittere entities?

24    A   That is correct.

25    Q   Physician Financial Partners is owned by --

1  has three owners, correct?

2      A   That is correct.

3      Q   One of which is MEC Capital

4      A   Correct.

5      Q   And that's your entity.

6      A   That is correct.

7      Q   One of which is my client, Dr. Marc McCord,

8  Signalman?

9      A   That is correct.

10      Q   And the third is an individual named Daniel

11  Dooley, or perhaps through his holding company, we're

12  not 100 percent sure.  But one or the other.

13      A   You are correct.

14      Q   All right.  So you're not a direct owner of

15  CurePoint, and you're not a direct owner of PFP.  You

16  own an interest in PFP through MEC?

17      A   Through MEC Capital, Inc.  Correct.

18      Q   And you have never been an officer or manager

19  for either CurePoint or PFP, correct?

20      A   Only as a designated manager.  Correct.

21      Q   And in each of those instances it's simply

22  been an oral conversation between you and Ms.

23  Dadabhoy?

24      A   Sitting here today I can't remember all

25  incidences, and if we're -- any were reduced to

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                        62

1  writing.  But the majority have been through oral

2  communications, correct.

3     Q   Now, you own 100 percent of MEC Capital,

4  which is one of the members of PFP, correct?

5     A   That is correct.

6     Q   And of that entity, Ms. Dadabhoy is the

7  President, Secretary, and COO?

8     A   That is correct.

9     Q   She is the custodian of all of its records?

10    A   That is correct.

11    Q   There's no Board of Directors for MEC?

12    A   Correct.

13    Q   And it has no employees?

14    A   That is correct.

15    Q   It's essentially a holding company?

16    A   That is correct.

17    Q   And Dr. McCord does not own any interest in

18  MEC?

19    A   That is correct.

20    Q   Similarly, Dr. McCord doesn't own any

21  interest in Mittere, Inc., or Mittere Tax and

22  Advisory?

23    A   That is correct.

24    Q   All right.  We've already heard a little bit

25  about Z.E.R.O. Holding.  That is an entity in which

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                              63

1  you hold some interest, and you told me the other day

2  you're not sure of the percentage but you do know it's

3  less than 50 percent.  Correct?

4      A  That is correct.

5      Q  And the other owners of Z.E.R.O. Holding

6  include Mr. Dooley that we mentioned earlier, or an

7  entity owned by him.  Correct?

8      A  That is correct.

9      Q  And also your brother, Marc McCord?  Or,

10  excuse me, Mark Miles?

11      A  Mark Miles, that is correct.

12      Q  And Mark Miles is a physician in Oklahoma, is

13  that right?

14      A  That's correct.

15      Q  And he has had no association with CurePoint?

16      A  He has helped obtain financing, but other

17  than that, no.

18      Q  Company --

19      A  No legal association.

20      Q  Never performed any physician services for

21  CurePoint?

22      A  That is correct.

23      Q  Yeah?

24      A  No physician services.

25      Q  Never been employed by CurePoint?

PROCEEDINGS                                                                October 12, 2022
CUREPOINT, LLC                                                                            64

1    A   That is correct.

2       Q   All right.  And there's several other

3  individuals who are members of Z.E.R.O. Holdings, but

4  none of them includes -- or they may have holding

5  companies -- but several other shareholders of

6  Z.E.R.O. Holdings, but none of them is Dr. Marc

7  McCord.  Correct?

8    A   Correct.

9    Q   And Z.E.R.O. Holdings is a -- owns several

10    Zerorez franchises.  Is that right?

11   A   Correct.

12      Q   And those franchise territories are all

13  outside of the state of Georgia?

14   A   Correct.

15      Q   And Zerorez has never provided any services

16  to CurePoint other than, I think you told me the other

17  day, it might have cleaned the clinic a time or two

18  during the COVID pandemic.  Is that right?

19   A   Correct.  Specifically sanitizing the clinic.

20      Q   Right.  But no invoices issued for those

21  services?

22   A   Not that I can recall.

23      Q   And then, finally, Eclipse Advisors is a name

24  you may come across -- excuse me.  Let's jump back to

25  Northwinds.  Northwinds Leasing is an entity that's

1 owned 50 percent by you, or MEC -- one or the other --

2 and your brother, Marc Miles.  Correct?

3    A   Correct.

4    Q   And Northwinds was a leasing company,

5 correct?

6    A   Correct.  And still is.

7    Q   It has no active leases with CurePoint?

8    A   Not at this time, correct.

9    Q   And it has never had any written leases with

10 CurePoint?

11    A   I don't -- I don't believe that is correct.

12 I think it did at one time.

13    Q   I went back and looked at Ms. Dadabhoy's

14 testimony.  Tell me if you think I'm wrong about this.

15 Many years ago, back in 2016 or '17 it may have leased

16 an HDR machine to CurePoint?

17    A   That is my memory.

18    Q   Okay.  But that lease has been -- has been

19 over for several years, correct?

20    A   I believe it -- that lease has been

21 satisfied.  Correct.

22    Q   All right.  And Northwinds provides no

23 services to CurePoint?

24    A   Correct.

25    Q   And Northwinds is managed either by your or

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    66

1   MEC, one or the other?

2       A   Correct.

3       Q   And, once again, Mittere Tax and Advisory

4   does the bookkeeping work for Northwinds, correct?

5       A   It reviews, does bookkeeping.  Reviews

6   bookkeeping, reviews any financial data, and prepares

7   the tax return on an annual basis for CurePoint.

8       Q   And finally, we have Eclipse Advisors that we

9   may come across in some of these documents.  That's an

10  entity owned by you and/or MEC.  Correct?

11      A   Correct.

12      Q   And Dr. McCord doesn't own any interest in

13  Eclipse Advisors?

14      A   That is correct.

15      Q   And never has?

16      A   That is correct.

17      Q   And then, finally, Eclipse Staffing is an

18  entity that's owned by you.  Correct?

19      A   Correct.

20      Q   And I think you told me the other day that it

21  is -- it functions as a pass-through staffing company?

22      A   Correct.  Specifically it is simply a payroll

23  pass-through.  It provides no HR or any other

24  oversights.

25      Q   All right.  So a summary of these three

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                        67

1  (inaudible) is they have varying owners and ownership

2  structures, but the common denominator of all of them

3  is you?

4      A   Every -- based on what you've asked me,

5  correct.

6      Q   And I'd like you to take a look, if you

7  would, please, at what we marked as Exhibit 41, which

8  is -- it's in the binder, but it's actually slipped in

9  the back.  It's not behind a tab, because we --

10     A   Is it after Omitted From Paper Version?

11     Q   I'm sorry?

12     A   I see something that -- Omitted After Paper

13  Version.

14     Q   All the way in the back, the very last thing.

15  It should be in the manila folder.

16     (Creditor's Exhibit 41 marked for identification.)

17         MR. LEVENGOOD:  It's tucked into the cover.

18         THE COURT:  See, it's --

19         THE WITNESS:  Oh, stuck in.

20         THE COURT:  -- stuck in the pocket?

21         THE WITNESS:  I see it.  Yes, sir.

22  BY MR. BARTON:

23     Q   All right.  And we talked about this the

24  other day.  This is the amended schedule that the

25  Debtor filed, correct?

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                            68

1    A   Correct.

2    Q   And you signed this document as the

3  designated manager of the Debtor?

4    A   Let me just confirm, Mr. Barton.

5    Q   Yeah, I think if you look at page 41 of 72,

6  at the top -- you see the document page numbers there?

7    A   I see that, Mr. Barton.

8    Q   All right.  That's -- that -- you signed on

9  behalf of the Debtor, correct?

10    A   Correct.

11    Q   Let me just ask you about a few of the

12  entries on these schedules.  First, let me ask you to

13  turn, please, to page 5 of 72.

14    A   I'm there.

15    Q   And the section entitled Accounts Receivable

16  Part III.

17    A   I see that.

18    Q   Now, those receivables -- I assume those are

19  receivables for patient services primarily.  Is that

20  right?

21    A   That is correct.  (cross talk)  Not

22  primarily, but 100 percent, sir.

23    Q   Those numbers do not include any amounts that

24  may be owed to CurePoint from any of your affiliated

25  entities, correct?

1    A   That is correct.

2    Q   And then if you look over at page 10 -- 10 of

3 72 -- under Part 11 you'll see a Section 75?

4    A   I'm there.

5    Q   Contingent on liquidated claims and causes of

6 action.  And the listing is possible claims against

7 entities listed on the statement of financial

8 accounts, number 4, for monies loaned.  Correct?

9    A   I see that.

10    Q   And I assume that that is a reference to the

11 due to/due from schedule that we'll get to in just a

12 second that lists certain intercompany transfers

13 between CurePoint and your affiliated companies?

14    A   I agree.  And possibly others.

15    Q   But in any event, the amount claimed is

16 unknown.  Right?

17    A   At the time of this filing, correct.

18    Q   And you haven't further amended your

19 schedules, have you?

20    A   Not that --

21    Q   As the Debtor for the --

22    A   Not that I'm aware of, no, sir.

23    Q   All right.  Then the flip side of that, I

24 believe, can be found starting on page 24.  This is a

25 list of unsecured claims.  And we won't go through all

PROCEEDINGS                                             October 12, 2022
CUREPOINT, LLC                                                        70

1 of them, but you'll see, for example, on page 25 we

2 have a claim for MEC Capital.  That's your entity,

3 correct?

4     A   That is correct.

5     Q   Amount undetermined?

6     A   Correct.

7     Q   Medical Management Institute.  That's one of

8 your entities?

9     A   Yes, sir.

10     Q   Amount undetermined.  The next page, page 26,

11 Mittere -- both of the Mittere entities, Northwinds,

12 PFP are on that page.  All undetermined, correct?

13     A   Correct.

14     Q   Same with Z.E.R.O. Holdings, which is over on

15 the following page, 27.

16     A   I see that, yes, sir.

17     Q   All right.  And then we get to the

18 attachment, which is -- begins on page 59 of the

19 docket entry.

20     A   I'm there.

21     Q   And that is a document entitled Due To/Due

22 From CurePoint, January 1, 2019 through August 19,

23 2022.  Correct?

24     A   That is correct.

25     Q   All right.  Now, this list -- and this lists

1  intercompany transfers between CurePoint and entities

2  with which you're affiliated?

3      A   That is correct.

4          THE COURT:  Mr. Barton, which page are you

5  on?

6          MR. BARTON:  Beginning with, Your Honor, on

7  page 59.

8          THE COURT:  Thank you.

9  BY MR. BARTON:

10     Q   And it runs, Mr. Miles, just to confirm,

11 several pages.  All the way through page 68.  Those

12 are all intercompany transfers listed back and forth

13 between your other affiliated entities and CurePoint.

14     A   That's correct.  And I know it's not a

15 question, but we discussed in the deposition there is

16 a mathematical error in the cumulatives.  Specifically

17 regarding Eclipse Staffing.

18     Q   Right.  So just to clear that up for the

19 Court, it's the column on the right-hand front page.

20 The sum number for Eclipse Staffing is -- turned out

21 to be incorrect.  It is some formula error, or

22 something like that, right?

23     A   Specifically, Mr. Barton, it does not include

24 an offset from the payroll amounts down below.

25     Q   Okay.

1   A  So it dramatically materially affects that

2  summation.

3   Q  All right.  But in any event, the transfers

4  listed on the left-hand side of the page, that go all

5  the way through page 68, those are all accurate

6  listings of transfers back and forth?

7   A  That is correct.

8   Q  And these transfers were pulled by your son,

9  Michael Miles, from the bank records of CurePoint?

10   A  That was -- that was pulled by what I would

11  call the accountant for CurePoint, correct.

12   Q  And Michael Miles works for Mittere Tax and

13  Advisors?

14   A  On an uncompensated basis.  He is a -- the

15  bookkeeper for CurePoint.

16   Q  He's the one that did the legwork?

17   A  The -- correct.  Did not mean to make that

18  difficult for you.

19   Q  That's fine.  And I think you told me the

20  other day that you spot-checked his work, but you

21  didn't go and do the legwork yourself from front to

22  back?

23   A  That is correct.

24   Q  Now, the other thing you know about the --

25  this schedule is that it's incomplete.  Right?

PROCEEDINGS                                                October 12, 2022
CUREPOINT, LLC                                                          73

1    A   Can you tell me with regard to timing, or

2  incomplete as to what, Mr. Barton?

3    Q   Well, it only begins in January 2019, right?

4    A   I didn't mean to assume that, but that's

5  where I thought you were going.

6    Q   Yeah.

7    A   That is correct.

8    Q   And we know that these intercompany transfers

9  were occurring back -- really to the inception of

10 CurePoint, right?

11   A   I don't know if it was inception, but

12 definitely back to 2015 at least, Mr. Barton.

13   Q   Close to it?

14   A   Yes, sir.

15   Q   And you recall in the initial 341 meeting you

16 were asked by the United States Trustee to update the

17 original petition, which it didn't even go back as far

18 as 2019.  It only went back a year.  Correct?

19   A   I don't recall that, but I will take your

20 word at that, sir.

21   Q   In any event, this was an updated schedule

22 you provided in response to that request.

23   A   That is correct.

24   Q   And then last Friday we had a resumption of

25 the 341 meeting in which it was observed that this

1  disclosure is -- remains incomplete because it only

2  goes back to 2019.  Right?

3    A  I do recall that.

4    Q  And you were asked to, again, update and

5  provide a full listing of all intercompany transfers.

6  Correct?

7    A  That is correct.

8    Q  And you have not done that?

9    A  I provided that to Debtor's Counsel early

10  this morning.

11    Q  Okay.  I don't have it, correct?  You haven't

12  provided it to me?

13    A  I did not provide it directly to you, Mr.

14  Barton.

15    Q  And the schedules haven't been updated yet?

16    A  The schedules have been -- well, I'm sorry.

17    Q  The bankruptcy schedules.

18    A  The bankruptcy schedules, to my knowledge,

19  have not been updated.

20    Q  Now you also recall that we took your -- or

21  the Debtor's examination on Monday of this week.

22  Right?

23    A  I do.

24    Q  And one of the things that we requested, and

25  that was indeed ordered to be produced, was older

PROCEEDINGS                                                October 12, 2022
CUREPOINT, LLC                                                          75

1  versions of the due to/due from which would cover

2  periods prior to January 2019, correct?

3      A   That's correct.  That's what was --

4      Q   And that --

5      A   -- said -- I'm sorry.  Go ahead.

6      Q   And that was not produced in response to our

7  third request?

8      A   I provided to Debtor's Counsel this morning.

9      Q   But in response to the notice of the

10  deposition, the documents were supposed to be provided

11  last Friday at 3:00, and they were -- and that older

12  versions of the due to/due from were not produced.

13  Correct?

14      A   No.  But the reason for that, Mr. Barton, is

15  your firm's been very specific about wanting to make

16  sure it's original.  And the copy I was looking at

17  only dated back to 2022, so it took a long period of

18  time to find the one dated 2018.  And so that was the

19  one provided to Debtor's Counsel.

20      Q   All right.  But our request was for all

21  versions.  Yes?

22      A   Correct.  And it is the only version.  But

23  when I looked at it in a different place -- which,

24  again, your firm is very good at looking at, the

25  property specifically -- when I looked at different --

1  on different computers, it was showing 2022.  And I

2  sent an email to Counsel saying that your firm, Mr.

3  Barton, has been very specific in looking at what are

4  the properties on that excel for purposes of date of

5  format.  And it took a while to find -- off that

6  computer.  And I don't -- I'm not an excel expert.  I

7  don't know why that changes.

8        MR. GEER:  Mr. Barton, do you -- I had my

9  focus on, because I didn't want to be interrupted

10  during trial.  I didn't know if you want me to forward

11  this email to you?

12        MR. BARTON:  It's --

13        MR. GEER:  I can forward it to you and you

14  can --

15        MR. BARTON:  It's not going to help me right

16  now.  Okay.

17        MR. GEER:  All right.

18        MR. BARTON:  Thank you.

19  BY MR. BARTON:

20     Q   Now, let me just ask you a couple of high

21  level questions about these transfers, at least so far

22  as we have them here in front of us.  These transfers

23  are all made pursuant to oral conversations between

24  you and Ms. Dadabhoy, and perhaps your son, Mr.

25  Michael Miles.

1    A   I will not say -- they were all transfers

2  that Michael Miles and Phillip Miles discussed.  I

3  don't know if Ms. Dadabhoy is involved with every

4  transaction.

5    Q   Okay.  Now, Ms. Dadabhoy, of course, is the

6  manager of CurePoint through PFP, right?

7    A   That is correct.

8    Q   Not you?

9    A   That is correct.

10    Q   Has she delegated to you the ability to make

11  transfers back and forth to all of your entities at

12  whatever time you deem it appropriate to do so?

13    A   Yes.

14    Q   And I gather that delegation has no

15  restriction on it?

16    A   Not reduced to writing, but we do talk about

17  larger transactions.

18    Q   But in particular she hasn't told you that

19  there is limitation on the frequency with which you

20  can transfer money between CurePoint and your

21  affiliated entities.  Correct?

22    A   Not that I recall, sir.

23    Q   And she has not set a specific dollar

24  restriction on your ability to transfer money between

25  your entities and CurePoint?

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                       78

1    A   Not that I recall.

2    Q   And none of these transfers is evidenced by

3  any sort of written document or undertaking by the

4  transferring party to the receiving party.  Correct?

5    A   It is documented on the ledger.

6    Q   Which is done after the fact?

7    A   Correct.  It is -- is it not a pro-forma

8  documentation.

9    Q   And so there's no loan agreement or

10  promissory note associated with any of these

11  transfers.  Correct?

12    A   Not that I'm aware of, no, sir.

13    Q   And there are no terms associated with any of

14  these transfers in terms of an interest rate, a

15  payment period, a payment term.  None of those terms

16  apply to any of these transfers.  Correct?

17    A   On the ones we're looking at beginning on

18  page 59, no.  But an earlier version that was sent,

19  possibly, because of the Northwinds' lease with

20  CurePoint.

21    Q   Okay.  That's -- those would be ones we don't

22  have here in the courtroom with us today, though.

23  Correct?

24    A   Not that I'm aware of.

25    Q   And that'll just be related to the lease of

1  that HDR machine that you mentioned?

2      A   That is correct.

3      Q   You're sure there's a written lease for that

4  HDR machine?

5      A   I have not researched that.  I have

6  confidence, but not absolute that there is.  But I do

7  remember a lease.

8      Q   Would you agree with me, Mr. Miles, that in -

9  - at the end of the day the only limitation on your

10  ability to transfer money from CurePoint to your

11  entities, or from your entities to CurePoint, is just

12  the amount of money that happens to be in the account

13  from which the transfer is being made.

14      A   I would not agree with that.  There has to be

15  -- as every business owner, or business manager, or

16  accounting manager lives and breathes, it's government

17  payments, payroll.  So one always has to make sure

18  that there's money in the account for those items, and

19  other items.

20      Q   All right.  Subject to that limitation you've

21  just described, there's not any limitation other than

22  what money happens to be available?

23      A   Correct.  I could list other vendors or

24  debtors that there needs to be money, but correct.

25      Q   All right.  Now I want to talk a little bit

1  about the CurePoint bank statements.  Because we've

2  had our discussion about this the other day, and I'm

3  still not clear where we are.  You are aware that my

4  firm is in possession of all of the CurePoint bank

5  statements because they've been gathered in state

6  court litigation.  Correct?

7      A   Your term all, I -- I'm -- I can't refer --

8  respond to, but I am aware that your firm has bank

9  statements.  I don't know what time period.

10      Q   All right.  And we got those bank statements

11  directly from the banks because CurePoint didn't have

12  the ability to recover all of them from its internal

13  records.  Correct?

14      A   I do seem to remember that.

15      Q   We got them from Synovus and Morris Bank

16  primarily.

17      A   Correct.

18      Q   And those bank statements were gathered in a

19  state court case in which there is a protective order

20  in place.  Correct?

21      A   That's my understanding, correct.

22      Q   And it happens to be a case in which

23  CurePoint is not a party directly, although it is the

24  subject of derivative claims that are being made

25  against you and the other managers relating to the

1  activities in the business of CurePoint.  Correct?

2     A   Correct.

3     Q   All right.  And you know that when this

4  bankruptcy case was filed we requested that the

5  documents be released for use in this case by the

6  Court, by the other creditors.  Documents being

7  CurePoint's bank records?

8     A   I was copied or forwarded, I can't remember

9  what, emails between your first and CurePoint's

10  Counsel with regard to that matter.

11     Q   And that would be Brian Railey (ph)?

12     A   That is correct, Brian Railey with Colhein

13  Meadows (ph).

14     Q   He -- Mr. Railey represents CurePoint, and

15  all the owners and managers of it, and PFP.  Correct?

16     A   It's -- that's my understanding.

17     Q   And we requested from Mr. Railey the

18  opportunity to use those bank records in this case.

19  Yes?

20     A   Correct.  I did see that email.

21     Q   And that request was refused.

22     A   To be clear, I don't remember seeing a

23  refusal.  I remember Brian asking questions.  But I am

24  not the manager over -- provide oversight to that

25  litigation.

PROCEEDINGS                                           October 12, 2022
CUREPOINT, LLC                                                      82

1    Q   All right.  But, in fact, if you look at tab

2   14.

3    A   I will.

4    Q   You will note Mr. Railey filed a motion on

5   your behalf to prevent the use of the bank statements

6   in this bankruptcy case.  And even alleged that we

7   were violating the automatic stay by requesting them.

8   Do you see that?

9    A   I see that.

10    Q   All right.  Now, we requested through

11   Debtor's counsel, and through you on Monday, that that

12   hold on these bank statements been -- would be

13   released.

14    A   I do remember you asking that.

15    Q   Agreed?  And we have not received any

16   response from you or CurePoint to that inquiry.

17        MR. GEER:  Your Honor, I want to object based

18   on that's just not right.

19        We have told them on behalf of every entity

20   that Mr. Miles represents that they could use those

21   bank statements.  They came back saying, well, what

22   about Dooley?  We don't represent Dooley, I don't have

23   any contact with Mr. Dooley.  We -- I went through

24   this with Mr. Tady on the phone.  I said, please use

25   your bank statements.  We do not care.

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              83

1        And we even talked about it at the

2   deposition.  You know, I don't think it's in violation

3   of the automatic stay to use the bank statements.  I

4   thought they were going to use them.  This is -- I

5   don't know why they can't use them.  I have no idea.

6        THE COURT:  All right.  Mr. Barton, a

7   response?

8        MR. BARTON:  Well, what I know, Your Honor,

9   is that Mr. Railey, who represents Mr. Miles and all

10  of the parties in the state court litigation filed

11  this motion, and it's filed on behalf of the

12  Defendants.  So I don't -- I don't know how to parse

13  this.

14       All I know is we've requested numerous times,

15  and we've asked Mr. Miles to ask his lawyer, Mr.

16  Railey, to release these documents.  We have them

17  here, we'd like them to be available, but I don't want

18  to be accused of violating a protective order in the

19  state court litigation.

20       If Mr. Miles can state on the record, to the

21  Court and to us, that the bank statements are released

22  from the protective order on behalf of all of the

23  parties to that case, then we're in a position to use

24  them.  Otherwise I'm not comfortable doing that.

25       THE COURT:  Mr. Geer?  Can you respond to

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              84

1  that?

2       MR. GEER:  I've said this for quite a while,

3  Your Honor.  We have no issue with him using those

4  bank statements.

5       THE COURT:  And is there any party to that

6  litigation that you don't represent?  You only

7  represent the Debtor?

8       MR. GEER:  We only represent CurePoint, Your

9  Honor.  I've got Mr. Miles to say on behalf of PFP,

10  any entity that he controls, and that's fine.  Mr.

11  Railey is -- he said fine as well.  I -- maybe there's

12  a lot of cooks in kitchen, it's a miscommunication.

13  I've talked to a number of lawyers on their side.

14  I've said you can use the bank statements.  We are

15  certainly not going to be prosecuting a lift of stay -

16  - or a violation of the stay at all.  If you have them

17  here, you can use them.  I don't see the deal.

18       THE COURT:  Well, I -- what I want to make

19  sure is that we're not violating another Court's

20  order.  And as Mr. Railey indicated to you, he's the

21  Counsel of record in the case.

22       MR. BARTON:  He is.

23       THE COURT:  And he's filed this motion asking

24  you not to use them.  But his --

25       MR. BARTON:  He's filed the motion, we've had

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    85

1  subsequent communications in which we provided him

2  what exactly we want to use.  That was, I think,

3  Friday.  And we haven't gotten an answer.  I asked Mr.

4  Miles if he would get with Mr. Railey to get a

5  response, and we haven't received a response.

6           The confounding thing about all of this, Your

7  Honor, is CurePoint is technically a party to that

8  case, and therefore it's not a party to the protective

9  order.  It's the owner, PFP, and the other managers.

10 If Mr. Miles would represent to all of us that he can

11 speak for all of them and release them, then I'm

12 comfortable with that.  But if not, then I don't think

13 we have the ability to use them today.

14          THE COURT:  Mr. Miles, can you speak on

15 behalf of all of the entities that you have an

16 interest in, and that you control, that you have no

17 objection to the use of CurePoint's bank statements in

18 this proceeding today?

19          THE WITNESS:  Specifically, Your Honor, I'm

20 looking at Exhibit 8614.  I can speak of, on behalf of

21 Phillip Miles.  I'll allow Ms. Dadabhoy, I think she's

22 a witness, to speak on her behalf.  I cannot speak for

23 V. Daniel Dooley, Dooley Investment Holdings.  I can

24 speak on behalf of MEC Capital for its authority.

25          THE COURT:  You can or can't?

PROCEEDINGS                                                October 12, 2022
CUREPOINT, LLC                                                           86

1          THE WITNESS:  Can.

2          THE COURT:  Okay.

3          THE WITNESS:  And I cannot speak on behalf of

4 Physician Financial Partners, LLC, as Ms. Dadabhoy

5 would have to speak to that.

6          MR. GEER:  I will represent Mr. -- excuse me,

7 Ms. Dadabhoy has already informed me that that's --

8 they --

9          THE COURT:  Not --

10          MR. GEER:  -- they can be used.

11          THE COURT:  Not an issue?  And V. Daniel

12 Dooley, and Dooley Investment Holdings, Inc.  What

13 interest, if any, do they have in withholding of bank

14 statements relative to CurePoint?

15          MR. GEER:  None, Your Honor.

16          THE COURT:  Mr. Barton, are you comfortable

17 going forward using the bank statements in light of

18 what he said?  He can't speak on behalf of those two

19 entities.

20          MR. BARTON:  I guess I'm uncomfortable.

21 There's been some history in these cases --

22          THE COURT:  Understood.

23          MR. BARTON:  -- where accusations have been

24 made.  I'm happy to take his representation that he

25 can speak for Mr. Dooley, who is his co-investor in

PROCEEDINGS                                                     October 12, 2022
CUREPOINT, LLC                                                              87

1  many of these businesses.  But if he can't make that

2  representation then I -- them I'm -- I feel

3  constrained.

4        THE COURT:  All right.  Can you make any kind

5  of representation with respect to whether V. Daniel

6  Dooley, or Dooley Investment Holdings, Inc. has any

7  objection to the use of CurePoint's bank statements in

8  this proceeding?

9        THE WITNESS:  Your Honor, I would answer that

10 I don't see why he would, but I have not asked that

11 question of him.

12       THE COURT:  Do you have the ability to

13 contact him now?

14       THE WITNESS:  I don't have my phone with me,

15 sir.

16       THE COURT:  All right.  Do you know his phone

17 number?

18       THE WITNESS:  Not off the top of my head,

19 Your Honor.

20       THE COURT:  Is it worth taking a few minutes

21 for him to reach out to get the answer to this?

22       MR. BARTON:  I think it would help everybody

23 if we could freely use the bank statements.

24       THE COURT:  All right.  It's --

25       MR. BARTON:  I will also point out, Your

PROCEEDINGS                                        October 12, 2022
CUREPOINT, LLC                                                    88

1  Honor, that to do a work around on this issue we

2  requested the bank statements directly from CurePoint

3  for the deposition on Monday.  They're in the

4  possession of Mr. Railey.  So if they were to be

5  produced outside that state court litigation, then I

6  don't think there'd be the restriction in place.  And

7  I know I -- maybe I seem like I'm being a little

8  hyper-technical here, but those documents weren't

9  produced by CurePoint, even though they're in

10  possession its other Counsel.  But barring

11  confirmation that Mr., I guess, Dooley is on board

12  with releasing them I would be uncomfortable.

13        THE WITNESS:  May I speak again, Your Honor?

14        THE COURT:  You may.

15        THE WITNESS:  It has been -- as the

16  designated manager for purposes of this bankruptcy,

17  Counsel for the Debtor has said this is traditionally

18  used.  My strong assumption, if I call Mr. Dooley, he

19  is a busy person.  I actually read in the paper his

20  father is ailing with COVID right now.  I think I

21  caught that just a couple of days about.  I don't know

22  why he would resist this.

23        THE COURT:  Does Mr. Railey represent the

24  Dooley -- Mr. Dooley and the Dooley entity --

25        MR. GEER:  I'm --

1        THE COURT:  -- in the state court litigation?

2        MR. GEER:  They would know better, I --

3        MR. BARTON:  He does.

4        MR. GEER:  -- I don't, Your Honor.

5        MR. BARTON:  He does, Your Honor.

6        THE COURT:  All right.  We're going to take a

7  10-minute break.  I'm going to ask that you reach out

8  to Mr. Railey.

9        MR. GEER:  Sure.  I did try pre -- I did try,

10  and I couldn't get a hold of him, before this.  But

11  I'll try again, Your Honor.

12        THE COURT:  All right.  We're going to --

13  (cross talk) -- take a 10-minute break.  I want -- I

14  want you to either reach Mr. Railey or Mr. Dooley to

15  get to the bottom of this, so that we can resolve this

16  issue and move forward as quickly as possible.  We'll

17  take a 10-minute break.

