# EXHIBIT C

                                                    Page 1

1              UNITED STATES BANKRUPTCY COURT
                NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION
3    IN RE:                    CHAPTER 11
4    CUREPOINT, LLC,           CASE NO. 22-56501-JWC
5          Debtor.
     -------------------------
6    MARK W. MCCORD, M.D.,
7          Movant,
8       vs.
9    CUREPOINT, LLC,
10         Respondent.
     -------------------------
11
12            DEPOSITION OF PHILLIP E. MILES
13
                   October 10, 2022
14
                     10:04 a.m.
15
16
                  Coles Barton, LLC
17
                150 South Perry Street
18
                     Suite 100
19
                Lawrenceville, Georgia
20
21
22
23   REPORTED BY:
24   LAURA R. SINGLE, CCR-B-1343
25

Page 2

```
1                A P P E A R A N C E S

2

3   For the Movant:

4           THOMAS M. BARTON, ESQ.
            Coles Barton, LLP
5           150 South Perry Street
            Suite 100
6           Lawrenceville, Georgia  30046
              (770) 995-5570
7             tbarton@colesbarton.com

8

9           J. MICHAEL LEVENGOOD, Esq.
            Law Office of Michael Levengood, LLC
10          150 South Perry Street
            Suite 208
11          Lawrenceville, Georgia  30046
              (678) 765-1745
12            mlevengood@levengoodlaw.com

13

14

15

16  For the Respondent:

17          WILL GEER, Esq.
            Rountree Leitman & Klein LLC
18          2987 Clairmont Road
            Suite, 350 Century Plaza I
19          Atlanta, Georgia  30329
              (404) 584-1238
20            wgeer@rlkglaw.com

21

22

23

24

25
```

Philip E. Miles (McCord)                                    October 10, 2022
Curepoint, LLC

Page 3

```
 1                A P P E A R A N C E S

 2

 3    For AMOA Finance, LLC:

 4            MICHAEL F. HOLBEIN, ESQ.
              Smith Gambrell Russell, LLP
 5            1105 West Peachtree Street, N.E.
              Suite 1000
 6            Atlanta, Georgia  30309
               (404) 815-3500
 7             mholbein@sgrlaw.com

 8

 9

10

11

12

13

14

15               *          *          *

16

17

18

19

20

21

22

23

24

25
```

Phillip E. Miles (Mr.Lord)                              October 10, 2022
Curepoint, LLC

                                                                Page 4

1                          I N D E X

2

3   EXAMINATION OF PHILLIP E. MILES                    PAGE

4   BY MR. BARTON.................................   6

5

6                       *        *        *

7

8   NUMBER                DESCRIPTION                  PAGE

9   For the Movant:

10  Exhibit 1       Motion for Order Authorizing        23
                    Bankruptcy Rule 2004
11                  Examination of CurePoint,
                    LLC

12

13  Exhibit 2       Summary of Assets and              32
                    Liabilities for
14                  Non-Individuals

15  Exhibit 3       CurePoint Due To (From)            39

16  Exhibit 4       Merchant Agreement                 54

17  Exhibit 5       Merchant Cash Advance              58
                    Agreement

18

19  Exhibit 6       Click Capital Group, LLC,          63
                    Standard Merchant Cash
20                  Advance Agreement

21  Exhibit 7       PointOne Capital, LLC,             66
                    Standard Merchant Cash
22                  Advance Agreement

23  Exhibit 8       U.S. Small Business                69
                    Administration Unconditional
24                  Guarantee

25

Philip F. Miles (McCord)                    October 10, 2022
Curepoint, LLC

1                        I N D E X
2
3    NUMBER                DESCRIPTION              PAGE
4    For the Movant:
5    Exhibit 9       Limited Liability Company         73
                     Resolution to Grant
6                    Collateral/Guarantee/
                     Subordinate Debt
7
     Exhibit 10      Newtek Closing Affidavit          76
8
     Exhibit 11      Letter to Matthew Kornfield       77
9                    from Constantine N.
                     Kokinakis, 3/18/22
10
     Exhibit 12      Notice of Hearing on Motion       81
11
     Exhibit 13      Itemized Statement                85
12
     Exhibit 14      Financial Industry                86
13                   Regulatory Authority Letter
                     of Acceptance, Waiver and
14                   Consent No. 20090167424
15
     Exhibit 15      FINRA Broker Check                86
16
     Exhibit 16      Synovus Bank Statements for       88
17                   CurePoint, LLC, for account
                     ending 9546
18
     Exhibit 17      Synovus Bank Statements for       88
19                   account ending 7944
20
21
22
23
24
25

Page 6

```
 1              P R O C E E D I N G S
 2          (Pursuant to Article 10(B) of the Rules and
 3       Regulations of the Georgia Board of Court
 4       Reporting, a written disclosure statement was
 5       submitted by the court reporter to all counsel
 6       present at the proceeding.)
 7                  *      *      *
 8                  PHILLIP E. MILES,
 9   Having been first duly sworn to state the truth, was
10   examined and testified as follows:
11                  EXAMINATION
12   BY MR. BARTON:
13       Q.   Mr. Miles, will you state your full name for
14   our record, please.
15       A.   Phillip with two Ls, P-H-I-L-L-I-P, Edward
16   Miles, M-I-L-E-S.
17       Q.   You and I have been through this drill a few
18   times.  Just a couple of reminders for the benefit of
19   the court reporter.  One is if you'll answer audibly
20   with a yes or no rather than uh-huh, uh-huh, shake,
21   nod of the head and those sorts of things.  That will
22   help us put down a clear record.
23          Similarly, if you will, wait until I've
24   completely finished my question before you begin an
25   answer so that the court reporter is not trying to
```

Page 7

1  take down two people talking at one time.  It's not

2  my intention to cut you off at any time during the

3  course of the day.  So if I do that inadvertently,

4  just let me know and I'll be happy to let you -- let

5  you finish.

6          MR. BARTON:  I think we agreed before the

7      deposition began that we'll reserve all

8      objections except those going to the form of the

9      question or the responsiveness of the answer

10     until time of first use of the transcript.

11         MR. GEER:  This is Will Geer.  That is

12     correct.

13  BY MR. BARTON:

14     Q.   Mr. Miles, is your home address still 300

15  Hayward Lane in Alpharetta?

16     A.   Yes.

17     Q.   And your wife is Lori?

18     A.   L-O-R-I, correct.

19     Q.   And she lives with you at that address?

20     A.   Correct.

21     Q.   And does your son Michael still reside at

22  that address?

23     A.   He does not.

24     Q.   What's his current address?

25     A.   I do not know that.  It is in Alpharetta.  I

Philip F. Miles (Mr.Cord)                                    October 10, 2022
Curepoint, LLC

Page 8

1    don't know the physical address.

2         Q.    Okay.  For how long has he not resided at

3    300 Hayward Lane?

4         A.    I'm guessing ten months, a year, nine

5    months.  I'm really guessing.

6         Q.    Okay.  He has lived at that address in the

7    past, correct?

8         A.    He was not born there.  He lived there from

9    1998; and then he moved out of an apartment in

10   Buckhead for a period of time, which I think you're

11   referring to, Mr. Barton.

12        Q.    The reason I asked this is because the last

13   time we had a session like this he was residing at

14   your address, although you did say it was temporary

15   and he was going to go somewhere else.

16        A.    That is correct.

17        Q.    Okay.  Your brother is Mark Miles?

18        A.    That is correct.

19        Q.    He's a physician?

20        A.    That is correct.

21        Q.    What is his specialty?

22        A.    He's a hospitalist, primary care internal

23   medicine.

24        Q.    Not an oncologist?

25        A.    Not an oncologist.

Page 9

1        Q.    And he resides in Oklahoma?

2        A.    That is correct.

3        Q.    He has no ownership interest in the Debtor,

4    CurePoint, does he?

5        A.    He does not.

6        Q.    And he's not an officer or manager of

7    CurePoint, is he?

8        A.    He is not an officer or manager of

9    CurePoint.  He's not.

10       Q.    He's not an officer or manager of Physicians

11   Financial Partner, which if it's okay with you we'll

12   shorten it to PFP.

13       A.    Correct.  He's not an officer, director, or

14   member.

15       Q.    Has he lent any money to CurePoint or PFP?

16       A.    No.

17       Q.    The 1175 Cicero Drive address, that is

18   CurePoint's principal business address?  Obviously,

19   not the clinic but the business address.  Does

20   CurePoint rent that space?

21       A.    It does.  Can I correct it's 11175 Cicero

22   Drive?

23       Q.    I left out a one.

24       A.    C-I-C-E-R-O Drive, Suite 100.  To fully

25   answer the question, it is executive suites.  It's

Phillip F. Miles (McCord)                    October 10, 2022
Curepoint, LLC

Page 10

1   shared offices.  So it's a tenant in Suite 100.

2       Q.   Does it have a written lease agreement with

3   the landlord?

4       A.   It does.

5       Q.   Okay.

6       A.   Not -- Mr. Barton, CurePoint does not.  It

7   is with one of my entities.

8       Q.   That was sort of my question.  My memory is

9   from the prior deposition is the actual tenant is

10  Mittere, Inc.?

11      A.   That is my memory as well, Mr. Barton.

12      Q.   Mittere, am I pronouncing that correctly or

13  no?

14      A.   It doesn't matter.  It's M-I-T-T-E-R-E, Inc.

15      Q.   Is there a written sublease with CurePoint

16  or any of your other entities?

17      A.   Not that I'm aware.

18      Q.   And then lastly we'll see on some of the

19  bank statements a -- I believe it's 3180 -- if can I

20  read my own writing -- Mathieson Drive, Unit 712

21  address?

22      A.   That is correct.

23      Q.   And is that Ms. Dadabhoy's home address?

24      A.   That is correct.  Mathieson is

25  M-A-T-H-I-E-S-O-N.

Phillip E. Miles (McCord)                          October 10, 2022
Curepoint, LLC

Page 11

1        Q.    Are you employed by CurePoint?

2        A.    I am not.

3        Q.    Where are you employed?

4        A.    Eclipse, E-C-L-I-P-S-E, Staffing.

5        Q.    And Eclipse Staffing issues your W-2?

6        A.    Mr. Barton, I think you always ask me this,

7    and I'm always guilty of not looking.  It comes

8    through as Halo.  There is a PEO called HR

9    Strategies; and I do not know sitting here today the

10   name on the W-2, the sender of the W-2.

11       Q.    Okay.  Are all of CurePoint's employees paid

12   through this HR Strategies?

13       A.    That is correct.

14       Q.    But do the funds flow through from

15   CurePoint; in other words, it's a CurePoint

16   obligation to pay those employees?

17       A.    That is correct, Mr. Barton.

18       Q.    And as it relates to your salary, is a

19   hundred percent of it attributable to CurePoint?

20       A.    No.

21       Q.    And how is your salary divided up?

22       A.    To the best my knowledge, it's paid by Zero

23   Holding.

24       Q.    But none by CurePoint?

25       A.    Not that I recall.

Phillip E. Miles (McCord)                                October 10, 2022
Curepoint, LLC

Page 12

1        Q.    Just so we can put on the record in this

2   proceeding sort of who the debtor is and who owns it,

3   et cetera.  Tell me if I have this correct.

4   CurePoint is owned by Physicians Financial Partners,

5   PFP, and RBS currently, correct?

6        A.    That is correct.

7        Q.    RBS holding a 4.99 percent share of the

8   entity?

9        A.    That is correct.

10       Q.    And the manager of CurePoint is PFP?

11       A.    That is correct.

12       Q.    And the manager of PFP is Ms. Dadabhoy?

13       A.    That's correct.  Dadabhoy, D-A-D-A-B-H-O-Y.

14       Q.    And you were not an owner of CurePoint,

15   correct?

16       A.    That is correct, not directly.

17       Q.    Right.  And we'll come back to that flow in

18   a second here.

19       A.    Okay.

20       Q.    And you're not an officer of CurePoint?

21             MR. GEER:  Did you ask a question?  I don't

22       think he heard you.

23             THE WITNESS:  Oh, I did.  I thought it was a

24       statement.

25             No.  I from time to time get designated as a

Phillip Myles (McCord)                          October 10, 2022
Curepoint, LLC

Page 13

1          manager of certain affairs of CurePoint; but, no,

2          I am not individually an officer stated in the

3          operating agreement.

4     BY MR. BARTON:

5          Q.    All right.  And when you say you're

6     designated as a manager from time to time, are those

7     destinations made by Ms. Dadabhoy?

8          A.    That is correct.

9          Q.    Because she's the manager of PFP which

10    manages CurePoint?

11         A.    That is correct.

12         Q.    And are those destinations made in writing?

13         A.    Not that I recall.  I don't recall for

14    purposes of this bankruptcy proceeding whether that

15    was in writing or not.  So, no, not that I recall.

16         Q.    So as it relates to the bankruptcy

17    proceeding, tell me how you came to understand that

18    you were designated to represent CurePoint in the

19    proceeding.

20         A.    Through lengthy -- very lengthy

21    conversations with Ms. Dadabhoy.

22         Q.    In which she designated you to represent the

23    company in the proceedings?

24         A.    That is correct.

25         Q.    But that destination was oral and not in

Phillip Miles (McCord)                              October 10, 2022
Curepoint, LLC

Page 14

```
 1   writing?
 2        A.   To the best of my recollection, it was
 3   verbal.
 4        Q.   Am I correct that Mittere Tax & Advisory
 5   does the bookkeeping and tax work for CurePoint?
 6        A.   That is correct.
 7        Q.   We'll come back to Mittere in just a second.
 8             Let's talk about PFP.  The owners of PFP are
 9   MEC Capital, Dr. Mark McCord, and either Daniel
10   Dooley or his holding company, Dooley Investment
11   Holdings, correct?
12        A.   That is correct.
13        Q.   Ms. Dadabhoy does not own an interest in the
14   entity?
15        A.   That is correct.
16        Q.   And you don't own an interest directly in
17   PFP, correct?
18        A.   No.  It is through MEC Capital, Inc., as you
19   stated.
20        Q.   And you're not an officer or manager of PFP?
21        A.   No.
22        Q.   And have not ever been?
23        A.   That is correct.
24        Q.   All right.  As it relates to MEC, do you
25   still own 100 percent of that entity?
```

Page 15

1    A.    That is correct.

2    Q.    And have since its inception?

3    A.    That is correct.

4    Q.    And if I recall correctly, Ms. Dadabhoy is

5    the president, secretary, and COO of MEC?

6    A.    That sounds correct.

7    Q.    Are you employed by MEC either directly or

8    indirectly through the HR Strategies entity?

9    A.    No, Phillip Miles is not employed by MEC

10   Capital.

11   Q.    Does MEC have any employees?

12   A.    It does not.

13   Q.    If I recall correctly, to the extent that

14   MEC performs any services, that work is done by you

15   and Ms. Dadabhoy?

16   A.    Historically, I believe there's been others

17   that have performed services for MEC on behalf of

18   others.  As it relates to CurePoint and PFP, I would

19   have to think through that question, Mr. Barton, if

20   it's only been Ms. Dadabhoy and myself.

21   Q.    Okay.  But I take it MEC has never had any

22   W-2 employees?

23   A.    To the best of my recollection, MEC has

24   never had a W-2 employee.

25   Q.    And Dr. Mark McCord has never owned or

Case 22-56501-pmb    Doc 336-3    Filed 10/11/23    Entered 10/11/23 13:20:48    Desc
Exhibit Exhibit Page 17 of C21
Phillip Miles (McCord)
Curepoint, LLC
October 10, 2022

Page 16

1    managed any aspect of MEC?

2          A.    That is correct.

3          Q.    Let's talk briefly about Zero Holding, LLC.

4    Am I correct that you own an interest in Zero Holding

5    through MEC?

6          A.    That is correct.

7          Q.    And what is the percentage ownership of MEC

8    and Zero Holding?

9          A.    It changes.  It has changed a number of

10   times.  I don't know the exact percentage today.

11         Q.    Is it more than 50 percent?

12         A.    No, it is not.

13         Q.    Does Daniel Dooley have an interest in Zero

14   Holding either directly or through his company?

15         A.    Either directly or through his entity, that

16   is correct.

17         Q.    And do you know the approximate percentage

18   that Mr. Dooley owns?

19         A.    I would be guessing as I sit here today,

20   Mr. Barton.

21         Q.    Okay.  Does your brother Mark Miles have an

22   interest in Zero Holding?

23         A.    He does.

24         Q.    And what about other shareholders in that

25   entity either directly or through a holding company?

Phillip P Miles (McCord)                          October 10, 2022
Curepoint, LLC

Page 17

```
 1        A.    There are other shareholders directly or

 2   indirectly through one of their entities.

 3        Q.    Is Ron Josephson one of those people?

 4        A.    That is correct.

 5        Q.    Alex Brown?

 6        A.    That is correct.

 7        Q.    Chris Shore?

 8        A.    That is correct.

 9        Q.    And Dr. Mark McCord has never owned any

10   interest in Zero Holding?

11        A.    That is correct.

12        Q.    He's never managed Zero Holding?

13        A.    That is correct.

14        Q.    And the business of Zero Holding is -- it

15   holds a Zerorez or several Zerorez franchise

16   territories?

17        A.    Master franchise territories, that is

18   correct.

19        Q.    And none of those territories are in

20   Georgia, correct?

21        A.    That is correct.

22        Q.    And Zero Holding has never performed by

23   services for CurePoint, correct?

24        A.    Actually, it did.

25        Q.    To clean the carpets?
```

Phillip Miles (McCord)                          October 10, 2022
Curepoint, LLC

Page 18

1      A.    No.  It sanitized the building during COVID.

2      Q.    How many times?

3      A.    To the best of my recollection, one or two.

4      Q.    Did it charge for those services?

5      A.    Not that I recall.

6      Q.    Generate an invoice of any kind?

7      A.    Not that I recall.

8      Q.    Who manages Zero Holding?

9      A.    I do through MEC Capital.

10     Q.    So is MEC the manager of the entity?

11     A.    To the best of my recollection, it is.

12     Q.    And does Mittere Tax & Advisory do the

13   bookkeeping and tax work for Zero Holding?

14     A.    It does.

15     Q.    Let's talk about Northwinds Leasing, LLC.

16   Who are the owners of Northwinds Leasing?

17     A.    As I sit here today, Mark Miles and I think

18   MEC Capital.  I would have to -- I don't recall a

19   hundred percent if it's Miles individually or through

20   MEC Capital.

21     Q.    One or the other, though?

22     A.    That is correct.

23     Q.    My understanding is at one time Northwinds

24   did sale leasebacks of construction equipment.

25     A.    As I sit here today, I don't remember any

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Page 20 of 121
Phillip Paul Miles (McCord)                    October 10, 2022
Curepoint, LLC

Page 19

1    construction equipment that Northwinds did sale

2    leasebacks.  I'm pretty sure its formation was for

3    medical equipment.

4         Q.   Did it lease any medical equipment to

5    CurePoint?

6         A.   It did.

7         Q.   And are any of those leases active

8    currently?

9         A.   Not that I -- sitting here today, I do not

10   think so.

11        Q.   When is the last time there's been an active

12   lease between Northwinds and CurePoint?

13        A.   It's been about a bit.  I don't recall.

14        Q.   A bit meaning more than three years?

15        A.   I don't recall if it's two years, three

16   years, or four years, Mr. Barton.

17        Q.   What was the equipment that Northwinds

18   leased?

19        A.   Sitting here, I recall an HDR machine,

20   Harry-Douglas-Robert machine.  Its formation was for

21   two linear accelerators back in 2010.

22             My apologies.  I'm going back to your

23   question on construction.  I don't think it's ever

24   done construction.

25        Q.   Okay.  Dr. Mark McCord has never had any

Phillip Miles (McCord)                              October 10, 2022
Curepoint, LLC

Page 20

1    ownership interest in Northwinds, correct?

2         A.   That is correct.  The only other owner of

3    Northwinds was Clay Thomas.

4         Q.   Mittere Tax & Advisory does bookkeeping and

5    tax work for Northwinds?

6         A.   That is correct.

7         Q.   You mentioned Eclipse Staffing earlier.

8    What is that business?  What does it do?

9         A.   It is a transitory pass-through payroll

10   entity.  I don't know the legal term for it, but

11   payroll generated and owed flows through Eclipse

12   Staffing.  Eclipse Staffing has a contract with HR

13   Strategies to provide PEO type services.

14        Q.   But it doesn't issue the W-2 to the

15   employees, correct?

16        A.   It does not.  HR Strategies does.

17        Q.   And does Eclipse Staffing have any contracts

18   with CurePoint?

19        A.   Not that I recall.

20        Q.   And who owns Eclipse Staffing?

21        A.   As I sit here today, I believe I do.

22        Q.   And who manages it?

23        A.   I do.

24        Q.   And Dr. Mark McCord has never had any

25   ownership interest in that entity, correct?

Phillip Eric Mittere (McCord)                    October 10, 2022
Curepoint, LLC

Page 21

1       A.   Not that I recall, correct.

2       Q.   All right.  Then we have Eclipse Advisors.

3   My notes don't say what the full name of that entity

4   is or was.  Do you recall?

5       A.   You were close.  Eclipse, E-C-L-I-P-S-E,

6   Advisors, LLC.

7       Q.   And that entity previously provided

8   bookkeeping and tax work and other services, correct?

9       A.   It was the predecessor to Mittere Tax &

10  Advisory.

11      Q.   It was owned or maybe it is still owned by

12  yourself and/or MEC?

13      A.   And MEC.

14      Q.   But today it doesn't have any active

15  business operations?

16      A.   Not that I'm aware of.

17      Q.   And has not since early 2018?

18      A.   That sounds correct.

19      Q.   All right.  Then we talked about Mittere Tax

20  & Advisory which provides the bookkeeping and tax

21  services for your entities, correct?

22      A.   That is correct.

23      Q.   And it is 100 percent owned by Mittere,

24  Inc.?

25      A.   As I sit here today, I believe that to be

Phillip Najjar (McCord)                          October 10, 2022
Curepoint, LLC

Page 22

1   true.

2        Q.   And managed by Mittere, Inc.?

3        A.   I believe that to be true.

4        Q.   And Dr. Mark McCord has never had any

5   ownership in that entity; is that correct?

6        A.   That is correct.

7        Q.   And the Mittere, Inc., entity is owned by

8   you and Ms. Dadabhoy, correct?

9        A.   That is correct.

10        Q.   And if I recall correctly, it doesn't have a

11   board.  It's just managed by the shareholders,

12   yourself and Ms. Dadabhoy --

13        A.   The --

14        Q.   -- or members?

15        A.   Like I said, I -- the members.  I'm not even

16   recalling if it's an LLC or Inc.

17        Q.   I have it down as Mittere, Inc.; but I might

18   have jotted it down incorrectly.  In any event,

19   whatever that entity is structured as, the owners

20   manage the entity?

