# EXHIBIT D

Page 1

1               U.S. BANKRUPTCY COURT

2             NORTHERN DISTRICT OF GEORGIA

3                  ATLANTA DIVISION

4

5    IN RE:  Curepoint, LLC         )  Case No. 22-56501

6                                   )  Chapter 11

7             DEBTOR.               )  Judge Cavender

8

9

10

11               TELEPHONIC MEETING

12               SEPTEMBER 12, 2022

13                  2:01 p.m.

14          PHILLIP MILES FOR CUREPOINT, LLC

15

16

17

18

19

20

21               Transcribed By:

22           KATHRYN TAYLOR, Certified

23         Court Reporter, No. 5082-8490-

24            7080-9088.  Transcribed from

25             electronic audio recording.

Case 22-56501-jwb Doc 363-04 Filed 10/07/23 Entered 10/07/23 19:25:18 Desc
Exhibit 10 - Transcript of 341 Meeting Page 3 of 105

Page 2

```
 1                    APPEARANCES OF COUNSEL

 2

 3   Lindsay P. S. Kolba, Esquire

 4   Office of the U.S. Trustee

 5   Suite 362 75 Ted Turner Drive, S.W.

 6   Atlanta, Georgia  30303

 7   (404) 331-4437

 8   lindsay.p.kolba@usdoj.gov

 9

10   FOR PREMIUM MERCHANT FUNDING 18, LLC, DIVERSE CAPITAL,

11   LLC, AND POINT ONE CAPITAL, LLC:

12   Taylor L. Dove, Esquire

13   HunterMaclean

14   200 E. Saint Julian Street

15   Savannah, Georgia  31412

16   (912) 236-0261

17   tdove@huntermaclean.com

18

19

20

21

22

23

24

25
```

1              A P P E A R A N C E   O F   C O U N S E L   C O N T I N U E D

2

3     FOR CUREPOINT, LLC:

4     Will B. Geer, Esquire

5     William A. Rountree, Esquire

6     Aaron Tady, Esquire

7     Rountree Leitman Klein & Geer, LLC

8     Century Plaza I, Suite 350

9     2987 Clairmont Road

10    Atlanta, Georgia   30329

11    (678) 587-8740

12    wgeer@rlkglaw.com

13

14    FOR LAFAYETTE STATE BANK:

15    David A. Garland, Esquire

16    Moore, Clark, DuVall & Rodgers, PC

17    P.O. Box 71727

18    Albany, Georgia   31708

19    (229) 888-3338

20    dgarland@mcdr-law.com

21

22

23

24

25

```
                                                    Page 4

 1               APPEARANCES CONTINUED

 2   FOR AMOA FINANCE:

 3   Michael F. Holbein, Esquire

 4   Smith, Gambrell & Russell, LLP

 5   1105 W. Peachtree Street, N.E., Suite 1000

 6   Atlanta, Georgia  30309

 7   (404) 815-3607

 8   mholbein@sgrlaw.com

 9

10   FOR DR. MARK MCCORD:

11   J. Michael Levengood, Esquire

12   Tom Barton, Esquire

13   Law Office of J. Michael Levengood, LLC

14   150 South Perry Street, Suite 208

15   Lawrenceville, Georgia  30046

16   (678) 765-1745

17   mlevengood@levegoodlaw.com

18

19   FOR ARVEST BANK:

20   Leslie M. Pineyro, Esquire

21   Jones & Walden, LLC

22   699 Piedmont Avenue, N.E.

23   Atlanta, Georgia  30308

24   (404) 564-9300

25   lpineyro@joneswalden.com
```

Page 5

1                  A P P E A R A N C E   O F   C O U N S E L   C O N T I N U E D

2

3      FOR FIRST LIBERTY CAPITAL PARTNERS, LLC:

4      Fred B. Wachter, Esquire

5      The Wachter Law Firm

6      106 Hammond Drive, N.E.

7      Atlanta, Georgia  30328

8      (770) 973-1100

9      fwachter@wachterlaw.com

10

11                       E N D   O F   A P P E A R A N C E S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                        INDEX TO EXAMINATION

2                                                    PAGE

3    PHILLIP MILES

4

5    Examination by MS. KOLBA                        11

6    Examination by MR. GARLAND                      43

7    Examination by MR. BARTON                       49

8    Examination by MR. HOLBEIN                      53

9    Re-examination by MS. KOLBA                     69

10   Examination by MR. WACHTER                      70

11   Examination by MS. PINEYRO                      73

12                        *       *       *

13                     A T T A C H M E N T S

14   Certificate

15   Reporter's Disclosure Statement

16                        *       *       *

17               T R A N S C R I P T   C O D E S:

18   --                  interruption/change in thought

19   . . .               incomplete thought

20   [sic]               denotes word/phrase that may seem

21                       strange or incorrect has been

22                       written verbatim

23   (ph)                phonetically spelled

24   (indiscernible)     not capable of being understood

25

Page 7

1              I N D E X   T O   E X H I B I T S

2    EXHIBITS              DESCRIPTION                    PAGE

3

4                  (No exhibits identified.)

5

6                      *     *     *

7        REPORTER'S NOTE:  Please note that since this

8    transcript being transcribed from an audio recording,

9             some speakers may be misidentified.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

                    P R O C E E D I N G S

1

2              MS. KOLBA:  Good afternoon.  This is the

3         first meeting of creditors for Curepoint, LLC,

4         Case Number: 22-56501, a Chapter 11 bankruptcy

5         case before Judge Cavender and the United States

6         Bankruptcy Court for the Northern District of

7         Georgia, Atlanta Division.

8              This case was commenced August 19th, 2022.

9         Today's date is September 12th, 2022, and the time

10        is 2:01 p.m.  My name is Lindsay Kolba.  I am a

11        trial attorney with the Office of the United

12        States Trustee.  Today's meeting is required under

13        Section 341 of the Bankruptcy Code.

14             The purpose of today's meeting is to allow

15        for the examination of the debtor under oath

16        concerning the administration of this bankruptcy

17        case.  Questions may include, but are not limited

18        to, why the case was filed, the operation of the

19        debtor's business, and the prospects for

20        reorganization in the debtor's case.

21             I will initially question the debtor.

22        Creditors who are present will have an opportunity

23        to examine the debtor under oath as well.

24             Just a couple of reminders before we begin:

25        Today's meeting is being digitally recorded, and

1      is being conducted by telephone.  So the recorder

2      cannot see who you are and cannot identify you, so

3      it is important that you identify yourself prior

4      to speaking.  It is also important that you speak

5      loudly enough for the recorder on my side of the

6      conversation to capture what is being said.  The

7      recording of today's meeting will be kept for two

8      years after this case is closed.  If for any

9      reason anyone needs to obtain a duplicate of the

10     recording or have a transcript prepared, those

11     arrangements can be made through the office of the

12     United States Trustee.

13          I will take appearances:  Debtor's counsel.

14          MR. GEER:  Will Geer for Curepoint, LLC, and

15     also, Will Rountree for Curepoint, LLC.

16          MS. KOLBA:  And, Mr. Geer, who will be

17     testifying on behalf of the debtor this afternoon?

18          MR. GEER:  Phillip Miles.

19          MS. KOLBA:  Thank you.  All right.  Others

20     present, if you could please enter your appearance

21     for the record, beginning with Mr. Garland.

22          MR. GARLAND:  David Garland on behalf of

23     Lafayette State Bank.

24          MS. KOLBA:  Mr. Levengood?

25          MR. LEVENGOOD:  Yes.  Michael Levengood,

```
 1      Aaron Tady, and Tom Barton on behalf of Dr. Mark

 2      McCord.

 3           MS. KOLBA:  Mr. Holbein?

 4           MR. HOLBEIN:  Yes.  Michael Holbein for AMOA

 5      Finance, A-M-O-A Finance, LLC.

 6           MS. KOLBA:  Mr. Dove?

 7           MR. DOVE:  Taylor Dove on behalf of Premium

 8      Merchant Funding 18, LLC, Diverse Capital, LLC,

 9      and Point One Capital, LLC.

10           MS. KOLBA:  Mr. Wachter?

11           MR. WACHTER:  Fred Wachter on behalf of First

12      Liberty Capital Partners, LLC.

13           MS. KOLBA:  And, Ms. Pineyro?  Leslie, are

14      you still on the line?

15           MS. PINEYRO:  Can you hear me now?

16           MS. KOLBA:  Yes.

17           MS. PINEYRO:  Hello.  Okay.  Leslie Pineyro

18      on behalf of Arvest.

19           MS. KOLBA:  Thank you.  Mr. Miles, if you

20      could please raise your right hand?  And let me

21      know when you have done so.

22           MR. MILES:  I have.

23           (Witness sworn.)

24    Whereupon,

25                     PHILLIP MILES,
```

Page 11

1    was called as a witness herein and, having first been

2    duly sworn, testified as follows:

3                          EXAMINATION

4    BY MS. KOLBA:

5         Q.   Could you please state your full name for the

6    record and your relationship to Curepoint, LLC?

7         A.   Phillip, with two L's, Miles M-I-L-E-S.  I'm

8    the designated manager for purposes of this subchapter

9    filing.  And I'm also a directing owner of the company.

10        Q.   All right.  Is the debtor's mailing address

11   still on Cicero Drive in Alpharetta?

12        A.   That is the company's -- that's the company's

13   mailing address, but not the clinic location.

14        Q.   I understand.  I'm asking if it's the mailing

15   address though.

16        A.   Yes.

17        Q.   Okay.  This is the address where quarterly

18   fee billing statements will be mailed in this case.

19   Your attorney does not receive a copy of those

20   quarterly fee billing statements.  So if at any point

21   during the pendency of this bankruptcy case the debtors

22   mailing address should change, it's important that you

23   let your counsel know so that they can file a change of

24   address with the court.

25             This case was recently -- the petition was

Page 12

1    recently amended to change or no longer elects to

2    proceed under Subchapter 5.  When the amended petition

3    was filed, the United States Trustee did solicit the

4    parties that were then listed on the list of creditors

5    who had the 28 largest unsecured claims to participate

6    in a -- an official committee of unsecured creditors.

7    Additional solicitations will be going out this

8    afternoon.

9           So if there are any parties that are

10   currently on the line that are interested in

11   participating in an official committee, you can send me

12   an e-mail and I will make sure that you receive a copy

13   of the solicitation materials.

14          All right.  Mr. Miles, part of your

15   preparation for today's meeting of creditors was your

16   attendance at an initial debtor interview with an

17   analyst or an auditor from the office from the United

18   States Trustee.  Prior to the initial debtor interview,

19   our office requested that you provide certain documents

20   and information.  Is it your understanding that you

21   have supplied all of the documents requested in

22   connection with the initial debtor interview?

23      A.   Yes.

24      Q.   Have you opened debtor in possession bank

25   accounts for Curepoint?

Page 13

1       A.   We are in the process.

2       Q.   Okay.  Where are you intending to open the

3   debtor in possession accounts?

4       A.   A bank called Access Bank.

5       Q.   Okay.  We received certificates of insurance,

6   but they did not list the United States Trustee as the

7   certificate holder.  Have you taken steps to have the

8   United States Trustee listed as a certificate holder on

9   the debtor's insurance?

10      A.   I have e-mailed.  I'll follow up on that.

11      Q.   I don't see where you've provided current

12  financial statements to our office.

13      A.   I will check on that as well.  My apology

14  that that hasn't been received yet.

15      Q.   We were also expecting to receive a list of

16  entities in which you have an interest in what your

17  affiliation with those entities is.  Have you provided

18  that?

19      A.   I have obviously not provided that directly,

20  but it was provided to the law firm.  I'll check and

21  make sure that gets over to you.

22      Q.   Okay.  You supplied tax returns to my office;

23  is that correct?

24      A.   Yes.  Again, not to mince words again.

25  Supplied it to the law firm.  But I'm glad to have it

Page 14

1    resent or check with them.  Whatever works for you.

2         Q.   All right.  I'm -- is the tax return that you

3    supplied to our office a true and correct copy of what

4    you filed with the taxing authorities?

5         A.   Yes, it is.

6         Q.   Okay.

7              MS. KOLBA:  Mr. Geer, your firm has filed an

8         application for employment.  The court has entered

9         an order approving that application subject to

10        objection for a period of twenty-one days.  I've

11        previously communicated with your office in

12        connection with the zero holding case, I believe,

13        regarding amendments that are needed to the

14        application to employ.  I will be sending you a

15        specific e-mail regarding Curepoint.

16   BY MS. KOLBA:

17        Q.   Mr. Miles, do you anticipate needing the

18   services of any other professionals during the pendency

19   of this bankruptcy case?  For example, do you

20   anticipate needing the services of an accountant, a

21   real estate broker, a financial consultant, or anyone

22   like that?

23        A.   Not at this time.

24        Q.   Okay.  Just a note about professionals in

25   Chapter 11 cases:  All professionals in Chapter 11

Page 15

1    bankruptcy cases have to have their employment approved

2    by the court.  To the extent that any professionals

3    render services to you prior to the court approving

4    their employment, there is the possibility that the

5    court could deny them compensation for those services.

6         Additionally, you are not permitted to pay

7    any professionals until the court has approved both the

8    amount of the compensation and that the compensation be

9    paid.  So if you determine that you do need the

10   services of additional professionals please be sure

11   that you're coordinating with your attorney's office so

12   that they can file the appropriate applications with

13   the court.

14        Additionally, do not pay any professionals

15   until you have a court order that authorizes you to

16   make a payment to those professionals.  Do you

17   understand all of that?

18        A.   I understand.

19        Q.   All right.  Is the debtor's name Curepoint,

20   LLC, correct as it is stated on the petition in this

21   bankruptcy case?

22        A.   That is -- that is correct.

23        Q.   Did you personally sign the petition, the

24   schedules, and the statement of financial affairs?

25        A.   I did.

1       Q.   Were these documents prepared by your

2    attorney's office?

3       A.   The documents prepare -- yes, they were.

4       Q.   Who provided the information to the

5    attorney's office that's contained in the schedules and

6    statement of financial affairs?

7       A.   I did.

8       Q.   Did anyone assist you in providing

9    information to your attorney's office?

10       A.   I had assistance from the accountant.

11       Q.   Who's the accountant?

12       A.   Michael Miles.

13       Q.   Did you read, review, and understand the

14    schedules and statement of financial affairs prior to

15    signing them?

16       A.   I did.

17       Q.   Since you signed them, are you aware of any

18    changes that need to be made in order to make those

19    documents true, complete, and accurate?

20            MR. GEER:  Lindsay, this is Will Geer.  Is

21        this a -- do you mind if I answer -- help him

22        answer that question?  For Schedule A/B, we need

23        to add some claims that we may have missed in --

24        pending some active litigation.  So we do need to

25        amend Schedule A/B.  And also, to add some

Case 22-56501-jwb Doc 86-4 Filed 10/07/23 Entered 10/07/23 19:25:48 Desc
Exhibit 10 - Transcript of 341 Meeting Page 18 of 106 2022 Page 17 of 105

Page 17

1          addresses to some co-debtors that were missed.

2          But unless Mr. Miles has other corrections, I'm

3          not aware of any others at this time.

4    BY MS. KOLBA:

5          Q.   Mr. Miles, do you adopt Mr. Geer's statement

6    as your testimony?

7          A.   I do.

8          Q.   Okay.

9          MR. KOLBA:  Mr. Geer, you said add claims to

10         Schedule A/B, will that be adding additional

11         parties?

12         MR. GEER:  I'm not sure I understand.  Adding

13         additional parties, like as in creditors, or what

14         do you mean?

15         MS. KOLBA:  Yeah.  Will there be any

16         additional entities added?

17         MR. GEER:  No, no, no.  He's -- no, no.

18         Yeah, I just wanted to make sure that I understood

19         the question, no.  I don't -- we will not be

20         adding additional creditors to that.

21    BY MS. KOLBA:

22         Q.   Okay.  Mr. Miles, can you please describe the

23    debtor's business, what it is that Curepoint, LLC,

24    does, briefly?

25         A.   It is a radiation oncology center in Dublin,

```
1    Georgia.  It treats tumor-based radiation --
2    tumor-based cancer patients utilizing radiation.  It is
3    a center that was created in 1991.  Curepoint developed
4    the assets in October of 2014.  It has two certificates
5    in needs -- that one needs in Georgia to operate
6    Radiation Oncology.
7         Q.   Were you involved with Curepoint when it
8    acquired the assets of the prior entity in 2014?
9         A.   No.  I was a passive owner at the time.
10        Q.   You were a passive owner?
11        A.   Correct.  I -- I was the owner.  Curepoint,
12   when it was purchased in 2014, had co-managers, two
13   individuals.  I was not one of them.
14        Q.   When did you take over management of
15   Curepoint?
16        A.   I have -- I've never been a manager of
17   Curepoint.  I was designated a manager of Curepoint for
18   the August 19th, 2020, filing.
19        Q.   When were you designated manager?
20        A.   2022 filing.  My apologies.
21        Q.   It's okay.  So you were designated the
22   manager on August 19th for the purposes of this filing?
23        A.   That is correct.
24        Q.   Why were you selected to be the manager for
25   the purposes of this filing?
```

Page 19

1      A.    My knowledge of the financial affairs going

2    back to October of 2014 on the acquisition.  My CPA

3    firm prepared financials, so I have always been in tune

4    with the financial affairs of Curepoint.  And the

5    current manager of Curepoint works day and night on the

6    operations of the clinic.

7      Q.    Can you briefly explain what caused the

8    debtor to file its Chapter 11 bankruptcy case?

9      A.    I can.  Starting in August/September of 2017,

10   the prior billing agent cut off the cash of Curepoint.

11   They then shut down the clinic in February of 2018.

12   There was other litigation processes, and the clinic

13   has constantly, since February of 2018, had litigation,

14   and it's had high-cost debt.  To pay off high-cost debt

15   it needed more high-cost debt.

16         And I have been unable, nor has anybody been

17   unable, to finance what I would call appropriately the

18   financial -- the capital stack of the company.  And so

19   on August 19th of 2022, it became very clear to me that

20   the only way out, because of the litigation that's been

21   persistent and consistent, as well as the high-cost

22   debt, was to file bankruptcy proceeding.

23     Q.    Is the business currently operating?

24     A.    The business is operating and treating cancer

25   patients.

Page 20

```
1            MS. KOLBA:  Mr. Geer, do you anticipate
2        filing a motion or anything to avoid the
3        appointment of a patient care ombudsman?
4            MR. GEER:  Yes.  I was going to discuss with
5        you offline, but if it -- yes.
6            MS. KOLBA:  Okay.  If the court has not
7        entered an order stating that an ombudsman is not
8        necessary, the United States Trustee will be
9        filing a notice appointing the patient -- or the
10       healthcare ombudsman on September 19th.
11           MR. GEER:  Okay.
12   BY MS. KOLBA:
13       Q.   Okay.  Mr. Miles, does the debtor operate
14   more than one location or just the one in Dublin?
15       A.   Just the one location.
16       Q.   Does the debtor own that premises or is it
17   leased?
18       A.   It is a tenant that leases the location.
19       Q.   From whom does it lease the location?
20       A.   An entity called Curepoint Dublin.
21       Q.   What is the relationship between Curepoint,
22   LLC, and Curepoint Dublin?
23       A.   Landlord/Tenant.  Landlord being Curepoint
24   Dublin, and tenant being Curepoint, LLC.
25       Q.   Curepoint Dublin on the schedules is -- the
```

Page 21

1    address is listed, "care of Michael Miles."  So is

2    there any other connection between the two?

3         A.   No.  Michael Miles did the initial

4    registration as a favor.

5         Q.   What is Mr. Michael Miles' relationship to

6    you personally?

7         A.   Michael Miles is my son and accountant for

8    Curepoint.

9         Q.   Is he employed by Curepoint or is he employed

10   by another company that Curepoint uses as its

11   accountant?

12        A.   Curepoint uses a PEO and uses an entity

13   called Eclipse Staffing as a payroll pass-through.

14   Ultimately, the payroll and benefits are provided by an

15   entity called HR Strategies out of, I think,

16   Lawrenceville, Georgia.

17             MR. ROUNTREE:  We disclosed all this the

18        first day here.

19   BY MS. KOLBA:

20        Q.   Understood.  What are the terms of the lease

21   between Curepoint and Curepoint Dublin?

22        A.   Curepoint Dublin purchased the building from

23   the legacy owner of the building on or around summer of

24   2020.  Curepoint, LLC, negotiated that time to have

25   improvements made to the building, and signed a

Page 22

1    ten-year lease that, I think, terms in 2019.

2         Q.   2019?

3         A.   I actually -- I'm always off at that date.

4    2029, my apologies.

5         Q.   What is the -- what is the monthly payment

6    under the lease?

