**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CUREPOINT, LLC, | Case No. 22-56501- PMB |
| Debtor. | |

**FIRST AMENDED DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF
LIQUIDATION FOR CUREPOINT, LLC PURSUANT TO CHAPTER 11 OF THE
BANKRUPTCY CODE**

## NOTICE

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN EITHER THIS FIRST AMENDED DISCLOSURE STATEMENT OR THE CHAPTER 11 PLAN OF LIQUIDATION EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS FIRST AMENDED DISCLOSURE STATEMENT AND THE CHAPTER 11 PLAN OF LIQUIDATION WERE COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE CHAPTER 11 TRUSTEE'S KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE CHAPTER 11 PLAN OF LIQUIDATION ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.   CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

PLEASE NOTE THAT MUCH OF THE INFORMATION CONTAINED HEREIN HAS BEEN TAKEN, IN WHOLE OR IN PART, FROM INFORMATION CONTAINED IN THE DEBTOR'S BOOKS AND RECORDS AND CERTAIN PLEADINGS FILED BY THE DEBTOR WITH THE BANKRUPTCY COURT.  ALTHOUGH THE CHAPTER 11 TRUSTEE HAS ATTEMPTED TO BE ACCURATE IN ALL MATERIAL RESPECTS, THE CHAPTER 11 TRUSTEE IS UNABLE TO REPRESENT OR WARRANT THAT ALL OF THE INFORMATION CONTAINED IN EITHER THIS FIRST AMENDED DISCLOSURE STATEMENT OR THE CHAPTER 11 PLAN OF LIQUIDATION IS WITHOUT ERROR.  THE STATEMENTS CONTAINED IN THIS FIRST AMENDED DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS FIRST AMENDED DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTIONS 1125 AND 1126 AND BANKRUPTCY RULES 3016, 3017 AND 3018 AND NOT NECESSARILY IN COMPLIANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11.

NO REPRESENTATION CONCERNING THE DEBTOR OR THE VALUE OF THE DEBTOR'S ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS FIRST AMENDED DISCLOSURE STATEMENT.  THE PLAN PROPONENT IS NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, INFORMATION CONTAINED IN THIS FIRST AMENDED DISCLOSURE STATEMENT AND PLAN.

YOU ARE STRONGLY URGED TO CONSULT WITH YOUR FINANCIAL, LEGAL AND TAX ADVISORS TO UNDERSTAND FULLY THE FIRST AMENDED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION.  THE FINANCIAL INFORMATION CONTAINED IN THIS FIRST AMENDED DISCLOSURE STATEMENT IS GIVEN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED.  THE DELIVERY OF THIS FIRST AMENDED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION DOES NOT, UNDER ANY CIRCUMSTANCE, IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN AFTER SUCH DATE.  THIS FIRST AMENDED DISCLOSURE STATEMENT AND THE CHAPTER 11 PLAN OF LIQUIDATION MUST BE READ IN CONJUNCTION WITH ANY EXHIBITS.

IF A HOLDER OF A CLAIM WISHES TO CHALLENGE THE ALLOWANCE OR DISALLOWANCE OF A CLAIM FOR VOTING PURPOSES UNDER THE TABULATION RULES SET FORTH IN THE SOLICITATION PROCEDURES, SUCH ENTITY MUST FILE A MOTION, PURSUANT TO BANKRUPTCY RULE 3018(A), FOR AN ORDER TEMPORARILY ALLOWING SUCH CLAIM IN A DIFFERENT AMOUNT OR CLASSIFICATION FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN AND SERVE SUCH MOTION ON THE UNDERSIGNED COUNSEL TO THE CHAPTER 11 TRUSTEE SO THAT IT IS RECEIVED NO LATER THAN **5:00 P.M., PREVAILING EASTERN TIME, ON THE DATE THAT IS ATLEAST FOURTEEN (14) DAYS PRIOR TO THE VOTING DEADLINE.**  ABSENCE THE OCCURRENCE OF A RESOLUTION EVENT AT LEAST TWO (2) DAYS PRIOR TO THE VOTING DEADLINE AND UNLESS THE BANKRUPTCY COURT ORDERS OTHERWISE, SUCH CLAIM WILL NOT BE COUNTED FOR VOTING PURPOSES IN EXCESS OF THE AMOUNT DETERMINED IN ACCORDANCE WITH THE TABULATION RULES.

**TABLE OF CONTENTS**

I.      OVERVIEW OF THE PLAN ........................................................................................... 1

II.     THE PLAN STRUCTURE ............................................................................................... 4

III.    THE ADEQUACY OF THE DISCLOSURE STATEMENT ........................................... 5

IV.     INTRODUCTION ............................................................................................................ 6

        4.1     PURPOSE OF THE DISCLOSURE STATEMENT ............................................. 6

        4.2     CONFIRMATION OF THE PLAN ...................................................................... 7

                4.2.1   Requirements ......................................................................................... 7

                4.2.2   Procedure .............................................................................................. 8

                4.2.3   Objections to Plan Confirmation ........................................................... 9

                4.2.4   Effect of Confirmation .......................................................................... 9

        4.3     VOTING ON THE PLAN ..................................................................................... 9

                4.3.1   Impaired Claims or Interests ................................................................ 10

                4.3.2   Eligibility ............................................................................................. 10

                4.3.3   Binding Effect ...................................................................................... 10

                4.3.4   Voting Procedures ................................................................................ 11

                4.3.5   Tabulation Procedures .......................................................................... 11

                4.3.6   Resolution Event .................................................................................. 13

        4.4     ACCEPTANCE OF THE PLAN .......................................................................... 13

                4.4.1   Creditor Acceptance ............................................................................. 13

                4.4.2   Cramdown Election .............................................................................. 13

        4.5     SOURCES OF INFORMATION ......................................................................... 14

        4.6     ADDITIONAL INFORMATION ......................................................................... 14

i

V.      THE DEBTOR...................................................................................................14

    5.1     THE DEBTOR'S CORPORATE HISTORY, STRUCTURE, AND BUSINESS
            OVERVIEW AS OF THE PETITION DATE.......................................14

    5.2     PREPETITION FINANCING ARRANGEMENTS ...........................15

            5.2.1   Equipment Financing ........................................................15

            5.2.2   Operational Financing ......................................................17

            5.2.3   Cash Advances ..................................................................18

    5.3     EVENTS LEADING TO THE BANKRUPTCY FILING ...................19

            5.3.1   The State Court Litigation ................................................19

            5.3.2   The Cash Advance Agreements ........................................20

    5.4     THE DEBTOR'S BANKRUPTCY PROCEEDING............................20

            5.4.1   The Petition Date ..............................................................20

            5.4.2   The First Day Motions and Orders ..................................20

            5.4.3   Other Motions and Significant Chapter 11 Case Events ..........................21

            5.4.4   The Sale Transaction.........................................................23

            5.4.5   Assumption and/or Rejection of Executory Contracts and Unexpired
                    Leases in Connection with the Sale ..........................25

            5.4.6   The Bar Dates ...................................................................25

            5.4.7   Pending Adversary Proceedings ......................................25

            5.4.8   Settlements .......................................................................26

            5.4.9   Professional Fee Applications..........................................29

    5.5     OTHER CLAIMS AGAINST THE DEBTOR .....................................29

            5.5.1   Administrative Claims ......................................................29

            5.5.2   Professional Fee Claims...................................................30

            5.5.3   Unsecured Priority Claims................................................30

|       | 5.5.4 | Unsecured Nonpriority Claims | 30 |
| VI.   | **SUMMARY OF THE CHAPTER 11 PLAN** | | 30 |
| 6.1   | IN GENERAL | | 30 |
| 6.2   | TREATMENT OF UNCLASSIFIED CLAIMS | | 30 |
|       | 6.2.1 | Administrative Claims | 30 |
|       | 6.2.2 | Professional Fee Claims | 31 |
|       | 6.2.3 | Priority Tax Claims | 31 |
|       | 6.2.4 | Statutory Fees | 31 |
| 6.3   | CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | | 32 |
|       | 6.3.1 | Class 1: Secured Tax Claims | 32 |
|       | 6.3.2 | Class 2:  Other Priority Claims | 32 |
|       | 6.3.3 | Class 3: Prepetition Secured Loan Claims | 33 |
|       | 6.3.4 | Class 4: Prepetition Equipment Claims | 33 |
|       | 6.3.5 | Class 5: AMOA Finance | 33 |
|       | 6.3.6 | Class 6: Lafayette Bank Claim | 34 |
|       | 6.3.7 | Class 7: MCA Claims | 34 |
|       | 6.3.8 | Class 8: General Unsecured Claims | 34 |
|       | 6.3.9 | Class 9: Interests | 35 |
| 6.4   | IMPLEMENTATION OF THE PLAN | | 35 |
|       | 6.4.1 | Sources of Consideration for Plan Distributions | 35 |
|       | 6.4.2 | Vesting of Assets | 35 |
|       | 6.4.3 | Liquidation Trust | 35 |
|       | 6.4.4 | Dissolution of Liquidation Trust | 42 |
|       | 6.4.5 | Liquidation Trust Security Matters | 43 |

6.4.6    Tax Returns ........................................................................................43

6.4.7    Cancellation of Existing Securities .................................................43

6.4.8    Indemnification Obligations ..........................................................43

6.4.9    Effecting Documents; Further Transactions ...................................43

6.4.10  Exemption from Certain Taxes and Fees........................................44

6.4.11  Treatment of Causes of Action ......................................................44

6.4.12  Ability to Seek and Obtain Discovery ...........................................44

6.4.13  Debtor's Directors, Officers and Managers ....................................44

6.4.14  Debtor's Existence .........................................................................45

6.4.15  Corporate Authority .......................................................................45

6.5    FUNDING AND DISBURSEMENTS ........................................................45

6.5.1    Distributions Generally ..................................................................45

6.5.2    Cash Payments ...............................................................................45

6.5.3    Distribution for Allowed Claims ....................................................45

6.5.4    Interest and Charges .......................................................................46

6.5.5    Compliance with Tax Requirements...............................................46

6.5.6    Fractional Dollars; De Minimis Distributions ...............................46

6.5.7    Delivery of Distributions to Holders of Allowed Claims ...........................47

6.5.8    Unclaimed Distributions ................................................................47

6.5.9    No Penalty Claims ..........................................................................47

6.5.10  Setoffs and Recoupments ...............................................................48

6.5.11  Distributions by Liquidation Trust.................................................48

6.5.12  Claims Paid or Payable by Third Parties ...................................48

6.6     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ..................................................................................................48

        6.6.1   Rejection of Executory Contracts and Unexpired Leases .........................49

        6.6.2   Claims Based on Rejection of Executory Contracts or Unexpired Leases 49

        6.6.3   Insurance Policies ....................................................................49

6.7     SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..50

        6.7.1   Settlement, Compromise, and Release of Claims and Interests ................50

        6.7.2   Liabilities to, and Rights of, Governmental Units ....................................50

        6.7.3   Exculpation ....................................................................50

        6.7.4   Releases of the Debtor and Chapter 11 Trustee .........................................51

6.8     INJUNCTION ......................................................................................52

6.9     CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ............52

        6.9.1   Conditions Precedent to the Effective Date ................................................52

        6.9.2   Waiver of Conditions ....................................................................53

        6.9.3   Effect of Failure of Conditions ....................................................53

6.10    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ........53

        6.10.1  Modifications and Amendments ....................................................53

        6.10.2  Effect of Confirmation on Modifications ................................................53

        6.10.3  Revocation or Withdrawal of Plan ................................................54

6.11    RETENTION OF JURISDICTION ................................................................54

6.12    MISCELLANEOUS PROVISIONS ................................................................54

        6.12.1  Immediate Binding Effect ....................................................54

        6.12.2  Additional Documents ....................................................54

        6.12.3  Reservation of Rights ....................................................55

6.12.4   Successors and Assigns................................................................55

6.12.5   Notices ........................................................................................55

6.12.6   Entire Agreement ........................................................................56

6.12.7   Exhibits .......................................................................................56

6.12.8   Severability of Plan Provisions ..................................................56

6.12.9   Votes Solicited in Good Faith ....................................................57

6.12.10      Closing of Chapter 11 Case .................................................57

6.12.11      No Admission against Interest .............................................57

6.12.12      No Waiver .............................................................................57

6.12.13      Headings ...............................................................................57

6.12.14      Governing Law .....................................................................57

6.12.15      Conflicts ...............................................................................58

6.12.16      No Discharge ........................................................................58

6.12.17      Post-Effective Date Notice ..................................................58

VII.    FEASIBILITY ....................................................................................58

   7.1     FINANCIAL FEASABILITY ANALYIS....................................58

      7.1.1   The Bankruptcy Code Standard .................................................58

      7.1.2   No Need for Further Reorganization of the Debtor ...................58

VIII.   ALTERNATIVES TO THE PLAN ......................................................58

   8.1     CHAPTER 7 LIQUIDATION ......................................................58

      8.1.1   The Bankruptcy Code Standard .................................................58

      8.1.2   The Plan is in the Best Interests of Creditors ...........................59

   8.2     ALTERNATIVE PLAN(S) ...........................................................59

IX.     CERTAIN U.S ....................................................................................60

9.1     GENERAL ........................................................................................................60

9.2     CONSEQUENCES TO THE DEBTOR ...................................................................61

        9.2.1  Cancellation of Debt Income ..................................................................61

        9.2.2  Transfer of Assets to Liquidation Trust and Dissolution of the Debtor ....61

9.3     CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS ................61

        9.3.1  Realization and Recognition of Gain or Loss ............................................61

        9.3.2  Distributions in Respect of Accrued Interest or OID.................................63

9.4     TAX TREATMENT OF THE LIQUIDATION TRUST AND HOLDERS OF
        BENEFICIAL INTEREST ....................................................................................63

        9.4.1  Classification of the Liquidation Trust .......................................................63

        9.4.2  General Tax Reporting by the Liquidation Trust and Holders of Beneficial
               Trust Interests.........................................................................................64

        9.4.3  Tax Reporting for Assets Allocable to Disputed Claims............................65

9.5     WITHOLDING ON DISTRIBUTIONS, AND INFORMATION REPORTING.65

X.      RISK FACTORS ..........................................................................................................66

10.1    CERTAIN BANKRUPTCY CONSIDERATIONS ..............................................66

10.2    CLAIMS ESTIMATION & CASH AVAILABLE AFTER DISTRIUTION .......67

XI.     CONCLUSION AND RECOMMENDATION..................................................................67

## **EXHIBITS**

**EXHIBIT A**          **CHAPTER 11 PLAN OF LIQUIDATION**

## EXECUTIVE SUMMARY

This First Amended Disclosure Statement ("**Disclosure Statement**") provides information regarding the Chapter 11 Plan of Liquidation of Curepoint, LLC pursuant to Chapter 11 of the Bankruptcy Code (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**"), which the Chapter 11 Trustee (the "**Plan Proponent**") is seeking to have confirmed by the Bankruptcy Court.  A copy of the Plan is attached hereto as **Exhibit A**.  The rules of interpretation set forth in Article I of the Plan shall govern the interpretation of this Disclosure Statement.

The Plan Proponent believes that the Plan is in the best interest of the Debtor's Estate and Creditors.  As such, the Plan Proponent recommends that all holders of Claims in the Voting Classes vote to accept the Plan by returning their ballots (each, a "**Ballot**") so as to be filed with the Clerk no later than the Voting Deadline (**December 8, 2023 at 5:00 p.m. (ET)**) with a copy of the Ballot provided to the Chapter 11 Trustee.  Assuming the requisite acceptances to the Plan are obtained, the Plan Proponent will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## I.     OVERVIEW OF THE PLAN

The Plan Proponent proposes a plan of liquidation under chapter 11 of the Bankruptcy Code.  Under chapter 11, a debtor may reorganize or liquidate its business for the benefit of its stakeholders.  After having sold substantially all of its assets, as described below, the consummation of a chapter 11 plan of liquidation is the principal final objective of this Chapter 11 Case.  A chapter 11 plan sets forth how a debtor will treat its claims and equity interests.

The primary objectives of the Plan are to maximize the value of recoveries to all holders of Allowed Claims and generally to distribute all property of the Estate that is or becomes available for distribution in accordance with the priorities established by the Bankruptcy Code.  The Plan Proponent believes that the Plan accomplishes these objectives and is in the best interest of the Estate and its creditors.

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditors of or equity security holders in a debtor, and any other entities or persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains property under the plan.  Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will prove for the exclusive treatment of Claims against and Interests in the Debtor, terminate all of the rights and interests of pre-bankruptcy equity security holders, and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Interests.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and certain other criteria.

Generally speaking, the Plan:

- Satisfies various Allowed Claims against the Debtor by payment in Cash on the Effective Date of the Plan;

- Vests the Liquidating Trust Assets in the Liquidating Trust, for the purpose of distribution to certain holders of Allowed Claims;

- Designates a Liquidation Trustee to wind down the Debtor's affairs, prosecute, continue or settle Retained Causes of Action, pay and reconcile Claims, and administer the Plan and Liquidation Trust; and

- Provides for 100 percent recovery for holders of Administrative Claims, Professional Fee Claims, Secured Tax Claims, Priority Tax Claims, Other Priority Claims, and Prepetition Secured Loan Claims.

The Plan Proponent believes that Confirmation of the Plan will avoid lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Plan classifies holders of Claims and Interests according to the type of the holder's Claim or Interest, as more fully described below. Holders of Claims in Class 4 (Prepetition Equipment Claims), Class 5 (Claims of the AMOA Parties), Class 6 (Lafayette Bank Claim), Class 7 (MCA Claims), and Class 8 (General Unsecured Claims) are entitled to vote to accept or reject the Plan.

THERE CAN BE NO ASSURANCE THAT THE ACTUAL CLAIM AMOUNTS WILL NOT DIFFER, AND PERHAPS SIGNIFICANTLY DIFFER, FROM THE ESTIMATES SET FORTH HEREIN.

The table below is only a summary of the classification of treatment of Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and Plan for a complete description and understanding of the classification and treatment of Claims and Interests.

| CLAIMS/INTERESTS | ESTIMATED ALLOWED CLAIMS[1] | TREATMENT | ESTIMATED RECOVERY |
|---|---|---|---|
| Administrative Claims (unclassified) | $513.62 (503)(b)(9)[2] | Unimpaired | Estimated Recovery Percentage: 100% |

---

[1] Claims subject to objection, Challenge or an Adversary Proceeding are excluded from this estimate as each claim is not currently "Allowed." Allowed Claim amounts may be modified by settlements between the applicable claimant and the Chapter 11 Trustee.