18        THE WITNESS:  Thank you, Your Honor.

19        THE BAILIFF:  All rise.

20        (Off the record.)

21        MR. BARTON:  So I think we can move through

22  this pretty quickly.

23        THE COURT:  All right.

24        MR. BARTON:  Your Honor, I have the bank

25  records we would like to have Mr. Miles look at.  I've

1  already put them into the notebook at a placeholder

2  where --

3      THE COURT:  Okay.

4      MR. GEER:  -- we have -- behind the tabs.  I

5  do have copies for you as well --

6      THE COURT:  Okay.

7      MR. GEER:  -- if I may approach.

8      THE COURT:  You may.  And what exhibit are

9  these?  Exhibit number?

10     MR. GEER:  These are 28, 29, 30, and 31.

11     THE COURT:  In the book?

12     MR. GEER:  That's correct, Your Honor.

13     THE COURT:  All right.

14     (Creditor's Exhibits 28, 29, 30, and 31 were

15  marked for identification.)

16     THE COURT:  Go ahead.

17     THE WITNESS:  Thank you, ma'am.

18     MR. BARTON:  And I have copies for

19  (inaudible).

20     MR. BARTON:  All right, Mr. Miles.  Thanks

21  for indulging us and assisting in that.  I just want

22  to get these quickly identified, and then we'll move

23  onto something else.

24     THE WITNESS:  Okay.

25  BY MR. BARTON:

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    91

1      Q   You should have, under tab 28, what's been

2   marked as Exhibit 86-28.  And you'll recognize this as

3   -- it's a very same exhibit that was marked in the

4   deposition of Z.E.R.O. Holding in the state court

5   case.

6      A   I, of course, don't have 100 percent

7   recollection, but it appears to be, sir.  Yes.

8      Q   Okay.  And these are excerpts.  They're not

9   every page because we'd have to bring several boxes,

10  but they're simply excerpts from the CurePoint bank

11  records that relate to Z.E.R.O. Holding transactions.

12     A   I understand.

13     Q   Okay.  Secondly, Exhibit 29, similarly was

14  marked in the Northwinds' deposition in the state

15  court case.  You see down at the bottom.  And these --

16  just identify these, if you would, as excerpts from

17  the CurePoint bank statements relating to Northwinds

18  Leasing.

19     A   That appears to be correct, Mr. Barton.

20     Q   And then thirdly, same question for Exhibit

21  number 30, which was marked in the state court case in

22  the deposition of MEC Capital.  And these are excerpts

23  from the CurePoint bank statements relating to the MEC

24  transfers.  Agreed?

25     A   That appears to be correct, Mr. Barton.

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                               92

1    Q   All right.  Finally, and I'll leave you alone

2  about the bank statements, we have Exhibit 31, which

3  was marked in the Mittere deposition in the state

4  court case, relating to excerpts from the CurePoint

5  statements that concern Mittere transactions.  Agreed?

6    A   It again appears to be correct, Mr. Barton.

7    Q   All right.  Thank you.

8    A   Thank you.

9    Q   Now I'm going to shift here to a couple of

10  other things very quickly.  First, if you would,

11  please, look at Exhibit Number 28 in the book.

12    A   I am there, sir.

13    Q   I'm sorry, not 28.  Excuse me, 32.

14    A   I am there.

15    Q   All right.  When we talked about this

16  document the other day, this is a -- an unconditional

17  guarantee that was delivered by CurePoint, LLC, the

18  Debtor, to Newtech Small Business Finance, LLC.

19    A   That is correct.

20    Q   Correct?  And the borrower, or the

21  beneficiary is Z.E.R.O. Holding.  Correct?

22    A   The borrower is, yes.

23    Q   And that's the same Z.E.R.O. Holding that we

24  talked about earlier that you have a partial ownership

25  interest in, correct?

PROCEEDINGS                                        October 12, 2022
CUREPOINT, LLC                                                    93

1    A  That is correct.

2    Q  And the amount on the notice, $3.5 million.

3    A  That is correct.

4    Q  And if you'll look at the third page of the

5  exhibit, page 3 of 3.

6    A  I see that.

7    Q  You see your signature there?

8    A  It is.

9    Q  Named as manager of CurePoint, LLC.  Correct?

10   A  That is correct.

11   Q  But that -- that's not a title that you held

12 at the time.

13   A  I was designated manager at the time.

14   Q  Pursuant to this oral understanding between

15 you and Ms. Dadabhoy?

16   A  That is correct.

17   Q  But you weren't the actual manager?

18   A  That is correct.

19   Q  Then turn, if you would, to Exhibit 33, the

20 next document.  Is this a closing affidavit that you

21 signed in connection with that same closing?

22   A  It is.

23   Q  And this was an SBA loan, correct?

24   A  That is correct.

25   Q  And you -- and your signature appears at the

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    94

1   bottom of the page above your name?

2      A   It does.

3      Q   And if you will look, please, at paragraph

4   number two, it states, "I am not a defendant in any

5   lawsuit in any jurisdiction."  Correct?

6      A   It does.

7      Q   And, in fact, at the time you were a

8   defendant in at least one, being the derivative action

9   filed by Dr. McCord that's been pending since 2018.

10  Correct?

11     A   That's correct, and that was disclosed.

12     Q   But not here?

13     A   It is not -- it is not on this closing

14  affidavit, correct.

15     Q   Then just if you would, please, to the next

16  exhibit, number 34.

17     A   I am there.

18         (Creditor's Exhibit 34 marked for

19  identification.)

20  BY MR. BARTON:

21     Q   And this is a document that CurePoint signed

22  in connection with that same loan transaction with

23  Newtech, correct?

24     A   Correct.

25     Q   And your signature appears again on the

1  second page at the manager of CurePoint.  Correct?

2      A   That's correct, for purposes of --

3      Q   When you didn't (cross talk) --

4      A   I'm sorry, did I speak over you?

5      Q   Is that correct?

6      A   Correct, for purposes of this loan.  That is

7  correct.

8      Q   Right.  But you weren't, in fact, the manager

9  at the time?

10     A   Not overall in CurePoint.  For purposes of

11  this loan I was designated to, correct.

12     Q   And you never have been?

13     A   I have been designated as manager, just as I

14  am in this bankruptcy proceeding, at different times.

15     Q   Right.  But not elected by the -- or

16  appointed by the members of the entity to serve in

17  that function?

18     A   That is correct.

19     Q   And you'll notice on the first page there is

20  a certification provided in the first paragraph.  The

21  second, or a section of it, called resolutions

22  adopted.  Do you see that?

23     A   I see it on CP275 (ph).  Yes.

24     Q   That's correct.  And that statement says, "At

25  a meeting of the members of the company, duly called

1  and held on March 18, 2022," and you skip down, "the

2  following named persons are members and managers of

3  CurePoint."  There was no actual meeting on March

4  18th, correct?

5      A  Not that I recall.

6      Q  And no actual resolution was adopted by the

7  company to your knowledge?

8      A  Not that I recall.

9      Q  All right.  So where it lists you as manager

10  there, that wasn't done pursuant to a resolution as

11  indicated here.  Right?

12     A  Not that I recall.

13     Q  And then we have identified as a manager Mark

14  Miles.  Just below your name.  Do you see that?

15     A  I do.

16     Q  And he has not, and never has been, the

17  manager of CurePoint, has he?

18     A  No, sir, he is not.

19     Q  That's your brother that lives in Oklahoma?

20     A  That is correct.

21     Q  Let me shift your attention, please, to

22  Exhibit Number 39.

23     A  I am there.

24     (Creditor's Exhibit 39 marked for identification.)

25  BY MR. BARTON:

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    97

1      Q   This is a merchant cash advance agreement

2  that you signed with Click Capital Group, LLC.

3  Correct?

4      A   We talked about this on Monday deposition.  I

5  don't recognize that signature, but it is -- I do

6  recognize Click Capital as a merchant advance.

7      Q   Okay.  And they did, in fact, advance funds

8  to Z.E.R.O. Holding?

9      A   My memory serves me that is correct.

10     Q   And the -- this document was produced by

11 CurePoint, right?  It's got the Bates number at the

12 bottom right-hand corner?

13     A   Correct.

14     Q   And I'm sure you would expect to have had a

15 written agreement with Click Capital before they

16 advanced the funds?

17     A   Either verbal or in writing.

18     Q   All right.  Now, this -- well, no.  Let me --

19 let me ask you answer my question.  You would expect

20 Click Capital to have required a written signed

21 agreement before they advanced funds?

22     A   I can't 100 percent say that.  What they

23 expect or not expect.

24     Q   All right.  In any event, CurePoint did, in

25 fact, produce this signed version?

1    A   It did.

2    Q   And then we have, at the top of the page

3   where it says merchant legal name --

4        MR. GEER:  What page number is that?

5        MR. BARTON:  I'm sorry, it's CP-167.  The

6   first page of the exhibit.

7   BY MR. BARTON:

8    Q   It says legal name, Z.E.R.O. Holding, LLC,

9   and all entities listed on Exhibit A.  Correct?

10   A   It does.

11   Q   All right.  And if we skip over to Exhibit A,

12  which begins on page 24 of 48.  Do you see that?

13   A   I'm there.

14   Q   All right.  So this purports to buy not just

15  Z.E.R.O. Holding, but other entities.  Correct?

16   A   I see that.

17   Q   Including MMI (ph), that's one of your

18  entities?

19   A   Correct.

20   Q   Mittere?  One of your entities?

21   A   Correct.

22   Q   PFP?

23   A   I see that.

24   Q   Did you have authority from Ms. Dadabhoy to

25  execute this agreement on behalf of PFP?

1    A   As I said in my deposition on Monday, I don't

2   remember this document being affixed.  And also, when

3   Click Capital did this I remember saying that most of

4   these entities either are not around or I have no

5   authority.

6    Q   Okay.  But did you have authority from Ms.

7   Dadabhoy to sign this document on behalf of PFP?

8    A   Again, in my testimony here today, I don't

9   recognize that signature and I don't remember having

10   to go to Ms. Dadabhoy on behalf of PFP.

11    Q   So it sounds like the answer would be you did

12   not have authority from her?

13    A   It would be a hypothetical that I would have

14   had to have had authority to sign this.  My testimony

15   here today is I don't recognize that signature.

16    Q   Let me try it another way.  Did you and Ms.

17   Dadabhoy have a specific conversation about your

18   execution of an agreement with Click Capital on behalf

19   of PFP?

20    A   Your question again presumes that I executed

21   this document.

22    Q   I'm only asking whether you had a

23   conversation, not whether you signed it.

24    A   I don't remember having a reason to have a

25   conversation.

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              100

1    Q   So no?

2    A   I do not believe I had a conversation about a

3  document that I do not believe I signed.

4    Q   Also obligates, or reports to obligate at

5  least, CurePoint on the top of -- this is page 26 of

6  48.  Correct?

7    A   Correct.

8    Q   And would you give me the same answer about

9  having conversations with Ms. Dadabhoy about this

10  agreement?

11    A   The exact same answer, you're correct.

12    Q   All right.  And we won't go through all of

13  these other entities, but some of these other entities

14  listed here you don't have any authority for

15  whatsoever.  Correct?

16    A   The majority -- and I remember discussing

17  this with Click -- don't exist.  For instance, in page

18  CP-1 -- oh, I'm sorry, you go by this.  Page 27.

19  Something called Radiation Oncology Center, and below

20  it in caps ZERO HOLDING CO., and I told Click Capital

21  at the time the majority don't exist and I don't

22  understand why they're doing -- would present this.

23    Q   And you certainly didn't have any authority

24  to buy AOA AMC, LLC, which is on page 36.  Correct?

25    A   That is correct.  If they were -- if there

PROCEEDINGS                                                 October 12, 2022
CUREPOINT, LLC                                                          101

1  were, indeed, tried to be bound I would not have one.

2      Q   The Junior Raiders Baseball, Inc. I'm going

3  to guess that's maybe a fundraising outfit for a youth

4  baseball league or something?

5      A   My memory serves me, that was a non-profit.

6  Again, one of multiple entities here that don't exist,

7  were in fact dissolved, or I had no authority if I

8  were presented to sign.

9      Q   All right.  All right.  Let me shift your

10  attention, please, to number 37.

11     A   I'm there.

12     (Creditor's Exhibit 37 marked for identification.)

13  BY MR. BARTON:

14     Q   And similar to the document we just looked

15  at, this is a merchant cash advance agreement between

16  PointOne Capital, LLC, and the merchant is identified

17  as CurePoint, LLC, and entities identified on Exhibit

18  A.  Do you see that?

19     A   Correct.

20     Q   And did you, in fact, sign this document at

21  the bottom left-hand corner?

22     A   On Exhibit 86-37 -- excuse me, page 123,

23  correct.

24     Q

25     Q   It all -- and it list you as the owner of

PROCEEDINGS                                     October 12, 2022
CUREPOINT, LLC                                              102

1   CurePoint, correct?  Just below your signature?

2       A   On page 1 of 23?

3       Q   That's correct.

4       A   Oh.  Yes, it does.

5       Q   All right.  And that wasn't accurate at the

6   time, was it?

7       A   No, it is not.

8       Q   And never has been?

9       A   No, I've never been a direct owner of

10  CurePoint.

11       Q   And it identifies your son, Michael Miles, as

12  an owner of CurePoint on the right-hand side next to

13  your name.  Correct?

14       A   Correct.

15       Q   Did your son Michael sign this on behalf of

16  any of the entities listed?

17       A   Not that I'm aware of.

18       Q   Did you ask him to?

19       A   Not that I'm -- recall or aware of.

20       Q   Have you asked him whether he signed this

21  document?

22       A   I have not.

23       Q   All right.  And we won't go through the

24  entire list, but if you look at Exhibit A, which

25  appears over on page 22 of 23, there is a number of

1  entities listed.  Some of which are yours, some of

2  which are not, some of which might be dissolved.

3  Would that be a fair summary?

4      A   That is correct.

5      Q   One in particular I want to ask you about is

6  CurePoint Dublin, LLC.  Which is over on page 23.  Do

7  you see that?

8      A   I do.

9      Q   That is CurePoint's landlord?

10     A   CurePoint Dublin, LLC is CurePoint, LLC's

11  landlord.

12     Q   Did you have authority to sign this document

13  from CurePoint Dublin, LLC.

14     A   If I were asked, I would not have the

15  authority.

16     Q   Well, whether you were asked or not, do you -

17  - would you have authority to sign any documents on

18  behalf of the landlord?

19     A   No.

20     Q   And did you have any conversations with the

21  landlord concerning this agreement with Point One

22  Capital?

23     A   There would have been no reason to.

24     Q   All right.  This document does bear

25  CurePoint's Bates numbers, from page 1 all the way

1  through that last page we just looked at.  Meaning it

2  was in the files of CurePoint.  Correct?

3     A  Correct.

4     Q  In exactly the form we're looking at here?

5     A  That is correct.

6     Q  All right.  Last thing I want to ask you

7  about is over on page 19 -- excuse me, Exhibit 19, 86-

8  19.

9     A  I am there, Mr. Barton.

10      (Creditor's Exhibit 19 marked for identification.)

11  BY MR. BARTON:

12     Q  All right.  We talked about this the other

13  day, so I want to work through very quickly.

14     A  Okay.

15     Q  This is the letter of acceptance, waiver, and

16  consent that you entered into with the FINRA

17  regulatory agency.  Correct?

18     A  That is correct.

19     Q  And in the background section on page 1 it

20  states that Respondent Miles -- that's you, correct?

21     A  Correct.

22     Q  "Entered into -- entered the securities

23  industry in October 2000 when he joined DB Alex Brown

24  (ph).  Mr. Miles was registered with FINRA member

25  Citigroup from March 5, 2004 through December 24,

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              105

1  2008."  Let me stop there.  Is that -- is that

2  accurate?

3      A   That is correct.

4      Q   It goes on and says, "When he was discharged

5  for refusing to answer questions from the firm about

6  certain customer transactions."  And that's accurate

7  as well, correct?

8      A   That's what it says.  That's not what

9  happened, but that's what it says.

10     Q   Okay.  But you did sign and approve the

11  document?

12     A   I did.

13     Q   And then the next sentence talks about the

14  licenses that you held at the time, Series 3, 7, and

15  66.  Correct?

16     A   That is correct.

17     Q   All right.  And then over on the next page,

18  page 2 of 5, at the top it states that, "On January

19  27, 2009, FINRA opened an investigation based on

20  allegations by the firm that a review of Mr. Miles'

21  accounts by the firm revealed unauthorized trading and

22  false account values, which were subsequently reported

23  to the firm under a FINRA form."  Do you see that?

24     A   I do.

25     Q   And that's accurate as well, right?

1      A   There were allegations.  But then when --

2  there was an examination of my computer and all that.

3  I received everything I needed to out of Citigroup

4  Smith Barney.  So there were allegations.

5      Q   Okay.  And you signed and approved this form

6  as written?

7      A   That's correct.  And I believe the form says

8  that I'm not admitting anything, yes.  And going back

9  to page 1 of 5, "I hereby accept and consent without

10  admitting or denying the findings."

11     Q   Right.

12     A   That is correct.

13     Q   But you did sign as printed?

14     A   No, that is correct.

15     Q   And didn't ask for any changes or

16  corrections?

17     A   No.  At that point I was confident I was

18  going to get my money out of Citi Group based on their

19  lack of findings of any misdeeds by Miles.

20     Q   The next paragraph on page 2 states that in

21  connection with that investigation, on four occasions

22  FINRA requested -- pursuant to its rules -- that Mr.

23  Miles provide a written statement concerning these

24  allegations.  Mr. Miles did not provide the requested

25  information.  That's accurate, isn't it?

1    A   That is correct.  There was an attorney

2  representing me, a Gerald Kline, who said this would

3  cost hundreds of thousands of dollars to fight.  That

4  is correct.

5    Q   Okay.  So you didn't respond to those

6  inquiries?

7    A   That is correct.  That was under advisement

8  of counsel at the time.

9    Q   And ultimately, under Section B, it provides

10  that you consented to the imposition of a permanent

11  bar from associated with any FINRA membered firm or

12  entity.  Correct?

13    A   That is correct.  Without -- again, in the

14  first page, without admitting or denying any findings.

15  Which there were none.

16    Q   All right.  But looking at the fourth page,

17  which is where your signature appears, right?

18    A   Right.

19    Q   It states, "I certify I've read and

20  understood all the provisions, and I agree to its

21  provisions voluntarily."  And that was accurate at the

22  time, correct?

23    A   That is correct.  This is a time period where

24  I knew I'd get my money out, and I knew Citi Group

25  Smith Barney, who is not listed here, had no claims

PROCEEDINGS                                October 12, 2022
CUREPOINT, LLC                                           108

1  against me.

2      MR. BARTON:  All right.  Those are all the

3  questions I have at this time, Your Honor.

4      THE COURT:  All right.  Mr. Levengood wants

5  your attention.

6      MR. LEVENGOOD:  Yeah.  Thank you.

7      MR. BARTON:  Mr. Levengood has pointed out

8  one thing I overlooked, Mr. Miles.  And we talked

9  about this the other day.

10  BY MR. BARTON:

11     Q   The guarantees that we looked at earlier, and

12  primarily the one to Newtech.  Do you recall that?

13     A   I do.

14     Q   There was no consideration flowing directly

15  to CurePoint for signing that loan.  Correct?

16     A   That is not correct.  I think I said that in

17  the deposition.  I pointed out where various MCAs (ph)

18  on behalf of CurePoint were, in fact, paid off.

19     Q   All right.  The vast majority of the money

20  went directly to Z.E.R.O. Holding, or to pay off

21  Z.E.R.O. Holding obligations?

22     A   The latter.  There were Z.E.R.O. Holding

23  obligations.  The vast majority went to pay off

24  Z.E.R.O. Holding obligations, but it was material

25  amount that paid off CurePoint.  I --

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    109

1    Q   Okay.  I'm not going to quibble with a couple

2  hundred thousand dollars out of 3.5 million.  But the

3  vast majority of it went to Z.E.R.O. Holding?

4    A   The vast majority of it went to obligors of

5  Z.E.R.O. Holding, not to Z.E.R.O. Holding.  But it

6  also --

7    Q   To discharge Z.E.R.O. Holding's obligations

8  to them?

9    A   That is correct.  But it also paid off

10  CurePoint obligations as well.  And at that time,

11  Newtech had offered up a loan for CurePoint.

12       MR. BARTON:  Your Honor, we would -- I don't

13  have any further questions of Mr. Miles.  I'll just

14  move for admission of the exhibits we went over.

15  Exhibit 41; 28 through 31, which are the bank

16  statements; 32 -- excuse me, 34, the Newtech

17  documents; 39, the Click Capital document; 37, the

18  Point One Capital document; and the FINRA document,

19  Exhibit 19.

20       THE COURT:  Mr. Geer, any objection?

21       MR. GEER:  No objection, Your Honor.

22       THE COURT:  Exhibits 41, 28 through 31, 32

23  through 34, 37, 39, and 19 will be admitted without

24  objection.

25       (Creditor's Exhibits 41, 28 through 31, 32,

1   34, 37, and 39 admitted into evidence.)

2        MR. BARTON:  Thank you, Your Honor.

3        THE COURT:  Mr. Holbein, do you have any

4   additional cross-examination?

5        MR. HOLBEIN:  I do, Your Honor.  I probably

6   should have done this when Mr. Barton did.  Can I

7   approach with binders?

8        THE COURT:  You may.

9        MR. HOLBEIN:  These are --

10       THE COURT:  (Inaudible) for the Debtor?

11       MR. HOLBEIN:  Yes.  Yes, Your Honor.

12       MR. GEER:  (Inaudible) if I knock it over?

13       THE COURT:  Yeah.  (cross talk)

14       MR. HOLBEIN:  To avoid adding yet another set

15   of identification numbers to these exhibits, we're

16   going with their docket entry appearance.  So I'll

17   refer to them at 84-1, 84-2, 84-3, et cetera.

18       Additionally, two of the exhibits are

19   composite exhibits.  They were not subdivided on the

20   docket, but they have been -- they were on the exhibit

21   list, and they should be eternally subdivided in the

22   copies for Your Honor,  and the witness.

23       THE COURT:  Just so that the record is clear,

24   I think this is right, Mr. Barton, all of your

25   exhibits appear at docket 86, correct?

1        MR. BARTON:  That's right, Your Honor.

2        THE COURT:  All right.

3        MR. BARTON:  Except the last one.

4        THE COURT:  Except for the last one, which

5   was the amended schedules and statement of financial

6   affairs.

7        MR. BARTON:  That's correct.

8        THE COURT:  All right.  Thank you.

9        MR. LEVENGOOD:  And the bank statements

10   aren't filed yet.

11        MR. BARTON:  Oh.

12        MR. LEVENGOOD:  The bank statements.

13        MR. BARTON:  Yeah.  The bank statements have

14   not been filed yet, but we will file them now that we

15   have that clear.

16        THE COURT:  All right.  Just so that -- I

17   would like them filed so that -- everything's on the

18   record.

19        MR. BARTON:  Absolutely, Your Honor.

20        THE COURT:  All right.  Thank you.

21        MR. HOLBEIN:  Your Honor, I just got a

22   request from Debtor's Counsel for a bathroom break.  I

23   don't oppose it.  I would say we have -- I have to ask

24   questions for Miles, and we have a fact witness that

25   we would like to call next who we need to get out by

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              112

1  2:00 p.m. because of a hearing that she has for her

2  special needs son in the school.  And so --

3          THE COURT:  Okay.

4          MR. HOLBEIN:  -- if we could push on through

5  past that instead of breaking for lunch after our

6  examination of Miles.  I just wanted to put that out

7  there, if that would be okay.

8          THE COURT:  Well, the only question for -- is

9  for y'all, and that is that they stop serving lunch at

10  1:15.

11          MR. HOLBEIN:  Yikes.

12          THE COURT:  So if anybody expects to eat, we

13  have to break before that for you to be able to eat at

14  all.

15          MR. HOLBEIN:  Okay.  I will talk to our

16  witness during this bathroom break and see how we're

17  going to handle it.

18          MR. LEVENGOOD:  Like, or you can just go.

19          MR. BARTON:  I can -- I mean, he can cover.

20          MR. LEVENGOOD:  Yeah.  I can cover, Your

21  Honor.  He can just go to the bathroom.

22          THE COURT:  Okay.

23          MR. BARTON:  Okay.  Thank you.

24          MR. HOLBEIN:  All right.  I'm going to --

25  then I'll proceed.

1      THE COURT:  Okay.

2      UNIDENTIFIED MALE SPEAKER:  Good solution.

3      THE WITNESS:  Sorry to speak directly, but it

4  -- do -- the -- could she go and then I come back up?

5  I don't mean to speak out of turn.

6      THE COURT:  If it's critical for you to have

7  the witness, we can take a break and interrupt the

8  cross-examination.  I mean --

9      MR. HOLBEIN:  That actually might be best, I

10  think, at this point --

11      THE WITNESS:  There you go, I'll wait.  I'm

12  not done.

13      MR. HOLBEIN:  -- to accommodate her schedule.

14  And I do appreciate the Court indulging us in that

15  regard.

16      THE COURT:  All right.  Is she available now?

17      MR. HOLBEIN:  Yes, Your Honor.

18      THE BAILIFF:  She's here.

19      MR. HOLBEIN:  She --

20      THE COURT:  She's here?

21      MR. HOLBEIN:  Yes.

22      THE COURT:  Okay.

23      MR. HOLBEIN:  Yes.

24      THE COURT:  All right.  Mr. Miles, if you

25  don't mind stepping down for a minute.  Okay?

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                            114

1        THE WITNESS:  Yeah, no problem at all.  Thank

2  you.

3        THE COURT:  I'm going to ask you not to talk

4  about your testimony with anybody.

5        THE WITNESS:  I will not.  (cross talk) I'm

6  just going to step out that way (cross talk) come back

7  in.  Can I be in while she talks?

8        THE COURT:  You may.

9        THE WITNESS:  Okay.  Thank you, Your Honor.

10        MR. HOLBEIN:  And this will be a short ways,

11  for at least us.

12        THE WITNESS:  I'm just going to place this

13  here?

14        MR. HOLBEIN:  Sure.  Yeah.  She won't use

15  this.  Or at least -- yeah, she won't use it.

16        THE BAILIFF:  Get you some (inaudible).  Pull

17  up a chair (inaudible).  Raise your right hand.

18  WHEREUPON,

19              CARMEN SIMMONS

20  called as a witness, and having been sworn by the

21  notary public, was examined and testified as follows:

22        THE BAILIFF:  And state your name for the

23  record, please.

24        THE WITNESS:  Carmen Simmons.

25        THE BAILIFF:  State it again?

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              115

1        THE WITNESS:  Carmen Simmons.

2        THE BAILIFF:  Thank you.

3        THE WITNESS:  Okay.

4              DIRECT EXAMINATION

5   BY MR. HOLBEIN:

6      Q   Good afternoon, Ms. Simmons.  My name is

7   Michael Holbein, I represent AMOA Finance.  You and I

8   have spoken before, isn't that correct?

9      A   Yes.

10     Q   So, Ms. Simmons, would you mind briefly

11  telling the Court and those in attendance what it is

12  you do for a living?

13     A   Yes.  I am the Revenue Cycle Manager for the

14  AOA practices.  I oversee all of the credentialing,

15  billing, and collections for the cancer center.

16     Q   And how long have you been in that position?

17     A   Five years.

18     Q   And before you were in that position, what

19  did you do?

20     A   I worked in orthopedics, did pre-

21  certification.  I worked a number of specialties.

22  Orthopedics, family practice, internal medicine,

23  urgent care.  I have a degree in surgical technology.

24  That's what I did.  That's what I went to school for,

25  is surgical technology.

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                              116

1      Q   In the course of your employment, have you

2   had cause to place a physician in a clinic?

3      A   That's not my direct role, no.

4      Q   Have you had cause to oversee a situation

5   where a physician needed to be placed in a clinic?

6      A   I don't oversee that aspect of it, but I do

7   assist with coordinating coverage, yes.

8      Q   Thank you.  That's the better question.  So I

9   will rephrase it.  Have you had the opportunity to

10  coordinate coverage for a physician being placed in a

11  clinic?

12     A   Yes.

13     Q   And what does that mean, to coordinate

14  coverage?

15     A   So at the time we had multiple locations.

16  Generally you have a primary physician assigned to

17  that center, and if they have to be out for a period

18  of time, sometimes extended, then we would need to

19  find a covering provider to see the patients in that

20  primary physician's absence.

21     Q   Okay.  And I think this might be a good time

22  to sort of drill down into the specifics of medical

23  billing.  So what is the significance of a primary

24  provider with respect to medical billing?

25     A   So the primary provider is your main

1 physician at that center.  They are the ones that are

2 contracted with the payors -- with Medicare, Medicaid,

3 your commercial -- they're the ones that are

4 credentialed with those payors, and those are the --

5 that's the provider that we bill under.

6   Q   And so if there are other physicians at that

7 clinic, would those services also be billed under that

8 primary physician's credentials?

9   A   Not necessarily.

10   Q   But would they in any circumstances?

11   A   They can be.  For instance, we have -- when

12 we had multiple locations, we have a group.  So if you

13 have a physician group and you have three, or four, or

14 five physicians in your group, you would credential

15 all of them with all of the payors.  So they can cover

16 for -- you know, they can cover for each other, but

17 they're all credentialed.  So each of them that sees a

18 patient, you would bill under that doctor.

19         MR. GEER:  Your Honor, I'm going to lodge an

20 objection.  And I was kind of waiting to see where Mr.