21        A.   That is correct.

22        Q.   And Dr. Mark McCord has never had an

23   ownership in that entity?

24        A.   That is correct.

25        Q.   All right.

Page 23

1          (Exhibit 1 was marked for

2      identification, attached at the end of

3      the original transcript.)

4  BY MR. BARTON:

5      Q.    I just want to ask you --

6      A.    My apologies.  May I grab my glasses?

7      Q.    Oh, sure.

8      A.    I should have had them already.  My

9  apologies.

10         Thank you.

11     Q.    Exhibit Number 1 is the motion for the

12  deposition that was later granted by order of the

13  Court.  I want to ask you about some of the documents

14  we requested that begin on page 5.

15     A.    I'm there.

16     Q.    So skipping down to number three at the very

17  bottom of the page, all documents including due

18  to/due from lenders maintained by CurePoint to show

19  intercompany transfers going back to 2015 including

20  any prior versions.

21         Now, we did have a version of a due to/due

22  from that was attached to the amended schedules,

23  correct?

24     A.    That is correct.

25     Q.    And we'll look at that in a minute.  In

Phillip Paul Myers (McCord)                                October 10, 2022
Curepoint, LLC

Page 24

1    addition, there was another version included in the

2    production that we'll also look at that looks like it

3    runs from 2019 forward; but there are other versions

4    of the due to/due froms that cover periods prior to

5    2019, correct?

6         A.   There are due to/due from -- I'm not going

7    to say there are froms.  There is a due to/due from

8    that predates January 1st, 2019.

9         Q.   Okay.  And that hasn't been produced?

10        A.   I do not believe it has.

11        Q.   Okay.  The version of the due to/due from

12   that was attached to the amended schedules, just from

13   a high level is that the same Excel spreadsheet that

14   in native form has been edited, worked on over the

15   course of the years in connection with the various

16   pieces of litigation that CurePoint has been involved

17   in?

18        A.   Correct.

19        Q.   And so the version that was attached to the

20   amended schedules left out the prior periods even

21   though those periods exist.  They've been analyzed,

22   correct?

23        A.   That is correct.

24        Q.   And I can't ask you why, but I just want to

25   confirm for the record that they exist.  They just

Phillip Miles (McCord)                          October 10, 2022
Curepoint, LLC

Page 25

1    weren't attached to the schedules.

2         A.    Correct.

3         Q.    And they weren't produced in response to our

4    document request?

5         A.    Not that I'm aware of, no.

6         Q.    And as understand it from our prior

7    depositions, that due to/due from is managed, if you

8    will, or worked on primarily by your son Michael?

9         A.    Mittere Tax & Advisory by Michael Miles

10   reviewed by Phillip Miles, correct.

11        Q.    And it is maintained in a Dropbox owned by

12   Mittere?

13        A.    Mr. Barton, to answer the question easily,

14   it is in a Dropbox.  I do not know the owner of that

15   Dropbox.  It is one of my entities.  I don't want to

16   misstate that it's Mittere that owns it.

17        Q.    That's fine.

18              But you have access to the Dropbox?

19        A.    Yes, sir.

20        Q.    And in terms of the work that was done for

21   the version that was attached to the amended

22   schedules, that work was done by Michael Miles?

23        A.    Performed by Michael Miles and reviewed by

24   Phillip Miles.

25        Q.    When you say reviewed, did you check each

Phillip Paige (McCord)                    October 10, 2022
Curepoint, LLC

Page 26

1   entry to link it to an entry on a bank statement or

2   did you spot check it or what was your process?

3           A.    Latter.  I spot checked it and made sure it

4   was in keeping with what's been produced in other

5   cases before.

6           Q.    All right.  It also requests in number

7   four -- back to Exhibit Number 1 -- communications

8   between CurePoint and any person or entity interested

9   in a potential sale of property as defined.

10              Have there been any such communications that

11  are in written form?

12          A.    There has.

13          Q.    And other than Dr. Randolph's entity, have

14  there been any such discussions?

15          A.    Yes.

16          Q.    But those have not been produced?

17          A.    I have produced them, I recall; but I could

18  tell you and get them produced.  It's been pretty

19  simplistic.

20          Q.    Do you have any interest in Dr. Randolph's

21  entity?

22          A.    No, sir, I do not.

23          Q.    Did you introduce Dr. Randolph to Liberty

24  Capital?

25          A.    Let me try to answer that more fully for

1    you.  I reintroduced Dr. Randolph to First Liberty.

2    First Liberty was a lender of Dr. Randolph and the

3    AOA entities long before I knew about the AOA

4    entities.  So there's a preceding relationship.

5         Q.   Was Dr. Randolph the point person for that

6    prior relationship?

7         A.   It's my understanding that First Liberty had

8    loans to Dr. Randolph or one of his entities, but

9    also I know First Liberty had loans to many of the

10   AOA entities.  Did I answer that question for you,

11   Mr. Barton?

12        Q.   I think so.

13        A.   Feel free to -- feel free to ask again.

14        Q.   You know I will.

15        A.   First Liberty -- Dale McCord would have had

16   the point on any AOA relationship, but it's my

17   understanding that First Liberty did loan to

18   Dr. Randolph for some of his endeavors.

19        Q.   Directly?

20        A.   Correct.  It's my understanding.

21        Q.   Who is the point person at First Liberty for

22   this particular loan?

23        A.   Brant, B-R-A-N-T, Frost, F-R-O-S-T.

24        Q.   And Mr. Frost has been the point person on

25   loans to CurePoint as well?

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Filip Page 29 (McCord)
Phillip Page 29 (McCord)          October 10, 2022
Curepoint, LLC

Page 28

1       A.    That is correct.

2       Q.    When we talked about First Liberty in a

3  prior case, it was a broker rather than a direct

4  lender to CurePoint?

5       A.    Was that a question?

6       Q.    Yes.

7       A.    I want to be careful with my verbiage.  I

8  don't know First Liberty's business, but there are --

9  as I understand it, A, they're not a bank and, B,

10  they have individual investors through any financing

11  they proffer.

12       Q.    So as we sit here today, does CurePoint have

13  a lending relationship with First Liberty directly as

14  a lender?

15       A.    That is correct.

16       Q.    Is that loan secured?

17       A.    I'm not trained in that area.  It's my

18  understanding it's not, but I cannot give you an

19  affirmative of security interest from a legal

20  perspective.

21       Q.    Who else has an interest in Dr. Randolph's

22  entity?

23       A.    I'm not aware that there's any other owner

24  of --

25             MR. GEER:  Just for clarity, what entity are

Philip Fox (McCord)                                        October 10, 2022
Curepoint, LLC

                                                              Page 29

1        we talking about?

2               THE WITNESS:  2406, Cancer Care --

3    BY MR. BARTON:

4        Q.    Thank you.

5        A.    -- LLC.

6               I'm not aware there are any other.

7        Q.    Okay.  All right.  Numbers five and six

8    sought documents relating to funds transferred

9    between CurePoint and any of your related entities to

10   or from those two requests together.

11              Now, we did have produced some bank

12   statements for some periods of time with some missing

13   months, but we don't have anything before I think

14   basically the end of 2017 that was produced to us.

15              CurePoint does have access to bank

16   statements prior to 2018, correct?

17       A.    I believe it does.

18       Q.    And those are in the possession of Brian

19   Raley?

20       A.    I do not know that.

21       Q.    Well, you know that in the prior litigation

22   Dr. McCord sought directly from CurePoint's bank bank

23   statements because CurePoint didn't have all of them

24   available, they weren't available on line, et cetera,

25   so we secured those through the banks directly,

Page 30

1  correct?

2      A.   I would have to agree that you would know

3  better than I do.

4      Q.   Okay.  Have you asked Mr. Raley to provide

5  to the Debtor for production in this case the bank

6  statements that he has in his possession?

7      A.   I asked Mr. Raley to interject himself into

8  any type of production, but I can't affirmatively say

9  I told him or requested he do so.  I requested he

10  talk to bankruptcy counsel.

11      Q.   Did you ask Mr. Raley to file a motion in

12  the State Court litigation to prevent the release

13  of --

14          MR. GEER:  Objection; attorney-client

15      privilege.

16          MR. BARTON:  I'm asking if he authorized

17      Mr. Raley to provide it, to file it.

18          MR. GEER:  I'm still going to object on

19      attorney-client privilege.

20          MR. BARTON:  Are you going to instruct him

21      not to answer?

22          MR. GEER:  Yeah.

23          MR. BARTON:  Okay.

24  BY MR. BARTON:

25      Q.   CurePoint is not a party to the State Court

Page 31

1  litigation with Dr. McCord, correct, the original

2  one?

3       A.   Mr. Barton, I'm not the lead on the

4  litigation process between CurePoint and PFP, so I

5  would have to ask you is CurePoint -- the Mark McCord

6  case, is that state court?

7       Q.   Yes.

8       A.   That's my ignorance on it.  I don't know.

9       Q.   Okay.

10       A.   Ms. Dadabhoy runs point on those two

11  pieces of litigation.

12       Q.   In any event, you as a designated manager of

13  CurePoint have not made any effort to ensure that

14  Mr. Raley provides the bank statements that he has in

15  his possession that would cover the periods prior to

16  the ones that were produced to us on Friday?

17       A.   I requested that Mr. Raley get involved with

18  the process and make sure he understands and does

19  what's in the best interest of CurePoint.  So I did

20  make him aware of the situation.

21       Q.   All right.  But in specific response to my

22  question, which is did you ask Mr. Raley to ensure

23  the documents that he has are produced to us that

24  were requested in our motion?

25       A.   I did not use that verbiage, Mr. Barton.

Phillip E. Miles (McCord)                          October 10, 2022
Curepoint, LLC

Page 32

1       Q.    All right.  But you're aware that we don't
2    have all the bank records available to us to use?
3       A.    For purposes of the bankruptcy, I'm not
4    aware of what you have or what you don't have.
5       Q.    Well, you know it was produced, I assume?
6       A.    Correct.
7       Q.    And you know that what was produced didn't
8    cover time periods before basically 2018?
9       A.    Correct.
10           (Exhibit 2 was marked for
11           identification, attached at the end of
12           the original transcript.)
13   BY MR. BARTON:
14      Q.    I'll start with a few questions about these
15   amended schedules.  This is a document that you're
16   familiar with and signed on behalf of the debtor?
17      A.    That is correct.
18      Q.    The first question I have for you is on page
19   18 of 72.  The numbers are up here.
20      A.    Thank you.  I'm there.
21      Q.    I'm just curious about this entry.  It
22   says:  Morris Bank -- creditor name, Morris Bank.
23   Notice only.  Loan purchased.
24           Is that a reference to the original, I think
25   what you called, the practice loan and the line of

Phillip Miles (McCord)                                        October 10, 2022
Curepoint, LLC

                                                                   Page 33

1     credit or is that a different loan?

2          A.   That would be -- it's what you just said.

3     It's my understanding that there's still a UCC

4     outstanding by Morris Bank; but, correct, there's

5     only been two loans with Morris Bank and CurePoint,

6     the original practice loan as you referred to it and

7     a line of credit.

8          Q.   Okay.  The reason I asked is, if I recall

9     correctly, my client, Dr. McCord, and I think you

10    guaranteed the loan from Morris Bank to AOMA for the

11    LINAC.  Do you recall that?

12         A.   I do not recall my guarantor -- my guarantee

13    of that.

14         Q.   I may have that wrong; but just to give you

15    a frame of reference that I was thinking about, this

16    reference here to loan purchase doesn't relate to

17    that loan.  Is that correct?

18         A.   I do not believe that to be related to that.

19         Q.   Then I wanted to ask you starting on page 24

20    of 72 where we're listing creditors with non-priority

21    unsecured claims, and there are references to your

22    affiliated entities including -- I see Eclipse

23    Staffing; MEC Capital; Medical Management Institute;

24    Mittere Tax & Advisory; Mittere, Inc.; PFP; and Zero

25    Holding all listed with the amount being

Phillip Miles (McCord)                                October 10, 2022
Curepoint, LLC

Page 34

1   undetermined.

2          Do you see those references?

3      A.   I do.

4      Q.   Why is it that the amount couldn't be

5   derived from the due to/due from that your son

6   Michael works on?

7      A.   It can.  It was my understanding that it

8   needed to coincide with the due to/due from provided,

9   but this could be updated.  I think I said on the

10  creditor call I'm going back to origination.

11     Q.   Is the due to/due from as we sit here today

12  in current form?  In other words, could you print a

13  copy of it and tell me to the penny what each of

14  those entities either owes to or is owed by

15  CurePoint?

16     A.   I could.

17     Q.   And the due to/due from is complete as of

18  today and requires no additional work or analysis?

19     A.   I do not believe it would require any

20  additional work or analysis.

21     Q.   Okay.  The reason I ask that, as you know,

22  is in the past there have been occasions where the

23  due to/due from had to be updated when we requested

24  it; and I'm simply trying to determine whether the

25  current version is already updated.

Phillip Miles (McCord)                                    October 10, 2022
Curepoint, LLC

Page 35

1        A.    Right.

2              And I want to be clear there is a -- it is

3    not a continuation.  There's one piece that starts

4    January 1st, 2019, and one prior to that.  I have

5    never -- I do not believe we've ever merged those

6    two, but there's a column that exists that says

7    pre-2019.

8        Q.    Gotcha.

9              So would the answer you just gave about the

10   work being done and completed be true for both of the

11   versions?

12       A.    That is correct.

13       Q.    So if we had those, we could put them

14   together and know to the penny what the numbers are

15   that could be filled in on the schedules?

16       A.    That's correct.  I don't even think you have

17   to do the work.  I think it's already been done.

18       Q.    It's been done?

19       A.    Yes, sir.

20       Q.    But we don't have those due to/due froms

21   produced to us?

22       A.    Not that I'm aware of.  It was to coincide

23   with this filing, amended filing.

24       Q.    Right.

25              But you saw that we requested them in our

Page 36

1   requests?

2        A.   I did.

3        Q.   And we don't have them, correct?

4        A.   Correct.

5        Q.   Actually, I do have them.  I just can't use

6   them because Mr. Raley has filed an objection in the

7   State Court preventing me from doing so, but you

8   already know that.

9             All right.  Over here on page 30 of 72 is a

10  listing of executory contracts, one of which is the

11  least for the center, correct?

12       A.   I see that.

13       Q.   I think we're going to come back to more

14  questions about the lease later; but the debtor is

15  listing the contact point being CurePoint Dublin,

16  LLC, which is the lessor -- the current lessor,

17  correct?

18       A.   Correct.

19       Q.   As being in care of your son at your home

20  address.

21       A.   I see that.

22       Q.   Where he no longer resides?

23       A.   That is correct.

24       Q.   And you can't tell us today where he does

25  reside?

Case 22-56501-pmb    Doc 336-3    Filed 10/11/23    Entered 10/11/23 13:20:48    Desc
Exhibit Exhibit Page 38 of 121
Phillip Miles (McCard)                                October 10, 2022
Curepoint, LLC

Page 37

1      A.    I don't recall the address.  He lives in

2    Alpharetta, Georgia; and I can easily supply that to

3    you if you need it.

4      Q.    Does the actual owner of CurePoint Dublin,

5    LLC, know that bankruptcy has been filed?

6      A.    He does, absolutely.

7      Q.    How was he informed of that?

8      A.    Verbally by me.

9      Q.    And what is his name?

10      A.    Marc, M-A-R-C.  I've said Levin in the past.

11    It's actually Lewyn, L-E-W-Y-N.

12      Q.    Go over on page 57 of 72.

13      A.    I'm there.

14      Q.    This is responding to payments,

15    distribution, or withdrawals credited or given to

16    insiders.  The one at the very bottom of the page is

17    Jamila Dadabhoy, $102,000 and change.

18          Do you see that?

19      A.    I do.

20      Q.    When was that payment made and what was it

21    for?

22      A.    I believe that is the 12 months of salary

23    paid to Ms. Dadabhoy.  That is not a distribution or

24    a one-time payment.  It's the adding up of her

25    salary.

Phillip Miles (McCord)                          October 10, 2022
Curepoint, LLC

Page 38

1      Q.   Okay.  We don't have a listing for you.

2      A.   I don't believe I received any payments from

3  CurePoint.

4      Q.   Do you recall that when CurePoint applied

5  for a PPP loan that you and Ms. Dadabhoy and your son

6  were all listed as employees?

7      A.   I don't recall that.

8      Q.   I would show it to you, but I can't because,

9  you know --

10     A.   There have been periods of time where we

11 have done allocations for purposes of PPP.

12     Q.   That loan -- CurePoint did receive a PPP

13 loan that was forgiven, correct?

14     A.   If my memory serves me, Mr. Barton, I

15 received two, both of which were forgiven.

16     Q.   Okay.  And this salary for Ms. Dadabhoy, is

17 that 100 percent of her time or is there some

18 allocation in there between other entities?

19     A.   100 percent of her time.

20     Q.   The salary would have come through this

21 Eclipse Staffing/HR Strategies structure?

22     A.   That is correct.

23     Q.   So I assume that she like the other folks

24 that work at the clinic in Dublin, their W-2 is not

25 going to say CurePoint on it; it's going to say

Phillip Page (McCord)                                    October 10, 2022
Curepoint, LLC

Page 39

1   either HR Strategies or Eclipse Staffing?

2        A.   For whatever reason, my memory is also

3   saying Halo; but it's effectively HR Strategies.

4        Q.   All right.  Next I want to get you to show

5   me -- I'm going to mark Exhibit Number 3, the version

6   of the due to/due from that was produced on Friday;

7   and it's different than the one attached to the

8   schedules.

9             (Exhibit 3 was marked for

10            identification, attached at the end of

11            the original transcript.)

12            MR. GEER:  There's one mistake on it from my

13        office, actually.  When we converted it to PDF,

14        it messed up a formula.  It should be Eclipse --

15        I'm noticing it right now.  There's like a

16        different number for Eclipse Staffing.  And he

17        got on to us a couple of times about it, and it

18        still got filed unfortunately.

19            MR. BARTON:  That's fine.  I just want to

20        figure out what it was.

21            MR. GEER:  That was our fault.  You'll see

22        the printout.  We had to move this part.

23            MR. BARTON:  Yeah.

24            MR. GEER:  I'm pointing to these payroll

25        numbers for the record.  We had to move them

Phillip Mayes (McCord)                    October 10, 2022
Curepoint, LLC

Page 40

1        because it wouldn't print; and when we moved

2        them, for some reason it messed the formula up.

3              MR. BARTON:  Okay.

4    BY MR. BARTON:

5        Q.   All right.  In any event, it sounds like the

6    only difference between the version that was attached

7    to the schedules and the version that was produced is

8    this Eclipse Staffing number changed from a negative

9    1.8 million and change to a positive 131,000 and

10   change?

11       A.   That is correct.

12       Q.   And that was just a spreadsheet printing

13   issue, it sounds like.

14       A.   That is correct.

15       Q.   So if we focus on Exhibit 3, which is the

16   correct version -- I think I asked you this on the

17   phone the other day, but I want to make sure it's in

18   our record that the bracketed number is a due from

19   CurePoint to the affiliate.

20       A.   That is correct.  Due to the entity.  The

21   positive bracketed number is from.

22       Q.   So for clarity to do a couple of examples,

23   if you look at the right-hand column, the top one is

24   MEC positive 41,000.  That's 41,000 owed by MEC to

25   CurePoint?

Phillip Miles (McCord)                                October 10, 2022
Curepoint, LLC

Page 41

1              MR. GEER:  That's 47.

2              THE WITNESS:  It's 47.

3    BY MR. BARTON:

4         Q.   I'm sorry.  Excuse me.

5         A.   You're okay.

6              It's 47,112 and a positive number means

7    CurePoint owes MEC.  A bracketed number, if you go

8    two down to Mittere, Mittere owes that amount of

9    money.

10        Q.   All right.  Then if we look at the left-hand

11   column, taking the first one as example, the

12   $235,052.62 with MEC, is that a payment from MEC to

13   CurePoint?

14        A.   That is a payment -- now you're throwing me.

15   That is a payment from CurePoint to MEC.  So the

16   heading is meant to say CurePoint has a due to.  Now

17   you've got me.  May I restart that?

18        Q.   Sure.  We can start the whole thing over

19   because --

20        A.   MEC -- that is a payment to MEC to

21   CurePoint.

22        Q.   Got it.

23        A.   From MEC to CurePoint, better said.

24             MR. GEER:  Can we go off the record one

25        second?

Page 42

1            MR. BARTON:  Sure.

2            (A recess was taken.)

3    BY MR. BARTON:

4        Q.    Okay.  Back on the record.

5            Looking at Exhibit Number 3, which is the

6    updated due to/due from -- and there's a couple of

7    examples here for clarity.  If we look at left-hand

8    column, the entry on January 2nd, 2019, of

9    $235,052.62 and it references MEC.  That is

10   referencing a transfer from MEC to CurePoint; is that

11   correct?

12       A.    Yes.

13       Q.    And then likewise for clarity the number

14   just below that, which is also on January 2nd, 2019,

15   of $7,000 referencing Northwinds is a transfer from

16   Northwinds -- excuse me, from CurePoint to

17   Northwinds?

18       A.    That is correct.

19       Q.    All right.  On the right-hand set of

20   columns, the positive number is owed by CurePoint and

21   the bracketed number is owed to CurePoint?

22       A.    Agreed.  Correct.

23       Q.    Are any of the entities in the listing on

24   the left-hand column, these individual

25   transactions -- does it combine more than one entity?

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Exhibit Page 44 of 121
Phillip Mixer (McCord)                          October 10, 2022
Curepoint, LLC

Page 43

1   Do you understand my question?  The reason I'm asking

2   is in the past I've seen versions of the -- or a

3   spreadsheet which might combine Northwinds and Zero

4   Holding into MEC, for example?

5        A.   It can.  So the answer to that is possibly.

6        Q.   Okay.  So we really would need to go to the

7   bank statement and look at the account from which the

8   transfer originated and the account to which it went

9   to know for sure?

10       A.   Correct.

11       Q.   And the source of these various transactions

12   would be the CurePoint bank statements?

13       A.   One of the sources, correct.

14       Q.   What would another source be?

15       A.   The other source would be the use when it

16  went to the entity and just knowledge base of the

17  transaction between the entities.  For instance,

18  Eclipse Staffing, we want to always make sure that it

19  was only for payroll.

20       Q.   Let me ask it a different way.  If we looked

21  at the CurePoint bank statements and we saw, for

22  example, the very top one, this transfer from MEC to

23  CurePoint of 235,000 and change, is it possible that

24  actually references funds transferred by some entity

25  other than MEC?