7         A.   It is a gross lease at 17,000 a month.

8         Q.   What's the square footage of the facility?

9         A.   Approximately, 6,700 square feet.

10        Q.   Do you believe the $17,000 is the market rent

11   for that space?

12        A.   I do, given the fact of the improvements, and

13   given the fact that it has two very high-cost radiation

14   vaults.  I'll be very quick.  The radiation vaults are

15   5 to 7 feet lead concrete, floor, ceiling, and all four

16   walls.

17        Q.   How many employees does Curepoint, LLC, have?

18        A.   Approximately nine.

19        Q.   Are they employed directly by Curepoint, LLC?

20        A.   My apologies again, no.  They are employed

21   through the HR Strategies PEO, Professional Employment

22   Organization, and their paystub says Eclipse Staffing.

23        Q.   And what is your personal relationship to

24   Eclipse Staffing and HR Strategies?

25        A.   I have no ownership direct or indirect with

Page 23

```
 1   HR Strategies.  They're an independent PEO.  I am the
 2   owner with myself or another entity of Eclipse
 3   Staffing.
 4        Q.   And does Mr. Michael Miles also have an
 5   ownership interest in Eclipse Staffing?
 6        A.   He does not.
 7        Q.   Okay.  Do you currently receive a salary or
 8   living allowance or any other payments from Curepoint?
 9        A.   I do not.
10        Q.   Does Mr. Michael Miles receive a salary or
11   living allowance from Curepoint?
12        A.   He receives a salary through Eclipse Staffing
13   and HR Strategies.
14        Q.   What's the amount?
15        A.   It is ultimately paid by Curepoint.
16        Q.   What's the amount that he receives?
17        A.   My recollection, approximately 75,000.
18        Q.   All right.
19        A.   He starts -- my apologies -- he starts the --
20   the -- the controller accounts payable financials they
21   prepare for Curepoint.
22        Q.   But he is paid through Eclipse Staffing?
23        A.   That is correct.
24        Q.   Has Curepoint, LLC, made any payments to
25   Eclipse Staffing in the past year that were not for
```

Page 24

1    payroll of the employees of Curepoint?

2          A.   The only thing I'd add to that, HR Strategies

3    does provide health care, so there's a health care

4    payment, a premium payment paid, I think, monthly to HR

5    Strategies to give us a pass-through -- I'm sorry.  I

6    don't know the books and records of HR Strategies.  But

7    a monthly payment is made for health care payments --

8    health insurance.

9          Q.   I'm asking -- I only ask about payments to

10   Eclipse Staffing.  Has Curepoint, LLC, made any

11   payments in the past year to Eclipse Staffing that were

12   not for the payroll of the employees of Curepoint?

13         A.   My apologies, but they -- they -- Curepoint

14   also pays to Eclipse Staffing to remit to HR Strategies

15   the health care premium on behalf of the employees.

16   That is the only thing.

17         Q.   What is the -- okay.  And what is the total

18   monthly obligation of Curepoint, LLC, for payroll of

19   its employees, including benefits?

20         A.   It's approximately -- it's approximately

21   $30,000.  I'm sorry.  You said monthly?

22         Q.   Yes.

23         A.   My apologies.  It's bi-weekly 30,000.  So

24   I -- I wouldn't be able to do the math, but

25   approximately 60 to 65,000 per month.

1    Q.   So in December of 2021, when you paid

2    $100,000 to Eclipse Staffing, what was the difference

3    for?

4    A.   That would've been, most likely without

5    having information, from three payroll cycles.  When

6    you do bi-weekly, two of the months per year are going

7    to have three payroll cycles.

8    Q.   Okay.  But it's approximately $35,000 -- or

9    $30,000 every two weeks, correct?

10    A.   That is correct.

11    Q.   So in December -- December 16th of 2021, when

12    you paid $57,500 to Eclipse Staffing, what was the

13    additional $20,000 for -- $27,000 for?

14    A.   Where I'm looking at it, my assumption is

15    that had been two payroll cycles.

16    Q.   Okay.  What is MEC Capital, Inc.?

17    A.   MEC Capital, Inc., is hundred percent owned

18    by Phillip Miles that I use as an investment end.  It

19    owns my investment in Physician Financial Partners

20    which in turns owns 95.01 percent of Curepoint.

21    Q.   Why would Curepoint be making payments to MEC

22    Capital, Inc.?

23    A.   There are transfers that we've detailed on

24    the -- for the --

25         MR. GEER:  Statement of financial affairs.

1          MR. MILES:  Statement of financial affairs.

2      There are amounts going to MEC Capital, to

3      Curepoint, and vice versa.

4  BY MS. KOLBA:

5      Q.   Okay.  That's not what I asked.  I asked,

6  "Why is Curepoint paying MEC Capital"?

7      A.   It would be payment back of any funding that

8  MEC Capital did for Curepoint.

9      Q.   All right.  In the statement of financial

10 affairs, you didn't list any funding coming from MEC

11 Capital, so can you tell me about that?

12     A.   I -- I own the SOFA four attachments that MEC

13 Capital did have payments to and from.  My apologies

14 for not knowing the different terminology, but MEC

15 Capital, SOFA four attachment.

16     Q.   I understand, which I'm looking at and you've

17 separately provided to my office.  There are no

18 payments coming in from MEC Capital, Inc., so why is

19 Curepoint paying MEC Capital, Inc.?  What services does

20 MEC Capital provide to Curepoint?

21     A.   Over the past four years, MEC Capital has

22 funded Curepoint, and it's funded Curepoint more than

23 payments back to MEC Capital.  It's my understanding

24 the SOFA four attachment is over the past twelve

25 months.

Page 27

1    Q.   Yes.  It does not --

2    A.   When MEC Capital set payment --

3    Q.   Yeah, but it does not detail any payments

4 coming from MEC Capital.  That's my point.

5    A.   On the SOFA four attachments?

6    Q.   Correct.

7         MR. GEER:  I think he's saying that those

8         payments pre-dated the one-year look back on SOFA

9         four.

10        MR. MILES:  That is correct.

11 BY MS. KOLBA:

12    Q.   So, again, were there -- are there any loan

13 documents or loan agreements between Curepoint, LLC,

14 and MEC Capital, Inc.?

15    A.   The company and its accountants keeps very

16 detailed ledgers on transfers to and from the various

17 entities.

18    Q.   That's not what I asked.  I said, "Are there

19 any loan documents detailing the arrangement between

20 MEC Capital, Inc., and Curepoint?"

21    A.   There are no loan documents.

22    Q.   What is Medical Management Institute, Inc.?

23    A.   Medical Management Institute, Inc., is a

24 billing and coding consulting company -- online and --

25 and online training and consultant company.

Page 28

1      Q.   Do you or Michael Miles have an interest in

2  that entity?

3      A.   I do.

4      Q.   And what services did Medical Management

5  Institute, Inc., provide to Curepoint, LLC?

6      A.   It's -- it's provided a number of services.

7  Most notably, when our physician died in April of 2021,

8  it -- it worked extensively in the proper way to do

9  billing and coding and collection for (indiscernible)

10  on a deceased -- after a physician passes.

11      Q.   I'm probably going to mispronounce this, but

12  what is -- is it Mittere, Inc.?

13      A.   Does your side say Mittere?

14      Q.   M-I-T-T-E-R-E?

15      A.   That is correct.

16      Q.   All right.  And it's Mittere?

17      A.   That is correct.

18      Q.   And what is that, Mittere, Inc.?

19      A.   Mittere is a health care consulting group.

20  It's also been a due to/due from on Curepoint, and it's

21  in the trader business and consulting on health care

22  and building medical office buildings.

23      Q.   And what services has that entity provided to

24  Curepoint, LLC?

25      A.   It has used its capital to fund Curepoint

1    when it needed funding.

2         Q.   Do you have an ownership interest in that

3    entity?

4         A.   I do.

5         Q.   What percentage of that entity do you own?

6         A.   I don't -- I say -- I would like to say it's

7    100 percent, but it might be -- that even might be 50

8    percent on funding.

9         Q.   Who would own the other 50 percent?

10        A.   I think Ms. Jamila Dadabhoy owns the other 50

11   percent.

12        Q.   And Curepoint has paid that entity $842,050

13   in the past year; is that correct?

14        A.    I don't have that number in front of me, but,

15   again, over -- I don't have the number in front of me.

16   That sounds high, but I do not have that added up in

17   front of me.

18        Q.   Are there invoices showing the services that

19   Mittere provided to Curepoint, LLC?

20        A.   Let me be clear.  Mittere has not done any

21   services.  It has been a funding over the past four or

22   five years for Curepoint, so there's a due to/due from,

23   but not services.

24        Q.   Are there any loan documents or any -- any

25   documents evidencing the terms of the agreement for

Case 22-56501-jwb    Doc 86-04    Filed 10/07/23    Entered 10/07/23 13:25:43    Desc
Exhibit 10 - Transcript of 341 Meeting    Page 31 of 106

Page 30

```
 1    funding between Mittere and Curepoint?

 2         A.   Other than the ledger, no.

 3         Q.   What is North Winds Leasing, LLC?

 4         A.   North Winds Leasing is a leasing company

 5    that's been around since 2010.

 6         Q.   Do you have an ownership interest in North

 7    Winds Leasing?

 8         A.   I do.

 9         Q.   What percentage of North Winds Leasing do you

10    own?

11         A.   50 percent.

12         Q.   Who owns the other 50 percent?

13         A.   Mark Miles.

14         Q.   What's Mark Miles' relationship to you?

15         A.   My brother.

16         Q.   And what services did North Winds Leasing

17    provide to Curepoint over the last year?

18         A.   Similar to others, it's been a -- a due

19    to/due from funder of Curepoint.

20         Q.   Okay.  And over the past year, you've caused

21    the debtor to pay $606,877.96 to North Winds Leasing;

22    is that correct?

23         A.   Again, I don't have that added up, but I know

24    North Winds funded more than that during the past year.

25         Q.   Okay.  I guess I need to go back and ask.
```

Page 31

1    You said that you were designated the manager of

2    Curepoint for the purposes of this filing, and that

3    that happened on August 19th of 2022; is that correct?

4        A.    That's correct.

5        Q.    Prior to August 19th of 2022, who was making

6    decisions about the financial operations of Curepoint.

7    Like, who would authorize payments to be made?

8        A.    I would -- I would ask its manager, Jamila

9    Dadabhoy, issued different times -- would delegate that

10   authority to me on financial affairs.

11       Q.    So you've been involved in the financial

12   affairs in cutting checks on behalf of Curepoint prior

13   to August 19th of 2022?

14       A.    That's correct.  It goes all the way back to

15   its acquisition in October of 2018.

16       Q.    Are there any documents other than --

17       A.    From the accounting --

18       Q.    Okay.  Are there any documents evidencing the

19   terms of the loans between Curepoint and North Winds

20   Leasing?

21       A.    The answer is the same as the others.

22   There's a ledger detailing the due to/due from.

23       Q.    But no -- no agreement detailing interest or

24   when payments would be made or how much?

25       A.    No.  There's never been any interest charged

Page 32

1    between the entities.

2         Q.   Okay.  What is Zero Holding, LLC?

3         A.   Zero Holding, LLC, is a master franchise in

4    three cities.

5         Q.   Franchise of what?

6         A.   It's a franchise of Zerorez, which is a

7    surface carpet residential and commercial cleaning.

8         Q.   Does it have a location in Atlanta or in

9    Dublin, Georgia?

10        A.   It does not.  It does not.

11        Q.   So what services has Zero Holding provided to

12   Curepoint, LLC, in the past year?

13        A.   It's been the same as the others.  It's been

14   a funder of due to/due from for purposes of cash flow.

15        Q.   And am I correct in saying that Zero Holding,

16   LLC, is currently a debtor in a separate Chapter 11

17   bankruptcy case?

18        A.   That is correct.

19        Q.   All right.  So --

20        A.   It is my understanding right now that -- I'm

21   sorry.  Go ahead.

22        Q.   No.  Go ahead.  Finish your answer.

23        A.   No.  It's my understanding right now of a

24   four-year period Zero Holding owes Curepoint $3,000.

25             MR. GEER:  We will -- we'll clearly need to

Page 33

1          amend Zero Holding's statement of financial
2          affairs, but that's -- that's, you know, what
3          the -- the reconciliation looks like right now, is
4          that, you know, the net is about $3,000 owing from
5          Zero Holding to Curepoint.
6    BY MS. KOLBA:
7          Q.   Why would Zero Holding be making any
8    investment in Curepoint?
9          A.   It's not an investment.  It is a -- a cash
10   flow loan -- or loan to and from, due to/due from.
11         Q.   Okay.  I want --
12         A.   Zero Holding is not an investor.
13         Q.   Okay.  I want to make it abundantly clear.
14   Curepoint, LLC, is not permitted to incur any debt or
15   borrow funds or do any of these, like, shifting of
16   monies between the other entities that you own,
17   control, or have access to the monies while we are in
18   bankruptcy; do you understand that?
19         A.   I've understood that since August 19th, and
20   I've definitely followed that.
21         Q.   Okay.  Looking at the schedules, there are a
22   number of entities that you've listed as co-obligors on
23   the debts of Curepoint.  And from my quick search, each
24   of these entities is an entity that either you or your
25   son has an interest in; is that correct?

Page 34

```
 1      A.   I'm not aware that my son has any ownership
 2  interest in any of the debtors.
 3      Q.   Not in the debtors.  I'm saying the
 4  co-debtors that you've listed on Schedule H --
 5      A.   The co-debtors, I'm not aware.
 6      Q.   Michael Miles is your son; correct?
 7      A.   That's correct.
 8      Q.   All right.  So if I checked the Georgia
 9  Secretary of States records and I see that he's listed
10  as the registered agent or owner of these entities,
11  you're telling me that he's not in -- he's not in any
12  way related to them?
13      A.   My apologies.  He's listed -- he does the
14  registrations, and I didn't -- I don't equate that --
15  my apologies if it's wrong, I don't equate that to
16  ownership.
17          MR. GEER: It's not.  You're right.  That has
18      nothing to do with ownership.  It's Will Geer
19      speaking.
20  BY MS. KOLBA:
21      Q.   Okay.  So why would these entities for which
22  your brother has no ownership interest and is -- or
23  son -- excuse me -- is only a registered agent, why
24  would they have co-signed on the debts of Curepoint,
25  LLC?
```

1      A.   I don't want to conflate why would my -- my

2   son does -- Michael Miles does registration, and

3   oftentimes because of all the litigation, there was a

4   need for the various creditors to have other debtors

5   listed.  The creditors would insist on it.

6      Q.   Right.  But why would those --

7      A.   But I don't want to conflate that with --

8      Q.   Okay.  But why would those entities co-sign

9   obligations of Curepoint, LLC?  What did they get in

10  exchange for making their assets available for the

11  payment of Curepoint debts?

12     A.   The creditors insisted on it.  I'm not aware

13  of any -- and also the other entities have been funding

14  over time to Curepoint.

15     Q.   Okay.  Why would those entities be funding

16  Curepoint if neither you nor Michael Miles have the

17  ability to direct the financial affairs of those

18  entities?  How would they have come to be obligated on

19  Curepoint debts if neither you nor anyone related to

20  you --

21          MR. GEER:  I -- I -- I'm going to have to

22       object at that point.  That's not what he said.

23       He didn't say that he had no -- you've only talked

24       about Michael Miles to be clear.  That's what I

25       heard.  Now if I've misunderstood it, I apologize,

Page 36

1          but that's not what I heard the question to be.
2     BY MS. KOLBA:
3          Q.   Okay.  So --
4          A.   He said Michael again.
5          Q.   Okay.  So Phillip Miles.  Then you have -- do
6     you have an ownership in all of the entities that are
7     listed as co-debtors on Curepoint's debts?
8          A.    Not all of those.  Some of those are -- when
9     I looked at this from the -- the co-debtors came from
10    the UCCs, and there's a number of entities that I have
11    no idea who these companies are, but I do -- you've
12    named most of them, who they are.  But some of them, I
13    really don't know who they are.
14         Q.   Okay.  So Curepoint --
15              MR. GEER:  And, Lindsay, I don't want to
16         interrupt your flow, but we've noticed on a few of
17         the documents that these entities just list --
18         like some of these MCAs just listed entities that
19         they found, but there's no signature lines, but
20         out of an abundance of caution, we just put what
21         we saw on the UCCs.
22              UNKNOWN SPEAKER:  And that's not the first
23         time we've seen MCAs do that.
24    BY MS. KOLBA:
25         Q.    Okay.  But, Mr. Miles, for the entities that

1   you do have an ownership interest in, why would they

2   have co-signed on the debts of Curepoint?

3        A.   The creditors required it.

4        Q.   Okay.  But they are not related to Curepoint

5   in any way, so why would those entities have pledged

6   their assets as collateral for Curepoint debts?

7        A.   The creditors required it, as I said a few

8   minutes ago.  Curepoint has been in exhaustive,

9   extensive litigation, and it's had to borrow at

10  incredibly high rates and go to what I would call a not

11  normal creditor oftentimes.

12       Q.   I understand that Mr. Miles, but I don't

13  think you're understanding my question.  There's

14  separate legal entities that are in no way affiliated

15  with Curepoint, LLC; is that correct?

16       A.    I have used every ability I have to keep

17  Curepoint funded to pay its high-cost debt at the

18  cancer treatment center, and so my entities that I do

19  control I've used that to the benefit of Curepoint.

20            MR. ROUNTREE:   I -- Lindsay, I think that

21       might be where we got offtrack, is that you asked

22       the question about Schedule H, whether he or his

23       son, Michael, had an interest in any of those

24       entities and then he answered.  He said "Well, I

25       don't think Michael has an interest in any of

Page 38

1          them."
2               And then we went down that road, but he never
3          said he didn't have an interest in them.  I think
4          that might be -- you might have misheard something
5          back then.  So I -- I think that's where the
6          misunderstanding is.
7               MS. KOLBA:  No.  He then --
8               MR. ROUNTREE:  Because he never said he
9          didn't have interest --
10              MS. KOLBA:  I understand, Mr. Rountree.  He
11         then testified that he did have an interest in
12         them.  And so I'm asking why he would put up, as
13         collateral for Curepoint debts, entities that
14         otherwise would not be obligated on debts that
15         belong to Curepoint.
16     BY MS. KOLBA:
17         Q.   Because, Mr. Miles, you have an independent
18     obligation as a fiduciary of each of these entities to
19     act in its best interests.  And so I'm trying to
20     discern what the relationship is and why these other
21     entities would co-sign on the debts of Curepoint when
22     they have no ownership interest in Curepoint, and
23     apparently there are no loan documents evidencing the
24     transactions between the two.
25         A.   I -- I'll try to answer it again to the best

Page 39

1    of my abilities.  Curepoint is a cancer treatment

2    center.  I have used my entities to be a co-signer or a

3    co-debtor to the best of Curepoint to keep that entity

4    alive and -- and -- in treating cancer patients.

5    That's the best I can answer for you.

6         Q.    Okay.  Is the debtor responsible -- is

7    Curepoint responsible for the utilities at the location

8    in Dublin?

9         A.    It is.

10        Q.    And is Curepoint current on its utility

11   payments?

12        A.    It is.

13        Q.    Have any of the utility providers contacted

14   Curepoint to obtain additional deposits in order to

15   continue providing services to Curepoint during the

16   pendency of the bankruptcy case?

17        A.    Not that I'm aware of.

18        Q.    What is the balance in the debtor's bank

19   accounts?  What are the balances in the debtor's bank

20   accounts today?

21        A.    Approximately $110,000.

22        Q.    All right.  As I'm sure you know, the purpose

23   of a Chapter 11 bankruptcy case is for the debtor to

24   reorganize it's financial affairs.  Can you describe

25   what it is that Curepoint intends to do in order to

Page 40

1    exit from this Chapter 11 bankruptcy case?

2         A.   Absolutely.  Aside from working to provide

3    the necessary schedules for this proceeding, I'm

4    working the classic 24/7 to find an asset purchaser.

5         Q.   And that would be to sell 100 percent of the

6    assets?

7         A.   That'd be a sale of 100 percent of the

8    assets, that's correct.

9         Q.   And you don't believe that you'll need any

10   assistance in brokering this entity to potential

11   purchasers?

12        A.   No.  I do not at this time.  I -- over the

13   course of the last four years, five years of the

14   litigation and the financial stress, I haven't found

15   one that -- because it's very specific.  I've also

16   worked with Atlanta Oncology on selling $40 million

17   dollars' worth of radiation oncology centers, so I'm

18   pretty good at that.

19        Q.   Would you be seeking to be compensated for

20   your services in assisting in the sale of this entity?