[2] Additional Administrative Claims could be filed on or before the Administrative Claims Bar Date.

| | | | Form of Recovery: Cash on the Effective Date |
|---|---|---|---|
| Professional Fee Claims, including Chapter 11 Fees | $995,455.33[3] | Unimpaired | Estimated Recovery Percentage: 100% <br><br> Form of Recovery: Cash on the Effective Date |
| Priority Tax Claims | $0.00 | Unimpaired | Estimated Recovery Percentage: 100% <br><br> Form of Recovery: Cash on the Effective Date |
| Secured Tax Claims (Class 1) | $0.00 | Unimpaired – Deemed to Accept | Estimated Recovery Percentage: 100% <br><br> Form of Recovery: Cash on the Effective Date |
| Other Priority Claims (Class 2) | $0.00 | Unimpaired - Deemed to Accept | Estimated Recovery Percentage: 100% <br><br> Form of Recovery:  Cash on the Effective Date |
| Prepetition Secured Loan Claims (Class 3) | $1,306,889.11 | Unimpaired – Deemed to Accept | Estimated Recovery Percentage: 100% <br><br> Form of Recovery: Cash on the Effective Date |
| Prepetition Equipment Claims (Class 4) | $1,218,700.57 | Impaired – Entitled to Vote | Estimated Recovery Percentage: Up to the value of Collateral <br><br> Form of Recovery: Return of Equipment and Deficiency Claim |
| Claims of the AMOA Parties (Class 5) | $3,400,000.00 | Impaired – Entitled to Vote | Estimated Recovery Percentage: |

---

[3] Includes actual fees through July 31, 2023 of the Chapter 11 Trustee's professionals and estimated professional fees through Confirmation.  Chapter 11 Trustee Fees are estimated at 3% of the Sale proceeds.

| | | | Form of Recovery: Cash totaling $995,000.00 and waiver of Deficiency Claim |
|---|---|---|---|
| Lafayette Bank Claim (Class 6) | $908,988.70 | Impaired – Entitled to Vote | Estimated Recovery Percentage: 40%<br><br>Form of Recovery: Cash totaling $375,000.00 on the Effective Date and Deficiency Claim |
| MCA Claims (Class 7) | $1,103,923.20 | Impaired – Entitled to Vote | Estimated Recovery Percentage: 9.51%<br><br>Form of Recovery: Cash on the Effective Date in an amount up to the pro rata percentage claim held against the Prepetition AR as of the Petition Date and Deficiency Claim |
| General Unsecured Claims (Class 8) | [$10,000,000.00][44] | Impaired – Entitled to Vote | Estimated Recovery Percentage: 15-18%<br><br>Form of Recovery: Beneficial Trust Interests |
| Interests (Class 9) | $0 | Impaired – Deemed to Reject | Estimated Recovery Percentage: 0%<br><br>Form of Recovery: None |

## SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

## II.    THE PLAN STRUCTURE

Pursuant to the Plan, payments of Claims will be made as follows unless a creditor agrees to less favorable treatment:

---

[44] Total amount of unsecured claims will depend on the outcome of the ongoing claims resolution process.  Actual recovery could be higher or lower than estimated.

- The Chapter 11 Trustee (if before the Effective Date) or Liquidation Trustee (if after the Effective Date) will pay Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Class 1 Allowed Secured Tax Claims, Class 2 Allowed Other Priority Claims and Class 3 Allowed Prepetition Secured Loan Claims in full in Cash at the Effective Date of the Plan or as soon as reasonably practicable thereafter;

- Holders of Class 4 Allowed Prepetition Equipment Claims will receive their respective equipment back from the Debtor on the Effective Date of the Plan or as soon as reasonably practicable thereafter (to the extent their respective Collateral has not previously been returned) and a Deficiency Claim for the difference between the value of the Collateral and the total amount of the Prepetition Equipment Claim.

- Holder of Allowed the Class 5 AMOA Settled Claims (AMOA Parties) will receive, pursuant to the AMOA Settlement, Cash totaling $995,000.00 and shall waive any and all other Claims available to the AMOA Parties, including any Deficiency Claim.

- Holders of Allowed Class 6 Claims (Lafayette Bank) will receive Cash up to the value of their Allowed Secured Claim (totaling $375,000.00) on the Effective Date of the Plan or as soon as reasonably practicable thereafter and a Deficiency Claim for the difference between its Secured Claim and total Claim.

- Unless agreeing to less favorable treatment, the Holders of Allowed Class 7 MCA Claims will receive Cash in an amount equal to the pro rata percentage claim each MCA Lender held against the Prepetition AR on the Effective Date of the Plan or as soon as reasonably practicable thereafter and a Deficiency Claim for the remainder of each MCA Claim.

- Holders of Class 8 Allowed General Unsecured Claims will receive their pro rata share of the Beneficial Trust Interests, which Beneficial Trust Interests shall entitle the holders thereof to receive their pro rata share of the Liquidating Trust Assets;

- Holders of Class 9 Existing Interests in the Debtor will be cancelled without any distribution to the holders of such Interests.

## III.   THE ADEQUACY OF THE DISCLOSURE STATEMENT

Before soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a plan.  The Plan Proponent submits this Disclosure Statement in accordance with such requirements.  This Disclosure Statement includes, without limitation, information about:

- The Debtor's corporate history and structure, business operations, and prepetition indebtedness (Sections 5.1 and 5.2)

5

- The events leading to the Chapter 11 Case and efforts to address the Debtor's financial constraints (Section 5.3);

- Significant pleadings filed in and events occurring in the Chapter 11 Case and certain relief granted by the Bankruptcy Court in connection therewith (Section 5.4);

- The classification and treatment of Claims and Interests under the Plan, including identification of the holders of Claims entitled to vote on the Plan, the procedures for voting and the projected recoveries on Allowed Claims (Sections 4.3, 6.3);

- The method of distribution of any recoveries that may be available to holders of Claims pursuant to the Plan, the process for resolving Disputed Claims, and other significant aspects of the Plan (Section 6.5);

- The releases contemplated by the Plan that are integral to the overall settlement of Claims and implementation of the Plan (Section 6.7);

- The statutory requirements for confirming the Plan (Section 4.2);

- Certain U.S. federal income tax consequences of the Plan (Section 6.5 and Art. IX);

- Certain risk factors that holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Art. X).

In light of the foregoing, the Plan Proponent believes that this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with section 1125 of the Bankruptcy Code.

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with the Consummation of the Plan, including documents to be included in the Plan Supplement (if any), are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

## IV.    __INTRODUCTION__

### 4.1    __PURPOSE OF THE DISCLOSURE STATEMENT__

The Plan Proponent provides this Disclosure Statement to the Office of the United States Trustee (the "**U.S. Trustee**") and to all of the Debtor's known Creditors and Interest holders pursuant to section 1125(b) of the Bankruptcy Code for the purpose of seeking confirmation of a Plan. A copy of the Plan is attached hereto as __Exhibit A__. The Court held a hearing on the approval of this Disclosure Statement on **October 16, 2023 at 1:20 p.m. (ET).**

The Plan Proponent strongly urges you to read this Disclosure Statement in its entirety before making any judgment about voting to either accept or reject the Plan because the Disclosure Statement contains a summary of the Plan and important information regarding alternatives to the Plan. Summaries of the Plan are included herein for the purpose of seeking Confirmation of the Plan and soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to voting to either accept or reject the Plan.

## 4.2    CONFIRMATION OF THE PLAN

4.2.1    **Requirements.**  The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The following summarizes some of the pertinent requirements:

(a)    **Acceptance by Impaired Classes.**  Except to the extent that the cram down provisions of section 1129(b) of the Bankruptcy Code may be involved, each Class of Claims and each Class of Interests must either accept the Plan or be deemed to accept the Plan because the Claims or Interests of such Class are not Impaired.

(b)    **Feasibility.**  The Bankruptcy Code is required to find that the Plan is likely to be implemented and that parties required to perform or pay monies under the Plan will be able to do so.

(c)    **The "Best Interest" Test.**  The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that the Plan is in the "best interests" of all Creditors and Interest holders.  To satisfy this requirement, the Bankruptcy Court must determine that each holder of a Claim against, or Interest in, the Debtor: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such holder would receive if the Debtor's property was liquidated under Chapter 7 of the Bankruptcy Code on such date.

(d)    **"Cramdown" Provisions.**  The Bankruptcy Code contains provisions for confirmation of the Plan even if the Plan is not accepted by all Impaired Classes, as long as at least one Impaired Class of Claims has accepted it.  These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.  A plan may be confirmed under the cramdown provisions if, in addition to satisfying all other requirements of section 1129(a) of the Bankruptcy Code, it (i) "does not discriminate unfairly," and (ii) is "fair and equitable," with respect to each class of claims or interests that is impaired under, and has not accepted, such plan.  As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the cramdown standard requires that a dissenting class receive full compensation for its allowed claim or interests before any junior class receives any distribution.  More specifically, section 1129(b) of the Bankruptcy Code provides that a

plan can be confirmed under that section if: (a) with respect to a secured class, (i) the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the holders of claim and interests that are junior to the claims of the dissenting class may not receive any property under the plan; or (c) with respect to a class of interests, either (i) each holder of an interests of such class must receive or retain on account of such interest, property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or a class of interests receives full compensation for its allowed claims or its allowed interests, no holder of claims or interests in any junior class may receive or retain any property on account of such claims or interests. With respect to a dissenting class of secured claims, the "fair and equitable" standard requires, among other things, that holders either (i) retain their liens and receive deferred cash payments with a value as of the plan's effective date equal to the value of their interests in property of the estate, or (ii) other receive the indubitable equivalent of these secured claims. The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims. The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank.

Because at least one (1) Class is deemed to have rejected the Plan, the Plan Proponent will request confirmation of the Plan, as it may be modified from time to time, under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. The Plan Proponent will also seek confirmation of the Plan over the objection of individual holders of Claims who are members of an accepting Class.

The Plan Proponent reserves the right to alter, amend, modify, revoke, or withdraw the Plan, any exhibit or schedules thereto, or any Plan document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. The Plan Proponent believes that the Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

   **4.2.2    Procedure.** To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy

Code.  The Bankruptcy Court has set **December 18, 2023 at 1:20 p.m. (ET)** for the hearing for the confirmation of the Plan (the "**Confirmation Hearing**").

      **4.2.3**    **Objections to Plan Confirmation**.  Any party-in-interest may object to confirmation of the Plan and appear at the Confirmation Hearing to pursue any such objections. The Bankruptcy Court has set **December 11, 2023 at 5:00 p.m. (ET)**. as the deadline for filing and serving any objections to Confirmation of the Plan.  Any objections must be filed with the Bankruptcy Court through CM/ECF filing or at the following address:

      U.S. Bankruptcy Court for the Northern District of Georgia, Atlanta Division
      Richard B. Russell Federal Building and United States Courthouse
      75 Ted Turner Drive, SW
      Atlanta, GA 30303

Service of any objection shall be made through the CM/ECF system, with courtesy copies by email, other electronic form as provided under the Local Rule, or by hard copy via hand delivery, first class or other mail or delivery upon the following parties:

      (a)    Counsel for the U.S. Trustee, Attn: Lindsay P.S. Kolba, United States Department of Justice, Office of the United States Trustee, 362 Richard Russell Building, 75 Ted Turner Drive, SA, Atlanta, GA, 30303 (Lindsay.p.kolba@usdoj.gov);

      (b)    Counsel to the Chapter 11 Trustee, Attn: Nathaniel T. DeLoatch, Eversheds Sutherland (US) LLP, 999 Peachtree Street, NE, Suite 2300, Atlanta, GA 30309-3996 (Nathanieldeloatch@eversheds-sutherland.com);

      (c)    The Debtor, Curepoint, LLC, 11175 Cicero Drive, Suite 100, Alpharetta, GA 3022; and

      (d)    Counsel to the Debtor, Attn: Will B. Geer, Caitlyn Powers and William Rountree, Rountree, Leitman, Klein & Geer, LLC, Century Plaza I, 2987 Clairmont Road, Suite 350, Atlanta, GA 30329 (wgeer@rlkglaw.com;  cpower@rlkglaw.com;  and wrountree@rlkglaw.com)

      **4.2.4**    **Effect of Confirmation.**  Except as otherwise provided in the Plan, the Asset Purchase Agreement, the Sale Order, or the Confirmation Order, Confirmation vests all property of the Estate constituting the Liquidating Trust Assets in the Liquidation Trust, to the same extent such Assets were held by the Debtor, but free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and interest holders, subject to the provisions of the Plan.  Confirmation serves to make the Plan binding upon the Debtor, all Creditors, Interest holders, and other parties-in-interest, regardless of whether they cast a Ballot to accept or reject the Plan.

**4.3**    **VOTING ON THE PLAN.**

**4.3.1**    <u>**Impaired Claims or Interests.**</u>    Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims or Interests in Classes "Impaired" by the Plan may vote on the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims or Interests may be "Impaired" if the Plan alters the legal, equitable, or contractual rights of the holders of such Claims or Interests treated in such Class.  The holders of Claims or Interests not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.  The holders of Claims or Interests in any Class which will not receive any payment or distribution or retain any property pursuant to the Plan are deemed to reject the Plan, unless they have agreed otherwise, and, in either event, do not have the right to vote.  All known holders of Claims classified in Class 4 (Prepetition Equipment Claims), Class 5 (AMOA Settled Claims), Class 6 (Lafayette Bank Claim), Class 7 (MCA Claims) and Class 8 (General Unsecured Claims) (each a "**Voting Class**," and collectively, the "**Voting Classes**") will receive Solicitation Packages.

**4.3.2**    <u>**Eligibility.**</u>    In order to vote on the Plan, each holder of a Claim in a Voting Class must have timely filed or been assigned a timely filed Proof of Claim, unless it holds a Claim that is scheduled by the Debtor and is not identified as disputed, unliquidated, or contingent on the Schedules and/or SOFAs.

Only the following holders in Claims in the Voting Classes are entitled to vote:

(a)    Holders of Claims for which Proofs of Claim have been Filed, as reflected on the Claims Register as of the Record Date;

(b)    Holders of Claims that are listed in the Schedules and Statements, with the exception of those Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled Claims that have been superseded by a Filed Proof of Claim);

(c)    Holders whose Claims arise pursuant to an agreement or settlement with the Debtor, as reflected in a document filed with the Bankruptcy Court, in a Final Order of the Bankruptcy Court, or in a document executed by the Debtor pursuant to the authority granted by the Bankruptcy Court, in each case regardless of whether a Proof of Claim has been filed; and

(d)    The assignee of any transferred or assigned Claim, only if such transfer or assignment: (i) has been fully effectuated pursuant to the procedures dictated by Bankruptcy Rule 3001(e) and (ii) is reflected on the Claims Register on or before the Record Date.

**4.3.3**    <u>**Binding Effect.**</u>    Whether a Creditor or Interest holder votes on the Plan or not, such Person or Entity will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court.  Absent timely submission of a Ballot in accordance with the Solicitation Procedures, a Creditor will not be included in the vote: (i) for purposes of accepting or rejecting the Plan, or (ii) for purposes of determining the number of Persons voting on the Plan.

       **4.3.4**    **Voting Procedures.**  Members of Class 4 (Prepetition Equipment Claims), Class 5 (AMOA Settled Claims), Class 6 (Lafayette Bank Claim), Class 7 (MCA Claims) and Class 8 (General Unsecured Claims) may vote to accept or reject the Plan and will receive a Solicitation Package.  Members of Class 1 (Secured Tax Claims), Class 2 (Other Priority Claims), and Class 3 (Prepetition Secured Loan Claims) are Unimpaired and deemed to accept the Plan. Members of Class 9 (Interests) are deemed to reject the Plan.  Accordingly, holders of Claims or Interests in Classes 1, 2, 3 and 9 are not entitled to vote on the Plan and will not receive a Solicitation Package.

In order for your vote to count, holders of Claims in the Voting Classes must complete, date, and sign the Ballot.  **Original completed Ballots accepting or rejecting the Plan must be (i) filed with the Clerk of the Bankruptcy Court; and (ii) properly mailed (please note that envelopes have been included with the Ballot) to:**

> Chapter 11 Trustee David A. Wender, Esq.
> Eversheds Sutherland (US) LLP
> 999 Peachtree Street, NE, Suite 2300
> Atlanta, GA 30309-3996
> Telephone: 404.853.8175
> Facsimile: 404.853.8806
> Davidwender@eversheds-sutherland.com

In the event that the original completed Ballot is mailed to the Clerk of the Bankruptcy Court, a copy of the completed Ballot must be provided to the Chapter 11 Trustee.

**BALLOTS MUST BE SUBMITTED BY THE VOTING DEADLINE. BALLOTS SENT BY ELECTONIC MAIL, FASCIMILE, OR OTHER FORM OF ELECTRONIC SUBMISSION (OTHER THAN THROUGH THE CM/ECF SYSTEM), ARE NOT ALLOWED AND WILL NOT BE COUNTED.  HAVING YOUR BALLET POST-MARKED BY THE VOTING DEADLINE IS NOT SUFFICIENT.  RATHER, IT MUST BE RECEIVED BY THE VOTING DEADLINE.**

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptances or rejection of the Plan must be **received** by mail or overnight delivery at the address set forth above on or before the Voting Deadline.  Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing or by agreement with the Chapter 11 Trustee.

       **4.3.5**    **Tabulation Procedures.**  In tabulating votes, the following hierarchy will be used to determine the amount of the Claim associated with each vote:

       (a)    If a Claim is deemed Allowed under the Plan, an order of the Court or a stipulated agreement between the parties, such Claim will be temporarily allowed for voting purposes in the deemed allowed amount set forth therein;

(b)     If a Claim for which a Proof of Claim has been timely filed for unknown or undetermined amounts, or is wholly unliquidated, or contingent (as determined on the face of the Claim or after a reasonable review of the supporting documentation by the Chapter 11 Trustee) and such Claim has not been Allowed, such Claim shall be temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00;

(c)     If a Claim, for which a Proof of Claim was timely filed, is listed in the Debtor's filed Schedules in an amount that is contingent, unliquidated or disputed in part, such Claim is temporarily allowed in the amount that is liquidated, non-contingent, and undisputed for voting purposes only, and not for purposes of allowance or distribution;

(d)     If a Claim for which a Proof of Claim was timely filed or was listed in the Debtor's Schedules in an amount that is liquidated, non-contingent, and undisputed, such Claim is allowed for voting in the amount set forth on the Proof of Claim or the Debtor's Schedules;

(e)     If a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim is temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

(f)     If a Claim is listed in the Debtor's Schedules as contingent, unliquidated, disputed or for $0.00 and a Proof of Claim was not (i) filed by the applicable Claims Bar Date; or (ii) deemed timely filed by an order of the Court prior to the Voting Deadline, such Claim shall be disallowed for voting purposes; *provided, however*, if the applicable bar date has not yet passed, such Claim shall be entitled to vote at $1.00.

(g)     Proofs of Claim filed for $0.00 are not entitled to vote;

(h)     If the Debtor has served an objection or request for estimation as to a Claim at least fourteen (14) days before the Voting Deadline, such Claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection, or as ordered by the Court before the Voting Deadline;

(i)     For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one Claim against the Debtor in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan;

(j)     Notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class shall be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtor has objected to such duplicate Claims; and

12

(k)    If a Proof of Claim has been amended by a later Proof of Claim that is filed on or prior to the Record Date, the later filed amending Claim shall be entitled to vote in a manner consistent with these tabulation rules, and the earlier filed Claim shall be disallowed for voting purposes, regardless of whether the Debtor has objected to such amended Claim.  Except as otherwise ordered by the Court, any amendments to Proof of Claim after the Record Date shall not be considered for purposes of these tabulation rules.

**4.3.6**    **Resolution Event.**  To the extent Claims in a Voting Class are subject to an objection other than a "reduce and allow" objection that is filed with the Court on or prior to fourteen (14) days before the Voting Deadline, the holder of such Claims shall not be entitled to vote to accept or reject the Plan unless the Plan Proponent seeks, on an expedited basis, one or more of the following prior to the Voting Deadline (each, a "**Resolution Event**"):

(a)    An order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

(b)    An order of the Bankruptcy Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Code Rule 3018(a), after notice and a hearing;

(c)    A stipulation or other agreement is executed between the holder of such Claim and the Plan Proponent resolving the objection and allowing such Claim in an agreed upon amount; or

(d)    The pending objection is voluntarily withdrawn by the objecting party.

## 4.4    ACCEPTANCE OF THE PLAN

**4.4.1**    **Creditor Acceptance.**  As a Creditor, your acceptance of the Plan is important.  In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must accept the Plan, or the Plan must qualify for cramdown of any non-accepting Class of Clams pursuant to section 1129(b) of the Bankruptcy Code.  At least one impaired Class of Creditors, excluding votes of Insiders, must actually vote to accept the Plan.  To the extent you hold a Claim in any of Classes 4, 5, 6, 7 or 8, you are urged to complete, date, sign and promptly submit the enclosed Ballot.  Please be sure to complete the Ballot properly and legibly identify the exact amount of your Claim, the name of the Creditor, and sign the Ballot.