21 Holbein was going with this, but are we talking about

22 the Debtor's clinic?  Is she, in fact, a fact witness?

23 It sounds like she's an expert witness, or they want

24 her to be an expert witness.

25         THE COURT:  Mr. Holbein?

PROCEEDINGS                                         October 12, 2022
CUREPOINT, LLC                                                    118

1        MR. HOLBEIN:  Well, I don't know what the

2 objection is.  I mean, I've -- is the objection

3 relevance?  Is the objection -- what is the objection?

4        MR. GEER:  Well, the objection is it sounds

5 like you're basically eliciting opinion testimony from

6 a fact witness.  She works for AMOA.  I've heard

7 nothing to say that she works for the Debtor's clinic,

8 or that she's actually testifying as to what goes on

9 in the Debtor's clinic.

10       MR. HOLBEIN:  I haven't asked her for -- Your

11 Honor.  I haven't asked her for her opinion yet.  I am,

12 in fact, qualifying her to offer an opinion at some

13 point, if needed.  But I think that the testimony that

14 I can -- that I'm eliciting right now is general in

15 nature regarding the billing practices of a medical

16 clinic.

17       Certainly the Court is free to consider the

18 weight of that versus any specific information that

19 the debtor provides.  But if the objection is that

20 she's offering opinion testimony, she is not.  Because

21 I haven't asked her for her opinion on anything.

22       THE COURT:  I'm going to overrule the

23 objection.

24 BY MR. HOLBEIN:

25    Q  Ms. Simmons, have you ever been in a

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    119

1  situation where you were coordinating the coverage for

2  -- where a physician has departed a practice?

3      A   No.

4      Q   Have you any experience where -- or are you

5  familiar with the process for coordinating coverage

6  where a physician is no longer with the practice?

7  Maybe not permanently, but temporarily.  (cross talk)

8  For example, if a physician went on vacation.

9      A   Yes.

10     Q   And what would you do in that situation?

11     A   You can obtain a locums tenens.

12     Q   And what is a locums?

13     A   A locums is -- they're usually traveling.

14 They pick up -- basically pick up shifts.  We work

15 with different companies that provide locums.  And so

16 we will tell them, hey, we need coverage for this date

17 range and then they provide a physician.  So that

18 physician is not contracted with our group, but they

19 can cover -- under CMS guidelines -- they can cover

20 the clinic on behalf of the physician that's away.

21 And we can continue to bill under the physician that's

22 away for up to 60 days.

23     Q   And when you say CMS guidelines, to be clear

24 we're talking about the Center for Medicare/Medicaid

25 Services.  Is that correct?

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                        120

1    A   Correct.

2    Q   And is it that you -- why do you refer just

3  to CMS guidelines?

4    A   Because they set -- they set the policy for

5  all the other payors.

6    Q   And you indicated that this interim physician

7  can bill under that provider number and contract for

8  up to 60 days.  How long, then, does it take to -- for

9  a new physician to qualify under the existing

10  contracts of a medical facility?

11    A   It's a process, so there's a number of

12  different payors.  On average I would say about 90

13  days.  For Medicare it can vary, payor to payor.  But

14  generally 60 to 90 days.

15    Q   And what happens during that 60 to 90 days?

16  Does that mean that the center can't bill -- or can't

17  offer any -- provide any healthcare services while

18  they're waiting for the physician to be credentialed?

19    A   I'm going to ask you to clarify context.

20    Q   Sure.  So, if a physician departed on May 1,

21  and a new physician was brought in that day, then over

22  that period that it took the new physician to be

23  credentialed, would that physician be able to provide

24  healthcare services in the interim up to the point

25  that it was credentialed?

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    121

1      A   Yes.  So you have 60 days that you can bill

2   under the previous physician that's out.  After the 50

3   days, if that interim physician is going to be

4   permanent, then they need to be credentialed.  That

5   61st day you cannot continue to bill under the

6   previous physician.

7      Q   Now what would happen for the billing of any

8   services provided on that 61st day if that new

9   physician was, in fact, subsequently credentialed?

10     A   If they are credentialed, then you switch to

11   billing under their NPI.

12     Q   Would you -- would that credentialing relate

13   back to the day that they applied for the credential?

14     A   In a lot of instances, yes.

15     Q   Would it relate back for Medicare/Medicaid

16   services?

17     A   Yes.  It would relate back to the date the

18   application was accepted.

19     Q   So earlier today, in their opening argument,

20   Debtor's Counsel indicated that if the primary

21   physician isn't there, you can't treat and not bill.

22   Based on what you're telling me, that doesn't sound

23   true.  Isn't it?

24         MR. GEER:  Your Honor. I don't believe that's

25   what I said.  I didn't say you couldn't treat anyone.

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                       122

1  I said you could treat but you couldn't bill, I

2  believe is what I said.

3          MR. HOLBEIN:  So I -- Your Honor. I wrote it

4  down.  It says you can't treat and not -- you can't --

5  you can't treat and not bill, in the context of if

6  there's not a physician there you can't treat, you

7  can't bill, you can't get revenue.  Now --

8          MR. GEER:  No.

9          MR. HOLBEIN:  -- the situation --

10         MR. ROUNTREE:  Those are two different

11 things.  You can -- it --

12         THE COURT:  One lawyer -- one lawyer --

13         MR. ROUNTREE:  Okay, I'm sorry.

14         THE COURT:  -- at a time, Mr. Rountree.  Mr.

15 Geer?

16         MR. ROUNTREE:  You never said you couldn't

17 treat.

18         MR. GEER:  I didn't say you couldn't treat.

19 I'm just going to maintain that.  I never said --

20         THE COURT:  Just rephrase your question.

21         MR. HOLBEIN:  Sure.

22         THE COURT:  That doesn't rely on the

23 arguments of Counsel.

24         MR. HOLBEIN:  Sure.

25 BY MR. HOLBEIN:

1    Q   Is it possible, then, that --

2         MR. HOLBEIN:  Well, if it doesn't rely on the

3    arguments of Counsel, I've elicited the testimony that

4    I needed.  That's fine.  That's all the questions I

5    have for this witness.

6         THE COURT:  Cross-examination?

7              CROSS EXAMINATION

8    BY MR. ROUNTREE:

9    Q   Good morning, Ms. Simmons.  My name is Will

10   Rountree, I represent CurePoint.  Just to clarify, you

11   -- I believe you testified you're an employee of AMOA?

12   A   The AOA entities, yes.

13   Q   The -- right.  Okay.  You're not employed by

14   CurePoint?

15   A   No, I am not.

16   Q   And you don't work in CurePoint's facility in

17   Dublin, Georgia?

18   A   No.

19   Q   Okay.  I just want to clarify one more thing,

20   and that's -- that'll be all the questions I have.  I

21   understand that if a -- is it a -- pronounce the Latin

22   term again for me?  Locum?

23   A   Locums -- locums tenens.

24   Q   Locums tenens physician comes in, you said

25   that they can bill under the -- the clinic's

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    124

1  credentials for 60 day -- for a 60-day interim period?

2      A   The primary provider, yes.

3      Q   The primary provider at that --

4      A   At that center.

5      Q   -- facility?

6      A   Yes.

7      Q   What if there is no primary provider?

8      A   Then you wouldn't have a facility open.

9      Q   Well, I mean, that's what I'm saying.  What

10  if the primary provider left, and you brought in a

11  locums tenens on their own, there would be no

12  credential under which to bill for that 60-day period.

13  Right?

14      A   You're saying if you termed the previous

15  contract.  Is that what you're asking me?  If the

16  previous provider that left went ahead and termed

17  their contracts.  Is that what you're asking me?

18      Q   Yes, ma'am.

19      A   Yeah.  You can't use it if he's termed.

20      Q   You can't -- you can't use it at that point.

21  And then, with regard to relation back, if

22  theoretically there were a primary provider under

23  which the locums tenens could bill for that interim

24  60-day period, you testified that after that 60-day

25  period, on the 61st day, they can no longer bill.

PROCEEDINGS                                            October 12, 2022
CUREPOINT, LLC                                                      125

1  Correct?

2      A   They can no longer bill under that previous

3  provider.

4      Q   Correct.  And you testified that it would

5  take 90 days, about, to get approval for a new

6  permanent doctor.  Correct?

7      A   It can, yes.

8      Q   And while you said that it sometimes relates

9  back, the billing couldn't happen, even on a relation-

10 back basis, until that 90 days or so had passed and

11 they had actually gotten their credential.  In other

12 words, you would be billing old receivables at that

13 point?  Or you would be creating a bill for services

14 that were --

15     A   You would have to hold the charges, yes.

16     Q   You would have to hold the charges.  Thank

17 you very much.

18     A   Correct.

19     Q   That's what I was trying to say.

20         MR. ROUNTREE:  No further questions.  Thank

21 you.

22         MR. HOLBEIN:  If I could redirect, Your

23 Honor?

24         THE COURT:  You may.

25             REDIRECT EXAMINATION

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                   126

1  BY MR. HOLBEIN:

2     Q   I just want to -- I want to go back to an

3  exchange that you had, where you said if you termed

4  the contract.  Does that mean if you terminate the

5  contract that the -- if the physician who had a

6  contract with the insurer terminates it?

7     A   Yes.

8     Q   And in order for the physician to terminate

9  the contract does the physician have to take active

10 steps to do that?

11    A   Yes.

12    Q   So if a physician were to depart a facility,

13 and the physician didn't want that facility to utilize

14 a locum tenens in his absence, that physician would

15 have to affirmatively reach out to both the insurance

16 company, and Medicare/Medicaid Services, and terminate

17 their contract.  Is that correct?

18    A   Correct.

19    Q   And the -- so the second exchange concerned

20 holding charges.  If charges are held -- in other

21 words, they're not billed contemporaneously with the

22 service being provided, can they still be billed?

23    A   Yes.

24    Q   And can they still be paid?

25    A   Yes.  As long as they are billed within the

1  timely filing guidelines of each payor.

2    Q   Okay.  Thank you.

3        THE COURT:  Any recross?

4              RECROSS EXAMINATION

5  BY MR. ROUNTREE:

6    Q   Ms. Simmons, in a situation like Mr. Holbein

7  was describing -- or let me just give you a

8  hypothetical, because I think we're all talking about

9  the same thing.  Let's say the attending physician

10  leaves, doesn't affirmatively cancel his credentials,

11  but is no longer there at the facility.  Correct?

12  Isn't it a requirement, at least for commercial

13  billings, that the attending physician review the

14  charges before they can be billed?

15    A   No.

16    Q   It is not?

17    A   Under a locum tenens, he doesn't have to

18  review every charge.  No.

19    Q   I'm just trying to understand how a locum

20  tenens could bill under a "attending physician" who is

21  no longer at the facility.  How would that happen?

22    A   The locum tenens policy doesn't tell you

23  they're in Spain this month, or they're in active

24  duty.  It doesn't give you the reason.

25    Q   Well, let me clarify the question.  I'm

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                  128

1  sorry.  I'm sorry.  Who had disassociated officially

2  from the facility, and was quite literally no longer

3  the attending physician there.  Not that they just

4  happened to be out of town at the moment.

5  A  I don't know the answer to that.

6  Q  Okay.  Thank --

7  A  In that situation.

8  Q  Thank you.

9      THE WITNESS:  Can I step down?

10     THE COURT:  Yes, you may.

11     THE WITNESS:  Thank you.

12     THE COURT:  Thank you so much.

13     MR. HOLBEIN:  Your Honor, can we excuse Ms.

14 Simmons?

15     THE COURT:  Any reason for them -- for her

16 not to be excused?

17     MR. ROUNTREE:  I don't believe so, Your

18 Honor.  Thank you.

19     THE COURT:  All right.  Thank you.  Ms.

20 Simmons, thank you very much for your testimony today.

21 All right.  It's not 10 'til 1:00.  If y'all want to

22 get lunch, I suggest we take a short break for lunch

23 and start back up at 1:30?  Anybody have any

24 objections for that time table?

25     MR. GEER:  No objection, Your Honor.

1        THE COURT:  All right.  We'll be in recess

2  until 1:30.

3        THE BAILIFF:  All rise.

4        (Off the record.)

5        THE BAILIFF:  Mr. Miles, back on the stand.

6        THE WITNESS:  Coming that way, ma'am.

7        THE BAILIFF:  All rise.

8        THE COURT:  Please be seated.

9        THE BAILIFF:  Your Honor, we're back on the

10  record for CurePoint, LLC.

11        THE COURT:  All right.  Just for the record,

12  we have not impaneled a jury, we have an intern in the

13  jury box.  Just so you know.

14        UNIDENTIFIED MALE SPEAKER:  A single member.

15        THE COURT:  And we're back on the record for

16  cross-examination of Mr. Miles.  Mr. Holbein?  Just a

17  reminder that you're under oath.

18        THE WITNESS:  Yes, sir.  Yes, Your Honor.

19  Again, Michael Holbein here, for AMOA Finance.

20              CROSS EXAMINATION

21  BY MR. HOLBEIN:

22     Q  Good afternoon, Mr. Miles.

23     A  Good afternoon.

24     Q  You and I spoke earlier this week, did we

25  not?

PROCEEDINGS                                                October 12, 2022
CUREPOINT, LLC                                                          130

1    A   Yes, I was under a deposition, I think, taken

2   by you.

3    Q   That's correct.  And so a lot of what we're

4   going to go over today is just the stuff we talked

5   about then.

6    A   Sounds good.

7    Q   In front of you there should be, or near you,

8   a binder with my client's exhibits.  Oh, perfect, you

9   have it.

10    A   Yes, sir.

11    Q   So I have on there tabbed the exhibit number,

12   and these are the same exhibits that we used Monday.

13   So when we talk about them, we can -- we'll refer to

14   them the same way, which was by the docket number, 84-

15   1, 84-2, et cetera.

16    A   I track that.

17    Q   Good.  So, Mr. Miles, the first thing I want

18   to talk about with you is a transaction between

19   Northwinds Leasing and Georgia Heritage Bank in 2017.

20   Do you recall that transaction that we discussed

21   Monday?

22    A   I do.

23    Q   Okay.  And related to that, do you recall

24   that in the same year AMOA Finance purchased a linear

25   accelerator from a company called Elekta?

PROCEEDINGS                                      October 12, 2022
CUREPOINT, LLC                                                131

1    A   I do.

2    Q   And I want to talk briefly about what a

3  linear accelerator is.  So a linear accelerator, my

4  understanding, and I know you'll have a much better

5  understanding than I do, is a rather large piece of

6  equipment.  Is that correct?

7    A   It is.

8    Q   In fact, it almost has its own little

9  substructure that it sits in.  Is that correct?

10    A   It absolutely does.  They reside when they're

11  active in a designated vault, which is generally five

12  to seven feet of leaded concrete.  They go into the

13  floor and behind a false wall.  That is correct.

14    Q   And also this -- a linear accelerator is

15  referred to in the industry as a Linac, is that

16  correct?

17    A   Yes.  L-I-N-E-C, people say.  I'm not picking

18  on your pronunciation.  A LINAC OR Linac.

19    Q   Okay.  Linac.

20    A   Correct.

21    Q   Linac.

22    A   Either way is fine, sir.

23    Q   And for our purposes today, I'll probably use

24  both terms and both pronunciations, unfortunately.

25    A   You have -- absolutely fine.

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    132

1    Q   So what I want to do first is I want to look

2   at what's been marked as Exhibit 84-1.  Can I get you

3   to turn to that?

4    A   If you'd be so kind, I've got a 1, 2, and

5   then I've got --

6    Q   One.  It'll be 1.

7    A   One.  Okay.  Okay.  Oh, anything -- okay.

8   Following you.  I'm there, sir.

9        (Creditor's Exhibit 84-1 was marked for

10   identification.)

11   BY MR. HOLBEIN:

12    Q   Okay.  And do you recognize this agreement,

13   or this document?

14    A   I do.

15    Q   And what is it?

16    A   It is a purchase and license agreement by

17   Customer AMOA Finance, site address CurePoint Cancer

18   Center, supplier Elekta.

19    Q   And, in fact, this purchase and license

20   agreement relates to the purchase of the linear

21   accelerator that I was just talking about.  Is that

22   correct?

23    A   That is correct.

24    Q   And --

25        MR. HOLBEIN:  So, Your Honor, I would like to

1  go ahead and offer Exhibit 1 into evidence.

2        THE COURT:  Any objection?

3        MR. GEER:  No objection, Your Honor.

4        THE COURT:  Exhibit 80 --

5        MR. HOLBEIN:  4-1.

6        THE COURT:  -- 4-1 will be admitted into

7  evidence without objection.

8        (Creditor's Exhibit 84-1 admitted into

9  evidence.)

10 BY MR. HOLBEIN:

11    Q   And as you previously mentioned, Mr. Miles,

12 this agreement references the purchase of a linear

13 accelerator by AMOA from Elekta.  Isn't that correct?

14    A   That is correct.

15    Q   And you're also aware that AMOA Finance

16 purchased -- or, I'm sorry, that AMOA Finance financed

17 the purchase of this linear accelerator with a loan

18 from Morris Bank.  Are you not?

19    A   I think I -- I'm sorry if it's -- to use the

20 word testify.  There was different financing from

21 Morris Bank, IberiaBank, and perhaps others.  I wasn't

22 privy to that.

23    Q   You are aware that AMOA Finance borrowed

24 money against this Linac, correct?

25    A   I -- as I just testified, I'm aware through

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              134

1  Iberia, Morris Bank, and also through the existing

2  Linac they used to purchase.

3      Q   So specifically AMOA borrowed money from

4  Morris Bank.  And I think you had said that you were

5  aware of that.  Okay.  So I'm going to show you a

6  document that's been marked as Exhibit 84-2, and it's

7  just under 2 in your tab.

8      A   Under A as well, sir?

9      Q   It should be number two.  So there should be

10  1 and then 2.  They should -- there will be A's -- an

11  A, and a B, and a C behind it.

12     A   That's correct.

13        THE COURT:  I don't have anything between 2

14  and A.

15        THE WITNESS:  Nor do I.

16        MR. HOLBEIN:  Oh.  I apologize for that.  At

17  page -- the first document is 38 pages.  So it would

18  be the 39th page.

19        THE COURT:  No.  Tab A has page 39.

20        MR. HOLBEIN:  Okay.

21        THE WITNESS:  That's consistent with mine.

22        MR. HOLBEIN:  That's fine.  Then let's use

23  that, and I apologize for mis-tabbing.

24        THE WITNESS:  I got it.

25        (Creditor's Exhibit 84-2 was marked for

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                             135

1  identification.)

2  BY MR. HOLBEIN:

3    Q  And do you recognize that?

4    A  I recognize it is a business loan agreement

5  between AMOA Finance and Morris Bank.

6    Q  And have you seen that before?

7    A  I recall that I have.

8    Q  And there is a -- Exhibit 2 is actually a

9  composite exhibit.  So B, C, D, et cetera, those are

10  all parts of the same exhibit.  Could I get you to

11  look through the composite exhibit for me?

12      MR. ROUNTREE:  Hey, Mr. Holbein, could we

13  have a second?  We can't pull it up on the computer,

14  and we don't -- I don't know that we have a hard copy

15  to follow along.

16      MR. GEER:  We don't have -- (cross talk) --

17  sorry.  The computer is not --

18      MR. ROUNTREE:  The computer is really slow.

19      MR. GEER:  It was working earlier.

20      MR. ROUNTREE:  Yeah.

21      MR. GEER:  Now it's not pulling up the

22  exhibits for us.

23      THE WITNESS:  You're not telling me anything

24  that doesn't surprise me.

25      MR. GEER:  Okay.  So this is not just us?

PROCEEDINGS                                        October 12, 2022
CUREPOINT, LLC                                                136

1       MR. HOLBEIN:  I have copies of the documents

2  that I can hand you as I'm looking at it.

3       MR. ROUNTREE:  Yeah, that's fine, if you

4  don't --

5       MR. GEER:  Yeah that's perfect.

6       THE WITNESS:  She's probably going to get it

7  fixed for them.

8       MR. ROUNTREE:  Oh, thank you.

9       THE WITNESS:  She's a smart lady.

10      THE COURT:  Hey, why don't they use this

11  notebook?  It'll be easier.  I have them on -- I can

12  pull them up.

13      MR. HOLBEIN:  Okay.

14      THE COURT:  More easily.

15      MR. HOLBEIN:  Thank you.

16      MR. ROUNTREE:  Thank you, Your Honor.  Do you

17  want me to meet you in the middle?

18      MR. GEER:  Thank you so much.

19      MR. HOLBEIN:  Could I check that out real

20  quick before you guys use it?  Just to see this tab

21  issue and how far this goes?

22      MR. ROUNTREE:  Is that (cross talk) --

23      MR. HOLBEIN:  Two.

24      MR. ROUNTREE:  -- 1 or 12?

25      THE BAILIFF:  (Cross talk) what they're going

1  to be -- (cross talk) --

2       THE COURT:  I got it.  Okay.

3       MR. HOLBEIN:  Yeah.  Yeah, yeah, yeah.  There

4  is a tab 2, 2-A.  Right.  (cross talk)  Yeah, I

5  misunderstood (inaudible).

6       MR. ROUNTREE:  Thank you.  Thank you, sir.

7  Thank you, Your Honor.

8       THE COURT:  Mm-hmm.

9  BY MR. HOLBEIN:

10      Q   Okay, Mr. Miles.

11      A   Yes, sir?

12      Q   I want to go back.  I want to look at the

13  entirety of Exhibit 2.  So that would be all of the

14  subparts.  If you wouldn't mind, so we can knock this

15  out at once, you recall seeing this Monday in Mr.

16  Barton's office.  Don't you?

17      A   I do recall that.

18      Q   And you reviewed it then?  Didn't you?

19      A   I did, and I'm flipping through it now.

20      Q   Okay, great.  Let me know when you've gotten

21  to the end.

22      A   I've flipped through the documents.  Of

23  course, I didn't review every page, Mr. Holbein.

24      Q   Right.  And I believe you previously

25  testified those are loan documents between AMOA

PROCEEDINGS                                         October 12, 2022
CUREPOINT, LLC                                                   138

1  Finance and Morris Bank.  Is that correct?

2      A   That's correct.

3      Q   And then if we -- oh.  Now let's go ahead and

4  walk through these.  First we have a loan agreement,

5  and that's at the first sub-tab.

6      A   Page 39?

7      Q   Yes.

8      A   I see that.

9      Q   And then the -- following that we have a

10  note, is that correct?

11     A   Is -- I'm -- apologize.  Yes, I do.

12  Commercial promissory note #43.

13     Q   Perfect.  And --

14         THE COURT:  Is that page 5 of 64?

15         MR. HOLBEIN:  Yes, Your Honor.

16         THE COURT:  Thank you.

17  BY MR. HOLBEIN:

18     Q   And if we look at the business loan

19  agreement, which is page 1 of 64, in addition to the

20  borrower, as we've already identified AMOA Finance,

21  there are guarantors listed.  Aren't there?

22     A   I'm flipping back to confirm.  Yes, I see

23  that.

24     Q   And one of those guarantors is the Debtor,

25  CurePoint, LLC.  Is that correct?

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                       139

1    A  I see that.

2    Q  To your knowledge, though, CurePoint has not

3  scheduled a -- has not scheduled Morris Bank as a

4  creditor on this particular debt.  Have they?

5    A  Not to my knowledge.  Well, no.  I -- I can't

6  recall that, but.

7    Q  Okay.  Now, let's go ahead and let's look at

8  page 9 of 64.  Let me know when --

9    A  I'm there.

10   Q  -- you're there.  All right.  And do you

11 recognize this particular document?

12   A  I do recognize it.

13   Q  And what is it?

14   A  It says up top, Self-Stated Commercial Loan

15 Settlement Statement from Morris Bank.

16   Q  Is it your understanding that this is the

17 settlement statement for the loan, between AMOA and

18 Morris Bank regarding the Elekta Infinity Linear

19 Accelerator?

20   A  I have reason -- I have no reason not to say

21 it is.

22   Q  All right.  Now, let's look at the top where

23 it says collateral description.  The Elekta Infinity

24 Linear Accelerator.  Do you see that there?

25   A  I do.

1    Q   Okay.  And then let's look at -- if we look

2  kind of toward the bottom, there's a table titled

3  Disbursements.  Do you see that table?

4    A  I do.

5    Q   And then three lines up from the bottom of

6  that you'll see a payment to Elekta.  Do you see that?

7    A  I do.

8    Q   And that's a million dollar payment to

9  Elekta.  Isn't that correct?  A million dollars,

10  starting on 691.

11    A  I see that.

12    Q   Okay.  Now, if you continue to 11, page 11 of

13  64, do you see this document here?

14    A  I see it, page 11 of 64.  That is a

15  commercial security agreement.

16    Q   That's correct.  And that commercial security

17  agreement is between AMOA Finance and Morris Bank.  Is

18  that correct?

19    A  That's what it appears to be.

20    Q   And if we turn the page, about midway down

21  you can see a specific collateral description.  Do you

22  see that?

23    A  I do.

24    Q   And do you see that the specific collateral

25  description identifies an Elekta Infinity Linear

1  Accelerator.  Is that correct?

2      A   I do.

3      Q   Okay.  Now, let's go to page 17.

4      A   I am there.

5      Q   All right.  And do you recognize page -- the

6  document of page 17?

7      A   When you say -- I can tell what it is, but --

8      Q   What is it?

9      A   It is a UCC Financing Statement from Morris

10  Bank, on behalf of securing AMOA Finance.

11      Q   And if we look down at the bottom of that UCC

12  Financing Statement, again we see a collateral

13  description.  And the collateral described is again an

14  Elekta Infinity Linear Accelerator.  Is that correct?

15      A   I do.  I see a Mark McCord, a Morris Bank,

16  and I do see the collateral.

17      Q   Right.  So now, finally, we're going to go

18  all the way back to pages 54 through 60.  So we're

19  beginning at page 54.  Do you recognize this document?

20      A   My page 54 is a Dale M. McCord (ph) signature

21  page?

22      Q   No, I'm sorry.  The 54 is page 54 of 64.  At

23  the very top, for Exhibit 2, Morris Bank loan

24  documents.

25          THE COURT:  See the blue writing?  Or it

1  might be --

2        THE WITNESS:  Is it the one under A?  Oh, 54

3  of -- 54 of 64, my apologies.  I am flipping now.

4  Bear with me.  I see it.  Yes, I do.  It's the lease

5  agreement?

6  BY MR. HOLBEIN:

7      Q   Right.  This is a lease agreement between

8  AMOA and CurePoint.  Is that correct?

9      A   That is correct.

10      Q   And the subject of this lease agreement --

11  well, are you familiar with this lease agreement?

12      A   I am.

13      Q   And the subject of this lease agreement is,

14  in fact, the linear accelerator that we've been

15  discussing all along.  Isn't that correct?

16      A   I could flip to, but it appears to be.

17      Q   Yeah.  And is it your recollection that

18  that's what the transaction was?

19      A   That it was a lease agreement between AMOA

20  Finance and CurePoint?

21      Q   No.

22      A   Correct.

23      Q   That it was a lease for the linear

24  accelerator?

25      A   Correct.

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    143

1    Q   Okay.  So one thing I want to clarify.  It --

2  all of these other loan documents, I see, if you'll

3  look at them they're dated in the year 2017.  And for

4  some reason, if you look at the top of page 54 of 64,

5  it's dated December 12, 2018.

6    A   I see that.

7    Q   Is it your understanding that that is a

8  typographical error?  And this was, in fact, executed

9  in 2017?

10    A   The lease, I know, was executed in 2017.  I

11  would have no knowledge of why that date exists.

12    Q   Okay.  No, and that was all I was asking.

13  For the purpose of clarifying that date.

14    A   Yeah.

15        MR. HOLBEIN:  Your Honor, Mr. Miles having

16  reviewed the entirety of the composite, Exhibit 2, by

17  his own testimony, I would offer composite Exhibit 2

18  into evidence at this time.

19        THE COURT:  Any objection?

20        MR. GEER:  Not to the admission of the

21  Exhibits, Your Honor.  We were only concerned that

22  we're on a trustee motion.  And if there's going to be

23  litigation in the future regarding whether or not this

24  is a true lease or not, to the extent that that's not

25  provided as evidence, then that's not what we're

PROCEEDINGS                                             October 12, 2022
CUREPOINT, LLC                                                      144

1  arguing here today.

2          MR. HOLBEIN:  No, that's --

3          MR. GEER:  Not to the admission of the

4  Exhibit, Your Honor.

5          THE COURT:  Exhibit 84-2, the composite

6  exhibit, will be admitted into evidence without

7  objection.

8          (Exhibit 84-2 was admitted into evidence.)

9  BY MR. HOLBEIN:

10     Q   All right.  Mr. Miles, do you -- do you own a

11  company called Northwinds Leasing?

12     A   I am part owner of that through -- correct.

13     Q   Well, are you part owner or indirect owner?

14  Or both?

15     A   Sitting here today I cannot remember if I'm

16  part or direct.

17     Q   Did you own it in 2017?

18     A   I did.

19     Q   And in 2017, you were principally responsible

20  for negotiating a loan from Georgia Heritage Bank to

21  Northwinds Leasing.  Isn't that correct?

22     A   That is correct.

23     Q   So I want to show you now, or I would like

24  you to turn to now, the document marked as Exhibit 3,

25  or 84-3.

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    145

1      A   I'm there.

2          (Creditor's Exhibit 84-3 was marked for

3   identification.)

4   BY MR. HOLBEIN:

5      Q   All right.  Do you know what this is?

6      A   This is an Elekta purchase agreement.

7      Q   And, in fact, this is an Elekta purchase

8   agreement that purports to be between Northwinds

9   Leasing and Elekta, Inc.  Isn't that correct?

10     A   That's correct.

11     Q   But this agreement -- and if you read the

12  agreement, the first line of text, or prose, I guess,

13  it says, "Elekta, Inc., a Georgia corporation, is

14  pleased to submit the following offer to sell."  Isn't

15  that what it says?