Phillip Miles (McCord)                    October 10, 2022
Curepoint, LLC

Page 44

1          A.    In that specific situation, no, but in other

2     situations, yes.  For instance, an example might be

3     that CurePoint paid a lease payment directly or no

4     payment directly to Synovus on behalf of Northwinds

5     or another entity.  There are examples where you just

6     can't look at bank statement to bank statement.

7          Q.    And are there records -- is there a

8     compilation of centralized set of records somewhere

9     that presumably it was your son doing the leg work on

10    this?

11         A.    Correct.

12         Q.    Is there a centralized set of records that

13    he looked to to know which column to put those

14    payments in?

15         A.    I don't know if it's centralized, but

16    it's -- yes, there is support for those.

17         Q.    And --

18         A.    Part of my review is to make sure that that

19    entity -- transfer to that entity, what was the

20    purpose of it for.

21         Q.    I assume you have not produced to us any of

22    the support for those instances in which a transfer

23    from company A to company B might actually reference

24    or be representative of a transfer to company C

25    because of some lease obligation or something?

Phillip F. Miller (McCord)                          October 10, 2022
Curepoint, LLC

Page 45

1      A.    Mr. Barton, sitting here today, I don't know
2   if there's a document in support or if it's just me
3   going through one by one on my review.
4      Q.    The due to/due from is not maintained
5   contemporaneously with these transfers, is it?
6      A.    It is updated, if not monthly, quarterly.
7   So I would have to get clarification when you mean
8   contemporaneously.  It's not updated daily.
9      Q.    In other words, you don't make an entry ever
10  time that a transfer occurs; you go back and look at
11  the bank statements?
12     A.    That is correct.  It is -- to the best of my
13  knowledge, it's monthly or quarterly.
14     Q.    Have any of these entities that received
15  transfers from CurePoint actually provided services
16  to CurePoint or are these all considered loans?
17     A.    I always want to caveat services; but, for
18  instance, Eclipse Staffing provides a conduit for
19  payroll.  That would be an example of where I believe
20  you would categorize that as a service.
21     Q.    And does it charge for that service?
22     A.    It does not.
23     Q.    So there's no invoices supporting that
24  service?
25     A.    Eclipse Staffing does not invoice CurePoint,

Page 46

1    but Eclipse Staffing does receive from HR Strategies

2    payroll reports that have been provided.

3         Q.   All right.  But other than the payroll

4    issue, are all of these other transfers that are

5    listed on the due to/due froms considered loans from

6    one entity to the other?

7         A.   Correct.  I believe a lease payment on

8    behalf would be considered a loan or a lease, but

9    yes.

10        Q.   All right.  And none of those loans is

11   referenced in a written document of any kind other

12   than the due to/due from; is that correct?

13        A.   The lease does have a document with it.

14        Q.   I'm talking about the extension of credit

15   part of it.

16        A.   Oh, no, not that I'm aware of, Mr. Barton.

17        Q.   And none of these loans contains any terms,

18   correct?

19        A.   No.

20        Q.   For example, there's no interest term?

21   There's no interest obligation?

22        A.   Not that I'm aware of, no.

23        Q.   There's no payment term?

24        A.   No.

25        Q.   There's no final payment date?

Page 47

```
 1        A.    No.
 2        Q.    And no demand for payment has ever been made
 3   by any of these entities to any of the others?
 4        A.    No.
 5        Q.    And these entities, most of them anyway,
 6   have different ownership interests attributable to
 7   them at least through a level of a holding company?
 8        A.    Some might have the same ownership, but they
 9   also -- by reviewing this, there are different
10   ownership, correct.
11        Q.    And there's no -- there's no loan agreement
12   or note associated with any of these transfers?
13        A.    Not that I'm aware of, no.
14        Q.    Are any of these transfers approved by any
15   formal resolution or approval by the either officers
16   or managers of these entities?
17        A.    No.
18        Q.    And the process by which one entity requests
19   an extension from another entity, is that simply an
20   oral conversation?
21        A.    That is correct.
22        Q.    And the parties to that conversation would
23   be who?
24        A.    Myself, Michael Miles, Jamila Dadabhoy.
25        Q.    Is there -- obviously, what -- I assume what
```

Phillip Page (McCord)                                    October 10, 2022
Curepoint, LLC

Page 48

1    we have here is a printed version of an Excel

2    spreadsheet?

3            A.    That is correct.

4            Q.    Is there -- are there any other worksheets

5    or other hidden data in this due to/due from that

6    would help someone understand whether a transfer from

7    entity A to entity B actually represented a payment

8    on behalf of a different entity?

9            A.    Not that I'm aware of.

10           Q.    Do we -- so at least for the time period

11   from January 1st, 2019, forward this is -- the

12   printout we have here as Exhibit 3 is all the

13   information that's on the spreadsheet?

14           A.    That is correct.

15           Q.    So specifically as it relates to CurePoint,

16   when it needs money, who authorizes the request for

17   money from one of these other entities?

18           A.    Michael Miles or Jamila Dadabhoy will note

19   that an important payable or funding of payroll needs

20   to be done, and we'll look at the cash available.

21           Q.    Essentially, what you're doing is looking at

22   a cash need by CurePoint and cash availability in the

23   accounts of one of these other entities?

24           A.    That's correct.

25           Q.    And then you simply transfer the cash from

Case 22-56501-pmb    Doc 336-3    Filed 10/11/23    Entered 10/11/23 13:20:48    Desc
Exhibit Exhibit Page 50 of 121
Phillip Miles (McCord)                        October 10, 2022
Curepoint, LLC

Page 49

1   the entity that has the money available to the entity

2   that needs it?

3          A.    We request from Synovus the transfer.

4          Q.    Out of the entity that has the money

5   available?

6          A.    That is correct.

7          Q.    And the reverse would likewise be true, if

8   one of your other entities needs cash and CurePoint

9   has funds available, does -- who approves that

10  advance on behalf of CurePoint?

11         A.    I do.

12         Q.    And under what authority do you do that on

13  behalf of CurePoint?

14         A.    Speaking with Ms. Dadabhoy.

15         Q.    Just orally?

16         A.    Correct.

17         Q.    And she delegated to you the ability to make

18  transfers out of CurePoint to these other entities at

19  any time you deem it appropriate?

20         A.    Correct.

21         Q.    With no limitation on amounts?

22         A.    The limitation being the amount in the

23  account; but, no, she's not given me a ceiling if

24  you're asking that.

25         Q.    Yeah.  That was my question.

Philip Miles (McCord)                                    October 10, 2022
Curepoint, LLC

Page 50

1        A.    Correct.

2        Q.    The only limitation is how much money

3   CurePoint happens to have in the account on any given

4   day?

5        A.    Or vice versa, correct.

6              MR. BARTON:  Can we take five minutes?

7              MR. GEER:  Sure.

8              (A recess was taken.)

9   BY MR. BARTON:

10       Q.    So, Mr. Miles, just before the break, we

11  were talking about Exhibit 3, this due to/due from --

12       A.    Yes.

13       Q.    -- and the fact that most of these entities

14  have at least slightly different ownership structure;

15  but it is correct to say that you have an ownership

16  interest at least indirectly in all of them, correct?

17       A.    That is correct.  At different times,

18  Mr. Barton, as you know, we've called them Miles

19  entities.

20       Q.    Right.

21       A.    That is correct.

22       Q.    All right.  And the earlier version of the

23  due to/due from that you described to me that covers

24  the period before 2019, have you made that available

25  to counsel for the Debtor?

1         A.   I don't believe I have.

2         Q.   Is that something you can get to counsel so

3    that it can get in our hands?

4         A.   I can.

5         Q.   Or just get Mr. Raley to send an e-mail and

6    we'll already have it.

7              I don't know these schedules like you guys

8    do, so I have to fumble through.  Can you look again

9    at the schedules on page 56 of 72?

10        A.   Yes, sir.

11        Q.   In that top section number three, payments

12   to creditors within 90 days of the filing and it

13   lists a $50,000 payment to Culhane Meadows.

14        A.   I see that.

15        Q.   That's Mr. Raley's firm?

16        A.   That is Mr. Raley's firm.

17        Q.   Did CurePoint advance money to Mr. Raley's

18   firm for other owners or members of CurePoint or PFP

19   in connection with litigation?

20        A.   It did not.

21        Q.   So, for example, you've paid Mr. Raley

22   directly, Mr. Dooley has paid Mr. Raley directly for

23   representing you in those cases?

24        A.   In the past?

25        Q.   Yes.

Page 52

1      A.    I don't know if Mr. Dooley has, but Miles

2    has.

3      Q.    Okay.  Has CurePoint paid any fees to

4    Mr. Raley in the original Mark McCord State Court

5    action, which I'll represent to you is not a party?

6      A.    Has CurePoint?

7      Q.    Has CurePoint paid any of Mr. Raley's fees

8    in the original State Court action that Dr. Mark

9    McCord filed?

10      A.    I don't know that sitting here whether

11    that's true or not true.

12      Q.    Who would know the answer to that?

13      A.    I would have to look at records to answer

14    that question.  There have been no advances -- I'm

15    not trying to assume what's in your head.  There's

16    been no advances to Culhane Meadows.  That might not

17    be what you're asking.  My apologies.

18      Q.    It's close to what I'm asking or maybe it is

19    what I'm asking.  I'm trying to figure out whether

20    CurePoint has paid Mr. Raley's fees in cases because

21    there's several, some of which I'm involved in and

22    some of which I am not, in which it is not a party.

23      A.    The fees to Culhane have come out of PFP for

24    defendant CurePoint and I'm sure a Miles entity, but

25    I do not have a list sitting here today.  And, again,

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Page 54 of 121
Phillip Page (McCord)                    October 10, 2022
Curepoint, LLC

Page 53

1    I'm not aware Mr. Dooley has paid anything.

2    Ms. Dadabhoy, I think, is on one of the lawsuits.

3         Q.   Is Culhane Meadows the only law firm that

4    was paid within 90 days of the filing?

5         A.   By CurePoint?

6         Q.   Yes.

7         A.   I believe that to be correct.  I'm not

8    aware -- I'm not aware of any other fee within 90 --

9    any other attorney being engaged.

10        Q.   Do you know the total amount that's been

11   paid to Culhane Meadows by CurePoint?

12        A.   Since 2018, I'm not.  Sitting here today, I

13   would be guessing.  If you remember, Smith Moore was

14   original counsel for CurePoint.

15        Q.   Right.

16        A.   I think Mr. Raley took it on in 2019.  I

17   can't remember if that was him individually or when

18   he joined Culhane.

19        Q.   You don't have an approximation for what was

20   paid to either to Mr. Raley's firm, Mr. Sandifer's

21   firm or --

22        A.   I would be guessing.

23        Q.   Other than the guarantee case that

24   Dr. McCord brought in State Court against CurePoint,

25   is CurePoint a defendant in any other State Court

Phillip Miles (McCord)                              October 10, 2022
Curepoint, LLC

Page 54

1   litigation?

2        A.   Not that I'm aware of.

3             (Exhibit 4 was marked for

4        identification, attached at the end of

5        the original transcript.)

6   BY MR. BARTON:

7        Q.   I'll show you Exhibit Number 4, which is the

8   merchant agreement with premium merchant funding.

9   When you get a chance to look through it, let me

10  know.  I'm just going to ask you if you recognize

11  what it is.

12       A.   I do.

13       Q.   Tell us what it is, please.

14       A.   It is a merchant account funding page 2.  I

15  don't see -- it's listed as CurePoint, LLC, Zero

16  Holding, LLC, with premium merchant funding dated

17  February 16, 2022.

18       Q.   You anticipated my first question, which is

19  why is the merchant listed as CurePoint, LLC/Zero

20  Holding, LLC?

21       A.   I do not know why it's listed like that.

22       Q.   You signed it on behalf of both entities,

23  correct?

24       A.   I did.

25       Q.   And did you review it before you signed it?

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Page 56 of 121
Phillip Miles (McCord)                    October 10, 2022
Curepoint, LLC

Page 55

1          A.    If I could, Mr. Barton, flip to the back.

2          Q.    Sure.

3          A.    They often -- the merchants often add

4    documents afterwards.  I'm sorry.  It's taking me

5    time to look through it.

6          Q.    Sure.  This is not one with a big Exhibit A,

7    I'll tell you that, if that helps you, at least that

8    I saw.

9          A.    They add to them.  Would you please restate

10   your question?

11         Q.    Sure.

12               Did you review this document before you

13   signed it?

14         A.    Yes.

15         Q.    And so presumably you saw that the merchant

16   was listed CurePoint, LLC/Zero Holding, LLC?

17         A.    I did.

18         Q.    And so did you understand that you were

19   making those entities jointly responsible for this

20   debt?

21         A.    I would only say I'm not an attorney.  It's

22   my understanding that the account it comes out of is

23   the driver who is liable for the debt.

24         Q.    And in this instance which account was that?

25         A.    I believe -- I believe it came out of Zero

Page 56

1    Holding account.

2         Q.    Look over -- do you see the little Bates

3    numbers at the bottom?

4         A.    I do.

5         Q.    112.

6         A.    Yes, sir.

7         Q.    Account number 9546.

8         A.    I see that.

9         Q.    Do you know -- I have a list somewhere.

10        A.    If you could that would be helpful,

11   Mr. Barton.  I do not keep those account numbers

12   memorized.

13        Q.    I have 9546 as a CurePoint account at

14   Synovus.

15        A.    I would go with that, Mr. Barton.

16        Q.    It looks like, if you look at the last page,

17   if I read this document correctly, the net amount of

18   the advance less the underwriting and all of that is

19   a little over $600,000.

20             Do you see that?

21        A.    I do.  If my memory serves me, there was a

22   payoff of other amounts with the small amounts.

23        Q.    Yeah.  You sort of anticipated my question.

24             What were these funds -- I assume this money

25   went into the CurePoint bank account?

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Page 58 of 121
Phillip Edward Miles (McCord)
Curepoint, LLC                                    October 10, 2022

Page 57

1        A.    That's what it appears, Mr. Barton.

2        Q.    And what did CurePoint use this money for?

3        A.    Working capital.

4        Q.    Within CurePoint?

5        A.    That is correct.

6        Q.    And at the bottom of the second page, which

7   is Bates page 99, where you're listed as Phillip

8   Edward Miles, owner, that's not correct for either

9   CurePoint or Zero Holding, is it?

10       A.    I'm not a direct holder in either entity,

11  that is correct.

12       Q.    Who authorized you to sign this document on

13  behalf of CurePoint?

14       A.    Ms. Dadabhoy would have authorized for me to

15  sign this.

16       Q.    Is that authorization in writing?

17       A.    It is not.

18       Q.    Oral conversation?

19       A.    That is correct.

20       Q.    Was she aware that this agreement was being

21  entered into?

22       A.    Correct.

23       Q.    Was she aware it was a joint obligation with

24  Zero Holding?

25       A.    If my memory serves me, yes.

Page 58

```
 1              (Exhibit 5 was marked for

 2        identification, attached at the end of

 3        the original transcript.)

 4   BY MR. BARTON:

 5        Q.    Exhibit Number 5 is a merchant cash advance

 6   agreement with Zen Capital.  I'll just let you take a

 7   look at that and let me know when you've familiarized

 8   yourself generally with it.

 9        A.    I have.  I've reviewed this pretty

10   extensively over the past couple of weeks,

11   Mr. Barton.

12        Q.    So just to frame our conversation here, on

13   the first page, it looks like you signed this

14   electronically as the owner of CurePoint, LLC, at the

15   bottom.

16        A.    At the bottom, it says that.  To the best of

17   my recollection, this particular document I have

18   questions of is that my DocuSign signature; but, yes,

19   it says Phillip Miles on it.

20        Q.    Did CurePoint enter into any kind of

21   agreement with Zen Capital?

22        A.    It did, this document.

23        Q.    But you're questioning whether you actually

24   signed it?

25        A.    I have serious questions on these
```

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Page 60 of 121
Phillip Miles (McCord)                          October 10, 2022
Curepoint, LLC

Page 59

1   signatures, yes, Mr. Barton.

2       Q.   Who was your point person at Zen Capital

3   that you dealt with?

4       A.   His name was Mark.  I do not remember his

5   last name.

6       Q.   And were you communicating with him by

7   e-mail?

8       A.   There is, and I can provide those.  I

9   shouldn't have said that, right?

10      Q.   Well, you just anticipated.  That's fine.

11      A.   I shouldn't be doing that.  My apologies.

12      Q.   This business address, that -- I'm looking

13  at sort of the middle of the first page -- that's

14  Ms. Dadabhoy's home address?

15      A.   That is correct.

16      Q.   And did CurePoint receive the funds

17  reflected in this agreement?

18      A.   It did.

19      Q.   And what did it use those funds for?

20      A.   Working capital.

21      Q.   Its own working capital?

22      A.   Correct.

23      Q.   All right.  The last several pages -- so I'm

24  looking at 5 through 8, Bates numbers 159 and forward

25  to 162.

Phillip Miles (McCord)                                October 10, 2022
Curepoint, LLC

Page 60

1         A.    I'm there.

2         Q.    This identifies you signing on behalf of a

3    variety of entities, some of which I heard of, some

4    of which I have not.  Did you enter your signature

5    for those various entities?

6         A.    Sitting here today, I don't recall entering

7    my signature for these entities.  I'm like you.  I

8    don't recognize a number of these entities.

9         Q.    Okay.  Let's go very quickly through them

10   starting on Bates page 159 and just tell me which

11   ones -- we'll go through them together, and I'll have

12   you tell me if you recognize it or you don't.

13         CurePoint and Zero Holding obviously we've

14   talked about.  Sterling Capital Group, LLC, are you

15   familiar with that?

16         A.    I am.  I think that's a dissolved entity.

17         Q.    Were you an owner at one time?

18         A.    I don't recall.

19         Q.    What about IBS Solutions, Inc.?

20         A.    It was my entity, and it may or may not be

21   dissolved.  I think it is an active one, Mr. Barton.

22         Q.    Next page, the Locklear Company, are you

23   familiar with that?

24         A.    I recognize that, but I think it is a

25   dissolved entity.

Phillip E. Miles (McCord)                                October 10, 2022
Curepoint, LLC

Page 61

1       Q.   Mittere we talked about.  HST, Inc., at the

2   bottom, are you familiar with that?

3       A.   I recognize it, but I think it is a

4   dissolved entity.

5       Q.   On the next page, Mittere Tax & Advisory

6   we've talked about.  Then we have PRSOG, LLC.

7       A.   Same.  I believe that's a dissolved entity.

8       Q.   Were these -- at the time you last saw this

9   document, were these entities listed on here?

10      A.   The document I looked at was the lawsuit

11  filed by Zen Capital, HighBar, or whoever they are.

12      Q.   Okay.  That's a different one.

13      A.   Yeah.

14      Q.   That's Point something.  I'm getting to

15  that.

16      A.   My apologies.

17      Q.   Yeah.  This is not the one that's in the New

18  York lawsuit.

19      A.   Oh, okay.

20      Q.   That one is PointOne Capital, which we'll

21  get to.

22      A.   The answers to the questions remain the same

23  about the entities.  Sitting here today, I cannot

24  remember a Zen Capital.

25      Q.   Okay.

Page 62

1          A.    They operate in different names, but my

2     answers to the entity questions are the same.

3          Q.    But at the time you -- did you, in fact,

4     apply electronic signature to a document with an

5     agreement with Zen Capital?

6          A.    I don't recall.

7          Q.    So you don't remember whether these entities

8     were listed on a draft version of a document at any

9     time?

10          A.    No.  As I said, I was conflating or

11     confusing this with the New York entity; and I would

12     have to look back at records for Zen Capital.

13          Q.    Okay.

14          A.    And also if it was actually funded or not

15     but I could check that, of course.

16               (Exhibit 6 was marked for

17          identification, attached at the end of

18          the original transcript.)

19     BY MR. BARTON:

20          Q.    Exhibit Number 6 is a merchant cash advance

21     agreement between Click Capital Group and Zero

22     Holding and others, let's say.  Did you sign this

23     document?

24          A.    I don't recall.  I can't even read it on

25     this document.

Page 63

1      Q.   Yeah.  The only thing I see is that it says

2  at the bottom above your name I've read and agreed to

3  the terms and conditions set forth above and there's

4  a little squiggle.

5      A.   A little squiggly there.

6      Q.   Is that yours?

7      A.   I don't recall if that's mine.

8      Q.   Did you ever have negotiations with Click

9  Capital Group on behalf of Zero Holding or CurePoint?

10     A.   I do.  I did.

11     Q.   And were funds advanced?

12     A.   Funds were advanced, yes, sir.

13     Q.   So you would expect that there was a written

14  agreement before the funds were advanced?

15     A.   That is correct.

16     Q.   But you're saying you're not sure if this is

17  it?

18     A.   That is correct.

19     Q.   In any event, you'll see this lists the

20  merchant as Zero Holding, LLC, and all entities

21  listed on Exhibit A.

22          Do you see that?

23     A.   I do.

24     Q.   And let's see where it starts because it's

25  really long.  Exhibit A starts on Bates number 190.

Page 64

1      A.    Correct.

2      Q.    Was that exhibit attached to a draft version

3  of this agreement that you saw?

4      A.    I remember it being on a draft.  I remember

5  e-mailing them and/or calling them to remove a

6  majority of these entities, if not all of them.

7      Q.    Okay.  Would you have had the authority to

8  bind PFP, which is listed on page 191, to this

9  agreement?

10     A.    Not that I'm aware of and that's why I asked

11 them to remove it from this document.

12     Q.    Would you have had the authority to bind

13 CurePoint, LLC, to this agreement?

14     A.    Only if Ms. Dadabhoy agreed.  I do remember

15 speaking to her about CurePoint but not PFP.

16     Q.    Okay.  So does that mean she did authorize

17 you to include CurePoint as an obligor?

18     A.    If my memory serves, correct.

19     Q.    Did you have a copy of this document in your

20 records?

21     A.    Did I have --

22     Q.    I mean --

23     A.    Not this particular -- I don't know if it's

24 this particular document, but I do have a Click

25 Capital document.

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit E Page 66 of 121
Phillip Miles (McCord)                    October 10, 2022
Curepoint, LLC

Page 65

1        Q.   Well, the reason I'm wondering is it says

2    CurePoint produced it to us.  It has its Bates

3    numbers on there.  I guess my question is, was the

4    executed version of this document that we have in

5    front of us as Exhibit Number 6 in CurePoint's

6    records?

7        A.   I don't know if this particular document,

8    but I do remember producing this document to counsel.

9        Q.   So you have it?

10       A.   I'm not trying to get caught up on words.

11   This particular document, I don't know; but, yes, I

12   did have -- I do have a Click Capital document.

13       Q.   And this is it?

14       A.   Correct.

15       Q.   And funds were received from Click Capital?

16       A.   Correct.

17       Q.   It looks to me like in this instance, if you

18   look on Bates page 186 --

19       A.   I'm there.

20       Q.   -- account number 9183 at Bank First would

21   be a Zero Holding account.