21        A.   No way, shape, or form.

22        Q.   Pardon?

23        A.   No.  Not a bit, no.  Zero.

24        Q.   How many companies have currently expressed

25   an interest in purchasing the assets of this entity?

Page 41

1          A.    I have had two individuals who, of course,
2     would use an entity, and one company to look at it and
3     expressed an interest.
4          Q.    When do you anticipate being able to file a
5     motion to approve the sale of the assets of the debtor?
6          A.    My apologies.  Can you repeat the question,
7     please?
8          Q.    When do you anticipate being able to file a
9     motion to sell the assets of the debtor?
10          A.    In my world, I'm hoping it's this week at
11     some time.  I also understand that Mark McCord or -- or
12     he, directly, or have someone reach out that he might
13     be an interested buyer as well.
14          Q.    What is --
15          A.    That was not including the three that I
16     mentioned.
17          Q.    What is your anticipated sale price for this
18     entity?
19          A.    I -- I have talked in the range of 5 to 6
20     million.
21          Q.    Okay.
22               MR. ROUNTREE:  Hey, Ms. Kolba, I -- there's a
23          little -- I don't know if we can get a motion out
24          that quickly.  We may have a ETA this week, but I
25          don't know if we'll be able to get a motion out.

Page 42

1           I just want to manage everyone's expectations on

2           that.

3                   MS. KOLBA:  Okay.

4     BY MS. KOLBA:

5           Q.   And then when would you anticipate being able

6     to file a plan of reorganization?

7           A.   That's a question above my pay grade.  I --

8     I've been working on a 363 asset purchase agreement.

9           Q.   Okay.

10                  MR. GEER:  We'd have -- Lindsay, this is Will

11          Geer speaking.  We'd have to get through the sale

12          motion first before discussing the timing of a

13          liquidating plan.

14                  MS. KOLBA:  Okay.

15    BY MS. KOLBA:

16          Q.   Mr. Miles, is Curepoint, LLC, currently in

17    good standing with the Georgia Secretary of State?

18          A.   It is.

19          Q.   It is a Georgia entity, correct?

20          A.   It is a Georgia entity, correct.

21          Q.   All right.

22                  MS. KOLBA:  Mr. Garland, do you have any

23          questions for Mr. Miles?

24                  MR. GARLAND:   Briefly, yes.

25                            EXAMINATION

Page 43

1    BY MR. GARLAND:

2         Q.   When is the last time you amended your

3    operating agreement?

4         A.   My memory serves summer of 2000 -- and I'm

5    not sure of my decades -- summer of 2018.

6         Q.   Okay.  In the last three years, where has the

7    bank accounts been located?

8         A.   Synovus.

9         Q.   Any others?

10        A.   We've got a small account that I always

11   forget about at Chase that never has more than a couple

12   grand in it.

13        Q.   Okay.  What type of accounting system does

14   Curepoint have?  Is it manual or is it computer?

15        A.   Currently, it uses Cloud-based QuickBooks

16   from Intuit.

17        Q.   Okay.  How often do you input the information

18   to keep it updated?

19        A.   I would have to ask accounting that, but

20   they're pretty active on accounts payable daily.

21        Q.   Okay.

22        A.   (Cross talk) transfers.

23        Q.   You had said earlier that there was tax

24   returns.  Which years have been filed?  Was 2021 filed?

25        A.   I'd have to check that.  That is a great

Page 44

1    question.  I did a final review last week.  I don't

2    know if it's been -- I don't know if it's been --  I

3    don't want to mislead you -- e-filed, but obviously the

4    tax deadline is the 15th.  So it had to have --

5         Q.   Right.

6         A.   -- been done by e-file tomorrow.

7         Q.   Okay.  How about 2020, is it current?  Has it

8    been filed?

9         A.   Yes, sir.  It was e-filed.

10        Q.   Okay.  And I assume 2019 was also?

11        A.   Yes, sir.

12        Q.   Does Curepoint have an independent CPA or is

13   it all in-house?

14        A.   All in-house, sir.

15        Q.   Do you have any appraisals -- current

16   appraisals of the property?

17        A.   Are you talking about the real estate or the

18   clinic and its equipment, sir?

19        Q.   Clinic and its equipment.

20        A.   No, sir.  I'm not aware -- I'm thinking.  I'm

21   not aware of there -- since the October 2014 purchase

22   there's been an appraisal.  There was an offer last

23   fall to buy the clinic and its equipment, but not a

24   formal third-party appraisal.

25        Q.   Okay.  Other than the -- the oncology source

Page 45

```
 1   of income, is there any other sources of income for

 2   Curepoint?

 3        A.   Not at this time.  We've been exploring over

 4   the past four years other sources that are -- to be

 5   honest with it, but not at this time, sir, no.

 6        Q.   In your statement of financial affairs, the

 7   first seven months, your income seemed to be

 8   significantly less than the previously two years; can

 9   you explain why?

10        A.   Very much so, sir.  We explained that one of

11   the buyers, Radiation Oncology, has been hit very hard

12   by COVID.  We're starting to see a pick up.  We also

13   had a bad revenue issue when our physician passed in

14   April 2021, and unfortunately in health care that takes

15   months, and even up to a year, to get rectified.

16        Q.   Okay.  Have y'all made any EBITDA projections

17   or EBITDA financial statements that y'all have used in

18   coming up with your sales?

19        A.   We have, sir.  And I'd be -- yes, we have,

20   sir.

21        Q.   Would you share that information or not?

22             MR. GEER:  The attorneys would like to review

23        it first, Mr. Garland.  Anything we don't -- we'd

24        like to see it first.

25             MR. GARLAND:  Okay.  Would you freely share
```

1          it, though, once you review it, or would I need to

2          do a formal request?

3                   MR. GEER:  Mark, just shoot us an e-mail so

4          we can review it and we can talk about it.

5                   MR. GARLAND:  All right.  Thank you.

6     BY MR. GARLAND:

7          Q.   Have you prepared any other projections of

8     income this year?

9          A.   No, sir.  Not other than the pro forma.

10         Q.   Is Lafayette State Bank's collateral

11    currently insured?

12         A.   It is.  Yes, sir.

13         Q.   Okay.  What coverage --

14         A.   My memory serves me.  There's 2.6,

15    approximately, million dollars of equipment coverage.

16         Q.   Is Lafayette listed as a loss payee --

17         A.   It is.

18         Q.   -- on there equip -- okay.

19              Would you mind providing that to me?

20         A.   No, sir.

21         Q.   So you will provide it?  I -- I -- no, sir,

22    was like you wouldn't do it.  You will?

23         A.   Yes, sir.  I -- I -- I thought you said if

24    there was reason not to, yes.  Glad to provide.

25         Q.   Thank you.  I didn't mean to ask a screwy

Page 47

1    question.  Apparently, I did.

2        A.   No.  I heard wrong.

3        Q.   Do you have any particularly critical vendors

4    that y'all have?

5        A.   Absolutely, sir.

6        Q.   Who is that?

7        A.   Obviously, today's world, you have to have

8    internet, so when the accelerators require water -- so

9    water is more critical than just simply the water

10   fountain or the toilets don't flush.  Water serves as

11   the chilling mechanism for the linear accelerator.

12   There's also software that guides the machine to let

13   the treatment planning -- that's what we show up to

14   February 2018 and also led to the decision-making on

15   August 19th because there was a threat to get that shut

16   off.  If you can't access your software, which is your

17   treatment planning and your electronic health records,

18   you can't offer it, you can't treat it.

19       Q.   Who's the software provider that you're

20   talking about?

21       A.   It's a software called Mosaiq, M-O-S-A-I-Q,

22   owned by Elekta.  I think it's owned by Elekta,

23   E-L-E-K-T-A.

24       Q.   Okay.  I assume you still have access to that

25   software at this point?

Page 48

1    A.   That -- that's correct.  Again, that's one of

2    the reasons that lead into the August 19th filing was

3    keeping them up -- payment up, sir.

4    Q.   Who's the Internet provider that you said was

5    a critical vendor?

6    A.   I knew you were going to ask that.  I don't

7    recall at this time.  It's -- it's -- they literally

8    have a -- I call it an office right around the corner

9    from us, and I do not remember the name of it, sir.

10   Q.   Okay.

11   A.   It's not Comcast or Xfinity.  It's -- it's a

12   smaller brand.

13   Q.   And is the water provided by the City of

14   Dublin or -- or the county there, or is it a different

15   provider of water?

16   A.   If my memory serves me, it's Dublin Water and

17   Sewer.

18   Q.   Are you current with them?

19   A.   Yes, sir.

20   Q.   Is there any other critical vendors?

21   A.   Obviously the landlord for purposes of, you

22   know, to open the doors, but I think I've covered it.

23   You have Georgia Power, you have Dublin Water, you've

24   got the Internet, you have Mosaiq, and then, sir, you

25   have the suppliers like McKesson which do, of course,

Page 49

1    very important gloves and other type of supplies.

2         Q.   Okay.  Give me just a second.  I think I'm

3    through with where we're going here.  I'll let somebody

4    else ask some questions at this point.

5              MS. KOLBA:  Okay.  Mr. Miles, I am going to

6         ask that you amend Schedule D.  You've listed

7         several secured creditors and you've given value

8         for the collateral that supports the claims, but

9         you've not actually listed what the collateral is,

10        so you -- you need to file an amendment.  And to

11        the extent that multiple creditors have an

12        interest in the same assets, you also need to list

13        the order in which they are in priority to one

14        another.  So you'll need to file an amendment to

15        Schedule D.

16             MR. MILES:  I will.

17             MS. KOLBA:  All right.  Mr. Levengood, do you

18        have any questions for Mr. Miles?

19             MR. LEVENGOOD:  Yes.  We -- we have a couple

20        of questions.

21             MS. KOLBA:  Go ahead.

22                       EXAMINATION

23   BY MR. BARTON:

24        Q.   Mr. Miles, this is Tom Barton.  I've got a

25   couple of questions for you.  The vaults that you

Page 50

1    mentioned in connection with the new lease, those had

2    been constructed prior to the -- to the acquisition by

3    the new lender, correct?

4         A.   I'm sorry (cross talk).  I'm sorry.  Not

5    clearly, Mr. Barton, one of the vaults had a pretty

6    significant reconfiguration since then.

7         Q.   Was that the vault where the (cross talk) is

8    located or the other one?

9         A.   Mr. Barton, let me get back.  I want to -- I

10   want to make sure I focus and get your question

11   answered correctly.  Did you ask Mr. -- what was the

12   time period -- is the vault configuration largely

13   happened before the sale of the building.  Am I

14   answering your question correctly?  Or please ask it

15   again, Mr. Barton.

16        Q.   No.  That -- that answers it.  And so could

17   you describe for us, please, what the improvements were

18   that spurred the increase in the rental rate from 9,000

19   to 17,000?

20        A.   Yes, sir.  It went from new roof,

21   landscaping, plumbing, electricity, floor.  There was

22   more than superficial.  I don't have the list in front

23   of me, but it was -- it was pretty significant.  I -- I

24   could tell you what the clinic looked like before and

25   after this and I -- it was a pretty significant

Page 51

```
 1    improvement to the building.
 2         Q.   And were those provided by the landlord, cost
 3    free to Curepoint?
 4         A.   One hundred percent, sir.
 5         Q.   And tell us, if you will, who you negotiated
 6    with Curepoint Holdings regarding those improvements.
 7         A.   I'm not a -- Curepoint Holdings, it's -- the
 8    landlord is Curepoint Dublin and the entity is
 9    Curepoint, LLC.
10         Q.   I'm sorry, Curepoint Dublin.  Who did you
11    negotiate with at Curepoint Dublin?
12         A.   I -- I wouldn't call it negotiation a
13    (indiscernible) construction, which is always done -- I
14    think they built the original building, and did the
15    vault in 2004, and did the vault reconfiguration in
16    2018.  So we put a list of what was needed for the
17    building to be upgraded and to -- I wouldn't call it an
18    "A-plus" property but into an "A" property.
19         Q.   But who is your point person with Curepoint
20    Dublin, the landlord?
21         A.   We dealt with Dublin Construction on that.
22    And then the payouts were sent to their bank.  I dealt
23    -- forgive me I've forgotten his name, the gentleman at
24    Dublin Construction.  Michael something.
25         Q.   I'm asking, though, with respect to the
```

Page 52

1    landlord, who is Curepoint's point person?

2         A.    It's a gentleman named Mark Levin.

3         Q.    And is Mr. Levin an owner of Curepoint

4    Dublin?

5         A.    I think he is.  I'm not aware of the

6    ownership structure of Curepoint Dublin.

7         Q.    And neither you nor any of your entities have

8    any ownership interest in it?

9         A.    No, Mr. Barton.

10        Q.    And none of your family members?

11        A.    No, sir.  No, Mr. Barton.

12        Q.    Does Daniel Dilley have any interest in it?

13        A.    No, Mr. Barton.

14        Q.    Can you tell us who the two individuals are

15   you're speaking with regarding the potential sale?

16        A.    Yes.  Dr. Eric Randolph is interested in

17   buying.  There's a gentleman named -- his name will

18   likely come to me.  For whatever reason I'm sure

19   everybody on the call has it.  Gary -- and his name

20   will come to me if I could circle back to you,

21   Mr. Barton.  I'm sure it'll light up.  Out of Houston

22   is interested in buying, he owns an entity called Four

23   Star Capital, which I'm most familiar with.  And then

24   there's a health care arranger provider called AWC

25   that's interested as well.

Page 53

1        Q.    Okay.  That's the entity that you mentioned

2    earlier?

3        A.    Yes, sir.

4        Q.    And what -- what stage in negotiations are --

5    are those three potential buyers in?  Has anything

6    been -- been done to due asset purchase agreement,

7    turnkey, anything?

8        A.    Yes, sir.  It's my understanding that 363 has

9    to be a full asset purchase agreement.  It can't be an

10   LOI.  Someone can correct me.  I'm just -- what I read.

11   But I'm working on an asset purchase agreement for --

12   for one, two, or three of them.

13       Q.    That's all we've got.  Thank you.

14       A.    Thank you.

15             MS. KOLBA:  Mr. Holbein, do you have any

16        questions for Mr. Miles?

17             MR. HOLBEIN:  I do -- I do, and we can pick

18        up right where they left off.

19             MS. KOLBA:  Okay.

20                          EXAMINATION

21   BY MR. HOLBEIN:

22       Q.    When did -- Mr. Miles, when did you -- when

23   was your first contact with a potential person, sir?

24       A.    The week -- what was it 20, 21st?  It would

25   been the week of 19, 20, 21 -- the week of August 22nd.

Page 54

1      Q.   And who was that?

2      A.   That would have been with Eric Randolph and

3   AWC.  But I want to be clear on that.  We've been -- we

4   actually had an LOI from ION Network/(indiscernible) of

5   2021.  Again, I don't want you to quote the decade, of

6   2021.  So we've been looking for a buyer for the past

7   four to five years at Curepoint.

8      Q.   Okay.  But that -- that -- that LOI

9   counterparty isn't one of the three that you've

10  mentioned.

11       So Eric Randolph 8/22.  Did you reach out to

12  him or did he reach out to you?

13     A.   I reached out to him.  Oh, and there's

14  another gentleman, my -- my apologies.  There's a

15  gentleman named Mike Prospri, P-R-O-S-P-R-I.  And I've

16  talked to Mr. Prospri off and on, including the

17  building (indiscernible) for the past three or four

18  years.

19     Q.   Do you have an APA draft of Mike Prospri

20  sitting on your desk too?

21     A.   No, sir.  Let me be clear.  I don't have --

22  I -- I don't have a -- a draft from any of these

23  potential buyers.  I have shared with them and

24  encouraged them to get an attorney that knows Section

25  363 purchases, (indiscernible) Section.  But, no, I

Page 55

```
 1   don't have a draft from any of them.
 2       Q.   Okay.  A minute ago -- a minute ago you were
 3   talking about -- you were asked if you had a term sheet
 4   and you said no, I need a APA, but I'm working on an
 5   APA with one of these three, is what you said.  So I
 6   was wondering if maybe you were just working on an APA
 7   with one of these four.  But now it sounds like you
 8   don't really have an APA, so I'm just trying to figure
 9   out where we are in the sales process.
10       A.   You -- you're absolute correct.  I do not
11   have a physical APA.  I talked about what needs to go
12   in the APA.
13       Q.   Is there any other kind, then?  There's -- so
14   Gary out of Houston with Four Star, when did -- when
15   was your first contact with him?
16       A.   It was that same week of the 22nd.
17       Q.   Did you reach out to him, or did he reach out
18   to you?
19       A.   I reached out to him.
20       Q.   AWC, same questions.
21       A.   We've been off and on talking to them for two
22   or three years, but most recently. I reached out to
23   them.  They initially reached out to us about the
24   Curepoint Clinic over two years ago.
25       Q.   Okay.  Who do you deal with at AWC?
```

Page 56

1      A.    A gentleman named Dr. Edwards.

2      Q.    Okay.  When you -- when you -- earlier when

3   Ms. Kolba was examining you, she asked about this, and

4   you said "We've had two individuals and one entity look

5   at it."  What does "look at it" mean?

6      A.    Significant conversations about the clinic.

7   All of these folks, except for the Houston group, know

8   the clinic very well and know radiation oncology very

9   well.  I'll simmer that down a bit.  Mike Prospri knows

10  Dublin very well, but didn't know radiation oncology,

11  and it's my understanding that he and his advisors are

12  talking to higher-end consultants about radiation

13  oncology.

14     Q.    Just -- so substantive conversations, what

15  does "substantive conversations" mean?  Have you

16  exchanged documents or anything?

17     A.    No.  There's been no exchange of documents at

18  this point, but I stressed the urgency in someone

19  getting in, and they --

20     Q.    (Cross talk.)

21     A.    Yes.  I don't recall at this time which ones,

22  but I know, if my memory serves me, two of them have an

23  NDA.

24     Q.    Okay.  Are you setting up a data room or a

25  share site for diligence?

1      A.    Each one uses it different.  For instance,

2    talking to AWC, they said to use Dropbox.  One group,

3    this guy had a ShareFile, and I've been putting

4    information in there.

5      Q.    So there's a lot of interest already for a

6    sale that hasn't been noticed.  How do you anticipate

7    dealing with that when this is subject to higher and

8    better offers?  Do you anticipate creating a document

9    room?

10     A.    That's, again, a question that I don't know

11   how to answer.  I don't know the 363 process that well.

12     Q.    Do -- when you've talked with these, you said

13   you were in the five to six million, that's a big

14   range, clearly, you'd want to get six more than five,

15   who would -- who -- who's offering you six million?

16   Can you tell me that?

17     A.    I -- I want to be clear that I don't want to

18   mislead you.  I don't have any e-mail or written form

19   of any offer.  It's been discussions and one group has

20   talked about six million, the other group has talked

21   about five-point-four, and other around five-two.

22     Q.    But this is without seeing any internal

23   diligence, without seeing books or anything like that?

24     A.    I've sent information to one of the groups.

25     Q.    What'd you provide?

1      A.   Your -- your traditional overview, executive

2  summary, financial --

3      Q.   Keep going.  Executive summary, financials?

4      A.   That's correct.

5      Q.   Okay.  So these are -- how new are these

6  financials?

7      A.   Through July 31.

8      Q.   Okay.  Have you been informed that I

9  represent AMOA Finance --

10     A.   Right.

11     Q.   Have you -- have you been informed that my

12  clients have expressed an interest in purchasing the

13  asset?  You did mention Mark McCord, but I wanted --

14     A.   I just had a -- a comment.  The McCord guy,

15  and I remembered Mark McCord, but that's all I heard.

16     Q.   Okay.  Would you mind sharing with them

17  everything that you've shared with everyone today?

18     A.   Whatever -- whatever the, excuse me for

19  saying it this way, the rules and regulations are.

20     Q.   Well, I mean, if you've shared it with

21  someone else, certainly you can share it with us.

22     A.   I'm not aware of the insider -- or

23  litigation, I'm not aware of those rules.  My

24  apologies, I'm just ignorant on that.

25     Q.   Okay.  The -- so backing up a little bit,

Page 59

1    maybe to having a APA documented this week was a little

2    ambitious?

3        A.    Possibly.  I don't -- I don't know.

4        Q.    Okay.  Let me ask you a question that we've

5    kind of -- everybody's kind of tried to nibble around

6    the edge of, and it goes back to Curepoint Dublin.  I

7    know you've repeatedly stated that you've filed an

8    affidavit indicating you had no ownership interest, but

9    there's clearly some curiosity regarding the

10   connection, and it's -- I think it's warranted by the

11   fact that who -- this appears to be an expensive lease

12   for the Market, and your son is listed as the

13   registered agent.