**4.4.2**    **Cramdown Election.**  As long as at least one Impaired Class votes to accept the Plan, excluding the votes of Insiders, the Plan Proponent may attempt to invoke the "cramdown" provisions of the Bankruptcy Code.  Cramdown may be an available remedy, because the Plan Proponent believes that, with respect to each Impaired Class, the Plan is fair and equitable, within the meaning of section 1129(b)(2) of the Bankruptcy Code and does not discriminate unfairly.

### 4.5     SOURCES OF INFORMATION

The information contained in this Disclosure Statement has been obtained from the Debtor's books and records and from pleadings filed by the Debtor and other parties-in-interest. Every reasonable effort has been made to present accurate information and such information is believed to be correct as of the date hereof. Any value given as to the Assets of the Debtor is based upon an estimation of such value. You are strongly urged to consult with your financial, legal and tax advisors to understand fully the Plan and Disclosure Statement.

The financial information contained in this Disclosure Statement is given as of the date hereof, unless otherwise specified. The delivery of this Disclosure Statement does not, under any circumstance, imply that there has been no change in the facts set forth herein since such date. This Disclosure Statement is intended, among other things, to summarize the Plan and must be read in conjunction with the Plan and its exhibits, if any. If any conflicts exist between the Plan and the Disclosure Statement, the terms of the Plan shall control.

### 4.6     ADDITIONAL INFORMATION

Should you have any questions regarding the Plan or this Disclosure Statement, or require clarification of any information presented herein, please contact the following attorneys for the Plan Proponent:

> Nathaniel T. DeLoatch
> Eversheds Sutherland (US) LLP
> 999 Peachtree Street, NE, Suite 2300
> Atlanta, GA 30309-3996
> Telephone: 404.853.8175
> Facsimile: 404.853.8806
> Nathanieldeloatch@eversheds-sutherland.com

## V.     THE DEBTOR

### 5.1     THE DEBTOR'S CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW AS OF THE PETITION DATE

The Debtor was owned and operated as a cancer treatment center that provided radiation treatment for cancer patients. Its facility was located at 2406 Bellevue Road, Suite 7, Dublin, Georgia. As of the Petition Date,[5] the Debtor employed ten (10) full-time salaried employees and regularly used three (3) independent contractors – two radiation oncologists and a physicist to service patients.

The Debtor is a limited liability company organized under the laws of the State of Georgia.

---

[5] Terms not otherwise defined herein shall have the meaning afforded to them in the Chapter 11 Plan filed contemporaneously herewith.

The Debtor is 95.01% owned by Physician Financial Partners, LLC ("**PFP**") and 4.99% owned by Radiation Business Solutions, Inc. ("**RBS**").  According to documents filed in the State Court Litigation, PFP is owned by Dr. Mark McCord ("**Dr. McCord**"), Daniel Dooley ("**Dooley**") or Dooley Investment Holdings, Inc. ("**Dooley Investment**"), and MEC Capital, Inc. ("**MEC**"). MEC is 100% owned by Phillip Miles.  PFP is the sole manager of the Debtor.  Jamila Dadabhoy ("**Dadabhoy**") is the manager of PFP.

According to the Debtor, Dadabhoy was responsible for the daily business operations of the Debtor.  Dr. McCord managed the medical services provided by the Debtor prior to termination of his relationship with the Debtor in February 2018.  Phillip Miles and his son, Michael Miles, were involved in the financial and business affairs of the Debtor prior to the appointment of the Chapter 11 Trustee.

**5.2     PREPETITION FINANCING ARRANGEMENTS**

Prior to the Petition Date, the Debtor sought financing from various sources, including equipment financing, operational financing and other cash advances, each of which are summarized below.

### 5.2.1     Equipment Financing.

(a)     <u>AMOA Finance, LLC Linear Accelerator Financing</u>.  On or around December 12, 2017, AMOA Finance, LLC ("**AMOA Finance**") entered into that certain *Business Loan Agreement*, *Commercial Promissory Note*, and *Commercial Security Agreement* with Morris Bank (collectively, the "**Morris Bank Loan Documents**"), whereby Morris Bank provided AMOA Finance a loan in the principal amount of $2,586,354.00 (the "**Morris Bank Loan**") so that AMOA Financing could purchase a certain Elekta Infinity linear accelerator ("**Elekta #1**").  In exchange, AMOA Finance granted Morris Bank a security interest in all of its assets, including Elekta #1. On or around December 12, 2018, the Debtor and AMOA Finance entered into that certain *Master Lease Agreement* and the accompanying *Schedule to Master Lease Agreement* (the "**AMOA Finance Lease**") providing for AMOA Finance's purported lease of Elekta #1 to the Debtor.  The AMOA Finance Lease provides that the total amount financed was $2,585,120 and required 72 monthly payments in the amount of $42,358.39.  AMOA Finance filed claims against the Debtor in the total amount of $1,631,570.91 (Claim Nos. 14 & 15) (collectively, the "**AMOA Claim**").

(b)     <u>Lafayette State Bank Linear Accelerator Financing</u>.  On or around May 9, 2019, the Debtor and Progress Leasing, LLC ("**Progress Leasing**") entered into that certain *Equipment Finance Agreement* (the "**Accelerator Financing**") whereby Progress Leasing purportedly provided the Debtor with financing to purchase an Elekta linear accelerator ("**Elekta #2**") and requiring Debtor to make 60 monthly payments in the amount of $30,991.65.  On or around May 20, 2019, Progress Leasing assigned all of its rights and interests in the Accelerator Financing to Lafayette State Bank ("**Lafayette Bank**").  Lafayette Bank and the Debtor later modified and extended the Accelerator

15

Financing through modifications executed on each of October 22, 2020, December 31, 2021, and July 19, 2022.  Lafayette Bank holds a security interest in Elekta #2 and filed a claim against the Debtor in the amount of $900,988.70 (Claim No. 16-1) (the **"Lafayette Bank Claim"**).

(c)    Arvest Equipment Financing.  On or around November 1, 2021, Phillip Miles caused the Debtor to enter that certain *Equipment Finance Agreement* (the "**First Arvest Agreement**"), providing for the financing of various printers and copiers. The First Arvest Agreement required 36 monthly payments in the amount of $5,490.79. Arvest filed a claim against the Debtor in the amount of $147,695.16 on account of the First Arvest Agreement (Claim No. 9) (the "**First Arvest Claim**").  The First Arvest Claim is secured by those various copiers and printers listed in the First Arvest Agreement.

On or around November 16, 2021, Phillip Miles caused the Debtor to enter into that certain *Equipment Finance Agreement* (the "**Second Arvest Agreement**") with Arvest, providing for the financing of additional copiers and printers.  The Second Arvest Agreement required 48 monthly payments in the amount of $16,203.38.  On account of the Second Arvest Agreement, Arvest filed a claim against the Debtor in the amount of $622,325.70 (Claim No. 8) (the "**Second Arvest Claim**," together with the First Arvest Claim, the "**Arvest Claims**").  The Second Arvest Claim is secured by the various copiers and printers listed in the Second Arvest Agreement. Upon information and belief, the copiers and printers listed in the First Arvest Agreement and the Second Arvest Agreement were not used by the Debtor.

(d)    Hewlett-Packard Financial Services Company Equipment Financing.  On or around November 2, 2021, Phillip Miles caused the Debtor to enter into that certain *Business Lease Agreement* (the "**HP Lease**") with Hewlett-Packard Financial Services Company ("**HP**"), providing for the leasing of various printers and copiers.  The HP lease requires 60 monthly payments in the amount of $2,583.96.  HP filed a claim against the Debtor asserting an unsecured claim in the amount of $126,613.55 (Claim No. 12) (the "**HP Claim**").  Upon information and belief, the copiers and printers provided for in connection with the HP Lease were not used by the Debtor.

(e)    Arrow Capital Solutions Equipment Financing.  On or around November 22, 2021, Phillip Miles caused the Debtor to enter into that certain *Installment Payment Agreement* (the "**Arrow Agreement**") with Arrow Capital Solutions ("**Arrow**"), providing for the financing of various copiers and printers with a total product value of $130,000.  The Arrow Agreement required 60 monthly payments in the amount of $2,484.17.  Arrow assigned its rights under the Arrow Agreement to U.S. Bank, N.A ("**U.S. Bank**"), which filed a claim against the Debtor asserting a secured claim in the amount of $131,661.01 (Claim No. 6-1) (the "**U.S. Bank Claim**").  The U.S. Bank Claim is secured by the various office equipment listed in the Arrow Agreement. Upon information and belief, the copiers and printers provided for in connection with the Arrow Agreement were not used by the Debtor.

(f)    First American Commercial Bancorp, Inc. Equipment Financing. On or around February 18, 2022, Phillip Miles caused the Debtor to enter into a *Lease Agreement* (the "**First American Lease**") with First American Commercial Bancorp., Inc. ("**First American**"), providing for the lease of various copiers and printers and requiring monthly rental payments of $3,732.97 for a period of 60 months. First American filed a secured claim against the Debtor in the amount of $190,405.15 (Claim No. 10) (the "**First American Claim**"). First American asserts a security interest in the copiers and printers listed in the First American Lease. Upon information and belief, the copiers and printers provided for in connection with the First American Lease were not used by the Debtor.

(g)    North American Banking Company. On or around November 15, 2021, Phillip Miles caused the Debtor to enter into the *EFA Agreement* (the "**North American EFA**") with North American Banking Company ("**North American**"), providing for the financing of various copiers and related equipment. The North American EFA required monthly payments in the amount of $1,706.68 for a period of 60 months. Upon information and belief, the copiers and related equipment provided in connection with the North American EFA were not used by the Debtor.

### 5.2.2    **Operational Financing.**

(a)    Bankers Healthcare Group, LLC Loan. On or around July 12, 2018, the Debtor and Bankers Healthcare Group, LLC ("**Bankers Healthcare**") entered into that certain *Financing Agreement Promissory Note/Security Agreement/Personal Guaranty* (the "**Bankers Healthcare Note**") for a loan in the principal amount of $265,289.28 and requiring the Debtor to repay Bankers Healthcare through 96 monthly payments in the amount of $2,763.43. The Bankers Healthcare Note appears to be secured by all of the assets of the Debtor as evidenced by the UCC-1 filed by Bankers Healthcare on July 17, 2018. Bankers Healthcare filed a Secured Claim against the Debtor in the amount of $105,344.81 (Claim No. 1) (the **"Bankers Healthcare Claim"**)

(b)    U.S. Small Business Administration Loan. On or around July 1, 2020, the Debtor and the U.S. Small Business Administration (the "**U.S. SBA**"), entered into that certain *Note* and *Security Agreement* providing the Debtor with a loan in the principal amount of $150,000 (the "**SBA Loan**"). The SBA Loan matures on July 1, 2050, and requires monthly payments of principal and interest in the amount of $731.00, with such payments beginning on July 1, 2021. The SBA Loan is purportedly secured by all assets of the Debtor. The U.S. SBA filed a Secured Claim against the Debtor in the amount of $161,928.08 (Claim No. 4) (the "**SBA Claim**").

(c)    CLG Servicing, LLC Loan. The Debtor is a counterparty on multiple loans from GLC Servicing, LLC ("**CLG**"). The Debtor is a party to that certain *Promissory Note* with CLG (the "**CLG Note**") dated July 16, 2020, in the principal amount of $453,000. The Debtor is a party to that certain *Loan Modification Agreement* with CLG (the "**CLG Note Modification**"), amending the maturity date of the CLG Note and granting to CLG a promissory note in the principal amount of $284,230.78. The Debtor is

a party to that certain *Term Loan Promissory Note* with CLG (the "**CLG Term Loan**," together with the CLG Note and CLG Note Modification, the "**CLG Loan Documents**"), in the principal amount of $837,500. The CLG Loan Documents are allegedly secured by a Lien on all of the Debtor's assets. CLG filed a Claim against the Debtor in the amount of $1,309,616.22 (Claim No. 20-2) (the "**CLG Claim**"). Upon information and belief, a substantial portion of the amounts reflected in the CLG Claim did not benefit the Debtor.

      **5.2.3    Cash Advances.** Beginning no later than 2022, Philip Miles caused the Debtor to became a party to multiple high-interest cash advance agreements, which are commonly known as merchant agreements, merchant cash advance agreements, and/or revenue agreements (a "**MCA**," or collectively, the "**MCAs**") with several different lenders (each, an "**MCA Lender**," and collectively, the "**MCA Lenders**"), as further discussed below. As a result of the MCAs, the Debtor collectively assigned more than 100% of its accounts receivable to the MCA Lenders.

      (a)    <u>Secure Capital, LLC Cash Advance.</u> On February 9, 2022, Philip Miles entered into that certain *Merchant Agreement* (the "**Secure Capital MCA**") with Secure Capital, LLC ("**Secure Capital**") wherein Secure Capital agreed to provide the Debtor with $250,000.00 in exchange for Secure Capital's alleged purchase of 10% of the Debtor's accounts receivable that were to be collected until Secure Capital received payments totaling $360,000.00. Upon information and belief, the Debtor did not receive $250,000.00 from Secure Capital on or after February 9, 2022.

      (b)    <u>Premium Merchant Funding 18, LLC Cash Advance.</u> On or around February 16, 2022, Philip Miles entered into that certain *Merchant Agreement* (the "**PMF MCA**") with Premium Merchant Funding 18, LLC ("**PMF**") whereby PMF agreed to provide $800,000.00 in exchange for PMF's alleged purchase of 15% of certain future accounts receivables that were to be collected until PMF received payments totaling $1,192,000.00 Upon information and belief, the Debtor did not receive $800,000.00 from Secure Capital on or after February 16, 2022.

      (c)    <u>City Capital NY Cash Advance.</u> On or about June 16, 2022, Phillip Miles entered into that certain *Revenue Purchase Agreement* (the "**City Capital MCA**") with City Capital NY ("**City Capital**") by which City Capital agreed to provide $330,000.00 to the Debtor in exchange for City Capital's alleged purchase of 20% of the Debtor's accounts receivable that were to be collected until City Capital received payments totaling $494,670.00. Upon information and belief, the Debtor did not receive $494,670.00 from City Capital on or after June 16, 2022.

On or about June 28, 2022, Philip Miles entered into that certain *Revenue Purchase Agreement* (the "**Second City Capital MCA**") with City Capital by which it agreed to provide $480,000.00 to the Debtor in exchange for City Capital's alleged purchase of 20% of the Debtor's accounts receivable that were to be collected until City Capital received payments totaling $719,520.00. Upon information and belief, the Debtor did not receive $480,000.00 from City Capital on or after June 28, 2022

(d)     Click Capital Group, LLC Cash Advance.  On or about July 5, 2022, Philip Miles entered into that certain *Standard Merchant Cash Advance Agreement* (the "**Click Capital MCA**") with Click Capital Group, LLC ("**Click Capital**") entered by which Click Capital agreed to provide $210,000.00 in exchange for Click Capital's purchase of 12% of certain future accounts receivable that were to be collected until Click Capital received payments totaling $309,750.00. Upon information and belief, the Debtor did not receive $210,000.00 from Click Capital on or after July 5, 2022.

On or about July 19, 2022, Philip Miles entered into that certain *Standard Merchant Cash Advance* (the "**Second Click Capital MCA**") with Click Capital by which Click Capital agreed to provide $250,000.00 in exchange for Click Capital's purchase of 21.63% of certain future accounts receivable that were to be collected until Click Capital received payments totaling $371,250.00. Upon information and belief, the Debtor did not receive $250,000.00 from Click Capital on or after July 19, 2022.

(e)     PointOne Capital, LLC Cash Advance.  On or about July 11, 2022, Philip Miles entered into that certain *Standard Merchant Cash Advance Agreement* (the "**PointOne MCA**") with PointOne Capital, LLC ("**PointOne**") whereby PointOne provided the Debtor with $181,980.00 in exchange for PointOne's alleged purchase of 14% of the Debtor's accounts receivable that were to be collected until PointOne received payments totaling $302,738.04.

## 5.3     EVENTS LEADING TO THE BANKRUPTCY FILING

**5.3.1     The State Court Litigation.**  Prior to 2018, disputes arose between Dr. McCord, Phillip Miles, Dadabhoy, MEC, PFP, the Debtor, the Debtor's Insiders, and other parties with interests (direct or indirect) in the Debtor.  These disputes involved, among other things, various breach of contract allegations, questions concerning ownership rights in the Debtor and other related entities, acts taken by the Debtor's Insiders to deprive the Debtor of funds to which it was arguably entitled, and alleged fraud, bad faith, and/or breach of fiduciary duties of the Debtor's beneficial owners and/or Insiders.  Dr. McCord's termination was also at issue in the State Court Litigation.

Consequently, starting in 2018, the Debtor became directly or indirectly involved in the following five (5) lawsuits filed in the Superior Court of Fulton County, Georgia (each, a "**State Court Lawsuit**," and collectively, the "**State Court Litigation**"):

(a)     Civil Action No. 2018CV301705 between plaintiff Dr. McCord and defendants Phillip Miles, Dadabhoy, Dooley, Dooley Investment, MEC, and PFP;

(b)     Civil Action No. 2018CV303289 between plaintiffs AMOA Finance, American Oncology Associates, LLC, American Professional Associates, LLC, and Atlanta Brachytherapy, LLC and the Debtor as the defendant;

(c)     Civil Action No. 2018CV303368 between plaintiff AMOA Finance and defendants Phillip Miles, Dadabhoy, Mark Miles, Northwinds Leasing, LLC ("**Northwinds**"), and Georgia Heritage Bank;

(d)     Civil Action No. 2018CV303781 between plaintiff Exponential Medical LLC and defendants Phillip Miles, Dadabhoy, and MEC; and

(e)     Civil Action No. 2021CV353534 between plaintiff AMOA Finance and the Debtor as the defendant.

Upon information and belief, the parties to the State Court Litigation (other than the Debtor) settled their claims against each other.

**5.3.2**     **The Cash Advance Agreements.**     As discussed above, beginning in 2022, the Debtor, through Phillip Miles, entered into multiple high-interest MCA's, pledging in excess of 100% of its accounts receivable, which strained the Debtor's cash position and resulted in the Debtor being unable to satisfy its various obligations to certain creditors.

Consequently, the Debtor faced pressure from various parties, including the MCA Lenders, who had threatened to initiate collection actions against the Debtor. To avoid the negative impact these actions would have on its business, the Debtor filed for protection under Chapter 11 of the Bankruptcy Code.

**5.4     THE DEBTOR'S BANKRUPTCY PROCEEDING**

**5.4.1     The Petition Date.** On August 19, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "**Bankruptcy Court**"). The Debtor originally elected to proceed under SubChapter V of the Bankruptcy Code [Doc. No. 1]. On September 8, 2022, the Debtor filed its amended Voluntary Petition, removing the SubChapter V election [Doc. No. 34].

**5.4.2     The First Day Motions and Orders.**

(a)     **Cash Collateral Motion.** On August 22, 2022, the Debtor filed its *Emergency Motion for Authority to Use Cash Collateral* [Doc. No. 2] (the "**Cash Collateral Motion**"), seeking permission to use its cash to pay operating expenses, including employee wages and benefits, utilities, vendor invoices, insurance premiums, and other expenses necessary to continue operations as set forth in the Debtor's proposed budget (the "**Cash Collateral Budget**") and granting replacement liens on all property acquired by the Debtor after the Petition Date that is the same or similar in nature, kind or character as the Lenders' (as defined in the First Interim Cash Collateral Order) respective pre-petition collateral, except that no such replacement lien attached to proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code. The Interim Cash Collateral Order granted replacement liens only to the extent a Lender held a valid, perfected

20

prepetition Lien.  The Bankruptcy Court granted the Cash Collateral Motion on an interim basis on each of August 30, 2022 ("**First Interim Cash Collateral Order,**" [Doc. No. 24]), September 19, 2022 ("**Second Interim Cash Collateral Order,**" [Doc. No. 49]), and October 17, 2022 ("**Third Interim Cash Collateral Order**," [Doc. No. 99] and collectively, the "**Interim Cash Collateral Orders**").