16     A   Can you direct me to what page again, please?

17     Q   Sure.  84-2, the first paragraph below the

18  table, with the identity of the parties.

19     A   84-3, you mean?

20         THE COURT:  it's Exhibit 3, page 2.

21         THE WITNESS:  Page 2?

22         MR. HOLBEIN:  No, it's 3, it is 3.  I'm

23  sorry.

24         THE COURT:  I'm looking at --

25         MR. HOLBEIN:  No, it is 2.  I'm --

1       THE COURT:  -- page 2 of 35.

2       MR. HOLBEIN:  You're right, Your Honor.  I

3  apologize.  So many numbers floating around.

4       THE WITNESS:  Right.

5  BY MR. HOLBEIN:

6    Q  84-2.

7    A  Page 2?

8    Q  So again, my question was that the first

9  paragraph of that reads, "Elekta, Inc., a Georgia

10  corporation, is pleased to -- "

11   A  Oh.  I see that now.

12   Q  Yeah.  And --

13   A  My apologies for being slow.

14   Q  And that verbiage -- that tends to suggest

15  that this is a document that's coming from Elekta,

16  doesn't it?

17   A  It would read that way.

18   Q  Yeah, but we know this document wasn't

19  purchased by -- wasn't prepared by Elekta, was it?

20   A  Not that I recall.

21   Q  And I'd like you to indulge me again, and

22  this may require a little bit of flipping, and even --

23  you may even want to remove the first page of this

24  exhibit.  But I want to compare Exhibit 84-3 to

25  Exhibit 84-1.

1    A   Okay.

2    Q   And if we do that, would you not agree that -

3  -

4        MR. ROUNTREE:  What page of 84-1 are we

5  looking at?

6        MR. HOLBEIN:  Well, the -- well, I'm looking

7  at the entirety of the document, but I think we can

8  focus on page 1, the first page.  And it would be page

9  2 of 84-3, simply because there's a cover page.

10  BY MR. HOLBEIN:

11    Q   That -- but for the substitution of

12  Northwinds Leasing, LLC as a customer, 84-3 and 84-2

13  are otherwise identical.  Would you agree with that?

14    A   Without reviewing the entirety, they -- that

15  would appear to be true.

16    Q   And we reviewed this Monday, isn't that

17  correct?

18    A   That is correct.

19    Q   And that was your testimony then as well,

20  isn't that correct?

21    A   That is correct.

22    Q   And, in fact, 84-1 says it's signed by

23  Michael McCord.  Isn't that correct?  If you look at

24  the third page of 84-1.

25    A   I see an electronic signature.

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    148

1    Q   By Michael --

2    A   Yes.

3    Q   -- McCord?

4    A   Yes, and we did speak about that on Monday.

5    Q   And Michael McCord, it would make sense for

6  him to sign for AMOA Finance, because he is affiliated

7  with AMOA Finance.  Isn't that correct?

8    A   I -- I would not know how to respond to that.

9  I have no knowledge of the ownership of AMOA Finance.

10  I don't believe.

11    Q   I didn't -- I'm sorry, I wasn't clear.  I

12  didn't say ownership, I said affiliated.  Michael

13  McCord is the front-facing manager of the AMOA

14  Finance.  Is that correct?

15    A   If you say so.

16    Q   Okay.  Now, I want to look at the third -- or

17  the fourth page this time of 84-3, and you'll also see

18  that Michael McCord is the signature.  Is that

19  correct?

20    A   Did you say 84-3?

21    Q   Yes, sir.  I said 84-3.  84-4.  84-4.

22    A   84 --

23    Q   Exhibit 84-3, I'm sorry.

24    A   Mm-hmm.

25    Q   Page 4 of 35.

PROCEEDINGS                                                              October 12, 2022
CUREPOINT, LLC                                                                        149

1      A   I see that.

2      Q   But Michael McCord doesn't have any position

3   with Northwinds Leasing, does he?

4      A   No, he does not.

5      Q   And, in fact, he has never had a position

6   with Northwinds Leasing, has he?

7      A   No.

8      Q   So with the exception of the replacement of

9   the purchaser, these are otherwise identical

10  documents.  Correct?

11     A   That appears to be true.

12     Q   In fact, I think the phrase we used when we

13  talked about it Monday was it looks like somebody took

14  84. -- or 84-1 and used it to make 84-3.

15     A   I think those were your words, but I have no

16  problem with those words.

17     Q   Right.  And in reality now, Northwinds

18  Leasing did not purchase a linear accelerator in 2017,

19  as evidenced by this purchase and license agreement.

20  Did it?

21     A   No.  It became a -- it was not the purchaser,

22  correct.

23     Q   Yeah.  And -- but yet Northwinds provided

24  this purchase and license agreement to Heritage Bank

25  in connection with an effort to borrow funds from

PROCEEDINGS                                        October 12, 2022
CUREPOINT, LLC                                                   150

1   Georgia Heritage Bank.  Is that correct?

2       A   That is correct.

3       Q   And it did so with your knowledge.  Isn't

4   that correct?

5       A   It did.

6       Q   If we could, let's turn to Exhibit 4.  Or

7   briefly.

8           MR. HOLBEIN:  If I haven't already, Your

9   Honor, I would offer Exhibit -- and I haven't --

10  Exhibit 84-3 into evidence.

11          THE COURT:  Any objection?

12          MR. GEER:  No, Your Honor.

13          THE COURT:  Exhibit 84-3 will be admitted

14  without objection.

15          (Creditor's Exhibit 84-3 was admitted into

16  evidence.)

17  BY MR. HOLBEIN:

18      Q   So, Mr. Miles, I want to look at 84-4.

19  Exhibit 4, page 1.

20          (Creditor's Exhibit 84-4 was marked for

21  identification.)

22  BY MR. HOLBEIN:

23      Q   Do you recognize this?

24      A   I do.

25      Q   And you reviewed this set of documents

1  Monday, didn't you?

2      A   I have not flipped through all of them.  But

3  the first one, the second one --

4      Q   Go ahead and take a moment to flip through,

5  and let me know when you're done.

6      A   I am, and I will.  I have.

7      Q   Thank you.  And do you recognize these

8  documents, then?

9      A   I do.

10     Q   And these documents, in fact, these are the

11  Georgia Heritage Bank loan documents regarding the

12  transaction that I was just referencing.  Aren't they?

13     A   That is correct.

14         MR. HOLBEIN:  This is another composite

15  exhibit that, at this time, Your Honor, I would like

16  to offer into evidence as Exhibit 4.

17         THE COURT:  Any objection, Mr. Geer?

18         MR. GEER:  No, Your Honor.

19         THE COURT:  Exhibit 84-4 will be admitted as

20  a composite exhibit without objection.

21         (Creditor's Exhibit 84-4 was admitted into

22  evidence.)

23  BY MR. HOLBEIN:

24     Q   Okay.  Now I want to, if you would look at --

25  let's look at page 1 of this exhibit.  And page 1 is a

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                          152

1  term sheet, correct?

2     A   It is.

3     Q   And then the borrower to this term sheet is

4  Northwinds Leasing, correct?

5     A   I see that.

6     Q   And the collateral, if you'll go down to item

7  number 7, is described as, "The loan will be secured

8  by a UCC on an Elekta Infinity Dual Modality Digital

9  Accelerator."  Is that correct?

10    A   I see that.

11    Q   And what that says, broken down to, is that

12  the collateral is a Linac.  Isn't that correct?

13    A   That is correct.

14    Q   And, in fact, this is the same Linac that we

15  discussed in connection with Exhibit 84-1, the Morris

16  Bank loan documents.

17    A   That is correct.  And what we spoke about on

18  Monday was the perfectly good linear -- Linac --

19    Q   Sure.  No, I know what we talked about

20  Monday, but --

21    A   Oh.

22    Q   -- the next thing I want to do is I want to

23  look at page 2 of this document.  Strike that.  We'll

24  rest with page 1.  Let's go ahead now and let's go to

25  page 6.

1    A   Okay.  Page 6 of 60?

2    Q   Yes.  Yes.

3    A   Okay.

4    Q   We're finally getting the hang of this.  Page

5  6 of 60.  Do you recognize that document?

6    A  I do.

7    Q   And that's a loan closing statement for this

8  transaction, where Northwinds Leasing borrowed money

9  from Georgia Heritage Bank.  Correct?

10    A   That's correct.

11    Q   And if you'll look at the collateral property

12  description on the loan closing statement, again we

13  have a description of, among other things, an Elekta

14  Infinity Dual Modality Digital Acceleration.  Is that

15  correct?

16    A   That is correct.

17    Q   And, in fact, that is the same Linac that we

18  referenced earlier on page 1 of this exhibit, and that

19  was referenced in Exhibits 84-1 and 84-3.  Is that

20  correct?

21    A   That is correct.

22    Q   I'm sorry.  Let me clarify something.  84-1,

23  84-2, and 84-3.

24    A   Okay.

25    Q   Yes.  Okay.  And if we look to page 8 of this

1  document, do you see where it says, "Borrower:

2  Northwinds Leasing"?

3      A  I do.

4      Q  And that is, in fact, your signature above

5  the line, Phillip Miles, f/b/o MEC Capital, is it not?

6      A  It is.

7      Q  And you were file -- and you were signing in

8  that capacity because MEC Capital is the owner -- or

9  is a member of Northwinds Leasing.  Is that correct?

10     A  At that time, correct.

11     Q  Yeah.  Now let's look at page 39.  Do you

12  recognize that document?

13     A  The promissory note?

14     Q  Yes, your -- yes.

15     A  I do.

16     Q  And that is, in fact, the promissory note

17  between Northwinds Leasing as the borrower and Georgia

18  Heritage Bank as a lender.  Isn't that correct?

19     A  That is correct.

20     Q  And if we -- let me find something real

21  quick.  Okay.  Let's move on to page 45.

22     A  Okay.

23     Q  And you recognize that document at page 45?

24     A  Yes, I do.

25     Q  And that is a security agreement between

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    155

1  Northwinds Leasing and Georgia Heritage Bank.  Is that

2  correct?

3      A   That is correct.

4      Q   And that security agreement, if you looked to

5  property description at line 3, about midway into the

6  page, it references an exhibit.  Is that correct?

7      A   See Exhibit A.  I see that.

8      Q   And if we look to page 49 of the same

9  exhibit, you will see an exhibit.  Is that correct?

10     A   I see it.

11      Q   And that exhibit identifies, among other

12  things, an Elekta Infinity Dual Modality Digital

13  Accelerator.  Is that correct?

14     A   That's correct.

15      Q   And that is, in fact, the same Linac that we

16  have been discussing in relation to Exhibits 84-3, and

17  84-2, and 84-1.  Is that correct?

18     A   That's correct.  And that's because our

19  linear accelerator -- Triplalex (ph) Linac accelerator

20  had been removed --

21     Q   Right.

22     A   -- by Michael McCord.

23     Q   Right.  So Northwinds did not own this linear

24  accelerator, did it?

25     A   No.  It did not have ownership.  I had owner

PROCEEDINGS                                       October 12, 2022
CUREPOINT, LLC                                                  156

1  -- it had a ownership in the linear -- Linac that was

2  removed.

3      Q   And so Northwinds was pledging as collateral

4  to Heritage Bank a linear accelerator that it did not

5  own.  Is that correct?

6      A   That's correct.  Because its linear

7  accelerator was nowhere to be found.

8      Q   Okay.  Now, we discussed this briefly Monday

9  -- well, actually more than briefly.  We discussed

10  this Monday.  Georgia Heritage Bank -- do you have any

11  reason to believe that Georgia Heritage Bank was aware

12  that it was acquiring a security interest -- or that

13  it was -- that it was being granted a security

14  interest by an entity that did not own the collateral?

15      A   If I remember my testimony, I said I do

16  believe they might have known, and they knew the issue

17  of the linear accelerator being removed.

18      Q   And so then it's your testimony here today

19  that Georgia Heritage Bank knew that it was -- that it

20  was taking as collateral a grant from an entity

21  incapable of making that grant?

22      A   I -- that was not my testimony.  My testimony

23  was Northwinds and CurePoint were trying to find out

24  where its linear accelerator was removed.

25      Q   Right.  But Northwinds didn't own this Linac,

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                   157

1   did it?

2        A   It did -- it did not.

3        Q   And so it couldn't rightly pledge its

4   ownership interest in something that it didn't own,

5   could it?

6        A   When you say rightly, I believe the parties

7   involved knew about that, but I -- I'm not an attorney

8   to answer a question rightly pledge.

9        Q   So let's look at this financing statement at

10  84-4 dash -- or at 84-4, 50.

11       A   Page 50 of 60.  I am there.

12       Q   Okay.  In the Exhibit it plainly describes a

13  Linac as the basis for the security interest.  Isn't

14  that correct?

15       A   It does, amongst other collateral.

16       Q   Now, when we talked about this Monday, you

17  told me that Georgia Heritage Bank was actually taking

18  a security interest in Northwinds Leasing's second

19  position security interest in the Linac.  Isn't that

20  correct?

21       A   I told you what I thought they were doing, I

22  didn't say it in absolute terms.

23       Q   Right.  But you said that you thought that

24  Northwinds -- or that Heritage -- Georgia Heritage

25  Bank was taking a security interest in -- a security

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                   158

1   interest.

2       A   I think I said I'm not an attorney, and

3   understanding the full legal ramifications of security

4   interest.  And I told you the issue regarding

5   CurePoint having no cash, and not knowing where its

6   linear accelerator was, to obtain cash flow to make

7   payroll.

8       Q   So here's what I don't get.

9       A   Okay.

10      Q   If Northwinds Leasing was giving a security

11  interest in its security interest, then why would you

12  provide the bank with a document falsely purporting to

13  show that Northwinds bought the linear accelerator.

14      A   I had told them the story, again, that

15  CurePoint had no cash for going on four or five

16  months, and it did not know where its main treating

17  asset and collateral, its linear accelerator -- it

18  subsequently found out that Michael McCord removed

19  that, signing on behalf of CurePoint.

20      Q   So it's okay to present false documents to a

21  bank if you don't have cash?

22      A   I did not say that.

23      Q   No, I'm saying that.  I'm asking you.

24      A   Are you talking about hypothetically or in

25  general?

PROCEEDINGS                                        October 12, 2022
CUREPOINT, LLC                                                159

1      Q   I'm talking about then.

2      A   They knew the story, they knew the time

3  period.  You're asking is it okay.  I had very strong

4  -- very long conversations with Georgia Heritage about

5  what was going on with the clinic and Northwinds at

6  the time.

7      Q   So it's your testimony today, to be clear,

8  that Georgia Heritage Bank knew that Northwinds didn't

9  own the linear accelerator?

10      A   I did not say -- and as -- consistent with

11  Monday in the deposition, I do not know, and cannot

12  testify on their behalf.  I can only --

13      Q   No --

14      A   -- testify of my memory, and what I knew at

15  the time.

16      Q   Well, but you did just testify that they knew

17  the situation.  And so, one of the components of the

18  situation, perhaps the most critical component of this

19  situation, is the fact that Northwinds Leasing doesn't

20  own a piece of collateral that it's pledging to secure

21  a debt.  And I'm asking you, is it your testimony that

22  Georgia Heritage Bank knew that to be the case?

23      A   I can't testify on the behalf of what Georgia

24  Heritage knew or didn't know.  I do not they're not an

25  entity and this loan was satisfied.  That's the facts

1  that I know.  But I cannot testify as to their

2  knowledge.

3      Q   Okay.  I'd like to pivot now and just talk

4  briefly about the sales process in this bankruptcy

5  case.  You created a data room containing documents

6  related to the sale.  Isn't that correct?

7      A   That is correct.

8      Q   And I believe you stated Monday that you

9  created it weeks ago.  Is that correct?

10     A   I opened up a Dropbox link weeks ago.  That

11  is correct.

12     Q   And are you the person responsible for

13  populating that link with documents?

14     A   I am.

15     Q   How many parties have accessed that Dropbox

16  since you've created it?

17     A   I don't have a list in front of me, but more

18  than a handful.

19     Q   Is a handful more than 10?

20     A   I would say more than one handful of five.  I

21  would say five to 10 have access.

22     Q   Five to 10.  And are you aware that my client

23  asked for access to those documents as early as August

24  29th?

25     A   I remember on a call that said -- I can't

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    161

1  recall if you emphatically said, or may want, but I do

2  remember you talking about your client.  I don't

3  remember the terms that you used.

4      Q   And do you remember again at the meeting of

5  creditors that I requested access to documents related

6  to the sale of the sale of (inaudible).

7      A   That's what I was referring to in my prior

8  statement.

9      Q   Okay.  Did Counsel for the Debtor ever inform

10  you on any of one of at least four occasions that I

11  requested access to documents related to the sale for

12  my client?

13      A   I know Counsel has told me that your client

14  would like access to the data room.

15      Q   What's prevented you from providing that

16  access until yesterday?

17      A   Heretofore everybody has directly asked.  Not

18  through any Counsel.  And I -- I had no problem a few

19  weeks ago, and I have no problem yesterday or the day

20  before, providing access.

21      Q   Did you have any problem on the day of the

22  meeting of creditors?

23      A   No.

24      Q   Then why didn't it happen then?

25      A   I don't know where it -- I don't believe

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    162

1  until yesterday I had an email address.  A Dropbox is

2  linked by an email address, and I don't -- I don't

3  think until yesterday I had an email address.

4      Q   You're aware that I entered my appearance by

5  name at the meeting of creditors, aren't you?

6      A   I -- I've heard your name many times.

7      Q   Right.

8      A   Yes, sir.

9      Q   And you have access to a computer with a

10  search engine?

11     A   I do.

12     Q   Okay.  And you're aware that law firms

13  maintain directories of lawyers in their firm,

14  including email addresses.  Aren't you?

15     A   That's correct.

16     Q   And you also, as manager for the Debtor, have

17  Counsel in this case, don't you?

18     A   I do.

19     Q   And you could probably presume that Counsel

20  for the Debtor would have my email address.  Couldn't

21  you?

22     A   I could.

23     Q   Did you ask them for it?

24     A   No.  Everybody else, including other

25  creditors, have called me directly.

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                   163

1     Q   All right.  Do you understand, though, that

2  if you are represented in a case I can't do that?

3     A   I -- I don't remember that.  If I did that, I

4  would have said that as -- said that statement as a

5  question.  I am not an attorney, and I do not know

6  bankruptcy proceedings.  And would never deny anybody

7  access who was a potential legitimate buyer.

8          MR. HOLBEIN:  Those are all the questions I

9  have.

10         THE COURT:  All right.

11         MR. HOLBEIN:  Oh, I'm -- I did move to admit

12  Exhibits 1 through 4, is that correct?

13         THE COURT:  Yes.

14         MR. HOLBEIN:  Yeah.

15         MR. ROUNTREE:  Okay.  (cross talk)

16         THE COURT:  Normally I would have you do

17  direct in your case.  Do y'all have a preference for

18  doing it now or later?

19         MR. GEER:  No, that's fine, Your Honor.  For

20  time -- I think for time purposes that makes a lot of

21  sense.

22         THE COURT:  Okay.  All right.  For now, you

23  can step down.

24         THE WITNESS:  Thank you, Your Honor.  Leave

25  the book here?

PROCEEDINGS                                                October 12, 2022
CUREPOINT, LLC                                                          164

1        MR. GEER:  I was going to ask -- just a --

2   related to that, Your Honor.

3        THE COURT:  Leave the book, yes.

4        MR. GEER:  Do you want me to just ask it

5   during my direct?

6        THE COURT:  Pardon?

7        MR. GEER:  I was just going to ask a

8   question.  I'm just -- I can do it in my -- I'll just

9   do it in my direct.

10        THE COURT:  Okay.  Next witness?

11        MR. BARTON:  Your Honor, we would call Karen

12   Fortune.

13        THE COURT:  All right.  Ms. Fortune?

14        THE BAILIFF:  Raise your right hand.

15   WHEREUPON,

16                 KAREN FORTUNE

17   called as a witness, and having been sworn by the

18   notary public, was examined and testified as follows:

19        THE BAILIFF:  All right.  Just speak a little

20   louder.  State your name for the record.

21        THE WITNESS:  My name is Karen Burnet, B-U-R-

22   N-E-T, Fortune.

23                 DIRECT EXAMINATION

24   BY MR. BARTON:

25     Q   Good afternoon, Ms. Fortune.  I can see you

1  around the monitor there.

2        THE COURT:  It's not easy.  The pandemic has

3  made things difficult.

4        MR. BARTON:  That's right.  I can see you on

5  the camera.

6        THE WITNESS:  Okay.

7  BY MR. BARTON:

8    Q   Tell us how you're employed, please.

9    A   I'm the managing partner of a CPA firm in

10  Marietta, Georgia called IAG Forensics and Valuation.

11    Q   And tell us generally what that firm does.

12  What is its business?

13    A   Well, we are a CPA firm, but we specialize in

14  forensic accounting, fraud investigations, litigation

15  support, and business valuations.

16    Q   All right.  And is that your current

17  specialty?

18    A   It is.

19    Q   Tell the Court, if you would, please, about

20  your educational background.

21    A   Well, don't hold it against me, but I went to

22  the University of Florida, both undergrad and grad

23  school.  And so I graduated undergrad in 1990, grad

24  school in '92.

25    Q   All right.  And give the Court the benefit,

1  just very briefly, of sort of the course of your

2  career, what you did after graduation.

3      A   Sure.  After graduation I went into public

4  accounting and served as an auditor and tax preparer

5  for several years.  Subsequent to that, I went into

6  industry and served first as a consultant, and then as

7  full-time CFO for a biotech company.  And then I

8  returned to public accounting to specialize in

9  forensic accounting, which I had done a little bit of

10  as an auditor.  And since 2002 that's what I've

11  primarily done, is forensic accounting, and fraud

12  investigations, and litigation support.

13      Q   And just from a high level, as you practice

14  it, what is the field of forensic accounting?

15      A   Well, forensic accounting just means

16  accounting principles and practices suitable for

17  court.  Being applied in a manner suitable for court.

18  So that's basically what it is.

19      Q   And do you hold any professional licenses or

20  certifications?

21      A   I do.  I'm a CPA, a certified public

22  accountant, and I have a CFF, which is I'm certified

23  in financial forensics.  I'm a Charter Global

24  Management accountant, and those would be the

25  credentials.

PROCEEDINGS                                      October 12, 2022
CUREPOINT, LLC                                                167

1       Q   That are relevant for today?

2       A   Yes.

3       Q   Have you taught or lectured in the field of

4   forensic accounting?

5       A   I have done, yes.

6       Q   And again, just from very high levels, what

7   are -- what are the focuses of those -- of the

8   coursework that you offered?

9       A   I'm sorry?  What are they?

10       Q   Just a general description of the kind of --

11   of coursework that you've been involved in offering.

12       A   Sure.  Well, when I speak at universities I'm

13   typically speaking to students, and so it's more about

14   the basics of forensic accounting.  So it might be

15   funds tracing, or it might be business valuation, or

16   it might be fraud investigations.  When I'm speaking

17   to law firms, then it may be more focused on a

18   particular practice area, and how forensic accounting

19   applies to their practice areas.  And then I've taught

20   various cases -- or various courses for the Georgia

21   Society of CPAs.

22       Q   And have you also published in the field of

23   forensic accounting?

24       A   I have.  It's been quite some time.

25       Q   So I assume this is not the first time that

1  you've testified in court?

2      A   It's not.

3      Q   All right.  How many times, approximately,

4  have you been qualified as an expert to testify in

5  actual court, as opposed to a deposition?

6      A   I think I've testified a little bit over --

7  maybe -- if I'm including arbitrations hearings and

8  trials, a little over 30 times, I believe.

9      Q   And have some of those been in federal Court?

10     A   They have.

11     Q   All right.  And have you ever had any portion

12  of your opinions excluded by any court?

13     A   No, I have not.

14         MR. BARTON:  Your Honor, at this time we

15  would tender Ms. Fortune as an expert in the field of

16  forensic accounting.

17         THE COURT:  Any objection?

18         MR. GEER:  Your Honor, I'm not sure what --

19  we weren't notified that there was going to be an

20  expert in forensic accounting today.  But I'm not sure

21  the relevance to a trustee motion when we're -- a

22  trustee is going to be appointed, and there are

23  already going to avoidance actions from that trustee's

24  own expert.  So I'm not really sure of the point of

25  the testimony, or where we're going with it.  As far

PROCEEDINGS                                        October 12, 2022
CUREPOINT, LLC                                                  169

1  as her -- you know, if we're going to go under whether

2  she's qualified or not, she sounds qualified.

3          THE COURT:  All right.

4          MR. GEER:  But as far --

5          THE COURT:  So you're not objecting to her

6  designation as --

7          MR. GEER:  Not objecting to --

8          THE COURT:  -- an expert witness?

9          MR. GEER:  -- her designation, Your Honor.

10          THE COURT:  All right.  There being no

11  objection for a designation, the Court will approve

12  her testimony as an expert witness.

13          MR. BARTON:  All right.  Thank you, Your

14  Honor.

15  BY MR. BARTON:

16     Q  Now, Ms. --

17          THE COURT:  Subject to, of course, to any

18  objections Mr. Geer might make as to questions going

19  forward.

20          MR. BARTON:  Understood.  And just as a brief

21  preview, all we've asked Ms. Fortune to do is to

22  analyze these transfers so that they can be summarized

23  for the Court.  Mr. Levengood referenced them in his

24  opening, and Ms. Fortune is simply going to provide a

25  summary of the findings, which are drawn out of the

1  bank account statements that we -- that we talked

2  about earlier.

3          THE COURT:  Okay.

4          MR. BARTON:  So that's the -- that's the

5  preview.

6  BY MR. BARTON:

7      Q   So if you could, Ms. Fortune, please just

8  describe to the Court the work that we asked you to

9  do, and what you did do in order to prepare to testify

10  today.

11     A   Certainly.  I believe it was back in January

12  of 2020, pre-pandemic, that we were engaged to perform

13  a funds tracing of CurePoint banking records that you

14  and your firm had provided to us.  And, simply put,

15  funds tracings are to determine the sources and uses

16  of cash.

17          So by obtaining banking records, which would

18  include bank statements, deposit detail with checks

19  run, check images, wire transfer advices, that type of

20  information, we compile monies that are -- a list of

21  monies that are coming in and monies that are going

22  out, the source of those monies coming in, and the

23  destinations of those monies going out.

24          And that's what we were asked to do.

25     Q   All right.  And originally you did that work

1  in connection with a pending state Court action.  Is

2  that right?

3      A   That's correct.

4      Q   And at that time were you provided account

5  statements for CurePoint from both Synovus and Morris

6  Bank?

7      A   We were, yes.

8      Q   And during what periods of time were those

9  statements provided?

10     A   The Morris Bank statements, I believe, began

11  in -- around November of 2014 and went to around

12  September of 2018.  And then there were two Synovus

13  bank accounts.  One was from January of 2018 through

14  later in 2019.  The other was, I believe, a pick up

15  from the Morris Bank, which was September or so of

16  2018, and those bank statements were provided to us

17  through February of 2021.

18     Q   All right.  Now, I know that you looked at a

19  number of different entities at the time, but for

20  today's purposes the focus is simply Z.E.R.O. Holding,

21  LLC, Northwinds Leasing, LLC, MEC Capital, Inc., and

22  Mittere, Inc.

23         And did you review the account statements you

24  just described to determine the flow of funds between

25  CurePoint and those four entities?

PROCEEDINGS                                                          October 12, 2022
CUREPOINT, LLC                                                                    172

1    A  I did.  It was part of the entire funds

2  tracing for those bank accounts.  So what we were able

3  to do is, again, from the sources and uses of funds,

4  determine where all the deposits were coming from and

5  where all the monies were going to.

6        And we were using the tool that we use, which

7  is QuickBooks, actually, we were able to pull all of

8  the transactions that were related to those four

9  entities that you mentioned.

10    Q  All right.  So if you would, look at Exhibit

11  Number 1 in your -- in the notebook that I hope is

12  still up there?

13    A  I don't think this is the right notebook.

14        (Creditor's Exhibit 1 was marked for

15  identification.)

16        THE COURT:  86-1?

17        MR. BARTON:  That's correct, Your Honor.

18  BY MR. BARTON:

19    Q  Is that a summary that you prepared regarding

20  intercompany transfers between CurePoint and Z.E.R.O.

21  Holding?

22    A  Yes.  So these will not only be -- if you're

23  going to use the word transfer, these will not only be

24  transfers, but also any deposits coming from Z.E.R.O.

25  Holding.  Or it could also be checks, wires, that type

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                            173

1  of thing, going to Z.E.R.O. Holding.

2      Q   All right.  Because this -- the account sync

3  that you had included the statements -- excuse me, the

4  checks and the other items with the statement?

5      A   They did, yes.

6      Q   And so for the period of time that's

7  described in this Exhibit, what did your review reveal

8  was the total amount transferred by Z.E.R.O. Holding

9  into CurePoint?

10     A   And I should say that this is for the entire

11  time period.  So whether it's -- it's not just limited

12  to the dates that are here.  So it would be for all

13  the bank accounts starting in November of 2014.  It

14  just so happened that we don't see these transaction

15  starting until the dates that you see --

16     Q   Right.

17     A   -- listed here.  To answer your question, the

18  total amounts coming from Z.E.R.O. Holding to

19  CurePoint, $511,400.

20     Q   Then from your review, what did you determine

21  were the amount of funds going out from CurePoint to

22  Z.E.R.O. Holding?

23     A   $1,255,400.

24     Q   And netted out to what?

25     A   $744,000.

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                              174

1    Q   All right.  And then is Exhibit 2 a similar

2  summary that you prepared regarding the flow of funds

3  between CurePoint and Northwinds Leasing?