22       A.   That is correct.

23       Q.   Were any of these funds received by

24   CurePoint?

25       A.   Not that I'm aware of.  I believe they all

Phillip Miles (McCord)                              October 10, 2022
Curepoint, LLC

Page 66

1    went to Zero Holding and Zero Holding then made

2    payments.

3        Q.   Okay.  Were any of those payments for the

4    benefit of CurePoint?

5        A.   Not that I --

6        Q.   Did it receive any consideration out of this

7    transaction?

8        A.   Not that I'm aware of.

9             (Exhibit 7 was marked for

10            identification, attached at the end of

11            the original transcript.)

12   BY MR. BARTON:

13       Q.   All right.  So Exhibit 7 is the --

14       A.   This is what I thought was Zen.

15       Q.   Right.

16            This is the one that's the subject of a

17   lawsuit in New York, correct?

18       A.   Correct.  It's like City of Monroe.  That's

19   correct, Mr. Barton.

20       Q.   Okay.  And on the first page of this

21   document, it has an electronic signature with your

22   name on it.  Did you sign this document?

23       A.   Sitting here today, I don't believe that

24   is -- this full document was signed by me, but that

25   is my -- it looks like an electronic signature on

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Page 68 of 121
Phillip Miles (McCord)                     October 10, 2022
Curepoint, LLC

Page 67

1    that page, correct, Mr. Barton.

2         Q.    Did your son Michael sign this document

3    electronically?

4         A.    I would have to ask him.

5         Q.    Well, he's not an owner of CurePoint,

6    correct?

7         A.    That is correct.

8         Q.    And neither are you?

9         A.    That is correct.

10        Q.    Did CurePoint have discussions with PointOne

11   about receiving a merchant cash advance?

12        A.    It did.  I erroneously referred to a Mark.

13   This is the Mark I referred to.

14        Q.    Okay.  And did CurePoint receive the funds?

15        A.    Without flipping to it, I believe CurePoint

16   did received the funds.

17        Q.    Okay.  And what were those funds used for?

18        A.    Working capital.

19        Q.    So have you discussed with your son Michael

20   whether or not he signed this document?

21        A.    I have not.

22        Q.    Did you see a draft of this document at some

23   point?

24        A.    I did.

25        Q.    And at the time you saw a draft, did it have

Phillip Miles (McCord)                    October 10, 2022
Curepoint, LLC

Page 68

1   Exhibit A attached to it, which is -- it begins on

2   Bates page 136?

3       A.   If I did, I would have told him to remove

4   it.  Again, most of these entities are dissolved,

5   liquidated, and a few I never heard of.

6       Q.   And some of them you certainly have no

7   authority to bind?

8       A.   100 percent.  I have no authority on a

9   number of these.

10      Q.   Including your landlord CurePoint Dublin,

11  LLC?

12      A.   That's correct.  And AOMA Finance, LLC.

13      Q.   Did you have a discussion with Mark or

14  whoever you were dealing with at PointOne Capital

15  about where he got this list of entities?

16      A.   I did.  I asked that they be removed.  I've

17  since spoken with their counsel, what's your plan

18  here.  So that might be a conversation for another

19  day.

20      Q.   Okay.  Bates page 134 --

21      A.   I am there.

22      Q.   -- reflects that funds were put into the

23  9546 account.  That's the CurePoint account at

24  Synovus?

25      A.   You're looking at that on my behalf,

Page 69

1    Mr. Barton.  Is that what you're showing?

2        Q.   That's what I'm showing.  Does that sound

3    right?

4        A.   Yes, sir.

5        Q.   Do you recall that CurePoint received the

6    funds?

7        A.   I do, Mr. Barton.

8        Q.   And I assume that you would expect that

9    PointOne Capital would not have advanced those funds

10   absent receipt of a signed cash advance agreement?

11       A.   Some type of a form of agreement, correct.

12       Q.   Are you aware of any version or form of

13   this -- of any agreement with PointOne Capital?

14       A.   I'm aware of in talking to this person Mark

15   who works for PointOne and HighBar that HighBar has

16   done funding in the past and did not have those

17   entities, so...

18       Q.   I have a couple of questions about this

19   Newtek small business finance loan.

20            (Exhibit 8 was marked for

21        identification, attached at the end of

22        the original transcript.)

23   BY MR. BARTON:

24       Q.   I'll show you Exhibit Number 8, which is the

25   unconditional guarantee by CurePoint, LLC.  The

Phillip Miles (McCord)                    October 10, 2022
Curepoint, LLC

Page 70

 1    borrower being Zero Holding, LLC.

 2             Do you see that?

 3        A.   I do.

 4        Q.   And did you sign this document for

 5    CurePoint?

 6        A.   Mr. Barton, I have two copies, if I can hand

 7    that back to you.

 8        Q.   Sorry.  It's an extra maybe.

 9        A.   I see my signature on CP-240.

10        Q.   Okay.  And it looks like that may actually

11    be an ink signature that we have a copy of.

12        A.   I do agree with that.

13        Q.   Was there an in-person closing of this

14    transaction?

15        A.   There was.

16        Q.   Okay.  And who attended?

17        A.   Myself; my wife, Lori Miles, came in; and

18    there was a -- I don't know if she was a paralegal,

19    an attorney on behalf of Newtek or a Notary.  I

20    cannot remember, but there was a representative of

21    Newtek that came in.

22        Q.   Okay.  So you signed this guarantee as the

23    manager of CurePoint, LLC, correct?

24        A.   As a designated manager of CurePoint for

25    purposes of this loan, correct.

Phillip Miller (McCord)                               October 10, 2022
Curepoint, LLC

Page 71

1       Q.    Well, it says just manager of CurePoint,

2    LLC, right?

3       A.    I agree.

4       Q.    Which is not accurate?

5       A.    Correct.

6       Q.    The manager is PFP, which is managed by

7    Ms. Dadabhoy?

8       A.    That is correct.

9       Q.    Did she authorize you to enter this

10   guarantee?

11      A.    She did.

12      Q.    And was that authority in writing?

13      A.    No, it was not.

14      Q.    Has CurePoint ever undertaken an obligation

15   as large as guaranteeing a $3.5 million loan?

16      A.    Not that I'm aware of.

17      Q.    Did CurePoint receive any consideration or

18   benefit for providing this guarantee to Zero Holding?

19      A.    Not at this time but Newtek was underwriting

20   a larger loan for CurePoint for this purpose.

21      Q.    All right.  But as it relates to this

22   particular loan, CurePoint received no consideration?

23      A.    I want to be careful.  I'm not trying to do

24   semantics, but Newtek was promising a loan for

25   CurePoint.

Page 72

1      Q.    In the future?

2      A.    That is correct, Mr. Barton.

3      Q.    All right.  And did -- can you tell us on

4   behalf of Zero Holding if Zero Holding received the

5   benefit of the 3.5 million?

6      A.    It did.

7      Q.    And you used all of those funds for its own

8   business reasons, business accounts?

9      A.    The only thing it -- it also paid off

10   merchant advances including the PMF that we're

11   looking at on behalf of CurePoint.  I don't want to

12   get caught in semantics with you on your question

13   that's about -- that's patronizing.  Some of those

14   merchant accounts say CurePoint and Zero Holding, but

15   PMF was paid off with the proceeds of that loan --

16   paid down, forgive me.

17      Q.    Did you negotiate this transaction on behalf

18   of Zero Holding?

19      A.    I did.

20      Q.    And did you negotiate the guarantee on

21   behalf of CurePoint?

22      A.    I did.

23      Q.    And who was your contact person at Newtek?

24      A.    There were two.  There was an Angel, and I

25   always -- in my memory I have her as Angel Newtek,

Phillip E. Miles (McCord)                    October 10, 2022
Curepoint, LLC

Page 73

1  which obviously isn't her last name.  And there was

2  another lady who is my contact.

3      Q.   And you understood this was going to be an

4  SBA loan?

5      A.   I did.

6      Q.   Did CurePoint put up any of its assets as

7  collateral for the guarantee?

8      A.   Not that I recall.

9           (Exhibit 9 was marked for

10          identification, attached at the end of

11          the original transcript.)

12  BY MR. BARTON:

13      Q.   I'll show you Exhibit Number 9.  Do you

14  recognize your signature --

15      A.   I do.

16      Q.   -- on this document on the first page?

17      A.   I do.

18      Q.   Again, it lists you as manager and says you

19  were authorized.

20           Do you see that?

21      A.   I do.

22      Q.   And the authority was an oral conversation

23  with Ms. Dadabhoy?

24      A.   That is correct.

25      Q.   It lists Mark Miles -- that's your brother,

Page 74

1    correct?

2         A.   That is correct.

3         Q.   -- as a member of CurePoint, which is not

4    correct.

5         A.   Mark Miles is not a member of CurePoint,

6    correct.

7         Q.   This says -- right above your signature, it

8    says:  Resolutions adopted.  At a meeting of the

9    members of the company duly called and held on March

10   18, 2022, at which a quorum was present and voting,

11   the resolutions set forth in this resolution were

12   adopted.

13             There wasn't a meeting of the members,

14   correct?

15        A.   I don't recall there being one.

16        Q.   The members would have been PFP and RBS?

17        A.   That is correct.

18        Q.   Was RBS even aware that CurePoint was

19   undertaking to guarantee a $3.5 million obligation of

20   Zero Holding?

21        A.   I don't recall if I called RBS or not.

22        Q.   It definitely didn't attend the meeting --

23        A.   That is correct.

24        Q.   -- there in Knoxville?

25        A.   Nashville.

Phillip E. Miller (McCord)                    October 10, 2022
Curepoint, LLC

Page 75

1        Q.    Nashville?

2        A.    Uh-huh (affirmative); or just outside.

3        Q.    This states that under actions authorized

4    that the signer was authorized to pledge

5    collateral -- grant security and collateral for

6    CurePoint.  Did you discuss that with Ms. Dadabhoy?

7        A.    I did.  And as I stated earlier, I don't

8    recall there being any assets pledged or otherwise.

9        Q.    And you -- on the second page, the first

10   full paragraph is entitled, Certification Concerning

11   Managers and Resolution.  It states:  The manager

12   named above, which was you, was duly elected,

13   appointed, or employed by or for the company and that

14   this resolution stands of record on the books of the

15   company is in full force and effect and has not been

16   modified or revoked in any manner.

17             That was not accurate, was it?

18       A.    Ms. Dadabhoy me gave me a verbal to sign.

19       Q.    Okay.  But the certification in that

20   paragraph wasn't accurate because there wasn't

21   actually a resolution stating on the books and

22   records of the company to that effect?

23       A.    Not that I remember.

24       Q.    And you certified that you had read the

25   resolution before signing when you so indicated in

Page 76

1    the language right above your signature on that page,

2    correct?

3         A.   Correct.

4              (Exhibit 10 was marked for

5         identification, attached at the end of

6         the original transcript.)

7    BY MR. BARTON:

8         Q.   I'll show you Exhibit 10.  It's called

9    closing affidavit.  Does your signature appear above

10   your name on that page?

11        A.   It does.

12        Q.   And I take it this was one of the documents

13   that you signed at the closing?

14        A.   Correct.

15        Q.   And presumably the paralegal is Jennifer

16   Auther who Notarized your signature?

17        A.   Correct.

18        Q.   And in the affidavit you swore that you were

19   not a defendant in any lawsuit in any jurisdiction,

20   correct?

21        A.   That is correct.

22        Q.   Which is not accurate.

23        A.   I have a number of documented conversations

24   with Newtek about the ongoing litigation, so I was

25   instructed that that was okay to sign by Newtek.

Phillip Miles (McCord)                              October 10, 2022
Curepoint, LLC

Page 77

1          Q.    Okay.  But it wasn't accurate?

2          A.    Correct.

3                (Exhibit 11 was marked for

4          identification, attached at the end of

5          the original transcript.)

6    BY MR. BARTON:

7          Q.    The last Newtek is Exhibit Number 11, and

8    this document is a letter to Matthew Kornfield of

9    Kensington Vanguard National Land Services.

10               Do you see that?

11         A.    I do.

12         Q.    Do you know who that is?

13         A.    I do not.

14         Q.    It talks about a closing being scheduled on

15   March 18th; and that did, in fact, occur, correct?

16         A.    I believe that is the date it did occur.

17         Q.    At your offices?

18         A.    That is correct.

19         Q.    And did your -- over on page 2, closing

20   instructions, the second bullet says:  Phillip Miles,

21   Mark Miles, Lori Miles are required to be present at

22   the closing.

23               Did your brother come to the closing?

24         A.    He did not.

25         Q.    Did you sign on his behalf pursuant to a

Phillip Page (McCord)                                    October 10, 2022
Curepoint, LLC

Page 78

1  power of attorney?

2       A.   No.  He signed.

3       Q.   He signed remotely?

4       A.   My memory serves me that a Notary was with

5  him and he signed.  I think there was only one

6  document, Mr. Barton, that he signed, I think.

7       Q.   And did Zero Holding receive these funds?

8       A.   My apologies.  Let me put my glasses on.

9       Q.   The 3.5 million.

10      A.   I only take exception -- I don't know if

11 there's a distinction, but there's the closing -- the

12 use, I would say, of the funds on CP-217 and CP-218

13 of which Zero Holding received very little money.

14 I'm sorry.  I shouldn't say it that way.  Received

15 351,532.82.

16           As I stated earlier, Premium Merchant

17 Funding, which we saw on MCA on behalf of CurePoint

18 Zero Holding, received 525,000; Click Capital, which

19 we talked about, received 159,000; and then our

20 investors received many payments and so did Ally.

21      Q.   So the payments that are listed on 217 and

22 218 we're referring to Exhibit 11, I think.

23      A.   That is correct.

24      Q.   That's the breakdown of how the money was

25 disbursed?

Phillip Miles (McCord)                              October 10, 2022
Curepoint, LLC

Page 79

 1        A.    That is the uses of the funds, correct,

 2    Mr. Barton.

 3        Q.    Okay.  So Clean Aid, is that money -- it

 4    looks like something having to do with cleaning

 5    carpets.

 6        A.    It's a -- I'm smiling because you're right.

 7    It's a -- loss of words, my apologies.  It is the

 8    equipment that produces the cleaned -- the cleaning

 9    water, the empowered water, yes, sir.

10        Q.    So those funds -- Zero Holding got the

11    benefit of those funds?

12        A.    That is correct.

13        Q.    What about Enterprise, the same?

14        A.    Zero Holding, correct, sir.

15        Q.    And then we've got two entries for Ally?

16        A.    That is correct.

17        Q.    Who was the obligor on those?

18        A.    Zero Holding.

19        Q.    What about Dynasty Capital?

20        A.    I would have to -- that is a merchant.  I

21    would have to look at that agreement.

22        Q.    Okay.  Do you know if CurePoint guaranteed

23    it?

24        A.    My best guess is yes; but sitting here

25    today, I don't a hundred percent know.

Page 80

1        Q.    Then there's an $800,000 First Liberty

2    Capital.  That's our same Brent Frost entity?

3        A.    Brant.

4        Q.    Brant, I'm sorry.

5              That was a loan to Zero Holding?

6        A.    That is correct.

7        Q.    And that was paid off?

8        A.    That is correct.

9        Q.    Arvest, is that equipment used by -- that

10    was used by Zero Holding?

11        A.    Equipment or vans.

12        Q.    Then we have PayPal.  Was that a Zero

13    Holding obligation?

14        A.    That is correct.

15        Q.    And then Click Capital, is that the same one

16    we talked about earlier, the same loan?

17        A.    I think that's a different loan, Mr. Barton.

18        Q.    And then Premium Merchant Funding, who was

19    the obligor on those notes?

20        A.    That is the loan we looked at earlier,

21    Mr. Barton.

22        Q.    Okay.  Got it.

23              All right.  And then the balance -- well, it

24    looks like the lawyer.  Then the balance is Zero

25    Holding working capital?

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit F Page 82 of 121
Phillip Miles (McCord)                              October 10, 2022
Curepoint, LLC

Page 81

 1       A.    Right.

 2             I'm going to get a sip of water.

 3       Q.    Sure.  Take your time.

 4             (Exhibit 12 was marked for

 5       identification, attached at the end of

 6       the original transcript.)

 7  BY MR. BARTON:

 8       Q.    Exhibit Number 12, my focus is really the

 9  attachments.

10       A.    Okay.

11       Q.    So the first one, it looks like it appears

12  on page 9 at the top.  It's a little bit covered up.

13             MR. GEER:  14 of 25, is that where we are?

14             MR. BARTON:  It's 9.

15             MR. GEER:  9?

16             MR. BARTON:  Yeah.

17             THE WITNESS:  Oh, I see.  I am there.

18  BY MR. BARTON:

19       Q.    There's two of them, I think, attached here.

20       A.    It's just covered up.  I see it, Mr. Barton.

21       Q.    So this is a finance agreement between

22  Arvest and CurePoint, correct?

23       A.    That is correct.

24       Q.    And it states that the equipment is located

25  at the clinic in Dublin.  Do you see where it says

Page 82

1    equipment location?

2         A.    I do.

3         Q.    Okay.  That's the clinic address?

4         A.    That is correct.

5         Q.    And the equipment we're talking about is

6    listed over on page 14, which is the schedule of

7    financed equipment; and I'm going to assume those are

8    copiers.  Does that sound right?

9         A.    That is correct.

10        Q.    Location, clinic address for all of them,

11   right?

12        A.    Correct.

13        Q.    And if you flip to the previous page, which

14   is page 13, it's executed by Phillip Miles as member

15   manager of CurePoint, LLC.

16              Do you see that?

17        A.    I do.

18        Q.    And that's your signature?

19        A.    I do.

20        Q.    Yes?

21        A.    Oh, I'm sorry.  Yes.

22        Q.    And the date, is that your handwriting?

23        A.    That is correct.

24        Q.    The reference to member is incorrect and the

25   reference to manager is incorrect, right?

Phillip Miles (McCord)                    October 10, 2022
Curepoint, LLC

Page 83

1          A.    That is correct.

2          Q.    And then down below we have Mark Miles.

3     That's your brother in Oklahoma?

4          A.    That is correct.

5          Q.    Is that his signature?

6          A.    It is.

7          Q.    Did he actually sign this document?

8          A.    I recall that he did.

9          Q.    And it's referencing him as a member,

10    though, which is incorrect?

11         A.    That is correct.  It's incorrect.

12         Q.    And these copiers -- that's a lot of copiers

13    for an oncology clinic.  Were they all used by

14    CurePoint?

15         A.    They were to be used by CurePoint and, as I

16    said on the -- not used directly by CurePoint, but

17    later being placed and used for CurePoint.

18         Q.    And is CurePoint the one placing them?

19         A.    Correct.

20         Q.    Placing them in referring physician offices?

21         A.    Not necessarily referring but in physician

22    offices.  I don't know if the term referring is

23    correct or not for all of them.

24         Q.    Why would -- are they urologists?

25         A.    Cardiologist, urologist, primary care, and

Page 84

1   others.  Sitting here today, I couldn't name all the

2   different practices.

3        Q.   Why would CurePoint place copiers in

4   physician offices?

5        A.   It is working with a group to obtain more

6   information about patients and patient care, so

7   it's -- CurePoint has been in the process of setting

8   up leases with the various entities.

9        Q.   Like subleases?

10       A.   Correct.  Well, let me be careful.  I don't

11  think Arvest has a -- is a lease.  I think it's

12  financing.

13       Q.   Okay.  So CurePoint is the owner of the

14  copiers subject to the financing?

15       A.   Correct.

16       Q.   But you understood that CurePoint was

17  agreeing not to move the equipment without telling

18  and getting the approval of Arvest?

19       A.   I believe I spoke to Arvest and redirected

20  where the copiers -- the copiers did not get

21  delivered to CurePoint.

22       Q.   They sent them directly to the physician

23  offices?

24       A.   That is correct.

25       Q.   Are there any leases in place with the

Phillip Miles (McCard)                                    October 10, 2022
Curepoint, LLC

                                                          Page 85

 1    physicians?

 2         A.    Not at this time.

 3         Q.    Are they paying for the copiers?

 4         A.    Not at this time.

 5         Q.    Have they ever?

 6         A.    Not yet.

 7         Q.    All right.  And if we went through the other

 8    financing agreement, which starts on page 17, would

 9    essentially the setup be the same?

10         A.    That is correct, Mr. Barton.

11               (Exhibit 13 was marked for

12          identification, attached at the end of

13          the original transcript.)

14    BY MR. BARTON:

15         Q.    I'll show you Exhibit 13 quickly.  This is

16    U.S. Bank.  This was attached to the proof of claim.

17    Just a couple of quick questions.

18               On the third page of the document, I see a

19    signature of Phillip Miles on behalf of CurePoint.

20    Did you sign this document?

21         A.    It appears that I did, Mr. Barton.

22         Q.    Reflecting title was manager, which is not

23    accurate?

24         A.    That is correct.

25         Q.    And it looks to me like over on -- I think

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Page 87 of 121
Phillip Emile (McCord)                          October 10, 2022
Curepoint, LLC

Page 86

1    it's the fourth page where we have the list of

2    equipment, more copiers.  Does that sound right?

3         A.   That is correct.

4         Q.   And were those also placed in physician

5    offices like the ones we talked about before?

6         A.   Mr. Barton, sitting here today and my best

7    memory would be those are at CurePoint.

8         Q.   Okay.

9              (Exhibit 14 and 15 were marked

10        for identification, attached at the

11        end of the original transcript.)

12   BY MR. BARTON:

13        Q.   I'm going to hand you 14 and 15 together.

14        A.   Okay.

15        Q.   We talked about these before.  In fact, one

16   of these has a sticker from before.  Just to put this

17   in the record, Number 14 is a consent document you

18   signed with FINRA in 2010?

19        A.   That is correct.

20        Q.   And in the background section, it states:

21   Mr. Miles was registered with FINRA member Citigroup

22   from March 5, 2004, to December 24, 2008, when he was

23   discharge for refusing to answer questions from the

24   firm about certain customer transactions.

25              I'll stop there.  Is that accurate?

Page 87

1    A.    That's what this says, that's correct.

2    Q.    But is it factually true?

3    A.    There is a big story there, but I don't

4    remember or recall sitting here today in 2008 if

5    that's why I was discharged.  I remember quitting

6    Citigroup.

7    Q.    But you did sign this document on page 4?

8    A.    That is correct.

9    Q.    And it states you held at the time a Series

10   3, 7, and 66 license?

11   A.    That is correct.

12   Q.    It says on page 2 that FINRA opened an

13   investigation based on allegations by the firm, that

14   review of Mr. Miles' accounts by the firm revealed

15   unauthorized trading and false account values, which

16   were subsequently reported by the firm to FINRA.