14           Previously you testified he did the

15   registration as a, quote, favor.  I'll note that you

16   also said that he was a registered agent or organizer

17   for perhaps some of the co-debtors.  What -- however,

18   to date, and, in fact, the most recent filing, he's

19   indicated as the registered agent for Curepoint Dublin,

20   LLC.  Does Michael -- who owns Curepoint Dublin, LLC?

21   Do you know?

22       A.    I do not know.  No, I don't know the answer

23   to the structure.

24       Q.    Yeah, I'm not asking the structure.  Do you

25   know any of its owners or members?

Page 60

```
 1        A.   I -- I do not know its owners or members.

 2        Q.   Do you know an individual named Mark Lewyn or

 3   or Levin, I believed you pronounced moments ago?

 4        A.   Yes.  That's correct.

 5        Q.   Who is that?

 6             MR. GEER:  For the record, he just said that

 7        a -- a few times, Mr. Holbein.  This is Geer

 8        speaking, and -- can you hear him okay?

 9             MR. HOLBEIN:  Sometimes.

10             MR. GEER:  Okay.  Okay.  Just make a -- yeah,

11        come a little closer to that.  Is that better?

12             MR. MILES:  Yeah.

13             MR. HOLBEIN:  Yeah.  I can hear him now.

14   BY MR. HOLBEIN:

15        Q.   Who is --

16             MR. GEER:  Okay.

17   BY MR. HOLBEIN:

18        Q.   Who is Mark Lewyn or Mark -- is it -- is it

19   L-E-W-Y-N [sic]?

20        A.   I think that's correct.

21        Q.   And who is he?

22        A.   He's a real estate investor.

23        Q.   Do you know him?

24        A.   I know him professionally, but not -- not

25   personally.  Well, let me state that right.
```

1      Q.   (Cross talk) know him professionally?

2      A.   I was referred to him as a potential buyer of

3   the building, summer of 2020.

4      Q.   So he -- what -- what was -- was he the

5   seller of the building?

6      A.   No.  He was the buyer.  The blacked asset --

7   the estate, I forget Dr. Safer created Dublin,

8   Curepoint Dublin, it was actually Titila (ph) back then

9   in 1991.  He also created Waycross.  He retired, passed

10   away, and the Curepoint Dublin building was the last

11   building in the estate.

12      Q.   And so it was sold to Lewyn, Levin?

13      A.   It was sold to Curepoint Dublin.

14      Q.   And -- and what was your role?  You said you

15   were contacted by him in connection with that sale.

16   What were you doing with that sale?

17      A.   Nothing.  I didn't -- I simply was trying to

18   get -- I was told by the estate of Dr. Safer's

19   attorneys that the building lease was expiring, and

20   they were looking to sell and would I be a buyer.  And

21   I, you know, didn't have the wherewithal to buy the

22   building back in 2020.

23      Q.   So did you contact Mark Lewyn, Levin?

24      A.   I was given -- yes, I was given his name by a

25   mutual contact.

Page 62

1      Q.   And so, you contacted him about -- about

2  potentially purchasing the company?

3      A.   Not the company, the building.

4      Q.   The building.  The building.

5      A.   Yes.  That's correct.

6      Q.   And so, if I've told you that Mark Lewyn is

7  the organizer of Curepoint Dublin, LLC, would that come

8  as a surprise to you?

9      A.   No.  I'm sorry, he's (indiscernible).  No,

10 that wouldn't be a surprise to me.

11     Q.   Okay.  Well, good.  I guess it turns out that

12 you do know the owner of Curepoint Dublin, LLC.  So --

13     A.   I don't have --

14          MR. GEER:  It's not a question.  It -- it was

15      just a statement that Mr. Holbein made on the

16      record so, you know.  Any other questions?

17          MR. HOLBEIN:  Yeah, I do.

18 BY MR. HOLBEIN:

19     Q.   So do you -- what is your understanding --

20 you -- you said that your son is the registered agent

21 only.  Does -- does -- do you know whether your son

22 knows Mark Lewyn, Levin?

23     A.   I'm not aware that he does.

24     Q.   I guess -- and, you know, at some point

25 Ms. Kolba is going to tell me to shut up.  And I will,

1    but until then, what I'm getting at, and this may come

2    down to a deposition too, is that, like, clearly, you

3    know, this -- like -- this isn't like "Can I borrow a

4    dollar" type of favor.  He is -- your son is still

5    currently the registered agent of an LLC that was

6    formed by a guy who you bird-dogged the purchase of a

7    building for.

8            So what we're all wondering is what else is

9    there, and it buggers the imagination that you don't

10   know.  Maybe you don't, and my imagination needs to be

11   buggered.  But I'm just telling you kind of what I am

12   asking, and I think we could save a lot of time, is if

13   it's innocuous, just to know, like, what is the

14   relationship between your son and your landlord?

15       A.    There -- other than -- is that the question?

16   Which I think it is.  When I answer --

17       Q.    Yeah, it is.  What is the relationship

18   between your son and the landlord?

19       A.    Yeah.  There -- there -- there is none, other

20   than the registered agent.  And -- and Michael is the

21   controller of Curepoint accounts payable clerk, remits

22   a check or a wire -- I don't know how it's done -- to

23   Curepoint Dublin.  And I'm not trying to be, I guess

24   the word is coy.  I don't -- I don't have access to the

25   Curepoint Dublin operating agreement.  I don't know of

Page 64

1    Mark, his family as a family entity.  Most people of

2    higher network status have estate planning, so I just

3    know he is the contact person, but I'm not privy to the

4    operating agreement.

5         Q.   So Mark is the contact person at Curepoint

6    Dublin?

7         A.   Oh, yes, yes.  I think I've been clear about

8    that.

9         Q.   I don't think you have, but that's okay.  We

10   are now.  We're clear now.

11        A.   Okay.

12        Q.   Mark Levin is the contact for Curepoint

13   Dublin?

14        A.   That's correct.

15        Q.   Okay.  I'm just trying to tie it all

16   together.  And --

17        A.   Yeah.  If -- if -- if we were late on a

18   payment he'd be the one, I'm sure, e-mailing us.

19        Q.   Okay.  And if I were to sue Curepoint Dublin,

20   that mail would get delivered to Michael at 300 Hayward

21   Lane, Alpharetta, Georgia.  What do you think he'd do

22   with it?

23        A.   I -- I'm not aware that any mail has been

24   delivered, so I wouldn't know how to answer that

25   question other than remit it to Mark.  But I'm not

1  aware.

2      Q.  Well, I mean, he's -- okay.  All right.  So

3  let me ask you about these loans, these intercompany

4  loans is what I'll call them, between your company and

5  Medical Management Institute, North Winds Leasing, Zero

6  Holdings, MEC Capital.  You've already testified that

7  they weren't documented.  Do these loans have specific

8  terms?

9      A.  No.  They -- they -- they -- it is contained

10 in a ledger, and it's in a due to/due from ledger.

11         MR. ROUNTREE:  I think he already testified

12     there's -- none of them have any interest.

13         MR. HOLBEIN:  Yeah.  He said no interest but

14     that's one term.

15 BY MR. HOLBEIN:

16     Q.  Did they have any payment -- repayment terms?

17     A.  No.

18     Q.  Would -- did these entities maintain separate

19 bank accounts from the debtor?

20     A.  Yes.

21     Q.  So their bank records would reflect deposits

22 and withdrawals and amounts consistent with these

23 ledgers?

24     A.  Yes.

25     Q.  Did these entities loan money to any other

Page 66

1    companies, other than the debtor?

2        A.   Yes.

3        Q.   Who?  Or well, beginning with MEC Capital?

4        A.   Yeah.  I -- I --

5             MR. ROUNTREE:  Hold on.  Are you asking a

6        question about a non-debtor entity and what a

7        non-debtor entity is loaned -- who -- who a

8        non-debtor entity has loaned money to?  Is that

9        the question?

10            MR. GEER:  That's too -- I'll say we've got

11       to object to that.  I mean, you know, it -- that

12       really doesn't relate to the debtor and -- and you

13       don't know anything about the --

14            MR. HOLBEIN:  These entities are entities and

15       debtor has paid seven figures during the year

16       before the filing.  These aren't lenders.  They're

17       not -- they're not traditional lenders.

18       They're -- they're intercompany lenders that

19       are -- with loans that are noted by book entry.

20       There's no terms, there's no interest, but there's

21       mountains of money moving back and forth.  And I'm

22       just asking -- I'm confirming that these aren't

23       lenders.  Candidly, I was surprised that your

24       client said they loaned money to other companies.

25       So, in my opinion, he opened the door.  That's why

Page 67

1      I'm --

2           MR. ROUNTREE:  Frankly, none of this is

3      unusual, and, you know, there are questions about

4      his fiduciary duties to non-debtor entities.

5      Insolvent entities make loans all the time to

6      affiliates.  I mean, that's a very common thing.

7      None -- none of this is --

8           MR. HOLBEIN:  Those questions didn't come

9      from me.  Those questions didn't come from me.  My

10     questions have to do with establishing.  I mean, I

11     guess if he's willing to admit that these were,

12     you know, not ordinary course transactions right

13     now then --

14          MR. GEER:  Oh, he's not admitting that.  He

15     didn't say it was an ordinary course.

16          MR. ROUNTREE:  He said that there's no terms

17     to the loan.

18          MR. HOLBEIN:  Right.  Okay.  So there are no

19     terms, no payment terms, no interest terms, no

20     terms of default, no note, no -- no -- nothing,

21     other than a book entry.  No e-mail.  That's

22     correct?

23          MR. ROUNTREE:  That -- I don't think he said

24     there's not an e-mail.

25          MR. MILES:  I don't -- I don't know if

Page 68

```
 1          there's an e-mail.
 2     BY MR. HOLBEIN:
 3          Q.   Well, you said there's no documentation.  I
 4     don't think that would be evidence of a transaction.
 5               Would it -- would it then be too much for the
 6     debtor, as a supplement to this, to substantiate the
 7     purported loans being repaid?  A supplement to SOFA
 8     four?
 9               MR. GEER:  Can you ask the question again,
10          Mr. Holbein?
11               MR. HOLBEIN:  Yeah, sure.
12     By MR. HOLBEIN:
13          Q.   The -- the transactions in SOFA four, would
14     it be -- would the debtor agree to supplement SOFA four
15     to substantiate the purported loan repayment?  So that
16     might look like bank statements from these entities
17     showing the payments to?
18               MR. ROUNTREE:  Do you mean supplement like --
19          I mean, I don't think it would be appropriate to
20          attach bank statements to the -- to the statement
21          of financial affairs but, you know, in  -- in
22          terms of accounting, I mean, that's -- you know,
23          that's exactly what we're working on so, you know,
24          I -- we're happy to share that as -- as it's
25          reasonable.
```

Page 69

```
 1              MR. HOLBEIN:  I don't care if you just give

 2         it to the -- the -- the US Trustee.

 3              MR. ROUNTREE:  Yeah.  I mean, I -- you know,

 4         that -- that shouldn't be an issue.

 5              MR. HOLBEIN:  That's good.  That's all the

 6         questions that I have.

 7                         RE-EXAMINATION

 8    BY MS. KOLBA:

 9         Q.   Okay.  Mr. Miles, are you aware that

10    Curepoint Dublin, LLCs, principal office address is

11    listed as the debtor's office address?  Mailing

12    address?

13         A.   I'm not aware of that.  I'm the only one in

14    that office and I've never received the mail from

15    Curepoint Dublin.  But to answer your question, no, I'm

16    not aware.

17         Q.   Okay.  According to the Georgia Secretary of

18    States records, Curepoint Dublin, LLCs, principal

19    office address is the same as the debtors mailing

20    address.

21         A.   I -- I'll ask Michael to get that changed

22    because that's -- I've never gotten any mail, but if

23    that's an issue I'll get that changed.

24         Q.   No.  I mean, it lists a separate address for

25    Michael as the registered agent and gives a different
```

Page 70

1    address for him as registered agent, but Curepoint

2    Dublin, LLCs, office address is the same as the

3    debtors.  So just wanted you to be aware.

4        A.    Thank you very much.

5        Q.    So, again, it stretches the bounds of

6    credibility that there's no relationship between the

7    two, I think to Mr. Holbein's point.

8            MS. KOLBA:  Mr. Dove, do you have any

9        questions for Mr. Miles?

10           MR. DOVE:  No questions for me.

11           MS. KOLBA:  Mr. Wachter, do you have any

12       questions for Mr. Miles?

13           MR. WACHTER:  I do.  Just a few brief

14       questions, if I may.

15           MS. KOLBA:  Go ahead.

16                    EXAMINATION

17   BY MR. WACHTER:

18       Q.    Mr. Miles, my name is Fred Wachter.  I

19   present First Liberty Capital Partners, LLC.  In

20   reviewing their loan documents and the schedules, I'm

21   trying to confirm which equipment was pledged as

22   collateral to First Liberty.  One of the items is in

23   Elekta Synergy, Serial Number 151686.  Is that the same

24   thing as the Elekta Infinity LINAK, or is that

25   something different?

Page 71

```
 1        A.   I would have to look at that.  I'm not aware

 2   of that.

 3        Q.   Do you -- are you aware generally what

 4   equipment was pledged to First Liberty?

 5        A.   I am not.

 6        Q.   Okay.  Do you know if there were any UCC

 7   financing statements that were filed to secure First

 8   Liberty's position as secured creditor?

 9        A.   I'm not aware.

10        Q.   Okay.  Were -- were you aware generally that

11   they were supposed to be getting a security interest in

12   some equipment owned by Curepoint in exchange for the

13   loans?

14        A.   They purchased the -- First Liberty purchased

15   the note from, forgive me, Georgia Note Holder, which

16   is purchased from Morris Bank.  I'm not aware of what

17   First Liberty's counsel did.  But they purchased the

18   notes.  Go ahead.

19        Q.   There were -- there were a series of four

20   different notes.  Am I correct about that?

21        A.   That sounds right.

22        Q.   Okay.  And -- but you're saying those notes

23   were purchased from -- from someone else, there was

24   another lender initially?

25        A.   There -- there was a funding of a purchase.
```

Page 72

1    I don't know if you'd consider that a purchase or not.

2    There was a payoff of a note called Georgia Note

3    Holders.

4         Q.   Maybe like a refinance?  Is that what you

5    mean?

6         A.   That would be the term I'd use.  I would use.

7         Q.   Okay.  Okay.  But -- but it's your

8    understanding if there was to be collateral for these

9    loans that First Liberty has them?

10        A.   That's makes sense to me.

11        Q.   Okay.  But you don't know specifically.  Will

12   you be able to amend your schedules to include

13   identifying which equipment First Liberty has a

14   security interest in?

15        A.   I will definitely take a look and do that.

16        Q.   Okay.  That's all I've got.

17             MR. GEER:  Mr. Wachter, could you -- this is

18        Will Geer speaking.  Do you have a UCC you can

19        send us?  I couldn't -- I couldn't find one.

20             MR. WACHTER:  I couldn't either.  That's why

21        I asked.

22             MR. GEER:  Okay.  Thank you.

23             MR. WACHTER:  Yep.

24             MS. KOLBA:  Ms. Pineyro, do you have any

25        questions for Mr. Miles?

Page 73

1              MS. PINEYRO:  Yes, ma'am.

2                       EXAMINATION

3     BY MS. PINEYRO

4          Q.    This is Leslie Pineyro.  I represent Arvest

5     Bank.  You listed a debt of approximately $700,000 to

6     Arvest Bank; is that correct?

7          A.    That is correct.

8          Q.    And you guaranteed that -- that indebtedness;

9     correct?

10         A.    I believe I did.

11         Q.    And Mark Miles did as well, correct?

12         A.    I believe he did.

13         Q.    And that loan is secured by 14 copiers,

14    right?

15         A.    That's correct.  That's correct to my

16    understanding.

17         Q.    Okay.  And in the schedules, you valued those

18    copiers at $600,000, correct?

19         A.    That's correct.

20         Q.    And how did you come to that valuation?

21         A.    I wouldn't say it was a guesstimate, but I

22    talked to the original equipment provider.

23         Q.    And who was that?

24         A.    Just like the -- Gary -- I can't remember who

25    that group is.  I'd -- I'll have to get that back to

Page 74

1    you from the purchase order.

2         Q.   Did you e-mail with them?  Did you speak with

3    them on the phone?  How did you speak with them?

4         A.   We spoke to them on the phone.  And I'll get

5    that name to you.

6         Q.   Okay.  And are those copiers currently

7    insured?

8         A.   They are.

9         Q.   Okay.  I've requested, that insurance a

10   couple of times from your counsel, do you think you

11   could get it sent to me, please?

12        A.   I can.

13        Q.   All right.  Where are those copiers currently

14   located?

15        A.   There are some in medical office buildings

16   and some at the location.

17        Q.   And you said there are some in medical office

18   buildings, where would those buildings be?

19        A.   One building in particular is in Alpharetta.

20   It's been working on doing -- Alpharetta.

21        Q.   And I guess I'm confused.  I thought you guys

22   had one location.

23        A.   We have one location.

24        Q.   So why are there multiple medical offices

25   with your copiers?

Page 75

```
 1        A.   The setup refers via fax into different
 2   referring sources.
 3        Q.   Explain that.  I'm sorry.
 4        A.   Radiation Oncology is very much driven by
 5   referrers, so we placed copiers in certain referring
 6   groups: cardiologists, medical oncology, et cetera, to
 7   provide referrers to us.  And the faxes are generally
 8   70, 80 pages.
 9        Q.   Could you please provide us with a list of
10   where each piece of our equipment is located?
11        A.   I'd be happy to.
12        Q.   Earlier you have mentioned that there was
13   litigation that was a cash drain on the debtor.  What
14   litigation are you referring to?
15        A.   There's been multiple litigations between
16   AOA, Atlanta Oncology Associates, American Professional
17   Associates.  One of the owners, Mark McCord, and as
18   Mr. Holbein mentioned, Amilee Finance, LLC.  There was
19   actually a fourth page in June of 2021 with
20   adjudication.  And there's continued litigation, and I
21   think there's still three cases outstanding between
22   ALA, Amilee Finance, and Mark McCord at Curepoint.
23        Q.   And the one that was adjudicated, was it
24   adjudicated in favor of Curepoint or against Curepoint?
25        A.   I tend to stay agnostic.  I believe that
```

1   Amilee Finance was considered to be valid.  So

2   therefore, the lease was valid.  And then Curepoint and

3   PFP were awarded -- my memory serves me -- 1.75

4   million.  The two are largely offset.  So Curepoint got

5   credit for about 41 payments of the loan lease.  And

6   then from that we were told -- Curepoint was told by

7   Amilee Finance counsel they just wanted out, to buy the

8   linear accelerator.  That's when I went to sell the

9   company to Ion and then that changed.  We have a record

10  of all the --

11      Q.   Okay.

12      A.   I'm sorry I spoke over you.

13      Q.   No, no.  You're fine.  I think I spoke over

14  you and -- and so it's my fault first.

15          What's the general nature of the three cases

16  that are still outstanding?

17      A.   Amilee Finance is filed to get paid more loan

18  lease payments and also it put in a security deposit

19  that they want -- and, again, I'm not the attorney.

20  This is largely what Jamila does as well as operate

21  the -- Ms. Dadabhoy does the, as well as operate the

22  center.  Mark McCord is suing to get paid for a payoff

23  he did as an owner of PFP on behalf of Curepoint of a

24  more Morris Bank note.  And then there's a

25  claim/counterclaim between Mark McCord, Curepoint, and

1    Physician Financial Partners of which Curepoint has a

2    counterclaim.  I think there's a counterclaim in all of

3    them.  I'm not sure.

4         Q.   Okay.  That's all for me.

5              MS. KOLBA:  Okay.  As I mentioned, you'll

6         need to amend Schedule D.  Also, because the

7         schedules were filed less than a week prior to

8         today's meeting, and when the schedules were

9         filed, there were parties that were listed that

10        did not receive notice of the commencement of the

11        case or today's meeting of creditors.  This

12        meeting is going to be continued to October 5th at

13        10:00 a.m.

14             In the meantime, counsel, you will be

15        responsible for insuring all of the parties that

16        are now listed on the debtors list of creditors,

17        receive notice of the continued meeting, and

18        you'll need to file a certificate of service

19        indicating that they've been served with notice of

20        commencement of the case, and then notice of the

21        continued meeting of creditors.