(b)    **Prepetition Wage Motion.**  On August 22, 2022, the Debtor filed its *Emergency Motion for Entry of an Order (A) Authorizing Debtor to Pay All Prepetition Payroll Obligations, and (B) Directing Banks to Honor Related Transfers* [Doc. No. 3] (the "**Prepetition Wage Motion**"), requesting permission to satisfy its prepetition payroll obligations for its salaried employees as well as the independent contractor physicians.  The Bankruptcy Court granted the Prepetition Wage Motion on a final basis on August 30, 2022, [Doc. No. 25], and authorized the Debtor to pay prepetition compensation to its employees and contractors in amount not to exceed $13,650.00 per individual.

(c)    **Authorization to Use Existing Bank Accounts.**  On August 22, 2022, the Debtor filed the *Emergency Motion for Order Authorizing the Continued Use of Existing Bank Accounts* [Doc. No. 4] (the "**Bank Account Motion**"), requesting permission to continue the use of its prepetition bank accounts through which it paid its expenses and received reimbursement payments from insurance providers resulting from the Debtor's services.  The Court granted this motion on an interim basis on September 7, 2022, [Doc. No. 33], and via final order on October 17, 2022 [Doc. No. 100].

### 5.4.3    Other Motions and Significant Chapter 11 Case Events

(a)    **Schedules and SOFAs.**  On September 9, 2022, the Debtor filed its Schedules [Doc. No. 37], and, on September 9, 2022, the Debtor filed amended Schedules [Doc. No. 82].   On the Petition Date, the Debtor's Schedules reflect that it held approximately $485,295.53 in accounts receivable of which $308,520.03 was collected.

(b)    **Debtor's Sale Motion.**  On October 5, 2022, the Debtor filed its *Emergency Motion (A) for Authority to Sell Assets Free and Clear of Liens, Claims, and Encumbrances (B) First Omnibus Motion to Assume and Assign Certain Executory Contracts and Leases and Establish Cure Costs in Connection Therewith  and (C) to Establish Bidding Procedures Governing the Proposed Sale* [Doc. No. 72] ("**Debtor's Sale Motion**"), requesting permission on an emergency basis to conduct an auction and sale of substantially all of the Debtor's assets and for the approval of a "stalking horse" bidder.  The Debtor's Sale Motion was heard by the Bankruptcy Court on an expedited basis [Doc. Nos. 73, 77].

Dr. McCord objected to the Debtor's Sale Motion because of, among other things, Phillip Miles' involvement in the proposed sale process and the need for a robust and independent sale and marketing process, rather than the expedited sale proposed by the Debtor [Doc. No. 91].  While no other parties filed objections to the Debtor's Sale Motion, other parties,

including Dr. McCord and the U.S. Trustee, subsequently sought the appointment of a chapter 11 trustee as discussed below in Section 5.4.3(c). Ultimately, the Court denied the Debtor's Sale Motion [Doc. No. 96].

(c)    **Appointment of the Chapter 11 Trustee.** On September 21, 2022, Dr. McCord and the U.S. Trustee filed motions to appoint a trustee [Doc. Nos. 52, 54]. On October 3, 2022, AMOA Finance also filed a motion to appoint a trustee [Doc. No. 68]. These parties sought the appointment of a trustee in the Chapter 11 Case due to Phillip Miles being the designated manager of the Debtor for the purposes of the bankruptcy case and because of the apparent and alleged conflicts arising from his involvement with the Debtor prior to the Petition Date. The parties raised several specific concerns, including (i) the Debtor's Schedules did not properly account for nor did they disclose potential preference and/or avoidance actions against Zeroholding, LLC ("**Zeroholding**"), Northwinds, MEC, Mittere, Inc. ("**Mittere**"), MMI Educational Technologies, LLC ("**MMI**"), and PFP, all of which were either owned or controlled by Phillip Miles (collectively, the "**Miles Entities**"); and (ii) Phillip Miles obligating the Debtor on numerous debts possibly intended to benefit the Miles Entities versus the Debtor.

Following a hearing on October 13, 2022, the Bankruptcy Court entered its order directing the appointment of a trustee [Doc. No. 96]. Thereafter, on October 19, 2022, the Bankruptcy Court approved the appointment of David A. Wender as the Chapter 11 Trustee (the "**Chapter 11 Trustee**") [Doc. No. 108]. On October 27, 2022, the Court entered an order approving Eversheds Sutherland (US), LLP as counsel for the Chapter 11 Trustee [Doc. No. 119].

(d)    **Trustee's Motion to Amend Interim Cash Collateral Order.** On November 21, 2022, the Chapter 11 Trustee filed a *Motion to Amend Third Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection* [Doc. No. 155] (the "**Cash Collateral Modification Motion**"), seeking modification of the Third Interim Cash Collateral Order to adjust the Debtor's Cash Collateral Budget to account for the Chapter 11 Trustee's appointment and his contemplated sale of the Debtor's assets. On December 2, 2022, the Court granted the Trustee's Cash Collateral Modification Motion and entered that certain *Amended Third Interim Order Authorizing the Trustee to use Cash Collateral and Granting Adequate Protection* [Doc. No. 173] (the "**Amended Third Interim Cash Collateral Order**"), approving the Chapter 11 Trustee's proposed Cash Collateral Budget and continuing the adequate protections granted through each of the Interim Cash Collateral Orders.

The final hearing on the Cash Collateral Motion was cancelled at the Chapter 11 Trustee's request as result of the Sale [Doc. No. 217].

(e)    **Stay Relief Motions.** Throughout the pendency of the Chapter 11 Case, various parties have filed stay relief motions pursuant to section 362 of the Bankruptcy Code. As set forth herein, certain of those stay relief motions have been granted by the Bankruptcy Court.

On September 22, 2022, Arvest filed its *Motion for Relief from the Automatic Stay* [Doc. No. 57], seeking relief from the automatic stay so it could collect its equipment. On November 22, 2022, the Court entered an order granting Arvest relief from the automatic stay, with the Chapter 11 Trustee's consent [Doc. No. 159].

      (f)    **Trustee's Abandonment of Property.**  On July 12, 2023, the Chapter 11 Trustee filed the *Notice of Abandonment of Certain Property of the Estate* [Doc. No. 292], providing for the abandonment of certain copiers and related equipment, which the Chapter 11 Trustee believed, upon information and belief, was subject to the North American EFA.  No objections were filed and the notice became effective on or about July 26, 2023.

      (g)    **Employment of Radiology Oncology Systems, Inc. as Appraiser.**  On January 17, 2023, the Chapter 11 Trustee filed the *Application to Retain Radiology Oncology Systems, Inc. as Appraiser* [Doc. No. 227] (the "**ROS Application**"), seeking authority to retain Radiology Oncology Systems, Inc. ("**ROS**") for the purpose of appraising certain of the Debtor's equipment, including the Elekta #1 and Elekta #2, and for authority to pay ROS a one-time fee of $3,800 for the valuation services.[6]  On March 16, 2023, after denying certain objections to the ROS Application, the Court entered the *Order Approving Application of Chapter 11 Trustee to Retain Radiology Oncology Systems, Inc. as Appraiser* [Doc. No. 261] (the "**ROS Order**").

      (h)    **Employment of Michael Miles.**  On January 17, 2023, the Chapter 11 Trustee filed a *Motion to Continue Employment of Michael Miles Effective as of January 1, 2023* [Doc. No. 226] (the "**Miles Application**"), seeking authority to continue the employment of Michael Miles on an as needed basis and for such limited tasks as required by the Chapter 11 Trustee, such as the filing of the Debtor's tax returns and providing limited accounting work.  On January 18, 2023, the Court entered the order approving the Miles Application, subject to objection [Doc. No. 228] (the "**Miles Order**").  On that same day, the Chapter 11 Trustee's counsel filed the declaration of Michael Miles in support of the Miles Application. [Doc. No. 229].  On January 23, 2023, the Trustee's counsel filed the amended declaration of Michael Miles in support of the Miles Application, in which Michael Miles clarified that he waived any claim he possessed against the Debtor's estate. [Doc. No. 236].  No objections were filed to the Miles Application and the Miles Order became effective on or around February 7, 2023.

      **5.4.4    The Sale Transaction.**  On November 7, 2022, the Chapter 11 Trustee filed an *Emergency Motion for (I) An Order (A) Approving Bidding Procedures, (B) Approving Procedures for the Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases, and (C) Scheduling an Auction and Sale Hearing; (II) An Order Approving (A) the Sale of the Debtor's Assets Free and Clear of Liens, Claims, and Encumbrances and (B) Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases; and (III)*

---

[6] The Chapter 11 Trustee filed an identical motion on December 17, 2022 [Doc. No. 207], but voluntarily withdrew the motion [Doc. No. 211].

*Granting Related Relief* [Doc. No. 124] (the "**Trustee's Sale Motion**"), proposing procedures for the marketing and approval of a sale of substantially all of the Debtor's assets.

In conjunction with the Trustee's Sale Motion, the Chapter 11 Trustee sought to employ SOLIC Capital Advisors, LLC ("**SOLIC**") as an investment banker. The Chapter 11 Trustee filed the *Application to Employ SOLIC Capital Advisors, LLC as Investment Banker to the Chapter 11 Trustee* [Doc. No. 130] (the "**SOLIC Application**") on November 14, 2023. The Court granted the SOLIC Application, subject to objection, on November 18, 2022 [Doc. No. 146, 191]. Ultimately, no parties objected to the SOLIC Application.

On November 18, 2022, the Court, after notice and hearing, entered the *Order (I) Approving Bidding Procedures, (II) Approving Procedures for the Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases, (III) Approving the Scheduling of a Sale or Auction, (IV) Scheduling a Sale Hearing to be Held in Person at 1:00 P.M. EST on December 15, 2022, and (V) Granting Related Relief* [Doc. No. 145] (the "**Bidding Procedures Order**"), which (i) approved the procedures governing the Chapter 11 Trustee's proposed sale of substantially all of the Debtor's assets, the assumption and assignment or rejection of Debtor's unexpired leases and executory contracts, (ii) set December 9, 2022, at 4:00 p.m. EST as the deadline by which interested parties could bid (the "**Bid Deadline**"), (iii) set December 10, 2022, at 4 p.m. EST as the deadline by which parties must object to the proposed sale, (iv) set December 13, 2022 at 9:30 a.m. EST as the date an auction on the Debtor's assets would be held if necessary (the "**Auction Date**"), and (v) scheduled December 15, 2022, at 1:00 p.m. EST as the date for a final hearing on the sale (the "**Sale Hearing**").

Following the Court's approval of the Trustee's Sale Motion, the Chapter 11 Trustee and SOLIC developed and commenced a robust marketing and sale process to identify potential purchasers and/or strategic partners and investors to maximize the value of the Debtor's assets for the benefit of all stakeholders and to obtain the highest and best price for the Debtor's assets, including: (i) developing marketing materials describing the Debtor, its business operations, assets and other pertinent information that may interest a potential purchaser; (ii) creating and supplementing a data room containing not only the marketing materials, but also operational and financial due diligence materials and other pertinent materials, such as the Sale Procedures Order and other materials necessary for an interested purchaser to conduct due diligence; and (iii) engaging and soliciting thirty-five (35) potential purchasers, including various hospital systems, private medical care providers, and investment bankers/private equity groups. Of the thirty-five (35) parties solicited, nine (9) parties expressed preliminary interest in acquiring the Debtor and executed confidentiality agreements for the purpose of gaining access to the data room and conducting their respective due diligence. Six (6) of these nine (9) parties requested and participated in separate due diligence calls with SOLIC.

At the conclusion of the marketing process, the Chapter 11 Trustee determined that the *Asset Purchase Agreement* (the "**APA**") submitted by 2406 CancerCare, LLC ("**CancerCare**" or "**Buyer**") provided the highest and best offer for the Debtor's assets. CancerCare proposed purchasing substantially all of the Debtor's assets and continuing the Debtor's ongoing business

operations in exchange for a purchase price of $5,425,000 in cash, plus assuming additional liabilities totaling approximately $119,329.66.

Consequently, and because there were no other competitive bids, the Chapter 11 Trustee cancelled the scheduled auction [Doc. No. 189] and sought Bankruptcy Court approval of the APA at the Sale Hearing.  On December 15, 2022, the Court entered the *Order (I) Approving Asset Purchase Agreement Among Debtor and Purchaser, (II) Authorizing Sale of Substantially All of Debtor's Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection therewith, and (IV) Granting Related Relief* (Doc. No. 200) (the "**Sale Order**"), approving and granting the Chapter 11 Trustee authority to execute the APA.  The Sale closed on December 21, 2022 (the "**Sale Closing Date**").

> **5.4.5    Assumption and/or Rejection of Executory Contracts and Unexpired Leases in Connection with the Sale.**  On January 12, 2023, the Chapter 11 Trustee filed the *Motion to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Doc. No. 224] (the "**Assumption Motion**") identifying certain Executory Contracts and Unexpired Leases to be assumed by the Debtor and assigned to the Buyer so that it could continue providing care to patients.  On February 8, 2023, the Court entered the order approving the Assumption Motion [Doc. No. 244].

Additionally, in conjunction with the Sale, the Chapter 11 Trustee rejected various Executory Contracts and/or Unexpired Leases, including, but not limited to, the First American Lease and the HP Lease effective as the Sale Closing Date as further discussed below [Doc. Nos. 215, 223, and 233].

> **5.4.6    The Bar Dates.**  On November 22, 2022, the Court entered the *Order and Notice Establishing the Bar Date Fixing Time for Filing Prepetition Claims* [Doc. No. 157] (the "**Bar Date Order**") setting January 31, 2023 as the deadline for parties to file Proofs of Claim (the "**Claims Bar Date**").  On November 23, 2022, the Chapter 11 Trustee provided notice of the Bar Date Order *via* First Class Mail, postage prepaid on all known creditors and parties in interest in the Chapter 11 Case.

On January 19, 2023, pursuant to the authority granted in the Sale Motion and Sale Order, the Chapter 11 Trustee filed the *Notice of Rejection Claims Bar Date and Certificate of Service of Same* [Doc. No. 233] (the "**Rejection Claim Notice**"), establishing February 24, 2023 as the deadline by which parties must file Rejection Claims arising from the rejection of an Unexpired Lease or Executory Contract (the "**Rejection Claims Bar Date**").  The Chapter 11 Trustee served the Rejection Claim Notice *via* First Class Mail, postage prepaid on all contract counter-parties to the Executory Contracts and Unexpired Leases that were rejected *via* the APA and Sale Order.

> **5.4.7    Pending Adversary Proceedings.**  Since his appointment, the Chapter 11 Trustee has initiated a number of adversary proceedings to resolve various Claims against the Debtor, including each of the following:

(a)      AMOA Finance Adversary Proceeding.  On December 13, 2022, the Chapter 11 Trustee initiated an adversary proceeding against AMOA Finance, Adv. Pro. No. 22-05170-PMB, seeking to recharacterize the AMOA Finance Lease as a disguised financing arrangement (the "**AMOA Finance Adversary Proceeding**").  On June 12, 2023, the Court entered the *Order Authorizing Mediation* [Doc. No. 12], which proceeded on June 20, 2023.  Leading up to the mediation, the parties agreed to mediate not only the AMOA Claims but also the Dr. McCord Claim given the interrelated nature of these claims. At the conclusion of the mediation, the Trustee and the AMOA Parties agreed to a settlement resolving the AMOA Settled Claims.  On or about June 20, 2023, the Chapter 11 Trustee approved the settlement with the AMOA Parties as further discussed at Section 5.4.8(b) herein.  The AMOA Finance Adversary Proceeding was closed on September 6, 2023.

(b)      CLG Adversary Proceeding.  On December 13, 2022, the Chapter 11 Trustee initiated an adversary proceeding against CLG, Adv. Pro. No. 22-05171-pmb, seeking to determine the validity and amount of CLG's asserted Claim against the Debtor and for recovery of certain prepetition transfers (the "**CLG Adversary Proceeding**"). On October 8, 2023, the Chapter 11 Trustee filed a consent motion memorializing the parties' agreement to resolve the CLG Adversary Proceeding [Doc. No. 334], as further discussed in Section 5.4.8(d) herein.

(c)      PMF Adversary Proceeding.  On December 13, 2022, the Chapter 11 Trustee initiated an adversary proceeding against PMF, Adv. Pro. No. 22-05172-pmb, seeking to determine the validity and amount of PMF's asserted claim against the Debtor and for recovery of certain prepetition transfers (the "**PMF Adversary Proceeding**").  On August 25, 2023, the Chapter 11 Trustee filed a consent motion memorializing the parties' agreement to resolve the PMF Adversary Proceeding [Doc. No. 304], and the Bankruptcy Court entered its order approving the settlement on August 28, 2023 [Doc. No. 308].  The PMF Adversary Proceeding was closed on October 3, 2023.  The settlement of the PMF Adversary Proceeding is further discussed in Section 5.4.8(e) herein.

**5.4.8      Settlements.**  The Chapter 11 Trustee has and is working to negotiate various settlements and resolve outstanding Claims and other disputes between the Debtor and certain Creditors in an effort to pave the way for the Confirmation of the Chapter 11 Plan. Additional settlements may be negotiated prior to the Confirmation Hearing.

(a)      Lafayette Bank Settlement.  On June 9, 2023, the Chapter 11 Trustee filed the *Consent Motion to Approve Compromise and Settlement of Claim of Lafayette State Bank (Claim No. 16-1) pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Doc. No. 282] (the "**Lafayette Bank Settlement Motion**"), requesting that the Bankruptcy Court approve a resolution with Lafayette State Bank concerning its Claim against the Debtor in the amount of $900,988.70 (Claim No. 16-1) (the "**Lafayette Bank Settlement**").  Pursuant to the Lafayette Bank Settlement, the parties have agreed that Lafayette Bank will have a Secured Claim in the amount of $375,000 and a Deficiency

Claim in the amount of $525,988.70.  On June 9, 2023, the Court approved the Lafayette Bank Settlement subject to a twenty-one (21) day objection period [Doc. No. 282].  No objections were filed.

(b)    AMOA Finance/ Dr. McCord Settlement.  On July 27, 2023, the Chapter 11 Trustee filed the *Consent Motion to Approve Compromise and Settlement of Claims of Dr. Mark McCord (Claim No. 7), AMOA Finance, LLC (Claim No. 14), and AMOA CP Acquisition, LLC (Claim No. 15)* (collectively, the "**AMOA Parties**") requesting that the Bankruptcy Court approve a resolution of the AMOA Adversary Proceeding, the Dr. McCord Claim, the AMOA Claim and the AMOA CP Acquisition Claim (the "**AMOA Settlement**") [Doc. No. 297].  Pursuant to the AMOA Settlement, the parties have agreed that the AMOA Parties will settle their claims for a total payment of $995,000.00 and waiver of any other Claims, including any Deficiency Claims, which could be filed by the AMOA Parties.  Dr. McCord also waives any and all rights he may have to participate as a General Unsecured Creditor under any Plan filed by the Chapter 11 Trustee.  On July 28, 2023, the Court approved the AMOA Settlement subject to a twenty-one (21) day objection period [Doc No. 298].  No objections were filed to the AMOA Settlement.