4    A   It is.

5        (Creditor's Exhibit 2 was marked for

6  identification.)

7  BY MR. BARTON:

8    Q   And was this summary, like Exhibit Number 1,

9  also generated from your review of CurePoint bank

10  statements?

11    A   It is.

12    Q   All right.  And the flow of funds coming out

13  of CurePoint to Northwinds was what?

14    A   The flow of funds from -- from CurePoint to

15  Northwinds was $3,064,019.12.

16    Q   And then the flow of funds the other way?

17  I'm sorry, I asked you backwards.  I probably tripped

18  you up there.  But the flow of funds coming the other

19  way was how much?

20    A   So the monies coming from Northwinds to

21  CurePoint, $333,000.

22    Q   And that netted for the period in question

23  how much?

24    A   $2,731,019.12.

25    Q   And that's from CurePoint to Northwinds?

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    175

1    A   That's correct.

2    Q   And then turn, if you would, to Exhibit

3  Number 3, please.

4    A   Okay.

5        (Creditor's Exhibit 3 was marked for

6  identification.)

7  BY MR. BARTON:

8    Q   And is this a similar analysis you performed

9  regarding the flow of funds between CurePoint and MEC

10  Capital?

11    A   It is.

12    Q   And what did your review find in terms of the

13  flow of funds during the period in question to MEC

14  Capital from CurePoint?

15    A   From CurePoint to MEC Capital was

16  $532,195.88.

17    Q   And the flow of funds coming back the other

18  way to CurePoint was?

19    A   $17,700.

20    Q   And so the net was what?

21    A   $514,495.88 went net to --

22    Q   To CurePoint?

23    A   -- from CurePoint to MEC Capital.

24    Q   To MEC.  Right.  All right.  And then,

25  finally, Exhibit 4 in the notebook.

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    176

1        (Creditor's Exhibit 4 was marked for

2   identification.)

3   BY MR. BARTON:

4      Q   Was this an analysis you prepared similar to

5   the other three of the flow of funds between CurePoint

6   and Mittere?

7      A   Yes.

8      Q   And what did your analysis find in terms of

9   the flow of funds from Mittere to CurePoint?

10     A   From Mittere to CurePoint was $287,500.

11     Q   And then the flow of funds going out from

12  CurePoint to Mittere?

13     A   $304,682.55.

14     Q   All right.  And the next of that was what?

15     A   $17,182.55 net going to Mittere.

16     Q   All right.  Now -- yep.  Were the review --

17  the review that you did that created those four

18  charts, done from the actual bank statements of

19  CurePoint?

20     A   The bank statements as well as all of the

21  supporting detail, yes.

22     Q   Now, subsequently this bankruptcy case was

23  filed, and did you become aware that the Debtor,

24  CurePoint, had submitted schedules that contained an

25  additional listing of due to -- to/from items attached

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                            177

1  to the back of it?

2      A  Yes.

3      Q  And did we ask you to perform some additional

4  analysis to dovetail those listings of in and out from

5  CurePoint with the analysis you had already done?

6      A  You did.

7      Q  And describe for the Court what you did in

8  connection with that additional analysis, please.

9      A  Certainly.  So I was provided with the

10 filings, the bankruptcy filings, and the due to/due

11 forms that were provided by CurePoint at the end of

12 the bankruptcy filing.  And to --

13     Q  And just to -- I'm sorry to interrupt, but to

14 make sure we're --

15     A  Sure.

16     Q  -- all talking about the same thing, there is

17 in your notebook an Exhibit 41.

18     A  Okay.

19     Q  Which is the amended schedule.  If you would

20 just confirm to the Court that the due to/due from

21 that starts on page 59 --

22         THE COURT:  It's actually a loose document.

23         MR. BARTON:  Yeah, it's --

24         THE COURT:  At the very back.

25         THE WITNESS:  Oh, is it?

PROCEEDINGS                                      October 12, 2022
CUREPOINT, LLC                                              178

1       MR. BARTON:  -- at the very back.

2       THE WITNESS:  Okay.  Okay.  I see it.

3  BY MR. BARTON:

4    Q   Just confirm for the Court that that's the

5  document you reviewed to perform this additional

6  analysis.

7    A   Yes, it is.

8    Q   All right.  And describe, if you would,

9  please, what you did.

10      A   So the first thing that I did was to capture

11  all of the transactions provided by CurePoint by date,

12  by entity, the inflow and the outflow, and to

13  summarize that data.

14        And in terms of the analysis, what I wanted

15  to do, and what you asked me to do, was to assume that

16  this information was correct.  I would normally not do

17  that without verification.  But the assumption was

18  that this information was correct.

19        I do have some doubts with regard to the

20  thoracity (sic).  But I captured all of the data, and

21  then for the period that followed all of the banking

22  records, and all of the actual support that was

23  provided, I then took all of the post-February 26,

24  2021 transactions and added those to my analysis by

25  entity.

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    179

1    Q   Okay.  And just to unpack what you said a

2  little bit, to make sure the Court understands.

3  Normally what you do as a forensic accountant is look

4  behind these numbers to ensure that they are properly

5  reflected in a bank statement or some other document.

6  Is that right?

7    A   That's correct.

8    Q   Here you just took them at face value because

9  of the constraints of time?

10   A   I did.  And to make sure my cutoff was a good

11 cutoff, I looked at the transactions from 2/26/2021,

12 or February 26, 2021, going backwards.  And I did

13 notice I had already captured these items in the

14 banking records.  I had those already in the analysis.

15 So I made sure of the cutoff.

16        The challenge that I had, and why I do

17 question some of the numbers, is that the schedule in

18 the bankruptcy filing is crediting certain

19 transactions to Mittere when they actually came from

20 Z.E.R.O. Holding.  And so they're not necessarily

21 accurate with regard to the banking records.

22   Q   Right.  So just make sure we're clear on what

23 you're saying.  You found instances where a

24 transaction was reflected for one entity on the

25 schedules, and you found the transaction but it may

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                      180

1  have credited a different entity.  Is that correct?

2      A   That's correct.

3      Q   But you didn't, given the constraints of

4  time, make any effort to try to forensically adjust

5  all of that.  correct?

6      A   Well, it didn't matter.  Because I am using

7  the banking records up until the point that the

8  banking records no longer were provided.  From there

9  on I do have to rely on this filing because there are

10  no additional banking records for me to compare them

11  to.

12     Q   Right.  Now, let's sort of get to the grand

13  summary at the end here.

14     A   Sure.

15     Q   Tell us -- walk us through, if you would,

16  what the analysis that you just described yielded for

17  each of our four entities.  In whatever order you have

18  them in your notes on.

19     A   Okay.  And I don't know if we want to get

20  into gruesome detail or not.  We can.  But certainly

21  for MEC Capital -- or M-E-C Capital, I'm not sure the

22  proper name -- when I add in the deposits that are

23  attributed as coming from them, and the outgoing

24  transfers, checks, et cetera.

25          The monies flowing to MEC Capital from

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                               181

1  CurePoint, the net of all of that, if one were to net

2  it, and adding that with the analysis I've previously

3  done, the net is that $596,095.88 has flowed out of

4  CurePoint -- again, net -- to MEC Capital.

5      Q   And what's the total outgoing to MEC Capital

6  without net?

7      A   The total outgoing to MEC -- I'm going to

8  have to ballpark it because I don't have them added

9  together, but it would be $185,900 -- let's see here -

10  - the total -- yes, I do have it.  Sorry.

11  $718,095.88.

12     Q   Right.  Okay.  And then for Mittere?  What

13  did your further analysis yield?

14     A   Mittere, if it all is combined, my analysis

15  with the post-February 26, 2021 transactions, the net

16  of that is $208,404.55 going out to Mittere from

17  CurePoint.

18     Q   And what is the total outgoing Mittere?

19     A   The total outgoing is $1,856,942.05.

20     Q   All right.  And then the same questions with

21  respect to Northwinds.  What is the total net outgoing

22  to Northwinds?

23     A   The total net outgoing is $1,346,140.29.

24     Q   And what is the total outgoing from CurePoint

25  to Northwinds with no netting?

1    A   The gross outgoing to Northwinds is

2  $3,644,040.29.

3    Q   All right.  And then finally, with respect to

4  Northwinds, what is the net outgoing from CurePoint to

5  Northwinds pursuant to your analysis?

6    A   I apologize.  I just said Northwinds'

7  numbers.

8    Q   Oh, did we transpose?  I'm sorry, I've got it

9  wrong.  I'm looking at the wrong line.  Z.E.R.O.

10  Holding is our last one.

11    A   Z.E.R.O. Holding.

12    Q   I apologize.

13    A   Okay.

14    Q   So the total net outgoing from Z.E.R.O.

15  Holding is how much?

16    A   The total net outgoing to Z.E.R.O. Holding is

17  $598,136.71.

18    Q   And the gross outgoing from Z.E.R.O. Holding

19  to CurePoint?  I'm -- excuse me, from CurePoint to

20  Z.E.R.O. Holding is how much?

21    A   The gross outgoing to Z.E.R.O. Holding from

22  CurePoint is $1,633,884.62.

23    Q   And then if we total all -- those two columns

24  up, what is the total net outgoing from CurePoint to

25  those four entities during the period of time that

PROCEEDINGS                                      October 12, 2022
CUREPOINT, LLC                                                      183

1  your analysis was able to cover?

2      A   The net outgoing for the total of those four

3  is $2,748,777.43.

4      Q   And then finally the gross outgoing from

5  those four entities -- excuse me, from CurePoint to

6  those four entities was how much?

7      A   $7,852,962.84.

8      Q   Thousand or million?

9      A   I'm sorry.  $7,852,962.84.

10          MR. BARTON:  Those are all the questions I

11  have, Your Honor.  I would move for admission of those

12  four exhibits, 1 through 4.

13          THE COURT:  Any objection to the admission of

14  Exhibits 86, 1 through 4?

15          MR. GEER:  One moment, Your Honor.  If you --

16          THE COURT:  Sure.

17          MR. GEER:  May I ask a question, Your Honor?

18  How far do these go back?

19          THE COURT:  The dates are on the documents.

20          MR. GEER:  There's a 20 -- I -- see.

21          MR. BARTON:  So the -- the -- are you asking

22  about the range of the transactions or the bank

23  account statements?

24          MR. GEER:  The range of the transactions.

25          MR. BARTON:  So if you look at each one, you

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    184

1  can just -- you have to look for the earliest

2  transaction --

3          MR. GEER:  Okay.

4          MR. BARTON:  -- on the deposit side, or the

5  outgoing side.

6          THE WITNESS:  If I may?  The -- for the bank

7  records that I was provided, they go back to November

8  of 2014.

9          MR. GEER:  Okay.  That was (inaudible).

10  (cross talk)

11          THE WITNESS:  But there may not be

12  transactions occurring, depending -- it -- they will

13  show up on the dates specific.

14          MR. BARTON:  Right.

15          MR. GEER:  No objection, Your Honor.

16          THE COURT:  All right.  Exhibit 86-1, 2, 3,

17  and 4 will be admitted without objection.

18          (Creditor's Exhibits 86-1, 2, 3, and 4 were

19  admitted into evidence.)

20          THE COURT:  Cross-examination?

21          MR. GEER:  Just a few questions, Your Honor.

22  May I approach the witness, Your Honor?

23          THE COURT:  You --

24          MR. GEER:  I don't believe she would have our

25  notebook.

1        THE COURT:  All right.  You may.

2                  CROSS EXAMINATION

3   BY MR. GEER:

4        Q   Good afternoon, Ms. Fortune.  My name is Will

5   Geer, I represent CurePoint.  I believe you've been in

6   the room the whole time.  I --

7        A   Apologize?

8        Q   I represent CurePoint, my name is Will Geer.

9   I believe you've been in the room the whole time.

10       A   I have, yes.

11       Q   Would you please turn to Exhibit 8, Ms.

12   Fortune?  This is in our notebook.  Can you --

13       A   Yes.  I think you already had it turned here

14   for me.

15       Q   All right, perfect.

16       A   Yep.

17       Q   Do you -- do you recognize the style of that

18   case?

19       A   I do.

20       Q   Did you testify in that case?

21       A   I did, yes.

22       Q   What was largely the subject of your

23   testimony in that case?

24       A   The subject of that was to perform a funds

25   tracing on the various AOA entities.

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    186

1    Q   Okay.  And what was the ultimate -- between -

2  - just the funds tracing between AOA entities?

3    A   And -- I'm trying to remember now.  This --

4  there were a few of them, actually.  Let's see here.

5  This also had to do with whether Mr. Miles had misused

6  certain AOA or AMOA funds.

7    Q   Okay.  And what ultimately occurred in that

8  case?  I mean, the judgment's right in front of you.

9  Can you tell me what the jury awarded in that case?

10   A   Let's see here.

11       MR. LEVENGOOD:  Not to be technical, Your

12  Honor, but it was not a jury trial.  So --

13       MR. GEER:  Oh, excuse me.  It was -- that's

14  right.  That's my mistake.

15       THE COURT:  It does say jury awarded.

16       MR. GEER:  It does?  Oh.

17       MR. ROUNTREE:  It is a jury trial.  Yeah, it

18  says jury awarded.  Yeah.

19       MR. GEER:  Oh, it is a jury trial, Your

20  Honor.  I'm -- now I'm confusing the cases.

21       MR. LEVENGOOD:  Well then I'm confused.

22  Because I was there, and I'm pretty sure there wasn't

23  a jury.

24       THE WITNESS:  No.

25       THE COURT:  On Miles and Eclipse claim for

1  punitive damage, the jury awarded a verdict.

2         MR. GEER:  Okay.

3         THE COURT:  I'm --

4         MR. GEER:  Yeah, that -- that's what confused

5  -- okay.

6         THE COURT:  Okay.

7  BY MR. GEER:

8     Q   So what did the jury award in that -- in that

9  case, Ms. Fortune?

10    A   This one says that the -- let's see.

11  $35,000.

12    Q   Isn't it true that they also awarded (cross

13  talk) --

14    A   I'm --

15    Q   -- damages --

16    A   -- reading here, I'm --

17    Q   -- $700,000?

18    A   -- sorry, I'm trying to find where you said

19  the jury -- okay.  Here it is.  The jury awarded -- do

20  you want me to just read it?

21    Q   That's fine.

22    A   Okay.  "The jury awarded a verdict in favor

23  of Miles and Eclipse against Defendants American

24  Professional Associates, LLC, APA, and Atlanta

25  Oncology Associates, PC, AOA, jointly and severally in

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                       188

1  the amount of $35,000.

2      Q   Okay.  Isn't it also true that the --

3      A   The --

4      Q   -- jury awarded a $700,000 of punitive

5  damages against AOA and --

6      A   Oh, I --

7      Q   -- APA?

8          MR. BARTON:  Your Honor, I know it's cross,

9  but I really don't see the relevance of --

10         THE WITNESS:  I'm still reading.

11         MR. BARTON:  -- that case to issues we're

12  here about today.

13         MR. GEER:  The jury heard --

14         THE COURT:  So your objection is?

15         MR. LEVENGOOD:  Relevance.

16         MR. BARTON:  Relevance.

17         THE COURT:  Mr. Geer?  Respond?

18         MR. GEER:  A jury -- well, Your Honor, the

19  jury heard her testimony, and this is what occurred

20  after they heard her testimony regarding a lot of

21  transactions that they claimed were monies owed.

22         THE COURT:  I'm going to overrule the

23  objection and allow the question.

24         THE WITNESS:  Do you want me to finish

25  reading?

1     MR. GEER:  You don't have to read.  You can

2  just answer the question, Ms. Fortune.

3     THE WITNESS:  Okay.

4     MR. GEER:  I'll make it a little easier so we

5  can get past it.

6  BY MR. GEER:

7   Q   Isn't it true that the jury also awarded a

8  $700,000 punitive damages against -- we'll call it the

9  McCord entities?

10   A   It says that, yes.

11   Q   Okay.

12     MR. GEER:  Your Honor, would you bear with me

13  for one second?  No.  No, Your Honor.

14     THE COURT:  No further questions?

15     MR. GEER:  I am -- I'm done with my

16  questioning.

17     THE COURT:  I'm sorry?

18     MR. GEER:  I'm done with my questioning, Your

19  Honor.

20     THE COURT:  All right.  Any redirect?

21     MR. BARTON:  Very briefly, Your Honor.

22            REDIRECT EXAMINATION

23  BY MR. BARTON:

24   Q   Ms. Fortune, was the analysis you did in the

25  case that Mr. Geer just reference to you different

1  than what you did here?

2       A  It is, yes.

3       Q  Can you describe for the Court generally the

4  difference in the analysis that you did there versus

5  here?

6       A  The difference is that in that case we were

7  dealing with a lot of expenses that were paid on

8  behalf of Mr. Miles' entities by the AOA, AMOA

9  companies, and looking at a lot of invoices, and

10  tallying up benefits and that type of thing that were

11  being paid on his company's behalf.

12       Q  As opposed to here where you're simply

13  looking at checks, deposits going back and forth

14  between the entities?

15       A  That's correct.

16          MR. BARTON:  That's all I have, Your Honor.

17          THE COURT:  All right.  Any further cross?

18          MR. GEER:  Yes, Your Honor.

19              RECROSS EXAMINATION

20  BY MR. GEER:

21       Q  So in that case you didn't just review what

22  we'll defer to as naked bank statements?

23       A  Refer to -- as --

24       Q  You didn't just refer to bank statements in

25  that case?

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                        191

1     A   We did use bank statements.  We used bank

2   statements.  There were --

3     Q   Did --

4     A   -- bank statements and supporting detail.

5   But there was a lot more.  There were various

6   insurance and payroll records, and that type of thing,

7   that we referred to.

8     Q   So you had additional documentation other

9   than bank statements you could rely on in that case?

10     A   Well, there were completely different issues

11   in that case.  It was demonstrating that payroll --

12   employees that were working for Mr. Miles' entities

13   were -- their benefits were being paid for by the AOA

14   and AMOA entities.

15     Q   But in this analysis you only reviewed bank

16   statements?

17     A   In this analysis, we're really just doing a

18   funds tracing.  That's correct.

19     Q   Okay.  This is a mic behind a -- if it don't

20   -- my voice doesn't carry quite as much as these

21   gentlemen, so I'll try to speak up.  And despite all

22   of that analysis, the jury still found in favor of

23   Miles in that case, correct?

24     A   They did.  Yes.

25        MR. GEER:  Thank you, Your Honor.

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                       192

1          THE WITNESS:  I wasn't the only witness, but

2   they did.

3          MR. GEER:  Thank you.

4          THE COURT:  All right.  Thank you very much.

5          THE WITNESS:  Thank you.

6          THE COURT:  You may step down.  Any other --

7          MR. BARTON:  May we --

8          THE COURT:  -- witnesses?

9          MR. BARTON:  May we excuse Ms. Fortune?

10          THE COURT:  Yes, you may -- no?

11          MR. GEER:  That's --

12          MR. ROUNTREE:  I think it's fine.

13          MR. GEER:  That's fine, Your Honor.

14          THE COURT:  Yeah.  You're free to go, Ms.

15   Fortune.  Thank you very much.

16          THE WITNESS:  Thank you.

17          MR. HOLBEIN:  Your Honor, I would like to

18   excuse our witness Mr. Brant Frost.  I don't need his

19   testimony any longer, after the cross-examination of

20   Mr. Miles.

21          THE COURT:  Any objection to the releasing of

22   Mr. Frost?

23          MR. GEER:  We may need him, Your Honor.

24          THE COURT:  All right.

25          MR. HOLBEIN:  Okay.  Well, y'all will

1  coordinate calling him, then?

2          MR. GEER:  Yeah.

3          MR. HOLBEIN:  Okay.

4          MR. GEER:  We'll coordinate that.  Which I

5  believe Mr. Walker is still listening in.

6          THE COURT:  Okay.  Any other witnesses?

7          MR. HOLBEIN:  Yes, Your Honor.  At this time

8  I'd like to call Dr. Randolph.

9          THE COURT:  Okay.

10          MR. LEVENGOOD:  Your Honor, I'd like to

11  connect -- correct one thing I said.  The case that I

12  was thinking of in my head when he said it wasn't -- I

13  was wrong.  I was -- I was -- crossing the stream of

14  two different cases.

15          THE COURT:  Okay.

16          MR. LEVENGOOD:  So what I said was incorrect.

17          THE COURT:  So there was a --

18          MR. HOLBEIN:  A lot of cases.

19          THE COURT:  -- jury here?

20          MR. LEVENGOOD:  Correct.

21          THE COURT:  Okay.

22          MR. LEVENGOOD:  I was not there at that

23  trial, that's why I was confused.

24          THE COURT:  Okay.

25          MR. HOLBEIN:  A lot of cases.

1        MR. LEVENGOOD:  A lot of cases.  A lot of

2  cases in this one.

3        THE COURT:  A lot of history.

4        MR. LEVENGOOD:  Yeah.

5        MR. ROUNTREE:  A lot of history.

6        THE BAILIFF:  It appears Dr. Randolph has

7  stepped out of the building to use his phone.

8        MR. HOLBEIN:  Okay.  That's who I got.

9        THE COURT:  All right.  Why don't we --

10        MR. HOLBEIN:  And that is our last witness.

11        THE COURT:  He's your last witness?  Why

12  don't we let the Debtor's put on their case -- start

13  putting on their case until we -- Mr. Randolph -- Dr.

14  Randolph shows back up.  I'm assuming y'all are going

15  to call Dr. Randolph as well?

16        MR. GEER:  Yes, Your Honor.

17        MR. HOLBEIN:  He is also under subpoena.

18        THE COURT:  Okay.

19        MR. GEER:  Okay.

20        THE COURT:  So you -- other than Dr.

21  Randolph, y'all have no other evidence?

22        MR. HOLBEIN:  No, Your Honor, I have no other

23  evidence.

24        THE COURT:  Okay.

25        MR. GEER:  Yeah.  Your Honor, I'd like to

1  call Phillip Miles.

2        THE COURT:  All right.  Mr. Miles?  Mr.

3  Miles, you're still under oath.

4        THE WITNESS:  Yes, Your Honor.

5            DIRECT EXAMINATION

6  BY MR. GEER:

7     Q   All right.  Good afternoon, Mr. Miles.

8     A   Good afternoon.

9     Q   Mr. Miles, could you tell the Court your

10  experience in selling radiation oncology centers?

11     A   Yes, I can.  It started back in 2012, 2013.

12  And I've had personal -- either being the lead, co-

13  lead, or managing other folks more than 10 radiation

14  centers over the past 10 years.  The sale of them.

15     Q   But you -- who did you sell those on behalf

16  of?

17     A   I sold the majority of -- well, the majority

18  of those are with American Oncology Associates, LLC.

19  A few of them -- or, actually, six if my memory --

20  actually, eight if my memory serves me, was a joint

21  venture between American Oncology, LLC and an entity

22  called ROSA, Inc. -- Radiation Oncology Services of

23  America, Inc -- and their joint venture between the

24  two parties called ROSA Georgia.

25     Q   And did you use an investment banker?

PROCEEDINGS                                           October 12, 2022
CUREPOINT, LLC                                                    196

1    A   The only time that Dr. Dale McCord -- Dale

2  McCord wanted to use an investment banker was jointly

3  on the sale of all of these centers of ROSA Georgia.

4  There was a engagement with a local healthcare centric

5  investment banking group for a few months.

6    Q   What ultimately happened with that?

7    A   They were -- it was terminated, or fired,

8  after a -- I would say three, four, no longer than

9  five months of their work.

10   Q   Okay.  So they weren't -- were they

11  responsible for the sale?

12   A   They were -- they were engaged to sell all

13  the ROSA Georgia centers to a third party.

14   Q   Did they actually do that?

15   A   They worked on it, but there was no

16  significant movement or accomplishment.  There was no

17  sale to any third party of any or all of the centers

18  at that time.

19   Q   Do you recall what they would charge to work

20  on that?

21   A   My memory serves me --

22   Q   -- sale?

23   A   -- it was a retainer.  I don't know if it was

24  a lump sum up front, by my memory serves me it was

25  $10,000 a month, plus a success fee.

1    Q   What's the typical percentage for a broker in

2  a situation like this, in your experience?

3        MR. BARTON:  Objection, Your Honor.

4        THE WITNESS:  They can vary, based --

5        THE COURT:  Hold on.  Wait, wait, Mr. Miles.

6        THE WITNESS:  I'm sorry.

7        THE COURT:  I've got an objection.  Thank

8  you.

9        THE WITNESS:  Okay.

10       MR. BARTON:  Objection, Your Honor, he's

11  asking for a --

12       THE WITNESS:  I'm sorry, Your Honor.

13       THE COURT:  That's okay.

14       MR. BARTON:  He's asking for testimony that

15  would require a specialized expertise in the market,

16  and he hasn't qualified the witness to render that

17  testimony.

18       MR. GEER:  I don't think that's expert

19  testimony.  What would -- what has a business broker

20  charged in the past, in his experience, that he's

21  worked with.

22       MR. BARTON:  Whether it's expert testimony or

23  fact testimony, he hasn't laid the foundation for him

24  to offer that testimony based on his personal

25  knowledge.

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                                198

1       THE COURT:  All right.  I'm going to sustain

2  the objection on foundation grounds.  You lay the

3  proper foundation.

4  BY MR. GEER:

5     Q   Mr. Miles, did you and -- were you part of

6  that engagement with -- I -- I'm -- apologize.  I

7  don't remember the name of the investment banking

8  firm.  Edge, I believe is what you said?  Edge

9  Consulting?

10     A   I believe their name was -- I don't know if

11  they're still around -- called Edge Capital.

12     Q   Edge Capital.  Do you recall seeing the

13  agreement between the -- we'll call them the AOA

14  entities and Edge Capital?

15     A   I do.  And specifically it's the ROSA Georgia

16  entities.

17     Q   Do you recall from reviewing that agreement

18  what their fee was?  Their percentage fee?

19     A   My memory serves me, it was a -- I don't -- I

20  do not remember if there was a lump sum up front

21  retainer.  I do remember a $10,000 a month, call it

22  per diem or monthly fee.

23     Q   Okay.  Do you remember if they had a

24  percentage that they were going to get from the sale

25  if --

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              199

1    A   I don't --

2    Q   -- they were successful?

3    A   My apologies.  I don't recall the percentage.

4    Q   Okay.  Moving on.  So you -- as far as this

5  case, Mr. Miles, and this sale to Dr. Randolph, what

6  other marketing efforts have you taken prior to today?

7    A   Since the August 19th filing there's been

8  tremendous outreach to different buyers.  Before that,

9  going all the way back to January, February of 2018, I

10  had routine outreach, inbounds and outbounds, for the

11  sale of the center.  Since August 19th.  Of course,

12  that cadence has rapidly picked up.

13    Q   Has any other entity or individual made an

14  offer, other than Dr. Randolph?

15    A   No one has made an offer since August 19th, a

16  financial offer.  No.  They've only been expression,

17  non-binding, of interest of purchase.

18    Q   Do you recall how much another offer was at -

19  - for -- I think you just testified that there was

20  someone with interest.

21    A   Correct.  We worked -- we being CurePoint,

22  the Debtor, worked on the sale of its assets back in

23  the fall of 2021.  So approximately a year ago.  And I

24  do remember that LOI and the due diligence there

25  under.

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                               200

1    Q   Who was that entity that was --

2    A   It's a --

3    Q   -- the proposed purchaser?

4    A   It's a group called ION, I-O-N, Networks out

5  of Nashville.

6    Q   Do you recall the purchase price?

7    A   $6 million.  So yes.

8    Q   Have there been any other offers previously?

9  Other than ION Network?

10    A   There have been verbal back-and-forth on

11  offers, but nothing reduced to writing.  And nothing

12  in a binding form.

13    Q   Have the McCords -- I will just call them the

14  McCord entities -- anyone on behalf of the McCords

15  ever offered to purchase CurePoint, LLC?

16    A   Several times.

17    Q   Can you go through the first time, from your

18  memory?

19    A   My memory was April 2017.  There was a

20  binding LOI.  There was a subsequent option to

21  purchase.

22        MR. BARTON:  Objection, Your Honor.  This is

23  hearsay.  He's testifying to the truth of offers

24  originating from someone other than him.  Without

25  those documents in front of us -- I think if they were

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                        201

1  in front of us they might still be hearsay, but right

2  now it's hearsay and it's -- it is inadmissible as

3  such.  He's offering the truth of the matter of these

4  purported LOIs.

5          MR. GEER:  I think --

6          THE COURT:  Mr. Geer?

7          MR. GEER:  It's their side, it's a party

8  opponent, Your Honor.  It's their -- it's their groups

9  that have offered these -- that have made these

10  offers.

11          MR. ROUNTREE:  In addition to the fact that

12  he's the Debtor's corporate representative and

13  received those offers on behalf of the Debtor.

14          THE COURT:  Any response to the argument that

15  they're admissions of a party opponent?

16          MR. BARTON:  They're also not the best

17  evidence.  The -- the LOIs themselves would be the

18  best evidence.

19          THE COURT:  Any response to the best evidence

20  objection?

21          MR. GEER:  Well, Your Honor, we do have an

22  Exhibit 2.  I believe this is the binding letter of

23  intent, in Exhibit 2 of our exhibits.

24          THE COURT:  All right.  Why don't you just

25  cross-examine him about the exhibit?

PROCEEDINGS                                   October 12, 2022
CUREPOINT, LLC                                          202

1        MR. GEER:  I'll do that, Your Honor.

2        THE COURT:  So the objection is sustained.

3  BY MR. GEER:

4     Q   Mr. Miles, do you have -- I'm trying to go a

5  little too fast, Your Honor.  Mr. Miles, do you have

6  our exhibit notebook in front of you?  It says Binder

7  1-3.