17         Are you aware that that, in fact, occurred?

18   A.    That did not occur, but that's what the

19   document says.

20   Q.    And you signed the document?

21   A.    I did.

22   Q.    And then it goes on to state that you failed

23   to respond to four separate requests for information

24   regarding those allegations.

25         Do you see that?

Phillip Page (McCord)                                    October 10, 2022
Curepoint, LLC

Page 88

1          A.    I do.

2          Q.    And it states that you did not provide a

3     request as -- a statement as requested?

4          A.    That is correct under advice of my counsel

5     at the time.

6          Q.    And you by signing this document consented

7     to, as shown in paragraph B there on page 2, a

8     permanent ban from being associated with any FINRA

9     member firm in any capacity?

10         A.    That is correct.

11         Q.    And Exhibit Number 15 is simply the printout

12    of the online reflection of what we just looked at in

13    Exhibit 14, correct?

14         A.    That's correct.  And as it says, without

15    admitting or denying the findings, that is correct.

16              MR. BARTON:  Do you want to take a couple of

17         minute break?  I still need to get him to

18         identify the account statements that we do have,

19         which I will be happy to just sort of set them on

20         the table and he can look at them while we take a

21         break.  I just want to check my notes and see if

22         there's anything else.

23              MR. GEER:  All right.

24              (A recess was taken.)

25              (Exhibits 16 and 17 were marked

Page 89

1      for identification, attached at the

2      end of the original transcript.)

3   BY MR. BARTON:

4      Q.    Exhibit 17 that I have in front of you

5   are -- can you identify these as CurePoint account

6   statements from the Synovus account ending in 7944?

7   It looks like they run from June of '21 through

8   August of '22.

9      A.    You're talking about this packet,

10  Mr. Barton, not the one with the rubber band?

11     Q.    That's a different exhibit.  The one you

12  have in your hand is Exhibit 17.

13     A.    June 2021 for account number ending 7944

14  through August 31, 2022.

15     Q.    Right.

16          And then Exhibit 16, if you can just

17  identify those as CurePoint account statements from

18  the Synovus account ending in 9546.  I won't give you

19  a range because according to my paralegal we're

20  missing December 17 and March 22 through July 22 out

21  of this range that starts in October of 2017.  If you

22  could just identify what we have here as CurePoint

23  account records.

24     A.    I do.

25          MR. BARTON:  All right.  I think those are

Page 90

1        all the questions we have.

2              MR. GEER:  Okay.

3              (Proceedings concluded at 12:23 p.m.)

4                        *        *        *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Phillip Miles (McCord)                              October 10, 2022
Curepoint, LLC

Page 91

1                  COURT REPORTER DISCLOSURES

2

3        The following representations and disclosures

4    are made in compliance with Georgia Law, more

5    specifically:

6

7              Article 10(B) of the Rules and Regulations

8    of the Board of Court Reporting (disclosure forms)

9    OCGA 9-11-28(c) (disqualification of reporter for

10   financial interest) OCGA 15-14-37(a) and (b)

11   (prohibitions against contracts except on a

12   case-by-case basis).

13

14   - I am a certified reporter in the State of Georgia.

15   - I am a subcontractor for Veritext Legal Solutions.

16   - I have been assigned to make a complete and

17     accurate record of these proceedings.

18   - I have no relationship of interest in the matter on

19     which I am about to report which would disqualify me

20     from making a verbatim record or

21     maintaining my obligation of impartiality in

22     compliance with the Code of Professional Ethics.

23   - I have no direct contract with any party in this

24     action and my compensation is determined solely

25     by the terms of my subcontractor agreement.

Phillip P. Miles (McCord)                                    October 10, 2022
Curepoint, LLC

Page 92

1                              FIRM DISCLOSURES

2

3    - Veritext was contacted to provide reporting services

4      by the noticing or taking attorney in this matter.

5    - There is no agreement in place that is

6      prohibited by OCGA 15-14-37(a) and (b). Any

7      case-specific discounts are automatically

8      applied to all parties, at such time as any

9      party receives a discount.

10   - Transcripts:  The transcript of this proceeding

11     as produced will be a true, correct, and

12     complete record of the colloquies, questions, and

13     answers as submitted by the certified court

14     reporter.

15   - Exhibits:  No changes will be made to the exhibits

16     as submitted by the reporter, attorneys, or

17     witnesses.

18   - Password-Protected Access:  Transcripts and

19     exhibits relating to this proceeding will be

20     uploaded to a password-protected repository, to

21     which all ordering parties will have access.

22

23                        *        *        *

24

25

Phillip F. Miles (McCord)                      October 10, 2022
Curepoint, LLC

Page 93

```
 1                     CERTIFICATE
 2    STATE OF GEORGIA:
 3    COUNTY OF GWINNETT:
 4              I hereby certify that the foregoing
      transcript was taken down, as stated in the caption,
 5    and the colloquies, questions and answers were
      reduced to typewriting under my direction; that the
 6    transcript is a true and correct record of the
      evidence given upon said proceeding.
 7              I further certify that I am not a
      relative or employee or attorney of any party, nor am
 8    I financially interested in the outcome of this
      action.
 9              I have no relationship of interest in
      this matter which would disqualify me from
10    maintaining my obligation of impartiality in
      compliance with the Code of Professional Ethics.
11              I have no direct contract with any
      party in this action and my compensation is based
12    solely on the terms of my subcontractor agreement.
                Nothing in the arrangements made for
13    this proceeding impacts my absolute commitment to
      serve all parties as an impartial officer of the
14    court.
                This the 23rd day of October, 2022.
15
16
17
18
19
                LAURA R. SINGLE, CCR-B-1343
20
21
22
23
24
25
```

Phillip E. Miles (McCord)                           October 10, 2022
Curepoint, LLC

Page 94

1    TO: WILL GEER, Esq.  wgeer@rlkglaw.com

2    Re: Signature of Deponent PHILLIP E. MILES

3    Date Errata due back at our offices:  30 days

4

5    Greetings:

6    The deponent has reserved the right to read and sign.
     Please have the deponent review the attached PDF

7    transcript, noting any changes or corrections on the
     attached PDF Errata.  The deponent may fill out the

8    Errata electronically or print and fill out manually.

9    Once the Errata is signed by the deponent and
     notarized, please mail it to the offices of Veritext

10   (below).

11   When the signed Errata is returned to us, we will
     seal and forward to the taking attorney to file with

12   the original transcript.  We will also send copies of
     the Errata to all ordering parties.

13

14   If the signed Errata is not returned within the time
     above, the original transcript may be filed with the

15   court without the signature of the deponent.

16   Please send completed Errata to:

17   Veritext Production Facility

18   20 Mansell Court

19   Suite 300

20   Roswell, GA 30076

21   770-343-9696

22   cs-southeast@veritext.com

23

24

25

Phillip Myles (McCord)                                    October 10, 2022
Curepoint, LLC

Page 95

1   ERRATA for Assignment #5520220

2   I, the undersigned, do hereby certify that I have read
    the transcript of my testimony, and that

3

4   ____ There are no changes noted.

5   ____ The following changes are noted:

6

            Pursuant to Rule 30(7)(e) of the Federal

7   Rules of Civil Procedure and/or OCGA 9-11-30(e), any
    Changes in form or substance which you desire to make to

8   your testimony shall be entered upon the deposition with
    a statement of the reasons given for making them.  To

9   assist you in making any such corrections, please use the
    form below.  If additional pages are necessary, please

10  furnish same and attach.

11  Page _____ Line _____ Change

12  _____

13  Reason for change_____

14  Page _____ Line _____ Change_____

15  _____

16  Reason for change_____

17  Page _____ Line _____ Change

18  _____

19  Reason for change_____

20  Page _____ Line _____ Change_____

21  _____

22  Reason for change_____

23  Page _____ Line _____ Change

24  _____

25  Reason for change_____

Phillip E Miles (McCord)                                October 10, 2022
Curepoint, LLC

Page 96

1   Page _____ Line _____ Change

2   _____

3   Reason for change_____

4   Page _____ Line _____ Change_____

5   _____

6   Reason for change_____

7   Page _____ Line _____ Change

8   _____

9   Reason for change_____

10  Page _____ Line _____ Change_____

11  _____

12  Reason for change_____

13  Page _____ Line _____ Change _____

14  _____

15  Reason for change_____

16  Page _____ Line _____ Change _____

17  _____

18  Reason for change_____

19

                      _____

20
                         PHILLIP E. MILES

21

22  Sworn to and subscribed before me this ___ day of

    _____, _____.

23

    _____

24

    NOTARY PUBLIC

25  My Commission Expires:_____

[& - 600,000]                                                                      Page 1

| & |
|---|
| **&**   2:17 14:4 18:12 20:4 21:9 21:20 25:9 33:24 61:5 |

| 1 |
|---|
| **1**   4:10 23:1,11 26:7 |
| **1.8**   40:9 |
| **10**   1:13 5:7 6:2 76:4,8 91:7 |
| **100**   1:18 2:5 9:24 10:1 14:25 21:23 38:17,19 68:8 |
| **1000**   3:5 |
| **102,000**   37:17 |
| **10:04**   1:14 |
| **11**   1:3 5:8 77:3,7 78:22 |
| **1105**   3:5 |
| **11175**   9:21 |
| **112**   56:5 |
| **1175**   9:17 |
| **12**   5:10 37:22 81:4,8 |
| **12314**   93:18 |
| **12:23**   90:3 |
| **13**   5:11 82:14 85:11,15 |
| **131,000**   40:9 |
| **134**   68:20 |
| **1343**   1:24 93:19 |
| **136**   68:2 |
| **14**   5:12 81:13 82:6 86:9,13,17 88:13 |

| 15 |
|---|
| **15**   5:15 86:9,13 88:11 |
| **15-14-37**   91:10 92:6 |
| **150**   1:17 2:5,10 |
| **159**   59:24 60:10 |
| **159,000**   78:19 |
| **16**   5:16 54:17 88:25 89:16 |
| **162**   59:25 |
| **17**   5:18 85:8 88:25 89:4,12,20 |
| **18**   32:19 74:10 |
| **186**   65:18 |
| **18th**   77:15 |
| **190**   63:25 |
| **191**   64:8 |
| **1998**   8:9 |
| **1st**   24:8 35:4 48:11 |

| 2 |
|---|
| **2**   4:13 11:5,10,10 15:22,24 20:14 32:10 38:24 54:14 77:19 87:12 88:7 |
| **20**   94:18 |
| **2004**   4:10 86:22 |
| **2008**   86:22 87:4 |
| **20090167424**   5:14 |
| **2010**   19:21 86:18 |
| **2015**   23:19 |
| **2017**   29:14 89:21 |
| **2018**   21:17 29:16 32:8 53:12 |

| 2019 |
|---|
| **2019**   24:3,5,8 35:4,7 42:8,14 48:11 50:24 53:16 |
| **2021**   89:13 |
| **2022**   1:13 54:17 74:10 89:14 93:14 |
| **208**   2:10 |
| **21**   89:7 |
| **217**   78:12,21 |
| **218**   78:12,22 |
| **22**   89:8,20,20 |
| **22-56501**   1:4 |
| **23**   4:10 |
| **235,000**   43:23 |
| **235,052.62**   41:12 42:9 |
| **23rd**   93:14 |
| **24**   33:19 86:22 |
| **240**   70:9 |
| **2406**   29:2 |
| **25**   81:13 |
| **2987**   2:18 |
| **2nd**   42:8,14 |

| 3 |
|---|
| **3**   4:15 39:5,9 40:15 42:5 48:12 50:11 87:10 |
| **3.5**   71:15 72:5 74:19 78:9 |
| **3/18/22**   5:9 |
| **30**   36:9 94:3 95:6 |
| **300**   7:14 8:3 94:19 |

| 30046 |
|---|
| **30046**   2:6,11 |
| **30076**   94:20 |
| **30309**   3:6 |
| **30329**   2:19 |
| **31**   89:14 |
| **3180**   10:19 |
| **32**   4:13 |
| **350**   2:18 |
| **351,532.82.**   78:15 |
| **39**   4:15 |

| 4 |
|---|
| **4**   4:16 54:3,7 87:7 |
| **4.99**   12:7 |
| **404**   2:19 3:6 |
| **41,000**   40:24,24 |
| **47**   41:1,2 |
| **47,112**   41:6 |

| 5 |
|---|
| **5**   4:17 23:14 58:1,5 59:24 86:22 |
| **50**   16:11 |
| **50,000**   51:13 |
| **525,000**   78:18 |
| **54**   4:16 |
| **5520220**   95:1 |
| **56**   51:9 |
| **57**   37:12 |
| **58**   4:17 |
| **584-1238**   2:19 |

| 6 |
|---|
| **6**   4:4,19 62:16,20 65:5 |
| **600,000**   56:19 |

Philip P. Niles (McCord)                    October 10, 2022
Curepoint, LLC

**[63 - analysis]**                                                    Page 2

| | | | |
|---|---|---|---|
| **63** 4:19 | **9546** 5:17 56:7 | **actual** 10:9 37:4 | **affirmatively** |
| **66** 4:21 87:10 | 56:13 68:23 | **add** 55:3,9 | 30:8 |
| **678** 2:11 | 89:18 | **adding** 37:24 | **agree** 30:2 70:12 |
| **69** 4:23 | **99** 57:7 | **addition** 24:1 | 71:3 |
| | **995-5570** 2:6 | **additional** 34:18 | **agreed** 7:6 42:22 |
| **7** | | 34:20 95:9 | 63:2 64:14 |
| **7** 4:21 66:9,13 | **a** | **address** 7:14,19 | **agreeing** 84:17 |
| 87:10 95:6 | **a.m.** 1:14 | 7:22,24 8:1,6,14 | **agreement** 4:16 |
| **7,000** 42:15 | **ability** 49:17 | 9:17,18,19 10:21 | 4:17,20,22 10:2 |
| **712** 10:20 | **absent** 69:10 | 10:23 36:20 | 13:3 47:11 54:8 |
| **72** 32:19 33:20 | **absolute** 93:13 | 37:1 59:12,14 | 57:20 58:6,21 |
| 36:9 37:12 51:9 | **absolutely** 37:6 | 82:3,10 | 59:17 62:5,21 |
| **73** 5:5 | **accelerators** | **administration** | 63:14 64:3,9,13 |
| **76** 5:7 | 19:21 | 4:23 | 69:10,11,13 |
| **765-1745** 2:11 | **acceptance** 5:13 | **admitting** 88:15 | 79:21 81:21 |
| **77** 5:8 | **access** 25:18 | **adopted** 74:8,12 | 85:8 91:25 92:5 |
| **770** 2:6 | 29:15 92:18,21 | **advance** 4:17,20 | 93:12 |
| **770-343-9696** | **account** 5:17,19 | 4:22 49:10 | **aid** 79:3 |
| 94:21 | 43:7,8 49:23 | 51:17 56:18 | **alex** 17:5 |
| **7944** 5:19 89:6 | 50:3 54:14 | 58:5 62:20 | **allegations** |
| 89:13 | 55:22,24 56:1,7 | 67:11 69:10 | 87:13,24 |
| **8** | 56:11,13,25 | **advanced** 63:11 | **allocation** 38:18 |
| **8** 4:23 59:24 | 65:20,21 68:23 | 63:12,14 69:9 | **allocations** |
| 69:20,24 | 68:23 87:15 | **advances** 52:14 | 38:11 |
| **800,000** 80:1 | 88:18 89:5,6,13 | 52:16 72:10 | **ally** 78:20 79:15 |
| **81** 5:10 | 89:17,18,23 | **advice** 88:4 | **alpharetta** 7:15 |
| **815-3500** 3:6 | **accounts** 48:23 | **advisors** 21:2,6 | 7:25 37:2 |
| **85** 5:11 | 72:8,14 87:14 | **advisory** 14:4 | **amended** 23:22 |
| **86** 5:12,15 | **accurate** 71:4 | 18:12 20:4 | 24:12,20 25:21 |
| **88** 5:16,18 | 75:17,20 76:22 | 21:10,20 25:9 | 32:15 35:23 |
| **9** | 77:1 85:23 | 33:24 61:5 | **amoa** 3:3 |
| **9** 5:5 73:9,13 | 86:25 91:17 | **affairs** 13:1 | **amount** 33:25 |
| 81:12,14,15 | **action** 52:5,8 | **affidavit** 5:7 | 34:4 41:8 49:22 |
| **9-11-28** 91:9 | 91:24 93:8,11 | 76:9,18 | 53:10 56:17 |
| **9-11-30** 95:7 | **actions** 75:3 | **affiliate** 40:19 | **amounts** 49:21 |
| **90** 51:12 53:4,8 | **active** 19:7,11 | **affiliated** 33:22 | 56:22,22 |
| **9183** 65:20 | 21:14 60:21 | **affirmative** | **analysis** 34:18 |
| | | 28:19 75:2 | 34:20 |

**[analyzed - bank]**                                                    Page 3

analyzed  24:21
angel  72:24,25
answer  6:19,25
  7:9 9:25 25:13
  26:25 27:10
  30:21 35:9 43:5
  52:12,13 86:23
answers  61:22
  62:2 92:13 93:5
anticipated
  54:18 56:23
  59:10
anyway  47:5
aoa  27:3,3,10,16
aoma  33:10
  68:12
apartment  8:9
apologies  19:22
  23:6,9 52:17
  59:11 61:16
  78:8 79:7
appear  76:9
appears  57:1
  81:11 85:21
applied  38:4
  92:8
apply  62:4
appointed  75:13
appropriate
  49:19
approval  47:15
  84:18
approved  47:14
approves  49:9
approximate
  16:17
approximation
  53:19

area  28:17
arrangements
  93:12
article  6:2 91:7
arvest  80:9
  81:22 84:11,18
  84:19
asked  8:12 30:4
  30:7 33:8 40:16
  64:10 68:16
asking  30:16
  43:1 49:24
  52:17,18,19
aspect  16:1
assets  4:13 73:6
  75:8
assigned  91:16
assignment  95:1
assist  95:9
associated  47:12
  88:8
assume  32:5
  38:23 44:21
  47:25 52:15
  56:24 69:8 82:7
atlanta  1:2 2:19
  3:6
attach  95:10
attached  23:2,22
  24:12,19 25:1,21
  32:11 39:7,10
  40:6 54:4 58:2
  62:17 64:2
  66:10 68:1
  69:21 73:10
  76:5 77:4 81:5
  81:19 85:12,16
  86:10 89:1 94:6

94:7
attachments
  81:9
attend  74:22
attended  70:16
attorney  30:14
  30:19 53:9
  55:21 70:19
  78:1 92:4 93:7
  94:11
attorneys  92:16
attributable
  11:19 47:6
audibly  6:19
august  89:8,14
auther  76:16
authority  5:13
  49:12 64:7,12
  68:7,8 71:12
  73:22
authorization
  57:16
authorize  64:16
  71:9
authorized
  30:16 57:12,14
  73:19 75:3,4
authorizes  48:16
authorizing  4:10
automatically
  92:7
availability
  48:22
available  29:24
  29:24 32:2
  48:20 49:1,5,9
  50:24

aware  10:17
  21:16 25:5
  28:23 29:6
  31:20 32:1,4
  35:22 46:16,22
  47:13 48:9 53:1
  53:8,8 54:2
  57:20,23 64:10
  65:25 66:8
  69:12,14 71:16
  74:18 87:17

**b**

b  1:24 6:2 12:13
  27:23 28:9
  44:23 48:7 88:7
  91:7,10 92:6
  93:19
back  12:17 14:7
  19:21,22 23:19
  26:7 34:10
  36:13 42:4
  45:10 55:1
  62:12 70:7 94:3
background
  86:20
balance  80:23,24
ban  88:8
band  89:10
bank  5:16,18
  10:19 26:1 28:9
  29:11,15,22,22
  30:5 31:14 32:2
  32:22,22 33:4,5
  33:10 43:7,12,21
  44:6,6 45:11
  56:25 65:20
  85:16

Phillip Pagel, Volume 1 (McCord)
Curepoint, LLC

October 10, 2022

**[bankruptcy - case]**

Page 4

| | | | **c** |
|---|---|---|---|

**bankruptcy** 1:1
4:10 13:14,16
30:10 32:3 37:5
**banks** 29:25
**barton** 1:16 2:4
2:4 4:4 6:12 7:6
7:13 8:11 10:6
10:11 11:6,17
13:4 15:19
16:20 19:16
23:4 25:13
27:11 29:3
30:16,20,23,24
31:3,25 32:13
38:14 39:19,23
40:3,4 41:3 42:1
42:3 45:1 46:16
50:6,9,18 54:6
55:1 56:11,15
57:1 58:4,11
59:1 60:21
62:19 66:12,19
67:1 69:1,7,23
70:6 72:2 73:12
76:7 77:6 78:6
79:2 80:17,21
81:7,14,16,18,20
85:10,14,21 86:6
86:12 88:16
89:3,10,25
**base** 43:16
**based** 87:13
93:11
**basically** 29:14
32:8
**basis** 91:12
**bates** 56:2 57:7
59:24 60:10

63:25 65:2,18
68:2,20
**began** 7:7
**begins** 68:1
**behalf** 15:17
32:16 44:4 46:8
48:8 49:10,13
54:22 57:13
60:2 63:9 68:25
70:19 72:4,11,17
72:21 77:25
78:17 85:19
**believe** 10:19
15:16 20:21
21:25 22:3
24:10 29:17
33:18 34:19
35:5 37:22 38:2
45:19 46:7 51:1
53:7 55:25,25
61:7 65:25
66:23 67:15
77:16 84:19
**benefit** 6:18 66:4
71:18 72:5
79:11
**best** 11:22 14:2
15:23 18:3,11
31:19 45:12
58:16 79:24
86:6
**better** 30:3
41:23
**big** 55:6 87:3
**bind** 64:8,12
68:7
**bit** 19:13,14
81:12

**board** 6:3 22:11
91:8
**bookkeeping**
14:5 18:13 20:4
21:8,20
**books** 75:14,21
**born** 8:8
**borrower** 70:1
**bottom** 23:17
37:16 56:3 57:6
58:15,16 61:2
63:2
**bracketed** 40:18
40:21 41:7
42:21
**brant** 27:23 80:3
80:4
**break** 50:10
88:17,21
**breakdown**
78:24
**brent** 80:2
**brian** 29:18
**briefly** 16:3
**broker** 5:15 28:3
**brother** 8:17
16:21 73:25
77:23 83:3
**brought** 53:24
**brown** 17:5
**buckhead** 8:10
**building** 18:1
**bullet** 77:20
**business** 4:23
9:18,19 17:14
20:8 21:15 28:8
59:12 69:19
72:8,8