22             It will use the same dial-in information as

23        today's meeting.  Mr. Miles, who will be preparing

24        the monthly operating reports on behalf of

25        Curepoint?

Page 78

1          MR. MILES:  Michael Miles will, and I'll
2     review.
3          MS. KOLBA:  All right.  Monthly operating
4     reports are due on the 21st of each month.  Your
5     case was filed on August 19th, so the first
6     monthly operating report will be due no later than
7     September 21st, and it will cover the period of
8     operations from August 19th through August 31st.
9          Each subsequent monthly operating report that
10     you file will cover the period of operations for
11     the full proceeding month.  So the operating
12     report that is filed in October, will cover the
13     period of September 1st through September 30th.
14          Now that this case is filed and is proceeding
15     under Chapter 11 and not under Subchapter 5, the
16     debtor is responsible for paying quarterly fees.
17     Quarterly fees are billed by calendar quarter and
18     the payment of the fee is due at the end of the
19     month following the end of the calendar quarter.
20     Because this case was filed during the third
21     calendar quarter, the first quarterly fee payment
22     will be due no later than October 31st.
23          To the extent that this case remains pending
24     in Chapter 11, you will have quarterly fee
25     payments due on January 31st, April 30th, and July

Page 79

1          31st of 2023.  The amount of the quarterly fees

2          that the debtor is required to pay is based on the

3          amount of the disbursements that are reported in

4          the operating reports that you file with the

5          court.

6                If you fail to file your monthly operating

7          reports on time, or if you fail to file them all

8          together, the Office of the United States Trustee

9          will estimate the amount of disbursements that

10         were made during the quarter, and we will bill our

11         quarterly fee based on that estimate.  Then at the

12         time the debtor files the monthly operating

13         reports, if an adjustment needs to be made to the

14         estimated fee, it will be made at the time that

15         the operating reports are filed with the court,

16         not at the time you separately provide

17         disbursement information to the United States

18         Trustees office.

19               So it is important that you both file the

20         monthly operating reports, and that you file those

21         monthly operating reports on time.  You are

22         responsible for paying the actual amount of

23         quarterly fees up until the time that this case is

24         closed.  That means that you are responsible for

25         paying quarterly fees up until the time that this

Page 80

```
 1        case is either converted to Chapter 7, dismissed

 2        pursuant to an order of the court, or closed after

 3        entry of a final decree, meaning that the debtor

 4        has filed its plan of reorganization, that plan

 5        has been confirmed, and the debtor has commenced

 6        making payments pursuant to that plan.

 7              Again, you are responsible for paying the

 8        actual amount of quarterly fees that has accrued

 9        during the calendar quarter.  Again, it is

10        calculated based on the amount of the

11        disbursements that are made during the quarter and

12        the fee schedule is available online.

13              And, again, the actual amount of fees,

14        regardless of any statement that you may receive

15        from the United States Trustees office.  To the

16        extent that you fail to make quarterly fee

17        payments on time, interest is assessed on late

18        payments.

19              Do you have any questions for me?

20              MR. GEER:  I do not at this time.  Thank you.

21              MS. KOLBA:  Again, this meeting will be

22        continued to October 5th, 2022, at 10:00 a.m.

23        using the same dial-in information as today's

24        meeting, and counsel will be responsible for

25        making sure that all creditors have received
```

Page 81

1    1          notice of the continued meeting of creditors.

2    2          That said, we are off the record.

3    3                    (Recording concluded.)

4    4

5    5

6    6

7    7

8    8

9    9

10   10

11   11

12   12

13   13

14   14

15   15

16   16

17   17

18   18

19   19

20   20

21   21

22   22

23   23

24   24

25   0082

Page 82

STATE OF GEORGIA      TRANSCRIPTION

COUNTY OF HENRY      TELEPHONIC MEETING


Pursuant to Article 8.B of the rules and regulations of

the Board of Court Reporting of the Judicial Council of

Georgia, I make the following disclosure:


I, Kathryn Taylor, am a Georgia Certified Court

Reporter.  I am here as an independent contractor for

Veritext Legal Solutions.


I was contacted by Veritext Legal Solutions to provide

transcription services.  The firm will not be providing

this transcript under any contract that is prohibited

by O.C.G.A. 1

_____

KATHRYN TAYLOR, CCR

No. 5082-8490-7080-9088

CERTIFIED COURT REPORTER

Page 83

```
 1
 2
       STATE OF GEORGIA      )
 3
       COUNTY OF HENRY       )
 4
 5
            I, KATHRYN TAYLOR, Certified Court Reporter for
 6
       the County of Henry and for the State of Georgia, do
 7
       hereby certify:
 8
            That the foregoing transcript is a true and
 9
       accurate account of the electronic sound recording sent
10
       to me by Veritext Legal Solutions, to the best of my
11
       ability.  I was not physically present when the
12
       recording took place initially.
13
            And I further certify that I am not a relative by
14
       blood or marriage, or an employee of attorney or
15
       counsel of any of the parties in the case, nor am I
16
       financially or in any way interested in the outcome of
17
       any action related to this transcript.
18
            This, the 30th da
19
20
                         _____
21
                         KATHRYN TAYLOR, CCR
22
                         No. 5082-8490-7080-9088
23
                         CERTIFIED COURT REPORTER
24
25
```

**[& - 5th]** Page 1

| & |
| --- |
| **&** 3:7,16 4:4,21 |

| 0 |
| --- |
| **0082** 81:25 |

| 1 |
| --- |
| **1** 81:1 |
| **1.75** 76:3 |
| **10** 81:10 82:8 |
| **100** 29:7 40:5,7 |
| **100,000** 25:2 |
| **1000** 4:5 |
| **106** 5:6 |
| **10:00** 77:13 80:22 |
| **11** 1:6 6:5 8:4 14:25,25 19:8 32:16 39:23 40:1 78:15,24 81:11 82:9 |
| **110,000** 39:21 |
| **1105** 4:5 |
| **12** 1:12 81:12 82:10 |
| **12th** 8:9 |
| **13** 81:13 82:10 |
| **14** 73:13 81:14 82:11 |
| **15** 81:15 82:12 |
| **15-14-37** 82:14 |
| **150** 4:14 |
| **151686** 70:23 |
| **15th** 44:4 |
| **16** 81:16 82:13 |
| **16th** 25:11 |
| **17** 81:17 82:14 |
| **17,000** 22:7,10 50:19 |

| 18 2:10 10:8 81:18 82:15 |
| --- |
| **19** 53:25 81:19 82:15 |
| **1991** 18:3 61:9 |
| **19th** 8:8 18:18 18:22 19:19 20:10 31:3,5,13 33:19 47:15 48:2 78:5,8 |
| **1st** 78:13 |

| 2 |
| --- |
| **2** 81:2 82:1 |
| **2.6** 46:14 |
| **20** 53:24,25 81:20 82:17 |
| **20,000** 25:13 |
| **200** 2:14 |
| **2000** 43:4 |
| **2004** 51:15 |
| **2010** 30:5 |
| **2014** 18:4,8,12 19:2 44:21 |
| **2017** 19:9 |
| **2018** 19:11,13 31:15 43:5 47:14 51:16 |
| **2019** 22:1,2 44:10 |
| **2020** 18:18 21:24 44:7 61:3,22 |
| **2021** 25:1,11 28:7 43:24 45:14 54:5,6 75:19 |
| **2022** 1:12 8:8,9 18:20 19:19 |

| 31:3,5,13 80:22 83:18 |
| --- |
| **2023** 79:1 |
| **2029** 22:4 |
| **208** 4:14 |
| **21** 53:25 81:21 82:19 |
| **21026** 82:15 83:19 |
| **21st** 53:24 78:4,7 |
| **22** 81:22 82:21 |
| **22-56501** 1:5 8:4 |
| **229** 3:19 |
| **22nd** 53:25 55:16 |
| **23** 81:23 82:23 |
| **236-0261** 2:16 |
| **24** 81:24 82:24 |
| **24/7** 40:4 |
| **25** 82:25 |
| **27,000** 25:13 |
| **28** 12:5 |
| **2987** 3:9 |
| **2:01** 1:13 8:10 |

| 3 |
| --- |
| **3** 81:3 82:2 |
| **3,000** 32:24 33:4 |
| **30,000** 24:21,23 25:9 |
| **300** 64:20 |
| **30046** 4:15 |
| **30303** 2:6 |
| **30308** 4:23 |
| **30309** 4:6 |
| **30328** 5:7 |
| **30329** 3:10 |

| 30th 78:13,25 83:18 |
| --- |
| **31** 58:7 |
| **31412** 2:15 |
| **31708** 3:18 |
| **31st** 78:8,22,25 79:1 |
| **331-4437** 2:7 |
| **341** 8:13 |
| **35,000** 25:8 |
| **350** 3:8 |
| **362** 2:5 |
| **363** 42:8 53:8 54:25 57:11 |

| 4 |
| --- |
| **4** 81:4 82:3 |
| **40** 40:16 |
| **404** 2:7 4:7,24 |
| **41** 76:5 |
| **43** 6:6 |
| **49** 6:7 |

| 5 |
| --- |
| **5** 12:2 22:15 41:19 78:15 81:5 82:3 |
| **50** 29:7,9,10 30:11,12 |
| **5082-8490** 1:23 |
| **5082-8490-70...** 82:20 83:22 |
| **53** 6:8 |
| **564-9300** 4:24 |
| **57,500** 25:12 |
| **587-8740** 3:11 |
| **5th** 77:12 80:22 |

**[6 - ala]**

| | | | |
|---|---|---|---|
| **6** | **95.01** 25:20 | 39:19,20 43:7,20 | **administration** |
| **6** 41:19 81:6 | **973-1100** 5:8 | 63:21 65:19 | 8:16 |
| 82:4 | **a** | **accrued** 80:8 | **admit** 67:11 |
| **6,700** 22:9 | **a.m.** 77:13 80:22 | **accurate** 16:19 | **admitting** 67:14 |
| **60** 24:25 | **aaron** 3:6 10:1 | 83:9 | **adopt** 17:5 |
| **600,000** 73:18 | **abilities** 39:1 | **acquired** 18:8 | **advisors** 56:11 |
| **606,877.96** 30:21 | **ability** 35:17 | **acquisition** 19:2 | **affairs** 15:24 |
| **65,000** 24:25 | 37:16 83:11 | 31:15 50:2 | 16:6,14 19:1,4 |
| **678** 3:11 4:16 | **able** 24:24 41:4 | **act** 38:19 | 25:25 26:1,10 |
| **69** 6:9 | 41:8,25 42:5 | **action** 83:17 | 31:10,12 33:2 |
| **699** 4:22 | 72:12 | **active** 16:24 | 35:17 39:24 |
| **7** | **absolute** 55:10 | 43:20 | 45:6 68:21 |
| **7** 22:15 80:1 | **absolutely** 40:2 | **actual** 79:22 | **affidavit** 59:8 |
| 81:7 82:5 | 47:5 | 80:8,13 | **affiliated** 37:14 |
| **70** 6:10 75:8 | **abundance** | **add** 16:23,25 | **affiliates** 67:6 |
| **700,000** 73:5 | 36:20 | 17:9 24:2 | **affiliation** 13:17 |
| **7080-9088** 1:24 | **abundantly** | **added** 17:16 | **afternoon** 8:2 |
| **71727** 3:17 | 33:13 | 29:16 30:23 | 9:17 12:8 |
| **73** 6:11 | **accelerator** | **adding** 17:10,12 | **agent** 19:10 |
| **75** 2:5 | 47:11 76:8 | 17:20 | 34:10,23 59:13 |
| **75,000** 23:17 | **accelerators** | **additional** 12:7 | 59:16,19 62:20 |
| **765-1745** 4:16 | 47:8 | 15:10 17:10,13 | 63:5,20 69:25 |
| **770** 5:8 | **access** 13:4 | 17:16,20 25:13 | 70:1 |
| **8** | 33:17 47:16,24 | 39:14 | **agnostic** 75:25 |
| **8** 81:8 82:6 | 63:24 | **additionally** | **ago** 37:8 55:2,2 |
| **8.b** 82:4 | **account** 43:10 | 15:6,14 | 55:24 60:3 |
| **8/22** 54:11 | 83:9 | **address** 11:10,13 | **agree** 68:14 |
| **80** 75:8 | **accountant** | 11:15,17,22,24 | **agreement** 29:25 |
| **815-3607** 4:7 | 14:20 16:10,11 | 21:1 69:10,11,12 | 31:23 42:8 43:3 |
| **842,050** 29:12 | 21:7,11 | 69:19,20,24 70:1 | 53:6,9,11 63:25 |
| **888-3338** 3:19 | **accountants** | 70:2 | 64:4 |
| **9** | 27:15 | **addresses** 17:1 | **agreements** |
| **9** 81:9 82:7 | **accounting** | **adjudicated** | 27:13 |
| **9,000** 50:18 | 31:17 43:13,19 | 75:23,24 | **ahead** 32:21,22 |
| **912** 2:16 | 68:22 | **adjudication** | 49:21 70:15 |
| | **accounts** 12:25 | 75:20 | 71:18 |
| | 13:3 23:20 | **adjustment** | **ala** 75:22 |
| | | 79:13 | |

[albany - authorities]                                    Page 3

**albany** 3:18
**alive** 39:4
**allow** 8:14
**allowance** 23:8
  23:11
**alpharetta** 11:11
  64:21 74:19,20
**ambitious** 59:2
**amend** 16:25
  33:1 49:6 72:12
  77:6
**amended** 12:1,2
  43:2
**amendment**
  49:10,14
**amendments**
  14:13
**american** 75:16
**amilee** 75:18,22
  76:1,7,17
**amoa** 4:2 10:4
  58:9
**amount** 15:8
  23:14,16 79:1,3
  79:9,22 80:8,10
  80:13
**amounts** 26:2
  65:22
**analyst** 12:17
**answer** 16:21,22
  31:21 32:22
  38:25 39:5
  57:11 59:22
  63:16 64:24
  69:15
**answered** 37:24
  50:11

**answering** 50:14
**answers** 50:16
**anticipate** 14:17
  14:20 20:1 41:4
  41:8 42:5 57:6,8
**anticipated**
  41:17
**anybody** 19:16
**aoa** 75:16
**apa** 54:19 55:4,5
  55:6,8,11,12
  59:1
**apologies** 18:20
  22:4,20 23:19
  24:13,23 26:13
  34:13,15 41:6
  54:14 58:24
**apologize** 35:25
**apology** 13:13
**apparently**
  38:23 47:1
**appearance** 3:1
  5:1 9:20
**appearances** 2:1
  4:1 5:11 9:13
**appears** 59:11
**application** 14:8
  14:9,14
**applications**
  15:12
**appointing** 20:9
**appointment**
  20:3
**appraisal** 44:22
  44:24
**appraisals** 44:15
  44:16

**appropriate**
  15:12 68:19
**appropriately**
  19:17
**approve** 41:5
**approved** 15:1,7
**approving** 14:9
  15:3
**approximately**
  22:9,18 23:17
  24:20,20,25 25:8
  39:21 46:15
  73:5
**april** 28:7 45:14
  78:25
**arrangement**
  27:19
**arrangements**
  9:11
**arranger** 52:24
**article** 82:4
**arvest** 4:19
  10:18 73:4,6
**aside** 40:2
**asked** 26:5,5
  27:18 37:21
  55:3 56:3 72:21
**asking** 11:14
  24:9 38:12
  51:25 59:24
  63:12 66:5,22
**assessed** 80:17
**asset** 40:4 42:8
  53:6,9,11 58:13
  61:6
**assets** 18:4,8
  35:10 37:6 40:6
  40:8,25 41:5,9

**49:12
**assist** 16:8
**assistance** 16:10
  40:10
**assisting** 40:20
**associates** 75:16
  75:17
**assume** 44:10
  47:24
**assumption**
  25:14
**atlanta** 1:3 2:6
  3:10 4:6,23 5:7
  8:7 32:8 40:16
  75:16
**attach** 68:20
**attachment**
  26:15,24
**attachments**
  26:12 27:5
**attendance**
  12:16
**attorney** 8:11
  11:19 54:24
  76:19 83:14
**attorney's** 15:11
  16:2,5,9
**attorneys** 45:22
  61:19
**audio** 1:25 7:8
**auditor** 12:17
**august** 8:8 18:18
  18:22 19:9,19
  31:3,5,13 33:19
  47:15 48:2
  53:25 78:5,8,8
**authorities** 14:4

[authority - capital]

| | | | |
|---|---|---|---|
| **authority** 31:10 | 68:20 71:16 | **billed** 78:17 | **business** 8:19 |
| **authorize** 31:7 | 73:5,6 76:24 | **billing** 11:18,20 | 17:23 19:23,24 |
| **authorizes** 15:15 | **bank's** 46:10 | 19:10 27:24 | 28:21 |
| **available** 35:10 | **bankruptcy** 1:1 | 28:9 | **buy** 44:23 61:21 |
| 80:12 | 8:4,6,13,16 | **bird** 63:6 | 76:7 |
| **avenue** 4:22 | 11:21 14:19 | **bit** 40:23 56:9 | **buyer** 41:13 54:6 |
| **avoid** 20:2 | 15:1,21 19:8,22 | 58:25 | 61:2,6,20 |
| **awarded** 76:3 | 32:17 33:18 | **blacked** 61:6 | **buyers** 45:11 |
| **aware** 16:17 | 39:16,23 40:1 | **blood** 83:14 | 53:5 54:23 |
| 17:3 34:1,5 | **barton** 4:12 6:7 | **board** 82:5 | **buying** 52:17,22 |
| 35:12 39:17 | 10:1 49:23,24 | **book** 66:19 | |
| 44:20,21 52:5 | 50:5,9,15 52:9 | 67:21 | **c** |
| 58:22,23 62:23 | 52:11,13,21 | **books** 24:6 57:23 | **c** 6:13,17,17 8:1 |
| 64:23 65:1 69:9 | **based** 18:1,2 | **borrow** 33:15 | **calculated** 80:10 |
| 69:13,16 70:3 | 43:15 79:2,11 | 37:9 63:3 | **calendar** 78:17 |
| 71:1,3,9,10,16 | 80:10 | **bounds** 70:5 | 78:19,21 80:9 |
| **awc** 52:24 54:3 | **beginning** 9:21 | **box** 3:17 | **call** 19:17 37:10 |
| 55:20,25 57:2 | 66:3 | **brand** 48:12 | 48:8 51:12,17 |
| | **behalf** 9:17,22 | **brief** 70:13 | 52:19 65:4 |
| **b** | 10:1,7,11,18 | **briefly** 17:24 | **called** 11:1 13:4 |
| **b** 3:4 5:4 7:1 | 24:15 31:12 | 19:7 42:24 | 20:20 21:13,15 |
| 16:22,25 17:10 | 76:23 77:24 | **broker** 14:21 | 47:21 52:22,24 |
| 82:14 | **believe** 14:12 | **brokering** 40:10 | 72:2 |
| **back** 19:2 26:7 | 22:10 40:9 | **brother** 30:15 | **cancer** 18:2 |
| 26:23 27:8 | 73:10,12 75:25 | 34:22 | 19:24 37:18 |
| 30:25 31:14 | **believed** 60:3 | **buggered** 63:11 | 39:1,4 |
| 38:5 50:9 52:20 | **belong** 38:15 | **buggers** 63:9 | **candidly** 66:23 |
| 59:6 61:8,22 | **benefit** 37:19 | **building** 21:22 | **capable** 6:24 |
| 66:21 73:25 | **benefits** 21:14 | 21:23,25 28:22 | **capital** 2:10,11 |
| **backing** 58:25 | 24:19 | 50:13 51:1,14,17 | 5:3 10:8,9,12 |
| **bad** 45:13 | **best** 38:19,25 | 54:17 61:3,5,10 | 19:18 25:16,17 |
| **balance** 39:18 | 39:3,5 83:10 | 61:11,19,22 62:3 | 25:22 26:2,6,8 |
| **balances** 39:19 | **better** 57:8 | 62:4,4 63:7 | 26:11,13,15,18 |
| **bank** 3:14 4:19 | 60:11 | 74:19 | 26:19,20,21,23 |
| 9:23 12:24 13:4 | **bi** 24:23 25:6 | **buildings** 28:22 | 27:2,4,14,20 |
| 13:4 39:18,19 | **big** 57:13 | 74:15,18,18 | 28:25 52:23 |
| 43:7 51:22 | **bill** 79:10 | **built** 51:14 | 65:6 66:3 70:19 |
| 65:19,21 68:16 | | | |