(c)    PointOne Capital, LLC.  On August 23, 2023, the Chapter 11 Trustee filed the *Consent Motion to Approve Compromise and Settlement of Claim of PointOne Capital, LLC (Claim No. 24-1) Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Doc. No. 302] (the "**PointOne Settlement Motion**"), requesting that the Bankruptcy Court approve a resolution with PointOne concerning its Claim against the Debtor in the amount of $236,339.05 (Claim No. 24-1) (the "**PointOne Settlement**").  Pursuant to the PointeOne Settlement, the parties have agreed that PointOne will have a General Unsecured Claim in the amount of $236,339.05.  On August 23, 2023, the Court approved the PointeOne Settlement subject to a twenty-one (21) day objection period [Doc. No. 303].  No objections were filed to the PointOne Settlement.

(d)    CLG.  On October 8, 2023, the Chapter 11 Trustee filed the *Consent Motion to Approve Compromise and Settlement of Claim of CLG Servicing, LLC (Claim No. 20-3)* [Doc. No. 334] (the "**CLG Settlement Motion**"), requesting that the Bankruptcy Court approve a resolution of CLG's Claim against the Debtor in the amount of $1,039,616.22 (Claim No. 20-3) (the "**CLG Settlement**").  Pursuant to the CLG Settlement, the parties have agreed that CLG's Claim will be settled for a total payment of $700,000 and waiver of any other Claims, including any Deficiency Claims, which could have been filed by the Claimants (as defined in the CLG Settlement Motion). On October 10, 2023, the Bankruptcy Court approved the CLG Settlement subject to a twenty-one (21) day objection period [Doc. No. 335].

(e)    PMF.  On August 25, 2023, the Chapter 11 Trustee filed the *Consent Motion to Approve Compromise and Settlement of Claim of Premium Merchant Funding 18, LLC (Claim No. 22)* [Doc. No. 304] (the "**PMF Settlement Motion**"),

27

requesting that the Bankruptcy Court approve a resolution of PMF's Claim against the Debtor in the amount of $390,714.20 (Claim No. 22) (the "**PMF Settlement**"). Pursuant to the PMF Settlement, the parties have agreed that PMF shall have a General Unsecured Claim in the amount of $225,000. On August 28, 2023, the Bankruptcy Court approved the PMF Settlement subject to a twenty-one (21) day objection period [Doc. No. 308]. No objections were filed to the PMF Settlement.

(f)    Click Capital.    On September 13, 2023, the Chapter 11 Trustee filed the *Consent Motion to Approve Compromise and Settlement of Claim of Click Capital Group, LLC (Claim No. 26)* [Doc. No. 328] (the "**Click Capital Settlement Motion**"), requesting that the Bankruptcy Court approve a resolution of Click Capital's Claim against the Debtor in the amount of $551,068.00 (Claim No. 26) (the "**Click Capital Settlement**"). Pursuant to the Click Capital Settlement, the parties have agreed that Click Capital's Claim will be settled for a total payment of $105,000 and waiver of any other Claims, including any Deficiency Claims, which could have been filed by Click Capital. On September 14, 2023, the Bankruptcy Court approved the Click Capital Settlement subject to a twenty-one (21) day objection period [Doc. No. 329]. No objections were filed to the Click Capital Settlement.

(g)    Secure Capital.    On September 6, 2023, the Chapter 11 Trustee filed the *Consent Motion to Approve Compromise and Settlement of Claim of Secure Capital, LLC (Claim No. 23)* [Doc. No. 324] (the "**Secure Capital Settlement Motion**"), requesting that the Bankruptcy Court approve a resolution of Secure Capital's Claim against the Debtor in the amount of $162,141.00 (Claim No. 23) (the "**Secure Capital Settlement**"). Pursuant to the Secure Capital Settlement, the parties have agreed that Secure Capital shall have a General Unsecured Claim in the amount of $81,070.50. On September 6, 2023, the Bankruptcy Court approved the Secure Capital Settlement subject to a twenty-one (21) day objection period [Doc. No. 325]. No objections were filed to the Secure Capital Settlement.

(h)    City Capital.    On August 28, 2023, the Chapter 11 Trustee filed the *Consent Motion to Approve Compromise and Settlement of Claims of City Capital NY, LLC (Claim No. 27 and 28)* [Doc. No. 309] (the "**City Capital Settlement Motion**"), requesting that the Bankruptcy Court approve a resolution of City Capital's Claims against the Debtor in the amounts of $312,820.00 (Claim No. 27) and $580,520.00 (Claim No. 28) (the "**City Capital Settlement**"). Pursuant to the City Capital Settlement, the parties have agreed that City Capital shall have: (i) a General Unsecured Claim in the amount of $156,410.00, and (ii) a General Unsecured Claim in the amount of $290,260.00. On August 29, 2023, the Bankruptcy Court approved the City Capital Settlement subject to a twenty-one (21) day objection period [Doc. No. 310]. No objections were filed to the City Capital Settlement.

(i)    Harvey L. Simpson, III.    On August 29, 2023, the Chapter 11 Trustee filed the *Consent Motion to Approve Compromise and Settlement of Claim of Harvey L. Simpson, III, M.D. (Claim No. 17) Pursuant to Rule 9019 of the Federal Rules*

28

*of Bankruptcy Procedure* [Doc. No. 313] (the "**Simpson Settlement Motion**"), requesting that the Bankruptcy Court approve a resolution of Harvey L. Simpson, III, M.D.'s ("**Simpson**") Claim against the Debtor in the amount of $146,196.00, including a priority amount of $15,150.00 (Claim No. 17) (the "**Simpson Settlement**"). Pursuant to the Simpson Settlement, the parties have agreed that Simpson shall have a General Unsecured Claim in the amount of $146,196.00. On August 30, 2023, the Bankruptcy Court approved the Simpson Settlement subject to a twenty-one (21) day objection period [Doc. No. 314]. No objections were filed to the Simpson Settlement.

5.4.9    **Professional Fee Applications.** Both the Debtor's counsel and counsel for the Chapter 11 Trustee have filed fee applications in the Chapter 11 Case.

(a)    Rountree, Leitman, Klein & Geer, LLC. Debtor's Counsel filed its *Final Application for Compensation* on October 24, 2022 for services rendered between August 17, 2022 and October 17, 2022 seeking compensation in the amount of $83,905.50 and reimbursement of expenses in the amount of $3,367.74 [Doc. No. 114]. On November 28, 2022, the Bankruptcy Court approved the final compensation of Rountree, Leitman, Klein & Geer, LLC in the reduced total amount of $79,773.24 [Doc. No. 167].

(b)    Eversheds Sutherland (US) LLP. Counsel for the Chapter 11 Trustee filed its *First Application for Compensation* on December 12, 2022 for services rendered between October 19, 2022 and October 31, 2022 seeking total compensation for services rendered and reimbursement of expenses in the amount of $47,690.20 [Doc. No. 190]. On January 31, 2023, the Bankruptcy Court approved Eversheds Sutherland (US) LLP's First Application for Compensation [Doc. No. 237]. On April 7, 2023, counsel for the Chapter 11 Trustee filed its *Second Application for Compensation* covering the period from November 1, 2022 through February 28, 2023 seeking reimbursement of fees in the amount of $322,465.20 and reimbursement of expenses in the amount of $22,299.93 [Doc. No. 268]. On June 15, 2023, the Bankruptcy Court approved the Eversheds Sutherland (US) LLP's Second Application for Compensation awarding professional fees in the reduced amount of $300,465.20 and reimbursement of expenses in the amount sought [Doc. No. 284].

5.5    **OTHER CLAIMS AGAINST THE DEBTOR**

5.5.1    **Administrative Claims.** Administrative Claims are Claims that are actual and necessary costs and expenses of preserving the Estate and operating the business of the Debtor incurred in the ordinary course of business during the pendency of the Debtor's Chapter 11 Case on or before the Effective Date, but excluding Professional Fee Claims. The Chapter 11 Trustee estimates that as of the date hereof, such unpaid Administrative Claims total approximately $515.00, excluding accounts payable that have been assumed by the Buyer and the claim of the Chapter 11 Trustee in respect of the Chapter 11 Trustee Fees. Additional Administrative Claims may be filed on or before the Administrative Claims Bar Date.

     5.5.2    **Professional Fee Claims.**  Professional Fee Claims are Administrative Claims for the compensation of the Debtor's or the Chapter 11 Trustee's professionals or other entities for professional services rendered or expenses incurred in the Debtor's Chapter 11 Case on or before the Effective Date.  All payments for Professional Fee Claims will be made in accordance with the procedures established in the Bankruptcy Code, the Bankruptcy Rules, the U.S. Trustee Guidelines, and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Bankruptcy Court will review and determine all applications for compensation for services rendered and reimbursement of costs.  The Chapter 11 Trustee estimates that as of the date hereof, there are approximately [$375,000.00] in outstanding Professional Fee Claims.

     5.5.3    **Unsecured Priority Claims.**  The Debtor estimates that it owes approximately $0.00 on account of Priority Tax Claims entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.  The Debtor's estimate that Priority Claims outstanding for employee wages and benefits totals approximately $0.00.

     5.5.4    **Unsecured Nonpriority Claims**.  The Debtor estimates that unsecured nonpriority Claims against the Debtor total approximately $10,000,000.00 plus certain unknown amounts scheduled as contingent, unliquidated, and disputed, but excluding amounts paid pursuant to various Bankruptcy Court orders and/or assumed or otherwise satisfied in connection with the Sale.[7]

## VI.    SUMMARY OF THE CHAPTER 11 PLAN[8]

### 6.1    IN GENERAL

The Plan provides for the payment in full of Allowed unclassified Claims and all Allowed Claims in Class 1, Class 2 and Class 3 in Cash on the Effective Date of the Plan or as soon as reasonably practicable thereafter.  Allowed Claims in Classes 4, 5, 6, and 7 will receive either payment in Cash on the Effective Date of the Plan or as soon as reasonably practicable thereafter, returned equipment and/or a Deficiency Claim as set forth in Section 6.3 hereof except for holders of Allowed Claims in Class 8 who will receive their pro rata share of the Beneficial Interests in the Liquidation Trust.  Class 9 Interest holders will receive no Distribution under the Plan.

### 6.2    TREATMENT OF UNCLASSIFIED CLAIMS

     6.2.1    **Administrative Claims.**  Except to the extent that a holder of an Allowed Administrative Claim and the Plan Proponent agree to less favorable treatment with respect to such Allowed Administrative Claim or such Allowed Administrative Claim is assumed by the Buyer under the Asset Purchase Agreement, each holder of an Allowed Administrative Claim shall be

---

[7] Certain of these General Unsecured Claims may be subject, either now or in the future to an objection or Challenge. Not all Claims referenced are or may be Allowed.

[8] In the event of any inconsistency or discrepancy between this summary of the Plan, on the one hand, and the actual terms and provisions of the Plan, on the other hand, the terms and provisions of the Plan shall govern for all purposes.

paid in full in Cash on the earlier of the date that is (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as the Effective Date, or (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, if such Administrative Claim is not Allowed as of the Effective Date.

**6.2.2    Professional Fee Claims.**  Any Person asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve pursuant to Bankruptcy Rule 2002, an application for final allowance of such Professional Fee Claim no later than thirty-five (35) days after the Effective Date (which an objection period of at least twenty-one (21) days for objections, if any, to such application); *provided, however* that any Professional who may receive compensation or reimbursement of expenses may continue to receive such compensation or reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order.  Objections to any Professional Fee Claim must be Filed and served on the requesting party no later than twenty-one (21) days from the service of an application for final allowance of a Professional Fee Claim.  Sufficient funds shall be placed in the Chapter 11 Trustee's IOLTA account to satisfy all distributions on account of Allowed Professional Fee Claims.  Upon entry of a Final Order approving such application for such Professional Fee Claim, the Chapter 11 Trustee shall promptly distribute any unpaid portion of such Allowed Professional Fee Claim from the IOLTA account.  To the extent that any Cash is remaining in the Chapter 11 Trustee's IOLTA Account after payment in full of Allowed Professional Fee Claims, the Chapter 11 Trustee shall promptly transfer any such remaining Cash to the Liquidation Trust and such Cash shall become a Liquidation Trust Asset and be treated in accordance with the Liquidation Trust Agreement, the Plan and the Confirmation Order.  To the extent there are insufficient funds in the Professional Fee Claims Reserve to pay all Allowed Professional Fee Claims in full, the Liquidation Trustee shall pay any shortfall from the Liquidation Trust Assets.

**6.2.3    Priority Tax Claims.**  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment or such Allowed Priority Tax Claim is assumed by the Buyer under the Asset Purchase Agreement, in exchange for full and final satisfaction, settlement, and release of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Liquidation Trustee, one of the following treatments: (i) Cash in an amount equal to the amount of the Allowed Priority Tax Claim, plus interests at the federal judgment rate in effect as of the Petition Date to the extent provided by section 511 of the Bankruptcy Code; or (ii) such other treatment (which treatment shall be no more favorable than the treatment set forth in subsection (i) of this section) as may be agreed upon by such holder and the Liquidation Trustee or otherwise determined upon an order of the Bankruptcy Court.  Allowed Priority Tax Claims shall be paid on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date on which such Priority Tax Claim against the Debtor becomes an Allowed Priority Tax Claim; or (iii) such date as may be ordered by the Bankruptcy Court.

**6.2.4    Statutory Fees.**  All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("**Quarterly Fees**") prior to the Effective Date shall be paid by the Debtor or the Liquidation Trustee out of the Liquidation Trust Claims Reserve.  On and after the

Effective Date, the Liquidation Trust shall be responsible for (i) filing post-Confirmation quarterly reports and any pre-Confirmation monthly reports not filed as of the Confirmation Hearing in conformity with the U.S. Trustee guidelines and (ii) all Quarterly Fees for the Chapter 11 Case until the entry of a final decree or until such Chapter 11 Case is closed or dismissed.

### 6.3    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

#### 6.3.1    <u>Class 1: Secured Tax Claims.</u>

(a)    <u>**Classification:**</u> This Class consists of Claims that, absent their Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.  As of the Petition Date, the Debtor owed approximately $0.00 on account of Secured Tax Claims.

(b)    <u>**Treatment:**</u>  To the extent not assumed by the Buyer under the Asset Purchase Agreement and unless a holder of a Class 1 Secured Tax Claim agrees to less favorable treatment, in exchange for a full and final satisfaction, settlement and release of its Allowed Class 1 Claim, each holder of an Allowed Secured Tax Claim shall receive, at the option of the Liquidation Trustee: (a) payment in full in Cash of such holder's Allowed Secured Tax Claim; or (b) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five (5) years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the Liquidation Trustee to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

(c)    <u>**Voting:**</u>  Class 1 is Unimpaired by the Plan, and each holder of a Class 1 Secured Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 1 Secured Tax Claims are not entitled to vote to accept or reject the Plan.

#### 6.3.2    <u>Class 2:  Other Priority Claims</u>.

(a)    <u>**Classification:**</u> This Class consists of Allowed Claims against the Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.  On the Petition Date, the Debtor owed approximately $515.00 in Other Priority Claims.

(b)    <u>**Treatment:**</u>  To the extent not assumed by the Buyer under the Asset Purchase Agreement and unless a holder of a Allowed Class 2 Other Priority Claim agrees to less favorable treatment, in exchange for a full and final satisfaction, settlement, and release of its Claim, each holder of a Class 2 Allowed Other Priority Claim shall receive payment in full in Cash of such holder's Allowed Other Priority Claim on the

Effective Date of the Plan, or as soon as reasonably practical thereafter, or such other treatment rendering such holder's Allowed Other Priority Claim Unimpaired.

(c)    **Voting:** Class 2 is Unimpaired by the Plan, and each holder of a Class 2 Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### 6.3.3    Class 3: Prepetition Secured Loan Claims

(a)    **Classification:** Class 3 consists of the Prepetition Secured Loan Claims held by Bankers Healthcare, the U.S. SBA and CLG.

(b)    **Treatment:** Except to the extent that a holder of Class 3 Prepetition Secured Loan Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, and release of its Allowed Class 3 Claim, each holder of such Allowed Prepetition Secured Loan Claim shall receive payment in Cash on the Effective Date of the Plan, or as soon as reasonably practicable thereafter, or such other treatment rendering each holder's Allowed Prepetition Secured Loan Claim Unimpaired, including receipt of interest at the Federal Judgment rate.

(c)    **Voting:** Class 3 is Unimpaired by the Plan, and each holder of a Class 3 Prepetition Secured Loan Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Class 3 Prepetition Secured Loan Claims are not entitled to vote to accept or reject the Plan.

### 6.3.4    Class 4: Prepetition Equipment Claims

(a)    **Classification:** Class 4 consists of the Prepetition Equipment Claims held by Arvest, HP, U.S. Bank and First American.

(b)    **Treatment:** Except to the extent that a holder of a Class 4 Prepetition Equipment Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, and release of its Allowed Class 4 Claim, each holder of such Allowed Prepetition Equipment Claim shall receive the return of its Collateral (to the extent their respective Collateral has not previously been returned) on the Effective Date of the Plan, or as soon as reasonably practical thereafter, and a Deficiency Claim for the difference between the value of the equipment and the balance of its loan amount.

(c)    **Voting:** Class 4 is Impaired by the Plan. Holders of Prepetition Equipment Claims are entitled to vote to accept or reject the Plan.

### 6.3.5    Class 5: AMOA Finance

(a)    **Classification:** Class 5 consists of the Claims of the AMOA Parties.

(b)    **Treatment:**  Except to the extent that the AMOA Parties agree to less favorable treatment, in exchange for full and final satisfaction, settlement, and release of their Allowed Class 5 Claims, the AMOA Parties shall receive payment in full of the Secured portion of the AMOA Finance Claim and AMOA CP Acquisition Claim (up the $995,000.00) in Cash on the Effective Date of the AMOA Settlement, and shall waive all Claims, including any right the AMOA Parties may have to a Deficiency Claim for the difference between the value of their Collateral and the total amount of their Claims.

(c)    **Voting:** Class 5 is Impaired by the Plan.  The AMOA Parties are entitled to vote to accept or reject the Plan.

### 6.3.6    Class 6: Lafayette Bank Claim

(a)    **Classification:** Class 6 consists of the Claim of Lafayette Bank.

(b)    **Treatment:** Except to the extent that Lafayette Bank agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, and release of its Allowed Class 6 Claim and pursuant to the Lafayette Bank Settlement, Lafayette Bank shall receive payment in full in Cash of the Secured portion of its Claim ($375,000.00) on the Effective Date of the Plan, or as soon as reasonably practicable thereafter, and a Deficiency Claim for the difference between the value of its Collateral and the total amount of its Claim.

(c)    **Voting:** Class 6 is Impaired by the Plan.  Lafayette Bank is entitled to vote to accept or reject the Plan.

### 6.3.7    Class 7: MCA Claims

(a)    **Classification:** Class 7 consists of the Claims of the MCAs.

(b)    **Treatment:**  Except to the extent that a holder of a Class 7 MCA Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, and release of its Allowed Class 7 Claim, each holder of such Allowed MCA Claim shall receive Cash in an amount equal to the percentage claim each MCA held against the Debtor's Prepetition AR on a pro rata basis, or as soon as reasonably practicable thereafter, and a Deficiency Claim for the difference between its percentage of the Debtor's Prepetition AR received on a pro rata basis and the total amount of its Claim.

(c)    **Voting:** Class 7 is Impaired by the Plan, and each holder of a Class 7 MCA Claim is entitled to vote to accept or reject the Plan.

### 6.3.8    Class 8: General Unsecured Claims

(a)    **Classification:**  This Class consists of all General Unsecured Claims against the Debtor, including any Deficiency Claims.