8     A   I do.

9     Q   All right.  Can you turn to Exhibit 2 for me?

10    A   I am there.

11        (Debtor's Exhibit 79-2 was marked for

12  identification.)

13 BY MR. GEER:

14    Q   Okay.  Does this -- do you recognize this

15  document?

16    A   I do.

17    Q   Okay.  Is this the document that the McCords

18  offered the Debtor to purchase --

19    A   This is what I earlier referred to --

20    Q   -- the Debtor's --

21    A   -- the April -- let me make sure.  Yes.

22  April of 2017 binding letter of intent.

23    Q   Okay.

24        MR. GEER:  Your Honor. I will submit Exhibit

25  2 into evidence.

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                            203

1        THE COURT:  Any objection?

2        MR. BARTON:  No objection.

3        THE COURT:  Debtor's Exhibit 79-2 will be

4   admitted into evidence without objection.

5        (Debtor's Exhibit 79-2 was admitted into

6   evidence.)

7   BY MR. GEER:

8    Q   Was this sale ever consummated, Mr. Miles?

9    A   No, it was not.

10    Q   Do you remember why?

11    A   It -- I don't know.  It wasn't because the

12   Debtor, CurePoint, didn't try to get it purchased.

13   It's because follow-up was not followed up by the

14   potential acquirer.  And then the acquirer made

15   subsequent offers.

16    Q   Did Marc McCord ever make any other offer for

17   the purchase of CurePoint's assets?

18    A   My memory serves me, I don't know if Marc

19   McCord, but the McCord family made other offers of the

20   CurePoint assets or entity.

21    Q   What was that amount?

22    A   It varied.  The one I remember was a 3.5 of

23   the member interest.

24    Q   Okay.

25    A   $3.5 million.  Then there was an offer of

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    204

1  much less in February -- that offer came through later

2  in 2017.  Then there was an offer in an email form,

3  offer/demand in email form in February of 2018.

4     Q   Do you recall what the amount was, Mr. Miles?

5     A   In February 2018?

6     Q   Yes.

7     A   It was $2 million.

8     Q   Okay.  Do you recall the events leading up to

9  that offer?

10     A   I will -- I will always remember the events

11  leading up to that offer.

12     Q   Could you describe them to the Court?

13     A   Yes.  Starting in September of 2017,

14  CurePoint, which had been billing its services through

15  a McCord entity called American Professional

16  Associates, LLC, APA, and weekly been getting

17  remittances of its charges, its cash collections, that

18  was cut off by APA in September of 2017.  Just like

19  APA cut off prior to the joint venture partner that I

20  referred to.

21        Specifically Miles, on behalf of the

22  CurePoint -- the Debtor -- was told that -- to work

23  with the McCord entity's designated CPA, CFO, a Keith

24  Daniel (ph).  To work with a due to/due from CurePoint

25  and the AOA entities.  Miles and Keith Daniel, and the

1  controller of the AOA entities at the time, worked

2  through that, came up with a number.

3          That number was adjusted, never materially,

4  pretty slightly.  In October, and November, and

5  December no money came in.  In January, no money came

6  in.  The number was finalized to a rather immaterial

7  amount.

8          Then in February of 2018, CurePoint received

9  a letter from its law firm, Smith Gambrell, and Marc

10  McCord, copying Dr. Martin Holdsman (ph), who is now

11  deceased, but he was the rendering full-time

12  physician, that its technology --

13          MR. BARTON:  Objection, Your Honor.  We're

14  back to best evidence on the contents of the letter.

15          THE COURT:  Response?

16          MR. GEER:  I believe he said the letter was

17  from Marc McCord?

18          THE WITNESS:  It was --

19          MR. BARTON:  He said Smith Gambrell in

20  Roswell.

21          MR. GEER:  Which is the lawyer for Marc

22  McCord?

23          MR. BARTON:  No.

24          MR. GEER:  Was it -- I'm not sure the context

25  of the letter, Your Honor.

1      THE COURT:  I'm going to sustain the

2  objection.

3      MR. GEER:  That's fine.

4      THE WITNESS:  There was, in the email, a

5  follow-up -- an email received in February 2018 sent

6  to me and Ms. Dadabhoy, copying the McCords and their

7  counsel, that if CurePoint did not --

8      MR. BARTON:  Objection, Your Honor.  I'm back

9  to best evidence on the contents of the document.

10  BY MR. GEER:

11    Q   You can't say anything about an email that we

12  don't have in person.

13    A   Okay.

14    Q   Unless it's the McCords or unless it's

15  another party.

16    A   Okay.

17      THE COURT:  I'm going to sustain the

18  objection.

19      THE WITNESS:  Okay.  Again, Miles, Ms.

20  Dadabhoy, and others received an email -- I'm sorry.

21  I did it again.  My apologies, Your Honor.  The --

22  there was an offer of $2 million, or what did happen,

23  the clinic software, electronic health records,

24  patient treatment solutions would be shut down.

25  BY MR. GEER:

PROCEEDINGS                                      October 12, 2022
CUREPOINT, LLC                                                207

1      Q   What was -- was CurePoint effectively shut

2   down during that time period?

3      A   I would -- I would not use the word -- it was

4   absolutely shut down.  It stopped being able to treat

5   patients.  It had no ability, its physicians or clinic

6   staff, to go into any patient records.  And without

7   those records, one cannot treat.

8      Q   Okay.  How long was -- how long did that

9   period last?

10      A   That lasted a period of four to six weeks,

11   until CurePoint was able to -- it -- CurePoint reached

12   out to Elekta, to re-engage with its prior software

13   that was being warehoused by APA.  And set up a new

14   software system to re-establish exactly what I said

15   before.  Its patient records, electronic health

16   records, and even more importantly, its treatment

17   plans.

18      Q   How much did CurePoint have to pay for that?

19      A   Over -- for the -- just the electronic health

20   records, treatment planning software, over 700,000.

21      Q   Getting back to the ION Network deal of, I

22   believe you said it was $6 million.  What happened

23   with that deal?

24      A   That was a deal that I worked at the same

25   time I was working to purchase -- get purchased on

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                          208

1 behalf of CurePoint the linear accelerator for AMOA

2 Finance.  We were providing all of the necessary

3 information to ION.  And over a period of two months

4 there was a tremendous amount of work.

5        We were told that the AMOA Finance wanted to

6 sell the machine, an amount it wanted to sell it for.

7 And when subsequently AMOA Finance refiled a different

8 type of litigation, I told the development personnel

9 at ION, as well as the CEO, that new litigation had

10 been proffered or filed.  And so that effectively

11 killed the deal.

12    Q   The current sale is to Dr. Randolph's entity,

13 2406 Cancer Care, LLC.  Correct?

14    A   That is correct.

15    Q   And is that for $6 million?

16    A   That is for $6 million.

17    Q   Is that the highest and best offer the Debtor

18 currently has for --

19        MR. BARTON:  Objection, Your Honor.  This is

20 -- I mean, it's leading.  I know where we're going,

21 but he -- he's led a good bit in setting the

22 foundation for this.  Now he's using legal terms of

23 art to lead the witness to answer the question.

24        THE COURT:  Response?

25        MR. GEER:  Your Honor. I'm simply getting

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                            209

1 through this.  I can certainly ask it a different way,

2 as far as, you know, the APA that we're all aware of,

3 but that's --

4        THE COURT:  Just rephrase the question.

5        MR. GEER:  I will rephrase the question, Your

6 Honor.

7 BY MR. GEER:

8    Q   Is there a current -- is there a current

9 asset purchase agreement between the Debtor and 2406

10 Cancer Care?

11   A   Yes.

12   Q   Do you -- do you know what the price is of

13 that?

14   A   I do.

15   Q   Can you tell the Court what the price is?

16   A   $6 million.

17   Q   Is that the only offer the Debtor has on the

18 table?

19   A   That is correct.

20   Q   How many other entities have you reached out

21 to prior to filing the sale motion, to try to obtain

22 an APA?

23   A   Since August 19th?

24   Q   Yes.

25   A   Most -- sitting here today, I don't have the

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                              210

1  absolute number, but 10 or more.

2      Q   Okay.  Should the sale motion be approved,

3  are you planning to market this further?

4      A   Absolutely.  I would -- if I had a free time

5  tomorrow, I would start marketing it further.

6      Q   Can you describe your efforts that you would

7  take, should the sale motion be approved?

8      A   I would.  Based on my decade-long history,

9  including for the AOA entities, I would talk to the

10  who's who of buyers, the most logical buyer of -- is

11  Northside.  I emailed their business developer on the

12  radiation oncology side a couple of weeks ago.  I

13  talked to the CEO of ION Networks.

14         I keep pretty good communication with

15  WellStar, and they've not expressed any interest.  I

16  have talked to Radiation Business Solutions.  I have

17  reviewed a prior -- what I call freestanding.

18  Freestanding simply being non-hospital-based

19  oncologies, or medical practice services.  21st

20  Century, who was a large owner/operator/buyer.

21  They're really not in the market anymore.

22         I routinely talk to HCA through their local

23  CEO down on Dublin, Georgia.  We have talked to, but

24  not paid any money to, a business broker who has sent

25  out the knowledge of this sale, this 363 sale to -- I

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                            211

1  actually can't remember.  I know it would be more than

2  100, and I think they came back and said there's eight

3  folks that have expressed an interest.  I have talked

4  to a couple of those.

5         I've had an inbound call from a couple other

6  creditors who wanted me to talk to someone.  We've

7  signed non-disclosures and absolutely spoken with

8  those folks.

9     Q   Who is Radiation Business Solutions?

10     A   Radiation Business Solutions is -- I will

11  call as RBS, it's in Nashville, Georgia.  Excuse me.

12  That's a -- they build Chaparral boats down there.

13  Nashville, Tennessee.  They are a large

14  owner/operator/manager of radiation oncology clinics.

15  They own clinics in Alaska.  I do not believe they own

16  any in Georgia.

17         Their CEO is a gentleman named Greg Merrill,

18  who was the COO of the ROSA Georgia relationship for a

19  number of years.  And again, that's a relationship

20  that existed between the AOA entities and our -- and

21  ROSA, Inc. out of Nashville.

22         Greg is the CEO of RBS.  RBS is also the

23  billing manager for CurePoint, and has been since

24  summer of 2018.

25     Q   So again, should the sale motion be approved,

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                     212

1  you -- are you going to market to all of these

2  entities and provide them access to the data room?

3     A  I'll market, provide access, and also do

4  follow-up.

5     Q  Okay.  You're going to provide access to the

6  data room to any bidder that requests access to it?

7     A  I do -- I will.  The only caveat I have is,

8  you know, they -- if you -- if you have someone that

9  doesn't -- I prefer a conversation to make sure people

10  understand it's radiation oncology service.  But if

11  they understand that versus radiology, which is often

12  times conflated, absolutely.  No -- it's a point and

13  click to give someone access to a Dropbox.

14     Q  Could you describe the information currently

15  present in the data room?

16     A  Yes.  It's income statements.  It is asset

17  listing.  And, most importantly, it is what anybody on

18  the buy or sale side of medical practices, it has the

19  RBS reports, which are very thorough, in current month

20  as well as trailing months and years, of the data.

21  The revenue, the billings, the charges, the A/R, the

22  collections, the payors, et cetera.

23        The only thing it doesn't have, which is

24  good, it doesn't have actual patient names.  It -- but

25  it does go through every CPT code.  So then anybody

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                            213

1  that knows radiation oncology, they know what imaging

2  is being done, follow-up is being done, and the

3  various treatments that are being done by CurePoint.

4        And again, it also has the financial data.

5  Which is very important.  Any kind of medical buy/sell

6  which is actual cash collections versus just charges

7  and A/R.

8     Q   How long ago did you actually complete the

9  population of the data room?

10     A   The -- as I said, it was weeks ago when I

11  started putting information in.  The last information

12  I dropped in was just a week or two ago.

13     Q   All right.  If parties requested more

14  information than (inaudible) do you have an issue

15  providing that to the data room?

16     A   No, not if it was relevant.  Not at all.  And

17  even if it wasn't relevant, if it doesn't -- I won't

18  do anything to harm CurePoint.  But under non-

19  disclosure, if it's a -- doesn't do anything to harm

20  CurePoint, I'd be glad to drop that in.

21     Q   Do you recall how much cash CurePoint

22  currently has in its DIP (ph) account?

23     A   CurePoint currently does not -- its accounts

24  have stayed at Synovus.  It operates a lockbox and

25  checking, and has over $350,000 in cash as we sit here

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    214

1  today.

2     Q   Do you recall what CurePoint had when we

3  first filed the case on August 19th?

4     A   If my memory serve me, somewhere in the $40-

5  60,000 range.

6        MR. GEER:  One second, Your Honor?  That's

7  all my questions in direct, Your Honor.

8        THE COURT:  All right.  Recross?

9        MR. HOLBEIN:  Yes, Your Honor.

10           RECROSS EXAMINATION

11  BY MR. HOLBEIN:

12     Q   Hello again, Mr. Miles.  Moments ago Mr. Geer

13  asked you if you're going to keep marketing, and you

14  responded yes.  And then I believe you followed that

15  up with a -- sort of a list of things that you've

16  already done.  When you say you're going to keep

17  marketing, what does that mean?

18     A   I would keep reaching out.  There's a -- one

19  can always say there's thousands of potential buyers,

20  but to the key buyers -- I will follow-up with ION.  I

21  will continue to follow-up with Northside.  And I'll

22  continue to follow-up -- we had a pre-dator (ph), and

23  also on the phone with a gentleman who's a physician,

24  or represents a physician group, I cannot recall, in

25  Florida.

1        I'll continue following up with folks that

2   I've already spoken to, and then I'm also -- I think I

3   mentioned in the past, talking to what would be a

4   wonderful buyer/joint venture partner/otherwise AWC

5   Networks.  So I'll continue following up.

6        There's also high net worths that do have an

7   interest because of -- generally folks have an

8   interest if, a) they have the capital and the

9   wherewithal, and b) they have an emotional sentimental

10  tie, i.e. a loved one has passed because of cancer, or

11  had cancer and has recovered.  Either way.

12      Q   Does Dr. Randall know that you're going to

13  keep looking for purchasers?

14      A   Dr. Randolph?

15      Q   Randolph, I'm sorry, yes.

16      A   Yes, he's absolutely aware of that.

17      Q   Okay.  The -- you mentioned that Northside

18  would be a potential purchaser.  Didn't you?  Did --

19      A   Oh, I'm sorry.  I thought -- did you say did

20  you?  Yes, I --

21      Q   Yes --

22      A   -- did.  Northside --

23      Q   Well, let me -- let me --

24      A   Fair enough.

25      Q   -- stop you there.  In fact, you've -- in the

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              216

1   clinics that you've sold, and you discussed them, the

2   10 or more clinics that you sold, many of those were

3   sold to Northside.  Isn't that correct?

4       A   I would say more fair to say the majority

5   have been sold to them.

6       Q   Majority?  Okay.

7       A   Yeah.

8       Q   That's great.  The majority of those were

9   sold to Northside.  In fact, when we discussed this

10  Monday I asked you if you had reached out to

11  Northside, and you said you had, didn't you?

12      A   Yes, I did.

13      Q   And you said that there was an exchange, and

14  Northside indicated that it was -- the transaction

15  wasn't right at the time.  Do you remember that?

16      A   I do.  And I -- more specifically, I think

17  Scott said no interest at this time.

18      Q   And then I asked you if I could have that

19  email.  Do you remember that?

20      A   I do.

21      Q   And did you give it to your Counsel, or to

22  me?

23      A   I gave it to Counsel.

24      Q   Okay.  I haven't seen it.

25          MR. GEER:  Your Honor, it would be hearsay

1  anyways.

2      MR. HOLBEIN:  Yeah, I'm not -- I'm not

3  offering it into evidence.  I'm --

4      MR. GEER:  Oh, okay.  I'm just --

5      MR. HOLBEIN:  I'm saying that I asked to look

6  at it.

7  BY MR. HOLBEIN:

8    Q  The -- who'd you speak with at ION?

9    A  It's a gentleman named Josh Johnson, the CEO

10  of ION Networks.

11    Q  And is he in charge of acquisitions?

12    A  He's the CEO, he -- so overall I think he's

13  in charge of everything.

14    Q  Right.

15    A  But he's always my point of contact, and then

16  --

17    Q  Have you sold anything to ION before?

18    A  No, I have not.

19    Q  Okay.

20      MR. HOLBEIN:  Those are all the questions I

21  have, Your Honor.

22      THE WITNESS:  Thank you.

23      MR. BARTON:  I'm sorry, may I have a --

24      THE COURT:  Yes, you may.

25      MR. BARTON:  -- couple of quick questions?

1              RECROSS EXAMINATION

2 BY MR. BARTON:

3    Q   Mr. Miles, you mentioned a minute ago about

4 this offer from ION last year, and I think you said it

5 was $6 million?

6    A   That is correct, Mr. Barton.

7    Q   Plus the $1 million earnout, right?

8    A   That's correct.

9    Q   Okay, so seven with the earnout.

10   A   That's correct.

11   Q   Okay.  You looked with Mr. Geer at Exhibit 2,

12 maybe you misspoke.  I think you said that was from

13 Dr. McCord.  That was from AOA, correct?

14   A   Yes.  And I didn't mean to misspoke.  It --

15   Q   That letter of intent?

16   A   -- specifically, Mr. Barton, it's from

17 American Oncology, LLC.

18   Q   Right.  And that LOI was later replaced with

19 an option agreement to AOA.  Correct?

20   A   I would only take exception to replaced.  I -

21 - the -- we -- CurePoint has received many offers from

22 the AOA entities.  I don't know if there was a, here's

23 a replacement.

24   Q   But there was a later option agreement,

25 correct?

1    A   That is correct.

2    Q   And it wasn't from Dr. McCord, it was from

3  AOA?

4    A   Sitting here today, I don't recall.  But that

5  would -- it would be logical to agree to you, Mr.

6  Barton.

7    Q   Right.  And you remember that there was a

8  $515,000 deposit put down for that option?

9    A   If my memory serves me correct.

10   Q   And both you and Dr. McCord guaranteed the

11  repayment of that option?

12   A   I don't recall that, Mr. Barton.

13   Q   All right.  But ultimately AOA tried to

14  exercise that option, and CurePoint refused to

15  participate.  Correct?

16   A   I don't remember it being that way.  It was -

17  - there was intermittent steps on what AOA was

18  demanding to execute that option.

19   Q   They wanted to execute it.  Yes?

20   A   I can't speak to them.

21   Q   Well, they expressed, to your point, they

22  wanted to exercise the option.

23   A   If my memory serves me, Mr. Barton, they said

24  please talk to our Smith Gambrell Counsel and start a

25  due diligence proceeding.

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    220

1    Q   Right.  That's an expression of interest in

2  closing the sale on the option agreement.

3    A   It was the start of a due diligence period.

4    Q   Right.  But that was never done, because any

5  due diligence was never provided by CurePoint.

6  Correct?

7    A   I don't remember there was.

8    Q   And as it relates to the AMOA litigation you

9  mentioned earlier, the reason it was refiled was

10  because CurePoint continued not to pay the lease

11  payments on the Linac.  Correct?  It was a suit on

12  rent, basically.

13    A   I think the refiling was a big difference in

14  what you are saying.  There was a time period from

15  June of -- after Judge Ellaby's (ph) decision, June of

16  20 -- I want to make sure I get these dates right --

17  '21.  There was an email received that said they just

18  want to be bought out.  And then there was supply of

19  what the purchase price, or the sales price, as the

20  case may be.  I worked fervently for that for two

21  months, received that, then they said, "No, we don't

22  want to sell.  And, by the way, you owe a security

23  deposit."

24    Q   Yeah.  No, I understand you had excuses for

25  why you didn't pay, but the point is CurePoint wasn't

1  paying on the lease.  Which resulted in a re-filed

2  lawsuit.  Correct?

3      A   I can't --

4      Q   That was the -- that was the complaint being

5  made by AMOA, was nonpayment of rent.

6      A   And the security deposit, and there were more

7  than excuses, Mr. Barton.  There was a -- definitely

8  my client wants to be bought out.  I spent two months,

9  sun up to sun down, trying to get financing.

10     Q   Okay, I -- respectfully, I understand all of

11  that.  It's just kind of a yes or no question.  The

12  (inaudible) of the lawsuit was non-payment of rent on

13  the Linac?

14     A   If my memory serves me on that lawsuit, it

15  also had a new twist, which was a security deposit.

16  I'm just trying to answer more thoroughly, Mr. Barton,

17  that's it.

18     Q   All right.  But the essence of the lawsuit

19  was nonpayment of the rent.  And, in fact, CurePoint

20  never made a single rent payment on that Linac without

21  being sued for it.

22     A   CurePoint as -- had a settlement that it --

23  excuse me, and adjudication where it was given credit

24  for payment, and then it was positioned to buy out the

25  linear accelerator.  And then there was a lawsuit

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                      222

1  adding to it a security deposit, and we're not going

2  to buy -- allow you to buy it out.

3      Q   It sounds like you're agreeing with me.

4      A   I --

5      Q   CurePoint never made a voluntary payment of

6  rent, it was always forced to do so by litigation.

7      A   I do not agree with that at all, Mr. Barton.

8      Q   All right.  One last thing.  If you would

9  look at Exhibit 41, that's the amended schedule.  It's

10  probably in the pocket in the back of that, the white

11  binder up there.

12     A   Bear with me.  I have it, Mr. Barton.

13     Q   Two questions, and we're both on page 27 of

14  the schedule.  There's --

15     A   I am there.

16     Q   There is two creditors listed.  The first one

17  is number 18 there, second from the top, it's Premier

18  Merchant Funding (ph).

19     A   Correct.

20     Q   And it's listed as a business guarantee.  I

21  assume that means CurePoint guaranteed a debt in the

22  amount of $200,000?

23     A   I think that's true.  This is one that

24  Newtech paid down, so I can't remember if it's the

25  Debtor or the guarantor.

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                   223

1    Q  Okay.

2    A  This definitely says a business guarantee.

3    Q  All right.  But you don't recall CurePoint

4  receiving any consideration for the guarantee, do you?

5    A  Sitting here today I don't recall where the

6  proceeds of the Premium Merchant Funding went to.

7    Q  All right.  Similarly, two down, number 20,

8  Zen Capital, also identified as a business guarantee

9  for $100,000?

10    A  I see that.

11    Q  So that was CurePoint guaranteeing an

12  obligation of another entity?

13    A  My apologies, I -- as I said in my testimony

14  Monday, I don't remember a Zen Capital.  And my

15  apologies, I did not research it yesterday.

16    Q  Okay.  You don't recall CurePoint receiving

17  any consideration for any guarantee obligation to Zen

18  Capital, do you?

19    A  I do not recall.

20       MR. BARTON:  Thank you.

21       THE COURT:  Anything further from this

22  witness?

23       MR. GEER:  No, Your Honor.

24       THE COURT:  All right.  Mr. Miles, you can

25  step down.  Thank you --

PROCEEDINGS                                                          October 12, 2022
CUREPOINT, LLC                                                                    224

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  -- very much.

3          THE WITNESS:  Thank you.

4          THE BAILIFF:  Dr. Randolph is --

5          THE COURT:  The doctor's there?

6          THE BAILIFF:  Yeah.

7          THE COURT:  Okay.  Why don't we call the

8   doctor for cross-examination and then --

9          THE WITNESS:  You found the doctor.

10          THE COURT:  We'll just go ahead and let the

11   doctor testify fully from both sides.  Cross-

12   examination first, and then direct, since he's on the

13   stand.  So he -- if he has to go, he can go.

14          THE WITNESS:  Your Honor, may I step out of

15   the courtroom for the restroom and come back?

16          THE COURT:  You may.

17          THE WITNESS:  Thank you, Your Honor.

18          THE BAILIFF:  Watch your step.  You can go

19   ahead and sit down.

20          THE WITNESS:  Okay.

21          THE BAILIFF:  Move your chair closer to the

22   microphone, (inaudible).  Raise your right hand.

23   WHEREUPON,

24               ERICH G. RANDOLPH

25   called as a witness, and having been sworn by the

1  notary public, was examined and testified as follows:

2         THE BAILIFF:  State your name for the record.

3         THE WITNESS:  It's Erich Graham Randolph.

4                    CROSS EXAMINATION

5  BY MR. HOLBEIN:

6     Q   Dr. Randolph, my name is Michael Holbein.  I

7  represent AMOA Finance, LLC, and I have just a few

8  questions for you this afternoon.  First off, I want

9  to thank you for appearing, and I apologize to any

10  disruption that was caused by the service of the

11  subpoena.  But, you know -- but I do appreciate you

12  being here today.

13        Dr. Randolph, do you -- do you live in

14  Dublin, Georgia?

15    A   I have a apartment in Dublin.

16    Q   Where --

17    A   I --

18    Q   Where do you live full time?

19    A   Well, I live three days a week in Atlanta.

20    Q   And you -- are you familiar with what's going

21  on right now in the bankruptcy case, in terms of the

22  sale of CurePoint?

23    A   I have some awareness.  I am not a lawyer, so

24  I can't explain the nuances of what it all entails.

25    Q   Right.  And are you also aware that my client

PROCEEDINGS                                        October 12, 2022
CUREPOINT, LLC                                                    226

1  and another entity have moved for the appointment of a

2  bankruptcy trustee?

3      A   I have heard that, yes.

4      Q   And do you have -- in -- do you have any

5  understanding of what that would entail?  The

6  appointment of a trustee?

7      A   It would entail probably dissolution of the

8  practice.  Because it would take time to probably get

9  through the weeds of everything, and patients wouldn't

10  be coming.  Because I know that I would not be there,

11  and I'm not sure how referrals would otherwise come in

12  to be taken care of.

13      Q   Why wouldn't you be there?

14      A   Because I have been dealing with court

15  actions for the past four years, relative to

16  involvement with AOA.  And the back and forth.  And I

17  don't really need to be in a situation where I am not

18  in control, and manipulated and moved around.  And so

19  for me to wait there until some resolution occurs, I

20  don't see that to be to my advantage or benefit.

21      Q   What if a trustee were appointed just to

22  oversee this -- the existing sale process?  Would you

23  have a problem with that?

24      A   I don't really believe that that is something

25  that's going to be concise and immediate.  And

1  therefore, I do not want to be involved in delays of

2  the process.  I mean, when I was told that the Chapter

3  5, or whatever it was, was going to be an asset sale,

4  and I expressed my interest in providing an offer.

5         And so I was given information, whether it

6  was complete and accurate, I don't know, but that if

7  my offer was taken then -- you know, there would be

8  maybe a few other steps, but it would close

9  immediately.  So that way there was not going to

10  necessarily be any downtime in terms of trying to

11  continue to build the practice.

12     Q   You're aware, though, that your offer is

13  subject to higher and better offers?

14     A   Yes.  I'm aware that it is subject to a

15  higher offer, if one comes about.  Yes.

16     Q   And you're also aware that there might be an

17  auction.  In other words, you could have an

18  opportunity to respond to the higher offer?

19     A   I don't know what I would have an opportunity

20  to do, because I don't know what the guidelines and

21  the processes would be.

22     Q   Have you -- who have you spoken with about

23  the sale process?

24     A   About the sale price?

25     Q   Process.  Process.

1    A   Process.  Well, I've gotten sketchy

2 information of sorts to -- and I say sketchy because

3 it's not been -- this has all happened very quickly,

4 and so I have gotten some information from CurePoint

5 and from their attorneys, in terms of processes of

6 sorts.  But I have not had a sit down go through every

7 line item, to ask them what happens if this, what

8 happens with that.

9         To me, it was just a simple thing that I put

10 an offer, and I felt that I would be able to manage.

11 And if it was taken, I'm good to go.  Because I am

12 used to building practices, and that's the reason I

13 was asked to come down there, was to build a practice.

14    Q   What -- if a trustee were appointed here

15 today, would you quit working for CurePoint?

16    A   If a trustee was appointed today, I probably

17 would plan on leaving.  Because I have no idea what

18 that would entail.

19    Q   Now, would you -- would you leave tomorrow?

20 Or would you --

21    A   I do not have an answer to your hypothetical

22 question.

23    Q   Sir?

24    A   I do not have an answer to your hypothetical

25 question.  Because I don't know what the parameters of

1  what that entails.

2      Q   Okay.  If you did leave, would you allow

3  CurePoint to employ a locums physician and continue to

4  bill under your insurance contract and provider

5  number, as a replacement physician?

6      A   If I left CurePoint, I would no longer be

7  practicing there.  And I don't have the authority to

8  allow somebody else to bill under my identification,

9  or account number, or anything of that nature.

10     Q   Is --

11     A   CurePoint would have to go about taking care

12  of that, if that was even available.  And billing is a

13  long process.

14     Q   Is -- when -- you're familiar with the

15  employment of locums physicians.

16     A   Yes.

17     Q   When a locums physician is employed doesn't

18  that physician bill under the supervising physician's

19  contract number?

20     A   Specifically, I assume that.  Because locums

21  are common in -- across the country.  But there

22  usually are arrangements that have been worked out

23  with the, I guess, insurance carriers about that.  And

24  the -- I don't really submit billing charges, so I

25  don't know all of those nuances.

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                            230

1    Q   Who does that sort of stuff?

2    A   Usually the billing people in the institution

3  that is engaging the locums.

4    Q   Now -- and forgive me, this is a hypothetical

5  again.  But in as much as it is something that hasn't

6  happened yet.  But I don't think it's a remote

7  hypothetical.  If you did determine that you were

8  going to leave CurePoint, would you have an ethical

9  obligation as a physician to make provisions for your

10  patients?

11   A   The entity would have that responsibility, to

12  make provisions for the patients.  And that's really

13  one of the ways that I ended up down there.  Because

14  when the center was closed by AOA, they were left

15  without a physician and left without infrastructure.