**c** 2:1 3:1 6:1 9:24
9:24 11:4 21:5
37:10 44:24
91:9
**call** 34:10
**called** 11:8 32:25
50:18 74:9,21
76:8
**calling** 64:5
**cancer** 29:2
**capacity** 88:9
**capital** 4:19,21
14:9,18 15:10
18:9,18,20 26:24
33:23 57:3 58:6
58:21 59:2,20,21
60:14 61:11,20
61:24 62:5,12,21
63:9 64:25
65:12,15 67:18
68:14 69:9,13
78:18 79:19
80:2,15,25
**caption** 93:4
**cardiologist**
83:25
**care** 8:22 29:2
36:19 83:25
84:6
**careful** 28:7
71:23 84:10
**carpets** 17:25
79:5
**case** 1:4 28:3
30:5 31:6 53:23
91:12,12 92:7

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Page 102 of 121
Phillip Pagels 2021 McCord
Curepoint, LLC
October 10, 2022

[cases - contemporaneously]                                                          Page 5

**cases** 26:5 51:23
  52:20
**cash** 4:17,19,21
  48:20,22,22,25
  49:8 58:5 62:20
  67:11 69:10
**categorize** 45:20
**caught** 65:10
  72:12
**caveat** 45:17
**ccr** 1:24 93:19
**ceiling** 49:23
**center** 36:11
**centralized** 44:8
  44:12,15
**century** 2:18
**certain** 13:1
  86:24
**certainly** 68:6
**certificate** 93:1
**certification**
  75:10,19
**certified** 75:24
  91:14 92:13
**certify** 93:4,7
  95:2
**cetera** 12:3
  29:24
**chance** 54:9
**change** 37:17
  40:9,10 43:23
  95:11,13,14,16
  95:17,19,20,22
  95:23,25 96:1,3
  96:4,6,7,9,10,12
  96:13,15,16,18
**changed** 16:9
  40:8

**changes** 16:9
  92:15 94:7 95:4
  95:5,7
**chapter** 1:3
**charge** 18:4
  45:21
**check** 5:15 25:25
  26:2 62:15
  88:21
**checked** 26:3
**chris** 17:7
**cicero** 9:17,21
**citigroup** 86:21
  87:6
**city** 66:18
**civil** 95:7
**claim** 85:16
**claims** 33:21
**clairmont** 2:18
**clarification**
  45:7
**clarity** 28:25
  40:22 42:7,13
**clay** 20:3
**clean** 17:25 79:3
**cleaned** 79:8
**cleaning** 79:4,8
**clear** 6:22 35:2
**click** 4:19 62:21
  63:8 64:24
  65:12,15 78:18
  80:15
**client** 30:14,19
  33:9
**clinic** 9:19 38:24
  81:25 82:3,10
  83:13

**close** 21:5 52:18
**closing** 5:7 70:13
  76:9,13 77:14,19
  77:22,23 78:11
**code** 91:22 93:10
**coincide** 34:8
  35:22
**coles** 1:16 2:4
**colesbarton.com**
  2:7
**collateral** 5:6
  73:7 75:5,5
**colloquies** 92:12
  93:5
**column** 35:6
  40:23 41:11
  42:8,24 44:13
**columns** 42:20
**combine** 42:25
  43:3
**come** 12:17 14:7
  36:13 38:20
  52:23 77:23
**comes** 11:7
  55:22
**commission**
  96:25
**commitment**
  93:13
**communicating**
  59:6
**communications**
  26:7,10
**company** 5:5
  13:23 14:10
  16:14,25 44:23
  44:23,24 47:7
  60:22 74:9

**75:13,15,22**
**compensation**
  91:24 93:11
**compilation** 44:8
**complete** 34:17
  91:16 92:12
**completed** 35:10
  94:16
**completely** 6:24
**compliance** 91:4
  91:22 93:10
**concerning**
  75:10
**concluded** 90:3
**conditions** 63:3
**conduit** 45:18
**confirm** 24:25
**conflating** 62:10
**confusing** 62:11
**connection**
  24:15 51:19
**consent** 5:14
  86:17
**consented** 88:6
**consideration**
  66:6 71:17,22
**considered**
  45:16 46:5,8
**constantine** 5:9
**construction**
  18:24 19:1,23,24
**contact** 36:15
  72:23 73:2
**contacted** 92:3
**contains** 46:17
**contemporane...**
  45:5,8

Phillip Eagles McClan
Curepoint, LLC

October 10, 2022

**[continuation - curepoint]**

Page 6

continuation
  35:3
contract   20:12
  91:23 93:11
contracts   20:17
  36:10 91:11
conversation
  47:20,22 57:18
  58:12 68:18
  73:22
conversations
  13:21 76:23
converted   39:13
coo   15:5
copiers   82:8
  83:12,12 84:3,14
  84:20,20 85:3
  86:2
copies   70:6
  94:12
copy   34:13 64:19
  70:11
correct   7:12,18
  7:20 8:7,16,18
  8:20 9:2,13,21
  10:22,24 11:13
  11:17 12:3,5,6,9
  12:11,13,15,16
  13:8,11,24 14:4
  14:6,11,12,15,17
  14:23 15:1,3,6
  16:2,4,6,16 17:4
  17:6,8,11,13,18
  17:20,21,23
  18:22 20:1,2,6
  20:15,25 21:1,8
  21:18,21,22 22:5
  22:6,8,9,21,24

23:23,24 24:5,18
24:22,23 25:2,10
27:20 28:1,15
29:16 30:1 31:1
32:6,9,17 33:4
33:17 35:12,16
36:3,4,11,17,18
36:23 38:13,22
40:11,14,16,20
42:11,18,22
43:10,13 44:11
45:12 46:7,12,18
47:10,21 48:3,14
48:24 49:6,16,20
50:1,5,15,16,17
50:21 53:7
54:23 57:5,8,11
57:19,22 59:15
59:22 63:15,18
64:1,18 65:14,16
65:22 66:17,18
66:19 67:1,6,7,9
68:12 69:11
70:23,25 71:5,8
72:2 73:24 74:1
74:2,4,6,14,17
74:23 76:2,3,14
76:17,20,21 77:2
77:15,18 78:23
79:1,12,14,16
80:6,8,14 81:22
81:23 82:4,9,12
82:23 83:1,4,11
83:19,23 84:10
84:15,24 85:10
85:24 86:3,19
87:1,8,11 88:4
88:10,13,14,15

92:11 93:6
corrections   94:7
  95:9
correctly   10:12
  15:4,13 22:10
  33:9 56:17
counsel   6:5
  30:10 50:25
  51:2 53:14 65:8
  68:17 88:4
county   93:3
couple   6:18
  39:17 40:22
  42:6 58:10
  69:18 85:17
  88:16
course   7:3 24:15
  62:15
court   1:1 6:3,5
  6:19,25 23:13
  30:12,25 31:6
  36:7 52:4,8
  53:24,25 91:1,8
  92:13 93:14
  94:15,18
cover   24:4 31:15
  32:8
covered   81:12
  81:20
covers   50:23
covid   18:1
cp   70:9 78:12,12
credit   33:1,7
  46:14
credited   37:15
creditor   32:22
  34:10

creditors   33:20
  51:12
cs   94:22
culhane   51:13
  52:16,23 53:3,11
  53:18
curepoint   1:4,9
  4:11,15 5:17 9:4
  9:7,9,15,20 10:6
  10:15 11:1,15,15
  11:19,24 12:4,10
  12:14,20 13:1,10
  13:18 14:5
  15:18 17:23
  19:5,12 20:18
  23:18 24:16
  26:8 27:25 28:4
  28:12 29:9,15,23
  30:25 31:4,5,13
  31:19 33:5
  34:15 36:15
  37:4 38:3,4,12
  38:25 40:19,25
  41:7,13,15,16,21
  41:23 42:10,16
  42:20,21 43:12
  43:21,23 44:3
  45:15,16,25
  48:15,22 49:8,10
  49:13,18 50:3
  51:17,18 52:3,6
  52:7,20,24 53:5
  53:11,14,24,25
  54:15,19 55:16
  56:13,25 57:2,4
  57:9,13 58:14,20
  59:16 60:13
  63:9 64:13,15,17

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Pages 104 McCord)
Phillip Pagel

Curepoint, LLC

October 10, 2022

[curepoint - document]                                                              Page 7

65:2,24 66:4
67:5,10,14,15
68:10,23 69:5,25
70:5,23,24 71:1
71:14,17,20,22
71:25 72:11,14
72:21 73:6 74:3
74:5,18 75:6
78:17 79:22
81:22 82:15
83:14,15,16,17
83:18 84:3,7,13
84:16,21 85:19
86:7 89:5,17,22
**curepoint's** 9:18
11:11 29:22
65:5
**curious** 32:21
**current** 7:24
34:12,25 36:16
**currently** 12:5
19:8
**customer** 86:24
**cut** 7:2

**d**

**d** 4:1 5:1 6:1
12:13,13
**dadabhoy** 12:12
12:13 13:7,21
14:13 15:4,15,20
22:8,12 31:10
37:17,23 38:5,16
47:24 48:18
49:14 53:2
57:14 64:14
71:7 73:23 75:6
75:18

**dadabhoy's**
10:23 59:14
**daily** 45:8
**dale** 27:15
**daniel** 14:9
16:13
**data** 48:5
**date** 46:25 77:16
82:22 94:3
**dated** 54:16
**day** 7:3 40:17
50:4 68:19
93:14 96:22
**days** 51:12 53:4
94:3
**dealing** 68:14
**dealt** 59:3
**debt** 5:6 55:20
55:23
**debtor** 1:5 9:3
12:2 30:5 32:16
36:14 50:25
**december** 86:22
89:20
**deem** 49:19
**defendant** 52:24
53:25 76:19
**defined** 26:9
**definitely** 74:22
**delegated** 49:17
**delivered** 84:21
**demand** 47:2
**denying** 88:15
**deponent** 94:2,6
94:6,7,9,15
**deposition** 1:12
7:7 10:9 23:12
95:8

**depositions** 25:7
**derived** 34:5
**described** 50:23
**description** 4:8
5:3
**designated** 12:25
13:6,18,22 31:12
70:24
**desire** 95:7
**destination**
13:25
**destinations**
13:7,12
**determine** 34:24
**determined**
91:24
**difference** 40:6
**different** 33:1
39:7,16 43:20
47:6,9 48:8
50:14,17 61:12
62:1 80:17 84:2
89:11
**direct** 28:3 57:10
91:23 93:11
**direction** 93:5
**directly** 12:16
14:16 15:7
16:14,15,25 17:1
27:19 28:13
29:22,25 44:3,4
51:22,22 83:16
84:22
**director** 9:13
**disbursed** 78:25
**discharge** 86:23
**discharged** 87:5

**disclosure** 6:4
91:8
**disclosures** 91:1
91:3 92:1
**discount** 92:9
**discounts** 92:7
**discuss** 75:6
**discussed** 67:19
**discussion** 68:13
**discussions**
26:14 67:10
**disqualification**
91:9
**disqualify** 91:19
93:9
**dissolved** 60:16
60:21,25 61:4,7
68:4
**distinction** 78:11
**distribution**
37:15,23
**district** 1:1
**divided** 11:21
**division** 1:2
**document** 25:4
32:15 45:2
46:11,13 55:12
56:17 57:12
58:17,22 61:9,10
62:4,8,23,25
64:11,19,24,25
65:4,7,8,11,12
66:21,22,24 67:2
67:20,22 70:4
73:16 77:8 78:6
83:7 85:18,20
86:17 87:7,19,20
88:6

Phillip Pagel - 305 McCord
Curepoint, LLC

October 10, 2022

**[documented - ethics]**

Page 8

| | | | |
|---|---|---|---|
| **documented** 76:23 | 35:20,20 39:6,6 40:18,20 41:16 42:6,6 45:4,4 46:5,5,12,12 48:5,5 50:11,11 50:23,23 94:3 | 34:14 39:1 47:15 53:20 57:8,10 | 68:15 69:17 84:8 |
| **documents** 23:13,17 29:8 31:23 55:4 76:12 | **duly** 6:9 74:9 75:12 | **elected** 75:12 **electronic** 62:4 66:21,25 | **entitled** 75:10 **entity** 12:8 14:14 14:25 15:8 16:15,25 18:10 |
| **docusign** 58:18 **doing** 36:7 44:9 48:21 59:11 | **dynasty** 79:19 | **electronically** 58:14 67:3 94:8 | 20:10,25 21:3,7 22:5,7,19,20,23 26:8,13,21 28:22 |
| **dooley** 14:10,10 16:13,18 51:22 52:1 53:1 | **e** | **employed** 11:1,3 15:7,9 75:13 | 28:25 40:20 42:25 43:16,24 |
| **douglas** 19:20 **dr** 14:9 15:25 17:9 19:25 20:24 22:4,22 26:13,20,23 27:1 27:2,5,8,18 28:21 29:22 31:1 33:9 52:8 53:24 | **e** 1:12 2:1,1 3:1,1 4:1,3 5:1 6:1,1,8 6:16 9:24 10:14 10:14,25 11:4,4 21:5,5 37:11 51:5 59:7 64:5 94:2 95:6,7 96:20 | **employee** 15:24 93:7 **employees** 11:11 11:16 15:11,22 20:15 38:6 **empowered** 79:9 **endeavors** 27:18 **engaged** 53:9 **ensure** 31:13,22 | 44:5,19,19 46:6 47:18,19 48:7,7 48:8 49:1,1,4 52:24 57:10 60:16,20,25 61:4 61:7 62:2,11 80:2 **entries** 79:15 |
| **draft** 62:8 64:2,4 67:22,25 | **earlier** 20:7 50:22 75:7 78:16 80:16,20 | **enter** 58:20 60:4 71:9 | **entry** 26:1,1 32:21 42:8 45:9 |
| **drill** 6:17 **drive** 9:17,22,24 10:20 | **early** 21:17 **easily** 25:13 37:2 **eclipse** 11:4,5 | **entered** 57:21 95:8 **entering** 60:6 | **equipment** 18:24 19:1,3,4,17 79:8 80:9,11 81:24 |
| **driver** 55:23 **dropbox** 25:11 25:14,15,18 | 20:7,11,12,17,20 21:2,5 33:22 38:21 39:1,14,16 40:8 43:18 | **enterprise** 79:13 **entities** 10:7,16 17:2 21:21 25:15 27:3,4,8 | 82:1,5,7 84:17 86:2 **errata** 94:3,7,8,9 94:11,12,14,16 |
| **dublin** 36:15 37:4 38:24 68:10 81:25 | 45:18,25 46:1 **edited** 24:14 **edward** 6:15 57:8 | 27:10 29:9 33:22 34:14 38:18 42:23 43:17 45:14 | 95:1 **erroneously** 67:12 **esq** 2:4,9,17 3:4 |
| **due** 4:15 23:17 23:18,21,21 24:4 24:4,6,6,7,7,11 24:11 25:7,7 34:5,5,8,8,11,11 34:17,17,23,23 | **effect** 75:15,22 **effectively** 39:3 **effort** 31:13 **either** 14:9 15:7 16:14,15,25 | 47:3,5,16 48:17 48:23 49:8,18 50:13,19 54:22 55:19 60:3,5,7,8 61:9,23 62:7 63:20 64:6 68:4 | 94:1 **essentially** 48:21 85:9 **et** 12:3 29:24 **ethics** 91:22 93:10 |

Phillip Fayne (McCord)
Curepoint, LLC

October 10, 2022

**[event - free]**

Page 9

**event**  22:18
  31:12 40:5
  63:19
**evidence**  93:6
**exact**  16:10
**examination**  4:3
  4:11 6:11
**examined**  6:10
**example**  41:11
  43:4,22 44:2
  45:19 46:20
  51:21
**examples**  40:22
  42:7 44:5
**excel**  24:13 48:1
**exception**  78:10
**excuse**  41:4
  42:16
**executed**  65:4
  82:14
**executive**  9:25
**executory**  36:10
**exhibit**  4:10,13
  4:15,16,17,19,21
  4:23 5:5,7,8,10
  5:11,12,15,16,18
  23:1,11 26:7
  32:10 39:5,9
  40:15 42:5
  48:12 50:11
  54:3,7 55:6 58:1
  58:5 62:16,20
  63:21,25 64:2
  65:5 66:9,13
  68:1 69:20,24
  73:9,13 76:4,8
  77:3,7 78:22
  81:4,8 85:11,15

86:9 88:11,13
  89:4,11,12,16
**exhibits**  88:25
  92:15,15,19
**exist**  24:21,25
**exists**  35:6
**expect**  63:13
  69:8
**expires**  96:25
**extension**  46:14
  47:19
**extensively**
  58:10
**extent**  15:13
**extra**  70:8

**f**

**f**  3:4 27:23
**facility**  94:17
**fact**  50:13 62:3
  77:15 86:15
  87:17
**factually**  87:2
**failed**  87:22
**false**  87:15
**familiar**  32:16
  60:15,23 61:2
**familiarized**
  58:7
**fault**  39:21
**february**  54:17
**federal**  95:6
**fee**  53:8
**feel**  27:13,13
**fees**  52:3,7,20,23
**figure**  39:20
  52:19

**file**  30:11,17
  94:11
**filed**  36:6 37:5
  39:18 52:9
  61:11 94:14
**filing**  35:23,23
  51:12 53:4
**fill**  94:7,8
**filled**  35:15
**final**  46:25
**finance**  3:3
  68:12 69:19
  81:21
**financed**  82:7
**financial**  5:12
  9:11 12:4 91:10
**financially**  93:8
**financing**  28:10
  84:12,14 85:8
**findings**  88:15
**fine**  25:17 39:19
  59:10
**finish**  7:5
**finished**  6:24
**finra**  5:15 86:18
  86:21 87:12,16
  88:8
**firm**  51:15,16,18
  53:3,20,21 86:24
  87:13,14,16 88:9
  92:1
**first**  6:9 7:10
  27:1,2,7,9,15,17
  27:21 28:2,8,13
  32:18 41:11
  54:18 58:13
  59:13 65:20
  66:20 73:16

75:9 80:1 81:11
**five**  29:7 50:6
**flip**  55:1 82:13
**flipping**  67:15
**flow**  11:14 12:17
**flows**  20:11
**focus**  40:15 81:8
**folks**  38:23
**following**  91:3
  95:5
**follows**  6:10
**force**  75:15
**foregoing**  93:4
**forgive**  72:16
**forgiven**  38:13
  38:15
**form**  7:8 24:14
  26:11 34:12
  69:11,12 95:7,9
**formal**  47:15
**formation**  19:2
  19:20
**forms**  91:8
**formula**  39:14
  40:2
**forth**  63:3 74:11
**forward**  24:3
  48:11 59:24
  94:11
**four**  19:16 26:7
  87:23
**fourth**  86:1
**frame**  33:15
  58:12
**franchise**  17:15
  17:17
**free**  27:13,13

Case 22-56501-pmb    Doc 336-3    Filed 10/11/23    Entered 10/11/23 13:20:48    Desc
Exhibit Pages 107 of 121
Phillip Falgren (McCord)                                    October 10, 2022
Curepoint, LLC

[friday - huh]                                                      Page 10

| | | | |
|---|---|---|---|
| **friday** 31:16 39:6 | **generally** 58:8 | 71:10,18 72:20 73:7 74:19 | **help** 6:22 48:6 |
| **froms** 24:4,7 35:20 46:5 | **generate** 18:6 | **guaranteed** 33:10 79:22 | **helpful** 56:10 |
| **front** 65:5 89:4 | **generated** 20:11 | **guaranteeing** 71:15 | **helps** 55:7 |
| **frost** 27:23,24 80:2 | **georgia** 1:1,19 2:6,11,19 3:6 | **guarantor** 33:12 | **hidden** 48:5 |

**friday** 31:16
39:6
**froms** 24:4,7
35:20 46:5
**front** 65:5 89:4
**frost** 27:23,24
80:2
**full** 6:13 21:3
66:24 75:10,15
**fully** 9:24 26:25
**fumble** 51:8
**funded** 62:14
**funding** 48:19
54:8,14,16 69:16
78:17 80:18
**funds** 11:14 29:8
43:24 49:9
56:24 59:16,19
63:11,12,14
65:15,23 67:14
67:16,17 68:22
69:6,9 72:7 78:7
78:12 79:1,10,11
**furnish** 95:10
**further** 93:7
**future** 72:1

**g**

**g** 6:1
**ga** 94:20
**gambrell** 3:4
**geer** 2:17 7:11
7:11 12:21
28:25 30:14,18
30:22 39:12,21
39:24 41:1,24
50:7 81:13,15
88:23 90:2 94:1

**generally** 58:8
**generate** 18:6
**generated** 20:11
**georgia** 1:1,19
2:6,11,19 3:6
6:3 17:20 37:2
91:4,14 93:2
**getting** 61:14
84:18
**give** 28:18 33:14
89:18
**given** 37:15
49:23 50:3 93:6
95:8
**glasses** 23:6 78:8
**go** 8:15 37:12
41:7,24 43:6
45:10 56:15
60:9,11
**goes** 87:22
**going** 7:8 8:15
19:22 23:19
24:6 30:18,20
34:10 36:13
38:25,25 39:5
45:3 54:10 73:3
81:2 82:7 86:13
**gotcha** 35:8
**grab** 23:6
**grant** 5:5 75:5
**granted** 23:12
**greetings** 94:5
**group** 4:19
60:14 62:21
63:9 84:5
**guarantee** 4:24
5:6 33:12 53:23
69:25 70:22

71:10,18 72:20
73:7 74:19
**guaranteed**
33:10 79:22
**guaranteeing**
71:15
**guarantor** 33:12
**guess** 65:3 79:24
**guessing** 8:4,5
16:19 53:13,22
**guilty** 11:7
**guys** 51:7
**gwinnett** 93:3

**h**

**h** 6:15 10:25
12:13
**halo** 11:8 39:3
**hand** 40:23
41:10 42:7,19,24
70:6 86:13
89:12
**hands** 51:3
**handwriting**
82:22
**happens** 50:3
**happy** 7:4 88:19
**harry** 19:20
**hayward** 7:15
8:3
**hdr** 19:19
**head** 6:21 52:15
**heading** 41:16
**heard** 12:22 60:3
68:5
**hearing** 5:10
**held** 74:9 87:9

**help** 6:22 48:6
**helpful** 56:10
**helps** 55:7
**hidden** 48:5
**high** 24:13
**highbar** 61:11
69:15,15
**historically**
15:16
**holbein** 3:4
**holder** 57:10
**holding** 11:23
12:7 14:10 16:3
16:4,8,14,22,25
17:10,12,14,22
18:8,13 33:25
43:4 47:7 54:16
54:20 55:16
56:1 57:9,24
60:13 62:22
63:9,20 65:21
66:1,1 70:1
71:18 72:4,4,14
72:18 74:20
78:7,13,18 79:10
79:14,18 80:5,10
80:13,25
**holdings** 14:11
**holds** 17:15
**home** 7:14 10:23
36:19 59:14
**hospitalist** 8:22
**hr** 11:8,12 15:8
20:12,16 38:21
39:1,3 46:1
**hst** 61:1
**huh** 6:20,20 75:2