| | | | |
|---|---|---|---|
| **capture** 9:6 | **certificates** 13:5 | 57:17 64:7,10 | **common** 67:6 |
| **cardiologists** | 18:4 | **clearly** 32:25 | **communicated** |
| 75:6 | **certified** 1:22 | 50:5 57:14 59:9 | 14:11 |
| **care** 20:3 21:1 | 82:7,22 83:5,23 | 63:2 | **companies** 36:11 |
| 24:3,3,7,15 | **certify** 83:7,13 | **clerk** 63:21 | 40:24 66:1,24 |
| 28:19,21 45:14 | **cetera** 75:6 | **client** 66:24 | **company** 11:9 |
| 52:24 69:1 | **change** 6:18 | **clients** 58:12 | 19:18 21:10 |
| **carpet** 32:7 | 11:22,23 12:1 | **clinic** 11:13 19:6 | 27:15,24,25 30:4 |
| **case** 1:5 8:4,5,8 | **changed** 69:21 | 19:11,12 44:18 | 41:2 62:2,3 65:4 |
| 8:17,18,20 9:8 | 69:23 76:9 | 44:19,23 50:24 | 76:9 |
| 11:18,21,25 | **changes** 16:18 | 55:24 56:6,8 | **company's** 11:12 |
| 14:12,19 15:21 | **chapter** 1:6 8:4 | **closed** 9:8 79:24 | 11:12 |
| 19:8 32:17 | 14:25,25 19:8 | 80:2 | **compensated** |
| 39:16,23 40:1 | 32:16 39:23 | **closer** 60:11 | 40:19 |
| 77:11,20 78:5,14 | 40:1 78:15,24 | **cloud** 43:15 | **compensation** |
| 78:20,23 79:23 | 80:1 | **code** 8:13 | 15:5,8,8 |
| 80:1 83:15 | **charged** 31:25 | **coding** 27:24 | **complete** 16:19 |
| **cases** 14:25 15:1 | **chase** 43:11 | 28:9 | **computer** 43:14 |
| 75:21 76:15 | **check** 13:13,20 | **collateral** 37:6 | **concerning** 8:16 |
| **cash** 19:10 32:14 | 14:1 43:25 | 38:13 46:10 | **concluded** 81:3 |
| 33:9 75:13 | 63:22 | 49:8,9 70:22 | **concrete** 22:15 |
| **caused** 19:7 | **checked** 34:8 | 72:8 | **conducted** 9:1 |
| 30:20 | **checks** 31:12 | **collection** 28:9 | **configuration** |
| **caution** 36:20 | **chilling** 47:11 | **comcast** 48:11 | 50:12 |
| **cavender** 1:7 8:5 | **cicero** 11:11 | **come** 35:18 | **confirm** 70:21 |
| **ccr** 82:18 83:21 | **circle** 52:20 | 52:18,20 60:11 | **confirmed** 80:5 |
| **ceiling** 22:15 | **cities** 32:4 | 62:7 63:1 67:8,9 | **confirming** |
| **center** 17:25 | **city** 48:13 | 73:20 | 66:22 |
| 18:3 37:18 39:2 | **claim** 76:25 | **coming** 26:10,18 | **conflate** 35:1,7 |
| 76:22 | **claims** 12:5 | 27:4 45:18 | **confused** 74:21 |
| **centers** 40:17 | 16:23 17:9 49:8 | **commenced** 8:8 | **connection** |
| **century** 3:8 | **clairmont** 3:9 | 80:5 | 12:22 14:12 |
| **certain** 12:19 | **clark** 3:16 | **commencement** | 21:2 50:1 59:10 |
| 75:5 | **classic** 40:4 | 77:10,20 | 61:15 |
| **certainly** 58:21 | **cleaning** 32:7 | **comment** 58:14 | **consider** 72:1 |
| **certificate** 6:14 | **clear** 19:19 | **commercial** 32:7 | **considered** 76:1 |
| 13:7,8 77:18 | 29:20 33:13 | **committee** 12:6 | **consistent** 19:21 |
| | 35:24 54:3,21 | 12:11 | 65:22 |

**[constantly - curepoint]**

| | | | |
|---|---|---|---|
| **constantly** 19:13 | **copy** 11:19 12:12 | **couple** 8:24 | 11:6 12:25 |
| **constructed** 50:2 | 14:3 | 43:11 49:19,25 | 14:15 15:19 |
| **construction** | **corner** 48:8 | 74:10 | 17:23 18:3,7,11 |
| 51:13,21,24 | **correct** 13:23 | **course** 40:13 | 18:15,17,17 19:4 |
| **consultant** 14:21 | 14:3 15:20,22 | 41:1 48:25 | 19:5,10 20:20,21 |
| 27:25 | 18:11,23 23:23 | 67:12,15 | 20:22,23,24,25 |
| **consultants** | 25:9,10 27:6,10 | **court** 1:1,23 8:6 | 21:8,9,10,12,21 |
| 56:12 | 28:15,17 29:13 | 11:24 14:8 15:2 | 21:21,22,24 |
| **consulting** 27:24 | 30:22 31:3,4,14 | 15:3,5,7,13,15 | 22:17,19 23:8,11 |
| 28:19,21 | 32:15,18 33:25 | 20:6 79:5,15 | 23:15,21,24 24:1 |
| **contact** 53:23 | 34:6,7 37:15 | 80:2 82:5,7,22 | 24:10,12,13,18 |
| 55:15 61:23,25 | 40:8 42:19,20 | 83:5,23 | 25:20,21 26:3,6 |
| 64:3,5,12 | 48:1 50:3 53:10 | **cover** 78:7,10,12 | 26:8,19,20,22,22 |
| **contacted** 39:13 | 55:10 58:4 60:4 | **coverage** 46:13 | 27:13,20 28:5,20 |
| 61:15 62:1 | 60:20 62:5 | 46:15 | 28:24,25 29:12 |
| 82:11 | 64:14 67:22 | **covered** 48:22 | 29:19,22 30:1,17 |
| **contained** 16:5 | 71:20 73:6,7,9 | **covid** 45:12 | 30:19 31:2,6,12 |
| 65:9 | 73:11,15,15,18 | **coy** 63:24 | 31:19 32:12,24 |
| **continue** 39:15 | 73:19 | **cpa** 19:2 44:12 | 33:5,8,14,23 |
| **continued** 3:1 | **corrections** 17:2 | **created** 18:3 | 34:24 35:9,11,14 |
| 4:1 5:1 75:20 | **correctly** 50:11 | 61:7,9 | 35:16,19 36:14 |
| 77:12,17,21 | 50:14 | **creating** 57:8 | 37:2,4,6,8,15,17 |
| 80:22 81:1 | **cost** 19:14,14,15 | **credibility** 70:6 | 37:19 38:13,15 |
| **contract** 82:13 | 19:21 22:13 | **credit** 76:5 | 38:21,22 39:1,3 |
| **contractor** 82:8 | 37:17 51:2 | **creditor** 37:11 | 39:7,10,14,15,25 |
| **control** 33:17 | **council** 82:5 | 71:8 | 42:16 43:14 |
| 37:19 | **counsel** 2:1 3:1 | **creditors** 8:3,22 | 44:12 45:2 51:3 |
| **controller** 23:20 | 5:1 9:13 11:23 | 12:4,6,15 17:13 | 51:6,7,8,9,10,11 |
| 63:21 | 71:17 74:10 | 17:20 35:4,5,12 | 51:19 52:3,6 |
| **conversation** 9:6 | 76:7 77:14 | 37:3,7 49:7,11 | 54:7 55:24 59:6 |
| **conversations** | 80:24 83:15 | 77:11,16,21 | 59:19,20 61:8,10 |
| 56:6,14,15 | **counterclaim** | 80:25 81:1 | 61:13 62:7,12 |
| **converted** 80:1 | 76:25 77:2,2 | **critical** 47:3,9 | 63:21,23,25 64:5 |
| **coordinating** | **counterparty** | 48:5,20 | 64:12,19 69:10 |
| 15:11 | 54:9 | **cross** 43:22 50:4 | 69:15,18 70:1 |
| **copiers** 73:13,18 | **county** 48:14 | 50:7 56:20 61:1 | 71:12 75:22,24 |
| 74:6,13,25 75:5 | 82:2 83:3,6 | **curepoint** 1:5,14 | 75:24 76:2,4,6 |
| | | 3:3 8:3 9:14,15 | 76:23,25 77:1,25 |

| | | | |
|---|---|---|---|
| **curepoint's** 36:7 52:1 | **debtor** 1:7 8:15 8:21,23 9:17 12:16,18,22,24 13:3 19:8 20:13 20:16 30:21 32:16 39:3,6,23 41:5,9 65:19 66:1,6,7,8,12,15 67:4 68:6,14 75:13 78:16 79:2,12 80:3,5 | **denotes** 6:20 **deny** 15:5 **deposit** 76:18 **deposition** 63:2 **deposits** 39:14 65:21 **describe** 17:22 39:24 50:17 **description** 7:2 **designated** 11:8 18:17,19,21 31:1 | **disbursements** 79:3,9 80:11 **discern** 38:20 **disclosed** 21:17 **disclosure** 6:15 82:6 **discuss** 20:4 **discussing** 42:12 **discussions** 57:19 |
| **curiosity** 59:9 **current** 13:11 19:5 39:10 44:7 44:15 48:18 **currently** 12:10 19:23 23:7 32:16 40:24 42:16 43:15 46:11 63:5 74:6 74:13 | **debtor's** 8:19,20 9:13 11:10 13:9 15:19 17:23 39:18,19 69:11 **debtors** 11:21 17:1 34:2,3,4,5 35:4 36:7,9 59:17 69:19 70:3 77:16 | **desk** 54:20 **detail** 27:3 **detailed** 25:23 27:16 **detailing** 27:19 31:22,23 **determine** 15:9 **developed** 18:3 **dgarland** 3:20 | **dismissed** 80:1 **district** 1:2 8:6 **diverse** 2:10 10:8 **division** 1:3 8:7 **document** 57:8 **documentation** 68:3 **documented** 59:1 65:7 |
| **cut** 19:10 **cutting** 31:12 **cycles** 25:5,7,15 | **debts** 33:23 34:24 35:11,19 36:7 37:2,6 38:13,14,21 | **dial** 77:22 80:23 **died** 28:7 **difference** 25:2 **different** 26:14 | **documents** 12:19,21 16:1,3 16:19 27:13,19 27:21 29:24,25 |
| **d** | **decade** 54:5 **decades** 43:5 **deceased** 28:10 **december** 25:1 25:11,11 | 31:9 48:14 57:1 69:25 70:25 71:20 75:1 **digitally** 8:25 | 31:16,18 36:17 38:23 56:16,17 70:20 **dogged** 63:6 |
| **d** 6:17 7:1 8:1 49:6,15 77:6 **dadabhoy** 29:10 31:9 76:21 **daily** 43:20 **daniel** 52:12 **data** 56:24 **date** 8:9 22:3 59:18 **dated** 27:8 **david** 3:15 9:22 **day** 19:5 21:18 83:18 | **decision** 47:14 **decisions** 31:6 **decree** 80:3 **default** 67:20 **definitely** 33:20 72:15 **delegate** 31:9 **delivered** 64:20 64:24 | **diligence** 56:25 57:23 **dilley** 52:12 **direct** 22:25 35:17 **directing** 11:9 **directly** 13:19 22:19 41:12 **disbursement** 79:17 | **doing** 61:16 74:20 **dollar** 63:4 **dollars** 40:17 46:15 **door** 66:25 **doors** 48:22 **dove** 2:12 10:6,7 10:7 70:8,10 |
| **days** 14:10 **deadline** 44:4 **deal** 55:25 **dealing** 57:7 **dealt** 51:21,22 **debt** 19:14,14,15 19:22 33:14 37:17 73:5 | | | |

## [dr - explain]

**dr** 4:10 10:1
52:16 56:1 61:7
61:18
**draft** 54:19,22
55:1
**drain** 75:13
**drive** 2:5 5:6
11:11
**driven** 75:4
**dropbox** 57:2
**dublin** 17:25
20:14,20,22,24
20:25 21:21,22
32:9 39:8 48:14
48:16,23 51:8,10
51:11,20,21,24
52:4,6 56:10
59:6,19,20 61:7
61:8,10,13 62:7
62:12 63:23,25
64:6,13,19 69:10
69:15,18 70:2
**due** 28:20,20
29:22,22 30:18
30:19 31:22,22
32:14,14 33:10
33:10 53:6
65:10,10 78:4,6
78:18,22,25
**duly** 11:2
**duplicate** 9:9
**duties** 67:4
**duvall** 3:16

**e**

**e** 2:14 6:13,17
7:1,1 8:1,1 11:7
12:12 13:10

14:15 28:14,14
44:3,6,9 46:3
47:23,23 57:18
60:19 64:18
67:21,24 68:1
74:2
**earlier** 43:23
53:2 56:2 75:12
**ebitda** 45:16,17
**eclipse** 21:13
22:22,24 23:2,5
23:12,22,25
24:10,11,14 25:2
25:12
**edge** 59:6
**edwards** 56:1
**either** 33:24
72:20 80:1
**electricity** 50:21
**electronic** 1:25
47:17 83:9
**elects** 12:1
**elekta** 47:22,22
70:23,24
**employ** 14:14
**employed** 21:9,9
22:19,20
**employee** 83:14
**employees** 22:17
24:1,12,15,19
**employment**
14:8 15:1,4
22:21
**encouraged**
54:24
**enter** 9:20
**entered** 14:8
20:7

**entities** 13:16,17
17:16 27:17
32:1 33:16,22,24
34:10,21 35:8,13
35:15,18 36:6,10
36:17,18,25 37:5
37:14,18,24
38:13,18,21 39:2
52:7 65:18,25
66:14,14 67:4,5
68:16
**entity** 18:8 20:20
21:12,15 23:2
28:2,23 29:3,5
29:12 33:24
39:3 40:10,20,25
41:2,18 42:19,20
51:8 52:22 53:1
56:4 64:1 66:6,7
66:8
**entry** 66:19
67:21 80:3
**equate** 34:14,15
**equip** 46:18
**equipment** 44:18
44:19,23 46:15
70:21 71:4,12
72:13 73:22
75:10
**eric** 52:16 54:2
54:11
**esquire** 2:3,12
3:4,5,6,15 4:3,11
4:12,20 5:4
**establishing**
67:10
**estate** 14:21
44:17 60:22

61:7,11,18 64:2
**estimate** 79:9,11
**estimated** 79:14
**et** 75:6
**eta** 41:24
**everybody** 52:19
**everybody's**
59:5
**everyone's** 42:1
**evidence** 68:4
**evidencing** 29:25
31:18 38:23
**exactly** 68:23
**examination** 6:1
6:5,6,7,8,9,10,11
8:15 11:3 42:25
49:22 53:20
69:7 70:16 73:2
**examine** 8:23
**examining** 56:3
**example** 14:19
**exchange** 35:10
56:17 71:12
**exchanged** 56:16
**excuse** 34:23
58:18
**executive** 58:1,3
**exhaustive** 37:8
**exhibits** 7:2,4
**exit** 40:1
**expectations**
42:1
**expecting** 13:15
**expensive** 59:11
**expiring** 61:19
**explain** 19:7
45:9 75:3

**explained** 45:10
**exploring** 45:3
**expressed** 40:24
  41:3 58:12
**extensive** 37:9
**extensively** 28:8
**extent** 15:2
  49:11 78:23
  80:16

**f**

**f** 4:3
**facility** 22:8
**fact** 22:12,13
  59:11,18
**fail** 79:6,7 80:16
**fall** 44:23
**familiar** 52:23
**family** 52:10
  64:1,1
**fault** 76:14
**favor** 21:4 59:15
  63:4 75:24
**fax** 75:1
**faxes** 75:7
**february** 19:11
  19:13 47:14
**fee** 11:18,20
  78:18,21,24
  79:11,14 80:12
  80:16
**fees** 78:16,17
  79:1,23,25 80:8
  80:13
**feet** 22:9,15
**fiduciary** 38:18
  67:4

**figure** 55:8
**figures** 66:15
**file** 11:23 15:12
  19:8,22 41:4,8
  42:6 44:6 49:10
  49:14 77:18
  78:10 79:4,6,7
  79:19,20
**filed** 8:18 12:3
  14:4,7 43:24,24
  44:3,8,9 59:7
  71:7 76:17 77:7
  77:9 78:5,12,14
  78:20 79:15
  80:4
**files** 79:12
**filing** 11:9 18:18
  18:20,22,25 20:2
  20:9 31:2 48:2
  59:18 66:16
**final** 44:1 80:3
**finance** 4:2 10:5
  10:5 19:17 58:9
  75:18,22 76:1,7
  76:17
**financial** 13:12
  14:21 15:24
  16:6,14 19:1,4
  19:18 25:19,25
  26:1,9 31:6,10
  31:11 33:1
  35:17 39:24
  40:14 45:6,17
  58:2 68:21 77:1
**financially** 83:16
**financials** 19:3
  23:20 58:3,6

**financing** 71:7
**find** 40:4 72:19
**fine** 76:13
**finish** 32:22
**firm** 5:5 13:20
  13:25 14:7 19:3
  82:12
**first** 5:3 8:3
  10:11 11:1
  21:18 36:22
  42:12 45:7,23,24
  53:23 55:15
  70:19,22 71:4,7
  71:14,17 72:9,13
  76:14 78:5,21
**five** 29:22 40:13
  54:7 57:13,14,21
  57:21
**floor** 22:15
  50:21
**flow** 32:14 33:10
  36:16
**flush** 47:10
**focus** 50:10
**folks** 56:7
**follow** 13:10
**followed** 33:20
**following** 78:19
  82:6
**follows** 11:2
**footage** 22:8
**foregoing** 83:8
**forget** 43:11
  61:7
**forgive** 51:23
  71:15
**forgotten** 51:23

**form** 40:21
  57:18
**forma** 46:9
**formal** 44:24
  46:2
**formed** 63:6
**forth** 66:21
**found** 36:19
  40:14
**fountain** 47:10
**four** 22:15 26:12
  26:15,21,24 27:5
  27:9 29:21
  32:24 40:13
  45:4 52:22 54:7
  54:17 55:7,14
  57:21 68:8,13,14
  71:19
**fourth** 75:19
**franchise** 32:3,5
  32:6
**frankly** 67:2
**fred** 5:4 10:11
  70:18
**free** 51:3
**freely** 45:25
**front** 29:14,15
  29:17 50:22
**full** 11:5 53:9
  78:11
**fund** 28:25
**funded** 26:22,22
  30:24 37:17
**funder** 30:19
  32:14
**funding** 2:10
  10:8 26:7,10
  29:1,8,21 30:1

[funding - huntermaclean.com]                                      Page 10

35:13,15 71:25
**funds** 33:15
**further** 83:13
**fwachter** 5:9

**g**

**g** 8:1
**gambrell** 4:4
**garland** 3:15 6:6
  9:21,22,22 42:22
  42:24 43:1
  45:23,25 46:5,6
**gary** 52:19 55:14
  73:24
**geer** 3:4,7 9:14
  9:14,16,18 14:7
  16:20,20 17:9,12
  17:17 20:1,4,11
  25:25 27:7
  32:25 34:17,18
  35:21 36:15
  42:10,11 45:22
  46:3 60:6,7,10
  60:16 62:14
  66:10 67:14
  68:9 72:17,18,22
  80:20
**geer's** 17:5
**general** 76:15
**generally** 71:3
  71:10 75:7
**gentleman** 51:23
  52:2,17 54:14,15
  56:1
**georgia** 1:2 2:6
  2:15 3:10,18 4:6
  4:15,23 5:7 8:7
  18:1,5 21:16

32:9 34:8 42:17
  42:19,20 48:23
  64:21 69:17
  71:15 72:2 82:1
  82:6,7 83:2,6
**getting** 56:19
  63:1 71:11
**give** 24:5 49:2
  69:1
**given** 22:12,13
  49:7 61:24,24
**gives** 69:25
**glad** 13:25 46:24
**gloves** 49:1
**go** 30:25 32:21
  32:22 37:10
  49:21 55:11
  70:15 71:18
**goes** 31:14 59:6
**going** 12:7 19:1
  20:4 25:6 26:2
  28:11 35:21
  48:6 49:3,5 58:3
  62:25 77:12
**good** 8:2 40:18
  42:17 62:11
  69:5
**gotten** 69:22
**grade** 42:7
**grand** 43:12
**great** 43:25
**gross** 22:7
**group** 28:19
  56:7 57:2,19,20
  73:25
**groups** 57:24
  75:6

**guaranteed** 73:8
**guess** 30:25
  62:11,24 63:23
  67:11 74:21
**guesstimate**
  73:21
**guides** 47:12
**guy** 57:3 58:14
  63:6
**guys** 74:21

**h**

**h** 6:13 7:1 34:4
  37:22
**hammond** 5:6
**hand** 10:20
**happened** 31:3
  50:13
**happy** 68:24
  75:11
**hard** 45:11
**hayward** 64:20
**health** 24:3,3,7,8
  24:15 28:19,21
  45:14 47:17
  52:24
**healthcare** 20:10
**hear** 10:15 60:8
  60:13
**heard** 35:25 36:1
  47:2 58:15
**hello** 10:17
**help** 16:21
**henry** 82:2 83:3
  83:6
**hey** 41:22
**high** 19:14,14,15
  19:21 22:13