(b)    **Treatment:** Except to the extent that a holder of an Allowed General Unsecured Claims agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, and release of each Allowed General Unsecured Claim, each holder of such Allowed General Unsecured Claim shall receive its pro rata share of the Beneficial Trust Interests, which Beneficial Trust Interests shall entitle the holders thereof to receive their pro rata share of the Liquidation Trust Assets.

(c)    **Voting:** Class 8 is Impaired by the Plan, and each holder of a Class 8 Claim is entitled to vote to accept or reject the Plan.

### 6.3.9    Class 9: Interests.

(a)    **Classification:** This Class consists of all Interests in the Debtor.

(b)    **Treatment:** Holders of Interests in the Debtor will receive no distribution under the Plan, and all Interests shall be cancelled.

(c)    **Voting:** Class 9 is Impaired by the Plan, and each holder of Class 9 Interests is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Class 9 Interests are not entitled to vote to accept or reject the Plan.

### 6.4    IMPLEMENTATION OF THE PLAN

**6.4.1    Sources of Consideration for Plan Distributions.** Effective Date distributions will be made from Cash on hand currently held by the Chapter 11 Trustee or from the Liquidation Trust Claim Reserve or the Professional Fee Claim Reserve. Distributions under the Plan on account of the Beneficial Trust Interest will be funded by the Liquidating Trust Assets.

**6.4.2    Vesting of Assets.** Except as otherwise provided in the Plan or any other agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all of the Liquidation Trust Assets shall immediately vest in the Liquidation Trust.

**6.4.3    Liquidation Trust.**

(a)    **Creation of Liquidation Trust.** On the Effective Date, the Liquidation Trust shall be created in accordance with the Liquidation Trust Agreement for the benefit of holders of Beneficial Trust Interests. The Liquidation Trust Agreement shall (i) be in form and substance consistent in all respects with the Plan, and (ii) contain customary provisions for trust agreements utilized in comparable circumstances, including any and all provisions necessary to ensure continued treatment of the Liquidation Trust as a grantor trust and the holders of Beneficial Trust Interests as the grantors and owners thereof for U.S. federal tax purposes. On the Effective Date, the Liquidation Trust Assets shall be conveyed or assigned to the Liquidation Trust, including: (a) the Retained Causes of Action; and (b) remaining Cash on hand after paying, funding, reserving against or

35

satisfying (i) the Professional Fee Claim Reserve; (ii) the Liquidation Trust Claims Reserve; and (iii) Quarterly Fees; and (c) all Insurance Policies of the Debtor. The powers, authority, responsibilities, and duties of the Liquidation Trust and the Liquidation Trustee are set forth and will be governed by the Liquidation Trust Agreement, the Plan and the Confirmation Order.

(b)    **Transfers to the Liquidation Trust.** On the Effective Date, the Debtor and its Estate shall transfer and shall be deemed to have irrevocably transferred to the Liquidation Trust, the Liquidation Trust Assets, which transfer shall be free and clear of Claims, Liens, Interests, encumbrances, and contractually imposed restrictions except as otherwise provided in the Plan.

(c)    **Purpose of the Liquidation Trust.** The Liquidation Trust shall be established for the primary purpose of liquidating its assets and making distributions to holders of Allowed Claims in accordance with the Plan, Confirmation Order, and the Liquidation Trust Agreement with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the Liquidation Trust. The Liquidation Trust, acting through the Liquidation Trustee, shall be authorized to exercise and perform the rights, powers, and duties held by the Estate with respect to the Liquidation Trust Assets, including, without limitation, the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, or any similar official who has been appointed to take control of, supervise, manage or liquidate the Debtor, to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Liquidation Trust Assets.

(d)    **Administration of the Liquidation Trust.** The Liquidation Trust shall be administered by the Liquidation Trustee pursuant to the Liquidation Trust Agreement and the Plan. In the event of any inconsistency between the Plan or the Confirmation Order and the Liquidation Trust Agreement as such conflict relates to anything other than the establishment of a Liquidation Trust, the Plan and the Confirmation Order shall control.

(e)    **Appointment of Liquidation Trustee.** As of the Effective Date, the Liquidation Trustee shall be appointed as trustee of the Liquidation Trust pursuant to the Liquidation Trust Agreement, the Plan, the Confirmation Order, and section 1123(b)(3) of the Bankruptcy Code, and shall have all of the rights, powers, authority, and obligations set forth in the Liquidation Trust Agreement, the Plan, the Confirmation Order, and the Bankruptcy Code. The Liquidation Trustee shall be the exclusive trustee of the Estate under Title 11 for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 601(b)(3).

(f)    **Compensation of the Liquidation Trustee.** The Liquidation Trustee shall be compensated pursuant to the terms of the Liquidation Trust Agreement. Any professionals retained by the Liquidation Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, subject to

36

approval by the Liquidation Trustee. The payment of fees and expenses of the Liquidation Trustee and his professionals shall be made in the ordinary course of business from the Liquidation Trust Assets and shall not be subject to Bankruptcy Court approval. As set forth in the Plan, David A. Wender is the proposed Liquidation Trustee and his proposed compensation is $800.00 per hour.

       (g)    **Responsibilities of the Liquidation Trustee.** The responsibilities of the Liquidation Trustee under the Liquidation Trust Agreement and this Plan shall include those set forth in the Liquidation Trust Agreement, including, without limitation, the following: (a) satisfying all unclassified Claims and Claims in Classes 1 through 7 Allowed as of the Effective Date from Cash on hand at the Effective Date; (b) the establishment and maintenance of such operating, reserve, and trust account(s) as are necessary and appropriate to carry out the terms of the Plan and Liquidation Trust, including funding and maintaining the Professional Fee Claim Reserve and Liquidation Trust Claims Reserve from Cash on hand at the Effective Date in amounts sufficient to satisfy all unpaid unclassified Claims and Claims in Classes 1 through 7 which are not Allowed as of the Effective Date; and (ii) funding the Liquidation Trust Expense Reserve from Liquidation Trust Assets; (c) the receipt of the Liquidation Trust Assets; (d) the investment of Cash that is a Liquidation Trust Asset; (e) the pursuit of objections to, estimations of, and settlements of all Claims, regardless of whether any such Claim is listed on the Debtor's Schedules, other than Claims that are specifically Allowed pursuant to the Plan; (f) the prosecution, settlement, or abandonment of any Retained Causes of Action; (g) unless otherwise provided in the Plan, the calculation of all distributions to be made under this Plan; (h) authorizing and making all distributions to be made under this Plan; (i) winding down the Debtor's affairs; and (j) such other responsibilities as may be vested in the Liquidation Trustee pursuant to this Plan, the Liquidation Trust Agreement, the Confirmation Order, other Bankruptcy Court Orders, or as otherwise may be necessary and proper to carry out the provisions of this Plan.

       (h)    **Powers of the Liquidation Trustee.** The powers of the Liquidation Trustee, as set forth in the Liquidation Trust Agreement shall include, without limitation and without further Bankruptcy Court approval, each of the following:

           i.    To act on behalf of the Liquidation Trust, including the right to effect all actions and execute all agreements, instruments, and other documents, and exercise all rights and privileges previously held by the Debtor or Chapter 11 Trustee, necessary or convenient to implement the provisions of the Plan and the Liquidation Trust Agreement;

           ii.    With respect to any Liquidation Trust Asset, to exercise in a manner not inconsistent with the Plan all power and authority that may be or could have been exercised, commence or continue all proceedings that may be or could

have been commenced or continued and take all actions that may be or could have been taken by any member, officer, director, or shareholder of the Debtor or the Chapter 11 Trustee with like effect as if authorized, exercised and taken by unanimous action of such officers, directors, and shareholders, including, without limitation, the dissolution of the Debtor;

iii.  To manage, monitor, and enforce all of the Debtor's and Estate's rights, and interests under the Plan, the Confirmation Order, the Liquidation Trust Agreement, any other agreements of the Debtor or the Chapter 11 Trustee, and any other orders of the Bankruptcy Court;

iv.  To establish, maintain, and adjust as may be appropriate, the Professional Fee Claim Reserve, the Liquidation Trust Claims Reserve, the Liquidation Trust Expense Reserve, and to authorize and make distributions from the Professional Fee Claim Reserve and the Liquidation Trust Claims Reserve and disbursements from the Liquidation Trust Expense Reserve, including disbursements necessary or appropriate in connection with winding down the Estate;

v.  To authorize and make distributions to holders of Allowed Claims as provided for or contemplated in the Plan;

vi.  To authorize and make through the Distribution Agent, distributions to holders of Beneficial Trust Interests provided for or contemplated under the Plan or the Liquidation Trust Agreement;

vii.  Except to the extent set forth in the Plan, to object to any Claims regardless of whether such Claim was Disputed on the Effective Date, to compromise or settle any Claim regardless of whether such Claim was Disputed on the Effective Date, prior to objection without supervision or approval of the Bankruptcy Court, free of any restriction of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the guidelines and requirements of the U.S. Trustee, other than those restrictions expressly imposed by the Plan, the Confirmation Order or the Liquidation Trust Agreement;

viii.  To make decisions, without further Bankruptcy Court

approval, regarding the retention or engagement of professionals, employees, and consultants by the Liquidation Trust and the Liquidation Trustee and to pay the fees and charges incurred by the Liquidation Trustee on the Liquidation Trust's behalf on or after the Effective Date for fees and expenses of professionals (including those retained by the Liquidation Trustee), disbursements, expenses or related support services relating to the Liquidation Trust;

ix.    To (a) file, if necessary, any and all tax and information returns required with respect to the treatment of the Liquidation Trust as a grantor trust pursuant to Treas. Reg. 1.671-4(a) or otherwise, (b) make tax elections by and on behalf of the Liquidation Trust; and (c) pay taxes, if any, payable by the Liquidation Trust;

x.    To take all other actions not inconsistent with the provisions of the Plan that the Liquidation Trustee deems reasonably necessary or desirable with respect to administering the Plan;

xi.    To implement and/or enforce all provisions of the Plan, including entering into any agreement or executing any document required by or consistent with the Plan, the Confirmation Order, or the Liquidation Trust Agreement;

xii.    To abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of its choice, any Liquidation Trust Asset in the reasonable business judgment of the Liquidation Trustee;

xiii.    Except as otherwise set forth in the Plan, to prosecute and/or settle any Retained Causes of Action, with or without the approval of the Bankruptcy Court, and exercise, participate in or initiate any proceeding or Adversary Proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction and participate as a party or otherwise in any administrative, arbitrative, or other nonjudicial proceeding and pursue to settlement or judgment such Retained Causes of Action;

xiv.    To purchase or create and carry all insurance policies and pay all insurance premiums and costs the Liquidation Trustee deems necessary or advisable;

xv.      To collect and liquidate and/or distribute all Liquidation Trust Assets pursuant to the Plan, the Confirmation Order, and the Liquidation Trust Agreement;

xvi.     To hold any legal title to any and all of the Liquidation Trust Assets;

xvii.    If any of the Liquidation Trust Assets are situated in any state or other jurisdiction in which the Liquidation Trustee is not qualified to act as trustee, to nominate and appoint a Person duly qualified to act as trustee in such state or jurisdiction and require from each such trustee such security as may be designated by the Liquidation Trustee in its discretion; confer upon such trustee all the rights, powers, privileges and duties of the Liquidation Trustee hereunder, subject to the conditions and limitations of the Liquidation Trust Agreement, except as modified or limited by the Liquidation Trustee and except where the conditions and limitations may be modified by the laws of such state or other jurisdiction (in which case, the laws of the state or jurisdiction in which the trustee is acting shall prevail to the extent necessary); require such trustee to be answerable to the Liquidation Trustee for all monies, assets, and other property that may be received in connection with the administration of all property; and remove such trustee, with or without cause, and appoint a successor trustee at any time by the execution of the Liquidation Trustee of a written instrument declaring such trustee removed from office, and specifying the date and time of removal;

xviii.   Retain any and all Insurance Policies of the Debtor providing coverage with respect to the Liquidation Trust Assets, any and all Claims or other liabilities, including the Retained Causes of Action;

xix.     To wind down the Debtor's affairs and complete tasks necessary to dissolve the Debtor;

xx.      Exercise such other powers as may be vested in or assumed by the Liquidation Trustee pursuant to the Plan, the Liquidation Trust Agreement, the Confirmation Order, other orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan and Liquidation Trust; and

40

xxi.    Solely with respect to Claims and/or any Liquidation Trust Assets, the Liquidation Trustee shall stand in the same position as the Debtor or Chapter 11 Trustee with respect to any claim the Debtor may have to an attorney-client privilege, the work-product doctrine, or any other privilege, and the Liquidation Trustee shall succeed to all of the Debtor's or Chapter 11 Trustee's rights to preserve, assert or waive any such privilege.

(i)    **Tax Treatment of the Liquidation Trust.**  The Liquidation Trust shall be structured to qualify and is intended to be treated as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Revenue Procedure 94-95 with no objective to continue or engage in the conduct of a trade or business, and thus, as a "grantor trust" within the meaning Sections 671 through 679 of the Tax Code.

(j)    **Tax Reporting.**

i.    The Liquidation Trustee shall file tax returns treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and in accordance with the applicable sections of the Plan.  The Liquidation Trust's items of taxable income, gain, loss, deduction, and/or credit (other than such items allocable to any assets allocable to, or retained on account of, Disputed Claims) will be allocated to each holder in accordance with their relative ownership of Beneficial Trust Interests.

ii.    As soon as possible after the Effective Date, the Liquidation Trustee shall make a good faith valuation of the Liquidation Trust Assets, and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes.  The Liquidation Trust shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidation Trust that are required by any Governmental Unit for taxing purposes.

iii.    The Liquidation Trust shall be responsible for payment, out of the Liquidation Trust Assets, of any taxes imposed on the Liquidation Trust (including any "disputed ownership fund") or the Liquidation Trust Assets.  In accordance therewith, any taxes imposed on any disputed ownership fund or its assets will be paid out of the assets of the disputed

41

ownership fund and netted against any subsequent distribution in respect of the allowance or disallowances of such Claims.

iv.     The Liquidation Trustee (a) may timely elect to treat any Liquidation Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (b) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the Liquidation Trustee and the holders of Beneficial Trust Interests) shall report for U.S. federal, state, and local income tax purposes consistently with the foregoing. The Liquidation Trustee shall be the administrator of any such applicable "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9(b)(2) and file all income tax returns with respect to any income attributable to a "disputed ownership fund" and shall withhold, as applicable, and pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit or loss allocable thereto.

(k)     **Retained Causes of Action.** The Liquidation Trustee shall have the sole right to pursue any existing or potential Retained Cause of Action, by informal demand and/or commencement or continuation of any litigation or prosecution of any Adversary Proceeding or other proceeding.

(l)     **Costs and Expenses of the Liquidation Trust.** The costs and expenses of the Liquidation Trust, including the fees and expenses of the Liquidation Trustee and other professionals retained on behalf of the Liquidation Trust, shall be paid out of the Liquidation Trust Expense Reserve, subject to the terms of the Liquidation Trust Agreement.

(m)     **Effective Date.** On the Effective Date, the Liquidation Trustee shall have the rights and powers set forth in the Plan, in the Confirmation Order and in the Liquidation Trust Agreement to carry out and implement the purposes and intent of the Plan.

**6.4.4    Dissolution of Liquidation Trust.** The Liquidation Trust shall be dissolved no later than five (5) years from the Effective Date of the Plan, unless the Bankruptcy Court, upon motion made prior to the fifth (5th) anniversary without the need for a favorable letter ruling from the IRS that any further extension would not adversely affect the status of either as a Liquidation Trust for U.S. federal income tax purposes, determines that a fixed period extension,

42

not to exceed five (5) years, is necessary to facilitate or complete the recovery on and liquidation of the Liquidation Trust Assets. Upon the filing of a motion for extension of the date of dissolution, such date shall be automatically extended until an order of the Bankruptcy Court is entered with respect to such motion or such motion is withdrawn.

**6.4.5    Liquidation Trust Security Matters.**   To the extent that the Beneficial Trust Interests are deemed to be "securities," the issuance of such interests under the Plan are exempt pursuant to section 1145 of the Bankruptcy Code, and from registration under the Securities Act of 1933, as amended, and any applicable U.S. federal, state, and local laws requiring registration of securities. It is currently anticipated that the Beneficial Trust Interests will be uncertificated and non-transferrable except to the extent expressly provided otherwise in the Liquidation Trust Agreement.

**6.4.6    Tax Returns.**   After the Effective Date, the Liquidation Trustee shall complete and file all final or otherwise required U.S. federal, state and local tax returns for the Debtor, and, pursuant to section 505(b) of the Bankruptcy Code, may request a determination of any unpaid tax liability of the Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

**6.4.7    Cancellation of Existing Securities.**   Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, and purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor related thereto shall be cancelled and deemed null and void; *provided, however*, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim against the Debtor shall continue in effect solely for purposes of enabling holders of Allowed Claims to receive distributions under the Plan as provided herein and therein, *provided further, however*, that the proceeding provision shall not result in any expense or liability to the Debtor, the Chapter 11 Trustee, or the Liquidation Trustee except to the extent set forth in or provided for under the Plan.

**6.4.8    Indemnification Obligations.**   Except as otherwise provided in the Plan or the Confirmation Order, any and all indemnification obligations of the Debtor, whether pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document, or other document or applicable law, shall be rejected as of the Effective Date of the Plan.

**6.4.9    Effecting Documents; Further Transactions.**   Prior to the Effective Date, the Debtor, and its directors, members, trustees, officers, managers, and the Chapter 11 Trustee are and, after the Effective Date, the post-Effective Date Debtor and the Liquidation Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions

of the Plan in the name of and on behalf of the Debtor, without the need for any approvals, authorizations, or consents, except for those expressly required pursuant to the Plan, or any further notice to or action, order, or approval of the Bankruptcy Court.

        **6.4.10**     **Exemption from Certain Taxes and Fees.**  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall forego the collection of such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax of governmental assessment.

        **6.4.11**     **Treatment of Causes of Action.**  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, sold, or settled in the Plan or pursuant to a Bankruptcy Court order, the Debtor reserves and assigns to the Liquidation Trust, any and all Retained Causes of Action, whether arising before or after the Petition Date, and preserves the right to commence, continue, prosecute, or settle such Retained Causes of Action, notwithstanding the occurrence of the Effective Date. The Liquidation Trustee, on behalf of the Liquidation Trust, may pursue such Retained Causes of Action, in its sole discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement (if any), or this Disclosure Statement to any Retained Cause of Action against them as any indication that the Liquidation Trust will not pursue any and all available Retained Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches shall apply to such Causes of Action as a consequence of Confirmation or Consummation of the Plan. For the avoidance of doubt, the Retained Causes of Action are expressly preserved regardless of any language in the Plan that could provide for release or exculpation of any such Retained Cause of Action.

        **6.4.12**     **Ability to Seek and Obtain Discovery.**  From and after the Effective Date, the Liquidation Trustee shall have the ability to seek and obtain examination (including document discovery and depositions) under Bankruptcy Rule 2004 against any Person or Entity, and the Bankruptcy Court shall retain jurisdiction to order examinations (including examinations under Bankruptcy Rule 2004) against any Person or Entity, and to hear all matters with respect to the same.

        **6.4.13**     **Debtor's Directors, Officers and Managers.**  On the Effective Date, all officers, directors, and managers of the Debtor shall be deemed to have resigned and shall be discharged from any further duties and responsibilities in such capacity. On and after the Effective Date, the Liquidation Trustee shall serve as the sole officer, sole director or sole manager of the Debtor, but he or she shall retain and enforce the Retained Causes of Action as the representative of the Estate in his or her capacity as the Liquidation Trustee under the Plan pursuant to section 1123(b) of the Bankruptcy Code and not as an officer, director or manager of the Debtor. Any and

all operating agreements, certificates of organization, and related corporate documents are deemed amended by the Plan to permit and authorize such sole appointment.