16  And the practice dwindled in numbers.

17        And so I was asked, once they were able to

18  get everything operational again, to come down.  But

19  they asked me, and it was on them to try to maintain

20  the viability of the center.

21   Q   Right.  I'm talking less about the viability

22  of the center, and more about the viability of the

23  patients that --

24   A   Well, the viability of the center is the

25  viability of the patients.  Because when the center

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                              231

1  was closed before, it was closed down for several

2  weeks.  They -- because you could not turn the machine

3  on because the McCords had shifted the technology over

4  under their license, and cut off access to medical

5  records and computer technology that would treat the

6  patients.

7          And as a result, there are patients -- even

8  when I started going down there -- who would come in,

9  and I would hear their story about how can we get our

10  records now.  And I also met a urologist, Dr. Hayes,

11  who was left high and dry, and he couldn't get his

12  medical records for his patients.

13          So in terms of ethics, I have ethics.  And

14  I'm not sure that everybody does with what they do.

15  But I have never abandoned a patient.  And I have

16  heard the term about abandonment thrown out there.

17  And I'm not sure what you classify as abandonment, and

18  what, you know, establishes one abandonment versus the

19  other.  But I don't just walk out the door, and leave

20  patients, and say go fend for yourself.

21      Q   Sure.  And I'll explain it, and put it into

22  the form of a question.  Because I did -- I did use

23  that word, and I'll tell you why.

24          In the course of these negotiations it's been

25  represented that if you were not -- if a trustee was

1  appointed, you would leave and the center would crater

2  almost immediately.  To me, that sounds like

3  abandonment.  But if you're saying that's not what

4  would happen, it's welcome news.  Is it -- which is

5  it?

6      A   If my offer is not accepted to start with,

7  and there's no bidding process that goes on that's

8  defined, and it's just left up in the air nebulous, I

9  would not want to have my career just up in the air

10  without definitive processes in place.  And if a

11  receiver was put in place who had no knowledge about

12  radiation oncology, there would be a ramp up time

13  period for them to get knowledge.

14        And I don't want to be tied down to

15  somebody's learning curve in a setting like this.

16  Because it would hinder operations.  I was already

17  involved in such an event when ROSA and AOA got into

18  legal battles, and receivers were put in place.  But

19  there was enough infrastructure in place such that we

20  were able to still be operational.  But it was still

21  some hoops that had to be gone through to get certain

22  things approved in that process.

23      Q   You understand there's a difference between a

24  bankruptcy trustee and a state court procedure.  Or a

25  federal case.

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    233

1     A   I can't say that I -- I didn't go to law

2   school, so I don't know the subtle nuances of that, to

3   be very honest.

4     Q   The -- if there was a -- if there was a

5   bankruptcy trustee who continued the sale process, and

6   didn't try to run the medical side of the clinic,

7   would you find that objectionable?

8     A   I don't know.  I can't answer that question.

9   I -- the question that I -- or the answer I can give

10  you is that if the process is allowed to proceed

11  forward as what was kind of mapped out as a

12  possibility, and that my offer was put in to be in

13  position to be accepted, and yet you can proceed

14  forward with getting your bids for other individuals.

15        But, to me, that would, in my mind, give me a

16  sense that there is a clear pathway for me potentially

17  winning that bid.  And if I didn't win the bid, fine.

18  I go on about my business.

19        But to have a trustee, and I don't know what

20  a trustee would do in that process, and whether it

21  would be months of them trying to find somebody, so I

22  stay out in limbo for months.  But I'm not sure on

23  that answer, the way you've structured it, whether I'd

24  be really comfortable doing that.

25        I mean, if I have a sense that it was

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                                234

1  proceeding along the way which I had the impression it

2  might, I would be inclined to let the sale occur, and

3  a trustee could come in afterwards and figure out

4  where people were going to get their share of the

5  money.  So that I would be paying into the Court or to

6  the trustee at that time.

7      Q   You're aware that a trustee could sell it to

8  you, aren't you?

9      A   I -- it -- I would say that I'm not sure who

10  has the absolute authority.  Whether it would be the

11  judge who would say, okay, this offer is valid and

12  there aren't any, so we're going to award him --

13      Q   Let me rephrase.  In the context that we have

14  now, the Debtor is selling it to you, and --

15      A   Debtor?  The Debtor?

16      Q   -- CurePoint.  CurePoint is selling the

17  business to you.

18      A   Well, I was not clearly understanding they

19  were selling it to me.  They were selling it --

20  offering it --

21      Q   The asset.

22      A   -- to me via the vector of this bankruptcy

23  proceeding.

24      Q   Okay.  Well, what you've filed is an asset

25  purchase agreement.

PROCEEDINGS                                     October 12, 2022
CUREPOINT, LLC                                              235

1    A  Correct.

2    Q  Where you're purchasing it -- or what they

3  filed.  I'm sorry.  What has been submitted is an

4  asset purchase agreement where you're purchasing it

5  from the Debtor.

6    A  Okay.

7    Q  And is that consistent with your

8  understanding?

9    A  That is basically consistent, yes.

10    Q  And what I -- what I'm asking you is that --

11  were you aware that if a trustee were appointed, that

12  asset purchase agreement might still be approved as

13  is?

14    A  Is that trustee appointed -- I don't know

15  where in the process of things that that would occur.

16    Q  Now.  If a trustee were appointed today, were

17  you aware that that asset purchase agreement might

18  still be the prevailing bid in a month?

19    A  Well -- (cross talk)

20        MR. GEER:  Objection, Your Honor.  I don't

21  think Mr. Holbein's laid a foundation for that alleged

22  possibility, particularly given the timelines in this

23  case.

24        MR. HOLBEIN:  I don't think I need to lay a

25  foundation for a possibility.  I'm asking him whether

PROCEEDINGS                                                   October 12, 2022
CUREPOINT, LLC                                                          236

1  he was aware of something.  He can say he was or he

2  wasn't.

3          MR. GEER:  He's stating it as though it's

4  fact.

5          MR. HOLBEIN:  No.

6          MR. GEER:  That's the problem.

7          THE COURT:  No, he phrased it as a

8  hypothetical.

9          MR. HOLBEIN:  Yes.

10         THE COURT:  He didn't state it as a fact, he

11 said it's a possibility.

12         MR. GEER:  We -- I'm saying I think it's an

13 impossibility, based on the timelines --

14         THE COURT:  Well, you can --

15         MR. GEER:  -- for closing.

16         THE COURT:  You can ask him all you want.

17         MR. GEER:  Okay.

18         THE COURT:  You can ask him the questions --

19         MR. GEER:  Okay.  Yeah.

20         THE COURT:  -- you want, but I don't find

21 that question objectionable, and I'm going to overrule

22 the objection.

23 BY MR. HOLBEIN:

24     Q   So Dr. Randolph, again, if -- were you aware

25 -- and I am definitely going to repeat myself, but

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              237

1  that's because of that interruption.  So I'm sorry.

2         Were you aware that if a trustee was

3  appointed today that the sale -- the sale process

4  might still go forward as is with you as the purchaser

5  on the existing timeline?  Were you aware of that?

6     A   I am not aware of what the processes would be

7  if a trustee was appointed today.  What that trustee

8  would have on their do-list of things that they have

9  to do to get to the next step.  And if it's a matter

10  of them putting out offers, are they going to

11  advertise them for six months?  Or are they going to

12  do it in a short window of time?  Such as weeks.

13    Q   Sixty days.  So to the extent, then, that you

14  do have a perception or any sort of understanding

15  regarding the consequences of the appointment of a

16  trustee, from where was that perception derived?

17    A   Repeat your question, please?

18    Q   Yeah.  It was really wordy, I apologize.  To

19  the extent that you have any understanding of this

20  process, where did you get that understanding?

21    A   As I said, I got some of that understanding

22  from CurePoint's manager, and then a brief

23  conversation that I had with the attorneys

24  representing CurePoint.

25    Q   Again, Dr. Randolph, I do appreciate you

1  coming down today.  I really appreciate it.  And I,

2  again, apologize for any disruption caused by the

3  service of the subpoena.

4        THE COURT:  All right.  Mr. Levengood?

5        MR. LEVENGOOD:  Thank you, Your Honor.

6             CROSS EXAMINATION

7  BY MR. LEVENGOOD:

8     Q   Dr. Randolph, my name's Michael Levengood.

9  It's very nice to meet you.  I appreciate the

10  opportunity to ask you a few short --

11     A   Go right ahead.

12     Q   -- questions.  In the Debtor's bid

13  procedures, the Debtor indicates that anybody who has

14  access to this due diligence room should execute a

15  confidentiality agreement.  Have you been asked to

16  execute a confidentiality agreement in connection with

17  your review of financial records with regard to

18  CurePoint?

19     A   I have not, to my recollection, ever had to

20  sign any confidentiality agreement.  I guess, from my

21  perspective, a document sometimes is only as good as

22  the intent of the person behind it.

23        I mean, I've been in court with many issues,

24  and the contracts are only as good as the people

25  behind the contracts.  And so when I'm asked to keep

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    239

1  something in confidence I do that.

2       Q   Thank you.  And would you be willing to

3  execute a non-disclosure agreement, like any other

4  potential bidder --

5       A   I would say --

6       Q   -- for the purchase of the assets?

7       A   -- in the general sense, yes.  But I'd need

8  to read what it's really saying in terms of what I'm

9  restricted on.

10      Q   Certainly.  Understood.  And then, secondly,

11  have you produced any financial information to the

12  Debtor with regard to your ability to close this

13  transaction?

14      A   I have financing through a banking

15  institution that I've had a long history of dealing

16  with, so they have an awareness of my financial

17  situation and wherewithal.

18      Q   Okay.  Do you have a written letter of

19  commitment from that financial institution?

20      A   I have had verbal, and they have told me they

21  will be providing me with the full documentation of

22  the funds, but that they are ready to move as soon as

23  this process is, I guess, moved through the standard

24  hoops.

25      Q   Thank you, sir.  If -- unfortunately, there's

1 been a little bit of a delay because of the activity

2 early on in the bankruptcy case in opening up the due

3 diligence data room to potential purchasers.  Would

4 you be opposed to extending the November 30th deadline

5 to December 15th, to give potential other bidders 60

6 days to review the financial information of the

7 Debtor?

8     A   I would be highly reluctant, and I will -- if

9 the Court will indulge me to give my reasoning for

10 that?  Okay.  I've been a practicing radiation

11 oncologist for over 30 years.

12        I was with the group that I severed from for

13 their actions and behavior.  And with that, I -- you

14 know, know the community in a general sense.  But

15 then, having gone down to Dublin, I have another sense

16 of what's out there.

17        But when I was with Atlanta Oncology

18 Associates, I was intimately involved in the sale of

19 the facilities that we had.  I was out there

20 marketing, and talking with the executives at

21 Northside, Emory.  And so I knew the landscape in

22 terms of what their interests were, what facilities

23 they were interested in, and which people they didn't

24 necessarily want to have a relationship with.

25        And so, with that, I don't know that until

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                            241

1  December, or 60 days, is going to change that

2  paradigm.  Because I also know that before Mr. Miles

3  and CurePoint filed their actions, I was aware that he

4  had reached out to different potential buyers who were

5  interested in buying CurePoint at some point earlier.

6       And they came back that they were not able to

7  because of their expansion plans that they have

8  already enacted.  So to that, I'm not sure what magic

9  hat finding a buyer would occur in such a limited time

10  window.

11       And those people who would want to put a bid

12  would want to do due diligence, and I'm not sure

13  financials necessarily speak to the true condition of

14  things.

15       Because when I got there they were treating

16  maybe 12 patients a day, now we're up into the high

17  20s.  And it took time to get it to that point, and I

18  just don't know that somebody will -- they're not

19  going to be retaining me, so therefore I'm not sure

20  how they would get off the ground and running.  And

21  I'm sure they're going to look at how they can get

22  paid.

23       And just hiring a locums does not guarantee

24  that.  And hiring a locums is not going to give those

25  people hospital privileges, or even insurance

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                               242

1  privileges.  And I am not going to, I guess, just

2  blindly endorse someone I have no awareness of just so

3  they can bill through my credentials.

4      Q  Dr. Randolph, I appreciate your concern about

5  that, and I'm grateful for your willingness to serve

6  the community in Dublin, and I commend you for

7  increasing the number of patients who you're able to

8  care for in the Dublin facility.  Those are all

9  wonderful things.

10         My question was simply if to give other

11  parties 60 days to do due diligence -- you may have

12  your own view that it isn't going to be helpful, but

13  if you would be willing to close on December 15th as

14  opposed to November 30th, it seems to me it might

15  resolve some objections in the bankruptcy hearing.

16         And so I'm just trying to understand, would

17  you be willing to go out to December.

18      A  Well, I am going to be handcuffed from the

19  standpoint of what my financial lender has outlined to

20  me, that they would be open to doing.  They don't want

21  to just be sitting out there.

22      Q  I understand.  And I --

23      A  So --

24      Q  I heard you say I don't want to be in limbo

25  for six months.  And I hope you'll understand that I

PROCEEDINGS                                                                          October 12, 2022
CUREPOINT, LLC                                                                                   243

1  don't --

2      A   Sixty days, even.

3      Q   -- believe.

4      A   Instead of six months.  Sixty days, even.  I

5  don't want to be in limbo for 60 days.

6      Q   Well, you're in limbo --

7      A   That is very true.  I've been in limbo --

8      Q   -- for 45.  We're really just talking about

9  15.

10      A   I've been in limbo for several years with my

11  litigation.

12      Q   I see.  Okay.  And I -- the only thing I

13  would share is I -- I'm -- I don't believe that it's

14  necessarily true that a third party purchaser would

15  not want to retain you if they were the successful

16  bidder for this property.  And it seems to me that you

17  certainly can compete, and I can understand why you'd

18  want to be the owner.  But I don't think that it's an

19  either/or.  Your -- it's your choice, ultimately.

20      A   This is true.

21          MR. ROUNTREE:  Your Honor, objection.  Is --

22  is the -- Counsel testifying here?  I mean, where's

23  the question?

24          MR. LEVENGOOD:  I'm just asking him -- I'll

25  withdraw the question, Your Honor.

PROCEEDINGS                                                      October 12, 2022
CUREPOINT, LLC                                                                244

1          THE COURT:  All right.  Thank you.

2          MR. LEVENGOOD:  And I thank you, sir.  That's

3  all the questions I have.

4          THE WITNESS:  You're welcome.

5          THE COURT:  Direct examination?

6          MR. GEER:  Yes, Your Honor.  Good afternoon,

7  Dr. Randolph.

8          THE WITNESS:  Good afternoon.

9          MR. GEER:  And thank you for being here

10  today.

11          MR. GEER:  Your Honor, I have a revised

12  version of the APA that I eluded to this morning.  Of

13  course, it's not filed on the exhibit list, but it is

14  part of the -- it is part of the motion to sell.  Will

15  the parties -- like how do I -- may I present this as

16  an exhibit to Dr. Randolph?

17          THE COURT:  Any objections?

18          MR. HOLBEIN:  No objection.

19          MR. LEVENGOOD:  I'd like a copy, but no

20  objections.

21          MR. GEER:  I only have one copy -- (cross

22  talk).

23          MR. HOLBEIN:  We'll share.

24          MR. GEER:  Can y'all share that?

25          MR. HOLBEIN:  Sure.

PROCEEDINGS                                     October 12, 2022
CUREPOINT, LLC                                              245

1        MR. GEER:  May I approach Your Honor?

2        THE COURT:  Do you have an extra one for?

3        MR. GEER:  Your Honor, I unfortunately do

4  not.

5        THE COURT:  Let's take a short --

6        MR. GEER:  I was going to -- I was going to -

7  -

8        THE COURT:  Let's take a short bathroom break

9  anyway.

10        MR. GEER:  Thank you so much.

11        THE COURT:  And so we can have multiple

12  copies made for the parties.

13        MR. GEER:  Thank you.

14        THE COURT:  We'll be in recess for a few --

15  five minutes

16        THE BAILIFF:  All rise.

17        (Off the record.)

18        THE BAILIFF:  All rise, the court will come

19  to order.

20        THE COURT:  Please be seated.

21        THE BAILIFF:  Your Honor, we're back on the

22  record for CurePoint.

23        THE COURT:  All right, Mr. Geer.

24        MR. GEER:  Thank you, Your Honor.

25            DIRECT EXAMINATION

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                           246

1  BY MR. GEER:

2      Q   Dr. Randolph?

3      A   Yes?

4      Q   My name is Will Geer, I represent CurePoint.

5  The Court was kind enough to print out copies of the

6  APA for us, because I failed to bring them.  We have

7  an old APA, and we have a new APA.

8      A   All right.

9      Q   They're not redlined, unfortunately, but I

10  would like to ask you about the old -- it says old one

11  attached to motion to sell at the top.  Do you have

12  that in front of you --

13     A   Yes.

14     Q   -- right now?

15     A   Yes, I do.

16     Q   Okay.  Are you familiar with this document,

17  Dr. Randolph?  And I'm not asking as a lawyer, or in

18  any capacity as that.  Are you -- have you -- have you

19  seen this document?

20     A   Well, I saw an asset purchase agreement.

21  This one I can't say that I have specifically seen it,

22  since it's old, because -- or maybe I just saw it but

23  didn't pay attention to it.  Because they have an

24  address down here for a Cancer Care for Campbelltown

25  Road, and I'm not sure where that address was derived

PROCEEDINGS                                October 12, 2022
CUREPOINT, LLC                                          247

1  from.

2      Q   And I'm going to flip through that.  And do

3  you -- can you tell me what page that is on, Dr.

4  Randolph?

5      A  It is an --

6      Q  Oh, I see it.

7      A  -- article 11.  It says, "If to purchaser to

8  2406 Cancer Care, LLC."

9      Q   Is that -- but other than that address issue,

10  is this -- are you familiar with this $6 million APA?

11     A  Yes, I am.

12     Q   And then Dr. Randolph, I -- we did print off

13  a new copy, based on some objections that the other

14  party had.  I'd like to go over what those are, so you

15  understand what the difference between the two APAs

16  are.

17     A  All right.

18     Q   When I say APA, I mean this document, the

19  asset purchase agreement.  Which is the agreement

20  between 2406 Cancer Care and CurePoint.  Okay?

21     A  Yes.

22     Q   And this -- and Mr. Levengood and I, and Mr.

23  Holbein and I briefly spoke, but there was a section

24  1.2, Dr. Randolph, in the old APA that listed

25  professional assets that included patient records, and

1  a number of other records related to patients.

2        We have removed that section, because that

3  will be -- and that -- and those assets, which are

4  patient records, are now in section 1.1 as the assets

5  that are going to be sold.  The only other change was

6  in 1.3, Dr. Randolph -- two changes, actually.  1.3,

7  excluded assets.  We added a sentence at 1.3(e).  And

8  this is on Debtor Exhibit 12, Dr. Randolph.

9     A   And this is on the new document?  One --

10  section 1.3?

11     Q   Correct, sir.

12        (Debtor's Exhibit 12 was marked for

13  identification.)

14  BY MR. GEER:

15     Q   The last sentence of 1.3(e) says, "This

16  includes any claims the estate may have against any

17  insider."  Which is from the excluded assets.  In

18  other words, when you purchase this -- excuse me.

19  Whatever entity purchases this will not be able to

20  purchase claims of the bankruptcy estate against other

21  entities.  That's what that means.

22     A   Okay.  I may need a little more clarification

23  on that --

24     Q   Well --

25        MR. HOLBEIN:  Your Honor --

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                   249

1          MR. GEER:  I can't give him legal advice, but

2  I just wanted to say that's --

3          THE COURT:  What's the -- wait.  There's an

4  objection.

5          MR. HOLBEIN:  Yeah.  My objection is that --

6  and I appreciate what Mr. Geer is trying to do.  My

7  objection is this explanatory process isn't an

8  examination of Dr. Randolph.  If we need -- if he

9  needs to have the agreement explained to him so he can

10  be questioned about it, I think that's one thing.  But

11  --

12          MR. GEER:  I do plan to question him on it --

13          MR. HOLBEIN:  Okay.

14          MR. GEER:  -- Your Honor.

15          MR. HOLBEIN:  Yeah, I need a question.  I

16  haven't heard a question.  That's my objection.

17          MR. GEER:  Understood.  Well, that's what I

18  was getting to before --

19          MR. HOLBEIN:  Okay.

20          MR. GEER:  -- (inaudible) he has not seen

21  this before.

22  BY MR. GEER:

23      Q   And the only other change the parties

24  discussed is Indiana -- it said Indiana law in the old

25  attached motion.  This one has changed it to Georgia

1 law.  So the agreement will be governed by Georgia

2 law.

3    A   Okay.

4    Q   Okay.  And, Dr. Randolph, are you ready,

5 willing, and able to purchase CurePoint through your

6 entity, 2406 Cancer Care, for $6 million?

7    A   Yes.

8    Q   Do you have financing to do so?

9    A   Yes.

10    Q   Debtor's Exhibit 12, which you have in front

11 of you, are you -- with Court approval, are you

12 willing to sign this agreement, which provides for a

13 $100,000 non-refundable deposit to be paid to the

14 Debtor?

15    A   You said Exhibit 12?  Oh, this --

16    Q   Yeah, it's in the very front --

17    A   -- is the --

18    Q   -- Dr. Randolph.

19    A   Okay.  Okay.  Okay.  And your question,

20 again, would I be willing to sign it, you said?  Yes.

21    Q   Correct.

22    A   Yes.

23      MR. GEER:  That's all I have, Your Honor.

24 One more question, actually.

25 BY MR. GEER:

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                      251

1     Q   Dr. Randolph, should the Court approve the

2  process to allow you to be what we call the stalking

3  horse bidder, are you prepared to send the $100,000

4  deposit within the next week?

5     A   Yes.

6     Q   Thank you.

7         THE COURT:  Recross?

8         MR. HOLBEIN:  I don't have any questions.

9         MR. BARTON:  No, thank you, Your Honor.

10        THE COURT:  Dr. Randolph?

11        THE WITNESS:  Yes.

12        THE COURT:  You mentioned you have the

13  financing to do the transaction.

14        THE WITNESS:  Yes.

15        THE COURT:  What is your understanding of the

16  terms of that financing?

17        THE WITNESS:  Well, I've got a verbal

18  commitment from the bank, Brant Frost, that he would

19  back my attempts to purchase CurePoint.  That he would

20  provide me with the financing for that.  And he --

21        THE COURT:  Financing in what amount?

22        THE WITNESS:  Six million dollars, plus -- I

23  think it may have been 600 -- $6,100,000.

24        THE COURT:  Any contingencies in that?

25        THE WITNESS:  No.

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              252

1        THE COURT:  Any written commitment to do

2  that?

3        THE WITNESS:  There has not been a written

4  commitment, it has been more verbal.  And he was going

5  to put forth the, I guess, documents once we got a

6  sense of where this was going to lead.  I have not

7  seen a written commitment.  It's all been on the

8  phone, talking to Mr. Frost.

9        THE COURT:  Dr. Randolph, have you consulted

10  with a lawyer for yourself in connection with

11  negotiating this transaction?

12        THE WITNESS:  I had one of my attorneys

13  review the documents, yes.

14        THE COURT:  Okay.  And they provided feedback

15  to Debtor's Counsel in connection with that?

16        THE WITNESS:  To the Debtor's Counsel, no.

17  They just pointed out two things to me, was that at

18  the point in time the entity was sold that the pre-

19  existing contracts of employment would be terminated.

20  And, you know, they pointed that out to me when they

21  reviewed the document I provided to them.  And -- but

22  not a Counsel that -- I guess -- what was the -- term

23  you used for the Counsel?  Or some?

24        THE COURT:  Well, my question goes to have

25  you consulted personal counsel --

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                                253

1        THE WITNESS:  Yes.

2        THE COURT:  -- in connection with this

3  transaction?

4        THE WITNESS:  Yes.

5        THE COURT:  And your understanding of what

6  role a trustee plays in a bankruptcy case, is your

7  understanding of -- your only understanding of that

8  through Counsel for the Debtor or Mr. Miles?

9        THE WITNESS:  I would say yes, as well as

10  previous experiences with trustees in AOA matters,

11  when there was conflict with ROSA of Georgia.

12        THE COURT:  Were those trustees appointed in

13  bankruptcy cases?

14        THE WITNESS:  They were not bankruptcy cases,

15  no.  They were in a litigation case, and trustees were

16  managing the assets.  As I understood.

17        THE COURT:  And what is your understanding of

18  the deadline that your financing source has imposed

19  upon you for closing the transaction?

20        THE WITNESS:  The last phone conversation we

21  had, it was going to be the end of November.

22        THE COURT:  And do you know what that's based

23  on?  Why that number?

24        THE WITNESS:  It is --

25        THE COURT:  Why that date?

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                   254

1        THE WITNESS:  Well, we were trying -- he was

2   -- we were hoping to have it occur earlier, and I was

3   informed that he could get it and have it in place for

4   November.  But he cannot tie up that commitment past

5   that time.  Because I don't know how his banking

6   institution functions in their timeline of, I guess,

7   committing funds.  But that's what he verbally

8   informed me.

9        THE COURT:  But technically he hasn't tied up

10  any commitment yet, right?  Because he hasn't --

11  there's no written commitment.

12       THE WITNESS:  There's no -- well, I --

13  there's no written commitment.  Verbal and maybe some

14  text communications with me.  But nothing written.

15       THE COURT:  And I get the sense, in listening

16  to you testify, that you're done with the fighting

17  between these parties.  Is that the impression I -- is

18  that impression accurate?  I mean, you've had to deal

19  with this, the infighting between the various parties

20  here for a long time.

21       THE WITNESS:  That's a loaded question, to

22  say that I'm tired.  I'll be truthful.  I am not one

23  to get tired when I feel that I'm either in the right

24  position, or in the right.  And when wrong -- or what

25  I perceive as wrong -- is done, and there's a light

1  that there's right that could be done, I'm willing to

2  stick with it.

3       I mean, the reason I went down to Dublin to

4  help with that practice was because I thought it was

5  an injustice done to the patients, and to the center,

6  by just shutting things off and leaving the entity

7  somewhat high and dry.

8       So I've dealt with battles before and, yes,

9  they can be very fatiguing.  But if there is an

10  objective and a purpose, I don't get that fatigued.

11  And I don't know if that answers your question, but --

12       THE COURT:  It does.  If, for whatever

13  reason, I was to decide that I'm duty-bound by the

14  bankruptcy code to appoint a trustee --

15       THE WITNESS:  Okay.

16       THE COURT:  -- are you saying you're going to

17  -- regardless of whether the trustee would be, you

18  know, engaged with you to try to sell the business to

19  you, you're going to walk away.  Is that -- that's --

20  is that your testimony?

21       THE WITNESS:  I did not say in the testimony

22  that I would just walk away.  Because, again, this is

23  a slight -- not a twist, but a different additive

24  about me staying there with the trustee, and trying to

25  sell the practice.

PROCEEDINGS                                      October 12, 2022
CUREPOINT, LLC                                                256

1       But, as I stated, I don't know what that

2   means.  If a trustee is appointed to try to sell the

3   practice, what that entails.  Is that -- I mean, I've

4   heard 60 days, but what are the actions that they're

5   going to do to get a bid process going.  And what

6   locks it in ironclad that it'll be that, as opposed to

7   another objection or another delay.

8       So delays are the things that I want to

9   avoid.  And I don't want to commit myself for

10  perpetual delays.

11      THE COURT:  If I -- if I didn't appoint a

12  trustee, but in reviewing the transaction thought that

13  the 45-day time table that's currently in front of me

14  is not sufficient, and felt like some additional time

15  was necessary, are you going to walk away from the

16  transaction?

17      THE WITNESS:  Well, again, I'm not trying to

18  be difficult, but it's somewhat vague as to what the

19  really means.  In the sense that if I see daylight,

20  that there is truly a -- an outcome that's going to

21  occur, I would not necessarily just be walking away.

22  But it's conceivable I might.  I mean, I'm just being

23  very honest about that.  I mean, I -- my time is

24  important, and my life is important, to keep it

25  moving.

PROCEEDINGS                                               October 12, 2022
CUREPOINT, LLC                                                        257

1        THE COURT:  All right.  Thank you very much.

2  Anybody have any other questions in light of my

3  questions?  Mr. Geer?

4        MR. GEER:  No questions of Dr. Randolph.

5        THE COURT:  All right.  Mr. Levengood?

6        MR. LEVENGOOD:  No, Your Honor.

7        THE COURT:  All right.  Dr. Randolph, thank

8  you very much.

9        THE WITNESS:  Am I --

10        THE COURT:  I really appreciate your time

11  today.

12        THE WITNESS:  Can I go pick my daughter up?

13        THE COURT:  You may.

14        THE WITNESS:  Okay.  Thank you.  Do you need

15  these documents back?

16        THE COURT:  You can just leave them there.

17        THE WITNESS:  Okay.

18        THE COURT:  Thank you so much.  Mr. Geer, any

19  other witnesses?

20        MR. GEER:  We'd like to call Brant Frost.

21  And I believe Mr. Walker, Fred Walker, represents him,

22  and said that he would be on the line and --

23        THE COURT:  Okay.

24        MR. GEER:  -- get in contact with him.

25        THE BAILIFF:  Your Honor, you're going to see

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    258

1  him on Zoom.

2          THE COURT:  Right, understood.

3          MR. WALKER:  If you need me to reach out to

4  him now, I'll reach out to him now and have you stay

5  on the line.

6          THE COURT:  If you could, please.

7          MR. WALKER:  Will do.

8          THE COURT:  What's the witness's name?

9          MR. GEER:  Brant Frost.  I believe it --

10  what's the --

11          MR. LEVENGOOD:  B-R-A-N-T.

12          MR. GEER:  B-R-A-N-T, Your Honor.  I believe

13  he's the fourth, Brant Frost, IV.