Phillip Pagel 30(b)(6)
Curepoint, LLC
October 10, 2022

[hundred - landlord]                                                   Page 11

| | | | |
|---|---|---|---|
| **hundred** 11:19 18:19 79:25 | **individual** 28:10 42:24 | **introduce** 26:23 **investigation** 87:13 | **k** |
| **i** | **individually** 13:2 18:19 53:17 | **investment** 14:10 | **keep** 56:11 **keeping** 26:4 **kensington** 77:9 |
| **ibs** 60:19 **identification** 23:2 32:11 39:10 54:4 58:2 62:17 66:10 69:21 73:10 76:5 77:4 81:5 85:12 86:10 89:1 | **individuals** 4:14 **industry** 5:12 **information** 48:13 84:6 87:23 **informed** 37:7 **ink** 70:11 **insiders** 37:16 **instance** 43:17 44:2 45:18 55:24 65:17 | **investors** 28:10 78:20 **invoice** 18:6 45:25 **invoices** 45:23 **involved** 24:16 31:17 52:21 **issue** 20:14 40:13 46:4 **issues** 11:5 **itemized** 5:11 | **kind** 18:6 46:11 58:20 **klein** 2:17 **knew** 27:3 **know** 7:4,25 8:1 11:9 16:10,17 20:10 25:14 27:9,14 28:8 29:20,21 30:2 31:8 32:5,7 34:21 35:14 36:8 37:5 38:9 |
| **identifies** 60:2 **identify** 88:18 89:5,17,22 **ignorance** 31:8 **impacts** 93:13 **impartial** 93:13 **impartiality** 91:21 93:10 **important** 48:19 **inadvertently** 7:3 | **instances** 44:22 **institute** 33:23 **instruct** 30:20 **instructed** 76:25 **instructions** 77:20 **intention** 7:2 **intercompany** 23:19 | **j** | 43:9 44:13,15 45:1 50:18 51:7 52:1,10,12 53:10 54:10,21 56:9 58:7 64:23 65:7 65:11 70:18 77:12 78:10 79:22,25 83:22 |
| **inception** 15:2 **include** 64:17 **included** 24:1 **including** 23:17 23:19 33:22 68:10 72:10 | **interest** 9:3 14:13,16 16:4,13 16:22 17:10 20:1,25 26:20 28:19,21 31:19 46:20,21 50:16 91:10,18 93:9 | **j** 2:9 **jamila** 37:17 47:24 48:18 **january** 24:8 35:4 42:8,14 48:11 **jennifer** 76:15 **joined** 53:18 | **knowledge** 11:22 43:16 45:13 **knoxville** 74:24 **kokinakis** 5:9 **kornfield** 5:8 77:8 |
| **incorrect** 82:24 82:25 83:10,11 **incorrectly** 22:18 **indicated** 75:25 **indirectly** 15:8 17:2 50:16 | **interested** 26:8 93:8 **interests** 47:6 **interject** 30:7 **internal** 8:22 | **joint** 57:23 **jointly** 55:19 **josephson** 17:3 **jotted** 22:18 **july** 89:20 **june** 89:7,13 **jurisdiction** 76:19 **jwc** 1:4 | **l** **l** 6:15,15,16 7:18 11:4 21:5 37:11 **lady** 73:2 **land** 77:9 **landlord** 10:3 68:10 |

Phillip Page, et al. McCord)                    October 10, 2022
Curepoint, LLC

**[lane - ls]**                                                      Page 12

| | | | |
|---|---|---|---|
| **lane** 7:15 8:3 | **lessor** 36:16,16 | **listing** 33:20 | **loans** 27:8,9,25 |
| **language** 76:1 | **letter** 5:8,13 77:8 | 36:10,15 38:1 | 33:5 45:16 46:5 |
| **large** 71:15 | **level** 24:13 47:7 | 42:23 | 46:10,17 |
| **larger** 71:20 | **levengood** 2:9,9 | **lists** 51:13 63:19 | **located** 81:24 |
| **lastly** 10:18 | **levengoodlaw....** | 73:18,25 | **location** 82:1,10 |
| **laura** 1:24 93:19 | 2:12 | **litigation** 24:16 | **locklear** 60:22 |
| **law** 2:9 53:3 | **levin** 37:10 | 29:21 30:12 | **long** 8:2 27:3 |
| 91:4 | **lewyn** 37:11 | 31:1,4,11 51:19 | 63:25 |
| **lawrenceville** | **liabilities** 4:13 | 54:1 76:24 | **longer** 36:22 |
| 1:19 2:6,11 | **liability** 5:5 | **little** 56:2,19 | **look** 23:25 24:2 |
| **lawsuit** 61:10,18 | **liable** 55:23 | 63:4,5 78:13 | 40:23 41:10 |
| 66:17 76:19 | **liberty** 26:23 | 81:12 | 42:7 43:7 44:6 |
| **lawsuits** 53:2 | 27:1,2,7,9,15,17 | **lived** 8:6,8 | 45:10 48:20 |
| **lawyer** 80:24 | 27:21 28:2,13 | **lives** 7:19 37:1 | 51:8 52:13 54:9 |
| **lead** 31:3 | 80:1 | **llc** 1:4,9,16 2:9 | 55:5 56:2,16 |
| **lease** 10:2 19:4 | **liberty's** 28:8 | 2:17 3:3 4:11,19 | 58:7 62:12 |
| 19:12 36:14 | **license** 87:10 | 4:21 5:17 16:3 | 65:18 79:21 |
| 44:3,25 46:7,8 | **likewise** 42:13 | 18:15 21:6 | 88:20 |
| 46:13 84:11 | 49:7 | 22:16 29:5 | **looked** 43:20 |
| **leasebacks** 18:24 | **limitation** 49:21 | 36:16 37:5 | 44:13 61:10 |
| 19:2 | 49:22 50:2 | 54:15,16,19,20 | 80:20 88:12 |
| **leased** 19:18 | **limited** 5:5 | 55:16,16 58:14 | **looking** 11:7 |
| **leases** 19:7 84:8 | **linac** 33:11 | 60:14 61:6 | 42:5 48:21 |
| 84:25 | **line** 29:24 32:25 | 63:20 64:13 | 59:12,24 68:25 |
| **leasing** 18:15,16 | 33:7 95:11,14,17 | 68:11,12 69:25 | 72:11 |
| **left** 9:23 24:20 | 95:20,23 96:1,4 | 70:1,23 71:2 | **looks** 24:2 56:16 |
| 41:10 42:7,24 | 96:7,10,13,16 | 82:15 | 58:13 65:17 |
| **leg** 44:9 | **linear** 19:21 | **llp** 2:4 3:4 | 66:25 70:10 |
| **legal** 20:10 28:19 | **link** 26:1 | **loan** 27:17,22 | 79:4 80:24 |
| 91:15 | **liquidated** 68:5 | 28:16 32:23,25 | 81:11 85:25 |
| **leitman** 2:17 | **list** 52:25 56:9 | 33:1,6,10,16,17 | 89:7 |
| **lender** 27:2 28:4 | 68:15 86:1 | 38:5,12,13 46:8 | **lori** 7:17 70:17 |
| 28:14 | **listed** 33:25 38:6 | 47:11 69:19 | 77:21 |
| **lenders** 23:18 | 46:5 54:15,19,21 | 70:25 71:15,20 | **loss** 79:7 |
| **lending** 28:13 | 55:16 57:7 61:9 | 71:22,24 72:15 | **lot** 83:12 |
| **lengthy** 13:20,20 | 62:8 63:21 64:8 | 73:4 80:5,16,17 | **ls** 6:15 |
| **lent** 9:15 | 78:21 82:6 | 80:20 | |

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Pages 110 McCord   Page 110 of 121
Phillip Pages 110 McCord
Curepoint, LLC

October 10, 2022

**[m - missing]**                                                           Page 13

| m | marc 37:10 | mean 45:7 64:16 | 62:20 63:20 |
|---|---|---|---|

**m**

m  2:4 6:16 10:14
  10:25 37:10
**m.d.**  1:6
**machine**  19:19
  19:20
**mail**  51:5 59:7
  94:9
**mailing**  64:5
**maintained**
  23:18 25:11
  45:4
**maintaining**
  91:21 93:10
**majority**  64:6
**making**  55:19
  91:20 95:8,9
**manage**  22:20
**managed**  16:1
  17:12 22:2,11
  25:7 71:6
**management**
  33:23
**manager**  9:6,8
  9:10 12:10,12
  13:1,6,9 14:20
  18:10 31:12
  70:23,24 71:1,6
  73:18 75:11
  82:15,25 85:22
**managers**  47:16
  75:11
**manages**  13:10
  18:8 20:22
**manner**  75:16
**mansell**  94:18
**manually**  94:8

**marc**  37:10
**march**  74:9
  77:15 86:22
  89:20
**mark**  1:6 8:17
  14:9 15:25
  16:21 17:9
  18:17 19:25
  20:24 22:4,22
  31:5 39:5 52:4,8
  59:4 67:12,13
  68:13 69:14
  73:25 74:5
  77:21 83:2
**marked**  23:1
  32:10 39:9 54:3
  58:1 62:16 66:9
  69:20 73:9 76:4
  77:3 81:4 85:11
  86:9 88:25
**master**  17:17
**mathieson**  10:20
  10:24
**matter**  10:14
  91:18 92:4 93:9
**matthew**  5:8
  77:8
**mca**  78:17
**mccord**  1:6 14:9
  15:25 17:9
  19:25 20:24
  22:4,22 27:15
  29:22 31:1,5
  33:9 52:4,9
  53:24
**meadows**  51:13
  52:16 53:3,11

**mean**  45:7 64:16
  64:22
**meaning**  19:14
**means**  41:6
**meant**  41:16
**mec**  14:9,18,24
  15:5,7,9,11,14
  15:17,21,23 16:1
  16:5,7 18:9,10
  18:18,20 21:12
  21:13 33:23
  40:24,24 41:7,12
  41:12,15,20,20
  41:23 42:9,10
  43:4,22,25
**medical**  19:3,4
  33:23
**medicine**  8:23
**meeting**  74:8,13
  74:22
**member**  9:14
  74:3,5 82:14,24
  83:9 86:21 88:9
**members**  22:14
  22:15 51:18
  74:9,13,16
**memorized**
  56:12
**memory**  10:8,11
  38:14 39:2
  56:21 57:25
  64:18 72:25
  78:4 86:7
**mentioned**  20:7
**merchant**  4:16
  4:17,19,21 54:8
  54:8,14,16,19
  55:15 58:5

**mean** 62:20 63:20
  67:11 72:10,14
  78:16 79:20
  80:18
**merchants**  55:3
**merged**  35:5
**messed**  39:14
  40:2
**mholbein**  3:7
**michael**  2:9,9
  3:4 7:21 25:8,9
  25:22,23 34:6
  47:24 48:18
  67:2,19
**middle**  59:13
**miles**  1:12 4:3
  6:8,13,16 7:14
  8:17 15:9 16:21
  18:17,19 25:9,10
  25:22,23,24
  47:24 48:18
  50:10,18 52:1,24
  57:8 58:19
  70:17 73:25
  74:5 77:20,21,21
  82:14 83:2
  85:19 86:21
  87:14 94:2
  96:20
**million**  40:9
  71:15 72:5
  74:19 78:9
**mine**  63:7
**minute**  23:25
  88:17
**minutes**  50:6
**missing**  29:12
  89:20

| | | | |
|---|---|---|---|
| **misstate** 25:16 | **n.e.** 3:5 | 77:7 | 39:25 56:3,11 |
| **mistake** 39:12 | **name** 6:13 11:10 | **nine** 8:4 | 59:24 65:3 |
| **mittere** 10:10,12 | 21:3 32:22 37:9 | **nod** 6:21 | **o** |
| 14:4,7 18:12 | 59:4,5 63:2 | **non** 4:14 33:20 | **o** 6:1 7:18 9:24 |
| 20:4 21:9,19,23 | 66:22 73:1 | **northern** 1:1 | 10:25 12:13 |
| 22:2,7,17 25:9 | 76:10 84:1 | **northwinds** | 27:23 |
| 25:12,16 33:24 | **named** 75:12 | 18:15,16,23 19:1 | **object** 30:18 |
| 33:24 41:8,8 | **names** 62:1 | 19:12,17 20:1,3 | **objection** 30:14 |
| 61:1,5 | **nashville** 74:25 | 20:5 42:15,16,17 | 36:6 |
| **mlevengood** | 75:1 | 43:3 44:4 | **objections** 7:8 |
| 2:12 | **national** 77:9 | **notarized** 76:16 | **obligation** 11:16 |
| **modified** 75:16 | **native** 24:14 | 94:9 | 44:25 46:21 |
| **money** 9:15 41:9 | **necessarily** | **notary** 70:19 | 57:23 71:14 |
| 48:16,17 49:1,4 | 83:21 | 78:4 96:24 | 74:19 80:13 |
| 50:2 51:17 | **necessary** 95:9 | **note** 47:12 48:18 | 91:21 93:10 |
| 56:24 57:2 | **need** 37:3 43:6 | **noted** 95:4,5 | **obligor** 64:17 |
| 78:13,24 79:3 | 48:22 88:17 | **notes** 21:3 80:19 | 79:17 80:19 |
| **monroe** 66:18 | **needed** 34:8 | 88:21 | **obtain** 84:5 |
| **monthly** 45:6,13 | **needs** 48:16,19 | **notice** 5:10 | **obviously** 9:18 |
| **months** 8:4,5 | 49:2,8 | 32:23 | 47:25 60:13 |
| 29:13 37:22 | **negative** 40:8 | **noticing** 39:15 | 73:1 |
| **moore** 53:13 | **negotiate** 72:17 | 92:4 | **occasions** 34:22 |
| **morris** 32:22,22 | 72:20 | **noting** 94:7 | **occur** 77:15,16 |
| 33:4,5,10 | **negotiations** | **number** 4:8 5:3 | 87:18 |
| **motion** 4:10 5:10 | 63:8 | 16:9 23:11,16 | **occurred** 87:17 |
| 23:11 30:11 | **neither** 67:8 | 26:6,7 39:5,16 | **occurs** 45:10 |
| 31:24 | **net** 56:17 | 40:8,18,21 41:6 | **ocga** 91:9,10 |
| **movant** 1:7 2:3 | **never** 15:21,24 | 41:7 42:5,13,20 | 92:6 95:7 |
| 4:9 5:4 | 15:25 17:9,12,22 | 42:21 51:11 | **october** 1:13 |
| **move** 39:22,25 | 19:25 20:24 | 54:7 56:7 58:5 | 89:21 93:14 |
| 84:17 | 22:4,22 35:5 | 60:8 62:20 | **office** 2:9 39:13 |
| **moved** 8:9 40:1 | 68:5 | 63:25 65:5,20 | **officer** 9:6,8,10 |
| **n** | **new** 61:17 62:11 | 68:9 69:24 | 9:13 12:20 13:2 |
| **n** 2:1 3:1 4:1 5:1 | 66:17 | 73:13 76:23 | 14:20 93:13 |
| 5:9 6:1 10:25 | **newtek** 5:7 | 77:7 81:8 86:17 | **officers** 47:15 |
| 27:23 37:11 | 69:19 70:19,21 | 88:11 89:13 | **offices** 10:1 |
| | 71:19,24 72:23 | **numbers** 29:7 | 77:17 83:20,22 |
| | 72:25 76:24,25 | 32:19 35:14 | |

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Page 112 of 121

Phillip Pages L. McCord
Curepoint, LLC

October 10, 2022

[offices - payments]                                                        Page 15

84:4,23 86:5
94:3,9
**oh** 12:23 23:7
46:16 61:19
81:17 82:21
**okay** 8:2,6,17
9:11 10:5 11:11
12:19 15:21
16:21 19:25
24:9,11 29:7
30:4,23 31:9
33:8 34:21 38:1
38:16 40:3 41:5
42:4 43:6 52:3
60:9 61:12,19,25
62:13 64:7,16
66:3,20 67:14,17
68:20 70:10,16
70:22 75:19
76:25 77:1 79:3
79:22 80:22
81:10 82:3
84:13 86:8,14
90:2
**oklahoma** 9:1
83:3
**once** 94:9
**oncologist** 8:24
8:25
**oncology** 83:13
**ones** 31:16 60:11
86:5
**ongoing** 76:24
**online** 88:12
**opened** 87:12
**operate** 62:1
**operating** 13:3

**operations** 21:15
**oral** 13:25 47:20
57:18 73:22
**orally** 49:15
**order** 4:10 23:12
**ordering** 92:21
94:12
**original** 23:3
31:1 32:12,24
33:6 39:11 52:4
52:8 53:14 54:5
58:3 62:18
66:11 69:22
73:11 76:6 77:5
81:6 85:13
86:11 89:2
94:12,14
**originated** 43:8
**origination**
34:10
**outcome** 93:8
**outside** 75:2
**outstanding** 33:4
**owed** 20:11
34:14 40:24
42:20,21
**owes** 34:14 41:7
41:8
**owned** 12:4
15:25 17:9
21:11,11,23 22:7
25:11
**owner** 12:14
20:2 25:14
28:23 37:4 57:8
58:14 60:17
67:5 84:13

**owners** 14:8
18:16 22:19
51:18
**ownership** 9:3
16:7 20:1,25
22:5,23 47:6,8
47:10 50:14,15
**owns** 12:2 16:18
20:20 25:16

**p**

**p** 2:1,1 3:1,1 6:1
6:15,15 11:4
21:5
**p.m.** 90:3
**packet** 89:9
**page** 4:3,8 5:3
23:14,17 32:18
33:19 36:9
37:12,16 51:9
54:14 56:16
57:6,7 58:13
59:13 60:10,22
61:5 64:8 65:18
66:20 67:1 68:2
68:20 73:16
75:9 76:1,10
77:19 81:12
82:6,13,14 85:8
85:18 86:1 87:7
87:12 88:7
95:11,14,17,20
95:23 96:1,4,7
96:10,13,16
**pages** 59:23 95:9
**paid** 11:11,22
37:23 44:3
51:21,22 52:3,7

52:20 53:1,4,11
53:20 72:9,15,16
80:7
**paragraph** 75:10
75:20 88:7
**paralegal** 70:18
76:15 89:19
**part** 39:22 44:18
46:15
**particular** 27:22
58:17 64:23,24
65:7,11 71:22
**parties** 47:22
92:8,21 93:13
94:12
**partner** 9:11
**partners** 12:4
**party** 30:25 52:5
52:22 91:23
92:9 93:7,11
**pass** 20:9
**password** 92:18
92:20
**patient** 84:6
**patients** 84:6
**patronizing**
72:13
**pay** 11:16
**payable** 48:19
**paying** 85:3
**payment** 37:20
37:24 41:12,14
41:15,20 44:3,4
46:7,23,25 47:2
48:7 51:13
**payments** 37:14
38:2 44:14
51:11 66:2,3

Phillip Eagles McCord
Curepoint, LLC
October 10, 2022

**[payments - produces]**                                                      Page 16

78:20,21
**payoff** 56:22
**paypal** 80:12
**payroll** 20:9,11
  39:24 43:19
  45:19 46:2,3
  48:19
**pdf** 39:13 94:6,7
**peachtree** 3:5
**penny** 34:13
  35:14
**peo** 11:8 20:13
**people** 7:1 17:3
**percent** 11:19
  12:7 14:25
  16:11 18:19
  21:23 38:17,19
  68:8 79:25
**percentage** 16:7
  16:10,17
**performed** 15:17
  17:22 25:23
**performs** 15:14
**period** 8:10
  48:10 50:24
**periods** 24:4,20
  24:21 29:12
  31:15 32:8
  38:10
**permanent** 88:8
**perry** 1:17 2:5
  2:10
**person** 26:8 27:5
  27:21,24 59:2
  69:14 70:13
  72:23
**perspective**
  28:20

**pfp** 9:12,15 12:5
  12:10,12 13:9
  14:8,8,17,20
  15:18 31:4
  33:24 51:18
  52:23 64:8,15
  71:6 74:16
**phillip** 1:12 4:3
  6:8,15 15:9
  25:10,24 57:7
  58:19 77:20
  82:14 85:19
  94:2 96:20
**phone** 40:17
**physical** 8:1
**physician** 8:19
  83:20,21 84:4,22
  86:4
**physicians** 9:10
  12:4 85:1
**piece** 35:3
**pieces** 24:16
  31:11
**place** 84:3,25
  92:5
**placed** 83:17
  86:4
**placing** 83:18,20
**plan** 68:17
**plaza** 2:18
**please** 6:14
  54:13 55:9 94:6
  94:9,16 95:9,9
**pledge** 75:4
**pledged** 75:8
**pmf** 72:10,15
**point** 27:5,16,21
  27:24 31:10

36:15 59:2
  61:14 67:23
**pointing** 39:24
**pointone** 4:21
  61:20 67:10
  68:14 69:9,13,15
**positive** 40:9,21
  40:24 41:6
  42:20
**possession** 29:18
  30:6 31:15
**possible** 43:23
**possibly** 43:5
**potential** 26:9
**power** 78:1
**ppp** 38:5,11,12
**practice** 32:25
  33:6
**practices** 84:2
**pre** 35:7
**preceding** 27:4
**predates** 24:8
**predecessor** 21:9
**premium** 54:8
  54:16 78:16
  80:18
**present** 6:6
  74:10 77:21
**president** 15:5
**presumably** 44:9
  55:15 76:15
**pretty** 19:2
  26:18 58:9
**prevent** 30:12
**preventing** 36:7
**previous** 82:13
**previously** 21:7

**primarily** 25:8
**primary** 8:22
  83:25
**principal** 9:18
**print** 34:12 40:1
  94:8
**printed** 48:1
**printing** 40:12
**printout** 39:22
  48:12 88:11
**prior** 10:9 23:20
  24:4,20 25:6
  27:6 28:3 29:16
  29:21 31:15
  35:4
**priority** 33:20
**privilege** 30:15
  30:19
**procedure** 95:7
**proceeding** 6:6
  12:2 13:14,17,19
  92:10,19 93:6,13
**proceedings**
  13:23 90:3
  91:17
**proceeds** 72:15
**process** 26:2
  31:4,18 47:18
  84:7
**produced** 24:9
  25:3 26:4,16,17
  26:18 29:11,14
  31:16,23 32:5,7
  35:21 39:6 40:7
  44:21 65:2
  92:11
**produces** 79:8

Case 22-56501-pmb    Doc 336-3    Filed 10/11/23    Entered 10/11/23 13:20:48    Desc
Exhibit Exhibit C Pages s14 McC21)
Phillip Eagles (McC)
Curepoint, LLC