29:16 37:10,17
**higher** 56:12
  57:7 64:2
**hit** 45:11
**holbein** 4:3 6:8
  10:3,4,4 53:15
  53:17,21 60:7,9
  60:13,14,17
  62:15,17,18
  65:13,15 66:14
  67:8,18 68:2,10
  68:11,12 69:1,5
  75:18
**holbein's** 70:7
**hold** 66:5
**holder** 13:7,8
  71:15
**holders** 72:3
**holding** 14:12
  32:2,3,11,15,24
  33:5,7,12
**holding's** 33:1
**holdings** 51:6,7
  65:6
**honest** 45:5
**hoping** 41:10
**house** 44:13,14
**houston** 52:21
  55:14 56:7
**hr** 21:15 22:21
  22:24 23:1,13
  24:2,4,6,14
**hundred** 25:17
  51:4
**huntermaclean**
  2:13
**huntermaclean...**
  2:17

[idea - know]                                                                    Page 11

**i**

idea  36:11
identified  7:4
identify  9:2,3
identifying
  72:13
ignorant  58:24
imagination
  63:9,10
important  9:3,4
  11:22 49:1
  79:19
improvement
  51:1
improvements
  21:25 22:12
  50:17 51:6
include  8:17
  72:12
including  24:19
  41:15 54:16
income  45:1,1,7
  46:8
incomplete  6:19
incorrect  6:21
increase  50:18
incredibly  37:10
incur  33:14
indebtedness
  73:8
independent
  23:1 38:17
  44:12 82:8
index  6:1
indicated  59:19
indicating  59:8
  77:19

indirect  22:25
indiscernible
  6:24 28:9 51:13
  54:4,17,25 62:9
individual  60:2
individuals
  18:13 41:1
  52:14 56:4
infinity  70:24
information
  12:20 16:4,9
  25:5 43:17
  45:21 57:4,24
  77:22 79:17
  80:23
informed  58:8
  58:11
initial  12:16,18
  12:22 21:3
initially  8:21
  55:23 71:24
  83:12
innocuous  63:13
input  43:17
insider  58:22
insist  35:5
insisted  35:12
insolvent  67:5
instance  57:1
institute  27:22
  27:23 28:5 65:5
insurance  13:5,9
  24:8 74:9
insured  46:11
  74:7
insuring  77:15
intending  13:2

intends  39:25
intercompany
  65:3 66:18
interest  13:16
  23:5 28:1 29:2
  30:6 31:23,25
  33:25 34:2,22
  37:1,23,25 38:3
  38:9,11,22 40:25
  41:3 49:12 52:8
  52:12 57:5
  58:12 59:8
  65:12,13 66:20
  67:19 71:11
  72:14 80:17
interested  12:10
  41:13 52:16,22
  52:25 83:16
interests  38:19
internal  57:22
internet  47:8
  48:4,24
interrupt  36:16
interruption
  6:18
interview  12:16
  12:18,22
intuit  43:16
investment
  25:18,19 33:8,9
investor  33:12
  60:22
invoices  29:18
involved  18:7
  31:11
ion  54:4 76:9
issue  45:13 69:4
  69:23

issued  31:9
it'll  52:21
items  70:22

**j**

j  4:11,13
jamila  29:10
  31:8 76:20
january  78:25
jones  4:21
joneswalden.c...
  4:25
judge  1:7 8:5
judicial  82:5
julian  2:14
july  58:7 78:25
june  75:19

**k**

k  47:23
kathryn  1:22
  82:7,18 83:5,21
keep  37:16 39:3
  43:18 58:3
keeping  48:3
keeps  27:15
kept  9:7
kind  55:13 59:5
  59:5 63:11
klein  3:7
knew  48:6
know  10:21
  11:23 24:6
  30:23 33:2,4
  36:13 39:22
  41:23,25 44:2,2
  48:22 56:7,8,10
  56:22 57:10,11
  59:3,7,21,22,22

Exhibit 10 - Transcript of 341 Meeting Page 96 of 106    Page 95 of 105

[know - loan]                                                    Page 12

59:25 60:1,2,23
60:24 61:1,21
62:12,16,21,24
63:3,10,13,22,25
64:3,24 66:11,13
67:3,12,25 68:21
68:22,23 69:3
71:6 72:1,11
**knowing** 26:14
**knowledge** 19:1
**knows** 54:24
56:9 62:22
**kolba** 2:3 6:5,9
8:2,10 9:16,19
9:24 10:3,6,10
10:13,16,19 11:4
14:7,16 17:4,9
17:15,21 20:1,6
20:12 21:19
26:4 27:11 33:6
34:20 36:2,24
38:7,10,16 41:22
42:3,4,14,15,22
49:5,17,21 53:15
53:19 56:3
62:25 69:8 70:8
70:11,15 72:24
77:5 78:3 80:21

**l**

**l** 2:12 11:7 47:23
60:19
**l's** 11:7
**lafayette** 3:14
9:23 46:10,16
**landlord** 20:23
20:23 48:21
51:2,8,20 52:1

63:14,18
**landscaping**
50:21
**lane** 64:21
**largely** 50:12
76:4,20
**largest** 12:5
**late** 64:17 80:17
**law** 4:13 5:5
13:20,25
**law.com** 3:20
**lawrenceville**
4:15 21:16
**lead** 22:15 48:2
**lease** 20:19
21:20 22:1,6,7
50:1 59:11
61:19 76:2,5,18
**leased** 20:17
**leases** 20:18
**leasing** 30:3,4,4
30:7,9,16,21
31:20 65:5
**led** 47:14
**ledger** 30:2
31:22 65:10,10
**ledgers** 27:16
65:23
**left** 53:18
**legacy** 21:23
**legal** 37:14 82:9
82:11 83:10
**leitman** 3:7
**lender** 50:3
71:24
**lenders** 66:16,17
66:18,23

**leslie** 4:20 10:13
10:17 73:4
**levegoodlaw.c...**
4:17
**levengood** 4:11
4:13 9:24,25,25
49:17,19
**levin** 52:2,3 60:3
61:12,23 62:22
64:12
**lewyn** 60:2,18
61:12,23 62:6,22
**liberty** 5:3 10:12
70:19,22 71:4,14
72:9,13
**liberty's** 71:8,17
**light** 52:21
**limited** 8:17
**linak** 70:24
**lindsay** 2:3 8:10
16:20 36:15
37:20 42:10
**lindsay.p.kolba**
2:8
**line** 10:14 12:10
**linear** 47:11 76:8
**lines** 36:19
**liquidating**
42:13
**list** 12:4 13:6,15
26:10 36:17
49:12 50:22
51:16 75:9
77:16
**listed** 12:4 13:8
21:1 33:22 34:4
34:9,13 35:5
36:7,18 46:16

49:6,9 59:12
69:11 73:5 77:9
77:16
**lists** 69:24
**literally** 48:7
**litigation** 16:24
19:12,13,20 35:3
37:9 40:14
58:23 75:13,14
75:20
**litigations** 75:15
**little** 41:23 58:25
59:1 60:11
**living** 23:8,11
**llc** 1:5,14 2:10,11
2:11 3:3,7 4:13
4:21 5:3 8:3
9:14,15 10:5,8,8
10:9,12 11:6
15:20 17:23
20:22,24 21:24
22:17,19 23:24
24:10,18 27:13
28:5,24 29:19
30:3 32:2,3,12
32:16 33:14
34:25 35:9
37:15 42:16
51:9 59:20,20
62:7,12 63:5
70:19 75:18
**llcs** 69:10,18
70:2
**llp** 4:4
**loan** 27:12,13,19
27:21 29:24
33:10,10 38:23
65:25 67:17

[loan - million]                                                                 Page 13

68:15 70:20
73:13 76:5,17
**loaned**  66:7,8,24
**loans**  31:19 65:3
65:4,7 66:19
67:5 68:7 71:13
72:9
**located**  43:7
50:8 74:14
75:10
**location**  11:13
20:14,15,18,19
32:8 39:7 74:16
74:22,23
**loi**  53:10 54:4,8
**longer**  12:1
**look**  27:8 41:2
56:4,5 68:16
71:1 72:15
**looked**  36:9
50:24
**looking**  25:14
26:16 33:21
54:6 61:20
**looks**  33:3
**loss**  46:16
**lot**  57:5 63:12
**loudly**  9:5
**lpineyro**  4:25

**m**

**m**  4:20 6:13 10:5
11:7 28:14
47:21
**ma'am**  73:1
**machine**  47:12
**mail**  12:12 14:15
46:3 57:18

64:20,23 67:21
67:24 68:1
69:14,22 74:2
**mailed**  11:18
13:10
**mailing**  11:10,13
11:14,22 64:18
69:11,19
**maintain**  65:18
**making**  25:21
31:5 33:7 35:10
47:14 80:6,25
**manage**  42:1
**management**
18:14 27:22,23
28:4 65:5
**manager**  11:8
18:16,17,19,22
18:24 19:5 31:1
31:8
**managers**  18:12
**manual**  43:14
**mark**  4:10 10:1
30:13,14 41:11
46:3 52:2 58:13
58:15 60:2,18,18
61:23 62:6,22
64:1,5,12,25
73:11 75:17,22
76:22,25
**market**  22:10
59:12
**marriage**  83:14
**master**  32:3
**materials**  12:13
**math**  24:24
**mcas**  36:18,23

**mccord**  4:10
10:2 41:11
58:13,14,15
75:17,22 76:22
76:25
**mcdr**  3:20
**mckesson**  48:25
**mean**  17:14
46:25 56:5,15
58:20 65:2
66:11 67:6,10
68:18,19,22 69:3
69:24 72:5
**meaning**  80:3
**means**  79:24
**mec**  25:16,17,21
26:2,6,8,10,12
26:14,18,19,20
26:21,23 27:2,4
27:14,20 65:6
66:3
**mechanism**
47:11
**medical**  27:22
27:23 28:4,22
65:5 74:15,17,24
75:6
**meeting**  1:11 8:3
8:12,14,25 9:7
12:15 77:8,11,12
77:17,21,23
80:21,24 81:1
82:2
**members**  52:10
59:25 60:1
**memory**  43:4
46:14 48:16
56:22 76:3

**mention**  58:13
**mentioned**  41:16
50:1 53:1 54:10
75:12,18 77:5
**merchant**  2:10
10:8
**mholbein**  4:8
**michael**  4:3,11
4:13 9:25 10:4
16:12 21:1,3,5,7
23:4,10 28:1
34:6 35:2,16,24
36:4 37:23,25
51:24 59:20
63:20 64:20
69:21,25 78:1
**mike**  54:15,19
56:9
**miles**  1:14 6:3
9:18 10:19,22,25
11:7 12:14
14:17 16:12
17:2,5,22 20:13
21:1,3,5,7 23:4
23:10 25:18
26:1 27:10 28:1
30:13,14 34:6
35:2,16,24 36:5
36:25 37:12
38:17 42:16,23
49:5,16,18,24
53:16,22 60:12
67:25 69:9 70:9
70:12,18 72:25
73:11 77:23
78:1,1
**million**  40:16
41:20 46:15

Case 22-56501-jwb Doc 363-4 Filed 10/07/23 Entered 10/07/23 13:25:18 Desc
Exhibit 10 - Transcript of 341 Meeting Page 98 of 106
Case 22-56501-jwb Doc 363-4 Filed 10/07/23 Entered 10/07/23 13:25:18 Desc
Exhibit 10 - Transcript of 341 Meeting Held on Sep 16, 2022 Page 97 of 105

**[million - office]**

| | | | |
|---|---|---|---|
| 57:13,15,20 76:4 | **mosaiq** 47:21 | 79:13 | 81:1 |
| **mince** 13:24 | 48:24 | **negotiate** 51:11 | **noticed** 36:16 |
| **mind** 16:21 | **motion** 20:2 41:5 | **negotiated** 21:24 | 57:6 |
| 46:19 58:16 | 41:9,23,25 42:12 | 51:5 | **number** 8:4 28:6 |
| **minute** 55:2,2 | **mountains** 66:21 | **negotiation** | 29:14,15 33:22 |
| **minutes** 37:8 | **moving** 66:21 | 51:12 | 36:10 70:23 |
| **misheard** 38:4 | **multiple** 49:11 | **negotiations** | |
| **misidentified** 7:9 | 74:24 75:15 | 53:4 | **o** |
| **mislead** 44:3 | **mutual** 61:25 | **neither** 35:16,19 | **o** 6:17 8:1 10:5 |
| 57:18 | **n** | 52:7 | 47:21 54:15 |
| **mispronounce** | **n** 6:13,17 7:1 8:1 | **net** 33:4 | **o.c.g.a.** 82:14 |
| 28:11 | 60:19 | **network** 54:4 | **oath** 8:15,23 |
| **missed** 16:23 | **n.e.** 4:5,22 5:6 | 64:2 | **object** 35:22 |
| 17:1 | **name** 8:10 11:5 | **never** 18:16 | 66:11 |
| **misunderstand...** | 15:19 48:9 | 31:25 38:2,8 | **objection** 14:10 |
| 38:6 | 51:23 52:17,19 | 43:11 69:14,22 | **obligated** 35:18 |
| **misunderstood** | 61:24 70:18 | **new** 50:1,3,20 | 38:14 |
| 35:25 | 74:5 | 58:5 | **obligation** 24:18 |
| **mittere** 28:12,13 | **named** 36:12 | **nibble** 59:5 | 38:18 |
| 28:16,18,19 | 52:2,17 54:15 | **night** 19:5 | **obligations** 35:9 |
| 29:19,20 30:1 | 56:1 60:2 | **nine** 22:18 | **obligors** 33:22 |
| **mlevengood** | **nature** 76:15 | **non** 66:6,7,8 | **obtain** 9:9 39:14 |
| 4:17 | **nda** 56:23 | 67:4 | **obviously** 13:19 |
| **moments** 60:3 | **necessary** 20:8 | **normal** 37:11 | 44:3 47:7 48:21 |
| **money** 65:25 | 40:3 | **north** 30:3,4,6,9 | **october** 18:4 |
| 66:8,21,24 | **need** 15:9 16:18 | 30:16,21,24 | 19:2 31:15 |
| **monies** 33:16,17 | 16:22,24 30:25 | 31:19 65:5 | 44:21 77:12 |
| **month** 22:7 | 32:25 35:4 40:9 | **northern** 1:2 8:6 | 78:12,22 80:22 |
| 24:25 78:4,11,19 | 46:1 49:10,12,14 | **notably** 28:7 | **offer** 44:22 |
| **monthly** 22:5 | 55:4 77:6,18 | **note** 7:7,7 14:24 | 47:18 57:19 |
| 24:4,7,18,21 | **needed** 14:13 | 59:15 67:20 | **offering** 57:15 |
| 77:24 78:3,6,9 | 19:15 29:1 | 71:15,15 72:2,2 | **offers** 57:8 |
| 79:6,12,20,21 | 51:16 | 76:24 | **office** 2:4 4:13 |
| **months** 25:6 | **needing** 14:17 | **noted** 66:19 | 8:11 9:11 12:17 |
| 26:25 45:7,15 | 14:20 | **notes** 71:18,20 | 12:19 13:12,22 |
| **moore** 3:16 | **needs** 9:9 18:5,5 | 71:22 | 14:3,11 15:11 |
| **morris** 71:16 | 55:11 63:10 | **notice** 20:9 | 16:2,5,9 26:17 |
| 76:24 | | 77:10,17,19,20 | 28:22 48:8 |

69:10,11,14,19
70:2 74:15,17
79:8,18 80:15
**offices** 74:24
**official** 12:6,11
**offline** 20:5
**offset** 76:4
**offtrack** 37:21
**oftentimes** 35:3
37:11
**oh** 54:13 64:7
67:14
**okay** 10:17
11:17 13:2,5,22
14:6,24 17:8,22
18:21 20:6,11,13
23:7 24:17 25:8
25:16 26:5
30:20,25 31:18
32:2 33:11,13,21
34:21 35:8,15
36:3,5,14,25
37:4 39:6 41:21
42:3,9,14 43:6
43:13,17,21 44:7
44:10,25 45:16
45:25 46:13,18
47:24 48:10
49:2,5 53:1,19
54:8 55:2,25
56:2,24 58:5,8
58:16,25 59:4
60:8,10,10,16
62:11 64:9,11,15
64:19 65:2
67:18 69:9,17
71:6,10,22 72:7
72:7,11,16,22

**ombudsman**
73:17 74:6,9
76:11 77:4,5
20:3,7,10
**once** 46:1
**oncology** 17:25
18:6 40:16,17
44:25 45:11
56:8,10,13 75:4
75:6,16
**ones** 56:21
**online** 27:24,25
80:12
**open** 13:2 48:22
**opened** 12:24
66:25
**operate** 18:5
20:13 76:20,21
**operating** 19:23
19:24 43:3
63:25 64:4
77:24 78:3,6,9
78:11 79:4,6,12
79:15,20,21
**operation** 8:18
**operations** 19:6
31:6 78:8,10
**opinion** 66:25
**opportunity**
8:22
**order** 14:9 15:15
16:18 20:7
39:14,25 49:13
74:1 80:2
**ordinary** 67:12
67:15
**organization**
22:22

**organizer** 59:16
62:7
**original** 51:14
73:22
**outcome** 83:16
**outstanding**
75:21 76:16
**overview** 58:1
**owes** 32:24
**owing** 33:4
**owned** 25:17
47:22,22 71:12
**owner** 11:9 18:9
18:10,11 21:23
23:2 34:10 52:3
62:12 76:23
**owners** 59:25
60:1 75:17
**ownership** 22:25
23:5 29:2 30:6
34:1,16,18,22
36:6 37:1 38:22
52:6,8 59:8
**owns** 25:19,20
29:10 30:12
52:22 59:20

| **p** |
| --- |

**p** 2:3 6:17 8:1
54:15,15
**p.m.** 1:13 8:10
**p.o.** 3:17
**page** 6:2 7:2
75:19
**pages** 75:8
**paid** 15:9 23:15
23:22 24:4 25:1
25:12 29:12

66:15 76:17,22
**pardon** 40:22
**part** 12:14
**participate** 12:5
**participating**
12:11
**particular** 74:19
**particularly**
47:3
**parties** 12:4,9
17:11,13 77:9,15
83:15
**partners** 5:3
10:12 25:19
70:19 77:1
**party** 44:24
**pass** 21:13 24:5
**passed** 45:13
61:9
**passes** 28:10
**passive** 18:9,10
**patient** 20:3,9
**patients** 18:2
19:25 39:4
**pay** 15:6,14
19:14 30:21
37:17 42:7 79:2
**payable** 23:20
43:20 63:21
**payee** 46:16
**paying** 26:6,19
78:16 79:22,25
80:7
**payment** 15:16
22:5 24:4,4,7
26:7 27:2 35:11
48:3 64:18
65:16 67:19

[payment - property]                                                                                    Page 16

78:18,21
**payments** 23:8
23:24 24:7,9,11
25:21 26:13,18
26:23 27:3,8
31:7,24 39:11
68:17 76:5,18
78:25 80:6,17,18
**payoff** 72:2
76:22
**payouts** 51:22
**payroll** 21:13,14
24:1,12,18 25:5
25:7,15
**pays** 24:14
**paystub** 22:22
**pc** 3:16
**peachtree** 4:5
**pendency** 11:21
14:18 39:16
**pending** 16:24
78:23
**peo** 21:12 22:21
23:1
**people** 64:1
**percent** 25:17,20
29:7,8,9,11
30:11,12 40:5,7
51:4
**percentage** 29:5
30:9
**period** 14:10
32:24 50:12
78:7,10,13
**permitted** 15:6
33:14
**perry** 4:14

**persistent** 19:21
**person** 51:19
52:1 53:23 64:3
64:5
**personal** 22:23
**personally** 15:23
21:6 60:25
**petition** 11:25
12:2 15:20,23
**pfp** 76:3,23
**ph** 6:23 61:8
**phillip** 1:14 6:3
9:18 10:25 11:7
25:18 36:5
**phone** 74:3,4
**phonetically**
6:23
**phrase** 6:20
**physical** 55:11
**physically** 83:11
**physician** 25:19
28:7,10 45:13
77:1
**pick** 45:12 53:17
**piece** 75:10
**piedmont** 4:22
**pineyro** 4:20
6:11 10:13,15,17
10:17 72:24
73:1,3,4
**place** 83:12
**placed** 75:5
**plan** 42:6,13
80:4,4,6
**planning** 47:13
47:17 64:2
**plaza** 3:8