**6.4.14** **Debtor's Existence.** From and after the Effective Date, the Debtor shall continue in existence for the purpose of winding up its affairs as expeditiously as practicable. Upon the Effective Date, all transactions and applicable matters provided under the Plan shall be deemed authorized by the Debtor without any requirement for further action by the Debtor. On and after the Effective Date, the Debtor's remaining assets and affairs shall be administered and managed by the Liquidation Trustee in accordance with the Plan.

The Liquidation Trustee shall have the authority to take all necessary action to dissolve the Debtor in conjunction with the issuance of a Final Decree closing the Chapter 11 Case or thereafter. Further, upon the aforementioned certification and entry of the Final Decree, the Liquidation Trustee shall be authorized, in his or her sole discretion, to discard or destroy any and all of the Debtor's books and records. Upon the Effective Date, the Debtor and its officers, directors, members, professionals, and/or other representatives shall turn over any remaining books and records in its or their possession to the Liquidation Trustee.

**6.4.15** **Corporate Authority.** The Confirmation Order shall constitute full and complete authority for the Chapter 11 Trustee, the Debtor and the Liquidation Trust to take all other actions that may be necessary, useful, or appropriate to consummate the Plan without further judicial or corporate authority.

## 6.5    FUNDING AND DISBURSEMENTS

**6.5.1** **Distributions Generally.** The Liquidation Trustee shall act as the Distribution Agent unless otherwise set forth in the Plan. The Distribution Agent shall make all Effective Date distributions under the Plan on account of Allowed Claims against the Debtor pursuant to the terms of the Plan, Confirmation Order and the Liquidation Trust Agreement, *provided, however*, that all Allowed Professional Fee Claims shall be paid out of the IOLTA Account maintained for the benefit of the Chapter 11 Trustee at Eversheds Sutherland (US) LLP, and all Allowed unclassified claims and Allowed Claims in Classes 1 through 7 not satisfied on the Effective Date shall be paid out of the Liquidation Trust Claims Reserve. All distributions to holders of Beneficial Trust Interests shall be made by the Distribution Agent from Liquidation Trust Assets. In the event the Liquidation Trustee is not the Distribution Agent, the Distribution Agent shall act at the direction of the Liquidation Trustee.

**6.5.2** **Cash Payments.** Cash payments made pursuant to the Plan shall be in U.S. funds, by the means agreed to by payor and payee, including by check or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the Liquidation Trustee shall determine in his or her sole discretion.

**6.5.3** **Distribution for Allowed Claims.** Except as otherwise provided in the Plan or Confirmation Order, or as otherwise ordered by the Bankruptcy Court, distributions to holders of Allowed Claims shall be made on the Distribution Date.

No holder of a Disputed Claim shall be entitled to a distribution from the Liquidation Trustee, the Liquidation Trust, the Debtor, the Chapter 11 Trustee or the Estate with respect to such Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest on such Disputed Claim except as provided in the Plan. The Liquidation Trustee shall establish one or more reserves in Cash in the full amount of any distributions that would otherwise be payable upon any Disputed Claims if they were Allowed Claims until such time as such Disputed Claims are determined by Final Order to be Allowed or not Allowed.

   **6.5.4**  **Interest and Charges.** No interest shall accrue or be paid on Allowed Claims unless specifically provided for in the Plan.

   **6.5.5**  **Compliance with Tax Requirements.** In connection with the Plan, to the extent applicable, the Liquidation Trust shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Liquidation Trust shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, including, without limitation, requiring that the holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each holder or establishing any other mechanisms they believe are reasonable and appropriate. The Liquidation Trust reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

   The Liquidation Trust shall not be required to make distributions on any Allowed Claim if the holder thereof has not provided all documentation that in the Liquidation Trustee's reasonable business judgment, is necessary to determine all tax withholding and reporting requirements for such Allowed Claim. To the extent such documentation is not provided within sixty (60) days of the respective Distribution Date, the distribution on such Allowed Claim shall be deemed Unclaimed Property.

   **6.5.6**  **Fractional Dollars; De Minimis Distributions.** Notwithstanding any other provision of the Plan, the Liquidation Trust shall not be required to make distributions or payment of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding down of such fraction to the nearest dollar. In addition, the Liquidation Trustee shall not be required to make any distribution in an amount less than $50.00. To the extent that such a distribution shall be called for as part of any interim distribution, the Liquidation Trust shall establish a reserve for all distributions in the amount of less than $50.00 and shall, when and if the holder of an Allowed Claim is entitled to a distribution of $50.00 or more, make such distribution at such time. The Liquidation Trust shall not be required to make any Final Distribution of less than $50.00 and all

monies otherwise payable in such amount shall be paid to the other holders of Allowed Claims, in accordance with the terms of the Plan, the Confirmation Order and the Liquidation Trust Agreement.

        **6.5.7**      **Delivery of Distributions to Holders of Allowed Claims.**  Distributions to holders of an Allowed Claims shall be made at the address set forth in the Schedules unless such addresses are superseded by Proofs of Claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 or at the last known address of such holders if the Liquidation Trustee has been notified in writing of a change of address.  If the distribution to any holder of an Allowed Claim is returned to the Liquidation Trustee as undeliverable or otherwise unclaimed, such Unclaimed Property shall be held in reserve as set forth in Art. V, Section (H) of the Plan.

        **6.5.8**      **Unclaimed Distributions.**  If any distribution to holders of an Allowed Claim or Beneficial Trust Interest is unclaimed or returned as undeliverable, such Unclaimed Property shall be held by the Liquidation Trustee in the Unclaimed Property Reserve for a period of sixty (60) days.  Once the distribution to holders of Allowed Claims or Beneficial Trust Interests becomes Unclaimed Property, the Liquidation Trustee shall, subject to the limitations sets forth in the Plan, (i) hold such Unclaimed Property in the Unclaimed Property Reserve solely for the benefit of such holder or holders who have failed to claim such Unclaimed Property, and (ii) release the Unclaimed Property from the Unclaimed Property Reserve and deliver to the holder entitled thereto upon presentation of proper proof by such holder of its entitlement thereto.  After the expiration of sixty (60) days, the holders of Allowed Claims or Beneficial Trust Interests entitled to such Unclaimed Property shall cease to be entitled thereto and shall be entitled to no further distributions under the Plan, and such Allowed Claims shall be deemed disallowed and expunged in their entirety and the funds shall become Liquidation Trust Assets and redistributed to the other holders of Allowed Claims in accordance with the terms of the Plan, Confirmation Order and the Liquidation Trust Agreement.  Such funds shall not be subject to the escheat laws of any state.

        If there is any residual Unclaimed Property at the time of dissolution of the Liquidation Trust, such residual Unclaimed Property shall be available for a subsequent distribution on a pro rata basis to holders of Beneficial Trust Interests or donated to a charitable organization at the sole discretion of the Liquidation Trustee.

        Nothing contained in the Liquidation Trust Agreement, the Plan, this Disclosure Statement, or the Confirmation Order shall require the Debtor, the Chapter 11 Trustee, the Liquidation Trustee, the Liquidation Trust or the Distribution Agent to attempt to locate any holder of an Allowed Claim or Beneficial Trust Interest.

        **6.5.9**      **No Penalty Claims.**  Unless otherwise specifically provided for in the Plan or the Confirmation Order, no holder of any Claim will be entitled to allowance of, or to receive any payment on account of, any penalty arising with respect to or in connection with such Claim and any such penalty shall be deemed disallowed and expunged.

**6.5.10    Setoffs and Recoupments.**  The Liquidation Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtor may have against the claimant pursuant to section 558 of the Bankruptcy Code or otherwise, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Chapter 11 Trustee or the Liquidation Trust of any such Claim it may have against the holder of the Claim.

**6.5.11    Distributions by Liquidation Trust.**  The Liquidation Trust shall not be obligated to make a distribution on account of Beneficial Trust Interests that would impair the ability of the Liquidating Trust to pay the expenses incurred by the Liquidation Trust.

**6.5.12    Claims Paid or Payable by Third Parties.**

(a)    **Claims Paid by Third Parties.**  The Liquidation Trustee shall reduce in full or in part a Claim (as applicable), and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full or in part (as applicable) on account of such Claim from a party that is not the Debtor, the Chapter 11 Trustee, or the Liquidation Trust.  To the extent a holder of such Claim receives a distribution under the Plan on account of such Claim and receives payment from a party that is not the Debtor, the Chapter 11 Trustee or the Liquidation Trust on account of such Claim, such holder shall repay, return, or deliver any distribution to the Liquidation Trust, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The Liquidation Trust and the Debtor's Estate reserve all of their rights, remedies, claims, and actions against any such holders who fail to repay or return any such distribution.

(b)    **Claims Payable by Third Parties.**  Distributions to each  holder of an Insured Claim shall be made on account of an Allowed Claim that is payable pursuant to the Debtor's Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtor's Insurers agrees to satisfy in full or in part a Claim, then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Applicability of Insurance Policies.**  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.

**6.6    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

6.6.1 **Rejection of Executory Contracts and Unexpired Leases.** Except as set forth in Section 6.6.3, on the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by the Debtor or the Chapter 11 Trustee; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to assume Filed on or before the Effective Date; or (iv) has been assumed and assigned to the Buyer.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejection of such Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, rejection of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date.

6.6.2 **Claims Based on Rejection of Executory Contracts or Unexpired Leases.** Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Confirmation Order, if any, must be Filed with the Bankruptcy Court within twenty-one (21) days after the earlier or (a) service of Notice of the Effective Date, or (b) service of notice of entry of an order of the Bankruptcy Court (other than the Confirmation Order) approving the rejection of a particular Executory Contract or Unexpired Lease on the counterparty thereto. The Notice of Effective Date shall indicate that all Executory Contracts and Unexpired Leases that do not fall into one of the four clauses set forth in Article VI, Section (A) of the Plan are deemed rejected as of the Effective Date. The Notice of Effective Date also shall set forth the deadline for filing Proofs of Claim with respect to the same. Absent order of the Bankruptcy Court to the contrary, any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed by the applicable deadline will not be considered Allowed and such person or entity shall not be treated as a creditor for purposes of distributions under the Plan. Rejection Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Class 8 of the Plan, which information shall be included in the Notice of Effective Date.

6.6.3 **Insurance Policies.** Each of the Debtor's Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Effective Date, (a) the Debtor shall be deemed to have assumed all Insurance Policies and agreements, documents, and instruments related to coverage of any Claim or Cause of Action and (b) such Insurance Policies and any agreements, documents, or instruments relating thereto shall revest in and be assigned to the Liquidation Trust.

Except as set forth in Section 6.6.1 of the Plan, nothing in the Plan, the Plan Supplement (if any), this Disclosure Statement, the Confirmation Order, or any other Order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such Insurance Policies or (ii) alters or modifies the duty, if any, that the Insurers or third party administrators have to pay claims covered by such Insurance Policies and their right to seek payment or reimbursement from the Debtor or the Liquidation Trust or draw on any Collateral or security therefore. For the avoidance of doubt, Insurers and third party administrators shall not

need to nor be required to file or serve a cure objection or a request, application, Proof of Claim, or motion for payment and shall not be subject to any bar date or similar deadline governing cure claims.

### 6.7    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

**6.7.1    Settlement, Compromise, and Release of Claims and Interests.** Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, or in any contract, instrument, or other agreement or document created pursuant to or in connection with the Plan, the distributions, rights, and treatments that are provided in the Plan shall, except as expressly provided in the Plan, be in complete settlement, compromise, and release, effective as of the Effective Date, of Claims, Interests, Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including any withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtor before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issues on or before the Effective Date, an all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Proof of Interest based upon such debt, right, or interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest is based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; and (c) the holder of such a Claim or Interest has accepted the Plan.  Subject to the occurrence of the Effective Date, the Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims and Interests against and in the Debtor.

**6.7.2    Liabilities to, and Rights of, Governmental Units.**  Notwithstanding anything to the contrary in the Plan or Confirmation Order, nothing in the Confirmation Order or the Plan discharges, releases, precludes, or enjoins: (a) any liability to any Governmental Unit that is not a Claim; (b) any Claim of a Governmental Unit arising after the Effective Date; (c) any police power or regulatory liability to a Governmental Unit that any Entity would be subject to as the owner or operator of any property after the Effective Date; (d) the rights of any Governmental Unit with respect to the transfer or assignment of any license, permit, registration, authorization, or approval, in each case, to the extent provided under applicable law; and/or (e) any liability to a Governmental Unit on the part of any Entity.

**6.7.3    Exculpation.  Effective as the Effective Date, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim or any obligation, Cause of Action, or liability from any Exculpated Claim; *provided, however*, that the foregoing exculpation shall have no effect on the liability of any person or Entity that results from any act or omission based on or arising out of gross**

50

negligence, fraud or willful misconduct *and provided further*, that no Retained Cause of Action is an Exculpated Claim and no party that is the target of a Retained Cause of Action is an Exculpated Party.

        **6.7.4**    <u>Releases of the Debtor and Chapter 11 Trustee.</u>  **For good and valuable consideration, the adequacy of which is hereby confirmed, each Creditor, shall be deemed to forever release, waive, and discharge the Debtor and the Chapter 11 Trustee of all claims, obligations suits, judgments, damages, demands, debts, rights, remedies, Causes of Action, and liabilities of any nature whatsoever, whether direct or derivative, known, or unknown, foreseen or unforeseen, matured or unmatured, fixed or contingent, liquidated or unliquidated, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, including, without limitation, any of the foregoing based on or relating to, or in any manner arising from, in whole or in part, the purchase, sale or rescission of the purchase, sale, or any other transaction relating to any Security of the Debtor, the Debtor, the Debtor's restructuring efforts, the Chapter 11 Case, the Plan, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Creditor, the negotiation and consummation of any sale of the Debtor's assets during the Chapter 11 Case, the restructuring of Claims and Interests before or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan or related agreements, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Creditor on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided, however*, that the foregoing releases shall have no effect on the liability of any person or Entity that results from any act or omission based on or arising out of gross negligence, fraud or willful misconduct, and (ii) shall not release any entitlement that a Creditor may have to receive a distribution as provide for herein, *and provided further* that nothing in this provision shall be deemed to release any Retained Cause of Action.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, or any document, instrument or agreement executed in conjunction with the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of holders of Claims and Interests, which includes by reference, each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by Creditors; (3) in the best interests of the Debtor and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to**

any Creditor asserting any Claim released by the release herein by any of the Released Parties.

**6.8    INJUNCTION.**

Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, all Entities that have held, hold or may hold any Interest in the Debtor or a Claim, Cause of Action, or other debt or liability against the Debtor or against any Released Party that have been released and/or exculpated under this Plan (the "**Released Claims and Interests**") are permanently enjoined from taking any of the following actions against the Debtor, the Estate, the Chapter 11 Trustee, the Liquidation Trust, the Liquidation Trustee, the Liquidation Trust Assets or the Released Parties or their respective predecessors, successors and assigns, subsidiaries, Affiliates, current (as of the Effective Date) directors, officers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, investment bankers, consultants, representatives, and other Professionals solely in their capacities as such or any property of the same, on account of such Released Claims and Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting any right of setoff (other than setoffs exercised prior to the Petition Date), or subrogation of any kind against any debt, liability or obligation on account of or in connection with or with respect to any Released Claims or Interests; and  (v) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with this provision; *provided, however*, that the foregoing injunction shall have no effect on the liability of any Person or Entity that results from any act or omission based on or arising out of gross negligence, fraud or willful misconduct, *and provided further,* that no Retained Cause of Action is subject to this Plan injunction.

**6.9    CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

**6.9.1    Conditions Precedent to the Effective Date.**  It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived:

(a)    The Bankruptcy Court shall have entered the Confirmation Order; *provided* that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry;

(b)    All documents and agreements necessary to implement the Plan shall have (i) all conditions precedent to the effectiveness of such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) been tendered for delivery, and (iii) been effected or executed;

(c)    The Liquidation Trust Claims Reserve shall have been funded consistent with the terms of the Plan;

(d)    The Liquidation Trust shall have been established in accordance with the Liquidation Trust Agreement and shall have been funded with the Liquidation Trust Assets;

(e)    All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

**6.9.2    Waiver of Conditions.**    The conditions to Consummation set forth in Article VIII of the Plan may be waived only by prior written consent of the Plan Proponent, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.  Upon the occurrence of all conditions to Confirmation and Consummation set forth in Article VIII of the Plan, the Plan Proponent shall immediately declare the Effective Date and file the Notice of Effective Date.

**6.9.3    Effect of Failure of Conditions.**    Unless expressly set forth in the Plan, if the Consummation of the Plan does not occur on or before the date that is one hundred and eighty (180) days following the Confirmation Date, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by the Debtor, any holders or any other Entity; (b) prejudice in any manner the rights of the Plan Proponent, any holders or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking by the Plan Proponent, any holder of any Claim or any other Entity in any respect.

## 6.10    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

**6.10.1    Modifications and Amendments.**    Except as otherwise specifically provided in the Plan, the Plan Proponent reserves the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Plan Proponent expressly reserves its rights, to revoke or withdraw, to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, this Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**6.10.2    Effect of Confirmation on Modifications.**    Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof

are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**6.10.3    Revocation or Withdrawal of Plan.**  The Plan Proponent reserves the right to revoke or withdraw the Plan before the Confirmation Date and to file a subsequent plan. If the Plan Proponent revokes or withdraws the Plan, or if the Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including fixing or limiting to an amount certain any of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claim or Interest; (ii) prejudice in any manner the rights of the Debtor, any holder of a Claim or Interests, or any other Entity; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Plan Proponent, any holder or any other Entity.

## 6.11    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, related to, the Chapter 11 Case pursuant to sections 105(a) and 1142 of the Bankruptcy Code; *provided, however,* that nothing herein shall grant the Bankruptcy Court any jurisdiction which it lacked prior to the Effective Date.  The Bankruptcy Court shall retain non-exclusive jurisdiction to hear any other matter not inconsistent with the Bankruptcy Code.

## 6.12    MISCELLANEOUS PROVISIONS

**6.12.1    Immediate Binding Effect.**  Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Plan Proponent and any and all present and former holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan or are receiving or retaining property under the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor and each of the respective successors and assigns of the foregoing persons and Entities.

**6.12.2    Additional Documents.**  On or before the Effective Date, the Plan Proponent may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Plan Proponent and all holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**6.12.3    Reservation of Rights.** Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in this Disclosure Statement, the Plan, or the taking of any action by the Plan Proponent, with respect to the Plan, the Disclosure Statement, or the Plan Supplement (if any), shall be or shall be deemed to be an admission or waiver of any of their respective rights to the holders of Claims and Interests or each other before the Effective Date unless otherwise set forth in an order of the Bankruptcy Court.