14          MR. WALKER:  I did reach him, he'll be

15  (inaudible).

16          THE COURT:  Thank you so much.  Good

17  afternoon, Mr. Frost.  Can you hear me?  You're on

18  mute currently.  All right.  Now -- (cross talk) --

19  you can hear me fine?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  And you can see me fine?  My

22  name's Jeff Cavender, I'm the judge in this matter.

23  I'm going to ask that you raise your right hand, if

24  you would.

25  WHEREUPON,

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    259

1                      BRANT FROST, IV

2  called as a witness, and having been sworn by the

3  notary public, was examined and testified as follows:

4        THE COURT:  All right.  Mr. Frost, before I

5  turn you over for questioning, I have a couple of

6  questions to ask you.  Do you have any documents in

7  front of you, Mr. Frost?

8        THE WITNESS:  No, sir.

9        THE COURT:  Do you have access to any

10  documents in the room you're in?

11        THE WITNESS:  No, sir.

12        THE COURT:  Do you have access to email or

13  phone while you're in that room?

14        THE WITNESS:  Well, I'm on my phone.  I could

15  -- I suppose I could hang up -- yeah, hang up and look

16  on -- (inaudible) on my phone.

17  MR. BARTON:

18        THE COURT:  I'm just going to ask that you

19  not communicate with any other party during the middle

20  of this testimony, via email, via text, or any other

21  method.  All right?

22        THE WITNESS:  Agreed.

23        THE COURT:  All right.  Thank you so much.

24  Mr. Geer?

25        MR. GEER:  Thank you, Your Honor.

1                    DIRECT EXAMINATION

2 BY MR. GEER:

3     Q   Mr. Frost, my name is Will Geer.  I represent

4 CurePoint, LLC in this bankruptcy case.  First I'd

5 like to start off with could you state your name for

6 the record?

7     A   Brant Frost, IV.

8     Q   And what is your relationship with First

9 Liberty Building and Loan, or First Liberty Capital

10 Partners?

11     A   I'm the president of both entities.

12     Q   Okay.  Are you familiar with the proposed

13 sale of CurePoint, LLC's assets to 2406 Cancer Care,

14 LLC, which is owned by Dr. Randolph?

15     A   Yes, sir.

16     Q   Are you willing to provide financing for that

17 sale at $6 million?

18     A   Yes, sir.

19     Q   If -- and there is a deadline of November

20 30th.  Is that correct?

21     A   That's correct.

22     Q   If that were to be pushed to November 15th,

23 would you still be willing to --

24          MR. ROUNTREE:  December.

25          MR. GEER:  What?

1        MR. ROUNTREE:  December.

2  BY MR. GEER:

3     Q   Oh, I'm -- would -- if it were pushed to

4  December 15th, would you still be willing to fund this

5  transaction?

6     A   I'd be willing to consider it, but I couldn't

7  commit today to funding it.

8     Q   If it's November 30th are you 100 percent

9  confident that you can fund this sale?

10     A   Well, 99 percent.  I can't be 100 percent,

11  with the economy (inaudible) and other things.  But as

12  well as -- well, with the certainties I've had through

13  my career, which is 29 years, I'm highly confident we

14  can close by the 30th.

15        MR. GEER:  I think we're good, Your Honor.

16        THE COURT:  All right.  Cross-examination?

17            CROSS EXAMINATION

18  BY MR. LEVENGOOD:

19     Q   Mr. Frost, this is Mike Levengood.  I

20  represent Dr. McCord.  And please explain why December

21  the 15th as a closing date you cannot commit to loan

22  the funds to -- through that date.

23     A   It's too -- over too (inaudible) out of cash

24  (inaudible) make all this money come --

25        THE COURT:  Hold on.  Hold on, Dr. Frost.  I

1  mean, Mr. Frost.  We're having trouble hearing you.

2  I'm going to ask you to start your answer again.

3          THE WITNESS:  The reason is that all of our

4  money comes from private loan participants.  And I

5  can't keep the money locked up for over 60 days, not

6  earning money.

7          And so our loan process is we have loan

8  requests, we underwrite it, we approve it, and then we

9  go out to our loan participant network and ask who

10  would like to participate in it, and I get

11  commitments.  I can't keep that tied up more than

12  three to four weeks.  I certainly can't do it for 60

13  or 70 days, and it not earning money.

14  BY MR. LEVENGOOD:

15     Q   So have you gone to your investors to see if

16  they would be willing to contribute $6,100,000 to make

17  this loan?

18     A   No.

19     Q   So as we sit here today you don't know

20  whether or not they will commit to participate in a

21  loan?

22     A   That's --

23          THE COURT:  Was that -- was that answer

24  that's correct?

25          THE WITNESS:  That's correct.

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              263

1  BY MR. LEVENGOOD:

2      Q   Thank you.  That's the --

3      A   Now, that's not unusual.  I'm happy to

4  elaborate on that (inaudible).

5      Q   Sure.  Go ahead and elaborate.

6      A   So our process is to receive the loan

7  request, underwrite it, approve it internally.  Once

8  we do that, we tell the client that we have approved

9  it internally.  They tell us whether or not they want

10  to proceed.

11          At that point, we go out to our participation

12  network and we get commitments.  And once we have a

13  commitment, then we would go to (inaudible) loan

14  documentation process, and then close.  All in that

15  takes about three weeks.  It's a little more

16  complicated (inaudible) ask for six weeks.

17          In the last -- I can guarantee the loan will

18  close, (inaudible) approved.  However, in the last 10

19  years, of every loan that we've approved, we have

20  funded 100 percent of them.  So based on that track

21  record, I'm highly confident to approve a loan request

22  to 2406.

23      Q   Mr. Frost --

24      A   And fund it.

25      Q   -- where are you in the process of

PROCEEDINGS                                              October 12, 2022
CUREPOINT, LLC                                                        264

1  considering the loan request by 2406 -- I'm trying to

2  get the name --

3     A   We've --

4     Q   Where are you?

5     A   We've (inaudible) and we've approved it

6  internally.  We're just waiting for the go from our

7  client that they're ready to proceed.

8     Q   And who did you -- who did you receive that

9  application from?

10    A   Dr. Randolph.

11    Q   Okay.

12        MR. LEVENGOOD:  Those are all the questions I

13  have, Your Honor.

14        MR. HOLBEIN:  I'll have to move over.  Sorry.

15        MR. LEVENGOOD:  Yeah.

16        MR. HOLBEIN:  Let us slide in here.

17            CROSS EXAMINATION

18  BY MR. HOLBEIN:

19    Q   Mr. Frost, have you ever loaned into a sale

20  for a purchase of assets in bankruptcy?

21    A   No, sir.

22    Q   All right.

23        MR. HOLBEIN:  That's all the questions I

24  have, Your Honor.

25        THE COURT:  All right.  Any further questions

PROCEEDINGS                                                October 12, 2022
CUREPOINT, LLC                                                          265

1  from the Debtor?

2        MR. GEER:  No, Your Honor.

3        THE COURT:  All right.  Mr. Frost, I very

4  much appreciate you being here today.

5        THE WITNESS:  Thank you very much, Your

6  Honor.

7        THE COURT:  Thank you.  Any other witnesses

8  from the Debtor?

9        MR. GEER:  No, Your Honor.

10        THE COURT:  Any rebuttal witnesses?

11        MR. LEVENGOOD:  No, Your Honor.

12        THE COURT:  All right.  Are both parties

13  resting?

14        MR. LEVENGOOD:  This party is, Your Honor.

15        THE COURT:  All three parties, let's just

16  say.

17        MR. HOLBEIN:  Yeah, yeah.  Your Honor, AMOA

18  Finance Capital, I believe we've moved to admit all of

19  the exhibits that we have presented, Exhibits 1

20  through 4.  To the extent we haven't, I think we would

21  offer those, but I think they have been.  We, at this

22  point, will rest.

23        THE COURT:  All right.  Mr. Geer?

24        MR. GEER:  Debtor rests, Your Honor.

25        THE COURT:  All right.  And Ms. Chappell

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                                266

1 (ph), can you confirm whether all the exhibits that

2 have been discussed at various times in the case have

3 been admitted?  Out of an abundance of caution?

4 (cross talk)  For all the parties?

5          MS. CHAPPELL:  All right.

6          MR. BARTON:  Yes.  Knocking the rust off.

7          MS. CHAPPELL:  Starting with AMOA, Exhibits 1

8 through 4, admitted.  Starting with the Debtor,

9 Exhibit 2 was admitted.  We reviewed Exhibit 8.  Any

10 others you want to?

11          MR. GEER:  I apologize, Ms. Fisher, I didn't

12 quite --

13          MS. CHAPPELL:  Exhibit 2, the binding letter

14 of intent.  That was reviewed and --

15          MR. GEER:  Yes.

16          MS. CHAPPELL:  -- and admitted.

17          MR. GEER:  Yes.

18          MS. CHAPPELL:  Okay.  That's all I have.

19          MR. ROUNTREE:  Do we have the -- 8, the

20 (inaudible).

21          MS. CHAPPELL:  Eight was reviewed, but never

22 admitted.

23          MR. GEER:  That's fine.  Could we offer that

24 for admission?

25          THE COURT:  Any objection to the admission of

PROCEEDINGS                                      October 12, 2022
CUREPOINT, LLC                                                267

1  Debtor's 79-8?

2       MR. LEVENGOOD:  Allow us to review it,

3  please.

4       MR. HOLBEIN:  Just I'm going to pull it up.

5  Is this the final judgement?

6       MR. ROUNTREE:  Yes.

7       MR. HOLBEIN:  No.

8       THE COURT:  No objection?

9       MR. HOLBEIN:  No objection.

10      THE COURT:  Debtor's Exhibit 79-8 will be

11  admitted.

12      (Debtor's Exhibit 79-8 was admitted into

13  evidence.)

14      THE COURT:  What about 12?

15      MR. GEER:  I was going to ask.  Your Honor,

16  may we admit Exhibit 12, that was the -- that was the

17  revised APA.

18      THE COURT:  Is it just a revised APA?

19      MR. GEER:  Yeah.

20      THE COURT:  That you seeking to admit?

21      MR. GEER:  Yes, Your Honor.

22      THE COURT:  Debtor's Exhibit 12, which is the

23  revised asset purchase agreement.  Any objections?

24      MR. LEVENGOOD:  No objection, Your Honor.

25      MR. HOLBEIN:  No objection.

1          THE COURT:  All right.  Debtor's revised

2  Exhibit 12 will be admitted without objection.

3          (Debtor's Exhibit 12 was admitted into

4  evidence.)

5          THE COURT:  What about --

6          MS. CHAPPELL:  All right.  Now we're going to

7  Marc McCord.  Exhibits 1, 2, 3, and 4 admitted; 19,

8  admitted; 28 through 32 -- I'm sorry, 28 through -- I

9  was correct, 32 were admitted.

10         THE COURT:  I have 28 through 34.

11         MS. CHAPPELL:  33, 34 --

12         MR. BARTON:  I have that as well.

13         MS. CHAPPELL:  -- 34.  I apologize.  And 39.

14         THE COURT:  37?

15         MR. BARTON:  And 37?

16         MS. CHAPPELL:  37, okay.

17         THE COURT:  39 and 41.

18         MS. CHAPPELL:  Got it.

19         MR. BARTON:  That's what I mean.

20         THE COURT:  All right.

21         MS. CHAPPELL:  Okay.

22         THE COURT:  We're all in agreement?  All

23  right.  All right.  The evidence is closed.  I'll hear

24  closing arguments.  We'll start with Mr. Levengood.

25         MR. LEVENGOOD:  Thank you, Your Honor.  Dr.

1  McCord believes that the Court must appoint a trustee.

2  We have demonstrated cause by clear and convincing

3  evidence.

4          The uncontested testimony of Dr. McCord's

5  expert witness was that MEC Capital owes at least

6  $596,000 to the Debtor, that Mittere, Inc. owes at

7  $204,000 -- $208,405 to the Debtor, Northwinds Leasing

8  owes at least $1,346,140 to the Debtor, and Z.E.R.O.

9  Holding owes at least $598,137 to the Debtor.  And

10  none of those amounts are listed in the schedules

11  filed by the Debtor under penalty of perjury, and Mr.

12  Miles has had not one, but two chances to get it

13  right.

14          We've also identified the fact that he

15  essentially treated the funds generated from CurePoint

16  as a piggy bank to fund his other Miles entity -- or

17  Miles-related entities.  And his authority is on the

18  strength of oral discussions with the manager of the

19  largest member of the Debtor.  And so we don't believe

20  that it is -- we believe we've demonstrated that cause

21  exists for the appointment of a trustee.  We also,

22  alternatively, believe that it's in the best interest

23  of creditors.

24          And my suggestion, for the Court's

25  consideration, is to appoint a trustee now, to

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                            270

1  encourage Mr. Miles to cooperate with the trustee.

2  And to report to the trustee with regard to Mr. Miles'

3  efforts to continue to market the property.  We don't

4  want to lose the sale process, and I think that the

5  bones that have been filed by the Debtor in the

6  Debtor's emergency motion move us forward.

7          And I believe it would be helpful if we could

8  have 60 days.  And so, if a trustee were appointed and

9  could supervise the sale process, supervise Mr. Miles'

10  activity through the sale process, it would give us

11  more comfort that the process would be an open one.

12          And, hopefully, if Dr. Randolph is unable to

13  close we'll at least be in a position to move forward.

14  What that would mean is we'd have due diligence

15  through December the 12th, have an auction sale on the

16  13th or 14th, and a closing on the 15th.  I throw that

17  out as a potential solution, and it would resolve the

18  McCords' -- or Dr. McCords' objection for the sale

19  motion.  Thank you.

20          THE COURT:  Mr. Levengood, let me ask you

21  this.  I mean, of anybody of the potential bidders

22  knows about the Debtor, it's your client or AMOA.  Why

23  do they really need more time?  It seems to me they

24  have sufficient information, or will have sufficient

25  information if they're given access to the data room,

1  in order to complete a transaction before November

2  30th.

3          Now, I could understand other parties who

4  aren't new to this Debtor needing more time.  But why

5  is it your clients need more time?

6          MR. LEVENGOOD:  Your Honor, my clients are in

7  the -- well, not my client.

8          THE COURT:  Right.  One of your -- I mean,

9  your client, and I know Mr. Holbein --

10          MR. LEVENGOOD:  May I allow Mr. Holbein to

11  answer that question?

12          THE COURT:  Sure.

13          MR. LEVENGOOD:  Because he's representing the

14  parties who are assembling the potential purchase and

15  --

16          THE COURT:  Okay.

17          MR. LEVENGOOD:  My understanding is that my

18  client is not making an offer to purchase the assets.

19          THE COURT:  Okay, thank you.

20          MR. LEVENGOOD:  You're welcome, thank you.

21  Any other questions?

22          THE COURT:  No.

23          MR. LEVENGOOD:  Okay, thank you.

24          THE COURT:  Thank you.  Mr. Holbein?

25          MR. HOLBEIN:  Thank you, Your Honor.  Michael

PROCEEDINGS                                             October 12, 2022
CUREPOINT, LLC                                                      272

1  Holbein for AMOA Finance.  I won't bury the lead.  We

2  need -- or my client is assembling a joint venture

3  opportunity to purchase it.  My client has some

4  insight into generalities regarding the clinic.  Where

5  it is, what it does, and into the practice area in

6  general.  However, for a transaction of this size it

7  needs to have access to financials.  And that's the

8  sort of information that needs to be in the data room.

9        My client, I would note -- also note --

10  hasn't sat on its hands in this process.  It's been

11  me, on their behalf, been pretty diligent in seeking

12  this information.  It isn't a manpower issue.  You

13  know, we hear that.  This is a -- it isn't.  It's been

14  there.  We haven't been allowed in.

15        So the other thing is the Court references a

16  November 30.  Well, November 30 is the closing.  We

17  would have to have a bid in before then.  If we're

18  talking about -- and so if we're talking about

19  November 30 to have a bid in, maybe -- maybe my client

20  could get it done in that time, if it were granted

21  immediate access to the materials that it's asking

22  for.  But the big if there is that -- if the materials

23  that it needs are there.

24        I think that I'll go back to kind of my whole

25  argument here.  I think it's pretty apparent that Dr.

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                               273

1  Randolph doesn't -- it -- I don't know the first thing

2  about radio oncology.  Okay?  But he doesn't

3  understand exactly how this process has been playing

4  off, and he has a perception that is likely not

5  aligned with what would happen in reality.  And that

6  perception has caused him to take a position that

7  allows the Debtors to present this as a emergent

8  situation.  When, in fact, it isn't.

9          And so we're looking at a Debtor who is

10  pushing through a sale due to an emergency of its own

11  making.  I think Your Honor is correct.  The -- we are

12  among the key cohort that would purchase this, and yet

13  we've been undeniably boxed out in this process.  I

14  don't know that that was intentional.  I don't think

15  from the lawyers that that was intentional.  But it

16  happened, and there has to be a consequence.

17          When a asset is being sold in bankruptcy, we

18  have to have a process that assures us that we're

19  exposing.  And simply flashing a sale up this quickly

20  doesn't -- we just got the APA that would be part of

21  this -- the stalking horse of the bid procedures

22  today.

23          So I agree with Mr. Levengood that there is a

24  middle course here.  That there is a scenario, or a

25  solution that the Court could adopt that would allow

PROCEEDINGS                                                    October 12, 2022
CUREPOINT, LLC                                                        274

1 for, on the one hand, someone to monitor this process

2 through the sale.  A trustee.  And make sure that the

3 information that we needed was available, that it was

4 there.  And that we weren't still being excluded.

5        And also that, based on the testimony that we

6 have today, that if, in fact, Dr. Randolph's offer is

7 real today, that it will be real in 60 days.  So --

8 but all of that is sort of -- it comes sequentially

9 after the first thing that this Court has to consider.

10 And that's whether there should be a trustee in place.

11 I think -- I mean, there's no dispute.  There will be

12 one in place.

13        But when we look at the evidence that was

14 provided today -- not argument of counsel, but the

15 evidence that was provided -- we see an individual who

16 is the acting manager of the Debtor, who funneled

17 millions of dollars out of the Debtor to unrelated

18 businesses, for unrelated reasons.

19        We also see that same individual involved in

20 bank transactions that are mind numbingly fraudulent.

21 In terms of pledging as collateral document -- or

22 items of million dollar equipment that don't belong to

23 the borrower pledging the collateral.  And a sort of

24 acknowledgement that if times are tough, and you need

25 cash, that's what you have to do.

1        The fact that we didn't have to pull teeth to

2   get -- to show this Court that Mr. Miles' entity

3   pledged a linear accelerator that it didn't own, and

4   got millions of dollars for it, shows that that's the

5   sort of individual who is disqualified from operating

6   a Debtor in Possession.  Regardless of what's going on

7   in the case.  That person is disqualified.

8        And at the Debtor's own direction, that

9   person has been acting as the manager for the entirety

10  of this case.  There has to be a consequence to that.

11  And the consequence is that a trustee comes in.  But

12  that doesn't mean that we have to abandon the work

13  that's been done to this point.  That goes back to the

14  solutions that Mr. Levengood told us.

15       Now, we're also, at this point, regarding the

16  marketing of the property the only evidence submitted

17  has come from Mr. Miles.  And I would offer to the

18  Court that his credibility has been greatly tarnished

19  through the course of these proceedings.  So we are to

20  rely on him for the proposition that this has, in

21  fact, been robustly marketed.  I do not think the

22  facts allow us to make that reliance.

23       At the end of the day, we have a situation

24  where the Court mandates that a trustee is -- be

25  appointed.  But we also have a situation where this

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    276

1  thing that looks like it might be a good thing, we

2  don't want it to go away.  What Mr. Levengood has

3  proposed would allow us to preserve that thing, to the

4  extent that it's real, while conforming with the

5  requirements of the bankruptcy code that we not allow

6  people who can't be trusted to run the process.

7        It isn't okay to let the fox guard the hen

8  house until the hen house gets sold.  It's never okay

9  to let the fox guard the hen house.

10       MR. GEER:  Your Honor, we've heard a lot of

11  testimony today, we've heard a lot of evidence today.

12  I think there's been a lot of gross

13  mischaracterization of what can actually happen, and

14  what the evidence has shown.

15       The evidence has shown from Brant Frost that

16  we have until November 30th.  I point blank asked him,

17  would you extend it?  I asked him this before this.  I

18  pleaded with him to do that.  He won't do it.  This is

19  the thought we have, Your Honor.  To put the physician

20  in charge of patient care at CurePoint and in an

21  ownership position.  He has taken this position, he's

22  putting his career on the line to do it.  He wants to

23  do it, he's willing to do it, and Mr. Frost just

24  testified that he's 99 percent capable that it will

25  happen.

1          As far as solutions, Your Honor.  Well, we

2    can even put in the sale order that as soon as the

3    sale falls through and we've received confirmation

4    that it is not going to happen, a trustee is

5    appointed.  That's what's happened.  A trustee is

6    already going to be appointed, Your Honor.  It's

7    merely a timing issue.  There is no case law that I've

8    seen that determines that the Court has to do it right

9    now.

10          Because you have to look at this not in a

11    vacuum, Your Honor.  This is not a, oh, we have to

12    look at this first.  You have to actually look at the

13    totality of the circumstances.  Read the YC Atlanta

14    case, read the Intercat case.  I mean, they go into

15    all of these millions of dollars of transactions that

16    happened pre-petition.

17          In the Intercom case a trustee with limited

18    powers was appointed.  This is no criticism of that

19    judge.  I don't even think that we are allowed to do

20    that, but he did it 20 years --

21          THE COURT:  I have before.

22          MR. GEER:  Okay, never mind.  I stand

23    corrected.  I didn't even know you could do that.  But

24    the point being, Dr. Randolph did testify that he is

25    not willing to wait around to see what happens.  Now,

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                            278

1  the Court probably is more familiar than I am on how

2  fast the trustee could be appointed, what would

3  happen.

4         But we also all know that in a situation

5  where you have a trustee, we can't control what that

6  trustee does.  We can't order the trustee, I don't

7  believe, to do -- because their business judgement is

8  now substituted, Your Honor, for the Debtor's business

9  judgement.  We don't know what they're going to do.

10 But I think, ultimately, what's going to happen is we

11 lose the sale.

12        That is what we are concerned as, as the

13 attorneys for this Debtor, Your Honor.  That we're

14 going to lose this bird in the hand for $6 million.

15 And the evidence has shown that is one of the best

16 offers the Debtor's ever had, to market and sale this

17 entity.  And certainly to an ideal individual to do

18 it, Your Honor.

19        As far as the APA, getting it just now, I

20 already went through.  There's two minor revisions,

21 Your Honor.  I don't think that there's been really

22 any objection, I believe, Mr. Levengood and I can work

23 through, or have already worked through regarding the

24 bidding procedure.  There is certainly a fair enough

25 breakup fee, extremely beneficial to the Debtor.  It's

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                  279

1  a $100,000 deposit that's non-refundable.

2       You know, we're -- we represent the Debtor,

3  we don't represent Mr. Randolph.  At the end of the

4  day, that's a -- that is a boon for the Debtor.  And

5  again, if this falls through for any reason a trustee

6  is automatically appointed anyway.

7       And so I just don't see the danger, given the

8  Debtor has gained another almost $300,000 cash.

9  There's been allegations of post-petition money moving

10 out of any account, or any theft, or anything like

11 that post-petition.

12      As the Court has noted to Dr. Randolph, there

13 is a sordid history between these entities.  Including

14 shutting down centers -- there's a lot here.  But

15 ultimately we have to look at where we are today, and

16 today we have an offer that it -- frankly, it's just a

17 mischaracterization.  We did not put ourselves here,

18 we don't control Brant Frost, who is also a

19 representative of a creditor of a $2.5 million claim

20 in this case.  We cannot help the financing situation

21 of the best buyer that we have.  And we have a concern

22 that this is a subterfuge, Your Honor, to try to

23 repress the value of the Debtor.  It has been seen in

24 the past.  To try to pick it up for less money than $6

25 million by McCord entities.  Thank you, Your Honor.

PROCEEDINGS                                           October 12, 2022
CUREPOINT, LLC                                                    280

1        THE COURT:  Thank you.  Ms. Kolba, do you

2   wish to be heard on any issue?

3        MS. KOLBA:  Your Honor, Lindsay Kolba on

4   behalf of the United States Trustee.  I would simply

5   like to remind everyone, because of just comments that

6   have been made today, that it is the United States

7   Trustee's position that once a trustee is appointed

8   the trustee takes over the operation of the business,

9   and will have to, you know, decide whether this is the

10  sale they want to go forward with or not, in their own

11  business judgement.

12        And it's not in the United States Trustee's

13  position within the power of the Court to direct a

14  Chapter 11 trustee to proceed with anything that may

15  have been proposed up to this point.  It's also the

16  United States Trustee's position that it really is not

17  a concept that a trustee can be appointed with limited

18  powers.  It's sort of a binary situation.  It's either

19  --

20        THE COURT:  Your office has agreed to that in

21  past cases of mine, Ms. Kolba.

22        MS. KOLBA:  Yeah, I understand, but it's

23  generally the position that a trustee is -- it's

24  either a trustee or a Debtor in Possession.  And

25  there's not in-between.  The -- I suppose the in-

PROCEEDINGS                                          October 12, 2022
CUREPOINT, LLC                                                    281

1  between would be the appointment of an examiner, and

2  the examiner powers, obviously, can be delineated by

3  the Court and, you know, with input from the parties.

4          So that was the genesis of the United States

5  Trustee's concern with the appointment of a trustee

6  with the sale process proceeding.  But beyond that,

7  you know, from the United States Trustee's

8  perspective, our motion has been resolved with the

9  consent of the Debtor to the appointment of a trustee

10  at the conclusion of the sale process.  But I just

11  wanted the Court to -- and the parties to have that

12  information as to the United States Trustee's position

13  on the appointment of a trustee.

14          With the timing, I have not checked with the

15  United States Trustee with respect to her availability

16  this week to do interviews of trustee candidates.

17  Certainly when the Court directs the United States

18  Trustee to appoint a trustee, we move with all speed

19  possible to consult with the parties, identify

20  appropriate candidates, conduct interviews, and make

21  an appointment as expeditiously as we possibly can.

22          Being that it is late Wednesday, I can't make

23  any promises that we could get the appointment process

24  complete this week.  But certainly it is something

25  that we can generally complete within one week's time.

1        THE COURT:  All right.  Thank you.  Mr.

2  Walker, do you have anything to add?

3        MR. WALKER:  I do not, Your Honor.

4        THE COURT:  All right.  Thank you.  Mr. Dobb?

5  0020

6        MR. DOBB:  I do not, Your Honor.

7        THE COURT:  Thank you.  Mr. Jones?  Is he

8  still there?

9        THE BAILIFF:  (Inaudible).

10        THE COURT:  Yep.

11        MR. JONES:  Your Honor, I have nothing to

12  add.

13        THE COURT:  All right.

14        MR. JONES:  This is for (inaudible).  Thank

15  you.

16        THE COURT:  Anyone else on Zoom have anything

17  to add?  Anything else from any other party?

18        MR. HOLBEIN:  I have one comment, Your Honor.

19  And I did not want to object during a closing

20  argument.  But at the tail end of the Debtor's closing

21  argument there was a representation made regarding

22  efforts to depress value of the Debtor.  We've had an

23  entire day to present evidence, and not a single

24  person or document supports that claim.  It has no

25  business in a closing argument.

PROCEEDINGS                                    October 12, 2022
CUREPOINT, LLC                                              283

1        MR. ROUNTREE:  The testimony of Dr. Randolph

2   certainly did.  He told a story of how they said sell

3   it for $2 million or we'll shut it down.  The Debtor

4   refused to sell it for $2 million, and they shut it

5   down for six weeks.  So that -- absolutely that's

6   supported by the evidence, Your Honor.

7        MR. HOLBEIN:  I don't -- it -- that is not

8   what that story supports.  That's -- my objection is

9   lodged.

10       THE COURT:  All right.  All right.  The

11  Court's going to take this under advisement.  My goal

12  would be to rule sometime later tomorrow.  And my

13  suggestion would we -- be we do it via Zoom.  Unless

14  everybody wants to come down here at some appointed

15  hour to hear what I have to say.  Anybody object to

16  having a ruling via Zoom tomorrow afternoon?

17       MR. GEER:  No, Your Honor.

18       MR. LEVENGOOD:  No objection, Your Honor.

19       THE COURT:  All right.

20       MR. HOLBEIN:  None.

21       THE COURT:  That's my goal.  If it rolls into

22  Friday, it may roll into Friday.  But my plan is to

23  get a ruling out as quickly as possible.  And so it'll

24  be either tomorrow afternoon, or sometime early

25  Friday.  And I'll have Ms. Chappell reach out to

PROCEEDINGS                                                          October 12, 2022
CUREPOINT, LLC                                                                    284

1  everybody as to when it's going to be.  All right?

2  Thank you all very much.

3          MR. ROUNTREE:  Thank you, Your Honor.

4          MR. HOLBEIN:  Thank you, Your Honor.

5          THE BAILIFF:  All rise.

6          (Whereupon, the proceeding was concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                                October 12, 2022
CUREPOINT, LLC                                                          285

1          C E R T I F I C A T I O N

2

3    Esquire Deposition Solutions, does hereby certify

4    that through an independent contractor we have

5    transcribed the audio, and that the foregoing is a

6    true and complete transcription of the audio

7    transcribed.

8    Inaudible or indiscernible passages of sound are

9    denoted.

10

11   IN WITNESS WHEREOF, I do hereunto set my hand on this

12   8th day of November, 2022.

13

14

15          /S/

16   For Esquire Deposition Solutions

17

18

19

20

21

22

23

24

25