October 10, 2022

[producing - reference]

Page 17

**producing** 65:8
**production** 24:2
  30:5,8 94:17
**professional**
  91:22 93:10
**proffer** 28:11
**prohibited** 92:6
**prohibitions**
  91:11
**promising** 71:24
**pronouncing**
  10:12
**proof** 85:16
**property** 26:9
**protected** 92:18
  92:20
**provide** 20:13
  30:4,17 59:8
  88:2 92:3
**provided** 21:7
  34:8 45:15 46:2
**provides** 21:20
  31:14 45:18
**providing** 71:18
**prsog** 61:6
**public** 96:24
**purchase** 33:16
**purchased** 32:23
**purpose** 44:20
  71:20
**purposes** 13:14
  32:3 38:11
  70:25
**pursuant** 6:2
  77:25 95:6
**put** 6:22 12:1
  35:13 44:13
  68:22 73:6 78:8

86:16

**q**

**quarterly** 45:6
  45:13
**question** 6:24
  7:9 9:25 10:8
  12:21 15:19
  19:23 25:13
  27:10 28:5
  31:22 32:18
  43:1 49:25
  52:14 54:18
  55:10 56:23
  65:3 72:12
**questioning**
  58:23
**questions** 32:14
  36:14 58:18,25
  61:22 62:2
  69:18 85:17
  86:23 90:1
  92:12 93:5
**quick** 85:17
**quickly** 60:9
  85:15
**quitting** 87:5
**quorum** 74:10

**r**

**r** 1:24 2:1 3:1 6:1
  7:18 9:24 10:14
  27:23,23 37:10
  93:19
**raley** 29:19 30:4
  30:7,11,17 31:14
  31:17,22 36:6
  51:5,21,22 52:4
  53:16

**raley's** 51:15,16
  51:17 52:7,20
  53:20
**randolph** 26:23
  27:1,2,5,8,18
**randolph's**
  26:13,20 28:21
**range** 89:19,21
**rbs** 12:5,7 74:16
  74:18,21
**read** 10:20 56:17
  62:24 63:2
  75:24 94:6 95:2
**really** 8:5 43:6
  63:25 81:8
**reason** 8:12 33:8
  34:21 39:2 40:2
  43:1 65:1 95:13
  95:16,19,22,25
  96:3,6,9,12,15
  96:18
**reasons** 72:8
  95:8
**recall** 11:25
  13:13,13,15 15:4
  15:13 18:5,7,18
  19:13,15,19
  20:19 21:1,4
  22:10 26:17
  33:8,11,12 37:1
  38:4,7 60:6,18
  62:6,24 63:7
  69:5 73:8 74:15
  74:21 75:8 83:8
  87:4
**recalling** 22:16
**receipt** 69:10

**receive** 38:12
  46:1 59:16 66:6
  67:14 71:17
  78:7
**received** 38:2,15
  45:14 65:15,23
  67:16 69:5
  71:22 72:4
  78:13,14,18,19
  78:20
**receives** 92:9
**receiving** 67:11
**recess** 42:2 50:8
  88:24
**recognize** 54:10
  60:8,12,24 61:3
  73:14
**recollection** 14:2
  15:23 18:3,11
  58:17
**record** 6:14,22
  12:1 24:25
  39:25 40:18
  41:24 42:4
  75:14 86:17
  91:17,20 92:12
  93:6
**records** 32:2
  44:7,8,12 52:13
  62:12 64:20
  65:6 75:22
  89:23
**redirected** 84:19
**reduced** 93:5
**reference** 32:24
  33:15,16 44:23
  82:24,25

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Pages 115 of 121
Phillip Eagles McCord
Curepoint, LLC                                                    October 10, 2022

[referenced - russell]                                                          Page 18

| | | | |
|---|---|---|---|
| **referenced** 46:11 | **remember** 18:25 | **requests** 26:6 | 94:6 |
| **references** 33:21 | 53:13,17 59:4 | 29:10 36:1 | **reviewed** 25:10 |
| 34:2 42:9 43:24 | 61:24 62:7 64:4 | 47:18 87:23 | 25:23,25 58:9 |
| **referencing** | 64:4,14 65:8 | **require** 34:19 | **reviewing** 47:9 |
| 42:10,15 83:9 | 70:20 75:23 | **required** 77:21 | **revoked** 75:16 |
| **referred** 33:6 | 87:4,5 | **requires** 34:18 | **right** 12:17 13:5 |
| 67:12,13 | **reminders** 6:18 | **reserve** 7:7 | 14:24 21:2,19 |
| **referring** 8:11 | **remotely** 78:3 | **reserved** 94:6 | 22:25 26:6 29:7 |
| 78:22 83:20,21 | **remove** 64:5,11 | **reside** 7:21 | 31:21 32:1 35:1 |
| 83:22 | 68:3 | 36:25 | 35:24 36:9 39:4 |
| **reflected** 59:17 | **removed** 68:16 | **resided** 8:2 | 39:15 40:5,23 |
| **reflecting** 85:22 | **rent** 9:20 | **resides** 9:1 36:22 | 41:10 42:19,19 |
| **reflection** 88:12 | **report** 91:19 | **residing** 8:13 | 46:3,10 50:20,22 |
| **reflects** 68:22 | **reported** 1:23 | **resolution** 5:5 | 53:15 59:9,23 |
| **refusing** 86:23 | 87:16 | 47:15 74:11 | 66:13,15 69:3 |
| **regarding** 87:24 | **reporter** 6:5,19 | 75:11,14,21,25 | 71:2,21 72:3 |
| **registered** 86:21 | 6:25 91:1,9,14 | **resolutions** 74:8 | 74:7 76:1 79:6 |
| **regulations** 6:3 | 92:14,16 | 74:11 | 80:23 81:1 82:8 |
| 91:7 | **reporting** 6:4 | **respond** 87:23 | 82:11,25 85:7 |
| **regulatory** 5:13 | 91:8 92:3 | **respondent** 1:10 | 86:2 88:23 |
| **reintroduced** | **reports** 46:2 | 2:16 | 89:15,25 94:6 |
| 27:1 | **repository** 92:20 | **responding** | **rlkglaw.com** |
| **relate** 33:16 | **represent** 13:18 | 37:14 | 2:20 94:1 |
| **related** 29:9 | 13:22 52:5 | **response** 25:3 | **road** 2:18 |
| 33:18 | **representations** | 31:21 | **robert** 19:20 |
| **relates** 11:18 | 91:3 | **responsible** | **ron** 17:3 |
| 13:16 14:24 | **representative** | 55:19 | **roswell** 94:20 |
| 15:18 48:15 | 44:24 70:20 | **responsiveness** | **rountree** 2:17 |
| 71:21 | **represented** 48:7 | 7:9 | **rubber** 89:10 |
| **relating** 29:8 | **representing** | **restart** 41:17 | **rule** 4:10 95:6 |
| 92:19 | 51:23 | **restate** 55:9 | **rules** 6:2 91:7 |
| **relationship** | **request** 25:4 | **returned** 94:11 | 95:7 |
| 27:4,6,16 28:13 | 48:16 49:3 88:3 | 94:14 | **run** 89:7 |
| 91:18 93:9 | **requested** 23:14 | **revealed** 87:14 | **runs** 24:3 31:10 |
| **relative** 93:7 | 30:9,9 31:17,24 | **reverse** 49:7 | **russell** 3:4 |
| **release** 30:12 | 34:23 35:25 | **review** 44:18 | |
| **remain** 61:22 | 88:3 | 45:3 54:25 | |
| | | 55:12 87:14 | |

Phillip Eugene McCord
Curepoint, LLC

October 10, 2022

[s - smith]

| s | | | |
| --- | --- | --- | --- |
| **s** 2:1 3:1 6:1,16 10:25 11:4 21:5 27:23 | **secured** 28:16 29:25 | **set** 42:19 44:8,12 63:3 74:11 88:19 | 70:22 76:13 78:2,3,5,6 86:18 87:20 94:9,11,14 |
| **salary** 11:18,21 37:22,25 38:16 38:20 | **security** 28:19 75:5 | **setting** 84:7 | **signer** 75:4 |
| **sale** 18:24 19:1 26:9 | **see** 10:18 33:22 34:2 36:12,21 37:18 39:21 51:14 54:15 | **setup** 85:9 | **signing** 60:2 75:25 88:6 |
| | | **sgrlaw.com** 3:7 | **similarly** 6:23 |
| **sandifer's** 53:20 | | **shake** 6:20 | **simplistic** 26:19 |
| **sanitized** 18:1 | 56:2,8,20 63:1 | **share** 12:7 | **simply** 34:24 47:19 48:25 88:11 |
| **saw** 35:25 43:21 55:8,15 61:8 64:3 67:25 78:17 | 63:19,22,24 67:22 70:2,9 73:20 77:10 81:17,20,25 82:16 85:18 87:25 88:21 | **shared** 10:1 | |
| | | **shareholders** 16:24 17:1 22:11 | **single** 1:24 93:19 |
| | | | **sip** 81:2 |
| **saying** 39:3 63:16 | **seen** 43:2 | **shore** 17:7 | **sir** 25:19 26:22 35:19 51:10 56:6 63:12 69:4 79:9,14 |
| **says** 32:22 35:6 58:16,19 63:1 65:1 71:1 73:18 74:7,8 77:20 81:25 87:1,12,19 88:14 | **semantics** 71:24 72:12 | **shorten** 9:12 | |
| | **send** 51:5 94:12 94:16 | **show** 23:18 38:8 39:4 54:7 69:24 73:13 76:8 85:15 | |
| | | | **sit** 16:19 18:17 18:25 20:21 21:25 28:12 34:11 |
| | **sender** 11:10 | | |
| | **sent** 84:22 | **showing** 69:1,2 | |
| | **separate** 87:23 | **shown** 88:7 | |
| **sba** 73:4 | **series** 87:9 | **sign** 57:12,15 62:22 66:22 67:2 70:4 75:18 76:25 77:25 83:7 85:20 87:7 94:6 | **sitting** 11:9 19:9 19:19 45:1 52:10,25 53:12 60:6 61:23 66:23 79:24 84:1 86:6 87:4 |
| **schedule** 82:6 | **serious** 58:25 | | |
| **scheduled** 77:14 | **serve** 93:13 | | |
| **schedules** 23:22 24:12,20 25:1,22 32:15 35:15 39:8 40:7 51:7,9 | **serves** 38:14 56:21 57:25 64:18 78:4 | | |
| | | **signature** 58:18 60:4,7 62:4 66:21,25 70:9,11 73:14 74:7 76:1 76:9,16 82:18 83:5 85:19 93:18 94:2,15 | **situation** 31:20 44:1 |
| | **service** 45:20,21 45:24 | | |
| **seal** 94:11 | | | **situations** 44:2 |
| **second** 12:18 14:7 41:25 57:6 75:9 77:20 | **services** 15:14 15:17 17:23 18:4 20:13 21:8 21:21 45:15,17 77:9 92:3 | | **six** 29:7 |
| | | | **skipping** 23:16 |
| | | **signatures** 59:1 | **slightly** 50:14 |
| **secretary** 15:5 | | **signed** 32:16 54:22,25 55:13 58:13,24 66:24 67:20 69:10 | **small** 4:23 56:22 69:19 |
| **section** 51:11 86:20 | **session** 8:13 | | **smiling** 79:6 |
| | | | **smith** 3:4 53:13 |

Phillip Eagles - McCall
Curepoint, LLC

October 10, 2022

**[solely - tax]**

Page 20

| | | | |
|---|---|---|---|
| **solely** 91:24 | 43:3 48:2,13 | 86:20 87:9 88:2 | **supporting** |
| 93:12 | **squiggle** 63:4 | **stating** 75:21 | 45:23 |
| **solutions** 60:19 | **squiggly** 63:5 | **sterling** 60:14 | **sure** 19:2 23:7 |
| 91:15 | **staffing** 11:4,5 | **sticker** 86:16 | 26:3 31:18 |
| **son** 7:21 25:8 | 20:7,12,12,17,20 | **stop** 86:25 | 40:17 41:18 |
| 34:5 36:19 38:5 | 33:23 38:21 | **story** 87:3 | 42:1 43:9,18 |
| 44:9 67:2,19 | 39:1,16 40:8 | **strategies** 11:9 | 44:18 50:7 |
| **sorry** 41:4 55:4 | 43:18 45:18,25 | 11:12 15:8 | 52:24 55:2,6,11 |
| 70:8 78:14 80:4 | 46:1 | 20:13,16 38:21 | 63:16 81:3 |
| 82:21 | **standard** 4:19 | 39:1,3 46:1 | **swore** 76:18 |
| **sort** 10:8 12:2 | 4:21 | **street** 1:17 2:5 | **sworn** 6:9 96:22 |
| 56:23 59:13 | **stands** 75:14 | 2:10 3:5 | **synovus** 5:16,18 |
| 88:19 | **start** 32:14 41:18 | **structure** 38:21 | 44:4 49:3 56:14 |
| **sorts** 6:21 | **starting** 33:19 | 50:14 | 68:24 89:6,18 |
| **sought** 29:8,22 | 60:10 | **structured** 22:19 | |
| **sound** 69:2 82:8 | **starts** 35:3 63:24 | **subcontractor** | **t** |
| 86:2 | 63:25 85:8 | 91:15,25 93:12 | **t** 10:14,14,25 |
| **sounds** 15:6 | 89:21 | **subject** 66:16 | 27:23,23 |
| 21:18 40:5,13 | **state** 6:9,13 | 84:14 | **table** 88:20 |
| **source** 43:11,14 | 30:12,25 31:6 | **sublease** 10:15 | **take** 7:1 15:21 |
| 43:15 | 36:7 52:4,8 | **subleases** 84:9 | 50:6 58:6 76:12 |
| **sources** 43:13 | 53:24,25 87:22 | **submitted** 6:5 | 78:10 81:3 |
| **south** 1:17 2:5 | 91:14 93:2 | 92:13,16 | 88:16,20 |
| 2:10 | **stated** 13:2 | **subordinate** 5:6 | **taken** 42:2 50:8 |
| **southeast** 94:22 | 14:19 75:7 | **subscribed** | 88:24 93:4 |
| **space** 9:20 | 78:16 93:4 | 96:22 | **talk** 14:8 16:3 |
| **speaking** 49:14 | **statement** 5:11 | **subsequently** | 18:15 30:10 |
| 64:15 | 6:4 12:24 26:1 | 87:16 | **talked** 21:19 |
| **specialty** 8:21 | 43:7 44:6,6 88:3 | **substance** 95:7 | 28:2 60:14 61:1 |
| **specific** 31:21 | 95:8 | **suite** 1:18 2:5,10 | 61:6 78:19 |
| 44:1 92:7 | **statements** 5:16 | 2:18 3:5 9:24 | 80:16 86:5,15 |
| **specifically** | 5:18 10:19 | 10:1 94:19 | **talking** 7:1 29:1 |
| 48:15 91:5 | 29:12,16,23 30:6 | **suites** 9:25 | 46:14 50:11 |
| **spoke** 84:19 | 31:14 43:12,21 | **summary** 4:13 | 69:14 82:5 89:9 |
| **spoken** 68:17 | 45:11 88:18 | **supply** 37:2 | **talks** 77:14 |
| **spot** 26:2,3 | 89:6,17 | **support** 44:16 | **tax** 14:4,5 18:12 |
| **spreadsheet** | **states** 1:1 75:3 | 44:22 45:2 | 18:13 20:4,5 |
| 24:13 40:12 | 75:11 81:24 | | 21:8,9,19,20 |

[tax - undertaking]                                                                          Page 21

| | | | |
|---|---|---|---|
| 25:9 33:24 61:5 | thinking 33:15 | total 53:10 | trying 6:25 |
| tbarton 2:7 | third 85:18 | trading 87:15 | 34:24 52:15,19 |
| tell 12:3 13:17 | thomas 2:4 20:3 | trained 28:17 | 65:10 71:23 |
| 26:18 34:13 | thought 12:23 | transaction | two 6:15 7:1 |
| 36:24 54:13 | 66:14 | 43:17 66:7 | 18:3 19:15,21 |
| 55:7 60:10,12 | three 19:14,15 | 70:14 72:17 | 29:10 31:10 |
| 72:3 | 23:16 51:11 | transactions | 33:5 35:6 38:15 |
| telling 84:17 | throwing 41:14 | 42:25 43:11 | 41:8 70:6 72:24 |
| temporary 8:14 | time 7:1,2,10 | 86:24 | 79:15 81:19 |
| ten 8:4 | 8:10,13 12:25,25 | transcript 7:10 | type 20:13 30:8 |
| tenant 10:1,9 | 13:6,6 18:23 | 23:3 32:12 | 69:11 |
| term 20:10 | 19:11 29:12 | 39:11 54:5 58:3 | typewriting 93:5 |
| 46:20,23 83:22 | 32:8 37:24 | 62:18 66:11 | |
| terms 25:20 | 38:10,17,19 | 69:22 73:11 | **u** |
| 46:17 63:3 | 45:10 48:10 | 76:6 77:5 81:6 | u.s. 4:23 85:16 |
| 91:25 93:12 | 49:19 55:5 | 85:13 86:11 | ucc 33:3 |
| territories 17:16 | 60:17 61:8 62:3 | 89:2 92:10 93:4 | uh 6:20,20 75:2 |
| 17:17,19 | 62:9 67:25 | 93:6 94:7,12,14 | unauthorized |
| testified 6:10 | 71:19 81:3 85:2 | 95:2 | 87:15 |
| testimony 95:2,8 | 85:4 87:9 88:5 | transcripts | unconditional |
| thank 23:10 29:4 | 92:8 94:14 | 92:10,18 | 4:23 69:25 |
| 32:20 | times 6:18 16:10 | transfer 42:10 | undersigned |
| thing 41:18 63:1 | 18:2 39:17 | 42:15 43:8,22 | 95:2 |
| 72:9 | 50:17 | 44:19,22,24 | understand |
| things 6:21 | title 85:22 | 45:10 48:6,25 | 13:17 25:6 28:9 |
| think 7:6 8:10 | today 11:9 16:10 | 49:3 | 43:1 48:6 55:18 |
| 11:6 12:22 | 16:19 18:17,25 | transferred 29:8 | understanding |
| 15:19 18:17 | 19:9 20:21 | 43:24 | 18:23 27:7,17,20 |
| 19:10,23 27:12 | 21:14,25 28:12 | transfers 23:19 | 28:18 33:3 34:7 |
| 29:13 32:24 | 34:11,18 36:24 | 45:5,15 46:4 | 55:22 |
| 33:9 34:9 35:16 | 45:1 52:25 | 47:12,14 49:18 | understands |
| 35:17 36:13 | 53:12 60:6 | transitory 20:9 | 31:18 |
| 40:16 53:2,16 | 61:23 66:23 | true 22:1,3 35:10 | understood 73:3 |
| 60:16,21,24 61:3 | 79:25 84:1 86:6 | 49:7 52:11,11 | 84:16 |
| 78:5,6,22 80:17 | 87:4 | 87:2 92:11 93:6 | undertaken |
| 81:19 84:11,11 | told 30:9 68:3 | truth 6:9 | 71:14 |
| 85:25 89:25 | top 40:23 43:22 | try 26:25 | undertaking |
| | 51:11 81:12 | | 74:19 |

Case 22-56501-pmb   Doc 336-3   Filed 10/11/23   Entered 10/11/23 13:20:48   Desc
Exhibit Pages 119 of 121

Phillip Ayeler, 30(b)(6) Cond)
Curepoint, LLC

October 10, 2022

Page 22

**[underwriting - zerorez]**

**underwriting**
  56:18 71:19
**undetermined**
  34:1
**unfortunately**
  39:18
**unit**  10:20
**united**  1:1
**unsecured**  33:21
**updated**  34:9,23
  34:25 42:6 45:6
  45:8
**uploaded**  92:20
**urologist**  83:25
**urologists**  83:24
**use**  7:10 31:25
  32:2 36:5 43:15
  57:2 59:19
  78:12 95:9
**uses**  79:1

**v**

**values**  87:15
**vanguard**  77:9
**vans**  80:11
**variety**  60:3
**various**  24:15
  43:11 60:5 84:8
**verbal**  14:3
  75:18
**verbally**  37:8
**verbatim**  91:20
**verbiage**  28:7
  31:25
**veritext**  91:15
  92:3 94:9,17
**veritext.com**
  94:22

**versa**  50:5
**version**  23:21
  24:1,11,19 25:21
  34:25 39:5 40:6
  40:7,16 48:1
  50:22 62:8 64:2
  65:4 69:12
**versions**  23:20
  24:3 35:11 43:2
**vice**  50:5
**voting**  74:10
**vs**  1:8

**w**

**w**  1:6 11:5,10,10
  15:22,24 20:14
  37:11 38:24
**wait**  6:23
**waiver**  5:13
**want**  23:5,13
  24:24 25:15
  28:7 35:2 39:4
  39:19 40:17
  43:18 45:17
  71:23 72:11
  88:16,21
**wanted**  33:19
**water**  79:9,9
  81:2
**way**  43:20 78:14
**we've**  35:5 50:18
  60:13 61:6
  79:15
**weeks**  58:10
**went**  43:8,16
  56:25 66:1 85:7
**west**  3:5

**wgeer**  2:20 94:1
**wife**  7:17 70:17
**withdrawals**
  37:15
**witness**  12:23
  29:2 41:2 81:17
**witnesses**  92:17
**wondering**  65:1
**words**  11:15
  34:12 45:9
  65:10 79:7
**work**  14:5 15:14
  18:13 20:5 21:8
  25:20,22 34:18
  34:20 35:10,17
  38:24 44:9
**worked**  24:14
  25:8
**working**  57:3
  59:20,21 67:18
  80:25 84:5
**works**  34:6
  69:15
**worksheets**  48:4
**writing**  10:20
  13:12,15 14:1
  57:16 71:12
**written**  6:4 10:2
  10:15 26:11
  46:11 63:13
**wrong**  33:14

**x**

**x**  4:1 5:1

**y**

**y**  12:13 37:11
**yeah**  30:22 39:23
  49:25 56:23

61:13,17 63:1
  81:16
**year**  8:4
**years**  19:14,15
  19:16,16 24:15
**york**  61:18 62:11
  66:17

**z**

**zen**  58:6,21 59:2
  61:11,24 62:5,12
  66:14
**zero**  11:22 16:3
  16:4,8,13,22
  17:10,12,14,22
  18:8,13 33:24
  43:3 54:15,19
  55:16,25 57:9,24
  60:13 62:21
  63:9,20 65:21
  66:1,1 70:1
  71:18 72:4,4,14
  72:18 74:20
  78:7,13,18 79:10
  79:14,18 80:5,10
  80:12,24
**zerorez**  17:15,15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.