**please** 7:7 9:20
10:20 11:5
15:10 17:22
41:7 50:14,17
74:11 75:9
**pledged** 37:5
70:21 71:4
**plumbing** 50:21
**plus** 51:18
**point** 2:11 10:9
11:20 27:4
35:22 47:25
49:4 51:19 52:1
56:18 57:21
62:24 70:7
**position** 71:8
**possession** 12:24
13:3
**possibility** 15:4
**possibly** 59:3
**potential** 40:10
52:15 53:5,23
54:23 61:2
**potentially** 62:2
**power** 48:23
**pre** 27:8
**premises** 20:16
**premium** 2:10
10:7 24:4,15
**preparation**
12:15
**prepare** 16:3
23:21
**prepared** 9:10
16:1 19:3 46:7
**preparing** 77:23
**present** 8:22
9:20 70:19

83:11
**pretty** 40:18
43:20 50:5,23,25
**previously** 14:11
45:8 59:14
**price** 41:17
**principal** 69:10
69:18
**prior** 9:3 12:18
15:3 16:14 18:8
19:10 31:5,12
50:2 77:7
**priority** 49:13
**privy** 64:3
**pro** 46:9
**probably** 28:11
**proceed** 12:2
**proceeding**
19:22 40:3
78:11,14
**process** 13:1
55:9 57:11
**processes** 19:12
**professional**
22:21 75:16
**professionally**
60:24 61:1
**professionals**
14:18,24,25 15:2
15:7,10,14,16
**prohibited** 82:13
**projections**
45:16 46:7
**pronounced**
60:3
**proper** 28:8
**property** 44:16
51:18,18

[prospects - registered]                                           Page 17

prospects  8:19
prospri  54:15,16
  54:19 56:9
provide  12:19
  24:3 26:20 28:5
  30:17 40:2
  46:21,24 57:25
  75:7,9 79:16
  82:11
provided  13:11
  13:17,19,20 16:4
  21:14 26:17
  28:6,23 29:19
  32:11 48:13
  51:2
provider  47:19
  48:4,15 52:24
  73:22
providers  39:13
providing  16:8
  39:15 46:19
  82:12
purchase  42:8
  44:21 53:6,9,11
  63:6 71:25 72:1
  74:1
purchased  18:12
  21:22 71:14,14
  71:16,17,23
purchaser  40:4
purchasers
  40:11
purchases  54:25
purchasing
  40:25 58:12
  62:2
purported  68:7
  68:15

purpose  8:14
  39:22
purposes  11:8
  18:22,25 31:2
  32:14 48:21
pursuant  80:2,6
  82:4
put  36:20 38:12
  51:16 76:18
putting  57:3

**q**

quarter  78:17,19
  78:21 79:10
  80:9,11
quarterly  11:17
  11:20 78:16,17
  78:21,24 79:1,11
  79:23,25 80:8,16
question  8:21
  16:22 17:19
  36:1 37:13,22
  41:6 42:7 44:1
  47:1 50:10,14
  57:10 59:4
  62:14 63:15
  64:25 66:6,9
  68:9 69:15
questions  8:17
  42:23 49:4,18,20
  49:25 53:16
  55:20 62:16
  67:3,8,9,10 69:6
  70:9,10,12,14
  72:25 80:19
quick  22:14
  33:23

quickbooks
  43:15
quickly  41:24
quote  54:5 59:15

**r**

r  6:17,17 8:1
  28:14 54:15,15
radiation  17:25
  18:1,2,6 22:13
  22:14 40:17
  45:11 56:8,10,12
  75:4
raise  10:20
randolph  52:16
  54:2,11
range  41:19
  57:14
rate  50:18
rates  37:10
reach  41:12
  54:11,12 55:17
  55:17
reached  54:13
  55:19,22,23
read  16:13 53:10
real  14:21 44:17
  60:22
really  36:13 55:8
  66:12
reason  9:9 46:24
  52:18
reasonable
  68:25
reasons  48:2
recall  48:7 56:21
receive  11:19
  12:12 13:15

23:7,10 77:10,17
  80:14
received  13:5,14
  69:14 80:25
receives  23:12
  23:16
recollection
  23:17
reconciliation
  33:3
reconfiguration
  50:6 51:15
record  9:21 11:6
  60:6 62:16 76:9
  81:2
recorded  8:25
recorder  9:1,5
recording  1:25
  7:8 9:7,10 81:3
  83:9,12
records  24:6
  34:9 47:17
  65:21 69:18
rectified  45:15
referred  61:2
referrers  75:5,7
referring  75:2,5
  75:14
refers  75:1
refinance  72:4
reflect  65:21
regarding  14:13
  14:15 51:6
  52:15 59:9
regardless  80:14
registered  34:10
  34:23 59:13,16
  59:19 62:20

## [registered - seeing]

63:5,20 69:25
70:1
**registration**   21:4
35:2 59:15
**registrations**
34:14
**regulations**
58:19 82:4
**relate**   66:12
**related**   34:12
35:19 37:4
83:17
**relationship**
11:6 20:21 21:5
22:23 30:14
38:20 63:14,17
70:6
**relative**   83:13
**remains**   78:23
**remember**   48:9
73:24
**remembered**
58:15
**reminders**   8:24
**remit**   24:14
64:25
**remits**   63:21
**render**   15:3
**rent**   22:10
**rental**   50:18
**reorganization**
8:20 42:6 80:4
**reorganize**   39:24
**repaid**   68:7
**repayment**
65:16 68:15
**repeat**   41:6

**repeatedly**   59:7
**report**   78:6,9,12
**reported**   79:3
**reporter**   1:23
82:8,22 83:5,23
**reporter's**   6:15
7:7
**reporting**   82:5
**reports**   77:24
78:4 79:4,7,13
79:15,20,21
**represent**   58:9
73:4
**request**   46:2
**requested**   12:19
12:21 74:9
**require**   47:8
**required**   8:12
37:3,7 79:2
**resent**   14:1
**residential**   32:7
**respect**   51:25
**responsible**   39:6
39:7 77:15
78:16 79:22,24
80:7,24
**retired**   61:9
**return**   14:2
**returns**   13:22
43:24
**revenue**   45:13
**review**   16:13
44:1 45:22 46:1
46:4 78:2
**reviewing**   70:20
**right**   9:19 10:20
11:10 12:14
14:2 15:19

23:18 26:9
28:16 32:19,20
32:23 33:3 34:8
34:17 35:6
39:22 42:21
44:5 46:5 48:8
49:17 53:18
58:10 60:25
65:2 67:12,18
71:21 73:14
74:13 78:3
**rlkglaw.com**
3:12
**road**   3:9 38:2
**rodgers**   3:16
**role**   61:14
**roof**   50:20
**room**   56:24 57:9
**rountree**   3:5,7
9:15 21:17
37:20 38:8,10
41:22 65:11
66:5 67:2,16,23
68:18 69:3
**rules**   58:19,23
82:4
**russell**   4:4

## s

**s**   2:3 6:13,17,17
7:1 8:1 11:7
47:21 54:15
**s.w.**   2:5
**safer**   61:7
**safer's**   61:18
**saint**   2:14
**salary**   23:7,10
23:12

**sale**   40:7,20 41:5
41:17 42:11
50:13 52:15
57:6 61:15,16
**sales**   45:18 55:9
**savannah**   2:15
**save**   63:12
**saw**   36:21
**saying**   27:7
32:15 34:3
58:19 71:22
**says**   22:22
**schedule**   16:22
16:25 17:10
34:4 37:22 49:6
49:15 77:6
80:12
**schedules**   15:24
16:5,14 20:25
33:21 40:3
70:20 72:12
73:17 77:7,8
**screwy**   46:25
**search**   33:23
**second**   49:2
**secretary**   34:9
42:17 69:17
**section**   8:13
54:24,25
**secure**   71:7
**secured**   49:7
71:8 73:13
**security**   71:11
72:14 76:18
**see**   9:2 13:11
34:9 45:12,24
**seeing**   57:22,23

**seeking** 40:19
**seen** 36:23
**selected** 18:24
**sell** 40:5 41:9
  61:20 76:8
**seller** 61:5
**selling** 40:16
**send** 12:11 72:19
**sending** 14:14
**sense** 72:10
**sent** 51:22 57:24
  74:11 83:9
**separate** 32:16
  37:14 65:18
  69:24
**separately** 26:17
  79:16
**september** 1:12
  8:9 19:9 20:10
  78:7,13,13 83:18
**serial** 70:23
**series** 71:19
**served** 77:19
**serves** 43:4
  46:14 47:10
  48:16 56:22
  76:3
**service** 77:18
**services** 14:18
  14:20 15:3,5,10
  26:19 28:4,6,23
  29:18,21,23
  30:16 32:11
  39:15 40:20
  82:12
**set** 27:2
**setting** 56:24

**setup** 75:1
**seven** 45:7 66:15
**sewer** 48:17
**sgrlaw.com** 4:8
**shape** 40:21
**share** 45:21,25
  56:25 58:21
  68:24
**shared** 54:23
  58:17,20
**sharefile** 57:3
**sharing** 58:16
**sheet** 55:3
**shifting** 33:15
**shoot** 46:3
**show** 47:13
**showing** 29:18
  68:17
**shut** 19:11 47:15
  62:25
**sic** 6:20 60:19
**side** 9:5 28:13
**sign** 15:23 35:8
  38:21
**signature** 36:19
  82:15 83:19
**signed** 16:17
  21:25 34:24
  37:2
**signer** 39:2
**significant** 50:6
  50:23,25 56:6
**significantly**
  45:8
**signing** 16:15
**similar** 30:18
**simmer** 56:9

**simply** 47:9
  61:17
**sir** 44:9,11,14,18
  44:20 45:5,10,19
  45:20 46:9,12,20
  46:21,23 47:5
  48:3,9,19,24
  50:20 51:4
  52:11 53:3,8,23
  54:21
**site** 56:25
**sitting** 54:20
**six** 57:13,14,15
  57:20
**small** 43:10
**smaller** 48:12
**smith** 4:4
**sofa** 26:12,15,24
  27:5,8 68:7,13
  68:14
**software** 47:12
  47:16,19,21,25
**sold** 61:12,13
**solicit** 12:3
**solicitation**
  12:13
**solicitations**
  12:7
**solutions** 82:9,11
  83:10
**somebody** 49:3
**son** 21:7 33:25
  34:1,6,23 35:2
  37:23 59:12
  62:20,21 63:4,14
  63:18
**sorry** 24:5,21
  32:21 50:4,4

**51:10 62:9 75:3**
  76:12
**sound** 83:9
**sounds** 29:16
  55:7 71:21
**source** 44:25
**sources** 45:1,4
  75:2
**south** 4:14
**space** 22:11
**speak** 9:4 74:2,3
**speaker** 36:22
**speakers** 7:9
**speaking** 9:4
  34:19 42:11
  52:15 60:8
  72:18
**specific** 14:15
  40:15 65:7
**specifically**
  72:11
**spelled** 6:23
**spoke** 74:4 76:12
  76:13
**spurred** 50:18
**square** 22:8,9
**stack** 19:18
**staffing** 21:13
  22:22,24 23:3,5
  23:12,22,25
  24:10,11,14 25:2
  25:12
**stage** 53:4
**standing** 42:17
**star** 52:23 55:14
**starting** 19:9
  45:12

## [starts - think]

**starts** 23:19,19
**state** 3:14 9:23
   11:5 42:17
   46:10 60:25
   82:1 83:2,6
**stated** 15:20
   59:7
**statement** 6:15
   15:24 16:6,14
   17:5 25:25 26:1
   26:9 33:1 45:6
   62:15 68:20
   80:14
**statements** 11:18
   11:20 13:12
   45:17 68:16,20
   71:7
**states** 8:5,12
   9:12 12:3,18
   13:6,8 20:8 34:9
   69:18 79:8,17
   80:15
**stating** 20:7
**status** 64:2
**stay** 75:25
**steps** 13:7
**strange** 6:21
**strategies** 21:15
   22:21,24 23:1,13
   24:2,5,6,14
**street** 2:14 4:5
   4:14
**stress** 40:14
**stressed** 56:18
**stretches** 70:5
**structure** 52:6
   59:23,24

**subchapter** 11:8
   12:2 78:15
**subject** 14:9
   57:7
**subsequent** 78:9
**substantiate**
   68:6,15
**substantive**
   56:14,15
**sue** 64:19
**suing** 76:22
**suite** 2:5 3:8 4:5
   4:14
**summary** 58:2,3
**summer** 21:23
   43:4,5 61:3
**superficial** 50:22
**supplement** 68:6
   68:7,14,18
**supplied** 12:21
   13:22,25 14:3
**suppliers** 48:25
**supplies** 49:1
**supports** 49:8
**supposed** 71:11
**sure** 12:12 13:21
   15:10 17:12,18
   39:22 43:5
   50:10 52:18,21
   64:18 68:11
   77:3 80:25
**surface** 32:7
**surprise** 62:8,10
**surprised** 66:23
**sworn** 10:23
   11:2
**synergy** 70:23

**synovus** 43:8
**system** 43:13

### t

**t** 6:13,13,13,17
   6:17 7:1 28:14
   28:14 47:23
**tady** 3:6 10:1
**take** 9:13 18:14
   72:15
**taken** 13:7
**takes** 45:14
**talk** 43:22 46:4
   50:4,7 56:20
   61:1
**talked** 35:23
   41:19 54:16
   55:11 57:12,20
   57:20 73:22
**talking** 44:17
   47:20 55:3,21
   56:12 57:2
**tax** 13:22 14:2
   43:23 44:4
**taxing** 14:4
**taylor** 1:22 2:12
   10:7 82:7,18
   83:5,21
**tdove** 2:17
**ted** 2:5
**telephone** 9:1
**telephonic** 1:11
   82:2
**tell** 26:11 50:24
   51:5 52:14
   57:16 62:25
**telling** 34:11
   63:11

**ten** 22:1
**tenant** 20:18,23
   20:24
**tend** 75:25
**term** 55:3 65:14
   72:6
**terminology**
   26:14
**terms** 21:20 22:1
   29:25 31:19
   65:8,16 66:20
   67:16,19,19,19
   67:20 68:22
**testified** 11:2
   38:11 59:14
   65:6,11
**testifying** 9:17
**testimony** 17:6
**thank** 9:19 10:19
   46:5,25 53:13,14
   70:4 72:22
   80:20
**that'd** 40:7
**thing** 24:2,16
   67:6 70:24
**think** 21:15 22:1
   24:4 27:7 29:10
   37:13,20,25 38:3
   38:5 47:22
   48:22 49:2
   51:14 52:5
   59:10 60:20
   63:12,16 64:7,9
   64:21 65:11
   67:23 68:4,19
   70:7 74:10
   75:21 76:13
   77:2

thinking  44:20
third  44:24
  78:20
thought  6:18,19
  46:23 74:21
threat  47:15
three  25:5,7 32:4
  41:15 43:6 53:5
  53:12 54:9,17
  55:5,22 75:21
  76:15
tie  64:15
time  8:9 14:23
  17:3 18:9 21:24
  35:14 36:23
  40:12 41:11
  43:2 45:3,5 48:7
  50:12 56:21
  63:12 67:5 79:7
  79:12,14,16,21
  79:23,25 80:17
  80:20
times  31:9 60:7
  74:10
timing  42:12
titila  61:8
today  39:20
  58:17
today's  8:9,12
  8:14,25 9:7
  12:15 47:7 77:8
  77:11,23 80:23
toilets  47:10
told  61:18 62:6
  76:6,6
tom  4:12 10:1
  49:24

tomorrow  44:6
total  24:17
trader  28:21
traditional  58:1
  66:17
training  27:25
transaction  68:4
transactions
  38:24 67:12
  68:13
transcribed  1:21
  1:24 7:8
transcript  7:8
  9:10 82:13 83:8
  83:17
transcription
  82:1,12
transfers  25:23
  27:16 43:22
treat  47:18
treating  19:24
  39:4
treatment  37:18
  39:1 47:13,17
treats  18:1
trial  8:11
tried  59:5
true  14:3 16:19
  83:8
trustee  2:4 8:12
  9:12 12:3,18
  13:6,8 20:8 69:2
  79:8
trustees  79:18
  80:15
try  38:25
trying  38:19
  55:8 61:17

63:23 64:15
  70:21
tumor  18:1,2
tune  19:3
turner  2:5
turnkey  53:7
turns  25:20
  62:11
twelve  26:24
twenty  14:10
two  9:7 11:7
  18:4,12 21:2
  22:13 25:6,9,15
  38:24 41:1 45:8
  52:14 53:12
  55:21,24 56:4,22
  57:21 70:7 76:4
type  43:13 49:1
  63:4

## u

u.s.  1:1 2:4
ucc  71:6 72:18
uccs  36:10,21
ultimately  21:14
  23:15
unable  19:16,17
understand
  11:14 15:17,18
  16:13 17:12
  26:16 33:18
  37:12 38:10
  41:11
understanding
  12:20 26:23
  32:20,23 37:13
  53:8 56:11
  62:19 72:8

73:16
understood  6:24
  17:18 21:20
  33:19
unfortunately
  45:14
united  8:5,11
  9:12 12:3,17
  13:6,8 20:8 79:8
  79:17 80:15
unknown  36:22
unsecured  12:5
  12:6
unusual  67:3
updated  43:18
upgraded  51:17
urgency  56:18
usdoj.gov  2:8
use  25:18 41:2
  57:2 72:6,6
  77:22
uses  21:10,12,12
  43:15 57:1
utilities  39:7
utility  39:10,13
utilizing  18:2

## v

valid  76:1,2
valuation  73:20
value  49:7
valued  73:17
various  27:16
  35:4
vault  50:7,12
  51:15,15
vaults  22:14,14
  49:25 50:5

**[vendor - zerorez]**                                                    Page 22

| | | |
|---|---|---|
| **vendor** 48:5 | 45:3 53:13 54:3 | **worth** 40:17 |
| **vendors** 47:3 | 54:6 55:21 56:4 | **would've** 25:4 |
| 48:20 | 59:4 66:10 | **written** 6:22 |
| **verbatim** 6:22 | **week** 41:10,24 | 57:18 |
| **veritext** 82:9,11 | 44:1 53:24,25,25 | **wrong** 34:15 |
| 83:10 | 55:16 59:1 77:7 | 47:2 |
| **versa** 26:3 | **weekly** 24:23 | |
| **vice** 26:3 | 25:6 | **x** |
| | **weeks** 25:9 | |
| **w** | **went** 38:2 50:20 | **x** 7:1,1 |
| | 76:8 | **xfinity** 48:11 |
| **w** 4:5 60:19 | **wgeer** 3:12 | |
| **wachter** 5:4,5 | **what'd** 57:25 | **y** |
| 6:10 10:10,11,11 | **wherewithal** | |
| 70:11,13,17,18 | 61:21 | **y** 60:19 |
| 72:17,20,23 | **william** 3:5 | **y'all** 45:16,17 |
| **wachterlaw.com** | **willing** 67:11 | 47:4 |
| 5:9 | **winds** 30:3,4,7,9 | **yeah** 17:15,18 |
| **walden** 4:21 | 30:16,21,24 | 27:3 59:24 |
| **walls** 22:16 | 31:19 65:5 | 60:10,12,13 |
| **want** 33:11,13 | **wire** 63:22 | 62:17 63:17,19 |
| 35:1,7 36:15 | **withdrawals** | 64:17 65:13 |
| 42:1 44:3 50:9 | 65:22 | 66:4 68:11 69:3 |
| 50:10 54:3,5 | **witness** 10:23 | **year** 22:1 23:25 |
| 57:14,17,17 | 11:1 | 24:11 25:6 27:8 |
| 76:19 | **wondering** 55:6 | 29:13 30:17,20 |
| **wanted** 17:18 | 63:8 | 30:24 32:12,24 |
| 58:13 70:3 76:7 | **word** 6:20 63:24 | 45:15 46:8 |
| **warranted** 59:10 | **words** 13:24 | 66:15 |
| **water** 47:8,9,9 | **worked** 28:8 | **years** 9:8 26:21 |
| 47:10 48:13,15 | 40:16 | 29:22 40:13,13 |
| 48:16,23 | **working** 40:2,4 | 43:6,24 45:4,8 |
| **way** 19:20 28:8 | 42:8 53:11 55:4 | 54:7,18 55:22,24 |
| 31:14 34:12 | 55:6 68:23 | **yep** 72:23 |
| 37:5,14 40:21 | 74:20 | |
| 58:19 83:16 | **works** 14:1 19:5 | **z** |
| **waycross** 61:9 | **world** 41:10 47:7 | **zero** 14:12 32:2 |
| **we've** 25:23 | | 32:3,11,15,24 |
| 36:16,23 43:10 | | 33:1,5,7,12 |
| | | 40:23 65:5 |
| | | **zerorez** 32:6 |