**6.12.4    Successors and Assigns.** The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, if any, of such Entity.

**6.12.5    Notices.** To be effective, all notices, requests, and demands to or upon the Debtor and the Plan Proponent shall be in writing. Unless otherwise expressly provided herein, notice shall be deemed to have been duly given or made when actually delivered or when received and telephonically confirmed, addressed to the following:

    **(a)**    **The Chapter 11 Trustee/ Plan Proponent:**

David A. Wender, Esq.
Eversheds Sutherland (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
Telephone: 404.853.8175
Facsimile: 404.853.8806
Davidwender@eversheds-sutherland.com

With a mandated copy (which shall not constitute notice) to:

Nathaniel T. DeLoatch
Eversheds Sutherland (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
Telephone: 404.853.8175
Facsimile: 404.853.8806
Nathanieldeloatch@eversheds-sutherland.com

    **(b)**    **The Debtor:**

Curepoint, LLC
11175 Cicero Drive, Suite 100
Alpharetta, GA 30022

With a mandated copy (which shall not constitute notice) to:

Attn: Will B. Geer, Caitlyn Powers and William Rountree
Rountree, Leitman, Klein & Geer, LLC
Century I Plaza
2987 Clairmont Road, Suite 350
Atlanta, GA 30329
Telephone: 404.584.1238
wgeer@rlkglaw.com, cpower@rlkglaw.com, wrountree@rlkglaw.com

**(c)      The Liquidation Trustee:**

David A. Wender, Esq.
Eversheds Sutherland (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
Telephone: 404.853.8175
Facsimile: 404.853.8806
Davidwender@eversheds-sutherland.com

With a mandated copy (which shall not constitute notice) to:

Nathaniel T. DeLoatch
Eversheds Sutherland (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
Telephone: 404.853.8175
Facsimile: 404.853.8806
Nathanieldeloatch@eversheds-sutherland.com

**6.12.6    Entire Agreement.** Except as otherwise indicated or set forth in an order of the Bankruptcy Court, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**6.12.7    Exhibits.** All exhibits and documents included in the Plan are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon written request to the Plan Proponent at the address above, or by downloading such exhibits and documents from the Bankruptcy Court's website at http://www.ganb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**6.12.8    Severability of Plan Provisions.** If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it

56

valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holdings, alterations or interpretations, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holdings, alteration or interpretations. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Plan Proponent's consent; and (c) non-severable and mutually dependent.

**6.12.9    Votes Solicited in Good Faith.** Once the Confirmation Order becomes a Final Order, the Plan Proponent will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Plan Proponent and the Debtor and its agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals, or the Plan Proponent will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of Securities offered or sold under the Plan or any previous plan.

**6.12.10    Closing of Chapter 11 Case.** The Liquidation Trust shall promptly, after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, any Local Rule, and any applicable order necessary to close the Chapter 11 Case.

**6.12.11    No Admission against Interest.** Neither the filing of the Plan, the Disclosure Statement, nor any statement contained herein or therein, is or shall be deemed an admission against interest. In the event that the Plan is not consummated, neither the Plan, the Disclosure Statement nor any statement contained herein or therein may be used for relief upon or in any manner in any suit, action, proceeding, or controversy within or outside of the Bankruptcy Court involving the Debtor or the Chapter 11 Trustee.

**6.12.12    No Waiver.** Except as otherwise specifically provided herein, nothing set forth in this Disclosure Statement or the Plan shall be deemed to be a waiver or release of any claims, rights or Causes of Action against any Person other than the Debtor.

**6.12.13    Headings.** The article and section headings used in this Disclosure Statement and in the Plan are inserted for convenience and reference only and neither constitute a part of the Plan or Disclosure Statement nor does any matter affect the terms, provisions, or interpretation of the Plan.

**6.12.14    Governing Law.** Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent otherwise provided in the

Plan, the rights and obligations arising under the Plan, will be governed by, and construed and enforced in accordance with the laws of Georgia, without giving any effect to the principles of conflicts of laws or such jurisdiction.

   **6.12.15 Conflicts.** Except as set forth in the Plan, to the extent that any provision of any other document or any exhibits, schedules, appendices, supplements, or amendments of any document referenced in the Plan (the "**Plan Related Documents**") conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided* that, with respect to any conflict or inconsistency between the Plan or the Plan Related Documents on the one hand, and the Confirmation Order on the other, the Confirmation Order shall govern.

   **6.12.16 No Discharge.** Notwithstanding any other provision of the Plan or Confirmation Order, pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtor will not receive a discharge.

   **6.12.17 Post-Effective Date Notice.** After the Effective Date, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, Persons and Entities must file with the Bankruptcy Court a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Liquidation Trustee is authorized to limit the list of Persons and Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Persons and Entities that have filed with the Bankruptcy Court such a renewed request *provided, however*, that parties in interest shall also serve those parties directly affected by, or having a direct interest in, the particular filing in accordance with either Bankruptcy Rules and/or Local Rules.

## VII. FEASIBILITY

  **7.1 FINANCIAL FEASABILITY ANALYIS.**

   **7.1.1 The Bankruptcy Code Standard.** The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless contemplated by the Plan.

   **7.1.2 No Need for Further Reorganization of the Debtor.** The Plan provides for the liquidation or distribution of the Debtor's limited remaining assets. Accordingly, the Plan Proponent believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor.

## VIII. ALTERNATIVES TO THE PLAN

  **8.1 CHAPTER 7 LIQUIDATION**

   **8.1.1 The Bankruptcy Code Standard.** Notwithstanding acceptance of the Plan by the requisite number of Creditors of any Class, the Bankruptcy Court must still independently determine that the Plan provides each member of each Impaired Class of Claims

and Interests a recovery that has a value at least equal to the value of the distribution that each such Creditor would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

In chapter 7 liquidation cases, unsecured creditors and interest holders of a debtor are paid from the available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (i) Secured creditors (to the extent of the value of their Collateral); (ii) Administrative and other priority creditors; (iii) unsecured creditors; (iv) debt expressly subordinated by its terms or by order of the Bankruptcy Court; and (v) Interest holders.

**8.1.2    <u>The Plan is in the Best Interests of Creditors.</u>**    The Plan Proponent believes that the Plan satisfies the best interests of creditors test because the Plan provides a greater recovery to the holders of Claims than such holders would receive under a liquidation under chapter 7 of the Bankruptcy Code.  For example, if a chapter 7 trustee were to be appointed in this case, he or she would likely require considerable time and incur substantial fees and expenses, including a fee for the trustee based on a percentage of the value of all property distributed in the chapter 7 case and fees of the trustee's professionals in analyzing the Debtor's case and assets. Given that the proposed Liquidation Trustee has served as the Chapter 11 Trustee and is familiar with this Chapter 11 Case and the Debtor's remaining assets, the Liquidation Trustee will be substantially more cost effective and efficient than a chapter 7 trustee that would need considerable time and resources to get up to speed, and thus, diminish the potential recovery to holders of Claims.  In addition, a chapter 7 case would trigger a new bar date for filing claims that would be more than 90 days following the conversion of the case to those under chapter 7.  *See* Fed. R. Bankr. P. 3002(c).  This raises the prospect of additional claims that were not asserted in the Chapter 11 Case.

Additionally, the Chapter 11 Trustee has negotiated various settlements with Creditors which are being approved and/or implemented through the Plan.  If the Plan is not confirmed, there is a possibility that Creditors would not be willing to negotiate the same settlements with a subsequently appointed Chapter 7 trustee, thus resulting in additional or higher claims against the Estate than the treatments being provided through the Plan.

Importantly, in this case, the only assets remaining are the Liquidation Trust Assets which will be distributed pursuant to the terms of the Plan.  The Debtor has few, if any, other assets that could be liquidated for value by a chapter 7 trustee.  Therefore, the Plan Proponent believes that there would be no purpose to converting this case to Chapter 7 and doing so would bring no benefit to Creditors, while imposing significant additional and unnecessary expenses and delays on the Debtor's Estate – thereby negatively affecting creditor recoveries.  Accordingly, the Plan Proponent believes that the Plan provides a greater recovery to the holders of Claims than such holders would receive under a liquidation under chapter 7 of the Bankruptcy Code and therefore is in the best interest of the Debtor's Creditors.

**8.2    ALTERNATIVE PLAN(S)**

If the Plan is not confirmed, the Plan Proponent or other persons could attempt to formulate and propose a different plan. The Plan Proponent believes that the Plan, as described herein, enables holders of Claims or Interests to realize the greatest possible value under the circumstances, and that compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## IX.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 9.1    GENERAL

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain holders of Allowed Claims. This summary does not address the U.S. federal income tax consequences to holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, or holders who's Claims are entitled to payment in full in Cash.

This summary is based on the Tax Code, existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The Plan Proponent has not requested an opinion or counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This discussion does not address non-U.S., state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (e.g., non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement, and other tax-deferred accounts, holders that are, or hold Claims through S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act. Creditors who are non-U.S. holders should consult their own tax advisors with respect to the tax consequences of the Plan applicable to them.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtor for U.S. federal income tax purposes, and that all Distributions to holders of Claims will be taxed accordingly.

ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A

HOLDER OF A CLAIM.  EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED
TO CONSULT ITS OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND
NON-U.S. INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER
THE PLAN.

### 9.2     CONSEQUENCES TO THE DEBTOR

**9.2.1     Cancellation of Debt Income.**   In general, absent an exception, a
taxpayer will realize and recognize cancellation of indebtedness income ("**CODI**") upon
satisfaction of its outstanding indebtedness for total consideration less than the amount of such
indebtedness.  The amount of CODI, in general, is the excess of (1) the adjusted issue price of the
indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of
such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include CODI in gross
income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the
Bankruptcy Code and the discharge of debt occurs pursuant to that case, or (b), to the extent that
the taxpayer is insolvent immediately before the discharge.  Instead, as a consequence of such
exclusion a taxpayer-debtor must reduce its tax attributes by the amount of CODI that it excluded
from gross income.  In general, tax attributes will be reduced in the following order: (a) net
operating losses ("**NOLs**"); (b) most tax credits; (c) capital loss carryovers; (d) adjusted tax basis
in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive
activity loss and credit carryovers; and (f) foreign tax credit carryovers.  Alternatively, the taxpayer
can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax
Code.

**9.2.2     Transfer of Assets to Liquidation Trust and Dissolution of the Debtor.**
The Debtor's transfer of assets to the Liquidation Trust may result in the recognition of gain or
loss by the Debtor, depending in part on the value of such assets on the date of such transfer to the
Liquidation Trust relative to the Debtor's adjusted tax basis in such assets.

### 9.3     CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS.

Pursuant to the Plan, each holder of an Allowed General Unsecured Claim will receive, in
full and final satisfaction of its applicable claim, a Beneficial Trust Interest representing such
holder's right to receive its pro rata share of certain Liquidation Trust Assets.  As discussed below
(see Section 9.4 – "Tax Treatment of the Liquidation Trust and Holders of Beneficial Interests"),
each holder of an Allowed General Unsecured Claim that receives a beneficial interest in the
Liquidation Trust will be treated for U.S. federal income tax purposes as directly receiving, and as
a direct owner of, an undivided interest in the Liquidation Trust Assets consistent with its economic
rights in the trust.

**9.3.1     Realization and Recognition of Gain or Loss.**   In general, a holder of
an Allowed General Unsecured Claim will recognize gain or loss with respect to its Allowed
General Unsecured Claim in an amount equal to the difference between (i) the sum of the amount

of any Cash and the fair market value of its undivided interest in the Liquidation Trust Assets consistent with its economic rights in the trust received in respect of its Claim (other than any consideration attributable to a Claim for accrued by unpaid interest or original issue discount ("**OID**")) and (ii) the adjusted tax basis of the Claim exchanged therefor (other than any tax basis attributable to accrued by unpaid interest or accrued OID previously included in the holder's taxable income).  Pursuant to the Plan, the Liquidation Trust will in good faith value the assets transferred to the Liquidation Trust, and all parties to the Liquidation Trust (including holders of Allowed General Unsecured Claims receiving Beneficial Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.  As discussed below, the amount of Cash or other property received in respect of an Allowed General Unsecured Claim for accrued by unpaid interest will be taxed as ordinary income, except to the extent previously included as income by a holder under its method of accounting.  See Section 9.3.2 below – "Distributions in Respect of Accrued by Unpaid Interest or OID."

In the event of the subsequent disallowance of any Disputed General Unsecured Claim or the reallocation of undeliverable distributions, it is possible that a holder of a previously Allowed Claim may receive additional distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed General Unsecured Claim may be deferred until all General Unsecured Claims are Allowed or Disallowed. Alternatively, it is possible that a holder will have additional gain in respect of any additional distributions received. See also Section 9.4.3 - Tax Treatment of the Liquidation Trust and Holders of Beneficial Interests – Tax Reporting for Assets Allocable to Disputed Claims," below.

After the Effective Date, a holder's share of any collections received on the assets of the Liquidation Trust (other than as a result of the subsequent disallowance of Disputed Claims or the reallocation of undeliverable distributions) should not be included, for U.S. federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Liquidation Trust.

If gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Allowed General Unsecured Claim disposed of is a capital asset in the hands of the holder and has been held for more than one year. Each holder of an Allowed General Unsecured Claim should consult its tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder. The character of any gain or loss depends on, among other things, the origin of the holder's Allowed General Unsecured Claim, when the holder receives payment in respect of such Allowed General Unsecured Claim, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Allowed General Unsecured Claim at a discount, whether the holder has taken a bad debt deduction with respect to such Allowed General Unsecured Claim, and/or whether (as intended and herein assumed) the Plan implements the liquidation of the Debtor for U.S. federal income tax purposes.

A holder's aggregate tax basis in its undivided interest in the Liquidation Trust Assets

generally will equal the fair market value of such interest increased by its share of the Debtor's liabilities to which such assets remain subject upon transfer to the Liquidation Trust, and a holder's holding period generally will begin the day following establishment of the Liquidation Trust.

       **9.3.2**    **Distributions in Respect of Accrued Interest or OID.**  In general, to the extent any amount received (whether stock, Cash or other property) by a holder of a debt instrument is received in satisfaction of accrued interest or OID accrued during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the holder's gross income under the holder's normal method of accounting).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

       You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued by unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

## 9.4    TAX TREATMENT OF THE LIQUIDATION TRUST AND HOLDERS OF BENEFICIAL INTEREST

       **9.4.1**    **Classification of the Liquidation Trust.**  The Liquidation Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the Liquidation Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below).  In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e. a pass-through entity).  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidation Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedures 94-45  all parties (including without limitation the Debtor, the Liquidation Trustee, and the holders of Beneficial Trust Interests) shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust as (1) a transfer of the Liquidation Trust Assets (subject to any obligations relating to those assets) directly to holders of Beneficial Trust Interests (other than to the extent Liquidation Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to the Liquidation Trust of the Liquidation Trust Assets in exchange for the Beneficial Trust Interests. Accordingly, except in the event of contrary definitive guidance, holders of Beneficial Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Liquidation Trust Assets (other than such Liquidation Trust Assets as are allocable to Disputed Claims).  While the following discussion assumes that the Liquidation Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Liquidation Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust as a grantor trust.  If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidation Trust and the holders of Claims could vary from discussed herein.

**9.4.2    General Tax Reporting by the Liquidation Trust and Holders of Beneficial Trust Interests.**    For all U.S. federal income tax purposes, all parties must treat the Liquidation Trust as a grantor trust of which the holders of Beneficial Trust Interests are the owners and grantors, and treat the holders of Beneficial Trust Interests, as the direct owners of undivided interests in the Liquidation Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein.  The Liquidation Trustee will file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a).  The Liquidation Trustee also shall annually send to each holder of a Beneficial Trust Interest a separate statement regarding the receipts and expenditures of the Liquidation Trust as relevant for U.S. federal income tax purposes.

Allocations of taxable income, gain, loss, deduction, and/or credit of the Liquidation Trust (other than such items allocable to any assets allocable to, or retained on account of, Disputed Claims, if such items are otherwise accounted for in a "disputed ownership fund among the holders of Beneficial Trust Interest) will be determined based on each holder's relative ownership of Beneficial Trust Interests.

As soon as reasonably practicable after the transfer of the Liquidation Trust Assets to the Liquidation Trust, the Liquidation Trust shall make a good faith valuation of the Liquidation Trust Assets.  All parties to the Liquidation Trust (including, without limitation, the Debtor, the Liquidation Trustee, the holders of Beneficial Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.  The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a holder of Beneficial Trust Interests will be treated as income or loss with respect to such holder's undivided interest in the Liquidation Trust Assets and not as income or loss with respect to its prior Allowed General Unsecured Claim.  The character of any income and the character and ability to use any loss will depend on the particular situation of the holders of Beneficial Trust Interests.

The U.S. federal income tax obligations of a holder with respect to its Beneficial Trust Interests are not dependent on the Liquidation Trust distributing any Cash or other proceeds.  Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidation Trust's income even if the Liquidation Trust does not make a concurrent distribution to the holder.  In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed General Unsecured Claim), a distribution of Cash by the Liquidation Trust will not be separately taxable to a holder of Beneficial Trust Interests since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time of the Cash was earned or received by the Liquidation Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidation Trust on account of Disputed Claims.

The Liquidation Trustee will comply with all applicable governmental withholding requirements as set forth herein and in the Plan.  See Section 9.5 below – "Withholding on Distributions, and Information Reporting."

> **9.4.3** <u>**Tax Reporting for Assets Allocable to Disputed Claims.**</u>  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidation Trustee of an IRS private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee (A) may elect to treat any Liquidation Trustee Assets allocable to or retained on account of, Disputed Claims (i.e., a Disputed Claims Reserve) as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.  Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claim Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidation Trust Assets (including any gain recognized upon the disposition of such assets).  All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as distributed by the Debtor.  All parties (including, without limitation, the Debtor, the Liquidation Trustee and the holders of Beneficial Trust Interests) will be required to report for tax purposes consistently with the foregoing.  A Disputed Claim Reserve will be responsible for payment, out of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

> **9.5** **WITHOLDING ON DISTRIBUTIONS, AND INFORMATION REPORTING**

All distributions to holders of Allowed General Unsecured Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Back up withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Holders of Allowed General Unsecured Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions

contemplated by the Plan would be subject to those Treasury Regulations.

In addition, a holder of an Allowed General Unsecured Claim or a holder of a Beneficial Trust Interests that is not a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtor even if no withholding would have been required if payment was made prior to the Chapter 11 Case. A non-U.S. holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders. Non U.S. holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtor or payments from the Liquidation Trust.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

## X.    RISK FACTORS

**Holders of Claims or Interests should read and carefully consider the following factors, as well as other information set forth in this Disclosure Statement, before making a judgment with respect to voting to either accept or reject the Plan.**

### 10.1    CERTAIN BANKRUPTCY CONSIDERATIONS

Even if all Impaired Voting Classes vote to accept the Plan and the requirements for "cramdown" are met, the Bankruptcy Court may exercise substantial discretion and may chose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of the distributions to dissenting holders of Claims or Interests may not be less than the value such holders would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Although the Plan Proponent believes that the Plan will meet such requirement, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Any objection to the Plan by a member of a class of Claims or Interests could also prevent Confirmation of the Plan or delay such Confirmation for a significant period of time.

If the Plan is not confirmed or is confirmed but does not go effective, it is unclear what distribution, if any, holders of Allowed Claims ultimately would receive with respect to their Claims.

### 10.2    CLAIMS ESTIMATION & CASH AVAILABLE AFTER DISTRIUTION

There can be no assurance that the estimated amount of Claims and Interests set forth herein are correct, and the actual allowed amounts of Claims and Interests may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions, including, without limitation, that additional Claims, including Administrative Claims, may be asserted against the Estate and such Claims are either not subject to a valid objection by the Debtor or such objections are overruled by the Bankruptcy Court.

## XI.    <u>CONCLUSION AND RECOMMENDATION</u>

It is important that you exercise your right to vote on the Plan.  It is the Plan Proponent's belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against and Interests in the Debtor.  In the opinion of the Plan Proponent, the Plan is preferable to any potential alternatives described in this Disclosure Statement because the Plan provides for a larger distribution to the holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims than proposed under the Plan. Accordingly, the Plan Proponent recommends that holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated: October 15, 2023

Respectfully Submitted,

CUREPOINT, LLC
By: /s/ *David A. Wender*
    David A. Wender, solely in his capacity as Chapter 11 Trustee

**<u>EXHIBIT A</u>**

**Plan of Liquidation**

**(filed contemporaneously herewith)**